**McCARTER & ENGLISH, LLP**
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
(973) 622-4444

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Plaintiffs
    National Collegiate Athletic Association,
    National Basketball Association, National
    Football League, National Hockey League, and
    Office of the Commissioner of Baseball doing
    business as Major League Baseball

|  |  |  |
|---|---|---|
|  | | **UNITED STATES DISTRICT COURT**<br>**DISTRICT OF NEW JERSEY** |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, an unincorporated association, NATIONAL BASKETBALL ASSOCIATION, a joint venture, NATIONAL FOOTBALL LEAGUE, an unincorporated association, NATIONAL HOCKEY LEAGUE, an unincorporated association, and OFFICE OF THE COMMISSIONER OF BASEBALL, an unincorporated association doing business as Major League Baseball, | : : : : : : : : : | Civil Action No. 3:12-04947 (MAS) (LHG) |
| Plaintiffs, | : : | |
| v. | : : : | |
| CHRISTOPHER J. CHRISTIE, Governor of the State of New Jersey, DAVID L. REBUCK, Director of the New Jersey Division of Gaming Enforcement and Assistant Attorney General of the State of New Jersey, and FRANK ZANZUCCKI, Executive Director of the New Jersey Racing Commission, | : : : : : : : | |
| Defendants. | : : | |

## DECLARATION OF ROGER GOODELL IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND, IF NECESSARY TO PRESERVE THE STATUS QUO, A PRELIMINARY INJUNCTION

I, ROGER GOODELL, under penalty of perjury, declare as follows:

1.     I am the Commissioner of the National Football League (the "NFL"), a position I have held since September 2006. Prior to being named Commissioner of the NFL, I served as the NFL's Chief Operating Officer, and have spent nearly thirty years serving the NFL in a variety of capacities. I submit this Declaration in support of Plaintiffs' Motion for Summary Judgment and, If Necessary to Preserve the Status Quo, a Preliminary Injunction.

2.     I am over the age of eighteen (18), am competent to make this Declaration, and have personal knowledge of the facts set forth herein.

### New Jersey's Contemplated Sports Betting Scheme Threatens to Irreparably Harm the NFL

3.     As Commissioner of the NFL, my most important responsibility is maintaining the integrity of professional football, and preserving public confidence in the NFL.

4.     The NFL is the most popular and widely recognized professional football league in the United States. The great popularity of NFL football, and the goodwill it has achieved with its fans and the public as a whole, is rooted in the integrity of the game itself. NFL football stands for clean, healthy competition, and rewards hard work, dedication, and honest effort. Maintaining these values and the highest integrity of the game of professional football is a critical aspect of preserving the NFL's goodwill. For these reasons, NFL owners and players have worked diligently since the league's inception nearly ninety years ago to protect the NFL's integrity and maintain the public's confidence in the league.

5.     The spread of sports betting, including the introduction of sports betting as proposed by the state of New Jersey, threatens to damage irreparably the integrity of, and public confidence in, NFL football. An increase in state-promoted sports betting would wrongly and unfairly engender suspicion and cynicism toward every on-the-field NFL event that affects the betting line. If gambling is freely permitted on sporting events, normal incidents of the game

2

such as bad snaps, dropped passes, turnovers, penalties, and play calling inevitably will fuel speculation, distrust and accusations of point-shaving or game-fixing.  I am aware that in the past, betting scandals related to legal sports betting have occurred both in the United States and in foreign countries.

6.     The new sports gambling scheme that New Jersey proposes would also greatly increase the likelihood that the allegiance of certain fans will be turned from teams, players and high-level athletic competition, toward an interest first and foremost in winning a bet. The core entertainment value of fair and honest competition between teams and athletes that is reflected in NFL games will be replaced by the bettor's interest, based not on team or player performance, but on the potential financial impact of each on-the-field event.

7.     State-sponsorship of sports gambling also trades unfairly on the property and goodwill of the NFL.  For example, casinos and other gambling institutions that permit betting on sports are often viewed unfavorably by a significant portion of the public.  The NFL, on the other hand, strives to preserve and promote an image of fairness, and has invested mightily in maintaining this image.  State-sponsorship of sports gambling threatens to confuse fans into believing that the NFL supports sports gambling, thereby allowing casino operators and other sports-betting operations to trade unfairly on the NFL's goodwill and image of fairness.

8.     The NFL cannot be compensated in damages for the harm that sports gambling poses to the goodwill, character and integrity of NFL football, and to the fundamental bonds of loyalty and devotion between fans and teams that the league seeks to maintain.  Once the character and integrity of NFL football have been compromised, and the bonds of loyalty and devotion between fans and teams have been broken, NFL football will have been irreparably injured in a manner that cannot adequately be calculated in dollars.

3

### The NFL Has Vigorously Opposed the
### Spread of Sports Gambling in the United States

9.     Because of the threat that sports gambling poses to the goodwill and integrity of NFL football, and to the fundamental bond of loyalty and devotion between fans and teams, the NFL has repeatedly and consistently been a leading opponent of legalized sports gambling.  Among the NFL's efforts to oppose the spread of sports gambling are the following:

(a)     The NFL's testimony and other efforts helped lead to the passage of the Professional and Amateur Sports Protection Act of 1992, which is at issue in this lawsuit. Then-NFL Commissioner Paul Tagliabue personally testified before Congress about the irreparable harm that sports gambling would cause to the character of team sports. Commissioner Tagliabue said:

> [S]ports gambling threatens the character of team sports. Our games embody our very finest traditions and values.  They stand for healthy competition, teamwork, success through preparation and honest effort.  With legalized sports gambling, our games instead would come to represent the fast buck, the quick fix, the desire to get something for nothing.  The spread of legalized sports gambling would change forever—and for the worse—what our games stand for and the way they are perceived.

Attached as Exhibit A is a true and correct copy of Commissioner Tagliabue's testimony to Congress.

(b)     From 2000-2002 the NFL, along with other professional sports leagues, sought to amend an ultimately unsuccessful federal bill that would have made it illegal to bet on college sports in all states, such that the proposed ban would cover professional sports as well.  Attached as Exhibit B is a true and correct copy of a July 5, 2000 letter from the NFL and other professional sports leagues to the Honorable Henry J. Hyde, Chairman of the House Judiciary Committee.  Attached as Exhibit C is a true and correct copy of a February 11, 2002

4

letter from the NFL and other professional sports leagues to members of the United States House of Representatives.

(c)     In 2002, the NFL, along with other professional sports leagues, opposed state-sponsored sports gambling in Delaware.  Attached as Exhibit D is a true and correct copy of the opposition statement of the NFL and other professional sports leagues to state-sponsored sports gambling in Delaware, dated December 18, 2002.

(d)     Recently, the efforts of the NFL and the other plaintiffs in this lawsuit resulted in the passage of federal legislation prohibiting Internet gambling and providing additional tools to combat sports gambling.  Attached as Exhibit E is a true and correct copy of a February 1, 2006 letter from the NFL and the other plaintiffs in this lawsuit to the U.S. Congress, supporting passage of the Unlawful Internet Gambling Enforcement Act ("UIGEA").

(e)     In 2007, the NFL and the other plaintiffs in this lawsuit successfully opposed legislation that would have repealed key provisions of the UIGEA. Attached as Exhibit F is a true and correct copy of a May 31, 2007 letter from the NFL and the other plaintiffs in this lawsuit to Members of the House Financial Services Committee.  Attached as Exhibit G is a true and correct copy of an October 2, 2007 letter from the NFL and the other plaintiffs in this lawsuit to Bernard A. Schmitt, Deputy Chief of Staff of the Joint Committee on Taxation, opposing a proposed bill seeking to repeal key provisions of the UIGEA.

(f)     In 2009, the NFL and the other plaintiffs in this lawsuit successfully opposed Delaware's efforts to expand state-sponsored sports gambling within its state in violation of PASPA.  Attached as Exhibit H is a true and correct copy of the decision of the United States Court of Appeals for the Third Circuit in *OFC Comm. Baseball v. Markell*, 579 F.3d 293 (3d Cir. 2009).

10.     The NFL's long and consistent opposition to gambling on the outcomes of its games is reflected in numerous provisions of its governing documents.  Such provisions include the following:

(a)     Article 8.13(C) of the Constitution and Bylaws of the NFL, which defines the disciplinary authority of the Commissioner, states that:

> Whenever the Commissioner . . . determines that a person employed by or connected with the League or any member club thereof has bet money or any thing of value on the outcome or score of any game or games played in the League or has had knowledge of or has received an offer, directly or indirectly, to control, fix, or bet money or other consideration on the outcome or score of a professional football game and has failed to report the same in the manner hereinafter prescribed, then the Commissioner shall have complete and unrestricted authority to enforce any or all of the following penalties: [suspension, lifetime ban, fine, cancellation of employment contracts, forced sale of ownership interest, or] . . . such other or additional punishment or discipline as the Commissioner may decide.

(b)     Article 9.1(C)(12) of the Constitution and Bylaws of the NFL defines as "conduct detrimental to the League and professional football" the "offering, agreeing, conspiring, or attempting to influence the outcome of any game or [to] be interested in any pool or wager of any game in which a member club participates."

(c)     Paragraph 15 of the standard form NFL Player Contract, which has been specifically approved by the labor union that represents NFL players in collective bargaining, provides that:

> Player recognizes the detriment to the League and professional football that would result from impairment of public confidence in the honest and orderly conduct of NFL games or the integrity and good character of NFL players.  Player therefore acknowledges his awareness that if he accepts a bribe or agrees to throw or fix an NFL game; fails to promptly report a bribe offer or an attempt to throw or fix an NFL game; bets on an NFL game; [or] knowingly associates with gamblers or gambling activity . . . [he is subject to fine, suspension, or termination of his contract.]

6

       (d)     Page 37 of the NFL League Policies for Players advises players that the subject of bribes and gambling are covered each summer in special training-camp discussions with players by members of the League's Security Department, that a notice is posted in every NFL locker room reminding the players of Paragraph 15 of the standard form NFL Player Contract, and that:

> the League has a longstanding policy against any advertising or promotional activities by players, clubs, coaches or other management personnel that can reasonably be perceived as constituting affiliation with or endorsement of gambling or gambling-related activities. All club employees, including coaches and players, are prohibited from being associated with such activities through endorsements, commercials, ads, or public appearances. Violators will be subject to appropriate discipline.

> Promotional appearances by players, coaches, or other personnel involving casinos, sports books, gambling cruises, or similar activities are **_not_** permitted.

       (e)     The NFL's Policy Manual for Administrative/Business Operations contains a policy entitled, "NFL Owner Involvement in Gambling-Related Businesses." This policy restates the strict separation between ownership of controlling interests in NFL teams and ownership of casinos, because, "even though lawful and regulated by state authorities, [casinos may] conduct sports betting and, specifically, point spread betting on NFL games." The policy sets forth detailed prohibitions regarding NFL owner involvement in the ownership or management of casinos, internet gambling enterprises, and other gambling-related enterprises, such as "tout services." The Policy rests on the premise that:

> no League interest will be served by even limited direct or indirect ownership of, or investment in, . . . casinos or other gambling-related businesses by NFL owners. Instead, such ownership would likely damage League interests in the long term by, among other things, blurring the line between the absolute need for integrity in the playing and presentation of NFL games and the risk created by a misplaced perception that gambling and participation in the NFL are compatible.

(f)      Attached as Exhibits I, J, K, L and M respectively, are true and correct copies of Article 8.13(C) of the Constitution and Bylaws of the NFL, Article 9.1(C)(12) of the Constitution and Bylaws of the NFL, paragraph 15 of the standard form NFL Player Contract, page 37 of the NFL League Policies for Players, and pages C70-C74 of Volume I of the NFL Policy Manual (Administrative/Business Operations).

Executed in New York, New York

August __9__, 2012

_____
                    Roger Goodell

8

# EXHIBIT A

STATEMENT OF PAUL TAGLIABUE

COMMISSIONER

NATIONAL FOOTBALL LEAGUE

before the

SUBCOMMITTEE ON ECONOMIC
AND COMMERCIAL LAW

HOUSE JUDICIARY COMMITTEE

September 12, 1991

Mr. Chairman and distinguished members of the Subcommittee.  I am pleased to appear before you today to urge in the strongest possible terms your adoption of the Professional and Amateur Sports Protection Act (H.R. 74).

This important legislation builds on bills passed last year by the House and the Senate -- though not by both -- to prevent the spread of sports gambling.  Like last year's bills, H.R. 74 would prohibit the states from estab- lishing sports lotteries.  Going beyond those bills, H.R. 74 would prohibit any other form of sports gambling authorized by state law based on professional or amateur games.

Mr. Chairman, we do not want our games used as bait to sell gambling.  Sports gambling should not be used as a cure for the sagging fortunes of Atlantic City casinos or to boost public interest in state lotteries.  We should not gamble with our children's heroes.

I have been privileged to serve the National Football League for more than 20 years -- first as outside

- 2 -

counsel and now as Commissioner.  During all this time, as before, the League has vigorously protected its reputation for integrity and the wholesome character of its games.

As the late Senator Kenneth B. Keating of New York said nearly 30 years ago in introducing the legislation codified in Title 18 that makes it a federal crime to fix or attempt to fix sporting contests:

> "Thousands of Americans earn a legitimate livelihood in professional sports. Tens of thousands of others participate in college sports as part of the physical fitness and character building programs of their schools.  Tens of millions of Americans find sports a favorite form of recreation.  We must do everything we can to keep sports clean so that the fans, and especially young people, can continue to have complete confidence in the honesty of the players and the contests.  Scandals in the sporting world are big news and can have a devastating effect on the outlook of our youth to whom sports figures are heroes and idols."  109 Cong. Rec. 2,016 (1963).

Thus, we strictly prohibit NFL club owners, coaches, players and anyone else connected with the NFL from gambling on NFL games or associating with persons involved in sports gambling.  Anyone who does so faces severe disciplinary action by the Commissioner, up to lifetime suspension.  Our League's Constitution also prohibits any NFL involvement with state lotteries.  Our clubs cannot accept advertising revenue from lotteries, and coaches and players cannot appear in lottery ads or promotional events.  We have advised the television networks that neither gambling-

- 3 -

-related commercials nor the dissemination of point-spread information are acceptable on NFL game broadcasts.

Legalized sports gambling threatens all that we have worked for in this respect -- and more. We oppose the spread of legalized sports gambling for four basic reasons.

First, sports gambling threatens the character of team sports. Our games embody our very finest traditions and values. They stand for healthy competition, teamwork, success through preparation and honest effort. With legalized sports gambling, our games instead would come to represent the fast buck, the quick fix, the desire to get something for nothing. The spread of legalized sports gambling would change forever -- and for the worse -- what our games stand for and the way they are perceived.

Second, sports gambling threatens the integrity of, and public confidence in, team sports. Sports gambling inevitably fosters a climate of suspicion about controversial plays and intensifies cynicism with respect to player performances, coaching decisions, officiating calls and game results. Cynical or disappointed fans would come to assume "the fix was in" whenever the team they bet on failed to beat the point spread. And legalized sports gambling involving head-to-head betting threatens more than just public confidence in the integrity of our games. Its proliferation would signify to the athletes that sports gambling has official

- 4 -

approval, and could well threaten actual corruption of the games by undermining the ability of professional and amateur sports organizations to police themselves.

Third, legalized sports gambling sends a terrible message to youth. Sports are very important to millions of our young people. Youth look up to athletes. Our players cannot be expected to serve as healthy role models for youth if they are made to function as participants in gambling enterprises. Legalized sports gambling also sends a regrettable message to our young people about government -- that "anything goes" when it comes to raising revenues or bolstering local economies, and that we might as well legalize, sponsor and promote any activity so that the state can get its "cut." This is a message we can ill afford to send.

Finally, legalized sports gambling would promote gambling among young people. Dr. Valerie Lorenz of the National Center for Pathological Gambling told Time earlier this year (Feb. 25) that the rise in teenage gambling is linked to the spread of state lotteries generally: "The message they're conveying is that gambling is not a vice but a normal form of entertainment." That negative message would certainly be sent by a state lottery based on something as popular with young people as team sports. And, as Dr. Lorenz has written, a sports lottery "not only teaches youngsters how to bet on football pools, but also encourages

- 5 -

them to do so."[1]   What is true in this regard for sports lotteries would be even truer for casino-style sports gambling.

Dr. Lorenz addressed these points in detail in a hearing before the Senate Subcommittee on Patents, Copyrights and Trademarks on June 26, 1991.  I respectfully request that her prepared statement be included in the record of this hearing.[2]

Mr. Chairman, no one opposes H.R. 74 on the ground that sports gambling is socially beneficial and should be encouraged.  The principal argument advanced in opposition to the legislation is that federal action in this area is inappropriate and that the states should be left to decide for themselves whether to sponsor or allow sports gambling.

_____

[1]   Lorenz, "State Lotteries and Compulsive Gambling," Journal of Gambling Studies, vol. 6, p. 392-93 (1990).

[2]   For the reasons discussed by Professor Arthur R. Miller of the Harvard Law School in his testimony last summer before a Senate subcommittee considering similar legislation, state-sponsored sports betting also misappropriates the goodwill and popularity of professional sports and amateur sports organizations and dilutes and tarnishes the service marks of such organizations.  See Legislation Prohibiting Sports Lotteries from Misappropriating Professional Sports Service Marks:  Hearing on S. 1772 before the Subcomm. on Patents, Copyrights and Trademarks of the Senate Comm. on the Judiciary, 101st Cong., 2d Sess. 251 (1990).  It bears repeating that the NFL has no desire to license or conduct our own gambling operations.  In any event, H.R. 74 would invalidate any state law that purportedly authorized us to conduct such operations.

- 6 -

Whatever superficial appeal it may have, this federalism
argument is without substance.  Indeed, at the annual meeting
of the National Governors' Association in Seattle last month,
a resolution that would have placed the NGA squarely in
opposition to H.R. 74 on federalism grounds was withdrawn
for lack of support.

In reality, team sports are national pastimes.
Sports gambling is a national problem and demands a national
solution.  The harms it inflicts are felt beyond the borders
of those states that sanction it.  The moral erosion it pro-
duces cannot be limited geographically.  Once a state legal-
izes sports gambling, it will be extremely difficult for
other states to resist the lure.  The current pressures in
such places as California and New Jersey to institute casino-
style sports gambling illustrate the point.  Since Oregon
instituted its sports lottery two years ago, proposals for
similar lotteries have surfaced in a number of other states.

Being opposed to sports gambling while concurrently
defending state prerogatives is substantively inconsistent.
The failure of federal legislation would increase the chance
that sports gambling will spread on a piecemeal basis and
ultimately develop an irreversible momentum.

H.R. 74 breaks no new philosophical ground.  It
presents no new issue of state prerogatives.  Congress has
previously recognized on several occasions that gambling has

- 7 -

no place in sports, professional or amateur.  Title 18 of
the United States Code contains a specific federal policy
against state sports gambling.  When Congress acted in 1974
to exempt state lotteries from the prohibitions of the federal
lottery and gambling laws generally, it specified that those
prohibitions would continue to apply to state sports lotteries
-- i.e., lotteries that involve "the placing or accepting of
bets or wagers on sporting events or contests."  18 U.S.C. §
1307(d).  As the House Judiciary Committee explained, the
exemptions of Sec. 1307 were not intended to apply indis-
criminately to all "gambling activities conducted by [a]
state."  H.R. Rep. No. 1517, 93d Cong., 2d Sess. 6-7 (1974).

H.R. 74 is, among other things, an effort to more
effectively enforce the federal policy embodied in these
provisions of Title 18.  Without the legislation, the Justice
Department cannot enforce the law without utilizing criminal
prosecutions of state officials.

Beyond the federal lottery and gambling laws,
Congress has legislated to protect the integrity of profes-
sional sports contests.  In 1964, Congress made it a federal
crime under Title 18 to influence or attempt to influence by
bribery any sporting contest.  18 U.S.C. § 224.  The offense
is punishable by a fine of up to $10,000 or imprisonment of
up to five years, or both.  This is not merely an "assimila-
tive offense" -- conduct that is criminal under federal law

- 8 -

because it is criminal under state law. Congress has recognized a distinct _federal_ interest in protecting sports from corruption. The House Judiciary Committee called such corruption "a challenge to an important aspect of American life -- honestly competitive sports."[3]

In addition, Congress and the courts have recognized the need for uniform national rules in dealing with professional and intercollegiate sports. Congress, for example, has enacted legislation that, among other things, limits the extent to which the NFL can televise games in conflict with high school and college sporting events. 15 U.S.C. §§ 1291-1294. And numerous courts have held that it is inappropriate to apply varying state laws and regulations to the nationwide business of professional sports. _See_, _e.g._, _Flood_ v. _Kuhn_, 407 U.S. 258, 284-85 (1972); _Partee_ v. _San Diego Chargers_, 34 Cal. 3d 378 (1983). Interest in national uniformity further supports congressional action with respect to the current issue.

We are not unsympathetic to the fiscal concerns that have motivated sports lottery and casino-style sports gambling proposals in some places. But those concerns cannot

---

[3]   H.R. Rep. No. 1053, 88th Cong., 1st Sess. 2 (1963) (also noting federal interest in ensuring the integrity of sporting contests even where states decline to act); S. Rep. No. 593, 88th Cong., 1st Sess. 3-4 (1963) (same).

- 9 -

justify the great long-range harm such proposals would entail
to our sport and others -- and to a generation of young
people whose attitudes toward team sports would be distorted
and diminished by perpetuating a gambling-oriented outlook.
Nor should Congress be misled by claims that legalization of
sports gambling would reduce illegal sports gambling in a
state.  According to the Director of New Jersey's Division
of Gaming Enforcement, "most law enforcement professionals
agree that legalization has a negligible impact on, and in
some ways enhances, illegal markets."[4]

As William L. Holmes noted in a prepared statement
submitted to the Senate Subcommittee on Patents, Copyrights
and Trademarks in connection with its June 26, 1991, hearing,
illegal entrepreneurs can always "outmarket" their legitimate
counterparts, offering better odds and, most important, tax-
free winnings.  I respectfully request that the prepared
statement of Mr. Holmes, a nationally known forensic gaming
expert and a 20-year veteran of the Federal Bureau of Inves-
tigation, be included in the record of this hearing.

The alternatives to congressional action are unat-
tractive and uncertain -- and there is no reason why

_____

[4]   Anthony J. Parillo, Proposal To Consolidate All
Legalized Gaming Enforcement Functions within a Single
Agency of the Department of Law & Safety, June 20, 1988,
p. 188.

- 10 -

professional or amateur sports organizations should be forced to resort to them in view of the federal and nationwide interests at stake here and the interstate character of the affected sports organizations.

Congress cannot afford to delay dealing with the problem of state-sanctioned sports gambling. At the moment, the problem is basically confined to Oregon and Nevada. If any significant number of other states should follow their example, it will be far more difficult for Congress to remedy the problem.

The NFL commends you, Mr. Chairman, for hearing testimony on this important issue, and we applaud Representative John Bryant, Representative Hamilton Fish, and the other co-sponsors of this bill for assuming bipartisan leadership in Congress on this issue of great public importance. We hope that H.R. 74 will proceed promptly to markup and be sent to the floor for an early vote.

I would be glad to answer any questions.

Paul Tagliabue

# EXHIBIT B

• National Football League • National Hockey League •
• National Basketball Association •
• Office of the Commissioner of Baseball •

July 5, 2000

Hon. Henry J. Hyde
Chairman
House Judiciary Committee
2138 Rayburn HOB
Washington, DC 20510-6216

Dear Mr. Chairman:

We are writing to commend you for holding a hearing on H.R. 3575, the Student Athlete and Protection Act, and to urge in the strongest possible terms that the bill be expanded to prohibit gambling not only on amateur sports, but on professional sports as well. Congress has not previously distinguished between gambling on amateur and professional games, and Congress should not do so now. The proponents of H.R. 3575 are justifiably concerned about young people gambling on college sports, but those same young people also gamble on our games, and this problem is likely to worsen if gambling is barred on college sports but remains legal on professional contests.

H.R. 3575 would amend the Professional and Amateur Sports Protection Act of 1992 (28 U.S.C. 3701-3704) ("PASPA"). PASPA generally prohibited the states from legalizing gambling on professional and amateur sports, but it also grandfathered certain gambling that was authorized by state law at the time of enactment. H.R. 3575 would repeal this grandfather provision so far as gambling on amateur athletic games is concerned and prohibit gambling on amateur games as a matter of federal law. But the bill does not prohibit gambling on professional games. Instead, it allows such gambling to continue to the extent grandfathered by PASPA. We respectfully urge that this remaining loophole be closed.

There can be no question that gambling harms professional sports. Gambling debases our players by using them as roulette chips. It creates an ever-present risk of corruption and undermines the public's confidence in our games. It promotes compulsive gambling and tarnishes our games in the eyes of our youngest fans.

For these reasons, the undersigned leagues strongly supported enactment of PASPA in 1992. In their testimony on that legislation, which you co-sponsored in the 102d Congress, the leagues documented their own extensive antigambling policies, which continue. For the same reasons, the leagues all strongly support the principles underlying H.R. 3125, the Internet Gambling Prohibition Act, sponsored by Representative Goodlatte, which would end Internet sports gambling that circumvents PASPA and the Wire Act. This landmark legislation, which the Judiciary Committee overwhelmingly approved on April 6, unanimously passed the Senate last fall and is awaiting action by the full House.

As the House Judiciary Committee noted in 1991, PASPA was a response to "the growing concern regarding the effect on professional and amateur sports of State-sanctioned sports gambling." H.R. REP. NO. 242 (Part 1), 102d CONG., 1ST SESS. 208 (1991). The Committee stated that it "appreciates that there exists a special relationship between American sports fans of all ages and their favorite teams, and that athletic competition embodies and affirms fundamental American values worth protecting from the potential taint of corruption and scandal." *Id.* In approving a forerunner of PASPA, the Committee expressed concern that state-sanctioned sports gambling "will undermine public confidence in the integrity of the sports involved, place undue pressure on players and coaches, and communicate negative values about sports to the youth of America." H.R. REP. NO. 681, 101ST CONG., 2D SESS. 192 (1990). As Chairman Brooks stated on the House floor:

"For so many of us, the playing field is the crucible where character, drive and team effort is formed and developed. It is of paramount importance that we safeguard both the image and reality of integrity in sports from the corrupting influence of gambling and the enticements of money on the American tradition of free and honest athletic competition." 138 CONG. REC. 32438 (1992).

Similar points were made by Representative Fish, the Ranking Minority Member of the Judiciary Committee. *Id.* at 32439. Like PASPA itself, the Judiciary Committee, the Chairman, and the Ranking Minority Member drew no distinction between gambling on amateur and professional games.

During the Senate floor debate on PASPA, Senator Bradley spoke eloquently of the harms gambling inflicts on sports. Tellingly, he invoked his experiences as a professional basketball player as well as invoking the college sports scandals of his younger days:

"Mr. President, where sports gambling occurs, I think fans cannot help but wonder if a missed free throw, or a dropped flyball, or a missed extra point was part of a player's scheme to fix the game. If sports betting spreads, more and more fans will question every coaching decision and every official's call. All of this puts undue pressure on players, coaches, and officials . . . [If sports gambling is legalized,] [s]ports would become the gamblers' game and not the fans' game, and athletes would become roulette chips. . . .

"I remember one game in Madison Square Garden. Toward the end of the game, one of my teammates happened to throw the ball up. We were ahead 6 or 8 points, I forget which. He threw the ball up at the other end of the court and the ball went in the basket. The next week the press speculated about whether it was timed to beat the line on the game. . . . Earlier in my life, when I was in high school and college, there were major sports scandals. Sports-fixing scandals. But the state came in and said this is wrong, and vigorously prosecuted." 138 CONG. REC. 12989-90 (1992).

Hon. Henry J. Hyde
July 5, 2000
Page 3

When Congress enacted PASPA, it made the judgment that the prohibition should not be applied retroactively to sports gambling operations that were already permitted by, and conducted pursuant to, state law. *See* S. REP. No. 248, 102d CONG., 1ST SESS. 8, 9-10 (1991). As the Senate Judiciary Committee emphasized, however, "all such sports gambling is harmful." *Id.* at 8. The decision to grandfather certain sports gambling from the prohibitions of the bill was based on other considerations.

If Congress is prepared to reconsider the judgment it made in 1992 that existing legal sports gambling should be grandfathered, then there is no justification -- moral, legal, or otherwise -- for limiting such reconsideration to gambling on amateur sports. The harms that sports gambling inflicts impact professional sports no less than amateur sports. The harms it inflicts are just as real, and the cost to the integrity and reputation of our games, and to our values as a nation, are just as great. If anything, the harms inflicted on professional sports by gambling may be even greater than the harms inflicted on amateur sports because gambling on our games is more widespread.

Some argue that Nevada professional sports books should be allowed to thrive because they are well-regulated and popular, and the gambling causes no harm. For the reasons stated above, we profoundly disagree. The logic of this argument is that federal law should allow professional sports books to be legal everywhere. But if sports gambling is unacceptable everywhere else as a matter of federal policy, it cannot be acceptable in Nevada.

The professional sports leagues have worked hard to educate and counsel our players, coaches and game officials regarding the dangers of sports gambling, and to take security measures to protect our employees from gambling influences. Through those efforts, we have been fortunate to avoid any serious gambling scandals in our leagues in recent years. We should not now be denied the benefits of legislative action simply because we cannot point to any gambling incidents but college sports can. The ill effects of gambling apply equally to both college and pro sports.

For all of these reasons, if Congress is now prepared to revisit the judgment it made in 1992, we strongly urge that H.R. 3575 be amended to extend its prohibition (and its repeal of PASPA's grandfather provision) to include gambling on professional sports. We respectfully ask that this letter be included in the record of the Committee's hearing on the proposed legislation.

> National Football League
> National Hockey League
> National Basketball Association
> Office of the Commissioner of Baseball

cc:   Members of the House Judiciary Committee

EXHIBIT C

MAJOR LEAGUE BASEBALL
NATIONAL BASKETBALL ASSOCIATION
NATIONAL FOOTBALL LEAGUE
NATIONAL HOCKEY LEAGUE

February 11, 2002

The Honorable Cliff Stearns
Chairman
House Subcommittee on Commerce,
   Trade and Consumer Protection
2125 Rayburn House Office Building
Washington, D.C. 20515

The Honorable Edolphus Towns
United States House of Representatives
2232 Rayburn House Office Building
Independence Avenue & South Capitol St., S.W.
Washington, D.C. 20515

Dear Chairman Stearns and Representative Towns:

Your Committee plans to hold a hearing that will address the issue of gambling on college athletic contests. Legislation is currently pending in both Houses that would end legalized gambling on amateur sports. Currently, under the Professional and Amateur Sports Protection Act of 1992 (PASPA), gambling on both professional and amateur sporting events is illegal in virtually every jurisdiction, with the exception of a sports book in Nevada and a sports lottery on NFL games in Oregon. Pending legislation would partially close one of these loopholes, by eliminating the Nevada sports book on amateur games only.

Our leagues support any reasonable effort to control sports betting. Nonetheless, we think that a college-only bill is flawed, and should be amended to prohibit gambling on professional sports as well.

On at least three prior occasions, Congress has addressed the subject of sports gambling, but has never before distinguished between betting on amateur games and betting on professional games. In 1961, Congress maintained parity between amateur and professional sports when it made fixing athletic contests a federal crime and banned interstate sports wagering over the telephone. The same approach was applied in 1974 when Congress amended the federal lottery laws to allow states to conduct lotteries, but expressly prohibited sports lotteries.

In 1998, the professional sports leagues, in conjunction with the NCAA, sought an extension of the sports lottery ban to all forms of sports gambling. The legislative effort lasted for three years, culminating in the 1992 PASPA law. PASPA made no distinction between professional and amateur athletics, and, indeed, was supported by definitive Congressional findings regarding the pernicious effects of gambling on both professional and amateur sports.

Chairman Cliff Stearns
Representative Edolphus Towns
February 11, 2002
Page two

Although the movement for PASPA came from the professional leagues, and the Oregon lottery never included college games, the NCAA was an active partner in the effort to enact the 1992 law. On sports gambling, both then and subsequently, the professional leagues and the NCAA have been united.

As we understand it, there are two primary rationales underlying the pending legislation, both of which are grounded in the report of the National Gambling Impact Study Commission. The first relates to fixing athletic contests and the second to the attraction of sports betting as a gambling gateway for college students.

With respect to the first issue, we understand and concur with the view that student-athletes may be exposed to economic temptation, but do not believe it is reasonable to conclude that these forces are only at work in college athletics. Indeed, all of the professional leagues take seriously the effect that gambling can have on the integrity of our games. All have adopted – and vigorously enforce – strict anti-gambling policies that are intended to insulate professional athletics from the corrosive impact of sports betting.

As to the attraction of sports betting to students, there is no reasonable basis to conclude that collegians are merely betting on college teams. If Congress wants to address fully gateway sports gambling, it cannot ignore the attraction to students of high-profile professional games. Indeed, that attraction will only increase if an amateur-only bill is passed and betting on professional sports contests becomes the only lawful form of sports wagering in Nevada.

We do not agree that the legislation must be limited to college games in order to implement a recommendation from the Gambling Commission. Indeed, the mere introduction of the pending bill already breaks with the Commission, which recommended that the Nevada legislature, not Congress, end legalized gambling on amateur sports. Further, the Commission made a specific finding that sports betting is a gateway form of gambling for young people, a conclusion that merits federal intervention. Amending such legislation to include professional sports would be entirely consistent with – and would in no way contravene – the report of the Gambling Commission.

We doubt that Congress intends to suggest that gambling on college games is harmful and undesirable, but that gambling on professional games is benign and tolerable. Nor do we believe that Congress seeks to instigate more gambling on professional contests, a result that is certain to occur if legislation extends only to gambling on amateur games. A college-only bill, though well-intentioned, only imperfectly solves problems at the college level, while creating new and substantial problems for professional sports.

If Congress intends to re-open federal sports gambling law, we urge that any such legislation maintain parity of treatment between amateur and professional sports. Any departure from this approach to which Congress has consistently adhered, will result in a highly regrettable precedent that is needlessly damaging to professional sports.

Chairman Cliff Stearns
Representative Edolphus Towns
February 11, 2002
Page three

We ask that this correspondence be made a part of the official hearing record.  Thank you for your consideration of our views.  We look forward to working with you on this legislation.

Respectfully submitted,

Thomas J. Ostertag
Senior Vice President and
  General Counsel
Office of the Commissioner of Baseball

Richard W. Buchanan
Senior Vice President and
  General Counsel
National Basketball Association

Jeffrey Pash
Executive Vice President
National Football League

William L. Daly
Executive Vice President and
  Chief Legal Officer
National Hockey League

EXHIBIT D

December 18, 2002

**STATEMENT OF MAJOR LEAGUE BASEBALL**
**THE NATIONAL BASKETBALL ASSOCIATION**
**THE NATIONAL FOOTBALL LEAGUE**
**THE NATIONAL HOCKEY LEAGUE**

**OPPOSING STATE-SPONSORED SPORTS GAMBLING**
**IN DELAWARE**

The four professional sports leagues oppose state-sponsored sports gambling in Delaware or any other state. We understand that Delaware is facing financial difficulties and needs to consider all possible sources of revenue. But we must oppose solutions that involve sports gambling.

Simply put, we do not want our games used as bait to sell gambling. We do not want our athletes used as roulette chips. We do not want the spread of illegal sports gambling and corruption that legalized sports gambling will bring. And we do not want any state, by promoting sports gambling, to send our children the harmful message that sports gambling is legitimate -- indeed, something the state encourages and rewards. We do not want any state to teach our children to gamble on their heroes.

Make no mistake. Gambling is what this is about. Not "gaming," not a "lottery." Gambling. One has only to recall the games offered by the Delaware Lottery Office in 1976 -- old-fashioned sports pools, in which participants could win by correctly selecting winning teams and point spreads, with prize amounts determined on a parimutuel basis. The only difference between those games and games offered in Las Vegas was that the state, rather than a private casino, was the house. According to newspaper reports at the time, the reason the state's experiment with sports gambling failed in 1976 is that professional gamblers loved the state's odds and flocked to play the games.

No state should place its stamp of approval on sports gambling.  Sports gambling threatens the character of team sports.  Our sports embody our very finest traditions and values.  They stand for clean, healthy competition.  They stand for teamwork.  And they stand for success through preparation and honest effort.  With legalized sports gambling, our games would instead represent the fast buck, the quick fix, the desire to get something for nothing.  Legalized sports gambling would change -- for the worse -- what our games stand for and the way they are perceived, and magnify the ever-present risks of corruption and scandal.  The inevitable questions that will arise about the integrity of our games -- questions that will arise in the minds of losing bettors, as well as the public at large -- will undermine the public confidence that is absolutely essential to our future operations.  We want fans to root for their home team to win, not to beat the spread; we likewise want our athletes to know they are being cheered to win.

Legalized sports gambling sends a terrible message to youth.  Sports are important to millions of our young people.  Youth look up to athletes.  Our players cannot be expected to serve as healthy role models for youth if they are made to function as participants in gambling enterprises.  And legalized sports gambling sends a regrettable message to our young people that "anything goes" when it comes to raising revenues or protecting local interests, and that we might as well legalize, sponsor, and promote any activity so that the state can get its "cut."  This is a message we can ill afford to send, especially in a time of political disaffection among youth.

Finally, and perhaps worst of all, legalized sports gambling would mean more sports gambling -- among adults and young people alike.  As Senator Bill Bradley stated a decade ago in opposing similar proposals, "legalized gambling does not replace illegal

gambling -- it only adds to it." Experts have long linked the rise in teenage gambling to the spread of state lotteries generally. As Dr. Valerie Lorenz of the National Center for Pathological Gambling stated a decade ago: "The message they're conveying is that gambling is not a vice but a normal form of entertainment." That message would certainly be sent by a state lottery based on team sports. And, as Dr. Lorenz has written, a sports lottery "not only teaches youngsters how to bet on football pools, but also encourages them to do so." The National Gambling Impact Study Commission, in its 1999 Final Report, more recently documented the harms caused by sports gambling.

For all of these reasons, Congress ten years ago enacted federal legislation prohibiting states from legalizing sports gambling, citing the harms identified above. Political realities, however, prevented Congress from prohibiting private sports gambling operations where they were already legal, as in Nevada, or sports lotteries already authorized by state law. The result was a grandfather provision in the federal statute that left future decisions with respect to sports lottery games up to Delaware within the authority preserved by that provision. But the fact that federal law leaves Delaware an option of instituting sports lottery games again does not mean that it should do so. For all of the reasons that led Congress to prohibit legalization of sports gambling, Delaware should not do so.

For all of these reasons, the four professional sports leagues oppose state-sponsored sports gambling in Delaware or any other state.

3

# EXHIBIT E

    

February 1, 2006

Dear Member of Congress:

As representatives of American sports, we are writing to ask you to co-sponsor H.R. 4411, the Unlawful Internet Gambling Enforcement Act. Passage of this bill is long overdue.   It needs to become law in 2006 in order to preserve the integrity of our respective sports.

Sports gambling threatens the character of team sports. Our games stand for the values of clean and healthy competition, and rewarding teamwork, preparation and honest effort.  When sports gambling is prevalent, the games begin to represent a "quick fix," the desire to get something for nothing, and even corruption.  Allowing rampant sports gambling can cause a cynical and suspicious perception of athletic events, in place of the traditional American values they should represent.

Gambling on Internet websites is already *illegal* throughout the United States.  No state has authorized this type of gambling, and Federal criminal laws support the enforcement of state gambling laws.  Unfortunately, there is a booming industry of offshore websites accepting bets and wagers from persons located in the United States.  Because these businesses are located offshore, they usually cannot be reached through state or federal law enforcement.  Easy access to Internet gambling websites and lack of law enforcement give the U.S. public a misimpression that Internet gambling is legal.  This encourages widespread gambling by minors and young adults, and it holds the potential to tarnish our sports if continued unchecked.

Sports betting has well-documented harmful effects, as Congress made clear when passing the Professional and Amateur Sports Protection Act of 1992 (PASPA).  Unfortunately, in the years since PASPA's enactment, sports gambling on the Internet has undermined Congressional policy.  H.R. 4411 is the most recent refinement of a multi-Congress effort to address this problem and we strongly endorse its purpose and content.

The Unlawful Internet Gambling Enforcement Act does not change the law with respect to what is currently legal and illegal, but it adds important and workable enforcement tools that will prevent or interdict illegal Internet gambling transactions even when the websites are operated offshore.

We ask that you move quickly to co-sponsor this important legislation and get it to the President's desk as soon as possible.

Sincerely,

Jeffrey Pash, Executive VP and General Counsel
National Football League

Tom Ostertag, Senior VP and General Counsel
Major League Baseball

Richard Buchanan, Senior VP and General
Counsel
National Basketball Association

William Daly, Deputy Commissioner
National Hockey League

Elsa Kircher Cole, General Counsel
National Collegiate Athletic Association

DC: 2081844-1

EXHIBIT F

    

May 31, 2007

Dear Members of the House Financial Services Committee:

On behalf of our respective professional and collegiate sports organizations, we ask for your continued support in protecting American athletics from the corrupting influence of sports gambling.

We wrote to you on April 25, to express our concerns about H.R. 2046, Chairman Frank's Internet gambling bill. Since then, advocates of H.R. 2046 have contended that we have no basis for concern, because H.R. 2046 creates "opt-outs" that permit individual leagues to prohibit gambling on their sports. However, with or without an opt-out, the bill sends a destructive message on how Congress views gambling on professional and college sports. Moreover, we believe that the bill's opt-outs will prove illusory. If H.R. 2046 were to pass, sports betting would likely proliferate and the integrity of American athletics would be compromised.

Congress has historically and consistently opposed sports gambling. In 1992, a bipartisan, overwhelming majority voted to enact PASPA—the Professional and Amateur Sports Protection Act. The House of Representatives' report found that that "there exists a special relationship between American sports fans of all ages and their favorite teams, and that athletic competition embodies and affirms fundamental American values worth protecting from the potential taint of corruption and scandal," and thus "these activities should be declared off limits from further exploitation as State 'revenue enhancers.'"

The Senate report further explained, "Sports gambling threatens to change the nature of sporting events from wholesome entertainment for all ages to devices for gambling. It undermines public confidence in the character of professional and amateur sports. Furthermore, State-sanctioned sports gambling will promote gambling among our Nation's young people." It also concluded that "[t]he moral erosion it produces cannot be limited geographically. Once a State legalizes sports gambling, it will be extremely difficult for other States to resist the lure."

PASPA passed 88 to 5 in the Senate and by voice vote in the House.

Since then, gambling operations—largely based outside of the U.S.—have turned to the Internet, where they were able to evade existing, longstanding gambling laws, including laws against sports gambling. Last year, Congress responded by passing UIGEA—the Unlawful Internet Gambling Enforcement Act—which enhances enforcement of America's gambling laws, including PASPA and other laws against sports gambling.

On July 11, 2006, the House passed UIGEA 317 to 93, reaffirming its commitment to protect American athletics from sports gambling. This strong vote tally reflects majorities of both parties and the affirmative votes of both Leaders.

H.R. 2046 would reverse Congress' longstanding consensus on the harms of sports gambling. Unsupported by any factual record, H.R. 2046 declares that sports betting is acceptable, and the bill expressly authorizes Internet sports gambling. Regardless of the existence of opt-outs, Congress' fundamental message would for the first time be one of approval for sports betting. Moreover, the sports opt-outs are likely to provoke legal challenges in U.S. courts and before the World Trade Organization.

We oppose H.R. 2046 for the following reasons:

- First, the bill states that sports betting is acceptable to Congress.

- Second, the opt-outs are subject to challenge in U.S. courts on the grounds that Congress has unconstitutionally delegated its lawmaking power (to ban Internet gambling) to private parties (commissioners of various sports leagues and conferences).

- Third, the "opt outs" for states and sports leagues are illusory because, if exercised, they might very well be struck down by the WTO as discriminating against foreign providers of gambling services. In that case, the U.S. would be hard pressed to invoke the "public morality" defense to argue, for instance, that offshore internet gambling facilities used by Louisiana citizens corrupt public morals, while Louisiana land-based casinos do not, or that sports gambling on football would corrupt public morals, but gambling on boxing or horse racing would not. Consistent with prior WTO rulings, the opt-outs will also prove difficult to defend if Congress gives its consent to Internet sports betting by passing H.R. 2046. Although the United States has announced its intent to withdraw from GATS "commitments" on gambling access, that process will be prolonged and with uncertain outcomes. Thus, the threat of WTO litigation remains active.

- Fourth, H.R. 2046 will lead to demands that PASPA be repealed. The bill would grant greater rights to foreign sports gambling operations, which could conduct Internet sports betting, than to State governments, which would remain barred by PASPA from authorizing sports betting. Arguments to "level the playing field" by repealing PASPA undoubtedly will follow and, once Congress is seen as having endorsed sports betting, will be difficult to resist.

We have long opposed sports betting because of the harm it inflicts on fans of all ages, professional and college athletes, and the integrity of American sports. Congress has long agreed and enforced a policy against sports betting. H.R. 2046 moves in exactly the opposite direction. In doing so, it advances no public interest and simply rewards foreign entities who have shamelessly ignored U.S. law for the past ten years. Accordingly, we urge you to reject it.

Sincerely,

Rick Buchanan, Executive VP and General Counsel
National Basketball Association

Elsa Kircher Cole, General Counsel
National Collegiate Athletic Association

William Daly, Deputy Commissioner
National Hockey League

Tom Ostertag, Senior VP and General Counsel
Major League Baseball

Jeffrey Pash, Executive VP and General Counsel
National Football League

cc: Members of the House of Representatives

# EXHIBIT G

    

October 2, 2007

Bernard A. Schmitt
Deputy Chief of Staff
Joint Committee on Taxation
1015 Longworth House Office Building
Washington, DC 20515-6675

Dear Mr. Schmitt:

On behalf of our respective professional and amateur sports associations, we would like to provide information for the public record that is material to any attempt to estimate the revenue effect of H.R. 2046, the "Internet Gambling Regulation and Enforcement Act of 2007" introduced by Rep. Barney Frank.

H.R. 2046 would grant the Treasury Department authority to license online gambling operators to do business with U.S. customers, provided that they comply with certain requirements, including the collection and payment of applicable Federal and State taxes. Section 5386 allows the chief executive officer of any sporting league to prohibit all license-holders from accepting Internet bets or wagers on any of the league's events or contests. Therefore, no tax revenue will be derived from this licensing scheme from any gambling on sports that have exercised their right to "opt out" of Internet gambling legalization.

Sports betting is incompatible with preserving the integrity of American athletics. For many decades, we have actively enforced strong policies against sports betting by our players, officials, and all other persons involved in our leagues. And the law on this point is consistent. Federal statutes bar sports betting, especially the 1961 Wire Act and the 1992 Professional and Amateur Sports Protection Act. Enforcement of these laws against sports betting was also a significant motive for enacting the Unlawful Internet Gambling Enforcement Act of 2006 (UIGEA). Our athletic associations have actively supported all of these laws.

We oppose the passage of H.R. 2046 even though it contains the opt-out for sports associations. This bill would for the first time grant Congressional approval to sports gambling, which would send the wrong message to the American public, even if all the sports associations opt out. Moreover, we have concerns that the validity of the sports opt-out provision would be challenged in U.S. courts or international tribunals.

Nevertheless, should H.R. 2046 become law, each of our respective sports associations intends to exercise its option to forbid Internet gambling on its sport, because approving online sports gambling would seriously weaken the integrity and strength of our sports.

Therefore, <u>any revenue estimate for H.R. 2046 should not include any tax revenues that might be projected to derive from gambling on our sports</u>.  This will ensure that tax revenues collected from Internet sports gambling will be virtually zero.

Sincerely,

Rick Buchanan, Executive VP and General Counsel
National Basketball Association

Elsa Kircher Cole, General Counsel
National Collegiate Athletic Association

William Daly, Deputy Commissioner
National Hockey League

Tom Ostertag, Senior VP and General Counsel
Major League Baseball

Jeffrey Pash, Executive VP and General Counsel
National Football League

cc:  H. Brenton Trigg, Joint Committee on Taxation

2

EXHIBIT H



OFC COMM BASEBALL, an unincorporated association doing business as Major League Baseball; NATL BASKETBALL ASSN, a joint venture; NATL COLLE-GIATE ATHLETIC ASSN, an unincorporated association; NATL FOOTBALL LEAGUE, an unincorporated association; NATL HOCKEY LEAGUE, an unincorporated association, Appellants, v. JACK A. MARKELL, Governor of the State of Delaware; WAYNE LEMONS, Director of the Delaware State Lottery Office, Appellees.

No. 09-3297

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

*579 F.3d 293; 2009 U.S. App. LEXIS 19460*

August 24, 2009, Argued
August 31, 2009, Filed

**SUBSEQUENT HISTORY:** US Supreme Court certiorari denied by Markell v. Office of Comm'r of Baseball, 2010 U.S. LEXIS 3712 (U.S., May 3, 2010)

**PRIOR HISTORY:**   [**1]
On Appeal from the United States District Court for the District of Delaware. (D.C. No. 09-cv-00538). District Judge: Honorable Gregory M. Sleet.
*Office of the Comm'r of Baseball v. Markell, 2009 U.S. Dist. LEXIS 69816 (D. Del., Aug. 10, 2009)*

**COUNSEL:** For Appellants: Kenneth J. Nachbar [Argued], Pauletta J. Brown, Megan W. Cascio, Susan W. Waesco, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For Appellees: Andre G. Bouchard [Argued], Joel E. Friedlander [Argued], Sean M. Brennecke, David J. Margules, Bouchard, Margules & Friedlander, Wilmington, DE.

**JUDGES:** Before: McKEE, FUENTES and HARDIMAN, Circuit Judges.

**OPINION BY:** HARDIMAN

**OPINION**

[*295]   OPINION OF THE COURT

HARDIMAN, *Circuit Judge.*

In this interlocutory appeal we review an order of the United States District Court for the District of Delaware denying a motion for preliminary injunction filed by the National Football League, the National Basketball Association, the National Hockey League, the Office of the Commissioner of Baseball, and the National Collegiate Athletic Association (collectively, Leagues). The Leagues sought to enjoin Delaware state officials from implementing certain elements of its Sports Lottery Act (Act), Del. Laws Ch. 28 (H.B. No. 100) (2009), *29 Del. Code   4801 et seq.,* on September 1, 2009. As we shall explain, we need not decide whether the   [**2] District Court's denial of the Leagues' preliminary injunction was proper because we hold as a matter of law that elements of Delaware's sports lottery violate federal law.

I.

In March 2009, the Governor of Delaware, Jack Markell, proposed legislation authorizing sports betting and table gaming at existing and future facilities in Delaware. On March 19, Governor Markell sought an advisory opinion from the Delaware Supreme Court pursuant to *10 Del. Code   141* and *29 Del. Code 2102,* regarding the constitutionality of his proposal under the Delaware Constitution. In a letter to the Delaware Supreme Court, Governor Markell described three types of proposed sports gambling: (1) point-spread bets on individual games; (2) over/under bets on individual games; and (3) multi-game parlay bets. [1] On May 14 -- while the request for an advisory opinion from the

Delaware Supreme Court was pending -- Governor Markell signed the Act into law. *In re Request of Governor for an Advisory Opinion (In re Request of Governor), A.2d , No. 150, 2009, 2009 Del. LEXIS 255, 2009 WL 1475736, at *2 (Del. May 27, 2009).*

1 Under regulations proposed pursuant to the Act, Delaware intends to offer three games: Single Game Lottery, [**3] Total Lottery, and Parlay Lottery. In Single Game Lottery, bettors must select the winning team in a single sports contest against a point spread. In Total Lottery, the bettor gambles on whether the total number of points scored by both teams in a single contest will be over or under a specified sum. The final game, Parlay Lottery, combines elements of the first two games in asking bettors to correctly choose the winners of two or more sports contests, or two or more over/under bets, or some combination of winners and over/under bets.

After hearing oral argument, the Delaware Supreme Court issued an opinion on May 29, which found that multi-game betting would not violate state law. In analyzing [*296] the legality of the Act and the "lotteries" proposed pursuant to the Act, the Delaware Supreme Court relied heavily on Judge Stapleton's decision in *National Football League v. Governor of the State of Delaware (NFL), 435 F. Supp. 1372 (D. Del. 1977)*. That case concerned the NFL's challenge to a sports betting scheme known as "Scoreboard" that Delaware conducted during the 1976 season. Scoreboard was comprised of three games: Football Bonus, Touchdown, and Touchdown II. In Football Bonus, the [**4] State offered two pools of seven NFL games each and bettors had to predict the winners -- without a point spread -- in one or both of the pools. In Touchdown, bettors selected both the winners and point spreads for either three, four, or five NFL games. Finally, Touchdown II -- which replaced Touchdown midway through the season -- required bettors to pick the winners, against the point spread, for between four and twelve NFL games. All of the Scoreboard games conducted in 1976 were confined to betting on the NFL, and all required that the bettor wager on more than one game at a time.

In *NFL*, Judge Stapleton held such wagering was permissible under the Delaware Constitution because chance is the "dominant factor" in multi-game (parlay) betting. The Delaware Supreme Court reached the same conclusion in its advisory opinion, *In re Request of Governor, 2009 Del. LEXIS 255, 2009 WL 1475736, at *8*, but did not decide the constitutionality of single-game betting, except to recognize that it differs from the parlay games addressed by Judge Stapleton. *Id.* The Delaware Supreme Court did not address the federal statutory question presented in this appeal.

Following receipt of the Delaware Supreme Court's advisory opinion, [**5] on June 30 the State published its proposed regulations to implement the Act (Regulations). According to the Regulations, Delaware intends to implement a sports betting scheme that would include wagers "in which the winners are determined based on the outcome of any professional or collegiate sporting event, including racing, held within or without the State, but excluding collegiate sporting events that involve a Delaware college or university, and amateur or professional sporting events that involve a Delaware team." A168. Delaware's proposed sports betting scheme includes single-game betting in addition to multi-game (parlay) betting, as the Regulations define the term "maximum wager limit" to include "the maximum amount that can be wagered on a *single sports lottery wager be it head-to-head or parlay* . . . ." A168 (Regulations 2.0, definition of "maximum wager limit") (emphasis added).

Delaware intends to commence its sports betting scheme on September 1, 2009, in time for the start of the upcoming NFL regular season. Though the NFL is its focus, Delaware intends to conduct -- and the Regulations sanction -- betting on all major professional and college sports.

II.

On July 24, the [**6] Leagues filed a complaint against Governor Markell and Wayne Lemons, the Director of the Delaware State Lottery Office (collectively, Delaware or State), claiming that elements of Delaware's proposed sports betting scheme violate the Professional and Amateur Sports Protection Act (PASPA), *28 U.S.C. 3701, et seq.* [2] Although PASPA [*297] has broadly prohibited state-sponsored sports gambling since it took effect on January 1, 1993, the statute also "grandfathered" gambling schemes in individual states "to the extent that the scheme was conducted by that State" between 1976 and 1990.

2 The PASPA claim was brought at Count I. The Leagues also brought a claim under state law at Count II, which alleged that the sports betting scheme violates Section 17 of the Delaware Constitution because it does not constitute a permissible "lottery." The state-law claim is not at issue in this appeal.

Four days after filing their complaint, the Leagues filed a motion for preliminary injunction, requesting that the District Court enjoin the State "from commencing, instituting, operating and maintaining a proposed 'sports

lottery' to the extent that such lottery permits (i) single-game sports betting, (ii) betting [**7] on sports other than professional football, or (iii) any other sports betting scheme that was not conducted by the State of Delaware in 1976" pending final adjudication of the Leagues' action.

The District Court held a scheduling conference on July 29 at which it urged the parties to reach an agreement by which the State would "stand down" pending an expedited adjudication of the merits. A268. The parties could not reach an agreement, however, so the District Court asked for written submissions and held a conference on August 5. Following the conference, the court orally denied the Leagues' motion and scheduled a trial for December 7. On August 10, the District Court issued a 13-paragraph memorandum order explaining its reasons for denying the injunction.

In its memorandum order, the District Court found that the Leagues had not shown a likelihood of success on the merits. *Office of Comm'r of Baseball v. Markell, F. Supp. 2d    , 2009 U.S. Dist. LEXIS 69816, 2009 WL 2450284, at *1 (D. Del. Aug. 10, 2009).* Noting that "both sides vigorously and ably contend that they are entitled to win on the merits," the District Court stated: "On the current record, the court is simply not in a position to give either [**8] side a nod on the merits. Indeed, there may exist factual disputes as to what, if anything, the State of Delaware actually did in the past with respect to sports gambling; or as to what, if any, proposed sports betting activities are exempted by the federal statute at issue." *2009 U.S. Dist. LEXIS 69816, [WL] at *2.* The District Court also noted that the Leagues suggested in their letter brief that the court treat their motion for preliminary injunction as a motion for summary judgment and questioned whether the Leagues had demonstrated both the requisite irreparable harm and that the balance of the equities fell in their favor. *See 2009 U.S. Dist. LEXIS 69816, [WL] at *2-4.*

On August 7 -- prior to receipt of the District Court's memorandum opinion -- the Leagues filed their notice of appeal. Three days later, the Leagues filed a motion to expedite their appeal and their opening brief. On August 12, Delaware filed a motion to dismiss the appeal and its opposition to the Leagues' motion to expedite. On August 13, we granted the Leagues' motion to expedite, issued a briefing schedule, and set oral argument for August 24.

It is often noted that the wheels of justice move slowly -- and for good reason. As the procedural history of this case demonstrates, [**9] however, that is not always the case. When a party seeks injunctive relief, the stakes are high, time is of the essence, and a straightforward legal question is properly presented to us, prudence dictates that we answer that question with dispatch.

III.

We begin, as always, by considering whether we have jurisdiction to hear this appeal. The Leagues claim we have jurisdiction [*298] under *28 U.S.C. 1292(a),* which provides: "courts of appeals shall have jurisdiction of appeals from: (1) Interlocutory orders of the district courts . . . granting, continuing, modifying, *refusing,* or dissolving injunctions." (emphasis added). The State disagrees, arguing that we must apply the test set forth in *Carson v. American Brands, Inc., 450 U.S. 79, 101 S. Ct. 993, 67 L. Ed. 2d 59 (1981),* which requires the Leagues to show that the District Court's denial of the motion for preliminary injunction will have a serious, perhaps irreparable, consequence; and can be effectively challenged only by immediate appeal. *Id. at 83; see also Stringfellow v. Concerned Neighbors In Action, 480 U.S. 370, 379, 107 S. Ct. 1177, 94 L. Ed. 2d 389 (1987).*

In arguing that the Leagues must establish the *Carson* factors, Delaware relies on dicta from some of our prior cases stating that both orders [**10] expressly denying injunctions and orders having the practical effect of denying injunctions must meet the two-prong *Carson* test. *See Vuitton v. White, 945 F.2d 569, 574 (3d Cir. 1991); Ross v. Zavarella, 916 F.2d 898, 902 (3d Cir. 1990).* But none of the cases upon which Delaware relies involved *express denials* of injunctive relief; rather, they dealt with orders that were alleged to have the *practical effect* of denying injunctive relief. Accordingly, the Leagues need not demonstrate that the order will have a "serious, perhaps irreparable, consequence" and can be "effectively challenged" only by immediate appeal. *See Cohen v. Bd. of Trs. of Univ. of Med., 867 F.2d 1455, 1464 (3d Cir. 1989).* The language of *1292(a)(1)* is clear and the Leagues need not satisfy any jurisdictional hurdle beyond the fact that they have appealed from an order refusing to enter an injunction.

We next turn to the scope of our review under *28 U.S.C.    1292(a).* We have adopted a broad view of appellate jurisdiction under this section. *See Kershner v. Mazurkiewicz, 670 F.2d 440, 445 (3D CIR. 1982); see also* 16 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE    3921.1, [**11] at 28 (2d ed. 1996) ("Jurisdiction of the interlocutory appeal [under    *1292(a)(1)*] is in large measure jurisdiction to deal with all aspects of the case that have been sufficiently illuminated to enable decision by the court of appeals without further trial court development."). Moreover, we have held that "[w]hen an appeal is taken from an order made appealable by statute, we have all the powers with respect to that order listed in *28 U.S.C.*

579 F.3d 293, *; 2009 U.S. App. LEXIS 19460, **

2106." [3] *United Parcel Serv., Inc. v. U.S. Postal Serv., 615 F.2d 102, 107 (3d Cir. 1980)*. Accordingly, we have broad authority to decide this case as appropriate under *2106*.

3    *Section 2106 provides: "The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances."*

Having determined that we have authority to address all aspects of this case, we must determine whether it is proper to exercise that authority. "As a general rule, when an appeal [**12] is taken from the grant or denial of a preliminary injunction, the reviewing court will go no further into the merits than is necessary to decide the interlocutory appeal." *Callaway v. Block, 763 F.2d 1283, 1287 n.6 (11th Cir. 1985)*. This ordinarily requires that we review the decision to grant or deny a preliminary injunction for abuse of discretion, employing the standard four-factor test. *See Allegheny [*299] Energy, Inc. v. DQE, Inc., 171 F.3d 153, 158 (3d Cir. 1999)*. Nevertheless, the Supreme Court has held the "general rule" of limited review is one of "orderly judicial administration, not a limit on judicial power." *Thornburgh v. Am. Coll. of Obstetricians & Gynecologists, 476 U.S. 747, 757, 106 S. Ct. 2169, 90 L. Ed. 2d 779 (1986), overruled on other grounds by Planned Parenthood of Se. Penn. v. Casey, 505 U.S. 833, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992)*.

In *Thornburgh*, the Supreme Court considered whether this Court properly exercised its jurisdiction in striking down portions of a Pennsylvania statute following an appeal from the district court's partial denial of a preliminary injunction. *See id. at 755-57*. The Supreme Court acknowledged that review of a preliminary injunction is normally limited to the injunction itself, but explained: "if a district [**13] court's ruling rests solely on a premise as to the applicable rule of law, and the facts are established or of no controlling relevance, that ruling may be reviewed even though the appeal is from the entry of a preliminary injunction." *Id.* At the same time, the Supreme Court cautioned: "A different situation is presented . . . when there is no disagreement as to the law, but the probability of success on the merits depends on facts that are likely to emerge at trial." *Id. at 757 n.8*. In affirming this Court's decision to address the merits of the plaintiff's case, the Supreme Court quoted from our opinion:

Thus, although this appeal arises from a ruling on a request for a preliminary injunction, we have before us an unusually complete factual and legal presentation from which to address the important constitutional issues at stake. The customary discretion accorded to a district court's ruling on a preliminary injunction yields to our plenary scope of review as to the applicable law.

*Id. at 757* (quoting *Am. Coll. of Obstetricians & Gynecologists v. Thornburgh, 737 F.2d 283, 290 (3d Cir. 1984)*).

The approach taken in *Thornburgh* has been embraced by a number of our sister courts of appeals. [**14] In an appeal from the grant of a preliminary injunction in *Campaign for Family Farms v. Glickman, 200 F.3d 1180 (8th Cir. 2000)*, the Court of Appeals for the Eighth Circuit exercised its discretion to reach the merits of the underlying dispute, determining that it was "faced with a purely legal issue on a fixed . . . record." *Id. at 1186-87*. The court explained: "[t]he considerations that caution against a broad scope of review in the usual interlocutory appeal -- that is, a tentative and provisional record with conflicting material facts -- simply are not present here." *Id. at 1187*. Likewise, in *Solantic, LLC v. City of Neptune Beach, 410 F.3d 1250 (11th Cir. 2005)*, the Court of Appeals for the Eleventh Circuit assessed the merits of the plaintiff's *First Amendment* claim on appeal after the district court denied his request for a preliminary injunction. Finding that the facts of the case were "simple and straightforward, and the record need[ed] no explanation," *id. at 1274*, the court explained that "we do not think it necessary or prudent to confine our opinion to holding that [the plaintiff] has shown a *likelihood* of success on the merits, when it is altogether clear that [the plaintiff] [**15] *will* succeed on the merits of its *First Amendment* claims," *id. at 1272* (emphasis in original). Finally, in *Doe v. Sundquist, 106 F.3d 702 (6th Cir. 1997)*, the Court of Appeals for the Sixth Circuit considered the merits of the plaintiffs' claim following a denial of their preliminary injunction motion. The court noted that "[i]f an issue unaddressed by the district [*300] court is presented with sufficient clarity and completeness and its resolution will materially advance the progress of the litigation," consideration of that issue is proper. *Id. at 707* (internal quotation marks and citation omitted). The court explained that "[t]he sort of judicial restraint that is normally warranted on interlocutory appeals does not prevent us from reaching clearly defined issues in the interest of judicial economy." *Id.* (citation omitted).

579 F.3d 293, *; 2009 U.S. App. LEXIS 19460, **

In light of *Thornburgh* and its progeny, we must determine whether the record in this appeal presents "a pure question of law" that is "intimately related to the merits of the grant [or denial] of preliminary injunctive relief," *United Parcel Serv., 615 F.2d at 107*, or whether the Leagues' "probability of success on the merits depends on facts that are likely to emerge [**16] at trial," *Thornburgh, 476 U.S. at 757 n.8.* For the reasons that follow, we conclude that this case falls into the former category.

In denying the Leagues' motion for preliminary injunction, the District Court hypothesized that "there *may* exist factual disputes as to what, if anything, the State of Delaware actually did in the past with respect to sports gambling or as to what, if any, proposed sports betting activities are exempted by the federal statute at issue." *Markell, 2009 U.S. Dist. LEXIS 69816, 2009 WL 2450284, at *2* (emphasis added). Contrary to the District Court's supposition, we have reviewed the record and cannot find any material issues of fact in dispute. As the Leagues rightly argue, Judge Stapleton's opinion in *NFL* is the definitive word regarding the scope and extent of Delaware's gambling scheme as it was conducted in 1976; the State neither challenged Judge Stapleton's findings 33 years ago nor does so now. Likewise, the parties do not dispute the scope and extent of the sports gambling scheme that Delaware intends to implement on September 1. As counsel for Delaware properly and candidly conceded at oral argument, the State intends to conduct widespread betting on both professional and college [**17] sports beyond the scope of the football-only parlays permitted in 1976. In sum, the parties agree upon what Delaware did in 1976 and what Delaware intends to do now. Given the absence of any disputed issue of material fact -- as confirmed by both parties at oral argument -- we conclude that this case does not turn on a "legal issue that might be seen in any different light after final hearing," *United Parcel Serv., 615 F.2d at 107,* and is ripe for adjudication as a matter of law. Therefore, we will proceed to assess the merits of the Leagues' claim that Delaware's sports betting scheme violates PASPA. [4]

4    Because we reach the merits of this case, we need not consider the parties' arguments regarding irreparable harm and the balancing of the equities.

IV.

We begin our legal analysis with the statutory language. PASPA prohibits any person or governmental entity from sponsoring, operating, advertising or promoting:

a lottery, [*301] sweepstakes, or other betting, gambling, or wagering scheme based, directly or indirectly (through the use of geographical references or otherwise), on one or more competitive games in which amateur or professional athletes participate, or are intended to participate, [**18] or on one or more performances of such athletes in such games.

*28 U.S.C.    3702.* The statute contains four exceptions, only one of which is relevant here. That exception provides that PASPA's general prohibition against sports betting shall not apply to: "lottery, sweepstakes, or other betting, gambling, or wagering scheme in operation in a State or other governmental entity, *to the extent that the scheme was conducted by that State* or other governmental entity at any time during the period beginning January 1, 1976, and ending August 31, 1990." *28 U.S.C. 3704(a)* (emphasis added).

Not surprisingly, the parties view PASPA's language differently, with both sides claiming that the plain language requires a favorable result on the merits.

A.

Delaware contends that its sports betting scheme qualifies for the exception in    3704(a)(1), claiming: "[t]he plain language of the pertinent PASPA exemption allows Delaware to reintroduce a sports lottery under State control because Delaware conducted such a scheme at some time between January 1, 1976, and August 31, 1990." Del. Br. at 3. The State also contends that the exemption "is broad in scope, and nowhere states that it restricts Delaware to [**19] operating particular lottery games for a particular sport." *Id.* at 32. In Delaware's view,    3704(a)(1) allows it to conduct any "sports lottery under State control," *id.,* because it did so in 1976. Although the State acknowledges, as it must, that the exception permits its lottery only "to the extent that the scheme was conducted," it argues that the word "scheme" refers neither to the three particular games it offered in 1976, nor to parlay betting in general, nor even to wagering on NFL games, but to a "sports lottery under State control in which the winners of lottery games were affiliated with the outcome of sporting events." *Id.* at 33.

Even assuming that Delaware's interpretation of the word "scheme" were persuasive, we must reconcile that interpretation with the statutory language "*to the extent* that the scheme *was conducted* by that State." (emphasis added). The State claims that this phrase merely "identifies a condition (*i.e.,* that a State must have conducted a sports lottery in the past in order to be permitted to oper-

579 F.3d 293, *; 2009 U.S. App. LEXIS 19460, **

ate a sports lottery in the future)," *id.* at 34, rather than limiting the State's gaming authority to either the particular sports or types of games previously [**20] offered. Delaware argues that because state law previously *authorized* a broad lottery encompassing many types of games and many sports, it may now *institute* a broad lottery with those features.

In contrast to Delaware's argument, the Leagues contend that the exception in *3704(a)(1)* applies only to lotteries or other schemes "to the extent" that such lottery or scheme "was conducted" between January 1, 1976 and August 31, 1990. The Leagues insist that it is not sufficient that a particular lottery may have been contemplated, or even authorized, but rather we must consider the specific means by which the lottery was *actually conducted.*

We agree with the Leagues' interpretation. As the exception found at *3704(a)(2)* makes clear, there is a distinction between wagering schemes that were merely "authorized" and those that were "conducted." *See 28 U.S.C. 3704(a)(2)* (which applies to a wagering scheme that was both (i) "authorized by a statute as in effect on October 2, 1991," and (ii) "actually was conducted during the period beginning September 1, 1989 and ending on October 2, 1991"). Whatever the breadth of the lottery authorized by Delaware state law in 1976, PASPA requires [**21] us to determine "the extent" -- or degree -- to which such lottery *was conducted.* We cannot hold -- as the State impliedly suggests -- that Congress meant to conflate "authorized" and "conducted." *See BFP v. Resolution Trust Corp., 511 U.S. 531, 537, 114* [*302] *S.Ct. 1757, 128 L. Ed. 2d 556 (1994)* ("It is generally presumed that Congress acts intentionally and purposefully when it includes particular language in one section of a statute but omits it in another."); *Alaka v. Attorney General, 456 F.3d 88, 97-98 (3d Cir. 2006)* ("It is a fundamental canon of statutory construction that where sections of a statute do not include a specific term used elsewhere in the statute, the drafters did not wish such a requirement to apply."). Thus, the sole exception upon which Delaware relies -- applicable to wagering schemes dating back to 1976 -- applies only to schemes that were "conducted." *28 U.S.C. 3704(a)(1).*

While minimizing the importance of the language of *3704(a)(2)*, Delaware asks us to draw parallels to *3704(a)(3)*, which provides:

a betting, gambling, or wagering scheme, other than a lottery described in paragraph (1), conducted exclusively in casinos located in a municipality, but only *to the extent* that-- (A) such scheme [**22] or a similar scheme was authorized,

not later than one year after the effective date of this chapter, to be operated in that municipality; and (B) any commercial casino gaming scheme was in operation in such municipality throughout the 10-year period ending on such effective date pursuant to a comprehensive State regulation authorized by that State's constitution and applicable solely to such municipality[.]

(emphasis added). Delaware argues that the phrase "to the extent" must mean the same thing in *3704(a)(1)* as it does in *3704(a)(3)*, where the phrase identifies a condition. We reject this argument out of hand because the exception contained in *3704(a)(3)* -- which deals with casinos -- differs in subject matter, structure, and syntax from the language of *3704(a)(1).*

As a fallback position, Delaware argues that PASPA is ambiguous such that resort to legislative history is necessary. We disagree, because as we have noted:

A statutory provision is not ambiguous simply because by itself, [it is] susceptible to differing constructions because in addition to the statutory language . . . itself, we take account of the specific context in which that language is used, and the broader [**23] context of the statute as a whole. We assume, for example, that every word in a statute has meaning and avoid interpreting one part of a statute in a manner that renders another part superfluous.

*Disabled in Action v. SEPTA, 539 F.3d 199, 210 (3d Cir. 2008)* (internal quotations and citations omitted). Applying these principles of statutory construction, we find unambiguous the phrase "to the extent that the scheme was conducted by that State," so our "inquiry comes to an end." *Kaufman v. Allstate N.J. Ins. Co., 561 F.3d 144, 155 (3d Cir. 2009)* (citation omitted). [5]

5   Delaware spends several pages of its brief explaining the legislative history and citing statements from various legislators. These statements are inconclusive at best. When we view them in their entirety rather than focusing on "cherry-picked" snippets, they offer no consistent insight into Congressional intent. For example, the Senate Report upon which Delaware relies, Del. Br. at 13, states that the exemption in *3704(a)(1)* "is not intended to prevent . . . Delaware from expanding their sports betting schemes

into other sports as long as it was authorized by State law. . . . At the same time, *paragraph (1)* does not intend [**24] to allow the expansion of sports lotteries into head-to-head betting . . . ." A152 (Senate Report). This excerpt from the Senate Report is unhelpful in two respects. First, it is at odds with PASPA's statutory language. Second, it contradicts Delaware's claim that single-game wagering is permitted. Similarly unhelpful are the many statements of individual legislators cited by Delaware because such "cherry-picked" statements cannot be deemed to reflect the views of other legislators, much less of a majority of those who enacted the statute. *Szehinskyj v. Attorney General, 432 F.3d 253, 256 (3d Cir. 2005)* ("[Appellant's] selective invocation of fragments of the floor debate is an object lesson in the perils of appealing to this particular kind of legislative history as a guide to statutory meaning. This case is a perfect illustration of the well-known admonition that what individual legislators say a statute will do, and what the language of the statute provides, may be far apart indeed. The law is what Congress enacts, not what its members say on the floor."). In sum, we conclude that "[t]he legislative history is more conflicting than the text is ambiguous," *Wong Yang Sung v. McGrath, 339 U.S. 33, 49, 70 S. Ct. 445, 94 L. Ed. 616 (1950),* [**25] and does not support the State's position.

[*303] Because we do not find PASPA ambiguous, we find unpersuasive Delaware's argument that its sovereign status requires that it be permitted to implement its proposed betting scheme. *See Gregory v. Ashcroft, 501 U.S. 452, 460-61, 111 S. Ct. 2395, 115 L. Ed. 2d 410 (1991)* ("[A]bsent an unmistakably clear expression to alter the usual constitutional balance between the States and the Federal Government, [federal courts] will interpret a statute to preserve rather than destroy the States' substantial sovereign powers.") (internal quotations omitted). PASPA unmistakably prohibits state-sponsored gambling, *28 U.S.C. 3702,* subject to certain exceptions, *28 U.S.C. 3704.* Through PASPA, Congress has "altered the usual constitutional balance" with respect to sports wagering, although Delaware retains the right to implement a sports wagering scheme "to the extent that the scheme was conducted" previously. Those words of limitation are not rendered nugatory by generalized notions of "state sovereignty."

Finally, Delaware argues that we cannot construe the language "to the extent that the scheme was conducted" so narrowly because doing so would render the PASPA exception a nullity. Certain [**26] aspects of Scoreboard were deemed impermissible by either Judge Stapleton, *NFL, 435 F. Supp. at 1387-88* (holding that Touchdown II violated the lottery provision of the Delaware Constitution by utilizing a fixed-payoff scheme), or the Delaware Supreme Court, *Op. of the Justices, 385 A.2d 695, 705 (Del. 1978)* (striking down Football Bonus and Touchdown because they awarded prizes on a pari-mutuel basis in violation of the State's Constitution). Consequently, the State reasons that if it is confined to the exact scheme conducted in 1976, the exception would be illusory as applied to Delaware. The State argues that Congress could not have intended this result, especially when the legislative history makes clear that Delaware was one of only four states that were intended beneficiaries of the exception. *See Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253, 112 S. Ct. 1146, 117 L. Ed. 2d 391 (1992)* (courts should disfavor interpretations of statutes that render language superfluous).

Delaware's reading overstates the narrowness of the exception provided by 3704(a)(1). We do not hold that PASPA requires Delaware's sports lottery to be identical in every respect to what the State conducted in 1976. Certain aspects of the lottery [**27] may differ from the lottery as conducted in 1976, as long as they do not effectuate a substantive change from the scheme that was conducted during the exception period. For example, as the State aptly noted -- and the Leagues conceded -- at oral argument, "to the extent the scheme was conducted" cannot mean that Delaware could institute a sports betting scheme for only four months as was done in 1976. Likewise, Delaware is neither limited to selling tickets at identical venues nor prohibited from allowing wagering on NFL teams that did not exist in 1976. [*304] Such *de minimis* alterations neither violate PASPA's language nor do violence to its central purposes, *viz.,* to limit the spread of state-sponsored sports gambling and maintain the integrity of sports. By contrast, expanding the very manner in which Delaware conducts gambling activities to new sports or to new forms of gambling -- namely single-game betting -- beyond "the extent" of what Delaware "conducted" in 1976 would engender the very ills that PASPA sought to combat. In construing statutes, we consider the statute's overall object and policy, and avoid constructions that produce "odd" or "absurd" results or that are "inconsistent [**28] with common sense." *Disabled in Action, 539 F.3d at 210* (internal citations omitted).

B.

In light of our reading of PASPA, we determine what scheme Delaware may conduct in 2009 with reference to the scheme it conducted in 1976. As Judge Stapleton held in *NFL* -- and as was not disputed in the proceedings before either the District Court or our Court in this matter -- the only sports betting scheme "conducted" by Delaware in 1976 involved the three Scoreboard

579 F.3d 293, *; 2009 U.S. App. LEXIS 19460, **

games. That betting scheme was limited to multi-game parlays involving only NFL teams. Thus, any effort by Delaware to allow wagering on athletic contests involving sports beyond the NFL would violate PASPA. It is also undisputed that no single-game betting was "conducted" by Delaware in 1976, or at any other time during the time period that triggers the PASPA exception. *See NFL, 435 F. Supp. at 1385* ("None of the [1976] games permits head-to-head or single game betting."). Because single-game betting was not "conducted" by Delaware between 1976 and 1990, such betting is beyond the scope

of the exception in   *3704(a)(1)* of PASPA and thus prohibited under the statute's plain language.

Under federal law, Delaware may, however, institute [**29] multi-game (parlay) betting on at least three NFL games, because such betting is consistent with the scheme to the extent it was conducted in 1976. Of course, we express no opinion regarding the legality of such a scheme under Delaware statutory or constitutional law.

For the foregoing reasons, we will vacate the order of the District Court and remand for proceedings consistent with this opinion.

EXHIBIT I

# CONSTITUTION
# AND BYLAWS
### OF THE
# NATIONAL
# FOOTBALL LEAGUE



**Effective February 1, 1970**
**(2006 Rev.)**

*Provisions of the Constitution relating to players (in particular, Articles XII, XIV, XV, XVI, XVII, and XVIII) remain subject to the provisions of the Collective Bargaining Agreement.

**Public Relations Department**

8.8    The Commissioner shall have authority to establish a Public Relations Department for the League, and such department shall be under his exclusive control and direction. He may employ persons to staff said department and shall fix and determine the compensation thereof.

**Broadcasts and Television**

8.9    Subject to the provisions of Article X hereof, the Commissioner shall have the exclusive authority to arrange for and sell all broadcasting and television rights to the Conference Championship games and the Super Bowl game.

**League Contracts**

8.10   The Commissioner shall have authority to arrange for and negotiate contracts on behalf of the League with other persons, firms, leagues, or associations; provided, however, that except in instances where the Commissioner is otherwise specifically authorized herein, any contract involving a substantial commitment by the League or its members shall not be binding unless first approved by the affirmative vote of not less than three-fourths or 20, whichever is greater, of the members of the League.

**Reports**

8.11   The Commissioner shall render an annual report to the League members at each Annual Meeting.

**Bond**

8.12   The Commissioner shall file and maintain in effect a surety bond with the League in the sum of fifty thousand dollars ($50,000). Said bond shall be conditioned upon faithful performance by the Commissioner of his duties and shall name the League as obligee. The expenses for such bond shall be paid by the League.

**Disciplinary Powers of Commissioner**

8.13   (A)   Whenever the Commissioner, after notice and hearing, decides that an owner, shareholder, partner or holder of an interest in a member club, or any player, coach, officer, director, or employee thereof, or an officer, employee or official of the League has either violated the Constitution and Bylaws of the League or has been or is guilty of conduct detrimental to the welfare of the League or professional football, then the Commissioner shall have complete authority to:

30                                                     Article VIII

(g)   If the members vote to terminate the membership or the interest of any member in a club of the League, then the member club or person charged shall be required to dispose of such membership or interest in the affected club in accordance with the provisions of Section 3.8(B) hereof.

(C)   Whenever the Commissioner, after notice and hearing, determines that a person employed by or connected with the League or any member club thereof has bet money or any other thing of value on the outcome or score of any game or games played in the League or has had knowledge of or has received an offer, directly or indirectly, to control, fix, or bet money or other consideration on the outcome or score of a professional football game and has failed to report the same in the manner hereinafter prescribed, then the Commissioner shall have complete and unrestricted authority to enforce any or all of the following penalties:

(1)   Suspend such person indefinitely or for a prescribed period of time;

(2)   Bar such person from the League for life;

(3)   Cancel or terminate the contract of such person in the League or any member club thereof;

(4)   Require the sale of any stock, or other interest of such offending person in any member club by the method and under the procedure specified in Section 3.8(B) hereof;

(5)   Fine such person in an amount not in excess of five hundred thousand dollars ($500,000);

(6)   Cancel or declare to be forfeited any interest in a member club, or in the franchise thereof, owned by any person so involved. In such event, any interest of the offending person so implicated in the club or any stock owned by such person in any member club shall be sold under the procedure provided in Section 3.8(B) hereof;

(7)   Assign to another club or a member of the League the lease on any stadium or playing field held for or owned by the offending club or by any person owning any interest therein;

(8)   Assign to one or more other clubs players on the Selection or Reserve Lists of the offending club;

34                                          Article VIII

(9)   Impose such other or additional punishment or discipline as the Commissioner may decide.

If the person involved is a player in the League, such player is obligated to report immediately such incident to the head coach, owner, or managing officer of the club with which he is affiliated. If the person involved is either an owner, officer, director, stockholder, or a partner of a member club or owns or holds an interest therein, or is a coach or employee (other than a player) thereof, such report shall be made promptly to the Commissioner. Any decision by the Commissioner under the circumstances referred to in this Section 8.13(C) shall be final, conclusive, and unappealable. All persons involved in or affected by any such decision agree to release and waive any and all claims arising out of or connected with such decision that such person may now have or hereafter possess against the Commissioner, individually and in his official capacity, as well as against the League or any officer or employee thereof and against every member club therein and any director, officer, shareholder, or partner thereof or against the holder of any interest therein, either for damages or for any other remedy or relief. The word "person" wherever used in this subparagraph (C) of Article VIII, Section 8.13, shall mean and include a member club, or any club owner, official, officer, stockholder, partner thereof, or anyone holding any interest therein, as well as a coach, player, or other employee thereof; it shall also include an officer or employee of the League or any official employed by the League.

(D)   Whenever the Commissioner finds, in his sole and exclusive discretion, that any person, whether or not connected or affiliated with the League or a member club therein, is guilty of conduct detrimental to the best interests of the League or professional football, then in addition to his other powers prescribed in the Constitution and Bylaws of the League, the Commissioner shall have the right to bar and prohibit such person from entry to any stadium or park used by the League or its member clubs or affiliates for the practice or exhibition of professional football.

(E)   The Commissioner shall have authority to change, reduce, modify, remit, or suspend any fine, suspension, or other discipline imposed by the Commissioner and not requiring approval of the member clubs.

EXHIBIT J

# CONSTITUTION AND BYLAWS OF THE NATIONAL FOOTBALL LEAGUE



**Effective February 1, 1970**
**(2006 Rev.)**

*Provisions of the Constitution relating to players (in particular, Articles XII, XIV, XV, XVI, XVII, and XVIII) remain subject to the provisions of the Collective Bargaining Agreement.

# Article IX

## Prohibited Conduct.

**Conflicting Interests and Prohibited Conduct**

9.1 (A) The violation of any of the provisions of this Article IX shall constitute conduct detrimental to the League and professional football.

(B) No member, or stockholder, officer, director, partner, or employee thereof, and no officer or employee of the League, including a game official, shall:

(1) Own or have any financial interest, directly or indirectly, in any other member club of the League;

(2) Directly or indirectly loan money to or become surety or guarantor for any other member club or any player, coach, or employee thereof, or holder of an interest therein;

(3) Directly or indirectly loan money or offer any gift or reward or become surety or guarantor for any game official or other official or employee of the League; or

(4) Act as the contracting agent or representative for any player or share or be financially interested in the compensation of any player in the League. Nothing herein shall prevent any player from negotiating on his own behalf or for his own account.

(C) No member, nor any stockholder, director, officer, partner, or employee thereof, or person holding an interest therein, nor any officer or employee of the League shall:

(1) Publicize or participate in the selection of any mythical All-League or All-Opponent team;

(2) Issue a free ticket of admission to a game to any visiting club or player thereof except pursuant to the Constitution and Bylaws of the League;

(3) Offer any gift or reward to a player, coach, or person connected with or employed by another member club for services promised, rendered, or to be rendered in defeating or attempting to defeat a competing club;

37                              Article IX

*See* 2002 Bylaw Proposal No. 6 (Arena Football League players), App., p. 2002-1

(8)  Offer or pay a player or coach, and no player or coach may receive any bonus, money, or thing of value, for winning any game played in the League.

No club or any representative thereof, shall offer to pay, directly or indirectly, to a player, and no player shall receive, any bonus of any kind unless such bonus provision is attached to and/or incorporated in the contract of such player;

(9)  Fail to present its team at the time and place where it is scheduled to play in a preseason or regular season game, unless such failure is caused by any unavoidable accident in travel or by conditions beyond the control of the member;

(10)  Tamper with players of college teams who are not eligible for play in the League under the eligibility rules thereof.

(11)  Tamper with a player or coaches or other employee under contract to or the property of another member club;

(12)  Offer, agree, conspire, or attempt to illegally influence the outcome of the member or fail to suspend immediately any officer or player or other employee of the member who shall be proven guilty of offering, agreeing, conspiring, or attempting to influence the outcome of any game or be interested in any pool or wager of any game in which a member club participates;

(13)  Dispense beer or other beverage in NFL stadia except by pouring into cups;

(14)  Use at any time, from the start to the finish of any game in which a club is a participant, any communications or information gathering equipment, other than Polaroid-type cameras or field telephones, including without limitation videotape machines, telephone tapping or bugging devices, or any other form of electronic device that might aid a team during the playing of a game;

(15)  In respect to minor league clubs and the Canadian Football League, the following prohibitions shall apply to all clubs in the League:

# EXHIBIT K

## APPENDIX A
## NFL PLAYER CONTRACT

THIS CONTRACT is between_____, he-
reinafter    "Player,"    and    _____,    a
_____corporation (limited partnership) (partnership), hereinafter "Club,"
operating under the name of the _____ as a
member of the National Football League, hereinafter "League." In consideration of the
promises made by each to the other, Player and Club agree as follows:

1. TERM. This contract covers _____ football season(s); and will begin on the
date of execution or March 1, _____, whichever is later, and end on February 28
or 29, _____, unless extended, terminated, or renewed as specified elsewhere in
this contract.

2. EMPLOYMENT AND SERVICES. Club employs Player as a skilled football player.
Player accepts such employment. He agrees to give his best efforts and loyalty to the
Club, and to conduct himself on and off the field with appropriate recognition of the
fact that the success of professional football depends largely on public respect for and
approval of those associated with the game. Player will report promptly for and partici-
pate fully in Club's official mandatory minicamp(s), official preseason training camp, all
Club meetings and practice sessions, and all preseason, regular season and postseason
football games scheduled for or by Club. If invited, Player will practice for and play in
any all-star football game sponsored by the League. Player will not participate in any
football game not sponsored by the League unless the game is first approved by the
League.

3. OTHER ACTIVITIES. Without prior written consent of the Club, Player will not
play football or engage in activities related to football otherwise than for Club or engage
in any activity other than football which may involve a significant risk of personal injury.
Player represents that he has special, exceptional and unique knowledge, skill, ability, and
experience as a football player, the loss of which cannot be estimated with any certainty
and cannot be fairly or adequately compensated by damages. Player therefore agrees that
Club will have the right, in addition to any other right which Club may possess, to enjoin
Player by appropriate proceedings from playing football or engaging in football-related
activities other than for Club or from engaging in any activity other than football which
may involve a significant risk of personal injury.

4. PUBLICITY AND NFLPA GROUP LICENSING PROGRAM.
    (a)    Player hereby grants to Club and the League, separately and together, the
right and authority to use, and to authorize others to use solely as described below, his
name, nickname, initials, likeness, image, picture, photograph, animation, persona, auto-
graph/signature (including facsimiles thereof), voice, biographical information and/or
any and all other identifying characteristics (collectively, "Publicity Rights"), for any and
all uses or purposes that publicize and promote NFL Football, the League or any of its

256

compete on the playing field than another player or players whom Club intends to sign or attempts to sign, or another player or players who is or are already on Club's roster, and for whom Club needs room.

12. TERMINATION. The rights of termination set forth in this contract will be in addition to any other rights of termination allowed either party by law. Termination will be effective upon the giving of written notice, except that Player's death, other than as a result of injury incurred in the performance of his services under this contract, will automatically terminate this contract. If this contract is terminated by Club and either Player or Club so requests, Player will promptly undergo a complete physical examination by the Club physician.

13. INJURY GRIEVANCE. Unless a collective bargaining agreement in existence at the time of termination of this contract by Club provides otherwise, the following Injury Grievance procedure will apply: If Player believes that at the time of termination of this contract by Club he was physically unable to perform the services required of him by this contract because of an injury incurred in the performance of his services under this contract, Player may, within 60 days after examination by the Club physician, submit at his own expense to examination by a physician of his choice. If the opinion of Player's physician with respect to his physical ability to perform the services required of him by this contract is contrary to that of the Club's physician, the dispute will be submitted within a reasonable time to final and binding arbitration by an arbitrator selected by Club and Player or, if they are unable to agree, one selected in accordance with the procedures of the American Arbitration Association on application by either party.

14. RULES. Player will comply with and be bound by all reasonable Club rules and regulations in effect during the term of this contract which are not inconsistent with the provisions of this contract or of any collective bargaining agreement in existence during the term of this contract. Player's attention is also called to the fact that the League functions with certain rules and procedures expressive of its operation as a joint venture among its member clubs and that these rules and practices may affect Player's relationship to the League and its member clubs independently of the provisions of this contract.

15. INTEGRITY OF GAME. Player recognizes the detriment to the League and professional football that would result from impairment of public confidence in the honest and orderly conduct of NFL games or the integrity and good character of NFL players. Player therefore acknowledges his awareness that if he accepts a bribe or agrees to throw or fix an NFL game; fails to promptly report a bribe offer or an attempt to throw or fix an NFL game; bets on an NFL game; knowingly associates with gamblers or gambling activity; uses or provides other players with stimulants or other drugs for the purpose of attempting to enhance on-field performance; or is guilty of any other form of conduct reasonably judged by the League Commissioner to be detrimental to the League or professional football, the Commissioner will have the right, but only after giving Player the opportunity for a hearing at which he may be represented by counsel of his choice, to

fine Player in a reasonable amount; to suspend Player for a period certain or indefinitely; and/or to terminate this contract.

16. EXTENSION. Unless this contract specifically provides otherwise, if Player becomes a member of the Armed Forces of the United States or any other country, or retires from professional football as an active player, or otherwise fails or refuses to perform his services under this contract, then this contract will be tolled between the date of Player's induction into the Armed Forces, or his retirement, or his failure or refusal to perform, and the later date of his return to professional football. During the period this contract is tolled, Player will not be entitled to any compensation or benefits. On Player's return to professional football, the term of this contract will be extended for a period of time equal to the number of seasons (to the nearest multiple of one) remaining at the time the contract was tolled. The right of renewal, if any, contained in this contract will remain in effect until the end of any such extended term.

17. ASSIGNMENT. Unless this contract specifically provides otherwise, Club may assign this contract and Player's services under this contract to any successor to Club's franchise or to any other Club in the League. Player will report to the assignee Club promptly upon being informed of the assignment of his contract and will faithfully perform his services under this contract. The assignee club will pay Player's necessary traveling expenses in reporting to it and will faithfully perform this contract with Player.

18. FILING. This contract will be valid and binding upon Player and Club immediately upon execution. A copy of this contract, including any attachment to it, will be filed by Club with the League Commissioner within 10 days after execution. The Commissioner will have the right to disapprove this contract on reasonable grounds, including but not limited to an attempt by the parties to abridge or impair the rights of any other club, uncertainty or incompleteness in expression of the parties' respective rights and obligations, or conflict between the terms of this contract and any collective bargaining agreement then in existence. Approval will be automatic unless, within 10 days after receipt of this contract in his office, the Commissioner notifies the parties either of disapproval or of extension of this 10-day period for purposes of investigation or clarification pending his decision. On the receipt of notice of disapproval and termination, both parties will be relieved of their respective rights and obligations under this contract.

19. DISPUTES. During the term of any collective bargaining agreement, any dispute between Player and Club involving the interpretation or application of any provision of the NFL collective bargaining agreement or this contract will be submitted to final and binding arbitration in accordance with the procedure called for in any collective bargaining agreement in existence at the time the event giving rise to any such dispute occurs.

20. NOTICE. Any notice, request, approval or consent under this contract will be sufficiently given if in writing and delivered in person or mailed (certified or first class) by

EXHIBIT L



## Gambling Policy

The subject of bribes and gambling are covered each summer in special training camp discussions with players by members of the League's Security department. You should be familiar with Paragraph 15 of your NFL Player Contract (entitled "INTEGRITY OF GAME"), which stresses these and related subjects, as well as with the text of the following sign which is posted in every NFL locker room:

### Notice
### To National Football League Personnel
### Bribes and Gambling

Among the types of conduct detrimental to the NFL and professional football that call for serious penalties are the following:

1. Accepting a bribe or agreeing to throw or fix a game or illegally influence its outcome;

2. Failing to promptly report any bribe offer or any attempt to throw or fix a game or to illegally influence its outcome;

3. Betting on any NFL game;

4. Associating with gamblers or with gambling activities in a manner tending to bring discredit to the NFL.

Any such conduct may result in severe penalties, up to and including a fine and/or suspension from the NFL for life.


ROGER GOODELL
Commissioner


You should also be aware that the League has a long-standing policy against any advertising or promotional activities by players, clubs, coaches, or other management personnel that can reasonably be perceived as constituting affiliation with or endorsement of gambling or gambling-related activities. All club employees, including coaches and players, are prohibited from being associated with such activities through endorsements, commercials, ads, or public appearances. Violators will be subject to appropriate discipline.

Promotional appearances by players, coaches, or other personnel involving casinos, sports books, gambling cruises, or similar activities are _not_ permitted.

# EXHIBIT M

## NFL Owner Involvement in Gambling-Related Businesses

### Introduction

The League's Constitution and Bylaws contain a number of prohibitions with respect to gambling, both specific prohibitions as to betting on NFL games and a general prohibition of conduct detrimental to the welfare or best interest of the League or professional football. These provisions have been the basis of the League's policy relative to gambling activities and the ownership of interests in gambling-related enterprises, whether casinos, racetracks or otherwise.

As to betting on professional football games, the League's Constitution specifically provides that any owner, shareholder, or partner in a member club who engages in betting on any NFL game may be required to forfeit and sell his interest in the member club (Article 8.13(C)). On this basis, the League has required strict separation between ownership of controlling interests in NFL teams and ownership of casinos such as those operated in Nevada. This is because those casinos, even though lawful and regulated by state authorities, conduct sports betting and, specifically, point spread betting on NFL games.

League policy has also consistently prohibited any association with illegal gambling or with individuals involved in illegal gambling (sports bookmaking, etc.) because such associations directly threaten and put at risk the integrity of the League and public confidence in professional football, and therefore represent "conduct detrimental."

In 1992, Congress enacted Federal legislation that, in effect, prohibited any expansion outside of Nevada of state-sponsored sports betting*. As a result of this legislation, all states other than Nevada were effectively prohibited from authorizing or licensing casinos that conduct sports betting, and all states were effectively prohibited from adopting state lotteries based on point spreads tied to the outcomes of professional or amateur sporting events. This 1992 Federal legislation rested on an express Congressional finding that sports gambling "threatens the integrity of, and public confidence in, amateur and professional sports."

During the past decade, however, America has seen an explosion in non-sports casino gambling and other types of gambling enterprises. (More recently, sports betting has become widely available through Internet operations tied to offshore gambling establishments.) The explosion in non-sports casino gambling has included a number of major casinos operated by Indian tribes in several states**. These and similar issues have increasingly engaged large segments of the public in regulatory disputes or state referenda such as California's Proposition 5, which was hotly contested in 1998 elections.

---

\*    Professional and Amateur Sports Protection Act, 28 U.S.C. § 3701 (1992).
\*\*   Such Indian casinos are operated under Federal Indian Gaming Regulatory Act, 25 U.S.C. § 2701 et seq. (1988).

To address issues raised by this explosion in non-sports gambling, we advised all member clubs in mid-1997 that we were considering with the Finance Committee whether to recommend new League policies and procedures relating to the possible ownership by NFL owners of interests in legalized gambling establishments, in particular, casinos, "card rooms," slot machine ventures, and other such operations, including those that are licensed and regulated by states or state agencies.

**Restatement of League Policy**

In reviewing League policy on these matters, we began by accepting the premise of the existing policy—namely, that there must be a clear line between (a) the ownership of interests in NFL teams and (b) forms of gambling that directly or indirectly damage, or seriously threaten to damage, the interests or welfare of the League and its member clubs. This premise has served the League well, and the limitations on other possible business activities of NFL owners resulting from this premise have proven to be well justified.

NFL owners have generally not been involved in the expanding forms of legal, state-regulated gambling that have developed in recent years. It is thus timely to restate the League's policy on these matters in light of current conditions, public attitudes, and League interests.

The League's Constitution gives the Commissioner the responsibility to decide when the owners of interests in NFL clubs have either violated the Constitution or been guilty of conduct detrimental to the welfare or best interest of the League or professional football (Article 8.13(A)). Pursuant to that authority, the Commissioner has determined that in applying the provisions of the Constitution and Bylaws dealing with "conduct detrimental," effective with this memorandum (January 26, 1999), the League's policy with respect to the ownership by any NFL owner of any interest in any type of gambling casino or other gaming or gambling business will be as set forth in paragraphs A through D below.

A.  Casinos

  1.  No owner of an interest in an NFL club may own, directly or indirectly, any interest in any gambling casino, whether or not such a casino operates a "sports book" or otherwise accepts wagering on sports.

  2.  No other officer or employee of an NFL club may own, directly or indirectly, any interest in any gambling casino, whether or not such a casino operates a "sports book" or otherwise accepts wagering on sports.

  3.  For purposes of this prohibition, the term "gambling casino" is to be broadly defined and includes casinos, card rooms, lotteries, slot machine operations, and the like.

B.  Internet Gambling Enterprises

  No owner of an interest in any NFL club, nor any other officer or employee of an NFL club may own, directly or indirectly, or operate any "on-line," computer-based, telephone, or Internet gambling service, whether or not such a service accepts wagering on sports.

**Page C72**   *Volume I, Administrative/Business Operations – League Rules & Policies*

C.  Other Gambling-Related Enterprises

No owner of an interest in an NFL club, nor any other officer or employee of an NFL club may own, directly or indirectly, or operate any other gambling-related enterprise, including advisory services such as publications, "tout services," and the like, whether or not such services address professional football or any other team sport.

D.  Publicly Traded Enterprises

1.  No owner of an interest in an NFL club, nor any other officer or employee of an NFL club may own any interest in a publicly traded enterprise where the enterprise is involved to a significant extent in activities related to gambling. For purposes of this prohibition, an enterprise is involved to a significant extent in activities related to gambling if one-third or more of the enterprise's gross revenues or operating profit in any of the last three years is attributable to gambling-related operations.

2.  NFL owners and other officers and employees of NFL clubs may own interests in publicly-traded enterprises where the primary business of the enterprise is not related to gambling, so long as the owner or employee does not own more than 5 percent of the company's stock and does not serve as an officer or director of the company.

Apparent or alleged violations of this policy will continue to be decided by the Commissioner on a case-by-case basis, after notice and hearing, as provided in Article 8.13(A).

This restated League policy rests on the premise that no League interest will be served by even limited direct or indirect ownership of, or investment in, non-sports casinos or other gambling-related businesses by NFL owners. Instead, such ownership would likely damage League interests in the long term by, among other things, blurring the line between the absolute need for integrity in the playing and presentation of NFL games and the risk created by a misplaced perception that gambling and participation in the NFL are compatible. At a time when college sports have seen a recurrence of gambling-related point shaving scandals, it is particularly appropriate to reinforce the separation of gambling from NFL football.

This restated policy also recognizes that although large segments of the public may have accepted the expansion of legalized casino and other gambling, and increasingly view such gambling as an acceptable and enjoyable form of entertainment, recent public opinion surveys confirm that sizable majorities of the public continue to view such gambling in very negative terms. Some such surveys even show, for example, that large segments of the public believe that organized crime is involved in legalized casino gambling and that legalized gambling of any form "opens the door for organized crime." Given these public attitudes, a public perception—shared by NFL fans—that either the League itself or NFL owners are engaged in, or profiting from, such legalized gambling is inconsistent with the welfare and best interest of the League.

## Gambling Policy

## Frequently Asked Questions

1) *Is gambling over the Internet allowed?*

   **Answer:** No.  Gambling over the Internet is currently illegal under Federal law, although amendments are being considered that would legalize certain types of Internet gambling.  However, sports betting over the Internet is illegal and would remain illegal under the proposals currently being considered in Congress.  NFL personnel may not participate in or associate with any type of illegal gambling activity.

2) *Is it ok if I have a friend or family member place a bet for me that would otherwise be prohibited?*

   **Answer:** No.  Having a third party place a bet on your behalf, otherwise known as "surrogate betting", is considered the same as placing the bet yourself.

3) *May an NFL or team employee (such as a coach or player) invest money in a legal gambling-related business such as a casino or other gambling-related enterprise (e.g., gambling advisory services such as publications or "tout services")?*

   **Answer:** No.  NFL personnel may not own, in whole or in part, directly or indirectly, or operate, any gambling-related enterprise.   Publicly traded companies with multiple lines of business are considered "gambling-related enterprises" if one-third or more of the enterprise's gross revenue or operating profit in any of the last three years was attributable to gambling-related operations.  This prohibition applies whether or not the investment is publicized.

4) *May an NFL or team employee accept a complimentary room or other "comp" from a casino?*

   **Answer:** No.  NFL personnel may not accept complimentary rooms or services from casinos or other gambling-related establishments, as this can easily be perceived as tantamount to accepting payment from them in exchange for being present at the casino.   This is true even if the individual is not asked to participate in any promotional activities and is simply offered the free room for being a "good customer".

5) *May an NFL or team employee participate in a golf outing or other non-gambling-related event held at or sponsored by a casino?*

   **Answer:** No.  NFL personnel may not participate in events that are held at or sponsored by casinos, as these events inevitably promote and advertise the venues at which they are held and the entities that sponsor them.

6)   *May NFL or team employees participate in a charity "casino night", charity poker tournament or other similar event?*

**Answer:** Yes, but only if <u>all</u> of the following conditions are met:
   (i)   The event is not held at or affiliated in any way with any casino or other gambling-related enterprise
   (ii)   100% of the proceeds from the event are donated to a legitimate charity
   (iii)   No money or other thing of value is wagered by the event participants
   (iv)   The participating employee donates 100% of anything won (e.g., money, trips) to the applicable charity

7)   *The NFL gambling policy prohibits NFL personnel from knowingly associating with gambling or gambling-related activities.   Does this mean I cannot have a personal relationship with someone that owns a casino?*

**Answer:**   Not necessarily. While the NFL gambling policy <u>does</u> prohibit NFL personnel from associating with individuals involved in <u>illegal</u> gambling (sports bookmaking, etc.) it does not necessarily prohibit NFL personnel from maintaining personal relationships with individuals that own or work in legal gambling-related businesses <u>provided</u> that such personal relationships do not result in the applicable NFL personnel being publicly associated with gambling.   As a result, these situations will be reviewed by the League Office on a case-by-case basis in light of the specific facts and circumstances.

As an important reminder, please note that the NFL gambling policy prohibits NFL personnel from disclosing "confidential information" for the purpose of enabling or facilitating gambling. This includes, without limitation, any non-public information regarding any NFL game or any individual's performance in any NFL game, strategy or game planning information, as well as information regarding player injuries.

Additional questions regarding the above, or any other aspects of the NFL gambling policies, should be directed to Joseph Hummel at (212) 450-2621, Deana Garner at (212) 450-2100 or Doug Paoletti at (212) 450-2544.