**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION et al., <br><br> Plaintiffs, <br><br><br> v. <br><br> CHRISTOPHER J. CHRISTIE et al., <br><br> Defendants. | Civil Action No. 3:12-cv-04947 (MAS) (LHG) <br> Honorable Michael A. Shipp, U.S.D.J. <br><br> Return Date:  December 18, 2012 |

---

**MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR
SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT**

---

THEODORE B. OLSON
(admitted *pro hac vice*)
MATTHEW D. MCGILL
(admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: (202) 955-8500
Facsimile: (202) 530-9662

JEFFREY S. CHIESA
ATTORNEY GENERAL OF THE STATE OF
NEW JERSEY

JOHN J. HOFFMAN
CHRISTOPHER S. PORRINO
STUART M. FEINBLATT
PETER SLOCUM
OFFICE OF THE ATTORNEY GENERAL OF
THE STATE OF NEW JERSEY
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, NJ  08625-0112
Telephone: (609) 984-9666
Facsimile: (609) 292-0690

*Attorneys for Defendants*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .................................................................................. 1

BACKGROUND ......................................................................................................... 3

   A.  The Sports Wagering Market and Its Legal Framework.................................... 3

   B.  The Leagues' Interactions With Sports Wagering .............................................. 6

   C.  New Jersey's Sports Wagering Law .................................................................... 8

   D.  Plaintiffs' Lawsuit Challenging New Jersey's Law............................................ 8

LEGAL STANDARD............................................................................................... 10

ARGUMENT ........................................................................................................... 10

  I.  The Leagues Lack Standing To Challenge New Jersey's Sports Wagering Law .............. 10

       A.    The Leagues Have Failed To Satisfy Their Burden To Come Forward
             With Facts Demonstrating That They Immediately Will Suffer A Concrete
             Injury Fairly Traceable To The Sports Wagering Law........................................ 10

       B.    PASPA Cannot, And Does Not, Circumvent Article III's Standing
             Requirement................................................................................................ 21

  II.  The Professional And Amateur Sports Protection Act Is Unconstitutional ...................... 22

       A.    PASPA Violates the Anti-Commandeering Principle of *New York v.*
             *United States* ................................................................................................ 23

       B.    PASPA's Discrimination Between States Exceeds the Power of the
             Commerce Clause and Violates the Principle of Equal Sovereignty.................. 33

       C.    The Exceptional Discrimination Here Deprives Residents of New Jersey
             and Other Disfavored States of Due Process And Equal Protection .................. 36

  III.  The Leagues Have Not Met The Standard For An Award Of Injunctive Relief .............. 38

CONCLUSION......................................................................................................... 40

# TABLE OF AUTHORITIES

**Cases**                                                              **Page**

*Alamo v. Clay*,
  137 F.3d 1366 (D.C. Cir. 1998) ................................................................. 16

*Alaska Airlines, Inc. v. Brock*,
  480 U.S. 678 (1987) .................................................................... 31, 32, 36

*Alston v. Advanced Brands & Importing Co.*,
  494 F.3d 562 (6th Cir. 2007) ................................................................. 14

*Am. Civil Liberties Union v. Ashcroft*,
  322 F.3d 240 (3d Cir. 2003) ................................................................. 39

*Ashwander v. Tennessee Valley Authority*,
  297 U.S. 288 (1936) ................................................................. 22

*Berckeley Inv. Group, Ltd. v. Colkitt*,
  455 F.3d 195 (3d Cir. 2006) ................................................................. 10

*Bischoff v. Osceola County*,
  222 F.3d 874 (11th Cir. 2000) ................................................................. 22

*Bolger v. First State Fin. Servs.*,
  759 F. Supp. 182 (D.N.J. 1991) ................................................................. 39

*Bond v. United States*,
  131 S. Ct. 2355 (2011) ................................................................. 23

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................................. 10

*City of Cleburne v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985) ................................................................. 37

*Clark v. Martinez*,
  543 U.S. 371 (2005) ................................................................. 29

*Crowell v. Benson*,
  285 U.S. 22 (1932) ................................................................. 29

*Currin v. Walker*,
  306 U.S. 1 (1939) ................................................................. 34, 36

*Delaware River Basin Comm'n v. Bucks Cnty. Water & Sewer Auth.*,
  641 F.3d 1087 (3d Cir. 1981) ................................................................. 35, 38

*Doe v. Nat'l Bd. of Med. Exam'rs*,
  199 F.3d 146 (3d Cir. 1999) ............................................................ 16, 21

*eBay Inc. v. MercExchange, LLC*,
  547 U.S. 388 (2006) ...................................................................... 38, 40

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
  485 U.S. 568 (1988) .......................................................................... 29

*Freeman v. Quicken Loans, Inc.*,
  132 S. Ct. 2034 (2012) ...................................................................... 30

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991) .......................................................................... 28

*Grocery Mfrs. Ass'n v. EPA*,
  693 F.3d 169 (D.C. Cir. 2012) ............................................................ 14

*Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*,
  452 U.S. 264 (1981) ................................................................ 24, 25, 34

*Hooper v. Bernalillo Cnty. Assessor*,
  472 U.S. 612 (1985) .......................................................................... 37

*Illinois Cent. R. Co. v. State of Illinois*,
  146 U.S. 387 (1892) .......................................................................... 34

*Joint Stock Soc'y v. UDV N. Am., Inc.*,
  266 F.3d 164 (3d Cir. 2001) .............................................................. 11

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ................................................................ 11, 21, 22

*Lujan v. Nat'l Wildlife Fed.*,
  497 U.S. 871 (1990) .......................................................................... 11

*Maldonado v. Ramirez*,
  757 F.2d 48 (3d Cir. 1985) ................................................................ 11

*Massachusetts v. EPA*,
  549 U.S. 497 (2007) .......................................................................... 17

*Mathews v. De Castro*,
  429 U.S. 181 (1976) .......................................................................... 37

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) .......................................................................... 10

*McCray v. Fidelity Nat'l Title Ins. Co.*,
  682 F.3d 229 (3d Cir. 2012).................................................................. 20

*Morales v. Trans World Airlines, Inc.*,
  504 U.S. 374 (1992).............................................................................. 40

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  132 S. Ct. 2566 (2012)..................................................................... 30, 32

*Natural Res. Def. Council, Inc. v. Texaco Ref. & Mktg., Inc.*,
  906 F.2d 934 (3d Cir. 1990).................................................................. 40

*New Jersey v. United States*,
  91 F.3d 463 (3d Cir 1996).................................................................... 24

*New Orleans v. Dukes*,
  427 U.S. 297 (1976).............................................................................. 38

*New York v. United States*,
  505 U.S. 144 (1992).................................................................... passim

*Nw. Austin Municipal Utility Dist. Number One v. Holder*,
  557 U.S. 193 (2009)................................................... 23, 33, 34, 37

*Office of the Comm'r of Baseball v. Markell*,
  579 F.3d 293 (3d Cir. 2009).......................................... 1, 27, 28, 39

*Pa. Prison Soc'y v. Cortes*,
  508 F.3d 156 (3d Cir. 2007).................................................................. 11

*Pa. Prison Soc'y v. Cortes*,
  622 F.3d 215 (3d Cir. 2010).................................................................. 22

*Pennsylvania v. West Virginia*,
  262 U.S. 553 (1923).............................................................................. 33

*Pennsylvania. v. Porter*,
  659 F.2d 306 (3d Cir. 1981).................................................................. 38

*Printz v. United States*,
  521 U.S. 898 (1997)............................................................... 26, 27, 29

*Reno v. Condon*,
  528 U.S. 141 (2000)............................................................................ 28, 29

*Ruhrgas AG v. Marathon Oil Co.*,
  526 U.S. 574 (1999).............................................................................. 22

iv

*Secretary of Agric. v. Central Roig Refining Co.*,
   338 U.S. 604 (1950)........................................................................ 36

*Shelby County v. Holder*,
   679 F.3d 848 (D.C. Cir. 2012).......................................................... 37

*South Carolina v. Baker*,
   485 U.S. 505 (1988)........................................................................ 28

*South Carolina v. Katzenbach*,
   383 U.S. 301 (1966)........................................................................ 34

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009)........................................................................ 21

*Treasurer of N.J. v. U.S. Dep't of the Treasury*,
   684 F.3d 382 (3d Cir. 2012).............................................................. 27

*United States v. Barrow*,
   363 F.2d 62 (3d Cir. 1966)............................................................... 27

*United States v. Louisiana*,
   363 U.S. 1 (1960)........................................................................... 23

*United States v. Parker*,
   108 F.3d 28 (3d Cir. 1997)............................................................... 27

*United States v. Ptasynski*,
   462 U.S. 74 (1983)......................................................................... 35

*United States v. Sacco*,
   491 F.2d 995 (9th Cir. 1974) ........................................................... 35

*Ward v. Maryland*,
   79 U.S. 418 (1871)......................................................................... 33

*Warth v. Seldin*,
   422 U.S. 490 (1975)....................................................................... 21

*Wawa, Inc. v. Government of New Castle Cnty., Delaware*,
   391 F. Supp. 2d 291 (D. Del. 2005)..................................................... 38

*Weinberger v. Romero-Barcelo*,
   456 U.S. 305 (1982)....................................................................... 40

*Wyoming v. Oklahoma*,
   502 U.S. 437 (1992)....................................................................... 38

v

*Zivotofsky v. Sec. of State*,
  444 F.3d 614 (D.C. Cir. 2006) ........................................................ 16

*Zobel v. Williams*,
  457 U.S. 55 (1982) ........................................................................ 37

**Statutes**

18 U.S.C. § 224 ................................................................................ 14

18 U.S.C. § 1084 ................................................................................ 3

28 U.S.C. § 3702 ....................................................................... passim

28 U.S.C. § 3703 ......................................................................... 9, 40

28 U.S.C. § 3704 ............................................................. 4, 28, 33, 37

31 U.S.C. § 5362 ................................................................................ 5

31 U.S.C. § 5363 ................................................................................ 5

42 U.S.C. § 2021e .......................................................................... 25

**Other Authorities**

1 J. Story, Commentaries of the Constitution of the United States § 957 (T. Cooley ed. 1873) .. 40

Fla. Op. Att'y Gen. 91-3 (1991) ........................................................ 6

Guide to Off-Reservation Gaming, Arizona Department of Gaming, available at
  http://www.gm.state.az.us/misc-pdf/TopGamingViolations.pdf. ............................................... 6

La. Op. Att'y Gen. 91-14 (1991) ....................................................... 6

Thomas B. Colby, *Revitalizing the Forgotten Uniformity Constraint on the Commerce Power*,
  91 Va. L. Rev. 249 (2005) .......................................................... 37, 38

**Rules**

Fed. R. Civ. P. 5.1 ........................................................................... 22

**Regulations**

44 N.J.R. 2374(a) .............................................................................. 8

## PRELIMINARY STATEMENT

Plaintiffs (collectively, the "Leagues") rushed this case to summary judgment on the claim that *Office of the Commissioner of Baseball v. Markell*, 579 F.3d 293 (3d Cir. 2009), and the Professional and Amateur Sports Protection Act ("PASPA"), 28 U.S.C. § 3701 *et seq.*, require New Jersey to maintain a ban on sports wagering.  There was nothing for this Court to do, the Leagues contended, except simply enter judgment in their favor.

But for two independent reasons, neither of which was addressed in *Markell*, not only must the Leagues' motion for summary judgment be denied, but clear precedent dictates that summary judgment, instead, should be granted in favor of Defendants.  First, the Leagues have failed to demonstrate Article III standing.  And, second, PASPA is unconstitutional.

In their motion to dismiss, Defendants demonstrated that the Leagues' Complaint failed even to allege the constitutionally indispensable elements of standing: a concrete injury-in-fact fairly traceable to Defendants, and redressable by a favorable judgment.  Now, to survive summary judgment, the Leagues bear the burden to come forward with actual evidence, not merely conclusory allegations, to prove those same elements.  The Leagues' failure is only more apparent.  Discovery has revealed that the Leagues have no proof whatsoever to carry their burden to establish standing, only their unsupported "common sense."

This is hardly surprising.  The Leagues' notion that New Jersey's legalization and strict regulation of sports wagering somehow would not only measurably change the multi-hundred-billion dollar, almost-entirely illegal, sports wagering market, but *also* do so in a way that would result in concrete harm to the Leagues was, from the very beginning, deeply implausible speculation.  Speculation unsupported by facts cannot satisfy a plaintiff's burden to survive summary judgment.  Defendants' cross-motion for summary judgment should therefore be granted, and the Leagues' complaint should be dismissed.

If the Court concludes that the Leagues have established standing—a determination the Court must make *before* addressing the merits—the Court should grant Defendants' cross-motion for summary judgment because PASPA plainly violates the Constitution.

PASPA purports to prohibit most (but not all) States of the Union from "authoriz[ing]" sports wagering.  Because Congress enacted PASPA at a time when nearly all States did prohibit sports wagering, PASPA's manifest purpose and effect is to compel most (but again, not all) States to maintain and continue to enforce their pre-existing bans on sports wagering.  Such compulsion violates the Constitution's structural principles of federalism in several ways.

Most obviously, it violates the anti-commandeering principle set out by the Supreme Court in *New York v. United States*, 505 U.S. 144 (1992).  That decision establishes that Congress may not commandeer state legislative powers to achieve a federal objective.  Yet that is precisely what PASPA does.  PASPA does not prohibit sports wagering; it requires *New Jersey* to prohibit sports wagering.  That is exactly what the Court's *New York* decision forbids.

Beyond that, the patently discriminatory manner in which PASPA commandeers state powers violates the fundamental principle that each State has equal sovereignty before the federal government and, therefore, constitutes an invalid exercise of Congress's power to regulate interstate commerce.  PASPA requires New Jersey and most other States to outlaw sports wagering, but it allows Nevada and a handful of other States to permit, regulate, and tax sports wagering activity.  The Leagues maintain that there is no uniformity requirement when Congress regulates under the Commerce Clause.  But that hardly means that Congress has a free hand to pick winners and losers among the States.  Otherwise, Congress could decree that automobiles may be made only in Michigan, or airliners only in Washington.

The Supreme Court recently, and unanimously, made clear that such discrimination

among the States is permissible only where disparities are justified by the presence of a "local evil." Thus, Congress can limit its regulation to Nevada when addressing a problem particular to Nevada. But, in PASPA, Congress did not confine its regulation to the States where State-sponsored sports wagering existed. It did just the opposite, and regulated only States where sports wagering **did not** exist. That turns the equal-sovereignty principle on its head.

Indeed, PASPA's discrimination in favor of Nevada and its citizens, and against other States and their citizens, is so blatant and so utterly lacking in justification that it fails even the low threshold for constitutional regulation set by the Due Process and Equal Protection Clauses. The Leagues have suggested that the favoritism shown to Nevada and other States was justified by the principle of "grandfathering." But the Third Circuit already has made clear that intention-al discrimination among commercial interests cannot be justified by a desire to permanently "grandfather" existing market participants.

It is therefore Defendants, not the Leagues, who are entitled to summary judgment.

## BACKGROUND

### A.  The Sports Wagering Market and Its Legal Framework

PASPA, which the Leagues treat as the beginning and end of this case, is only part of the legal framework governing wagering on sporting events. Sports wagering is **not** illegal under Federal law, and indeed Federal criminal law imposes no prohibition on sports wagering, so long as that activity is legal under the law of the State in which it occurs.[1] Meanwhile, state laws de-termining the legality of sports wagering have varied from State to State. Nevada first author-ized sports wagering in 1949. SUMF ¶ 3.[2] Other States, including Delaware, Oregon, and Mon-

---

[1]  *See, e.g.*, 18 U.S.C. § 1084 (barring use of a "wire communication facility" to assist placement of bets or wagers, except when wagering is legal under state law); *id*. §§ 1952, 1955.

[2]  "SUMF" refers to Defendants' Separate Statement of Facts, submitted with this memorandum.

3

tana, have permitted sports wagering to varying degrees at various times.  SUMF ¶¶ 4-6.

In 1992, Congress enacted PASPA "to stop the spread of State-sponsored sports gambling."  S. Rep. No. 102-248, at 4.  It did not attempt to achieve this goal by prohibiting sports wagering directly.  Instead, Congress prohibited *State governments* from legalizing sports wagering:  PASPA makes it "unlawful" for "a governmental entity to sponsor, operate, advertise, promote, license, or authorize by law or compact" sports wagering activity.  28 U.S.C. § 3702.

Congress also included a patchwork of exceptions, designed to preserve the legality of sports wagering in Nevada and other States.  PASPA exempts sports wagering "in a State or other governmental entity, to the extent that the scheme was conducted by that State or other governmental entity at any time during the period beginning January 1, 1976, and ending August 31, 1990."  *Id*. § 3704(a)(1).  PASPA also gave limited permission to New Jersey to authorize sports wagering in Atlantic City, but only if an authorizing law was passed "not later than one year after the effective date" of the Act.  *Id*. § 3704(a)(3).  New Jersey did not authorize sport wagering within that one-year period.

Although PASPA's stated goal was to "stop the spread" of "State-sponsored" sports wagering, it is undisputed that the volume of sports wagering has grown.  During the twenty-year period since PASPA was enacted, the annual volume of State-sponsored sports wagering in Nevada *increased* from $1.5 to $2.9 billion.  SUMF ¶ 8.  What PASPA actually has done is, in the words of the NBA's Commissioner, given Nevada "a monopoly of types" for most forms of sports wagering.  SUMF ¶ 9.  Like many other monopolies, Nevada's is extremely profitable: Millions of people travel to Las Vegas each year from all over the world.  SUMF ¶ 14.

The volume of *illegal* sports wagering, meanwhile, dwarfs Nevada's legal market, and has grown exponentially over roughly the same period.  SUMF ¶¶ 8, 15-16.  In 1989, the illegal

sports wagering market was estimated at $50 billion, whereas recent estimates are in the range of $270 to $500 billion annually.  SUMF ¶ 15.  Illegal wagering on the NFL's Super Bowl is estimated at over $6 billion annually—more than double the total annual volume of legal sports wagering in Nevada on all sporting events.  SUMF ¶ 17.

The Internet, which was not widely available when PASPA was enacted, also has played a crucial role in the expansion of sports wagering.  The Federal Unlawful Internet Gambling Enforcement Act of 2006 generally prohibits acceptance of funds in connection with unlawful Internet gambling.  31 U.S.C. § 5363.  But, with the Leagues' *support*, the Internet Gambling Act singled out for special treatment a particular type of sports wagering activity—"fantasy sports contests"—and *permitted* such "contests" so long as they are legal under state law and meet several additional conditions set out in the law.  *See id*. § 5362(1)(E)(ix).  Notwithstanding this special treatment, fantasy sports leagues generally qualify as sports wagering because they involve risking sums of money on the outcomes of actual games and performances of players; the winner of the fantasy league often receives a financial prize at the conclusion of the season, and often that prize is the result of a pool formed by participants at the beginning of the season.  SUMF ¶ 19.  Some types of League-supported fantasy sports are therefore illegal under wagering laws in some States.[3]

With the apparent blessing of the Federal government *and* the Leagues, which actively supported this special treatment, the fantasy sports market has grown exponentially, from virtually non-existent in the early 1990s into a market that is now estimated at $5 billion per year.  SUMF ¶ 22.  Again, that is larger than the entire legal sports wagering market in Nevada.

_____

[3]  *See* Fla. Op. Att'y Gen. 91-3 (1991), *available at* 1991 WL 528146; La. Op. Att'y Gen. 91-14 (1991), *available at* 1991 WL 575105; Guide to Off-Reservation Gaming, Arizona Department of Gaming, *available at* http://www.gm.state.az.us/misc-pdf/TopGamingViolations.pdf.

**B.  The Leagues' Interactions With Sports Wagering**

Even as wagering on the Leagues' games has expanded, the Leagues themselves have flourished.  As set out in Dr. Willig's expert report, the NCAA has seen significant growth in numerous metrics—including the number of Division I basketball teams, the number of football bowl games, basketball media rights revenue, and football bowl game payouts—since PASPA's enactment.  SUMF ¶ 23.  The professional Leagues have grown too, as measured according to the number of teams, aggregate team value, attendance, total revenue, and broadcast revenue. SUMF ¶ 24.  The Leagues generate billions of dollars in revenues each year.  SUMF ¶ 24.

Because the professional Leagues recognize that some fans are more motivated to watch games when they have a financial interest in the outcome, they actively encourage fans to partic-ipate in fantasy sports.  SUMF ¶ 25.  All of the professional Leagues offer fantasy sports through League-sponsored web sites, many of which offer financial prizes or allow participants to set up their own pool to create a financial prize.  SUMF ¶ 25. ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

While the professional Leagues have encouraged fans to play fantasy sports, they gener-ally have prohibited players, officials, and other participants from wagering on the League's own games, in order to prevent match-fixing.  By all reports, the Leagues' policies work.  In profes-sional sports, there have been just two incidents of match fixing over the course of nearly a cen-tury, and both occurred more than 60 years ago. SUMF ¶ 30.  Although widespread incidents of match fixing occurred in the NCAA in 1951 and 1961, there have been no widespread incidents since; the few events that have occurred have been sporadic in nature and limited to isolated schools.  SUMF ¶¶ 31-32.  And even these few examples of match fixing all were connected to *illegal* sports wagering.  SUMF ¶¶ 30, 33. ████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████.

The factual record demonstrates that the Leagues, beyond regulating the conduct of their own players and referees, have not been particularly concerned about sports wagering. When asked why the NFL has not gathered information about levels of sports wagering, the NFL's 30(b)(6) witness referred to the NFL's $10 billion per year in revenues and explained "what we are doing seems to be working." SUMF ¶ 24. Indeed, **none** of the Leagues produced **any** studies, analyses, consumer surveys, or other evidence regarding their assertion that authorizing sports wagering in New Jersey will negatively impact fans' perceptions of the integrity of their games, or that it will otherwise harm Plaintiffs' reputation or goodwill. SUMF ¶ 94. Most of the Leagues have not studied the impact of sports wagering on fan perceptions or loyalty at all, despite the massive existing sports wagering market. ████████████████████████

████████████████████████████████████████████████████

██████████████████████████████    ███████████████████████████

████████████████████████████████████████████████████

████████████████████

Far from worrying about fans' perceptions of sports wagering, in recent years the Leagues have expanded their relationships with gambling operators and increasingly have held games in places where sports wagering is legal. SUMF ¶¶ 41-61. For example:

- ████████████████████████████████████████████████
  ████████████████████████

- Beginning in 2007, and continuing to the present, the NFL has hosted a game each year in London, where sports wagering is legal. SUMF ¶ 46.

[4] ██████████████████████████████████████████████████████
████████████████████████████████████████

- In August 2009, the NCAA changed its policies to permit NCAA championships to be hosted in States that allow some types of sports wagering.  SUMF ¶ 50.

The Leagues' changes to their official policies reflect an evolution in their subjective views about sports wagering.  As the NBA's Commissioner made clear in 2009, the NBA's previous "league policy" against sports gambling "was formulated at a time when gambling was far less widespread—even legally. . . . But having said that, it's now a matter of national policy: Gambling is good."  SUMF ¶ 11.

## C.  New Jersey's Sports Wagering Law

Against this backdrop, New Jersey moved last year to allow State-regulated (and taxable) sports wagering operators in Atlantic City and at the racetracks to compete with sports wagering operators in Nevada.  Following approval of an amendment to the State Constitution, the State Legislature authorized sports wagering in casinos and racetracks that obtain licenses from the State permitting such activity.  *See* N.J.S.A. § 5:12A-1 *et seq.* ("the Sports Wagering Law").

New Jersey has since promulgated regulations to ensure that legal sports wagering in New Jersey is closely monitored and regulated.  *See* 44 N.J.R. 2374(a).   Among other things, the regulations authorize examination of accounts and records by state officials, *id*. § 13:69N-3.1(d); mandate production of reports on sports wagering, *id*. § 13:69N-3.1(a); prohibit placing a bet on behalf of another person, *id*. § 13:69N-2.1; and prohibit wagering by individuals under 21 years old, *id*. § 13:69N-2.2(f).  In addition, casinos or racetracks offering sports betting are required to "file with the Division [of Gaming Enforcement] internal controls for all aspects of sports wagering operations," and "shall not commence sports pool wagering until internal controls have been approved by the Division."  *Id*. § 13:69N-1.11.

## D.  Plaintiffs' Lawsuit Challenging New Jersey's Law

Without waiting to judge the effectiveness of New Jersey's regulations, the Leagues filed

8

this facial challenge, seeking a declaration that the Sports Wagering Law and accompanying reg-

ulations "violate PASPA," as well as an injunction barring Defendants from implementing them.

Compl. ¶ 35.  Three days later, the Leagues filed for summary judgment.  Dkt. 10.

In their Complaint, the Leagues asserted that New Jersey's law would harm them in two

ways: (1) by increasing the risk of match-fixing and thereby "threaten[ing] the integrity" of their

games; and (2) by "fostering suspicion that individual plays and final scores of games may have

been influenced by factors other than honest athletic competition."  Compl. ¶¶ 5-6.  In addition,

the Leagues asserted that PASPA "explicitly gives amateur and professional sports organizations

standing."  Compl. ¶ 18 (citing 28 U.S.C. § 3703).

When Defendants moved to dismiss the Complaint for lack of standing, the Leagues re-

sponded by disclaiming any reliance on the first alleged harm as a "misunderstanding."  Dkt. 39,

at 20.  Instead, the Leagues relied on a reformulated version of the second theory alleged in their

Complaint—"concerns that state-sponsored sports gambling has an adverse impact on their com-

petitive sporting events and their relationship with their fans."  Dkt. 39, at 10.  After Defendants

pointed out in their motion to dismiss that Congress lacks authority to confer standing by statute,

the Leagues also reformulated their theory that PASPA itself gives them standing; the Leagues

argued that PASPA granted them a "statutory right" to be free of the spread of State-sponsored

gambling, and that they had standing to seek to vindicate that "right."  Dkt. 39, at 12.

While the parties were briefing Defendants' motion to dismiss, Defendants sought dis-

covery to probe behind the Leagues' allegations of harm.  The Leagues opposed discovery, argu-

ing that PASPA and the Leagues' own subjective beliefs about their alleged harms should suf-

fice.  This Court rejected that argument and ordered that discovery could proceed.

During discovery, the Leagues, once again, reformulated their standing argument, now

adopting three separate theories.  First, many of the Leagues' witnesses reverted to their already-abandoned theory that the Sports Wagering Law will increase the risk of match fixing.  SUMF ¶ 72.  Second, the Leagues repeated their assertion that fans will perceive match fixing is occurring, even if it is not.  SUMF ¶ 72.  Third, the Leagues asserted that New Jersey's Sports Wagering Law will undermine the bonds of loyalty between fans and teams, by causing fans to root based on financial self-interest rather than team loyalty.  SUMF ¶ 72.  The Leagues' witnesses testified that these theories are not on based on any studies, surveys, or analyses, but rather are based on subjective "beliefs," "concerns," "experience," and "common sense."  SUMF ¶¶ 74-76, 82, 94, 103.

## LEGAL STANDARD

A defendant moving for summary judgment may meet its burden by "pointing out . . . an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  And, once the defendant has met that burden, the plaintiff must respond with something more than "metaphysical doubt."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In this respect, "summary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

## ARGUMENT

## I.  The Leagues Lack Standing To Challenge New Jersey's Sports Wagering Law

### A.  The Leagues Have Failed To Satisfy Their Burden To Come Forward With Facts Demonstrating That They Immediately Will Suffer A Concrete Injury Fairly Traceable To The Sports Wagering Law

Article III of the Constitution requires a plaintiff to demonstrate a "concrete and particularized" injury that is (1) "actual or imminent, not conjectural or hypothetical," (2) "fairly tracea-

ble to the challenged action of the defendant," and (3) "likely" to be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks and alterations omitted).  The Leagues have asserted that they have no obligation to establish that gambling will cause them cognizable injury, and that the burden instead ought to rest on New Jersey to establish that injury will not occur.  *See, e.g.,* SUMF ¶ 76 ("[T]he burden of proof, to me, ought to be on those who are legalizing gambling . . . .");  ████████████████████ ████████████████████████████████████████████████████████████████████  But, to the contrary, the law is clear that the burden to establish standing rests squarely on the party invoking the jurisdiction of the Court—here, **the Leagues**.  *See, e.g.*, *Joint Stock Soc'y v. UDV N. Am., Inc.*, 266 F.3d 164, 175 (3d Cir. 2001) (Alito, J.) ("The party invoking federal jurisdiction bears the burden . . ." (quoting *Lujan*, 504 U.S. at 561)).

Nevertheless, the Leagues have maintained that they "need not provide proof" that the Sports Wagering Law "will be detrimental to their interests."   Dkt. 39, at 1-2.  In depositions, the Commissioners repeatedly disclaimed *any* obligation to proffer a factual foundation for their fears of injury, relying instead on their subjective opinion that ██████████████████  as well as their "view" that gambling is a "threat."  SUMF ¶ 74.  But at summary judgment, "proof" of injury is exactly what the Leagues are required to provide.  The Leagues "can no longer rest on . . . mere allegations of injury," *Pa. Prison Soc'y v. Cortes*, 508 F.3d 156, 162 (3d Cir. 2007); nor can they survive by simply "replac[ing] conclusory allegations of the complaint . . . with conclusory allegations of an affidavit," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).  They instead must set forth "specific facts" sufficient to allow this Court to conclude that the requirements of Article III have been satisfied.  *Pa. Prison Soc'y*, 508 F.3d at 162; *see also Maldonado v. Ramirez*, 757 F.2d 48, 51 (3d Cir. 1985) (surviving summary judgment requires "facts, rather

than opinions or conclusions"; statements that are "essentially conclusory and lacking in specific facts" are "inadequate").[5]

Through discovery, the Leagues have articulated three distinct theories of injury: (1) that New Jersey's law will cause an increase in sports wagering, which will in turn cause an increase in match fixing; (2) that the Leagues' reputation will be harmed because fans will believe match fixing is occurring, even if it is not; and (3) that increased prevalence of sports wagering will undermine fan loyalty by causing fans to root on the basis of self-interest. *See supra* p. 10 (citing deposition transcripts).[6]  Each of these theories is speculative, implausible, and counterfactual, and the Leagues advanced no evidence that would allow a factfinder to conclude that any of them imminently will occur as a result of New Jersey's legalization of sports wagering.

### 1.   The Sports Wagering Law Will Not Cause An Increase In Match Fixing

Although the Commissioners now express concern that the Sports Wagering Law could lead to an increase in match fixing, the Leagues previously disclaimed as a "misunderstanding" any reliance on this theory.  *See* Dkt. 39, at 20.  And for good reason.

---

[5]  The Leagues also cannot circumvent Article III by pointing to similar conjecture in PASPA's legislative history.  *See* Dkt. 43, at 3-5.  Such material is legally and factually irrelevant:  Just as Congress cannot avoid the requirements of Article III by statute, it cannot do so through a committee report.  In any event, Congressional findings made in 1992 bear no logical relation to the existence of an injury claimed to be suffered in 2012.  Beyond that, as detailed in Defendants' objections to the Leagues' Statement of Undisputed Material Facts, the legislative history and similar documents are inadmissible hearsay and therefore cannot be considered at summary judgment.  *See, e.g.*, *Bright v. Firestone Tire & Rubber Co.*, 756 F.2d 19, 22 (6th Cir.1984) (per curiam); *Anderson v. City of New York*, 657 F. Supp. 1571, 1579 (S.D.N.Y.1987).

[6]  In depositions, the NFL Commissioner also expressed concern that gambling operators might trade on the League's goodwill, and the President of the NCAA expressed concern that student athletes might suffer harm if persuaded to engage in sports wagering.  These concerns were not alleged in the Leagues' complaint and therefore cannot be their basis for standing in this action.  Beyond that, the NFL's claim is foreclosed by *NFL v. Governor of Del.*, 435 F. Supp. 1372 (D. Del. 1977).  *See also* Dkt. 43, at 2 n.1.  The NCAA's expressed concern for student-athletes does not allege an injury *to the NCAA*, and the NCAA cannot invoke the potential injuries of non-members to establish its standing to sue.  *See Summers*, 555 U.S. at 498.

a.  The Leagues Have Presented No Evidence That Match Fixing Will Increase

The Leagues have never pointed to *any* evidence to carry their burden to establish that legalizing sports wagering in New Jersey would increase the volume of sports wagering (as opposed to simply shifting wagering from unregulated, illegal venues to highly regulated and transparent legal venues), or that any hypothetical increase would lead to an increase in match fixing. When specifically asked to articulate a factual basis for this concern, the Leagues' witnesses proved unable to do so; the NCAA's 30(b)(6) witness, for instance, claimed only to be "relying on conversations and my job responsibilities."  SUMF ¶ 82; *see also id.* ¶¶ 76, 82 (citing deposition testimony).  This first theory of injury is thus entirely without support in the record.

b.  Undisputed Facts Demonstrate That Match Fixing Will *Not* Increase

Uncontroverted evidence demonstrates that this theory of injury is not just conjectural, but also deeply implausible.  Although both legal and illegal sports wagering has increased in prevalence over time, the prevalence of match fixing has not:  Incidents of match fixing have been rare or non-existent, and if anything have grown less frequent. *See supra* pp. 6-7.

There is no reason to think that legalizing and regulating sports wagering in New Jersey would change this state of affairs.  An individual inclined to engage in match fixing would have obvious reasons to prefer an illegal betting operation, including a greater likelihood of avoiding detection by police and the Leagues.  SUMF ¶ 84.  For this reason, every incidence of match fixing identified by the Leagues has involved bets placed through *illegal* sports wagering operations.  SUMF ¶ 30-33.[7]  And even if an individual did for some inconceivable reason prefer to use a transparent, regulated, and legal betting operation, such an individual could take advantage

---

[7]  One single NCAA match fixing scandal involved *both* legal and illegal bets.  SUMF ¶ 33. That incident hardly demonstrates that the availability of legal sports wagering in New Jersey is likely to increase the incidence of match fixing, particularly as the Leagues have been unable to point to *any* other incident involving legal wagering.

of substantial betting operations that *already* are legal in Nevada.  SUMF ¶ 87.

Indeed, assuming it has any effect, shifting a portion of the sports wagering market from illegal to tightly regulated venues is likely to decrease—not increase—the incidence of match fixing.  The history of state lotteries is instructive:  After lotteries were legalized, beginning in 1964, "numbering games" dominated by organized crime largely disappeared.  SUMF ¶ 91.  A similar evolution in the field of sports wagering would drive gamblers to legal venues, where those wishing to engage in match fixing are most likely to be detected.  SUMF ¶ 85; *see also* SUMF ¶¶ 34-37.  When asked about the opinion of the former chairman of Nevada's Gaming Control Board (who also served as a member of the National Gambling Impact Study) that the existence of legal sports wagering in Nevada has "assisted athletic leagues in their enforcement activities aimed at preventing game fixing," the President of the NCAA did not disagree.  SUMF ¶ 93 ("I have no reason to believe that his opinion is better or worse than anybody else's.").

c.   Any Increase In Match Fixing Would Be Caused By The Actions Of The Leagues' Own Representatives And Employees

Finally, any harm that could occur to the Leagues as a result of match fixing would result from corrupt behavior on the part of the Leagues' *own representatives and employees*.  *See* Dkt. 29, at 16-19 (citing and discussing cases).  The purported harm, in other words, would be "a 'self-inflicted harm' not fairly traceable to the challenged government action."  *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 177 (D.C. Cir. 2012).  This is particularly so given that their alleged injuries would be precipitated by the "intervening criminal acts" of their own agents.  *Alston v. Advanced Brands & Importing Co.*, 494 F.3d 562, 565 (6th Cir. 2007); *see also* 18 U.S.C. § 224(a).  The law precludes the Leagues from manufacturing a justiciable controversy based on speculation that their own players and employees will break the law.

14

## 2. The Leagues' Individual Concerns About Negative Fan Perceptions Do Not Prove a Cognizable Injury

The Commissioners' second alleged injury—that, even if increased match fixing does not occur, fans will believe it is going on—is as befuddling as it is conjectural and implausible.

### a. The Leagues Have Presented No Evidence Demonstrating That Legalization of Sports Wagering In New Jersey Is Likely To Injure the Leagues' Reputations Among Their Fans

The record provides no basis for a conclusion that the Leagues have met their burden to demonstrate that the Sports Wagering Law will cause reputational harm.  Indeed, when pressed to articulate a factual basis for this theory of injury, the Commissioners once again were unable to do so.  SUMF ¶ 94 (citing deposition testimony).  ███████████████████████

███████████████████████████████████████████████████████████

████████████████  And, when asked whether the percentage of the public perceiving NBA games to be tainted by match fixing would increase, ████████████████████████

████████████████ █████████████████████████ ██████ ████████████

██████████████████████████, this Court likewise cannot find that the Leagues have carried their burden to establish standing.

### b. The Undisputed Facts Demonstrate That The Sports Wagering Law Will *Not* Inflict Reputational Injury

Notwithstanding Plaintiffs' unsupported speculation—which by itself does not give rise to a genuine factual dispute—the actual evidence in this case ***refutes*** the Leagues' concerns about negative fan perceptions.  The previous half-century has seen steadily rising volume of legal and illegal sports wagering.  *See supra* pp. 4-5.  Yet the Leagues have flourished.  SUMF ¶ 24 (citing deposition testimony).  Or, as the NFL's 30(b)(6) witness explained, "[w]e've done better each year."  SUMF ¶ 24.  ███████████████████████ ████████████████ b██████

███████████████████████████████████████████████████████████

████████████████████████████████████████████ ██

████████████████████████████████

The Leagues' own conduct demonstrates that they do not perceive a danger of reputational harm from association with sports betting.  In December 2009, NBA Commissioner David Stern referred to nationally legalized gambling as a "possibility" that may be a "huge opportunity."  SUMF ¶ 10.  Consistent with this statement, the Leagues allow sporting events to be held where sports wagering is legal and the record is replete with instances of the Leagues permitting their games to be sponsored by or otherwise associated with gambling activities.  *Supra* pp. 7-8.

      c.  <u>The Leagues Have Not Demonstrated That They Would Suffer Concrete Consequences As A Result Of Their Claimed Reputational Injury</u>

Even imagining the Leagues could demonstrate a likelihood that New Jersey's Sports Gambling Law would affect fans' perceptions of the Leagues (which they cannot), the Leagues have not brought forth any evidence showing that these changes would be likely to injure the Leagues in a ***concrete*** way.  *See* Dkt. 43, at 5-7 (citing cases).  Courts have never found that a change in perception alone can satisfy Article III; otherwise, litigants could manufacture standing simply by averring their own, wholly subjective, belief that a legislative enactment will alter how they are perceived.  *See, e.g.*, *Alamo v. Clay*, 137 F.3d 1366, 1370 (D.C. Cir. 1998) (no standing because plaintiff failed to show that "stigma" would have "detrimental consequences").  Yet the Leagues have not even alleged, much less proven with evidence, that alteration in fans' perceptions would result in a real injury felt by the Leagues.  If anything, record evidence of the Leagues' prosperity in the face of widespread sports wagering demonstrates the contrary.[8]

---

[8]  The cases cited by the Leagues are not to the contrary.  In *Doe v. Nat'l Bd. of Med. Exam'rs*, 199 F.3d 146 (3d Cir. 1999), plaintiff was injured by the possibility that he might be perceived as disabled only because being so perceived would give rise to a risk "based in reality" of discrimination.  *Id.* at 153.  *See* Dkt. 43, at 6.

      d.  The Leagues' Hypothetical Reputational Injury Would Not Be Fairly
          Traceable To The Sports Wagering Law

Finally, the Leagues have never offered any satisfactory explanation of how their hypothetical reputational injury could be fairly traced to the Sports Wagering Law. *See* Dkt. 29, at 19-20 & n.3; Dkt. 43, at 3 n.2 (citing cases). Any hypothetical harm sports wagering possibly could inflict has *already* been inflicted by the existing, multi-hundred-billion dollar sports betting market. The Leagues point to absolutely no reason to believe that the Sports Wagering Law would change fans' perceptions of the prevalence of match-fixing.

In fact, the Leagues' asserted reputational "concern" may only be *heightened* if sports wagering continues to take place in illegal, unregulated venues, where betting is more likely to be associated in the public mind with criminal behavior, rather than in New Jersey's tightly regulated and transparent venues; any contrary suggestion by the Leagues is guesswork, at best, and cannot satisfy the Leagues' burden to show that it is "likely, as opposed to merely speculative," that an injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 561.[9]

    **3.  The Sports Wagering Law Will Not Damage The Relationship Between Fans
       And Teams**

Finally, the Commissioners suggested the Sports Wagering Law will undermine the bonds of loyalty between fans and teams, by causing fans to root on the basis of self-interest. This theory once again lacks factual support and is, indeed, flatly contradicted by the record.

---

[9] The Leagues' only response to this concern is to cite *Massachusetts v. EPA*, 549 U.S. 497 (2007), but that case is a world away from the circumstances presented here. *EPA* stands for the proposition that the government may attack a problem in pieces; the Court thus found standing even though regulating emissions of U.S. automobiles would make only an incremental contribution to combatting global warming. Here, however, the law the Leagues seek to enforce makes no effort to attack sports betting in "pieces"; instead, it *preserves* sports betting so long as it occurs in Nevada and a handful of other States. And, there is no reason to think that invalidating New Jersey's law will have *any* salutary effect—even an incremental one—on the "concern" of the Leagues regarding the impact of sports betting on public perception of their games.

a.   The Leagues Have Put Forth No Evidence Establishing That This Claimed
Injury Is Likely To Occur

When asked to explain the factual basis for this final theory of injury, the Commissioners

again turned to their own speculation about "human nature," without any studies, analyses, sur-

veys, or other evidence.  SUMF ¶ 103.  But there is no inherent inconsistency between a fan

rooting for "his team" to win and the same fan hoping to win his wager on that game—or even

more obviously, his wager on some other game, or some other sport.  The Commissioner of the

NFL, attempting to explain this lack of evidence, stated that the NFL does not "do studies on

common sense."  SUMF ¶ 103.  The Commissioner of the NBA, meanwhile, ███████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████  The Leagues cannot carry their burden

to establish standing through vague and counterintuitive statements regarding "common sense."

b.   The Undisputed Facts In The Record, Including The Leagues' *Own* Promotion
Of "Fantasy" Sports, Demonstrate That This Injury Will Not Occur

The record evidence instead demonstrates that the Leagues' asserted harm is ***not*** likely to

occur.  The Leagues fail to reconcile their theory of injury with the current existence of a multi-

hundred-billion dollar sports wagering industry.  Fans who are inclined to give themselves a fi-

nancial stake in the outcome of a game already have any number of outlets to do so, including

legal betting in Las Vegas, "fantasy" sports, illegal online betting, other illegal venues, and in-

formal betting with acquaintances.  Yet the Leagues provide no evidence whatsoever that these

existing financial incentives have degraded the bonds of loyalty between fans and teams.  The

most-watched sporting event in the United States is the Super Bowl, but that event is also the

subject of significant sports wagering, including illegal wagering estimated at $6 billion annual-

ly.  SUMF ¶ 17.  And, notwithstanding the prevalence of betting on the NCAA's "March Mad-

ness" basketball championship tournament (estimated at $2.5 billion annually), that tournament

18

has grown dramatically in popularity, with the value of TV rights sold by the NCAA rising form an inflation-adjusted $35 million in the early 1980s to approximately $770 million today.  SUMF ¶ 18.  The NCAA evidently recognizes the value of the March Madness betting phenomenon; it has sanctioned the development of a March Madness application for Facebook and links to an online bracket application that may be used to set up betting pools.  SUMF ¶ 18.  And it has done so all while labeling the participation in March Madness pools with entry fees as sports gambling and prohibiting such participation by its student athletes, coaches, and officials.  SUMF ¶ 19.

The Leagues themselves also provide an additional means for fans to become financially interested in the outcome of the Leagues' games through so-called "fantasy" sports leagues.  The "fantasy" leagues strongly resemble—and are sometimes indistinguishable from—traditional sports wagering activities.  SUMF ¶ 19.  For instance, the NBA co-sponsors a fantasy league that is functionally indistinguishable from sports wagering and that allows participants to pay an entry fee to compete against unknown competitors for financial pay-offs; the MLB website offers fans an opportunity to win $5.6 million by predicting which players will get a hit in a game; and the NFL promotes a game on its website whereby fans predict the score of a game and compete to win a trip to the Pro Bowl.  SUMF ¶ 19.

Having promoted "fantasy" sports, the Leagues hardly can be heard to argue that analogous sports wagering activities will cause them injury.  To the contrary, the Leagues' embrace of and profit from sports wagering in the form of "fantasy" sports suggests that legalizing sports wagering in New Jersey would, if anything, ***promote*** fan interest in the Leagues' sporting events.  The Leagues promote "fantasy" sports because they have found that such financial incentives only increase fans' involvement and interest in their games.  For example, the Commissioner of the NBA testified that ███████████████████████████████████████████████

██████████████████████████████████ The NFL has con-
cluded that participation in fantasy sports can "enhance our fan experience and increase the loy-
alty of our fans."  SUMF ¶ 25.  Independent empirical studies likewise have found an association
between participation in fantasy sports and greater consumption of sporting events—in person,
on TV, and over the internet.  SUMF ¶ 25.  And, similarly, sports and sports wagering are con-
sidered "complementary" goods, meaning those who engage in sports wagering are more likely
to also be interested in the Leagues' sporting events.  SUMF ¶ 104.[10]

       c.   <u>The Leagues Cannot Show That This Hypothetical Injury Is Traceable To De-
            fendants, Or Likely To Be Suffered Imminently</u>

Even imagining the opposite is true, and sports wagering will decrease fan loyalty—a
proposition for which the Leagues have provided no support, and which is contradicted by the
undisputed facts and the Leagues' own conduct—the Leagues never explain how this harm could
be traced to the Sports Wagering Law, as opposed to the existing sports wagering market, or the
Leagues' own promotion of fantasy sports.  *See supra* p. 17.

And, there is no reason to think that the Leagues will suffer this or any other harm ***immi-
nently***, as Article III requires.  *See* Dkt. 29, at 10 (citing cases).  The Third Circuit has instructed
that a "threatened injury must be certainly impending, and proceed with a high degree of imme-
diacy."  *McCray v. Fidelity Nat'l Title Ins. Co.*, 682 F.3d 229, 243 (3d Cir. 2012) (quotation
marks omitted).  Given the absence of any demonstrated harm from existing sports wagering, the
Leagues cannot meet their burden to establish that injury is "certainly impending" with "a high
degree of immediacy" because of the Sports Wagering Law.

---

[10]  The Leagues have argued that their sponsorship of fantasy gambling is irrelevant because
Congress has legalized such gambling activity.  But the Leagues have never explained why con-
gressional approval of sports wagering would alter its impact on fan relationships.  The notion
that a fan's relationship with the Leagues would be affected differently if he made a regulated
wager in New Jersey rather than Nevada is insupportable.

**B. PASPA Cannot, And Does Not, Circumvent Article III's Standing Requirement**

Unable to provide the factual support necessary to satisfy Article III, the Leagues assert that this Court's jurisdiction may rest on the fact that "Congress prohibited the spread of state-sponsored gambling and granted sports organizations the right to enjoin such gambling on their own events." Dkt. 39, at 11. This, however, conflates the creation of a statutory cause of action with the requirement that a plaintiff demonstrate Article III standing.

Both the Supreme Court and the Third Circuit have affirmed that the jurisdictional limitations imposed by Article III cannot be eliminated by congressional fiat. *See* Dkt. 29, at 21-22 (citing cases); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009) ("[T]he requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute."); *Doe*, 199 F.3d at 152 (1999) (the "proper analysis of standing" should focus "on whether the plaintiff suffered an actual injury, not on whether a statute was violated"). Against this authority, the Leagues cite to cases establishing a distinct and, in this case, irrelevant proposition: specifically, that where Congress establishes a statutory right, *the deprivation of which affects a party in a concrete and particularized way*, such deprivation can constitute Article III injury. *See* Dkt. 39, at 12-14. This second principle permits Congress to "creat[e] legal rights, the invasion of which creates standing," *Warth v. Seldin*, 422 U.S. 490, 500 (1975), but ***only*** where "Congress[ ] elevat[es] to the status of legally cognizable injuries concrete, *de facto* injuries." *Lujan*, 504 U.S. at 578; *see also* Dkt. 29, at 22-24 (discussing cases); Dkt. 43, at 8-10 (same). This principle cannot excuse the Leagues from their obligation at the summary judgment stage to demonstrate concrete, *de facto* injury.

Moreover, contrary to the Leagues' suggestion, PASPA grants no "right" to the Leagues at all, apart from the right to sue to enforce its provisions. *See* Dkt. 43, at 10-11. PASPA pro-

hibits certain States from authorizing a sports "wagering scheme," 28 U.S.C. § 3702, but it does

not obligate those States to take or withhold any action **with respect to the Leagues**.  By none-

theless claiming standing based on a violation of PASPA's broad "Federal policy" against sports

gambling, the Leagues seek to accomplish what even they acknowledge Article III does not per-

mit: "convert[ing] the undifferentiated public interest in executive officers' compliance with the

law into an 'individual right' vindicable in the courts."  Dkt. 39, at 13 (quoting *Lujan*, 504 U.S.

at 577).  The Leagues claim an "interest" in challenging state laws that authorize sports betting,

and yet that "interest" is not tied to any substantive right guaranteed by Congress, much less any

**concrete** injury actually or imminently suffered by the Leagues.  This Court lacks jurisdiction.[11]

## II.  The Professional And Amateur Sports Protection Act Is Unconstitutional

Even beyond the Leagues' failure to muster facts satisfying their burden to prove stand-

ing, their suit fails because PASPA, on which it is predicated, violates the U.S. Constitution.[12]

In *Northwest Austin Municipal Utility District Number One v. Holder*, the Supreme Court

noted the "fundamental principle" that "all the States enjoy 'equal sovereignty.'"  557 U.S. 193,

---

[11]  Even if this Court were to accept the Leagues' testimony about their beliefs and concerns as competent evidence of harm (which it is not), **at most** that evidence gives rise to a factual dispute as to this Court's jurisdiction; in that event, the Court should set an evidentiary hearing to resolve the factual dispute.  *Bischoff v. Osceola Cnty.*, 222 F.3d 874, 879 (11th Cir. 2000) ("[A] district court cannot decide disputed factual questions or make findings of credibility essential to the question of standing on the paper record alone but must hold an evidentiary hearing."); *see also Pa. Prison Soc'y v. Cortes*, 622 F.3d 215, 227 (3d Cir. 2010).

[12]  Pursuant to Fed. R. Civ. P. 5.1, Defendants have filed concurrently a notice of a constitutional question and served a copy on the U.S. Attorney General.  This Court must allow the Attorney General at least 60 days to decide whether to intervene in this action, during which time, the Court "may not enter a final judgment holding the statute unconstitutional."  Fed. R. Civ. P. 5.1. The Court, however, can immediately resolve this case on the jurisdictional grounds advanced by Defendants, namely that the Leagues have failed to demonstrate their Article III standing to sue. Indeed, Article III **requires** this Court "to satisfy itself of its jurisdiction over the subject matter before it considers the merits of [this] case."  *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999).  This obligation applies with particular force where resolution of the merits requires the Court to pass upon the constitutionality of an Act of Congress.  *See Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 341-344 (1936) (Brandeis, J. concurring).

203 (2009) (quoting *United States v. Louisiana*, 363 U.S. 1, 16 (1960)).  By requiring New Jersey to maintain and enforce bans on sports wagering while allowing other States to regulate and profit from sports wagering as they see fit, PASPA violates this "fundamental principle." And because this disparate regulation cannot be explained by the existence of localized issues, PASPA exceeds Congress's powers under the Commerce Clause and violates even the low threshold for economic regulation set by the Due Process and Equal Protection Clauses.

But even more obviously, PASPA commandeers state legislative and police powers by forcing States to prohibit sports wagering, thereby violating the Tenth Amendment.  PASPA does not seek to curtail sports wagering by directly prohibiting such activity in some or all States.  Instead, it mandates that certain *States* not "authorize by law or compact" sports wagering and thereby requires those same *States* to maintain and enforce their pre-existing bans on sports wagering.  The Tenth Amendment, under established precedent, does not permit the federal government to "commandeer" state legislative and enforcement functions in such a manner.

### A. PASPA Violates the Anti-Commandeering Principle of *New York v. United States*

#### 1. By Freezing Preexisting State Bans on Sports Wagering, Section 3702(1) Unconstitutionally Commandeers State Legislatures

1.  As the Supreme Court repeatedly has held, the structure of the Constitution—and, in particular, its affirmation of "the integrity, dignity, and residual sovereignty of the States," *Bond v. United States*, 131 S. Ct. 2355, 2364 (2011)—imposes constraints on the means by which the federal government may implement otherwise permissible policy choices.  Those constraints are reflected in the Tenth Amendment, which "confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States."  *New York v. United States*, 505 U.S. 144, 156 (1992).

One of the critical limits on the federal government's exercise of power is that "Congress

23

may not simply 'commandee[r] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program.'"  *New York*, 505 U.S. at 161 (quoting *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 288 (1981)).  That is because "[w]hile Congress has substantial powers to govern the Nation directly, including in areas of intimate concern to the States, the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions."  *Id.* at 162; *see also New Jersey v. United States*, 91 F.3d 463, 466-67 (3d Cir 1996).  This limitation applies "even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts."  *New York*, 505 U.S. at 166.

PASPA flouts this limitation.  The principal function of the statute is "to require States to govern according to Congress' instructions."  *Id.* at 162.  PASPA does not merely prohibit individuals from betting, or institutions from running sports-betting operations; instead, its central command is that no covered ***State*** may "authorize"—*i.e.*, legalize—sports betting.  28 U.S.C. § 3702(1).  This mandate that States maintain a ban on sports betting is indistinguishable from a federal law requiring States to enact laws prohibiting sports betting.  After all, a requirement that a State keep a preexisting regulatory regime in place "directly . . . compel[s] the States to require or prohibit [certain] acts" just as much as a mandate to pass a new law.  *New York*, 505 U.S. at 166.  And now that New Jersey has authorized sports wagering, the Leagues effectively seek an injunction requiring New Jersey to re-implement its former prohibition—relief indistinguishable from a classic commandeering.  *See* Compl., at 10-11 (seeking, *inter alia*, to enjoin Defendants from authorizing sports gambling).

This is a far easier case than *New York v. United States*, the seminal case in which the Supreme Court invalidated a federal law because it impermissibly commandeered the States' leg-

24

islative process.  In *New York*, a federal law required a State either to "'provide for the disposal of [radioactive] waste'" within its borders or to "'take title to the waste.'"  *Id.* at 153–54 (quoting 42 U.S.C. § 2021e(d)(2)(C)).  The law did not require the States to keep laws on their books under threat of injunction; it merely required that States assume liability for radioactive waste within their borders if they chose not to provide for its disposal by law.  *Id.* at 174-75.  The Supreme Court held that the statute unconstitutionally commandeered the States' legislative process.

Observing that "the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions," *New York* held that Congress lacked authority to direct State governments either to "regulat[e] pursuant to Congress's direction" or to "become liable for the . . . damages" caused by the radioactive waste.  *Id.* at 162, 175–76.  "Because an instruction to state governments to take title to waste, standing alone, would be beyond the authority of Congress, and because a direct order to regulate, standing alone, would also be beyond the authority of Congress, it follows that Congress lacks the power to offer the States a choice between the two."  *Id.* at 176.  The challenged statute, the Court explained, "'commandeer[s] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program,'" and was accordingly outside Congress's constitutional authority.  *Id.* (quoting *Hodel*, 452 U.S. at 288) (internal citation omitted).

Like the statute invalidated in *New York*, PASPA "offers a state government no option other than that of implementing legislation enacted by Congress."  *New York*, 505 U.S. at 177.  But it does so even more directly:  A State, unless Congress favored it in PASPA, ***must*** continue to prohibit sports wagering on threat of injunction and accompanying contempt sanctions.  This is as straightforward a case of legislative commandeering as one could imagine.  Congress has unabashedly "mandate[d] state regulation."  *Id.* at 179.  *See also Printz v. United States*, 521 U.S.

898, 912 (1997) ("[S]tate legislatures are *not* subject to federal direction."); *id.* at 975 (Souter, J.,

dissenting) ("Congress may not require a state legislature to enact a regulatory scheme . . . .").

As the Supreme Court has recognized, the principal problem with commandeering state

legislative power is that it takes the machinery of state government away from the control of

state residents.  Under our federal system, if citizens of a State "do not consider that making pro-

vision for the disposal of retroactive waste is in their best interest, they may elect state officials

who share their view."  *New York*, 505 U.S. at 168.  While "[t]hat view can always be pre-

empted under the Supremacy Clause if it is contrary to the national view," that would require

"the Federal Government [to] make[] the decision in full view of the public."  *Id.*  The State then

may "choose to have the Federal Government rather than the State bear the expense of a federal-

ly mandated regulatory program," and "it will be federal officials that suffer the consequences if

the decision turns out to be detrimental or unpopular."  *Id.*  In that way, "state governments re-

main responsive to the local electorate's preferences; state officials remain accountable to the

people."  *Id.*  PASPA subverts this accountability.  *Id.*

In New Jersey itself, gambling has been successfully regulated for decades; legalization

of sports wagering could boost the local economy with the added benefits of regulating and tax-

ing a pre-existing black market and otherwise recapturing revenue streams driven by PASPA to

Nevada.  Yet if PASPA forced New Jersey to invalidate its extremely popular Sports Gambling

Law, "it may be state officials who will bear the brunt of public disapproval, while the federal

officials who devised the regulatory program may remain insulated from the electoral ramifica-

tions of their decision."  *New York*, 505 U.S. at 169.  This is particularly so because PASPA not

only diverts a potentially significant source of revenue for New Jersey to Nevada, but also forces

New Jersey to "absorb the financial burden of implementing a federal regulatory program."

*Printz*, 521 U.S. at 930.  Indeed, the Senate Committee Report observed that PASPA would re-

sult in "no cost to the federal government" at all.  *See* S. Rep. No. 102-248, at 11.  Thus, under

PASPA, "Members of Congress can take credit for 'solving'" the supposed "problems" associat-

ed with sports gambling while sticking unwilling States with the bill.  *Printz*, 521 U.S. at 930.  It

is hard to imagine a more effective tool to undermine fiscal accountability.

  2.  The Leagues advance only a token argument that PASPA is consistent with these fed-

eralism principles, relying on inapposite Third Circuit precedent providing that "there can be no

violation of the Tenth Amendment" where Congress acts pursuant to one of its enumerated pow-

ers, such as the Commerce Clause.  Mot. at 14 (quoting *United States v. Parker*, 108 F.3d 28, 31

(3d Cir. 1997)).  Yet *New York* itself holds that the anti-commandeering principle is an inde-

pendent limit on Congress's enumerated powers.  Accordingly, the Court invalidated the statute

even though the state officials did "not contend that Congress lack[ed] the power to regulate" the

disposal of radioactive waste.  *New York*, 505 U.S. at 159-60; *id.* at 166 (even though the Com-

merce Clause "authorizes Congress to regulate interstate commerce directly[,] it does not author-

ize Congress to regulate state governments' regulation of interstate commerce").  The Third Cir-

cuit recognized as much in *Treasurer of N.J. v. U.S. Dep't of the Treasury*, 684 F.3d 382 (3d Cir.

2012).  It explained *New York* as holding that the mere act of Congress commandeering a State's

governing function "exceed[s] Congress's powers under Article I of the Constitution."  *Id.* at

404.  Thus, when Congress impermissibly commandeers state regulatory powers, it is *not* validly

acting pursuant to its enumerated powers under the Commerce Clause.

  The Leagues likewise misread the Third Circuit's decision in *Markell*.  Delaware's feder-

alism argument in that case was one of statutory interpretation, not one based on *New York* or

*Printz*.  This is evident from Delaware's brief, and from a citation the Leagues omit from their

block quotation, which explains that "absent an unmistakably clear expression to alter the usual constitutional balance between the States and the Federal Government, [courts] will interpret a statute to preserve rather than destroy the States' substantial sovereign powers." *Markell*, 579 F.3d at 303 (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460-61 (1991)); *see also* Appellees' Answering Brief in Opposition to Appellants' Appeal of the Denial of Their Motion for a Preliminary Injunction, *Office of the Comm'r of Baseball v. Markell*, 2009 WL 5635556.  Delaware did not, as New Jersey does here, invoke the Supreme Court's decisions in *New York* and *Printz* to make a constitutional argument; and New Jersey does not invoke "generalized notions of 'state sovereignty'" as a tool of statutory interpretation. *Cf. Markell*, 579 F.3d at 303.

Delaware's failure to raise an anti-commandeering argument is unsurprising given that the argument was not implicated in that case.  The Delaware statute authorized only ***State-run*** sports-betting operations. *See id.* at 301.  A statute that merely "regulate[s] state activities,' rather than 'seek[ing] to control or influence the manner in which States regulate[ ] private parties,'" does not violate the anti-commandeering principle. *Reno v. Condon*, 528 U.S. 141, 151 (2000) (quoting *South Carolina v. Baker*, 485 U.S. 505, 514–15 (1988)) (second alteration in *Reno*).  Application of PASPA to a state-operated lottery or sports-betting scheme does "not require [a state] Legislature to enact any laws or regulations, and it does not require state officials to assist in the enforcement of federal statutes regulating private individuals." *Id.*  As a consequence, the Third Circuit in *Markell* had no occasion to consider whether application of PASPA to require a State to continue to ban sports wagering violates the Constitution.[13]

---

[13]  New Jersey's failure to authorize sports betting in Atlantic City casinos during the one-year window permitted by PASPA does not affect New Jersey's right to challenge PASPA's constitutionality. *See* 28 U.S.C. § 3704(a)(3); *New York*, 505 U.S. at 181.  States "cannot consent" even affirmatively, let alone through PASPA's limited-time-only opt-out mechanism, "to the enlargement of the powers of Congress beyond those enumerated in the Constitution." *Id.* at 182.

3.  Because PASPA is clearly unconstitutional under *New York*, it should be invalidated. At a minimum, however, PASPA raises serious constitutional questions.  If it is not invalidated in its entirety, it should be construed narrowly to prohibit only State-run or State-sponsored sports betting.  That interpretation would not run afoul of *New York* because it would "not require the States in their sovereign capacity to regulate their own citizens" but would merely restrict the States' own activities as operators of gambling operations.  *Reno*, 528 U.S. at 151.

The canon of constitutional avoidance permits a court to "choos[e] between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts."  *Clark v. Martinez*, 543 U.S. 371, 381 (2005).  Thus, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is *plainly contrary* to the intent of Congress."  *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) (emphasis added).  For example, the Supreme Court held that the Public Utility Regulatory Policies Act of 1978 did not violate the anti-commandeering principle only by "constru[ing] the most troubling provisions . . . to contain only the 'command' that state agencies 'consider' federal standards, and . . . only as a precondition to continued state regulation of an otherwise pre-empted field."  *Printz*, 521 U.S. at 926 (quoting *FERC*, 456 U.S. at 764–65).

A saving construction need not be the ***most*** plausible reading of a statute. The requirement is only that the constitutional interpretation be "fairly possible" in light of the text of the statute.  *Crowell v. Benson*, 285 U.S. 22, 62 (1932).  For example, the Chief Justice's opinion last term upholding the Affordable Care Act re-characterized the Act's requirement that most individuals purchase health insurance as a "tax" in order to bring it within Congress's taxing

29

power.  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2593–2600 (2012) (opinion of Roberts, C.J.).  Although "[t]he most straightforward reading of the individual mandate is that it commands individuals to purchase insurance," the Chief Justice explained, "the Commerce Clause does not give Congress that power," so it "may reasonably be characterized as a tax."  *Id.* at 2593, 2600.

Section 3702 of PASPA makes it unlawful for a "governmental entity to *sponsor, operate, advertise, promote, license, or authorize* by law or compact" a sports-betting scheme.  18 U.S.C. § 3702(1).  The first four verbs refer only to State-run or State-sponsored schemes, and thus enforcing those prohibitions does not plainly require that the federal government commandeer the State legislature.  PASPA's regulation of the State's authorization and licensing of private sports-betting schemes, in contrast, clearly crosses into impermissible commandeering. This Court may avoid such a patent constitutional flaw by limiting the construction of "license" and "authorize" to the implementation of State-run sports-betting schemes, like lotteries, state-owned casinos, or wagering facilities that are jointly operated or owned by the State and private entities.  That construction finds support in "the commonsense canon of *noscitur a sociis*, which counsels that a word is given more precise content by the neighboring words with which it is associated."  *Freeman v. Quicken Loans, Inc.*, 132 S. Ct. 2034, 2042 (2012) (quotation marks omitted).  Section 3702(2) would then only prevent persons from sponsoring, operating, advertising, or promoting sports gambling that is impermissibly run or sponsored by the State.  This construction would address PASPA's principal impetus: that "[t]hirty-two States and the District of Columbia have *State-sponsored* lottery games" and were "considering a wide variety of *State-sponsored* gambling schemes."  Sen. Rep. 102-248, at 5.  It is thus reasonable to construe PASPA as limited to that prohibition in order to preserve its constitutionality under *New York*.

**2. Section 3702(1) of PASPA Is a Non-Severable, Integral Part of PASPA's Commandeering of State Legislatures**

To the extent the Leagues contend that the individual Defendants are violating Section 3702(2) of PASPA, which prohibits any person from "sponsor[ing], operat[ing], advertis[ing], or promot[ing]" a sports wagering scheme "pursuant to the law or compact of a governmental entity"—and it is not clear that they are—that contention also fails. Unless the saving construction of PASPA outlined above is adopted, Section 3702(2) must fall with Section 3702(1).

PASPA does not contain any provision directing the courts that Section 3702(1) is severable. Accordingly, Section 3702(2) can survive only if, without Section 3702(1), the remaining provisions of PASPA would operate in the manner that Congress intended and would have been enacted by Congress standing alone. *See Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987). PASPA does not satisfy this standard.

With Section 3702(1) in force, Section 3702(2) not only complements Section 3702(1)'s prohibition by warning individuals who consider running gambling operations under an invalid state law that they may also face suit, but also complements the criminal prohibition on gambling in violation of state law contained in Title 18. If gambling is conducted in violation of *state* law, it is a crime; and if it is conducted pursuant to a state law that itself violates *federal* law, it is a civil violation until the unlawful state law is invalidated by Section 3702(1), at which point the conduct once again is a crime. *See supra* n.1. But without Section 3702(1), Section 3702(2) would make "unlawful" the very same conduct (operation of a sports wagering scheme in conformance with state laws) that Congress previously determined to be lawful under the criminal law. Nothing in the text or history of PASPA suggests that Congress intended to create such an inconsistency in its regulation of sports wagering.

Moreover, without Section 3702(1), Congress would have needed to rely on federal ma-

31

chinery to enforce Section 3702(2). It would be nonsensical to expect States to expend any resources to identify or shut down the wagering they had just legalized. Yet Congress clearly did not envision undertaking any such role, as the Senate Committee Report promised that PASPA's aims would be achieved at "no cost to the federal government." Sen. Rep. 102-248, at 9. PASPA, if transformed into a federally enforced ban on sports wagering activity authorized by state law, would not "function in a *manner* consistent with the intent of Congress." *Alaska Airlines*, 480 U.S. at 685. Upholding such a transformed statute "would be to make a new law, not to enforce an old one." *Nat'l Fed'n of Indep. Bus.*, 132 S. Ct. at 2667.

Finally, there is no indication in PASPA or its legislative history that Congress would have enacted PASPA without Section 3702(1). Had it wanted to do so, it simply could have amended the existing criminal bans on sports wagering. But Congress instead required ***States*** to prohibit sports betting, through Section 3702(1). Section 3702(2) provides a complementary prohibition on individual conduct, but not one that sensibly can stand on its own.

In this respect, PASPA stands in stark contrast to the statute at issue in *New York*. There, Congress had enacted three types of incentives to encourage States to provide for the disposal of radioactive waste. The Court concluded that two incentives were constitutional, while the third constituted unlawful commandeering of the State's authority. *New York*, 505 U.S. at 174-75. In that context, the Court concluded that it was "common sense" that Congress's overall purpose of incentivizing the States should not be frustrated by also invalidating the lawful incentives. *Id.* at 186. PASPA's prohibition on state regulation is of an entirely different type; its invalidation changes the character of the remaining statutory prohibition and of the federal government's obligations under it. As a result, the statute cannot withstand the invalidation of § 3702(1).

**B. PASPA's Discrimination Between States Exceeds the Power of the Commerce Clause and Violates the Principle of Equal Sovereignty**

Section 3702's ban on sports wagering activity is subject to significant exceptions in States where such activity was legal and actually conducted prior to PASPA's enactment. *See* 28 U.S.C. § 3704. Those exceptions, however, are unconstitutionally discriminatory and exceed Congress's powers under the Commerce Clause.

The Commerce Clause itself does not address whether regulation adopted pursuant to that clause must treat the States uniformly. *See* U.S. Const. art. 1, § 8. But the Supreme Court has long recognized that a purpose of the clause is "to insure uniformity in regulation" across the States. *Pennsylvania v. West Virginia*, 262 U.S. 553, 596 (1923). As the Court explained over 100 years ago, "the want of uniformity in commercial regulations[ ] was one of the grievances of the citizens under the Confederation; and the new Constitution was adopted, among other things, to remedy those defects in the prior system." *Ward v. Maryland*, 79 U.S. 418, 431 (1871). *See also* Thomas B. Colby, *Revitalizing the Forgotten Uniformity Constraint on the Commerce Power*, 91 Va. L. Rev. 249, 270 (2005) ("The inability to create uniform rules was the problem—the very reason why the new nation needed a federal commerce power."). States feared regional alliances would result in discrimination against groups of States. Colby, 91 Va. L. Rev. at 276. The Supreme Court thus held that "Congress, as well as the States, is forbidden to make any discrimination in enacting commercial or revenue regulations." *Ward*, 79 U.S. at 431.

The uniformity requirement of the Commerce Clause, as applied to the States themselves, is further mandated by the broader and more fundamental principle that "all the States enjoy 'equal sovereignty.'" *Nw. Austin*, 557 U.S. at 203. This principle provides that "[t]here can be no distinction between the several states of the Union in the character of the jurisdiction, sovereignty, and dominion which they may possess and exercise over persons and subjects within

their respective limits." *Illinois Cent. R. Co. v. State of Illinois*, 146 U.S. 387, 434 (1892). Although the doctrine of equal sovereignty "'does not bar . . . remedies for *local* evils which have subsequently appeared,'" any "departure from the fundamental principle of equal sovereignty requires a showing that a statute's disparate geographic coverage is sufficiently related to the problem that it targets." *Nw. Austin*, 557 U.S. at 203 (quoting *South Carolina v. Katzenbach*, 383 U.S. 301, 328-29 (1966)) (alteration in original).

There can be no doubt that PASPA denies New Jersey and the other disfavored States the sovereignty that it grants to Nevada and the favored States; while the latter States are free to permit, regulate, or prohibit sports wagering within their borders, New Jersey has no choice but to prohibit it. Yet the Senate Report makes clear that Congress did not consider sports wagering a "local evil[]," but instead a "national problem" with effects "felt beyond the borders of those States that sanction it." Sen. Rep. 102-248, at 5. Yet Congress limited the sovereignty only of the States that ***did not*** "sanction it."

The Supreme Court has occasionally noted, as the Leagues observe, that "[t]here is no requirement of uniformity in connection with the commerce power." Mot. at 11 (quoting *Currin v. Walker*, 306 U.S. 1, 14 (1939)). But it has not addressed the type of discrimination here; instead, those cases involved regulations that either fell unevenly on individuals within a single State, or fell more heavily on certain individuals because of *local circumstances not spread uniformly throughout the country*. In *Currin*, for example, plaintiffs residing in North Carolina contended that a statute was discriminatory because similarly situated individuals elsewhere in North Carolina were not regulated by it. 306 U.S. at 13. And in *Hodel*, the plaintiffs relied "solely on a statute's lack of uniform geographic impact," even though the disparity resulted from inherent geographical conditions of the various States. *Hodel*, 452 U.S. at 331. Perhaps most strikingly,

34

in *Sacco*, the statute operated unequally in different States because it "relie[d] on a violation of state law for one of its elements," which is to say it deferred to state law and policy choices rather than limiting them. *United States v. Sacco*, 491 F.2d 995, 1003 (9th Cir. 1974).

Congress's only rationale for PASPA's intentional discrimination is the presence or absence of pre-enactment sports gambling activity. *See* Sen. Rep. 102-248. This sort of permanent grandfathering is insufficient to justify a discriminatory statute. *Delaware River Basin Comm'n v. Bucks Cnty. Water & Sewer Auth.*, 641 F.2d 1087, 1098-99 (3d Cir. 1981). Grandfathering may be used to "undertake reforms one step at a time," but cannot be employed to advantage existing users forever. *Id.* at 1098. If PASPA's discrimination were allowed, no principled basis would exist to deny Congress the right to similarly limit car manufacturing to Michigan, cigarette manufacturing to Virginia, or fish processing to Alaska. Yet this was the very evil that the founders feared: that "'a combination of a few States in Congress might secure a monopoly of certain branches of trade and business to themselves, to the injury, if not the destruction, of their less favored neighbors.'" *United States v. Ptasynski*, 462 U.S. 74, 81 (1983) (quoting 1 J. Story, Commentaries of the Constitution of the United States § 957 (T. Cooley ed. 1873)). Those founders did not grant Congress authority to intentionally discriminate among the States.

Given the specific intent of PASPA's promoters to protect the market power of the few favored States, PASPA cannot survive once the exceptions of Section 3704 are invalidated. Indeed, PASPA's sponsor, Senator Bradley, responded to a suggestion that the exceptions be removed by straightforwardly acknowledging that "I understand there is some difficulty with that, and I want to get a piece of legislation that deals with the future." Hearing of the Subcommittee on Patents, Copyrights and Trademarks of the Committee on the Judiciary; *see also* Sen. Rep. 102-248, at 8 (explaining that "the committee . . . has no wish to apply this prohibition retroac-

tively to . . . those sports gambling operations which already are permitted under State law.").  In short, Congress "would not have enacted" PASPA without Section 3704.  *See Alaska Airlines*, 480 U.S. at 685.  As such, the remainder of PASPA must fall with Section 3704.

### C.  The Exceptional Discrimination Here Deprives Residents of New Jersey and Other Disfavored States of Due Process And Equal Protection

Even cases declining to recognize a broad uniformity requirement under the Commerce Clause assume that "there might be discrimination of such an injurious character as to bring into operation the due process clause of the Fifth Amendment."  *Currin*, 306 U.S. at 14.  The Supreme Court has upheld statutes with disparate impact against this principle where those statutes are basically good faith efforts to legislate in a non-discriminatory fashion.  *See, e.g.*, *id.* (approving Congress's allocation of a limited number of expert tobacco inspectors in order to cover markets "where the greatest number of growers may be served with the facilities that are available"); *Secretary of Agric. v. Central Roig Ref. Co.*, 338 U.S. 604, 617 (1950) (rejecting due process challenge to discriminatory sugar quotas because Congress attempted to "fix their amount as to achieve approximate justice in the shares allotted to each area and the persons within it").

In contrast, PASPA was not an attempt to provide rough equity or effectively allocate scarce resources.  Instead, it protected all gambling activity of some States, while denying others the right to permit any such activity, despite the Senate Committee's "firm[] belie[f] that *all* such sports gambling is harmful."  *See* Sen. Rep. 102-248, at 8 (emphasis added).  Congress's decision causes a massive transfer of revenue from New Jersey to Nevada and other favored States, which operate free from competition.  If discrimination between States may ever be of "such an injurious character" as to violate due process, PASPA, which permits a handful of States to directly profit by monopolizing substantial revenue that is denied to the disfavored States, is that case.

The Supreme Court only permits discrimination against States with respect to their sovereign powers (here, to regulate sports wagering) where the "statute's disparate geographic coverage is sufficiently related to the problem that it targets." *Nw. Austin*, 557 U.S. at 203. This test requires a "fit" between the targeted problem and the scope of the statute akin to the congruence and proportionality test under the Fourteenth Amendment. *Shelby County v. Holder*, 679 F.3d 848, 859 (D.C. Cir. 2012); *id.* at 885 (Williams, J., dissenting). PASPA turns this notion upside down. While the most significant legal sports wagering existed at the time of enactment, and exists now, in the state of Nevada, PASPA permits that wagering to continue unabated. Yet PASPA prohibits sports wagering in States where such wagering has never legally taken place. In PASPA, Congress identified where a supposed problem existed—and regulated elsewhere.

PASPA's baseless distinction between the States, and the citizens of favored and disfavored States, fails even the more forgiving rational basis test required by the Due Process and Equal Protection Clauses. Though the rational basis test is deferential, it "is not a toothless one." *Mathews v. De Castro*, 429 U.S. 181, 185 (1976). When a "choice is clearly wrong, a display of arbitrary power, not an exercise of judgment," the Court will not hesitate to strike it down. *Id. See, e.g.*, *Zobel v. Williams*, 457 U.S. 55, 65 (1982) (discrimination based on duration of residency); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985) (discrimination against the mentally retarded); *Hooper v. Bernalillo Cnty. Assessor*, 472 U.S. 612, 624 (1985) (discrimination against certain veterans). PASPA's irrationality is at its peak in its treatment of New Jersey. Had New Jersey implemented sports gambling within a year of PASPA's enactment, PASPA would not have prohibited that gambling. *See* 28 U.S.C. § 3704(a)(3). Congress could not have rationally concluded that if New Jersey began sports gambling immediately, it somehow would be less injurious than if it waited a decade or more.

As noted above, Congress's apparent desire to maintain the sports-wagering status quo in perpetuity does not provide a rational basis for legislation.  Sen. Rep. 102-248.  To be sure, "a legislature may undertake reforms one step at a time," adopting "a gradual approach to solving a problem."  *Delaware River Basin Comm'n*, 641 F.2d at 1098 (citing *New Orleans v. Dukes*, 427 U.S. 297 (1976)).  PASPA does not involve a congressional decision to "undertake reforms one step at a time," but a conscious choice to *permanently* favor certain States over others.  The Third Circuit has indicated that a "permanent exemption" of certain entities from regulation cannot be justified on this basis, *id.*; this type of legislation is subject to "heightened rational basis scrutiny."  *Wawa, Inc. v. Gov't of New Castle Cnty., Delaware*, 391 F. Supp. 2d 291, 298 n.2 (D. Del. 2005).  The mere invocation of "grandfathering" is insufficient.  *Delaware River Basin*, 641 F.2d at 1098.  Because that is the only basis on which Congress excluded certain states from PASPA's reach, that distinction violates due process and equal protection.[14]

### III.   The Leagues Have Not Met The Standard For An Award Of Injunctive Relief

A plaintiff who establishes a violation of federal law is not automatically entitled to injunctive relief.  Rather, such a plaintiff must satisfy an additional, four-part test, demonstrating: "(1) that it has suffered an irreparable injury; (2) that remedies available at law are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  Undisputed facts demonstrate that the Leagues are ***not*** entitled to injunctive relief.

---

[14]   Defendants have standing to raise these due process and equal protection arguments, both by virtue of their own injury and the injury to New Jersey's citizens.  *See, e.g.*, *Wyoming v. Oklahoma*, 502 U.S. 437, 450 (1992) (State has standing to raise Constitutional arguments based on impact of challenged law on its tax revenues); *Pennsylvania v. Porter*, 659 F.2d 306, 317-18 (3d Cir. 1981) ("[T]he traditional federal law remedy of a *parens patriae* action is generally available to the states for the enforcement of the fourteenth amendment in appropriate cases.").

As demonstrated above, the Leagues have not demonstrated that the Sports Wagering Law will cause them ***any*** injury at all—much less injury that is "actual," rather than "potential," and that would qualify as "irreparable." *Bolger v. First State Fin. Servs.*, 759 F. Supp. 182, 191 (D.N.J. 1991); *see supra* pp. 10-21. To the contrary, the Leagues boast of ███████████ ████████████████████████████████████ and admit that "[w]e've been profitable" and have "done better each year," SUMF ¶ 24. *See supra* p. 6. Given the absence of any demonstrable injury from this multi-hundred-billion dollar sports wagering market, the Leagues cannot possibly establish that they will suffer irreparable injury simply by virtue of the fact that some, small portion of the sports wagering market will be transferred from existing venues to the tightly regulated casinos and racetracks of New Jersey.

The Leagues also cannot establish that the balance of hardships favors an injunction, or that an injunction would be in the public interest. The Leagues will suffer no hardship if the Sports Wagering Law is allowed to go into effect. But, an injunction would impose significant hardship on the government of New Jersey, as well as the public that it serves. An injunction would commandeer the legislature to implement Federal policy, inappropriately disturbing the representative relationship between the People and the legislature; would deprive the State of needed revenue; and would place New Jersey and its citizens at a permanent disadvantage relative to other States not subject to PASPA's prohibition, including Nevada. The infliction of these harms would violate the Constitution and would not advance the public interest. *See supra* pp. 22-37; *see also Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003) ("[T]he public interest [is] not served by the enforcement of an unconstitutional law.").

The Leagues previously have sought to escape the application of this reasoning by arguing that, once a violation of PASPA is shown, the propriety of permanent injunctive relief is es-

tablished by *Office of the Comm'r of Baseball v. Markell*, 579 F.3d 293 (3d Cir. 2009).  Dkt. 38, at 9.  *Markell*, however, did not order or otherwise address the plaintiffs' right to injunctive relief.  To the contrary, the Supreme Court's decision in *eBay* sets forth the test for a permanent injunction, and unmistakably sets forth the four-factor test detailed above.  547 U.S. at 391.[15] Thus, in *Morales v. Trans World Airlines, Inc.*, the United States Supreme Court vacated an injunction preventing enforcement of allegedly preempted State regulations on the ground that the plaintiffs had failed to demonstrate irreparable injury; the Court found that the district court had impermissibly "disregarded the limits on the exercise of its injunctive power."  504 U.S. 374, 382 (1992).  Likewise, here, this Court cannot enter an injunction absent a showing by the Leagues that they have satisfied the standard four-factor test for the entry of such relief.  And, as explained above, the Leagues have failed in multiple respects to cross that threshold.

## CONCLUSION

For the foregoing reasons, this Court should deny the Leagues' Motion for Summary Judgment, and should grant Defendants' Cross-Motion for Summary Judgment.

Dated:  November 21, 2012                          Respectfully submitted,

---

[15]  Citing decisions of the Ninth Circuit, the Leagues have argued that the *eBay* test does not apply when a statute provides private parties only with an action for injunctive relief.  Dkt. 38, at 10.  But the Third Circuit disagrees.  *See Natural Res. Def. Council, Inc. v. Texaco Ref. & Mktg., Inc.*, 906 F.2d 934, 940 n.6 (3d Cir. 1990) ("[A]bsent a clear Congressional statement, courts should not infer that Congress intended to alter equity practices.").  That is because the Supreme Court has instructed that "[u]nless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982).  While PASPA does permit a "civil action to enjoin a violation," it does not so limit the federal courts' jurisdiction in equity as to require that every violation be enjoined.  *See* 28 U.S.C. § 3703.

By:

|  | JEFFREY S. CHIESA |
|---|---|
|  | ATTORNEY GENERAL OF THE STATE OF NEW JERSEY |

/s/ Theodore B. Olson

/s/ Christopher S. Porrino

THEODORE B. OLSON
(admitted *pro hac vice*)
MATTHEW D. MCGILL
(admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: (202) 955-8500
Facsimile: (202) 530-9662

CHRISTOPHER S. PORRINO
  Assistant Attorney General
  Director, Division of Law
JOHN J. HOFFMAN
STUART M. FEINBLATT
PETER SLOCUM
OFFICE OF THE ATTORNEY GENERAL OF
THE STATE OF NEW JERSEY
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, NJ  08625-0112
Telephone: (609) 984-9666
Facsimile: (609) 292-0690

*Attorneys for Defendants*