**McCARTER & ENGLISH, LLP**
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
(973) 622-4444

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
Four Times Square
New York, New York 10036
(212) 735-3000

**BANCROFT PLLC**
1919 M Street, N.W., Suite 470
Washington, DC 20036
(202) 234-0090

Attorneys for Plaintiffs
    National Collegiate Athletic Association,
    National Basketball Association, National
    Football League, National Hockey League, and
    Office of the Commissioner of Baseball doing
    business as Major League Baseball

|  |  |
|---|---|
|  | **UNITED STATES DISTRICT COURT**<br>**DISTRICT OF NEW JERSEY** |

| | | |
|---|---|---|
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, *et al.*, | : : : | Civil Action No. 12-cv-4947 (MAS)(LHG) |
| Plaintiffs, | : : | Hon. Michael A. Shipp, U.S.D.J.<br>Hon. Lois H. Goodman, U.S.M.J. |
| v. | : : : | |
| CHRISTOPHER J. CHRISTIE, Governor of the State of New Jersey, *et al.*, | : : : | |
| Defendants. | : : | |

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR MOTION
FOR SUMMARY JUDGMENT AND, IF NECESSARY
TO PRESERVE THE STATUS QUO, A PRELIMINARY INJUNCTION, AND BRIEF IN
OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

## *Table of Contents*

Table of Authorities ................................................................................................ ii

Preliminary Statement............................................................................................1

Argument ................................................................................................................2

I.   The Sports Organizations Have Standing Under PASPA....................................2

II.  PASPA Is Constitutional....................................................................................8

    A.  PASPA Does Not "Commandeer" the Legislative Processes of the States;
        It Preempts State Law Through the Ordinary Operation of the Supremacy
        Clause..........................................................................................................8

    B.  Defendants' Other Constitutional Arguments Lack Merit....................................15

III. The Sports Organizations Are Entitled to a Permanent Injunction....................20

Conclusion ............................................................................................................25

### *Table of Authorities*

#### *Cases*

*Alston v. Countrywide Fin. Corp.*, 585 F.3d 753 (3d Cir. 2009) ........................................4

*American Civil Liberties Union v. Ashcroft*, 322 F.3d 240 (3d Cir. 2003), *aff'd*, 542 U.S. 656 (2004)................................................................................................................25

*American Express Travel Related Servs. Co. v. Sidamon-Eristoff*, 755 F. Supp. 2d 556 (D.N.J. 2010), *aff'd*, 669 F.3d 374 (3d Cir. 2012)............................................................23

*Antoninetti v. Chipotle Mexican Grill, Inc.*, 643 F.3d 1165 (9th Cir. 2010), *cert. denied*, 131 S. Ct. 2113 (2011)................................................................................................21, 23

*Arizona v. United States*, 132 S. Ct. 2492 (2012) ........................................................9

*BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254 (3d Cir. 2000)......................22

*Camp v. Lockheed Martin Corp.*, No. H-97-1938, 1998 WL 966002 (S.D. Tex. Dec. 29, 1998) ........................................................................................................................7

*Carter v. Welles-Bowen Realty, Inc.*, 553 F.3d 979 (6th Cir. 2009)................................4

*Chamber of Commerce v. Edmondson*, 594 F.3d 742 (10th Cir. 2010) ........................................25

*City of New Orleans v. Dukes*, 427 U.S. 297 (1976) ................................................16, 20

*Close v. Glenwood Cemetery*, 107 U.S. 466 (1883) ........................................................8

*Coach, Inc. v. Fashion Paradise, LLC*, No. 10-4888 (JBS/KMW), 2012 WL 194092 (D.N.J. Jan. 20, 2012) ........................................................................................24

*Currin v. Wallace*, 306 U.S. 1 (1939) ........................................................................16

*Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286 (3d Cir. 2005)............................................2

*Delaware River Basin Commission v. Bucks County Water & Sewer Authority*, 641 F.2d 1087 (3d Cir. 1981)......................................................................................18, 19

*eBay Inc. v. Mercexchange, L.L.C.*, 547 U.S. 388 (2006) ........................................................21

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568 (1988)........................................................................................................13

*First Sav. Bank, F.S.B. v. U.S. Bancorp.*, 117 F. Supp. 2d 1078 (D. Kan. 2000)..........................8

*General Instrument Corp. of Del. v. Nu-Tek Elecs. & Mfg., Inc.*, 197 F.3d 83 (3d Cir. 1999) ........................................................................................................................2

*In re Global Indus. Techs., Inc.*, 645 F.3d 201 (3d Cir.), *cert. denied*, 132 S. Ct. 551 (2011) ........................................................................................................................2

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) .................................................4

*Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707 (1985) ..............9

*Hobson v. Wilson*, 556 F. Supp. 1157 (D.D.C. 1982), *aff'd in part, rev'd in part on other grounds*, 737 F.2d 1 (D.C. Cir. 1984).......................................................................5

*Hodel v. Indiana*, 452 U.S. 314 (1981).................................................................16, 17

*Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264 (1981)............10

*Horvath v. Keystone Health Plan East, Inc.*, 333 F.3d 450 (3d Cir. 2003) .....................4

*Hyde v. Ann*, No. 3:10-CV-1880, 2012 WL 3780536 (M.D. Pa. Aug. 10, 2012), *report and recommendation adopted*, 2012 WL 3782541 (M.D. Pa. Aug. 31, 2012)...................7

*INS v. Chadha*, 462 U.S. 919 (1983) ...............................................................................8

*In re K-Dur Antitrust Litig.*, No. 01-1652 (JAG), 2007 WL 5297756 (D.N.J. Sept. 25, 2007) .............................................................................................................................7

*Kansas Health Care Ass'n v. Kansas Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536 (10th Cir. 1994).....................................................................................................................22

*Kurns v. Railroad Friction Prods. Corp.*, 132 S. Ct. 1261 (2012) ...............................15

*Lockhart v. Hoenstine*, 411 F.2d 455 (3d Cir. 1969) ......................................................7

*Lopez v. Monterey Cnty.*, 525 U.S. 266 (1999).............................................................17

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ......................................................3

*Mariani v. United States*, 80 F. Supp. 2d 352 (M.D. Pa. 1999).....................................5

*Massachusetts v. Environmental Protection Agency*, 549 U.S. 497 (2007) ....................3

*McFarlane v. Ben-Menashe*, No. 93-1304 (TAF), 1995 WL 129073 (D.D.C. Mar. 16, 1995), *opinion withdrawn in part on reconsideration on other grounds*, 1995 WL 799503 (D.D.C. June 13, 1995)...................................................................................5

*Meyer v. Portfolio Recovery Assocs.*, 696 F.3d 943 (9th Cir. 2012) ............................24

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) .........................................9

*National R.R. Passenger Corp. v. Caln Twp.*, No. 08-5398, 2010 WL 92518 (E.D. Pa. Jan 8, 2010)................................................................................................................22, 25

*New Jersey Coal. of Auto. Retailers v. DaimlerChrysler Motors Corp.*, 107 F. Supp. 2d 495 (D.N.J. 1999)..................................................................................................22

*New York v. United States*, 505 U.S. 144 (1992)...............................................10, 11

*Northwest Austin Municipal Utility District Number One v. Holder*, 557 U.S. 193 (2009)..........17

*OFC Comm Baseball v. Markell*, 579 F.3d 293 (3d Cir. 2009)............................... passim

*OFC Comm Baseball v. Markell*, No. 09-538 (GMS) (D. Del. Sept. 1, 2009).............................21

*Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358 (3d Cir. 1996) .................................7

*Parsons v. Bedford,* 28 U.S. (3 Pet.) 433 (1830) ........................................................13

*Port Drivers Fed'n v. All Saints Express, Inc.*, 757 F. Supp. 2d 443 (D.N.J. 2010) ....................24

*Printz v. United States*, 521 U.S. 898 (1997)....................................................10, 11

*Railway Labor Execs. Ass'n v. Gibbons*, 455 U.S. 457 (1982) .....................................16

*Reno v. Condon*, 528 U.S. 141 (2000) .........................................................11, 12

*Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364 (2008)............................9

*Salem Blue Collar Workers Ass'n v. Salem*, 33 F.3d 265 (3d Cir. 1994)........................17, 19, 20

*Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410 (7th Cir. 1992) ....................................8

*Secretary of Agric. v. Central Roig Ref. Co.*, 338 U.S. 604 (1950)...............................................16

*Sierra Club v. Franklin Cnty. Power of Ill., LLC*, 546 F.3d 918 (7th Cir. 2008) ....................21, 24

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966)........................................................18

*Southeastern Pa. Transp. Auth. v. Pennsylvania Pub. Util. Comm'n*, 210 F. Supp. 2d 689 (E.D. Pa. 2002), *aff'd*, 342 F.3d 242 (3d Cir. 2003) ........................................................24

*Temple Univ. v. White*, 941 F.2d 201 (3d Cir. 1991) ........................................................23

*Thimons v. PNC Bank, N.A.*, 254 F. App'x 896 (3d Cir. 2007)........................................................7

*Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773 (5th Cir. 1990) ............................................23

*United States v. Ferrara*, No. 92-2869 (NHJ), 1993 WL 405477 (D.D.C. Feb. 8, 1993).............23

*United States v. Thompson*, 393 F. App'x 852 (3d Cir. 2010) ........................................................6

*Vance v. Bradley*, 440 U.S. 93 (1979) ........................................................17

iv

*Warth v. Seldin*, 422 U.S. 490 (1975) ..................................................................4

*Wiley Mission v. New Jersey*, No. 10-3024 (RBK/JS), 2011 WL 3841437 (D.N.J. Aug. 25, 2011) ....................................................................................................25


### *Statutes*

18 U.S.C. § 1084 .................................................................................................14

18 U.S.C. § 1301, *et seq.* ....................................................................................14

18 U.S.C. § 1952 .................................................................................................14

18 U.S.C. § 1955 .................................................................................................14

28 U.S.C. § 3701, *et seq.* ................................................................................1, 10

Fed. R. Evid. 602 ..................................................................................................6

Fed. R. Evid. 701 ..................................................................................................6

Fed. R. Evid. 803(8) .............................................................................................5

N.J. Const., art. 4, § 7, pt. 2.D ...........................................................................12

N.J.S.A. 5:12A-1, *et seq.* (2012) .....................................................................1, 5

S. Rep. No. 102-248 (1992), *reprinted in* 1992 U.S.C.C.A.N. 3553 ............5, 14, 16

U.S. Const., Art. VI, cl. 2 ....................................................................................15


### *Other Authorities*

*Prohibiting State-Sanctioned Sports Gambling: Hearing on S. 473 and S. 474 Before the Subcomm. On Patents, Copyright and Trademarks of the S. Comm. on the Judiciary*, 102d Cong. 1 (1991) ......................................................................19

## *Preliminary Statement*

In their opposition to plaintiffs' motion for summary judgment – and in support of their own cross-motion for summary judgment – defendants do not deny that, by enacting and implementing its Sports Wagering Law, N.J.S.A. 5:12A-1, *et seq.* (2012), New Jersey has acted in deliberate and direct violation of the federal Professional and Amateur Sports Protection Act, 28 U.S.C. § 3701, *et seq.* ("PASPA"). Instead, defendants seek to defend their blatant violation of federal law by arguing that (i) plaintiffs National Collegiate Athletic Association, National Basketball Association, National Football League, National Hockey League, and Office of the Commissioner of Baseball, doing business as Major League Baseball (collectively the "Sports Organizations"), lack standing to challenge New Jersey's violation of the statute (Opp. Br. 10-22), (ii) PASPA is unconstitutional (*id.* at 22-38), and (iii) the Sports Organizations are not entitled to have this Court enjoin the State's violation of PASPA (*id.* at 38-40). Each of these contentions is baseless, and plaintiffs are entitled to summary judgment as a matter of law. *See OFC Comm Baseball v. Markell*, 579 F.3d 293 (3d Cir. 2009).

Rather than seeking a declaration that PASPA is unconstitutional and abiding by the law pending that determination, New Jersey simply chose to break the law for its own economic ends and to challenge anyone to try to stop it. The Sports Organizations brought this action to do just that and have been met with the frivolous contention that the very professional and amateur sports organizations that Congress sought to protect when it enacted PASPA – and the very Sports Organizations whose games New Jersey seeks to appropriate for its unlawful sports gambling scheme – lack a personal stake in this litigation. The Sports Organizations' standing to challenge New Jersey's violation of PASPA is obvious, and defendants' arguments to the contrary should be summarily rejected. Defendants' constitutional challenges to PASPA are

equally specious.  PASPA, which is presumed to be constitutional, does not in any way

commandeer New Jersey's legislative process, does not unconstitutionally distinguish among the

states, does not invade New Jersey's sovereignty, and does not violate the Due Process Clause of

the Fifth Amendment.  Finally, defendants' argument that this Court may not permanently enjoin

New Jersey's unapologetic violation of PASPA is also baseless.  A permanent injunction should

follow as a matter of course from defendants' acknowledgement that the State's conduct violates

federal law.  Plaintiffs' motion for summary judgment, therefore, should be granted.

***Argument***

**I.**     ***The Sports Organizations Have Standing Under PASPA.***

The issue of the Sports Organizations' standing under PASPA as a matter of law

has been fully briefed in connection with defendants' motion to dismiss the complaint.  As

demonstrated below and in plaintiffs' opposition to defendants' motion to dismiss (Dkt. No. 39),

there can be no serious question that the Sports Organizations have standing to challenge New

Jersey's violation of PASPA, and defendants' arguments to the contrary are frivolous.

As the Sports Organizations have previously shown (Dkt. No. 39, at 6-11), the

requirements for standing under Article III of the United States Constitution are easily satisfied;

they serve only to limit federal courts to "actual cases and controversies" and "to assure that

litigants have a 'personal stake' in the litigation." *Danvers Motor Co. v. Ford Motor Co.*, 432

F.3d 286, 291 (3d Cir. 2005) (Alito, J.).  Those requirements are "very generous" and are met as

long as there is an "'identifiable trifle' of injury." *In re Global Indus. Techs., Inc.*, 645 F.3d 201,

210 (3d Cir.), *cert. denied*, 132 S. Ct. 551 (2011); *see also Danvers*, 432 F.3d at 294; *General

Instrument Corp. of Del. v. Nu-Tek Elecs. & Mfg., Inc.*, 197 F.3d 83, 87 (3d Cir. 1999).

2

The Sports Organizations undisputedly have a personal stake in whether New Jersey will be permitted to implement its Sports Wagering Law in blatant and acknowledged violation of PASPA. The games on which New Jersey intends to authorize gambling belong to the Sports Organizations. They are plaintiffs' games, and defendants do not – indeed, cannot – claim otherwise. There can be no legitimate dispute that the Sports Organizations have a concrete, personal interest in producing and marketing their own games and in how those games are perceived by their customers. When, as here, the "plaintiff is himself an object of the action (or forgone action) at issue[,] . . . there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992). The Sports Organizations' games are at the heart of this controversy, and it is nonsense to claim that the Sports Organizations lack Article III standing to challenge the State's violation of PASPA by purporting to authorize gambling on those very games.[1]

Moreover, as also demonstrated in opposition to defendants' motion to dismiss (Dkt. No. 39, at 11-17), in enacting PASPA, Congress recognized the harm that the spread of state-sponsored sports gambling threatened to cause the Sports Organizations and expressly granted the Sports Organizations a statutory right to be free from the spread of such sports gambling. Contrary to defendants' argument, the Supreme Court has clearly held that "Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before." *Massachusetts v. Environmental Protection Agency*,

---

[1]    Defendants' expert, Professor Willig, readily agreed that the Sports Organizations have such an interest, including an interest in offering a product that is not perceived differently because of the spread of state-sponsored gambling. (Plaintiffs' Reply Statement of Undisputed Material Facts Pursuant to Local Rule 56.1, submitted herewith ("Reply SUMF") ¶ 23.)

549 U.S. 497, 516 (2007) (citation omitted).  The Court has also held that "[t]he actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.'"  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982) (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)).  So long as Congress does not attempt to "convert the undifferentiated public interest in executive officers' compliance with the law into an 'individual right' vindicable in the courts," *Lujan*, 504 U.S. at 577, it is free to "create new interests the invasion of which will confer standing."  *Carter v. Welles-Bowen Realty, Inc.*, 553 F.3d 979, 985 (6th Cir. 2009).  The Sports Organizations need not demonstrate anything more than the violation of such a statutory right to establish their standing.  *See, e.g.*, *Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 763 (3d Cir. 2009); *Horvath v. Keystone Health Plan East, Inc.*, 333 F.3d 450, 456 (3d Cir. 2003).

In PASPA, Congress did not grant a cause of action to remedy some undifferentiated public interest, but granted a right of action only to those whose discernible interests PASPA was enacted to protect – professional and amateur sports organizations whose own games are the object of a challenged violation.  As previously explained (Dkt. No. 39, at 14-16), PASPA could hardly be more unequivocal in "identify[ing] the injury it seeks to vindicate and relat[ing] the injury to the class of persons entitled to bring suit."  *Massachusetts*, 549 U.S. at 516.

Defendants' effort (Opp. Br. 11-22) to fabricate a factual dispute with respect to the Sports Organizations' Article III standing is unavailing for several reasons.

*First*, and foremost, defendants have not disputed the relevant material facts on which plaintiffs premise their motion for summary judgment.  (Reply SUMF ¶¶ 1-22.)  As noted above, the threshold showing for Article III standing is extremely low, and the undisputed fact

4

that the games New Jersey proposes to appropriate for its gambling scheme are *plaintiffs'* games

is sufficient to satisfy that showing.  Plaintiffs have an obvious, undisputed and particularized

interest in how their own games will be presented to the public and their fans, including with

respect to whether those games will be the basis for state-sponsored sports wagering.  Congress

agreed, concluding that the spread of state-sponsored sports gambling threatens to harm the

integrity of plaintiffs' games, change the nature of plaintiffs' sporting events "from wholesome

entertainment for all ages to devices for gambling," and "undermine public confidence in the

character of professional and amateur sports."  S. Rep. No. 102-248, at 4-5 (1992), *reprinted in*

1992 U.S.C.C.A.N. 3553, 3555.[2]  The Third Circuit also agreed, holding that one of PASPA's

central purposes is to protect "the integrity of sports" and that Delaware's attempt to expand

sports gambling within its borders "would engender the very ills that PASPA sought to combat."

*Markell*, 579 F.3d at 304.  Indeed, even the State of New Jersey agreed, protecting the athletic

programs of its own colleges and universities from the ill effects of sports gambling by

exempting them from its Sports Wagering Law.  N.J.S.A. 5:12A-1 (2012).  For litigation

purposes, defendants may not like Congress' conclusions, but this Court is not the proper forum

---

[2]     Notwithstanding defendants' baseless assertion to the contrary, PASPA's legislative history
constitutes admissible evidence on this motion.  Indeed, congressional records are presumed
trustworthy as public records and reports.  *See* Fed. R. Evid. 803(8) and advisory committee
note.  Accordingly, courts frequently admit congressional reports into evidence.  *See, e.g.,*
*Mariani v. United States*, 80 F. Supp. 2d 352, 360-61 (M.D. Pa. 1999) (holding minority
report of congressional committee admissible under Rule 803(8)); *McFarlane v. Ben-*
*Menashe*, No. 93-1304 (TAF), 1995 WL 129073, at *4-5 (D.D.C. Mar. 16, 1995) (holding
congressional task force report trustworthy and admissible under Rule 803(8)), *opinion*
*withdrawn in part on reconsideration on other grounds*, 1995 WL 799503 (D.D.C. June 13,
1995); *Hobson v. Wilson*, 556 F. Supp. 1157, 1181 (D.D.C. 1982) (holding portions of Senate
Committee report admissible under public records exception), *aff'd in part, rev'd in part on*
*other grounds*, 737 F.2d 1 (D.C. Cir. 1984).

for defendants to replay the debate before Congress that led to the enactment of PASPA in the first place.

       *Second*, defendants' assertion that there is no evidence to support the Sports Organizations' Article III standing is flatly wrong. Ten witnesses, including four League Commissioners, the NCAA's President and witnesses tendered by each plaintiff pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure all testified under oath, based on their personal knowledge and experience, regarding the Sports Organizations' personal interest in the production of their games, the manner in which their games are perceived by their fans, and the Sports Organizations' reasonable concern about the effects the introduction of sports betting in New Jersey would have on their games and their relationship with their fans. (*See* Reply SUMF ¶ 24.) Because, as noted above, there can be no serious dispute that the Sports Organizations have a concrete, personal stake in the production of their games and in the manner in which their fans perceive those games, none of the sworn testimony taken during the discovery in this case is necessary to make a determination that the Sports Organizations have standing to challenge New Jersey's violation of PASPA.[3]  Nevertheless, that testimony further confirms the Sports Organizations' standing to challenge New Jersey's violation of PASPA.  *United States v. Thompson*, 393 F. App'x 852, 858 (3d Cir. 2010) (lay witness testimony based on particularized knowledge by virtue of his experience was admissible); *see also* Fed. R. Evid. 602 (lay witness may testify based on personal knowledge); Fed. R. Evid. 701 (lay witness may testify to opinion

---

[3]    For the same reasons, the purportedly undisputed facts set forth in Defendants' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 are in no way material to the only issues that are relevant to the Sports Organizations' entitlement to summary judgment, namely, standing, the constitutionality of PASPA, and the availability of permanent injunctive relief. (*See* Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1, submitted herewith, at 1.)

based on perception and experience).  In addition, a 1999 National Gambling Impact Study

Commission Report found that legalized sports gambling is injurious to the integrity of sports,

and ████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████ (Reply SUMF ¶¶ 25██.)  Such evidence similarly confirms the

Sports Organizations' standing to challenge New Jersey's Sports Wagering Law.

*Third*, defendants cannot create a genuine factual dispute simply by claiming to

disbelieve the Sports Organizations' evidence.  *Thimons v. PNC Bank, N.A.*, 254 F. App'x 896,

899 (3d Cir. 2007) ("One cannot create an issue of fact merely by . . . denying averments . . .

without producing any supporting evidence of the denials."); *Lockhart v. Hoenstine*, 411 F.2d

455, 458 (3d Cir. 1969) ("a mere denial is insufficient to raise a disputed issue of fact, and an

unsubstantiated doubt as to the veracity of the opposing [evidence] is also not sufficient"

(citation omitted)); *Hyde v. Ann*, No. 3:10-CV-1880, 2012 WL 3780536, at *12 (M.D. Pa. Aug.

10, 2012) (same), *report and recommendation adopted*, 2012 WL 3782541 (M.D. Pa. Aug. 31,

2012).  Defendants offer no factual evidence to dispute the testimony of the Sports

Organizations' witnesses that their organizations have an important personal stake and critical

business interest in how sports gambling may affect their games and how their own fans perceive

them.[4]

---

[4]   Defendants' reliance solely on lawyers' arguments and the factually irrelevant opinion of an
economist is insufficient to dispute the sworn testimony of the employees and officials of the
Sports Organizations.  *See, e.g.*, *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1372 (3d
Cir. 1996) ("legal memoranda . . . are not evidence and cannot by themselves create a factual
dispute sufficient to defeat a summary judgment motion"); *In re K-Dur Antitrust Litig.*, No.
01-1652 (JAG), 2007 WL 5297756 (D.N.J. Sept. 25, 2007) (party could not use irrelevant
declaration testimony to create a fact dispute and survive summary judgment); *Camp v.
Lockheed Martin Corp.*, No. H-97-1938, 1998 WL 966002, at *4 (S.D. Tex. Dec. 29, 1998)
(granting summary judgment after excluding irrelevant expert testimony that was offered as
*(cont'd)*

Because the Sports Organizations have a concrete interest in how their own games are presented, perceived, and affected, Congress has granted the Sports Organizations the statutory right to present their games free from the spread of state-sponsored sports gambling. The Sports Organizations have standing to challenge New Jersey's infringement of that right. This Court should summarily reject defendants' specious claim that the Sports Organizations lack Article III standing to challenge New Jersey's unabashed violation of PASPA, and grant summary judgment in the Sports Organizations' favor.

## II.    *PASPA Is Constitutional.*

Notwithstanding defendants' suggestion to the contrary, the burden rests on defendants to prove that PASPA is unconstitutional – and it is a heavy one.  Like all acts of Congress, PASPA is "presumed to be a constitutional exercise of legislative power until the contrary is clearly established" by the challenger.  *Close v. Glenwood Cemetery*, 107 U.S. 466, 475 (1883); *see also INS v. Chadha*, 462 U.S. 919, 944 (1983).  Defendants do not come close to clearly establishing that PASPA is unconstitutional, as all of their arguments are foreclosed by governing precedent, the text of the statute itself, or both.

### A.    *PASPA Does Not "Commandeer" the Legislative Processes of the States; It Preempts State Law Through the Ordinary Operation of the Supremacy Clause.*

Defendants first contend that PASPA violates the Constitution's anti-commandeering principle because it compels states "to prohibit sports wagering."  (Opp. Br. 25.) The basic flaw in that argument is readily apparent:  That is simply not what PASPA does.

---

(cont'd from previous page)

support for fact dispute); *see also First Sav. Bank, F.S.B. v. U.S. Bancorp.*, 117 F. Supp. 2d 1078, 1084-85 (D. Kan. 2000) (citing *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415-16 (7th Cir. 1992)) (excluding expert testimony where expert's theory failed to account for numerous factors relevant to the harm suffered by plaintiffs and merely assumed a causal relationship because of the temporal relationship between events).

PASPA does not *compel* states to do anything, but rather only *prohibits* states from authorizing gambling on professional or amateur sports.  Because the Constitution unequivocally grants Congress the power to prohibit states from regulating on matters of federal concern, PASPA is no more controversial than the Supremacy Clause itself.

Nothing in the Constitution prohibits Congress from exercising its own regulatory power to prohibit states from passing laws that conflict with federal policy.  Quite the contrary, it is well settled that Congress may preempt state law either by enacting federal regulation in its place or by prohibiting states from enacting or enforcing laws that it considers contrary to federal policy.  *See Arizona v. United States*, 132 S. Ct. 2492, 2501 (2012) ("There is no doubt that Congress may withdraw specified powers from the States by enacting a statute containing an express preemption provision.").  Indeed, such federal laws are commonplace.  When Congress deregulated the airline industry, for example, it expressly prohibited states from "enforcing any law 'relating to rates, routes, or services' of any air carrier." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378-79 (1992) (quoting 49 U.S.C. § 1305(a)(1)).  Similarly, when Congress deregulated trucking, it directed that a state "may not enact or enforce a law . . . related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." *Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 368 (2008) (quoting 49 U.S.C. § 14501(c)(1)).  There is nothing remotely objectionable about such provisions, which constitute routine exercises of Congress' power "[u]nder the Supremacy Clause . . . to pre-empt state law by so stating in express terms." *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985).

The anti-commandeering doctrine invoked by defendants comes into play only in the limited circumstances in which, "[r]ather than addressing [a] problem . . . directly" through

9

its own regulatory and preemptive powers, "Congress has impermissibly directed the States to regulate" or implement federal regulatory schemes. *New York v. United States*, 505 U.S. 144, 160 (1992). Such laws run afoul of the Constitution's inherent command that "Congress may not simply 'commandee[r] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program.'" *Id.* at 161 (quoting *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 288 (1981)); *see also Printz v. United States*, 521 U.S. 898, 925 (1997) ("the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs").

   PASPA makes plain on its face that it does not in any way implicate anti-commandeering concerns. As the Third Circuit has concluded, PASPA "unmistakably prohibits state-sponsored gambling," thereby expressly "alter[ing] the usual constitutional balance" between state and federal regulatory power "with respect to sports wagering." *Markell*, 579 F.3d at 303. PASPA implements that prohibition on the spread of state-sponsored gambling in three ways. *First*, PASPA makes it unlawful for states to sponsor, operate, advertise, or promote sports gambling, thereby prohibiting states from entering into the sports gambling market themselves. *See* 28 U.S.C. § 3702(1). *Second*, PASPA makes it unlawful for states to "license" or "authorize" sports gambling, thereby foreclosing states from passing laws that contradict the federal policy against sports gambling, such as the law New Jersey is attempting to implement in this case. *Id. Third*, PASPA makes it unlawful for any "person" to sponsor, operate, advertise, or promote sports gambling "pursuant to the law or compact of a" state, thereby extending the prohibition against state-sponsored gambling to all other actors. *See* 28 U.S.C. § 3702(2).

   Noticeably absent from those prohibitions is the irreducible minimum of a successful commandeering claim – namely, anything that "compel[s] the States to implement, by

legislation or executive action," federal policy against state-sponsored gambling. *Printz*, 521 U.S. at 925. Indeed, notwithstanding defendants' repeated attempts to re-write PASPA to fit that mold, they do not – and cannot – identify any language *in the statute itself* that "requir[es] States to enact laws prohibiting sports betting" or to "keep laws on their books under threat of injunction." (Opp. Br. 24.) PASPA says nothing about what gambling laws states must enact or maintain, and rather addresses only what laws states may *not* enact. Indeed, at the time PASPA was enacted, New Jersey's own constitution expressly forbade sports wagering. Hence, PASPA was entirely consistent with New Jersey state law, and did not require New Jersey to take any action. PASPA's prohibition of state-sponsored sports gambling affected New Jersey only after New Jersey sought to violate PASPA by enacting its Sports Wagering Law.

PASPA is therefore nothing like the statute challenged in *New York*, which required states either to take title to radioactive waste or to "regulat[e] according to the instructions of Congress." *New York*, 505 U.S. at 175. And it is nothing like the Brady Act provision at issue in *Printz*, which required state law-enforcement officers to implement a federal regulatory scheme governing firearm transactions. *Printz*, 521 U.S. at 903. Accordingly, by its plain terms, PASPA simply does not implicate the commandeering concerns defendants invoke. It bears emphasis that successful commandeering challenges are extraordinarily rare precisely because statutes actually commandeering state legislators or executives to act are just as rare. *See id.* at 905-10 (surveying the U.S. Code and finding no analogous laws). The Supreme Court has identified only two federal statutes that have ever violated this anti-commandeering principle – the statutes at issue in *New York* and *Printz* – despite states' unsuccessful efforts to extend the anti-commandeering rule to statutes that preempt state law or regulate state activities. *See, e.g., Reno v. Condon*, 528 U.S. 141, 151 (2000) (rejecting commandeering claim where statute did

"not require the States in their sovereign capacity to regulate their own citizens," "to enact any laws or regulations," or "to assist in the enforcement of federal statutes regulating private individuals").

Recognizing as much, defendants ultimately concede that PASPA does not *actually* direct states to legislate, but nonetheless insist it has the "purpose and effect" of doing so because it *implicitly* prohibits states from repealing existing sports gambling prohibitions. (Opp. Br. 2.) Defendants cannot manufacture a commandeering claim by pretending that PASPA contains a requirement that appears nowhere in the statute. *See, e.g., Condon,* 528 U.S. at 150-51. Nothing in PASPA necessarily compels states, either implicitly or explicitly, to maintain prohibitions on gambling, and the Sports Organizations have never claimed otherwise. The Court need look no further than the facts and procedural history of this case to confirm as much, as both New Jersey and the Sports Organizations have recognized that removing a prohibition on sports gambling is not the same as enacting an authorization of it.

Before enacting its Sports Wagering Law, New Jersey amended its state constitution to remove the existing prohibition against state laws authorizing wagering "on the results of any professional, college, or amateur sport or athletic event." N.J. Const., art. 4, § 7, pt 2.D.[5]  That amendment alone was not enough to *authorize* such gambling, so New Jersey enacted the Sports Wagering Law and promulgated regulations thereunder (the "Sports Gambling Regulations").  Precisely because PASPA does not prohibit states from simply

---

[5]  New Jersey has, however, maintained its prohibition against wagering on any athletic events actually held in New Jersey or events held anywhere else in the world if "any New Jersey college team participates."  As explained in plaintiffs' opening brief (and ignored by defendants), this protectionist amendment of the constitution gives rise to a presumption of invalidity under the dormant Commerce Clause and only serves to confirm the legitimacy of the Sports Organizations' concerns about the likely effects of state-sponsored gambling on their games and their fan relationships.  (*See* Opening Br. 13 n.7.)

*removing* gambling prohibitions, the Sports Organizations did not bring suit to compel New Jersey to maintain or reinstate its prohibition after it amended its constitution.  To the contrary, the Sports Organizations filed suit only *after* New Jersey enacted the Sports Wagering Law and promulgated the Sports Gambling Regulations, and alleged only that *those* actions violated PASPA, by "*expressly authoriz[ing]* sports gambling in New Jersey and establish[ing] a licensing scheme to regulate such gambling."  (Compl. ¶¶ 32-33 (emphasis added).)  The Sports Organizations have neither asked this Court to hold that New Jersey's constitutional amendment violates PASPA nor sought "an injunction requiring New Jersey to re-implement its former prohibition."  (Opp. Br. 24.)  Instead, the complaint seeks only a declaration that the Sports Wagering Law and the Sports Gambling Regulations promulgated pursuant to it that affirmatively authorize sports gambling may not be enforced because they violate PASPA. (Compl. at 11 (Prayer for Relief).)  Defendants thus err in arguing that PASPA "mandate[s]" that states "maintain a ban on sports betting" or "requir[es] States to enact laws prohibiting sports betting."  (Opp. Br. 24.)

Defendants' effort to inject ambiguity into the language of PASPA (despite the Third Circuit's express conclusion in *Markell* that PASPA is not ambiguous, 579 F.3d at 302) provides no basis for this Court to accept their construction of the law as commandeering the states.  Defendants readily acknowledge that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless the construction is plainly contrary to the intent of Congress."  (Opp. Br. 29 (quoting *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988))); *see also Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 448-49 (1830) ("No court ought, unless the terms of an act rendered it unavoidable, to give a construction to it which

13

should involve a violation, however unintentional, of the constitution."). Notwithstanding defendants' vague insinuations, nothing in PASPA or its legislative history evinces Congress' intent to force states to prohibit gambling, rather than to preempt laws that authorize it.

In fact, Congress' decision to prohibit states from authorizing sports gambling, rather than to directly prohibit all such gambling itself, is reflective of Congress' efforts to be *respectful* of state sovereignty. As defendants note (Opp. Br. 3 n.1), when PASPA was debated and enacted, a variety of federal criminal laws already prohibited gambling activities that violated or were not authorized by state law. *See, e.g.*, 18 U.S.C. §§ 1084, 1952, 1955. Congress incorporated state law into those federal laws because most states had already regulated in this area, thus giving Congress the opportunity to complement, rather than either duplicate or preempt, state gambling regulations. At the same time, Congress also evinced its specific concern with sports gambling. For example, when Congress exempted state lotteries from criminal laws against importing, transporting, or mailing lottery tickets and related matter, *see* 18 U.S.C. §§ 1301-1302 (establishing prohibitions); 1307(a)-(b) (establishing exemptions for "a lottery conducted by a State acting under authority of State law"), Congress also specifically defined the term "lottery" to exclude "the placing or accepting of bets or wagers on sporting events or contests," *id.* § 1307(d). *See generally* S. Rep. No. 102-248, at 6 (1992), *reprinted in* 1992 U.S.C.C.A.N. 3553, 3557 (describing § 1307(d) as reflecting part of the "specific Federal policy against sport gambling" in Title 18).

By the time of PASPA's enactment, however, it had become clear that some states' attitudes toward sports gambling were shifting away from federal policy, as a number of states "ha[d] considered or [were] reviewing the possibility of a sports theme for their lotteries" or authorizing or partaking in other forms of sports gambling. *See id.* at 5. By prohibiting states

14

from taking those affirmative steps to *authorize* sports gambling, Congress devised a statutory scheme that would allow federal law to continue to treat sports gambling as criminal in states that did not already allow it, while at the same time accommodating the reliance interests of the very few states that did.  Accordingly, PASPA's structure reflects not an attempt to circumvent commandeering principles and force states to prohibit gambling, but rather an entirely rational means of preventing states from adopting laws that undermine federal policy.

Because PASPA does not compel states to enact or implement federal policy, defendants' constitutional challenge ultimately reduces to nothing more than an attack on the Supremacy Clause itself.  Congress unquestionably has the power to regulate interstate commerce and to preclude states from enacting laws that conflict with federal policy.  And Congress may preempt state law through the "direct operation of the Supremacy Clause," *Kurns v. Railroad Friction Prods. Corp.*, 132 S. Ct. 1261, 1265 (2012), and its mandate that federal law "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const., Art. VI, cl. 2.  Defendants may disagree with the policy decision that PASPA reflects, but that does not empower New Jersey to elevate its own preferences above those of the federal government in an area constitutionally committed to Congress.  The Supremacy Clause requires this conflict to be resolved in favor of federal law.[6]

**B.**    ***Defendants' Other Constitutional Arguments Lack Merit.***

Defendants alternatively contend that, by adopting exceptions in section 3704 that "discriminate" among the states, Congress has exceeded its power under the Commerce Clause,

---

[6]    Because PASPA involves nothing more than the ordinary operation of the Supremacy Clause, defendants' constitutional avoidance and severability arguments (Opp. Br. 29-32), are wholly without merit.  No part of the statute is unconstitutional, so there is nothing to sever.  The Court should apply PASPA as written to preempt the Sports Wagering Law and Sports Gambling Regulations.

impermissibly distinguished among the states, violated principles of state sovereignty, and violated the Due Process Clause of the Fifth Amendment. (Opp. Br. 33-38.) None of these arguments has any merit.

As the Sports Organizations explained in their opening brief (Opening Br. 11), it is settled law that "uniformity in the applicability of legislation is not required by the Commerce Clause." *Railway Labor Execs. Ass'n v. Gibbons*, 455 U.S. 457, 468 (1982); *see also Currin v. Wallace*, 306 U.S. 1, 14 (1939) ("There is no requirement of uniformity in connection with the commerce power."); *Hodel v. Indiana*, 452 U.S. 314, 332 (1981) (same). Indeed, Congress has long devised "national policy with due regard for the varying and fluctuating interests of different regions," *Secretary of Agric. v. Central Roig Ref. Co.*, 338 U.S. 604, 616 (1950), and it needs nothing more than a rational basis to draw such distinctions, *see Hodel*, 452 U.S. at 331-32. Accordingly, when Congress exercises its commerce power, "[a] claim of arbitrariness cannot rest solely on a statute's lack of uniform geographic impact." *Id.* at 332.

Here, Congress had undeniably rational reasons for devising federal sports gambling policy with due regard for the interests of different states, and in particular those with reliance interests in pre-existing state sports gambling laws. The section 3704 exemptions were adopted in significant part because Congress had no "desire to threaten the economy of Nevada, which over many decades has come to depend on legalized private gambling, including sports gambling, as an essential industry, or to prohibit lawful sports gambling schemes in other States that were in operation when the legislation was introduced." S. Rep. No. 102-248, at 8 (1992), *reprinted in* 1992 U.S.C.C.A.N. 3553, 3559. Given the rationality of this purpose, and of Congress' overarching purpose to "stop the spread of State-sponsored sports gambling," *id.* at 4, PASPA is plainly permissible under the Constitution. *See City of New Orleans v. Dukes*, 427

16

U.S. 297, 304-05 (1976); *Salem Blue Collar Workers Ass'n v. Salem*, 33 F.3d 265, 272 (3d Cir. 1994).

Rather than identify any Commerce Clause cases suggesting otherwise, defendants attempt to repackage their argument in state sovereignty terms, relying almost exclusively on the Supreme Court's statement in *Northwest Austin Municipal Utility District Number One v. Holder*, 557 U.S. 193 (2009), that a "departure from the fundamental principle of equal sovereignty requires a showing that a statute's disparate geographic coverage is sufficiently related to the problem that it targets." *Id.* at 203. *Northwest Austin* is entirely inapposite. That case involved Congress' power under the Fifteenth Amendment to supervise state election law and policy through the Voting Rights Act. Discrimination among states in that kind of invasive legislation, "which authorizes federal intrusion into sensitive areas of state and local policymaking," *id.* at 202 (quoting *Lopez v. Monterey Cnty.*, 525 U.S. 266, 282 (1999)), demands an entirely different analysis from that applicable in the Commerce Clause context. Under the Commerce Clause, the Supreme Court has made clear that Congress' differentiation among states in "social and economic legislation is valid unless 'the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [a court] can only conclude that the legislature's actions were irrational.'" *Hodel*, 452 U.S. at 332 (quoting *Vance v. Bradley*, 440 U.S. 93, 97 (1979)).[7]

Again, PASPA easily satisfies that deferential standard. Defendants' principal argument that it does not – that "Congress's only rationale for PASPA's intentional discrimination is the presence or absence of pre-enactment sports gambling activity" and that

---

[7]   Defendants themselves make this plain in the very next paragraph of their brief, where they pivot to the actual standard that governs in Commerce Clause cases – rational basis review – and begrudgingly acknowledge that this review is "deferential." (Opp. Br. 37.)

such "permanent grandfathering" cannot justify a discriminatory statute (Opp. Br. 35) – is neither a correct statement of the law nor a valid argument for the assertion that PASPA is irrational. The presence of pre-PASPA sports gambling activity was certainly a driving factor in Congress' calculation; the handful of states that already permitted sports gambling by the time Congress considered PASPA (in Nevada's case, for decades) had become economically dependent upon it. There is nothing irrational or arbitrary about Congress' decision to protect those states and the reliance interests that their pre-existing laws had created while at the same time advancing the federal policy to stop the spread of sports gambling in areas without comparable reliance interests.[8]

Nor can defendants rely on *Delaware River Basin Commission v. Bucks County Water & Sewer Authority*, 641 F.2d 1087 (3d Cir. 1981), to get them around that fatal flaw in their constitutional challenge. As an initial matter, *Delaware River Basin* involved an equal protection challenge. Because states do not have equal protection rights under the Constitution, the case is readily distinguishable on that ground alone, and is therefore of little use to defendants' Commerce Clause and state sovereignty arguments. *See South Carolina v. Katzenbach*, 383 U.S. 301, 323 (1966). *Delaware River Basin* is also no help to their due process and equal protection arguments, which are really just another variation on the same "equal sovereignty" theme. *Delaware River Basin* does not support application of the

---

[8]   Nor is there anything irrational about Congress' decision to include an exemption in PASPA that allowed New Jersey one year to establish casino-based sports gambling. (Opp. Br. 37.) That decision makes the legislation more rational, not less. At the time of PASPA's enactment, New Jersey had its own reliance interest with respect to legalized gambling in general given its long-established, state-regulated gaming industry, especially in Atlantic City. That Congress gave New Jersey a brief window to consider expanding that program to include sports gambling underscores its attempts to accommodate New Jersey's distinct economic interests to the extent consistent with PASPA's broader goals.

heightened scrutiny defendants seek, but rather found only one *particular* grandfather clause

irrational on a *particular* set of facts.  That much is clear from the court's ultimate conclusion

that the challenged policy "appear[ed] to be arbitrary, rather than a rational, implementation" of

the water policy at issue.  *Delaware River Basin*, 641 F.2d at 1098.  And it is equally clear from

the fact that the Third Circuit has since continued to apply rational basis review when reviewing

challenges to grandfather provisions, and has *rejected* such challenges when those provisions

serve the rational purpose of furthering important reliance interests.  *See Salem Blue Collar*

*Workers Ass'n*, 33 F.3d at 272 ("We find no irrationality in this grandfather clause.").

   In any event, the unusual facts that led the Third Circuit to find a particular

grandfathering policy irrational in *Delaware River Basin* bear no resemblance to the facts of this

case.  There, nothing in the challenged municipal water regulation or its legislative history

provided any explanation for why the grandfather provision had been included, leaving the court

to guess at what purpose the provision was intended to serve.  641 F.2d at 1094.  Moreover, the

sole post hoc document attempting to provide a rationale for the provision offered reasons that

"seem[ed] at best unrelated, and perhaps even contrary, to" the broader regulatory scheme, and

the court could identify no "reliance interest" that the grandfather provision might serve.  *Id.* at

1093, 1999.  Here, by contrast, there is a complete legislative record documenting the purpose of

PASPA's exemptions and why Congress considered them consistent with its broader goal of

"halt[ing] the spread of State-sponsored sports gambling."  *Prohibiting State-Sanctioned Sports*

*Gambling: Hearing on S. 473 and S. 474 Before the Subcomm. On Patents, Copyright and*

*Trademarks of the S. Comm. on the Judiciary*, 102d Cong. 1, 5 (1991) (statement of Sen.

DeConcini, Chairman).  That record reveals that Congress had eminently rational reasons for

crafting PASPA's regulatory scheme in the manner that it did – its determination of which states

qualified for grandfathering was directly related to the states' clear and important reliance interests, and the exemptions were limited in a way that Congress deemed consistent with PASPA's overarching goals.

Defendants' alternative argument that *permanent* grandfather clauses are somehow more suspect than limited ones (Opp. Br. 35, 38) is equally meritless. Nothing in the Supreme Court's decision in *City of New Orleans v. Dukes*, 427 U.S. 297 (1976), remotely suggested that the rationality of the distinction between push-cart operators of recent vintage and those who had operated for more than eight years depended on the ultimate expiration of the preference for those who operated longer. Quite the contrary, the Court noted that it was entirely rational for the city to draw that *permanent* distinction – which was granted to the push-cart company, not the specific individual who operated it at the time – based on both reliance interests and its determination that the more established vendors "had themselves become part of the distinctive character and charm" of the area. *Id.* at 305. Thus, the "gradual approach" to which the Court referred does not require the elimination of distinctions, permanent or otherwise, where those distinctions are based on important reliance interests.

In short, there is plainly "no irrationality in [PASPA's] grandfather clause." *Salem Blue Collar Workers Ass'n*, 33 F.3d at 272. Accordingly, defendants have not come close to meeting their heavy burden of proving that Congress acted unconstitutionally when it squarely preempted New Jersey's attempt to authorize state-sponsored sports gambling.

## III.    *The Sports Organizations Are Entitled to a Permanent Injunction.*

Finally, defendants argue (Opp. Br. 38-40) that the Sports Organizations are not entitled to judgment permanently enjoining New Jersey's acknowledged violation of PASPA. But a permanent injunction preventing New Jersey from implementing its Sports Wagering Law

in violation of PASPA follows ineluctably from a decision on the merits in this case. *See, e.g.,* *Sierra Club v. Franklin Cnty. Power of Ill., LLC*, 546 F.3d 918, 936 (7th Cir. 2008) ("So the court's injunction, which prohibits the Company from 'actual construction of the Plant until [it has] obtained a valid PSD permit,' is essentially the same as the court's finding on the merits."); *OFC Comm Baseball v. Markell*, No. 09-538 (GMS), at 2 (D. Del. Sept. 1, 2009) (Dkt. 36) (granting the Sports Organizations a permanent injunction after the Third Circuit had concluded that Delaware's proposed sports betting scheme violated PASPA). A failure to enjoin New Jersey's continued violation of PASPA after New Jersey has conceded that its Sports Wagering Law violates federal law, and thus the Supremacy Clause of the Constitution, would produce the very "'odd' or 'absurd' results . . . 'inconsistent with common sense'" that the Third Circuit in *Markell* admonished lower courts to avoid. 579 F.3d at 304 (citation omitted).

Defendants argue that the Sports Organizations are not entitled to the permanent injunction they seek because they allegedly have failed to meet the four-part test articulated in *eBay Inc. v. Mercexchange, L.L.C.*, 547 U.S. 388 (2006). Whether the Sports Organizations need to make a specific showing on each of the four factors of the *eBay* test in this case, where New Jersey has concededly violated federal law, is debatable. *See, e.g., Antoninetti v. Chipotle Mexican Grill, Inc.*, 643 F.3d 1165, 1175 (9th Cir. 2010), *cert. denied*, 131 S. Ct. 2113 (2011); *Sierra Club*, 546 F.3d at 935. Nevertheless, the Sports Organizations easily satisfy all four parts of the *eBay* standard: they are threatened with irreparable injury; remedies at law, such as monetary damages, are inadequate to compensate the Sports Organizations for that injury; the balance of hardships between the Sports Organizations and defendants favors permanently

21

enjoining the State's violation of PASPA; and the requested permanent injunction would serve the public interest. *See eBay*, 547 U.S. at 391.[9]

*First*, the Sports Organizations are threatened with irreparable injury as a result of New Jersey's violation of PASPA. In *Markell*, the Third Circuit succinctly concluded that the spread of sports gambling by even a single state "would engender the very ills that PASPA sought to combat." 579 F.3d at 304. Those ills, including harm to the integrity and public confidence in amateur and professional sports, are by their nature irreparable. *See, e.g., BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 263 (3d Cir. 2000) (damage "to BP's reputation, credibility and ability to license its technology if FCFC's plant became operational, giving rise to the public perception that BP was unable to protect its proprietary trade secrets," constituted irreparable injury).

Moreover, as explained above, in PASPA, Congress granted the Sports Organizations the statutory right to be free from the spread of state-sponsored sports gambling on their games. New Jersey's violation of plaintiffs' substantive rights under PASPA constitutes irreparable injury. *See Kansas Health Care Ass'n v. Kansas Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1543 (10th Cir. 1994) ("a legally cognizable injury to [plaintiffs] resulting from [Kansas's] noncompliance with the [federal statute]" constituted irreparable injury); *New Jersey Coal. of Auto. Retailers v. DaimlerChrysler Motors Corp.*, 107 F. Supp. 2d 495, 500 (D.N.J.

---

[9]   "[T]he standard for granting permanent injunctive relief is the same as for a preliminary injunction, except that the moving party must actually succeed on the merits instead of merely showing a likelihood of success." *National R.R. Passenger Corp. v. Caln Twp.*, No. 08-5398, 2010 WL 92518, at *8 (E.D. Pa. Jan 8, 2010) (citation omitted). Given defendants' acknowledgement that New Jersey's conduct violates PASPA, the Sports Organizations thus incorporate by reference herein the arguments set forth in their moving brief in support of their motion for a preliminary injunction (Dkt. No. 10-2, at 15-24), both as to their request for a preliminary injunction if necessary to preserve the status quo pending final judgment, and in support of their entitlement to a permanent injunction.

1999) (loss of dealers' statutory rights constituted irreparable injury). Finally, New Jersey's enactment and implementation of its Sports Wagering Law in violation of federal law likewise violates the Supremacy Clause of the Constitution. Such constitutional violations are themselves sufficient to establish irreparable injury. *See Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 784 (5th Cir. 1990) ("permitting states to regulate [in the face of a federal policy of deregulation] would violate the Supremacy Clause, causing irreparable injury"); *American Express Travel Related Servs. Co. v. Sidamon-Eristoff*, 755 F. Supp. 2d 556, 614 (D.N.J. 2010) ("that the [SVC Plaintiffs] will suffer an immediate irreparable harm is buttressed by my finding that the [state statute] is unconstitutional"), *aff'd*, 669 F.3d 374 (3d Cir. 2012); *United States v. Ferrara*, No. 92-2869 (NHJ), 1993 WL 405477, at *1 (D.D.C. Feb. 8, 1993) (violation of the Supremacy Clause "alone constitutes irreparable harm").

*Second*, monetary remedies are inadequate to compensate the Sports Organizations for the injury threatened by New Jersey's violation of PASPA. As an initial matter, PASPA does not permit an action for damages; it authorizes only injunctive relief. 28 U.S.C. § 3703. Where, as here, the State's violation of PASPA is admitted and "an injunction is the only relief available to a private party under the Act, it would be an abuse of discretion for the district court now to deny injunctive relief." *Antoninetti*, 643 F.3d at 1175. Moreover, even if damages were available to remedy a violation of PASPA, the Eleventh Amendment would bar the Sports Organizations from recovering damages against the State or its representatives acting in their official capacity. *See, e.g., Temple Univ. v. White*, 941 F.2d 201, 215 (3d Cir. 1991) ("As to the inadequacy of legal remedies, the Eleventh Amendment bar to an award of retroactive damages against the Commonwealth clearly establishes that any legal remedy is unavailable and that the only relief available is equitable in nature.") (citation omitted). And finally, even if

23

damages were available for a violation of PASPA, the continuing nature of New Jersey's

violation of PASPA, if not enjoined, would require the Sports Organizations to return to this

Court each time the State issues a new sports gambling license.  The burden on the Sports

Organizations of repeated litigation renders monetary damages, even if available, inadequate,

and establishes the irreparability of the Sports Organizations' threatened injury.  *See Meyer v.*

*Portfolio Recovery Assocs.*, 696 F.3d 943, 951 (9th Cir. 2012) (plaintiff demonstrated irreparable

injury where defendant would have continued to violate federal law if an injunction was not

issued); *Port Drivers Fed'n v. All Saints Express, Inc.*, 757 F. Supp. 2d 443, 461 (D.N.J. 2010)

(irreparable harm and no adequate remedy at law based on the "burden of future litigation");

*Southeastern Pa. Transp. Auth. v. Pennsylvania Pub. Util. Comm'n*, 210 F. Supp. 2d 689, 727

(E.D. Pa. 2002) (finding irreparable injury and no adequate remedy at law based on "relitigation

of a finally decided issue"), *aff'd*, 342 F.3d 242 (3d Cir. 2003).

   *Third*, the balance of hardships weighs in favor of the Sports Organizations.

Weighed against the irreparable injury that the State's violation of PASPA threatens to inflict on

the Sports Organizations if the Court does not issue an injunction, the issuance of a permanent

injunction will simply require defendants to comply with federal law.  As a matter of law,

compliance with valid federal law constitutes no cognizable hardship whatsoever.  *See, e.g.,*

*Sierra Club*, 546 F.3d at 936 (balance of harms favored permanent injunction where injunction

required defendant to comply with the Clean Air Act); *Coach, Inc. v. Fashion Paradise, LLC*,

No. 10-4888 (JBS/KMW), 2012 WL 194092, at *9 (D.N.J. Jan. 20, 2012) (balance of hardships

favored permanent injunction because "[t]he only hardship imposed upon the Defendants is that

they obey the law"); *Port Drivers Fed'n*, 757 F. Supp. 2d at 461 (balance of hardships favored

injunction where defendant simply required to comply with federal regulations).

*Fourth*, the requested permanent injunction would serve the public interest by requiring defendants to comply with federal law. *See Chamber of Commerce v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010) (public interest served "by enjoining the enforcement of the invalid provisions of state law") (citation omitted). Because the enactment and implementation of New Jersey's Sports Wagering Law violates the Supremacy Clause, it is unconstitutional and, as the Third Circuit has held, "the public interest [is] 'not served by the enforcement of an unconstitutional law.'" *American Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003), *aff'd*, 542 U.S. 656 (2004); *see also Wiley Mission v. New Jersey*, No. 10-3024 (RBK/JS), 2011 WL 3841437, at *20 (D.N.J. Aug. 25, 2011) ("requiring the Department to abide by the Constitution serves the public interest"); *National R.R. Passenger Corp.*, 2010 WL 92518, at *9 ("public interest favors granting injunctive relief enjoining the enforcement of the Ordinance against Amtrak because its enforcement would violate federal law").

In sum, plaintiffs fully satisfy the requirements for permanent injunctive relief.

## *Conclusion*

For the foregoing reasons, as well as the reasons set forth in the moving papers, this Court should grant the Sports Organizations' motion for summary judgment, deny defendants' cross-motion for summary judgment, and enter final judgment permanently enjoining defendants and all others acting on their authority, instruction and behalf, or under the authority of their respective offices, from taking any action to cause or permit the State of New Jersey to implement any sports gambling program in violation of PASPA and, if necessary to preserve the status quo pending a final decision on the merits of this case, a preliminary injunction to the same effect.

Dated:  December 7, 2012                    Respectfully submitted,

                                            **MCCARTER & ENGLISH, LLP**


                                            By:   *s/William J. O'Shaughnessy*
                                                    William J. O'Shaughnessy
                                                    Richard Hernandez
                                                    Four Gateway Center
                                                    100 Mulberry St.
                                                    Newark, New Jersey 07102
                                                    (973) 622-4444
                                                    woshaughnessy@mccarter.com
                                                    rhernandez@mccarter.com

                                                    Jeffrey A. Mishkin
                                                    Anthony J. Dreyer
                                                    **SKADDEN ARPS SLATE MEAGHER &**
                                                        **FLOM LLP**
                                                    Four Times Square
                                                    New York, NY 10036
                                                    (212) 735-3000
                                                    jmishkin@skadden.com
                                                    adreyer@skadden.com

                                                    Paul D. Clement
                                                    Erin E. Murphy
                                                    **BANCROFT PLLC**
                                                    1919 M Street, N.W., Suite 470
                                                    Washington, DC 20036
                                                    (202) 234-0090
                                                    pclement@bancroftpllc.com
                                                    emurphy@bancroftpllc.com

                                                    *Attorneys for Plaintiffs*
                                                       *National Collegiate Athletic Association,*
                                                       *National Basketball Association, National*
                                                       *Football League, National Hockey League,*
                                                       *and Office of the Commissioner of Baseball,*
                                                       *doing business as Major League Baseball*

26