**McCARTER & ENGLISH, LLP**
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
(973) 622-4444

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
Four Times Square
New York, NY 10036
(212) 735-3000

**BANCROFT PLLC**
1919 M Street, N.W., Suite 470
Washington, DC 20036
(202) 234-0090

Attorneys for Plaintiffs
    National Collegiate Athletic Association,
    National Basketball Association, National
    Football League, National Hockey League, and
    Office of the Commissioner of Baseball doing
    business as Major League Baseball

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, et al., | : : | **UNITED STATES DISTRICT COURT DISTRICT OF NEW JERSEY** |
| Plaintiffs, | : : | Civil Action No. 3:12-cv-4947 (MAS) (LHG) |
| v. | : : : | Hon. Michael A. Shipp, U.S.D.J. Hon. Lois H. Goodman, U.S.M.J. |
| CHRISTOPHER J. CHRISTIE, et al., | : : | |
| Defendants. | : : : :: | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF
UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1**

Plaintiffs National Collegiate Athletic Association (the "NCAA"), National Basketball Association (the "NBA"), National Football League (the "NFL"), National Hockey League ("NHL"), and the Office of the Commissioner of Baseball ("MLB"), respectfully submit this Response to Defendants' Rule 56.1 Statement of "Undisputed" Material Facts, dated November 21, 2012 (Dkt. 76-2) ("Defs.' SUMF").

It is important to note at the outset that, as more fully set forth in Plaintiffs' Reply Brief in Support of Their Motion for Summary Judgment, and, if Necessary to Preserve the Status Quo, a Preliminary Injunction, and Brief in Opposition to Defendants' Cross-Motion for Summary Judgment, the purportedly "undisputed" facts in Defendants' Rule 56.1 Statement are in no way material to the only issues that are relevant to Plaintiffs' entitlement to summary judgment – namely, standing, the constitutionality of the Professional and Amateur Sports Protection Act ("PASPA"), and the availability of permanent injunctive relief. Each of these issues can, and should be resolved as a matter of law.

## GENERAL RESPONSES AND OBJECTIONS

As part of their attempt to burden Plaintiffs in the limited time in which they have to respond to Defendants' Opposition to Summary Judgment, and to erroneously suggest the absence of any dispute regarding propositions they know full well are disputed (although entirely irrelevant to the resolution of Plaintiffs' Motion for Summary Judgment), Defendants have submitted a wildly excessive statement of purportedly material "facts" that extends far beyond the bounds of zealous advocacy, and represents a gross imposition on the time of the Court. Defendants' 106 paragraphs – many of which comprise multiple factual statements – suffer from a variety of deficiencies that render them not only unduly burdensome, but also highly misleading. Among other shortcomings that pervade Defendants' statements:

1.      Defendants selectively quote from documents and transcripts to suggest erroneously that Plaintiffs have accepted and do not dispute Defendants' assertions.

2.      Defendants utterly ignore testimony and documents that plainly contradict assertions they falsely contend are undisputed, nearly all of which, in any event, have nothing to do with Plaintiffs' entitlement to summary judgment.

3.      Defendants directly rely on inadmissible hearsay, including dozens of citations to the report of their expert Robert D. Willig (the "Willig Report") – an individual with no knowledge or experience in analyzing legal or illegal sports gambling activity, or the effects of that activity – as so-called "evidence" of propositions which Mr. Willig has merely adopted wholesale from third-party documents.  *See* Fed R. Civ. P. 56(c); *Stuckey v. Blessing*, 2012 WL 1714974, at *3 (M.D. Pa. Apr. 26, 2012) ("[A] party may not rely upon inadmissible hearsay assertions to avoid summary judgment."); *Countryside Oil Co. v. Travelers Ins. Co.*, 928 F. Supp. 474, 482 (D.N.J. 1995) ("It is well settled that only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment.").  Although experts are not prohibited from basing their opinions on some hearsay evidence, simple transmission of hearsay statements in an expert report does not render those statements admissible for the truth of the matter asserted. *See Crowley v. Chait*, 322 F. Supp. 2d 530, 553 (D.N.J. 2004) ("[A]n expert may not be used simply as a vehicle for the admission into evidence of otherwise inadmissible hearsay testimony"); *United States v. Tomasian*, 784 F.2d 782, 786 (7th Cir. 1986) ("Rule 703 does not sanction the simple transmission of hearsay; it only permits an expert opinion based on hearsay."); Wright & Gold, Federal Practice & Procedure § 6273 ("Rule 703 does not authorize admitting hearsay on the pretense that it is the basis for expert opinion when, in fact, the expert adds nothing to the out-of-court statements other than transmitting them to the jury.  In such a

case, Rule 703 is simply inapplicable and the usual rules regulating the admissibility of evidence control.")

Mr. Willig's recitation of hearsay should be entirely disregarded for the further reason that, at his deposition, he acknowledged that he decided to disclose in his report only those sources that he "obviously relied upon because it's literally cited to" and not other documents that he "considered," and that he would "explain at the appropriate time that [he] might very well have seen" other documents, even though he could not specify what those documents were. *See* Hernandez Certif.[1] Ex. 31 (Willig Dep.) at 81:15-84:10 ("So I might well have seen, for example, excerpts from this and in some sense reviewed or considered but not relied upon and those . . .  probably did not wind up on the list of materials so-called considered if I didn't also cite to it in my report or in the backup to the report"); *id.* ("Q: Were there any other things that you think you considered and that you didn't rely upon and report to us?  A: "Probably. I've looked at a lot of web sites and if I didn't actually use them for a specific point then they wouldn't be on the list of things considered because I didn't cite to them, for example.")  This constitutes a clear violation of Federal Rule of Civil Procedure 26(a)(2)(B), which requires disclosure of "the facts or data considered by the witness" in forming his opinions. *See* 2010 Advisory Committee Notes for Fed. R. Civ. P. 26 ("The disclosure obligation extends to any facts or data 'considered' by the expert in forming the opinions to be expressed, not only those relied upon by the expert.").

---

[1]    "Hernandez Certif." refers to the  Certification Of Richard Hernandez In Opposition To Defendants' Cross-Motion For Summary Judgment And In Further Support Of Plaintiffs' Motion For Summary Judgment And, If Necessary To Preserve The Status Quo, A Preliminary Injunction.

4.      Many of Defendants' statements are not factual in nature and instead improperly present arguments as to the sufficiency of Plaintiffs' evidence.  Local Civ. R. 56.1(a); *Everest Reins. Co. v. Int'l Aerospace Ins. Servs., Inc.*, 2012 WL 3638702, at *7 n.3 (D.N.J. Aug. 22, 2012) (disregarding legal conclusions in Rule 56.1 statement); *Sprint Spectrum, L.P. v. Zoning Bd. of Adjustment*, 2010 WL 4868218, at *18 (D.N.J. Nov. 22, 2010) (granting motion to strike Rule 56.1 statement "to the extent that it asserts legal arguments").  *See, e.g,.* Defs.' SUMF ¶¶ 76, 78, 79, 81, 82, 94, 103, 106 (stating that Plaintiffs have "no empirical evidence").

5.      Defendants rely on numerous articles and other documents that were neither identified in Defendants' Rule 26 Disclosures nor produced to Plaintiffs, in clear violation of the Court's October 19 Order.  *See* Dkt. 54 ("Ordered, pursuant to the parties' meet-and-confer discussions . . . that to the extent not already produced the parties shall produce documents in their possession, custody and control on which they intend to rely no later than October 29, 2012").  These documents are not properly part of the summary judgment record.

As a result of all of the foregoing, Plaintiffs are now improperly burdened with clarifying the evidentiary record.

## SPECIFIC RESPONSES AND OBJECTIONS

### Defendants' Statement No. 1:

Federal criminal law prohibits transmission of information on a "wire communication facility" for the purpose of assisting the placement of bets and wagers, but makes an exception when the wagering is legal under State law.  *See* 28 U.S.C. § 1804.

### Plaintiffs' Response:

**Disputed.**  There is no statute at 28 U.S.C. § 1804.  To the extent that Defendants intended to refer to 18 U.S.C. § 1084 ("Transmission of wagering information; penalties") and/or any related provisions, Defendants' characterization of "federal criminal law" is incomplete and inaccurate.  That statute establishes criminal liability for "knowingly us[ing] a

wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers."  Moreover, contrary to Defendants' claim, the statute merely permits the "wires" to be used for placing sports bets if those bets are legal where *both* the sender and recipient are located; to wit, the statute does not "prevent . . . the transmission of information assisting in the placing of bets or wagers on a sporting event or contest from a State or foreign country where betting on that sporting event or contest is legal into a State or foreign country in which such betting is legal."  18 U.S.C. § 1084(b).

**Defendants' Statement No. 2:**

Federal anti-racketeering laws apply to businesses "involving gambling," but only when gambling is "in violation of the laws of the State in which [it is] committed."  *Id.* § 1952.

Plaintiffs' Response:

**Disputed.**  To the extent that Defendants intended to refer to 18 U.S.C. § 1952 ("Interstate and foreign travel or transportation in aid of racketeering enterprises"), Defendants' characterization of the statute is incomplete and inaccurate.  The statute defines "unlawful activity" to include "any business enterprise involving gambling . . . in violation of the laws of the State in which they are committed *or of the United States* . . . ."  18 U.S.C. § 1952(b) (emphasis added).

**Defendants' Statement No. 3:**

Sports wagering was legalized in Nevada in 1949.  Declaration of Peter Slocum ("Slocum Decl."), Exhibit 1 (Willig Report, ¶ 15).

Plaintiffs' Response:

**Not disputed.**

**Defendants' Statement No. 4:**

Oregon began operating a lottery game based on NFL games in 1989, but discontinued the lottery in 2007. *Id.* (Willig Report, ¶ 20).

Plaintiffs' Response:

**Not disputed**, subject to the clarification that the Oregon state law that authorized the operation of the lottery game based on the results of multiple (rather than single-game) sporting events (Or. Rev. Stat. § 461.213) was repealed, effective July 1, 2007. *See* 2005 Ore. ALS 810.

**Defendants' Statement No. 5:**

Montana allows sports pools, fantasy sports leagues, and sports tab games in which players wager against and settle with each other rather than wagering against and settling with the house. *Id.*

Plaintiffs' Response:

**Not disputed**, subject to the clarification that the Montana statutes governing such activities "do not authorize betting or wagering on the outcome of an individual sports event."  Mont. Code Ann., § 23-5-806 ("Sports betting prohibited – applicability").

**Defendants' Statement No. 6:**

In 2009, Delaware began permitting wagering on NFL games through multi-game parlay cards. *Id.*

Plaintiffs' Response:

**Not disputed.**

**Defendants' Statement No. 7:**

The amount of legal and illegal sports gambling in the United States has increased substantially from 1960 to the present.  *Id.* (Willig Report, ¶¶ 15-18, 22); *see also id.* Exhibit 2 (Results from 2008 NCAA Study on Collegiate Wagering [Plaintiffs' 00003054] ("Gambling expansion will continue in the U.S. and around the world.")); *id.* Exhibit 3 (Goodell Dep. 29:5-18) (an increase in the amount of money wagered on sports "wouldn't surprise me")).

<u>Plaintiffs' Response</u>:

**Disputed**.  The term "substantially" is vague and ambiguous.  Plaintiffs further object because Defendants' reliance on the Willig Report is improper insofar as that report relies on hearsay – in this instance, figures concerning the "amount of legal and illegal sports gambling" that Mr. Willig simply copied wholesale from articles by third parties (Willig Report, ¶¶ 15-18 (n. 5-11), ¶ 22).  *See* General Objection No. 3.

Indeed, at deposition, Mr. Willig acknowledged that some of the data that he was relying upon – including estimates as to the amount of sports wagering – were "not good data" and "not reliable" in and among themselves:

> [I]llegal gambling, which makes up so much of total gambling over my time period, I mean, between ninety-five and ninety-nine percent of the total gambling is estimated to be illegal and the data on illegal gambling year to year, it's just – that's not good data, *that's not reliable*.  We have estimates from a variety of sources, some of *the sources have different degrees I think of credibility* and can be spliced together the way I have for two very simple overall conclusions which are in my report.  *But to say there's enough information content that's credible in year-over-year data on levels of total gambling activity is just not in this data set*.  And to really identify these equations would take lots more data on the close structure of gambling activity than are available…  [T]he gambling data, certainly the illegal kind,  are not there.

(Hernandez Certif. Ex. 31 (Willig Dep.) at 165:22-166:21 (emphasis added).)

In addition, the quotation from NFL Commissioner Goodell's testimony is misleadingly excerpted and does not constitute admissible evidence.  Commissioner Goodell was asked, without foundation, if he was "aware that over the last 20 years at least, the amount of both legal and illegal sports gambling in the United States has increased," to which the Commissioner ultimately replied, "*I'm not familiar with that* but it wouldn't surprise me."

(Hernandez Certif. Ex. 6 (Goodell Dep.) at 29:5-18 (emphasis added).)

**Defendants' Statement No. 8:**

The annual volume of legal sports wagering in Nevada has increased from approximately $1.5 billion shortly before PASPA's enactment, to $2.9 billion in 2011. Slocum Decl. Exhibit 1 (Willig Report ¶ 17); *see also id.* Exhibit 2 (Results from 2008 NCAA Study on Collegiate Wagering [Plaintiffs' 00003053] (stating that "Approximately $2.57 billion was gambled in 2008 in Nevada's legal sportsbook.")).

Plaintiffs' Response:

**Disputed**. Plaintiffs object to the Statement because Defendants' reliance on the

Willig Report is improper insofar as that report relies on hearsay – in this instance, figures

concerning the "annual volume of legal sports wagering in Nevada" that Mr. Willig simply

copied wholesale from articles by third parties (although he does not include a citation for these

particular figures). (Willig Report, ¶ 17.) *See* General Objection No. 3. Even if these figures

were admissible, the Statement is a misleading representation of the purported increase in legal

sports wagering volume, as Mr. Willig reported that the $1.5 billion amount in 1990 would

amount to "$2.4 billion in current dollars." (*Id.*)

**Defendants' Statement No. 9:**

In December 2009, Commissioner David Stern stated: "We have morphed considerably in our corporate view where we say, look, Las Vegas is not evil. Las Vegas is a vacation and destination resort, and they have sports gambling and, in fact, there's a federal statute that gives them a monopoly of types. And we actually supported that statute back in '92." Slocum Decl. Exhibit 4 (Ian Thomsen, Sports Illustrated: "Stern Open to Legalized Betting, Rule Changes" (Dec. 11, 2009) [Defendants' 00022]); *see also id.* Exhibit 5 (Stern Dep. 53:5-54:10 (discussing same)).

Plaintiffs' Response:

It is **not disputed** that Commissioner Stern made a statement to the effect quoted

and that the statement was included among other quotations in an article posted on SI.com on

December 11, 2009. The Statement is **otherwise disputed** to the extent that Defendants

contend that Commissioner Stern or the NBA has at any time been a proponent of legalized

sports gambling in Nevada or otherwise. As Commissioner Stern explained at his deposition,

the statement was intended to convey his opinion that "if something is made legal, that we should approach it – even if we don't like it, we should accept what it is even though we fight against its expansion." (Hernandez Certif. Ex. 8 (Stern Dep.) at 55:7-10.)

**Defendants' Statement No. 10:**

    In December 2009, NBA Commissioner David Stern referred to nationally legalized gambling on the NBA as a "possibility" that "may be a huge opportunity."  Slocum Decl. Exhibit 4 (Ian Thomsen, Sports Illustrated:  "Stern Open to Legalized Betting, Rule Changes" (Dec. 11, 2009) [Defendants' 00022]); *see also id*. Exhibit 5 (Stern Dep. 55:11-59:7 (discussing same)).

Plaintiffs' Response:

        **Disputed.**  Defendants have conflated two different quotations in the SI.com article and inaccurately presented both of them devoid of any context to erroneously suggest that Commissioner Stern endorses further legalization of sports gambling.  In fact, he maintained that the NBA was not endorsing legalization and that sports gambling was still a "threat."  According to the article, when asked "[w]hy not make room under the big tent for the minority of fans who like to bet on NBA games," Commissioner Stern stated "OK, but then you're arguing there may be good and sufficient business reasons to do that . . . [B]ut it's fair enough that we may have moved to a point where that leap is a possibility, *although that's not our current position*."  (Defendants' 00022 (emphasis added).)  Subsequently, Commissioner Stern is quoted as saying "I think the threat is the same legal and illegal – *the threat is there*. Gambling, however it may have moved closer to the line [of being acceptable], *is still viewed on the threat side* . . . [a]lthough we understand fully why, buried within that threat there may be a huge opportunity as well."  (*Id*., emphasis added.)

        Commissioner Stern also testified at deposition that these statements referred to how the NBA would handle the issue *if* sports gambling was legalized by the federal government, as opposed to state governments: "What I meant was, as I see it, whenever this

federal law for legalized gambling occurs, it would come with enough money to deal with the

apparatus necessary to protect the sports from the threats that are posed." (Hernandez Certif. Ex.

8 (Stern Dep.) at 58:20-25; *see also id.* at 65:2-10 ("[I]t is a rational thought, because I've had it,

that at some point in the future there will be a modification of PASPA.  And . . . that would be

the least damaging, I think, than having 49 cuts which is – one of which is New Jersey's ham-

handed attempt to grab a few bucks at the expense of professional and amateur sports.").

**<u>Defendants' Statement No. 11:</u>**

In December 2009, NBA Commissioner David Stern acknowledged that the NBA can
no longer oppose gambling on moral grounds: "Considering the fact that so many state
governments – probably between 40 and 50 – don't consider it immoral, I don't think that
anyone [else] should.  It may be a little immoral, because it really is a tax on the poor, the
lotteries.  But having said that, it's now a matter of national policy:  Gambling is good."
Slocum Decl. Exhibit 4 (Ian Thomsen, Sports Illustrated:  "Stern Open to Legalized Betting,
Rule Changes" (Dec. 11, 2009) [Defendants' 00022]); *see also id.* Exhibit 5 (Stern Dep. 51:19-
52:19 (discussing same)).

<u>Plaintiffs' Response:</u>

It is **not disputed** that Commissioner Stern made a statement to the effect quoted

and that the statement was included among other quotations in an article posted on SI.com on

December 11, 2009.  The Statement is **otherwise disputed** to the extent that Defendants

contend that Commissioner Stern or the NBA has at any time been a proponent of legalized

sports gambling.  Defendants exclude the full context of the quotation – which addresses

gambling generally, and not sports gambling – and Commissioner Stern's deposition testimony

that the NBA continues to oppose further legalization of sports betting: "Gambling is good,

that's like my Gordon Gekko line from [the film "Wall Street" that] 'greed is good' so that's

what I mean; gambling is treated as good because the hunger for money outweighs any social

issues."  (Hernandez Certif. Ex. 8 (Stern Dep.) at 51:19-52:19.)  In the same article,

Commissioner Stern reaffirmed the NBA's opposition to further legalization of sports gambling

(*see supra* Responses to Defs.' SUMF ¶¶ 9-10).

**Defendants' Statement No. 12:**

NBA Commissioner David Stern believes that the culture in the United States and the leaders of the United States have become less concerned with gambling.  Slocum Decl. Exhibit 5 (Stern Dep. 57:14-58:11).

Plaintiffs' Response:

**Disputed**.  Defendants' mischaracterize the cited testimony from Commissioner

Stern, which was made in response to a question as to whether gambling generally – as opposed

to sports gambling – has "moved closer to the line of becoming acceptable:"

> It's the very thing that we – the continual leaking into the mainstream conversation of point spreads and, you know, the reporting on Las Vegas and the like and the -- but really more about gambling itself.  We've gone from a culture that didn't allow lotteries to one where I'll bet you a majority of our states have a physical presence that allows some kind of casino gambling, starting out on the Indian reservations going to downtown casinos in Detroit and Cleveland and New York City actually.  So that the broader context of gambling has – the fact that it's a regressive tax is less concerning to the people who are supposed to lead us, and they're interested only on the funding side.  So it's – it has been a march.  I've been a witness, I've been a witness to it.

(Hernandez Certif. Ex. 8 (Stern Dep.) at 57:14-58:11.)

**Defendants' Statement No. 13:**

NBA Commissioner David Stern believes that PASPA will be modified, the federal government will take over gaming for funding reasons, and that this modification may benefit the NBA.  *Id.* (Stern Dep. 56:12-57:2, 58:20-59:7, 64:5-65:10).

Plaintiffs' Response:

**Disputed**.  Defendants mischaracterize the cited testimony.  Commissioner Stern

recognizes the *possibility* that, "[n]ot any time soon," the federal government *could* seek to

"take over gaming and over our objections likely because the march of funding needs is so

11

great." (Hernandez Certif. Ex. 8 (Stern Dep.) at 56:12-57:2.)  Commissioner Stern then

explained that *if that were to actually happen*, a uniform national regulatory policy would be

preferable to each state making its own "ham-handed attempt to grab a few bucks at the expense

of professional and amateur sports." (*Id.* at 64:5-65:10.)

**Defendants' Statement No. 14:**

There are approximately forty direct flights each week from Newark, New Jersey to Las
Vegas.  Newark Liberty Airport Flight Schedules, available at:
http://timetables.oag.com/fe_tt//nyc/flights.asp

Plaintiffs' Response:

It is **not disputed** only that there are multiple direct flights from Newark, New

Jersey to Las Vegas, Nevada "each week."  The Statement is **otherwise disputed**.  Plaintiffs

object to the *number* of such flights as inadmissible hearsay.  Plaintiffs further dispute the

Statement insofar as Defendants improperly cite to it in their brief to support a proposition that

Nevada's "monopoly of types" on legal sports wagering in the United States is the reason why

"[m]illions of people travel to Las Vegas each year from all over the world." (Dkt. 76-1, at 4.)

**Defendants' Statement No. 15:**

The total volume of sports wagering in the United States is estimated to be in the
hundreds of billions of dollars annually, with the illegal sports wagering market having
increased from an estimated $50 billion in 1989 (adjusting for inflation) to an estimated range
of $270 to $500 billion today.  Slocum Decl. Exhibit 1 (Willig Report ¶ 22); *id.* Exhibit 6
(Pedowitz Report to NBA Board of Governors, Oct. 1, 2008 [Plaintiffs' 00003465-66] ("[T]otal
volume of sports betting in the United States is $325 to $400 billion")); *see also id.* Exhibit 7
(National Gambling Impact Study Commission Report, 1999 [Plaintiffs' 00002363] (1999
estimate of illegal sports betting in the U.S. ranged from $80 billion to $380 billion)); *id.*
Exhibit 8 (Emmert Dep. 17:17-18:10 (illegal sports activity is "very significant activity")); *id.*
Exhibit 3 (Goodell Dep. 28:7-29:4 ("I think it's fair to say it's a billion dollars plus.")); *id.*
Exhibit 9 (Selig Dep. 10:20-11:17 (admitting "huge" nature of illegal sports gambling); *id.*
Exhibit 10 (MLB 30(b)(6) Dep. 36:5-14 ("There's no question there's illegal betting going
on.")); *id.* Exhibit 5 (Stern Dep. 14:12-20 (illegal gambling is a multibillion dollar enterprise)).

Plaintiffs' Response:

   **Disputed**.  Defendants can only support the uncontroversial proposition that

illegal sports gambling exists in the United States and may be substantial.  Any attempt to fix

actual numbers to the volume of that activity ("$50 billion" and "$270 to $500 billion") is

unavailing.  While Plaintiffs have no reason to dispute that third parties have made estimates of

the illegal sports wagering market, the Willig Report merely adopts those estimates as true and

accurate – i.e., for the truth of the matter asserted.  (Willig Report ¶ 22.)  Mr. Willig's mere

acceptance, "summariz[ing]," and "compil[ation]" of these third party estimates does not alter

their hearsay nature.  *See* General Objection No. 3.

   To the extent that Defendants rely on any non-hearsay sources, Mr. Willig

acknowledged that third party estimates of illegal gambling activity are not "credible."  *See*

*supra* Plaintiffs' Response to Defs.' SUMF ¶ 7.  This is further confirmed by the deposition

testimony cited by Defendants, which merely reflect that the witnesses had no foundational

basis to confirm the accuracy of those estimates.  *See, e.g.*, Hernandez Certif. Ex. 4 (MLB

30(b)(6) Dep.) at 26:5-19, 27:3-14 ("It's probably a very hard market to estimate."); *id.* Ex. 2

(Emmert Dep.) at 17:17-18:10 ("I can't say whether I know the precise size of it, and I'm not

sure anyone, of course, can do that"); *id.* Ex. 8 (Stern Dep.) at 14:12-25 (noting he does not

"know what the specifics are" concerning the volume of illegal sports gambling);  *id.* Ex. 5

(Selig Dep.) at 10:14-22 (only stating his awareness that gambling in Las Vegas and elsewhere

is "huge"); *id.* Ex. 6 (Goodell Dep.) at 28:7-29:4 ("I don't recall the specific number").

**Defendants' Statement No. 16:**

   Less than 1% of the estimated betting on sports that occurs annually in the United States
consists of sports wagers placed legally in Nevada.  Slocum Decl. Exhibit 1 (Willig Report ¶
21); *id.* Exhibit 6 (Pedowitz Report to NBA Board of Governors, Oct. 1, 2008 [Plaintiffs'
00003466] ("less than 1% of this betting taking place legally in Nevada")); *id.* Exhibit 7
(National Gambling Impact Study Commission Report, 1999 [Plaintiffs' 00002363] ($2.3

billion in legal sports wagering)); *see also id*. Exhibit 5 (Stern Dep. 14:21-15:9); *id*. Exhibit 12
(NBA 30(b)(6) Dep. 69:17-22 (assuming that illegal sports gambling is larger than legal market);
*id*. Exhibit 11 (Mullin Dep. 30:10-33:14 (Illegal sports gambling is "anywhere from ten to 50
times the legal volume.")).

Plaintiffs' Response:

  **Disputed**.  Defendants can only support the uncontroversial proposition that
illegal sports gambling in the United States may be substantially greater in volume than legal
sports gambling (which is largely confined to Nevada).  Any attempt to fix percentages to the
volume of legal versus illegal sports gambling is unavailing.

  Defendants rely on the Willig Report, which merely adopts wholesale a third
party's hearsay statement: "The American Gaming Association, for example, estimates that
'Nevada's legal sports wagering represents less than 1% of all sports wagering
nationwide.'"  (Willig Report ¶ 21.)  Mr. Willig's mere transmission of the American Gaming
Association's estimate does not alter its hearsay nature.  *See* General Objection No. 3.

  To the extent that Defendants rely on any non-hearsay sources, Mr. Willig
acknowledged that third party estimates of illegal gambling activity are not "credible."  *See*
*supra* Plaintiffs' Response to Defs.' SUMF ¶ 7.  This is further confirmed by the deposition
testimony cited by Defendants, which merely reflect that the witnesses acknowledged that the
illegal sports gambling market likely is larger than the legal market, without reference to
specific figures or establishment of any foundation to confirm that Defendants' proposed figures
are accurate.  *See* Hernandez Certif. Ex. 8 (Stern Dep.) at 15:2-9 ("I haven't seen that, but it
wouldn't surprise me if it's a small percentage of the total amount."); *id.* Ex. 7 (NBA 30(b)(6)
Dep.) at 69:7-16 (stating that he does not "have an independent basis to agree or disagree" that
"a relatively small percentage of the total volume of sports betting in the United States takes
place legally in Nevada"); *id.* Ex. 10 (Mullin Dep.) at 31:2-16, 33:6-14 ("I could say generally

that there is more illegal gambling . . . than there is in Las Vegas" but "there is no exact number

on that").

**Defendants' Statement No. 17:**

The American Gaming Association indicates that $93.9 million was wagered legally in Nevada on the 2012 Super Bowl as compared to over $6 billion wagered illegally.  Slocum Decl. Exhibit 1 (Willig Report ¶ 24).

Plaintiffs' Response:

**Disputed**.  While Plaintiffs do not dispute that the American Gaming

Association has presented such estimates, Defendants once again cite third party estimates for

the truth of the matter asserted.  As such, Plaintiffs object to the statement as hearsay.  That

these estimates were reprinted in the Willig Report does not alter their hearsay status.  *See*

General Objection No. 3.

**Defendants' Statement No. 18:**

The FBI estimates that illegal wagering on March Madness totals $2.5 billion every year, as compared to legal wagering on March Madness of about $80-$90 million.  The March Madness tournament has grown in popularity; the value of TV rights sold by the NCAA have grown from an inflation adjusted $35 million in the early 1980s to approximately $770 million today.  The NCAA has sanctioned the development of a March Madness Facebook application, promotes March Madness brackets on the NCAA website, and provides links to March Madness brackets that allow groups to set up and manage bracket games that may involve wagering.  *Id.* (Willig Report ¶¶ 23, 37(c), 97-98).

Plaintiffs' Response:

**Disputed**.  Plaintiffs object to this Statement as being comprised of multiple

distinct statements, which Plaintiffs address in turn:

First Sentence:  **Disputed**.  Defendants cite to the Willig Report for the

proposition that the FBI estimates are accurate and thus it is impermissibly hearsay.  *See*

General Objection No. 3.  In addition, the Willig Report does not cite directly to those estimates,

but only to the American Gaming Association website.  (Willig Report, ¶ 23.)

<u>Second Sentence</u>: **Not Disputed**.

<u>Third Sentence</u>: **Disputed**.  March Madness brackets are not on the NCAA website.  While the "NCAA.com" website – which is not operated by the NCAA, but rather one of its corporate broadcast partners – provides links to March Madness brackets that allow groups to set up and manage bracket games, there is no support for the proposition that those bracket games "may involve wagering."  The Willig Report does not cite anything to support the statement that the "CBSSports.com online bracket program" – which is also not operated by the NCAA – "may be used by groups to set up and manage private bracket games that involve wagering (e.g., office pools)." (Willig Report ¶ 98.)  Indeed, Mr. Willig himself recognizes that such pools are "often illegal."  (Willig Report ¶ 95, n. 123.)

To the extent that Defendants are claiming the NCAA authorizes or encourages wagering, or that wagering accounts for the popularity of March Madness, those positions are erroneous and unsupported.  None of the websites cited by Mr. Willig authorize sports wagering in any form.  In fact, the third party-operated NCAA.com "bracket challenge" prominently features the NCAA's "Don't Bet On It" logo/slogan, which reflects the NCAA's concerted effort to prevent wagering on its events.  (Willig Report ¶ 98 n.127.)  Moreover, the NCAA's policies unequivocally preclude all NCAA staff, student-athletes, coaches, and athletic administrators – i.e. those individuals within the NCAA's "jurisdiction" (*see* Hernandez Certif. Ex. 1 (NCAA 30(b)(6) Dep.) at 172:18-21) – from wagering on sports, including March Madness events.  *See* Slocum Decl. Ex. 4, at Plaintiffs' 001845-46; (NCAA Rules 10.02.1, 10.3); Hernandez Certif. Ex. 1 (NCAA 30(b)(6) Dep.) at 94:17-95:13 (discussing Rule 10.3).  The NCAA also devotes significant resources to education in order to limit the amount of sports wagering that occurs on March Madness.  *See, e.g.*, *id.* at 252:7-12 ("I can tell you that we do our best to provide education related to the pools, and also to encourage people to enjoy the

16

tournament for the shear [sic] competition that's taking place and not because of money that they may have in a pool."); *id.* at 121:14-23 (discussing how NCAA increased its educational efforts after learning results of a 2003 study); Slocum Decl. Ex. 14 (NCAA "Don't Bet on It" presentation) at Plaintiffs' 00002301, 00002315; *id.* Ex. 2 (Presentation of NCAA Research on Collegiate Wagering) at Plaintiffs' 00003050.

**Defendants' Statement No. 19:**

     Fantasy sports wagering, like real-world sports wagering, involves putting money at stake on actual game performances that are subject to chance, with a financial prize going to the winner (which is often the result of a pool formed by the leagues' participants at the beginning of the season). Slocum Decl. Exhibit 1 (Willig Report ¶¶ 84, 89-93) (describing similarities between fantasy sports and sports wagering; describing official NBA Fantasy "Pro Leagues" that involve entry fees, allow participants to compete against unknown competitors, and offer financial payouts; describing NFL fantasy offerings including games offering $1 million prizes and another game that offers a trip to the Pro Bowl for correctly picking the score of a single game; and describing MLB fantasy games including the "Beat the Streak" game that offers $5.6 million prize for correctly predicting hits); *id.* Exhibit 10 (MLB 30(b)(6) Dep. 102:6-12, 130:9-20 (some fantasy leagues have entry fees and monetary prizes and players may select high entry fees with larger payouts); *id.* at 104:2-8 (admitting uncertain nature of individual player performances)); Slocum Decl. Exhibit 12 (NBA 30(b)(6) Dep. 119:6-16 (some fantasy sports leagues have entry fees and prizes)); *id.* Exhibit 5 (Stern Dep. 36:25-37:5 (same)); *id.* Exhibit 13 (NCAA 30(b)(6) Dep. 25:15-25, 169:11-20, 170:16-171:9 (NCAA prohibits participation in fantasy sports leagues and March Madness pools with entry fees and prizes to the winner as impermissible sports wagering)); *id.* Exhibit 14 (Results of NCAA Gambling Surveys and Trends in Sports Wagering Cases [Plaintiffs' 00002317] (NCAA determined that it was a "major infraction" for a head coach to own and operate a fantasy league)); *id.* Exhibit 15 (NFL Gambling Policy [Plaintiffs' 00003110] ("Gambling – the wagering of money and/or something else of value, on an event with an uncertain outcome . . . [T]he use of exercise of skill, strategy, and/or knowledge, unless it *completely negates the element of chance*, does not convert an activity into something other than gambling.") (emphasis added)); *id.* Exhibit 16 (NFL 30(b)(6) Dep. 29:21-31:4 (wagering money on a player's statistics over the course of an entire season (which occurs in fantasy games) meets the NFL's definition of sports gambling); *id.* at 155:23-156:19 (admitting that fantasy football outcomes are uncertain)); *id.* Exhibit 12 (NBA 30(b)(6) Dep. 119:17-120:4 (fantasy sports involve combinations of skill and chance)); *id.* Exhibit 17 (Fantasy Industry Trends, Fantasy Sports Trade Association [Plaintiffs' 00003548] (20% of fantasy sports participants report that one of their motivations to play is to win money)); *id.* Exhibit 18 (Yahoo.com Fantasy Hockey Rules [Plaintiffs' 00004064] (providing for entry fees of $20 to $100 and opportunity to win $600)); *id.* Exhibit 19 (Bettman Dep. 61:7-17 (NHL "work[s] with Yahoo.com Fantasy Hockey")).

<u>Plaintiffs' Response</u>:

**Disputed.** The Statement is ambiguous and misleading. Fantasy sports operated or promoted by Plaintiffs do not constitute sports wagering, as they do not – contrary to Defendants' assertion – "involve[ ] putting money at stake on actual game performances that are subject to chance, with a financial prize going to the winner." *See, e.g.* Slocum Decl. Ex. 20 (NFL.com Fantasy website), at Plaintiffs' 00003136; *id.* Ex. 27 (NBA-authorized Yahoo! fantasy game website) at Plaintiffs' 00004041; *id.* Ex. 28 (NHL-authorized Yahoo! fantasy game website) at Plaintiffs' 00004066-69; Hernandez Certif. Ex. 12 (MLB.com "Beat the Streak" game website) at Plaintiffs' 00004083. None of these games even require that any money be paid in order to participate. This is conceded by Mr. Willig in ¶ 89 of his Report, in which he notes that the fantasy games promoted by the professional leagues "are free for participants and there is no monetary wagering."

Defendants' reference to the "Yahoo! Pro Leagues" as a purported counter example is erroneous and inaccurate. Deposition testimony from both the NHL and NBA made clear that neither league is affiliated with those pay-for-play "Pro Leagues" and only sponsor the **free** offerings on the Yahoo! Website. (Hernandez Certif. Ex. 9 (Bettman Dep.) at 61:18-62:7 ("[W]e work with Yahoo Sports for an NHL fantasy game and I think Yahoo also has their own game on hockey . . . Yahoo Fantasy Sports doesn't say NHL and it has an entry fee."); *id.* Ex. 7 (NBA 30(b)(6) Dep.) at 129:3-14 ("that particular pro league reference, that's not our game, that's Yahoo's game").) Similarly, although the MLB-sponsored fantasy game on the CBS Sports website has an entry fee, that entry fee provides for a subscription to MLB.com GameDay Audio (streaming webcasts of MLB games), the value of which often exceeds the entry fee and is unrelated to any prize. (*Id.* Ex. 4 (MLB 30(b)(6) Dep.) at 131:3-11 ("This isn't a wager, it's a purchase").)

To the extent that private individuals wholly unaffiliated with any of the Plaintiffs may misuse fantasy sports as a means by which to engage in illegal sports wagering or activity not condoned or promoted by the Leagues does not suggest any equivalency between fantasy sports themselves and sports gambling.  *See id.* Ex. 8 (Stern Dep.) at 36:25-37:7 (recognizing that some fantasy leagues with entry fees may be illegal).  Defendants have no support other than hearsay for the notion that such fantasy sports are "often" wagered upon: e.g., the "Fantasy Sports Trade Association" document and the Willig Report (which merely cites to third-party hearsay references).  *See* General Objection No. 3.  In fact, Plaintiffs' offerings sometimes include explicit disclaimers that wagering is not permitted.  *See, e.g.*, Slocum Decl. Ex. 27 (NBA-authorized Yahoo! fantasy website) at Plaintiffs' 00004041 (noting that the games are "for entertainment purposes only and may not be used in connection with any form of gambling or wagering"); Hernandez Certif. Ex. 13 (2011 NFL Playoff Challenge Fantasy Game) at Plaintiffs' 00003151 ("This Game May Not Be Used To Conduct, Advertise Or Promote any Form of Gambling"); *id.* Ex. 14 (MLB.com "Beat the Streak in a Day Contest") at Plaintiffs' 00002210 ("This Contest may not be used for, or in connection with, any form of gambling.").

At all events, fantasy sports – including those that have "entry fees" –  are expressly permitted under federal law, which recognizes that the games are not gambling.  The Unlawful Internet Gambling Enforcement Act ("UIGEA") specifically excludes fantasy sports from its definition of "bet" or "wager" where (1) the value of prizes are established in advance and do not depend upon the number of, or fees paid by, participants; (2) all winning outcomes reflect relative knowledge and skill of the participants and are determined by accumulated individual statistics or multiple real-world sporting events; and (3) no winning outcome is based on any single performance of an individual athlete or team.  31 U.S.C. § 5362(1)(E)(ix); *see also Humphrey v. Viacom, Inc.*, 2007 WL 1797648, at *7, *11 (D.N.J. June 20, 2007) (ruling

19

fantasy sports leagues that feature both an entry fee and a prize that is not conditional on the number of entrants "do not constitute gambling as a matter of law"). All of the fantasy games operated or sponsored by Plaintiffs fit within the UIGEA exclusion.

    At deposition, Plaintiffs' representatives made clear repeatedly that fantasy sports are wholly dissimilar from, and do not implicate the same concerns about affecting the integrity of the game as, "real-world" single-game sports wagering of the type that New Jersey seeks to authorize. *See, e.g.*, Hernandez Certif. Ex. 9 (Bettman Dep.) at 60:16-17 ("But fantasy sports is a game; it's not like betting or gambling."); *id.* Ex. 3 (NFL 30(b)(6) Dep.) at 157:21-25 ("[M]ostly you're playing for bragging rights against the people against whom you play."); *id.* Ex. 8 (Stern Dep.) at 40:4-6 ("I don't think that fantasy has any impact on how people root for teams."); *id.* Ex. 7 (NBA 30(b)(6) Dep.) at 130:2-131:3 (noting that fantasy sports are "radically different than sports gambling"); *id.* Ex. 4 (MLB 30(b)(6) Dep.) at 23:11-12 ("Fantasy games are an entirely different thing."). For example, even beyond the lack of entry fees and "wagering" activity, fantasy sports are primarily intended for entertainment, promote enhanced interest in individual players' athletic achievements, and pose no risk to sports leagues since it would be wholly impractical to attempt to "fix" given the number of players on disparate teams and circumstances. *See, e.g.*, *id.* Ex. 3 (NFL 30(b)(6) Dep.) at 166:9-18 ("It allows our fans to further connect with individual athletes."); *id.* Ex. 7 (NBA 30(b)(6) Dep.) at. 123:8-16 (fantasy sports provide fans with a "deeper connection with the league as a whole"); *id.* Ex. 9 (Bettman Dep.) at 58:15-59:6 ("It let's [sic] people who think that they can be great judges of talent be their own general managers, have some fun with our game as part of being fans.").

**Defendants' Statement No. 20:**

The NBA is not concerned that fantasy basketball with entry fees will damage the bonds of loyalty between fans and teams.  Slocum Decl. Exhibit 12 (NBA 30(b)(6) Dep. 130:2-6.)

Plaintiffs' Response:

**Disputed.**  Defendants mischaracterize the 30(b)(6) witness's testimony, citing to only the first line of a 22-line answer and ignoring prior testimony that refutes Defendants' assertion.  Prior to the cited testimony, the deponent explained that "within the context of what fantasy sports has become . . . a low-stakes entry fee . . . or a prize of some nature . . . the NBA doesn't view that as being a problem."  (Hernandez Certif. Ex. 7 (NBA 30(b)(6) Dep.) at 129:18-25.)  When asked whether the NBA was concerned that "a fantasy basketball contest would damage the bonds of loyalty and devotion between fans and teams," the witness responded:

> Well, again, no.  But I mean, in order to explain that, just because this is radically different than sports gambling, I mean, no one here is -- you know, the entry fee is not someone's rent and as far as I'm aware, people don't become addicted to playing fantasy basketball, at least as far as I'm aware. And so this is -- fantasy, again, it's an additive product, it's a small audience of people who are particularly avid fans that want to do this or their avidity is already demonstrated.  And it doesn't concern us that their loyalty to the NBA and their passion for the NBA is going to be directed entirely toward their fantasy experience. They got into this in the first place because they were crazy NBA fans and presumably and likely with some particular team that they are crazy about.  And we don't have a concern that this is going to overwhelm their loyalty.

(*Id*. at 130:2-131:3.)  Divorced of the complete response and the assumptions that the deponent made in response to the incomplete hypothetical posed by the questioner, Defendants' characterization of the testimony is incomplete and inaccurate.

**Defendants' Statement No. 21**:

MLB allows its players to play fantasy baseball and is not concerned about their participation in fantasy leagues with entry fees or monetary prizes. Slocum Decl. Exhibit 10 (MLB 30(b)(6) Dep. 106:9-107:11).

Plaintiffs' Response:

**Disputed**.  Defendants not only mischaracterize the stated testimony, but also ignore the fact that the witness rejected Defendants' attempt to mischaracterize MLB's view of fantasy games.  The witness explained that he "consider[s] fantasy sports to be far removed from gambling" based on his understanding that "there's no connection between the fee and the prize. You can't choose to bet more to increase your winnings." (Hernandez Certif. Ex. 4 (MLB 30(b)(6) Dep.) at 106:9-107:11, 107:25-108:9.)

It is not disputed that MLB has no express policy prohibiting its players from playing fantasy baseball provided that it does not violate any of MLB's other rules or policies, including rules or policies addressing (and prohibiting) sports wagering.  However, employees, officers and directors of MLB entities are not eligible to participate in any fantasy game operated by MLB.  *See, e.g.*, Slocum Decl. Ex. 24 (MLB.com fantasy rules) at Plaintiffs' 00004072.

**Defendants' Statement No. 22**:

The fantasy sports market is now estimated to be a $5 billion per year industry.  Slocum Decl. Exhibit 1 (Willig Report n.92).

Plaintiffs' Response:

**Disputed.**  Plaintiffs object to the Statement because the Willig Report merely recites a hearsay, third-party "estimate" for the proposition that such estimate is accurate.  *See* General Objection No. 3.  Moreover, this Statement relies on additional layers of hearsay:  Mr. Willig's "support" is a journal article that in turn supports its conclusion that fantasy sports

today represent approximately a $5 billion per year industry by citing to three other sources that

provide varying estimates.

**Defendants' Statement No. 23:**

From 1960 to the present, the NCAA has seen growth in the number of Division I basketball teams, the number of football bowl games, basketball media rights revenue, and football bowl game payouts.  Slocum Decl. Exhibit 1 (Willig Report, ¶ 37, Exhibits III-B-1, III-B-2, III-B-3, III-B-4).

Plaintiffs' Response:

**Not disputed**.

**Defendants' Statement No. 24:**

From 1960 to the present, the professional sports leagues (Plaintiffs MLB, NBA, NFL, and NHL) have seen growth in the number of teams, aggregate team value, attendance, total revenue, and broadcast revenue.  Slocum Decl. Exhibit 1 (Willig Report, ¶¶ 34-35, Exhibits III-A-1, III-A-2, III-A-3, III-A-4, III-A-5); *id* Exhibit 9 (Selig Dep. 28:5-8 (MLB has grown "dramatically" over the past 20 years and Selig is "[v]ery proud of it. You bet.")); *id* Exhibit 10 (MLB 30(b)(6) Dep. 90:17-25 ("We believe the sport has grown extremely nicely in the past 20 years."); *id.* at 92:5-9, 93:13-21 (MLB attendance, broadcast and team revenue have increased since 1995)); Slocum Decl. Exhibit 16 (NFL 30(b)(6) Dep. 90:24-91:9 ("We've been profitable. We've done better each year [despite legal sports gambling in Las Vegas]."); *id* at 61:3-15 (NFL has "grown from the fifth most popular sport to a $10 billion-a-year industry . . . what [we] are doing seems to be working.")); Slocum Decl. Exhibit 12 (NBA 30(b)(6) Dep. 111:10-18, 114:2124, 115:18-20 (NBA attendance, number of teams, broadcast revenue, and team revenue have increased)); *id.* Exhibit 19 (Bettman Dep. 12:14-14:22, 19:15-25 ("for the last seven years, six out of the seven years, I believe have had record attendance.  Our TV ratings and viewership are at an all-time high, our revenues have set records . . . .")).

Plaintiffs' Response:

**Not disputed**.

**Defendants' Statement No. 25:**

The professional sports leagues support and encourage their fans to participate in fantasy sports, which often involve a prize to the winner, because fantasy sports: (a) engage younger fans, (b) increase fan avidity, viewership, and consumption of league products, and (c) generate revenue for the leagues. Slocum Decl. Exhibit 1 (Willig Report ¶¶ 85-94 (citing several empirical investigations concluding that participation in fantasy sports predicts many types of sports consumption, including higher levels of game attendance, greater consumption of televised sport, and increased consumption via the Internet)); *id.* Exhibit 20 (NFL.com Fantasy Football Official Rules [Plaintffs' 00003147] (offering grand prize worth $16,600)); *id* Exhibit

21 (NFL.com "Rush Fantasy Official Rules" [Plaintiffs' 00003179] (fantasy football game for children under the age of fifteen with a grand prize of a "scholarship" check for $10,000)); *id.*



; Slocum Decl. Exhibit 16 (NFL 30(b)(6) Dep. 157:2-8; 215:4-25; 228:18229:2; 246:13-19 (NFL sponsors fantasy football games, including "Custom Leagues" options that allows fantasy football players to calculate and track fees associated with his or her league, that allows participants to win trips, game tickets, and "scholarship" checks, including a fantasy football game for children under the age of fifteen that offers a "scholarship" check for $10,000);

; *id.* at 161:3-10 (Participation in fantasy sports enhances the fan experience and increases the loyalty of fans, which in turn provides a financial benefit to the NFL)); Slocum Decl. Exhibit 24 (MLB.com 2012 Fantasy Baseball Official Rules [Plaintiffs' 00004071-82] (offering $10,000 prize)); *id.* Exhibit 25 (MLB.com Million Dollar Pick'Em Official Rules [Plaintiffs' 00002211-13] (offering $1,000,000.00 for predicting specific outcomes of MLB games)); *id.* Exhibit 26 (MLB.com Odyssey Official Rules [Plaintiffs' 00002214-18] (offering prize for predicting game outcomes)); *id.* Exhibit 9 (Selig Dep. 62:19-24, 63:9-16 (MLB supports fantasy baseball leagues with monetary prizes because "anything that will create interest in baseball is fine")); *id.* Exhibit 10 (MLB 30(b)(6) Dep. 137:9-142:21 (discussing MLB.com fantasy games cited above)); *id.* Exhibit 27 (Yahoo Sports (in partnership with NBA.com) Official Fantasy Basketball Rules [Plaintiffs' 00004037-63] at Plaintiffs' 00004039 (offering pro leagues with entry fees between $20 and $100)); *id.* Exhibit 12 (NBA 30(b)(6) Dep. 124:16-125:1, 127:15-23, 129:3-25 (NBA is not concerned with NBA players or fans participating in fantasy sports with small entry fees and the NBA earns rights fees of a "couple of hundred thousand dollars" and a share of advertising revenue from partnership with Yahoo fantasy basketball)); *id.* Exhibit 5 (Stern Dep. 35:23-36:8 (Fantasy sports raise the profile of the Leagues because "fans consuming different aspects of our game like that are good for the game.")); *id.* Exhibit 28 (NHL.com Official Fantasy Hockey Rules [Plaintiffs' 00004066] (official NHL fantasy hockey game));

Plaintiffs' Response:

It is **not disputed** only that the professional sports leagues offer or sponsor fantasy sports.  The Statement is **otherwise disputed** to the extent that Defendants mischaracterize the sponsorship of fantasy sports and similar games that offer prizes as equivalent to supporting or encouraging sports wagering.  In this connection, Plaintiffs refer to and incorporate their Response to Defs.' SUMF ¶ 19 (including that all of the fantasy sports games offered by Plaintiffs are free to play, do not involve a "wager," and are excluded from the definition of "bet" or "wager" under UIGEA).

**Defendants' Statement No. 26:**

Plaintiffs have strict rules and by-laws prohibiting match fixing and point shaving, and penalties include fines, suspensions, expulsions, and/or permanent disqualification or ineligibility. Slocum Decl. ████████████████████████████████; *id.* Exhibit 31 (MLB Rule 21 (Plaintiffs' 00001798)); *id.* Exhibit 32 (NHL Constitution & By-Laws (Plaintiffs' 00001915-20)); *id.* Exhibit 33 (NCAA Bylaw, Article 10: Ethical Conduct; NCAA Employee Handbook (Plaintiffs' 00003708-10)).

Plaintiffs' Response:

**Not disputed.**

**Defendants' Statement No. 27:**

The Leagues educate players, officials, and staff on anti-gambling policies and rules. Slocum Decl. Exhibit 3 (Goodell Dep. 9:3-12 (staff meets with players, staff, and referees on an annual basis to make sure they understand and abide by anti-gambling policies)); Slocum Decl. Exhibit 34 (Plaintiffs' 00001838-39 (NBA anti-gambling education pamphlet)); *id.* Exhibit 12 (NBA 30(b)(6) Dep. 141:10-144:17 (describing extensive anti-gambling educational efforts)); *id.* Exhibit 10 (MLB 30(b)(6) Dep. 171:5-172:16 (same)).

Plaintiffs' Response:

**Not disputed.**

**Defendants' Statement No. 28:**

The Leagues' strict anti-gambling policies have been successful in preventing game fixing.  Slocum Decl. Exhibit 8 (Emmert Dep. 82:21-83:6 (NCAA believes its anti-gambling regulations are effective)); *id.* Exhibit 3 (Goodell Dep. 29:19-30:4 (NFL's "very strict rules"

which are enforced "very strictly" have protected the integrity of its games notwithstanding increase in legal and illegal sports wagering); *id.* at 26:4-11 (NFL's antigambling policies are "the most important" factor in the NFL's successful prevention of game fixing)); Slocum Decl. Exhibit 16 (NFL 30(b)(6) Dep. 61:7-15 (NFL is $10 billion-a-year industry, so "what we are doing seems to be working")); *id.* Exhibit 9 (Selig Dep. 18:21-19:2 (MLB policies have "absolutely" been a part of allowing MLB to build the integrity of the sport from 1919 to the present)); *id.* Exhibit 10 (MLB 30(b)(6) Dep. 76:22-77:8 ("We have frankly done a very good job in preserving our sport as one that is honest and consists of good, clean competition.")); *id.* Exhibit 5 (Stern Dep. 59:8-25 (NBA has been effective in preventing game fixing)); *id.* Exhibit 19 (Bettman Dep. 25:6-13 (NHL's antigambling policies have prevented integrity of NHL from being questioned)); *id.* Exhibit 12 (NBA 30(b)(6) Dep. 46:9-16 (there is no game-fixing in the NBA because "this is an area that we police and pay some attention to")); *see also* Slocum Decl. Exhibit 13 (NCAA 30(b)(6) Dep. 198:20-199:2 (The results of a 2008 NCAA study on student-athlete sports wagering showed that education efforts by the NCAA "can be effective" in reducing the levels of student-athlete sports wagering)).

Plaintiffs' Response:

> **Disputed.** The Statement is ambiguous and misleading. Defendants refer narrowly to "game fixing," but Plaintiffs' concerns about sports gambling's effects on the integrity of the games extend beyond simply manipulation of the final scores of those games. *See, e.g.*, Hernandez Certif. Ex. 10 (Mullin Dep.) at 38:25-39:20 ("You've asked a lot of questions about game fixing and, you know, outcome of the game, but I'm also very concerned in my capacity about lesser things that might impact the integrity of a game" such as "supplying information to gamblers"). In addition, Defendants disregard the fact that Plaintiffs are alleging harm not only by actual game-fixing activities, but also an increased *perception* by fans that their games are anything less than completely open and honest athletic competition. *See, e.g.*, *id.* Ex. 2 (Emmert Dep.) at 33:1-9 (describing how point shaving scandals "add a level of cynicism and suspicion around college sport"); *id.* Ex. 9 (Bettman Dep.) at 38:2-17 (discussing potential "cloud of suspicion"); *id.* Ex. 6 (Goodell Dep.) at 50:18-51:2 (explaining that "the perception that a game is influenced by some outside party is not in the best interest of the game").

Although Plaintiffs are confident that their anti-sports gambling policies – along with other factors, including the existence of PASPA – are important tools that help to diminish the *risks* to the integrity of their games (and fans' perception thereof), there is no support for the notion that these policies have succeeded in "preventing" all harmful effects of sports gambling.  In fact, the evidence is to the contrary.  Despite Plaintiffs' best efforts, there have been many violations of rules and gambling-related scandals among the Plaintiffs.  *See, e.g.*, *id.* Ex. 15 at Plaintiffs' 00002845-46 (excerpt from 2003 NCAA study reflecting that student-athletes have been approached by game fixers and have themselves been involved in wagering on games, taking money to play poorly in games, and providing inside information); *id.* Ex. 16 at Plaintiffs' 00003740-43 (excerpt from 2008 NCAA study showing same); *id.* Ex. 1 (NCAA 30(b)(6) Dep.) at ███████████, 109:16-110:25, 117:20-24, 122:15-124:15 (discussing multiple student gambling rule violations ███████████;[2] *id.* Ex. 8 (Stern Dep.) at 66:21-67:13 (discussing response to Donaghy scandal); ████████████████████ ████████████████████████; *id.* Ex. 5 (Selig Dep.) at 7:10-8:8, 25:4-12, 32:22-33:5, 76:10-21 (discussing MLB and NFL gambling scandals); *id.* Ex. 6 (Goodell Dep.) at 31:10-12 ("It's a constant battle to make sure that we keep our game safe from any kind of outside influences"); *id.* Ex. 9 (Bettman Dep.) at 24:6-19, 37:21-38:12, 81:10-21 (noting that the Rick Tocchet scandal "shows even in its 'most benign' form, what any interaction with gambling can have to sully the name and reputation of a game").  Moreover,

---

[2]   Defendants refer to testimony about the NCAA studies that education efforts "can be effective" in reducing student-athlete sports wagering, but fail to refer to the findings that student-athletes engage in game fixing activity despite the existence of those education efforts.  This is one of the pervasive instances in which Defendants disingenuously "cherry pick" soundbites from deposition testimony and ignore documents and testimony that refute the facts that they claim are undisputed.

there may be any number of other game-fixing activities that were never detected or reported; although Defendants note that NCAA President Emmert testified that he "thinks" that the NCAA regulations are "effective," they omit the rest of his answer: "But we also know that there are individuals who engage in that behavior, and I'm sure there are some that don't get caught and some that do." (*Id*. Ex. 2 (Emmert Dep.) at 83:4-6.)

Nor have the Plaintiffs' policies been successful in fully preventing some fans from perceiving the outcome of games as being influenced by gambling. ████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████. Indeed, Defendants' own *questions* confirm that the existence of sports betting causes some fans to suspect that normal incidences of athletic events were influenced by game-fixing in order to win a bet. *See* Hernandez Certif. Ex. 6 (Goodell Dep.) at 44:25-45:3 ("Q: Are you aware that there were any accusations that the 49ers' [coaching] decision was motivated by point-shaving?"); *id.* at 47:5-9 ("Q: Are you aware of any accusations by the public that the outcome of that [Seahawks-Packers] game was motivated by game-fixing?").

**Defendants' Statement No. 29:**

The NBA has developed statistical screening methods that "detect data patterns that may suggest misconduct by referees and others" and has hired a former consultant to help coordinate wagering intelligence and game screening. Slocum Decl. Exhibit 6 (Pedowitz Report, p. 113 ¶ (d) [Plaintiffs' 00003478]).

Plaintiffs' Response:

It is **not disputed** that the law firm of Wachtell, Lipton, Rosen and Katz worked with the NBA and others to develop a "prototype, proprietary system for screening games in an effort to help detect data patterns that may suggest misconduct by referees and others."

(Plaintiffs' 00003478.)  It is also not disputed that the NBA hired "Steven Angel, a former

consultant with Sibson [Consulting] as Senior Vice President for League Operations and

Officiating to, among other things, help coordinate wagering intelligence and game screening."

(*Id.*)

**Defendants' Statement No. 30:**

There has been one case of game fixing in Major League Baseball in 1919 (which
involved illegal gambling), one case of attempted game fixing in the National Football League
in 1946 (which also involved illegal gambling), no cases of game fixing in the history of the
National Basketball Association, and no cases of game fixing in the history of the National
Hockey League. Slocum Decl. Exhibit 1 (Willig Report, 11¶ 41-53); *id.* Exhibit 16 (NFL
30(b)(6) Dep. 70:12-24 ("We believe there's been no match-fixing with regard to NFL games in
the United States or anywhere else.")); *id.* Exhibit 3 (Goodell Dep. 24:4-26:3 (same)); *id.*
Exhibit 9 (Selig Dep. 8:22-9:18, 23:12-15 (no instances of MLB game fixing since 1919 Black
Sox scandal which involved illegal gambling; other MLB gambling incidents did not involve
game fixing)); *id.* Exhibit 10 (MLB 30(b)(6) Dep. 67:9-14 (same)); *id.* Exhibit 11 (Mullin Dep.
43:13-19 (same); *id.* at 9:25-10:4 (no recent tips or investigations into game fixing); *id* at 49:10-
21 (all investigations in gambling scandals involved illegal gambling)); Slocum Decl. Exhibit 5
(Stern Dep. 65:11-66:23 (no instances of point shaving or game fixing in NBA's history,
including Donaghy incident)); Slocum Decl. Exhibit 12 (NBA 30(b)(6) Dep. ▇▇▇▇▇▇,
72:14-73:4 (unaware of any instances of game fixing or point shaving in NBA and all recent
violations of NBA anti-gambling rules involved illegal gambling)); *id.* Exhibit 6 (Pedowitz
Report, p. ES 3 [Plaintiffs' 0003360] (no evidence that Donaghy improperly influenced games));
*id.* Exhibit 19 (Bettman Dep. 20:23-21:2 (no instances of NHL game fixing)).

Plaintiffs' Response:

**Disputed.**  The Statement is ambiguous and misleading.  Defendants improperly

focus on "game fixing" to the exclusion of other harms to Plaintiffs caused by sports gambling,

and erroneously cite to this Statement in their memorandum of law to support the proposition

that "the Leagues' policies work" in preventing the harms to Plaintiffs from sports gambling.

(Dkt. 76-1, at 6.)  Plaintiffs refer to and incorporate their Response to Defs.' SUMF ¶ 28.

It is not disputed that MLB, the NFL, the NBA, and the NHL are not aware of

any confirmed incidences – aside from those set forth in the Statement – that individuals

attempted or actually did fix the outcomes (win versus loss) of their League's games.

**Defendants' Statement No. 31:**

With respect to the Football Bowl Subdivision (I-A) in college football (the primary revenue generating division), there have been only three incidents of match fixing during the period of legalized sports wagering in Nevada.  Slocum Decl. Exhibit 1 (Willig Report, ¶ 55).

Plaintiffs' Response:

**Disputed.**  The Statement is ambiguous and misleading.  Defendants improperly focus on "match fixing" to the exclusion of other harms to Plaintiffs caused by sports gambling, and erroneously cite to this Statement in their memorandum of law to support the proposition that "there have been no widespread incidents [of match fixing] since" the "1950s and 1960s." (Dkt. 76-1, at 6.)  Plaintiffs refer to and incorporate their Response to Defs.' SUMF ¶ 28.

In addition, Defendants ignore NCAA studies that reflect that: (1) a significant percentage of student-athletes in Division I men's football self-reported, among other things, being asked to provide inside information to outside sources (2.0% and 3.5% in 2004 and 2008, respectively), actually providing inside information to outside sources (2.5% and 1.1% ), being asked to influence a game (2.3% and 1.2%), and betting on their own team's games (2.9% and 2.2%).  (Hernandez Certif. Ex. 16, at Plaintiffs' 00003740-42; *see also id.* Ex. 15, at Plaintiffs' 00002846 (in 2003, 2.3% of football players reported they were asked to affect the outcome of a game, with 1.4% actually affecting the outcome of a game).)

**Defendants' Statement No. 32:**

With respect to Division I college basketball (the primary revenue generating division), there have only been two episodes of widespread point shaving in NCAA history, both of which occurred over 50 years ago, and six incidents involving 2-4 players at individual schools. *Id.* (Willig Report, ¶¶ 56-58).

Plaintiffs' Response:

**Disputed.**  The Statement is ambiguous and misleading.  Defendants improperly focus on "point shaving" to the exclusion of other harms to Plaintiffs caused by sports gambling,

and erroneously cite to this Statement in their memorandum of law relating to match fixing –

that is, to support the proposition that "there have been no widespread incidents [of match

fixing] since" the "1950s and 1960s." (Dkt. 76-1, at 6.) Plaintiffs refer to and incorporate their

Response to Defs.' SUMF ¶ 28.

　　　　　In addition, Defendants ignore NCAA studies that reflect that: (1) a significant

percentage of student-athletes in Division I men's basketball self-reported, among other things,

being asked to provide inside information to outside sources (1.2% and 3.8% in 2004 and 2008,

respectively), actually providing inside information to outside sources (1.2% and 0.9%), being

asked to influence a game (2.4% and 1.6%), and betting on their own team's games (2.7% and

2%) (Hernandez Certif. Ex. 16 at Plaintiffs' 00003740-42); and (2) ███████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████; *see also id.* Ex. 15 at Plaintiffs' 00002846 (in 2003, 2.1% of basketball players

reported they were asked to affect the outcome of a game as a result of a gambling debt, with

1% actually affecting the outcome of a game).)

　　　　　In addition, Defendants and Mr. Willig provide no support for the proposition

that Division I college basketball is "the primary revenue generating division."

### Defendants' Statement No. 33:

　　　　　Among the college sports match fixing and point shaving incidents, all involved illegal
gambling; ████████████████████████████████████████.
Slocum Decl. Exhibit 13 (NCAA 30(b)(6) Dep. ████████████████, 218:6-219:10
(discussing details of NCAA match fixing incidents)); *id.* Exhibit 7 (National Gambling Impact
Study Commission Report, Statement of William A. Bible, Former Chairman of Nevada's
Gaming Control Board [Plaintiffs' 00002494] ("Not one college sports scandal is the result of
legal sports wagering.")).

<u>Plaintiffs' Response</u>:

      **Disputed**.  Defendants' premise that they have identified all incidents of college sports match fixing is incorrect.  *See supra* Responses to Defs.' SUMF ¶¶ 28, 31-32.  The bald statement of Mr. Bible made solely in his individual capacity – in a personal statement attached as an appendix to the National Gambling Impact Study Commission Report – is conclusory and impermissible hearsay.

      Defendants cite to this Statement in their memorandum of law for the proposition that "even these few examples of match fixing all were connected to ***illegal*** sports wagering." (Dkt. 76-1, at 6.)  But Defendants cannot support their assertions that gambling incidents involving illegal markets are unrelated to legal sports gambling markets, or that legalized sports gambling will eliminate game fixing, other sports betting-related scandals, or the other harms that the spread of state-sponsored sports gambling poses to Plaintiffs.  *See, e.g.*, Hernandez Certif. Ex. 10 (Mullin Dep.) at 36:17-37:9 (discussing the interrelation between legal and illegal sports gambling activity); ███████████████████████████████████████████ ███████████████████████████████████████████ ██████████████; *id.* Ex. 8 (Stern Dep.) at 45:19-46:9 (stating that "some of that illegal gambling that you referred to finds its way back to Las Vegas and gets its impetus from the setting of lines in Las Vegas.").  Indeed, as recently as October of this year, 25 people, including Michael Colbert, "a prominent Las Vegas sports book director" – who oversaw the legal sports book for numerous Las Vegas casinos and who had previously contended that he and others in the legal sports gaming community could ensure the integrity of the sports betting process through legalized gaming (*see id.* Ex. 18 at Plaintiffs' 00004189) – were indicted for alleged involvement in an illegal sports gambling ring alleged to have exceeded $50 million. (*Id.* Exs. 19, 32.)

32

At all events, Defendants acknowledge that at least one match fixing or point shaving incident in college sports was confirmed to involve placing bets in both the legal and illegal sports gambling markets.

**Defendants' Statement No. 34:**

The Leagues communicate with legal gambling establishments in Las Vegas for the purpose of preventing game fixing. Slocum Decl. Exhibit 8 (Emmert Dep. 96:16-21, 97:19-25 ("There's a line of communication that exists between some of our staff and some of them.")); *id.* Exhibit 13 (NCAA 30(b)(6) Dep. 66:24-67:5; 145:14-147:17, ▮▮▮▮▮ (discussing same)); *id.* Exhibit 12 (NBA 30(b)(6) Dep. 60:13-62:13, 66:24-67:15 (describing communications between NBA and Las Vegas)); *id.* Exhibit 5 (Stern Dep. 67:25-69:20 (same)); *id.* Exhibit 19 (Bettman Dep. 46:22-47:11, 49:20-24 (describing relationship with Las Vegas Sports Consultants who monitor Vegas line movements)).

Plaintiffs' Response:

**Disputed**.  Plaintiffs dispute the statement insofar as it purports to discuss "the Leagues" but provides no support for the proposition with respect to MLB or the NFL.  The NCAA, NBA, and NHL have, in the past, communicated with entities related to legal sports gaming in Las Vegas in order to attempt to monitor sports gambling activity and detect activity that may point to possible match fixing or other threats to the integrity of games.

Plaintiffs dispute any contention by Defendants that communication with legal gambling establishments will eliminate game fixing, other sports betting-related scandals, or the other harms that the spread of state-sponsored sports gambling poses to Plaintiffs.  As the NCAA 30(b)(6) witness observed, "while our preference would be that there not be any wagering on sports in the state of Nevada or Vegas . . . we were going to try and make the best of a bad situation."  (Hernandez Certif. Ex. 1 (NCAA 30(b)(6) Dep.) at 146:8-14; *see also id.* at 66:24-67:5 (noting how NCAA does not rely on Las Vegas to identify match fixing); *id.* Ex. 7 (NBA 30(b)(6) Dep.) at 63:14-64:2 (recognizing that cooperation with Las Vegas "could be helpful in certain circumstances," but noting that such cooperation has not yet been helpful); *id.*

33

Ex. 2 (Emmert Dep.) at 57:3-11 ("We . . . would strongly prefer that there not be legal gambling

on intercollegiate athletics anywhere . . . But since it exists [in] Las Vegas and in Nevada in

general, we attempt to garner as much information about them, just as we do about illegal

gambling"); *id.* at 95:18-20 ("I don't know of a game that's been prevented by a conversation

with [Las Vegas gambling operators] from being fixed"); *id.* Ex. 8 (Stern Dep.) at 45:19-46:9

(explaining that the NBA is "probably" harmed by the presence of legalized gambling in

Nevada because "some of that illegal gambling that you referred to finds its way back to Las

Vegas and gets its impetus from the setting of lines in Las Vegas.  So it's – on balance, if there

were no gambling in Las Vegas, I would be happier for the League."); *id.* Ex. 10 (Mullin Dep.)

at 36:17-37:9 (discussing the interrelation between legal and illegal sports gambling activity).)

**Defendants' Statement No. 35:**

The NBA "obtain[s] information on a regular basis from individuals and entities
involved in the gambling business who can provide the League with information about unusual
movements in the betting lines, rumors about things such as injury reports or referee schedules
or where the 'smart money' is being wagered.  By flagging games or individuals for the League
to investigate, these monitors may help the League detect gambling or misuse of confidential in-
formation."  The Pedowitz Report noted that "this system has been working properly, as certain
games were brought to the League's attention during the 2007-2008 season."  The NBA also
uses line movement data for every game in an effort to detect signs of potential misconduct.
Slocum Decl. Exhibit 6 (Pedowitz Report, p. 113 ¶¶ (c)-(d) [Plaintiffs' 00003478]); *id.* Exhibit
5 (Stern Dep. 69:1-20 (NBA uses sports gambling operators in Las Vegas to help monitor
gambling activity and those monitors have brought games to NBA's attention)); *id.* Exhibit 12
(NBA 30(b)(6) Dep. 60:13-62:13 (NBA obtains information from Las Vegas Sports Consultants,
an entity that supplies betting lines to casinos, and from Mark Goldman, who formerly ran a
sportsbook at a major Las Vegas casino)).

Plaintiffs' Response:

**Not disputed.**   Plaintiffs note that while the NBA "agree[s] that information of

that kind [from individuals involved in the gaming business] could be helpful in certain

circumstances," it has yet to be helpful or lead to any investigations.  (Hernandez Certif. Ex. 7

(NBA 30(b)(6) Dep.) at 63:23-64:13.)

**Defendants' Statement No. 36**:

Las Vegas Sports Consultants provides daily betting lines to the NBA and contacts the NBA if anything suspicious occurs. Slocum Decl. Exhibit 12 (NBA 30(b)(6) Dep. 71:24-72:13).

Plaintiffs' Response:

**Not disputed**, except to clarify that the NBA 30(b)(6) witness testified that Las

Vegas Sports Consultants contacts the NBA if "something unusual . . . comes to their attention."

**Defendants' Statement No. 37**:

Legal sports wagering operators in Nevada have assisted athletic leagues in their enforcement activities aimed at preventing game fixing and point shaving. Slocum Decl. Exhibit 8 (Emmert Dep. 56:17-20, 96:1-15 ("[We will try and garner as much information from the . . . Nevada gambling establishment as we can to understand the behavior, understand the dynamics, and try and discover anything that's going on related to our games.")); *id.* Exhibit 13 (NCAA 30(b)(6) Dep. 213:16-19 (gaming establishment personnel attended meetings on preventing game fixing)); *id.* Exhibit 12 (NBA 30(b)(6) Dep. 62:14-64:13 (NBA has received reports from Las Vegas and recognizes that the information may be helpful)); *id.* Exhibit 6 (Pedowitz Report, p. 113 ¶¶ (c)-(d) [Plaintiffs' 00003478] ("We note that this system has been working properly, as certain games were brought to the League's attention during the 2007-2008 season.")); *see also* Slocum Decl. Exhibit 19 (Bettman Dep. 49:20-24 (describing relationship with Vegas consultants as "prudent.")).

Plaintiffs' Response:

**Disputed**.  Plaintiffs dispute the Statement insofar as it purports to discuss

"athletic leagues" generally, but provides no support for the proposition with respect to MLB or

the NFL.  Entities involved in legal sports gaming operations in Las Vegas have communicated

with the NCAA, NBA, and NHL in connection with those Leagues' attempts to monitor sports

gambling activity and detect activity that may point to possible match fixing or other threats to

the integrity of their games.

Plaintiffs dispute any contention by Defendants that communication with legal

gambling establishments will eliminate game fixing, other sports betting-related scandals, or the

other harms that the spread of state-sponsored sports gambling poses to Plaintiffs.  *See supra*

Response to Defs.' SUMF ¶ 34.

**Defendants' Statement No. 38:**

Plaintiffs' Response:

**Defendants' Statement No. 39:**

Plaintiffs' Response:

**Defendants' Statement No. 40:**

███████████████████████████████████████████████

Plaintiffs' Response:

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████

███████████████████████████████████████

**Defendants' Statement No. 41:**

The NBA "ha[s] relationships with casinos" and is "engaged with enterprises that run casinos," including NBA owners who own casinos.  Slocum Decl. Exhibit 5 (Stern Dep. 8:16-11:6).

Plaintiffs' Response:

**Disputed**.  The Statement is vague insofar as it fails to explain what

"relationships" Commissioner Stern was referring to in his deposition.  Commissioner Stern

explained that: (1) the NBA has had internal meetings in Las Vegas that are usually "in the

proximity or actually in a casino or hotel that houses a casino;" (2) some NBA team owners have relationships with casinos or "own them or work in them;" (3) the NBA was in contact with the Las Vegas Convention and Visitors Bureau.

**Defendants' Statement No. 42:**

██████████████████████████████████████████████████
███████████████████████████████████

Plaintiffs' Response:

        ███████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████

**Defendants' Statement No. 43:**

        In 2007, the NBA hosted its All-Star Game in Las Vegas. Slocum Decl. Exhibit 5 (Stern Dep. 9:3-7).

Plaintiffs' Response:

        **Not disputed**.

**Defendants' Statement No. 44:**

██████████████████████████████████████████████████
████████████████

Plaintiffs' Response:

        ███████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████

**Defendants' Statement No. 45**:

NHL teams play in Canada where forms of sports betting are legal and hundreds of millions of dollars are wagered. Slocum Decl. Exhibit 19 (Bettman Dep. 27:17-24, 43:6-14 (discussing gambling in Canada)).

Plaintiffs' Response:

**Disputed**. The term "forms of sports betting" is ambiguous. The state-run sports gambling permitted and practiced in certain Canadian provinces is "parlay multi-game betting," not single game betting (Hernandez Certif. Ex. 9 (Bettman Dep.) at 26:23-27:16), ████

████████████████████████████████████████████

It is not disputed that NHL teams play in Canada and that the NHL believes that the volume of legal gambling in Canada is "probably a few hundred million." (*Id*. at 42:20-43:2.) However, the NHL is "not happy" that such parlay betting is "conducted and we'd be better off without it, but it's a fact of life." (*Id*. at 27:21-23.)

**Defendants' Statement No. 46**:

Beginning in 2007 and continuing to the present, the NFL has hosted a game each year in London, where sports wagering is legal and bets can be placed on the NFL's game just around the corner from Wembley Stadium. Slocum Decl. Exhibit 16 (NFL 30(b)(6) Dep. 63:3-11 ("I know for a fact that sports gambling in England is legal and Wembley Stadium has a ticket booth to take wagers at the stadium.")).

Plaintiffs' Response:

**Disputed**. While the NFL has held a game in London each year beginning in 2007, and England does permit certain forms of sports gambling, the cited testimony provides no support for the proposition that bets can be placed on the NFL game "just around the corner

from Wembley Stadium.  (Hernandez Certif. Ex. 3 (NFL 30(b)(6) Dep.) at 63:12-17 ("Q: Are you aware that bets are taken at other venues close to Wembley Stadium?  A: I don't have any first-hand information about that."); *see also id.* at 63:9-11 ("So whether or not there's gambling being done in other venues, I can't tell you for sure.").)  Defendants' quotation of the witness's testimony is misleading insofar as it implies that bets can be placed at Wembley Stadium on the NFL game being played there.  In the sentence following the testimony quoted by Defendants, the witness states that "I can tell you unequivocally that those ticket booths for gambling are closed when our games are played at Wembley Stadium."  (*Id.* at 63:6-9.)

The Statement is further disputed to the extent that Defendants are contending that the NFL supports or promotes gambling on NFL games played in London, when in fact the NFL (as noted) directs the closing of the betting kiosks at Wembley Stadium, and is cognizant of the threat to the integrity of the game posed by the presence of legalized gambling in England – albeit a reduced threat given the "short period of time" that the NFL teams are there (for one game).  (*Id.* Ex. 6 (Goodell Dep.) at 12:11-20 ("It's not what we choose, it's not what we believe is in the best interest of sports, but we don't dictate the rules or the laws.").)  In addition to closing the ticket booths, the NFL takes other steps to limit this threat.  *See, e.g., id.* at 11:24-12:5 ("We inform our teams before they go [to London] that the policies in the NFL apply even in those circumstances.  So we go out of our way to make sure they understand that [sports gambling] is not permissible for them during that period of time."); *id.* Ex. 3 (NFL 30(b)(6) Dep.) at 63:22-64:1 ("We control what we control and we do take steps to make sure . . . that broadcast and sponsorship and the advertising are consistent with the practice followed in the United States.").

**<u>Defendants' Statement No. 47</u>:**



<u>Plaintiffs' Response</u>:

**Defendants' Statement No. 48:**

Plaintiffs' Response:



**Defendants' Statement No. 49:**

Plaintiffs' Response:

*see also* Hernandez
Certif. Ex. 3 (NFL 30(b)(6) Dep.) at 120:8-120:15 (NFL clubs can enter sponsorship
agreements with state lotteries "[w]ith the prohibitions that the lottery cannot be dependent on
the outcome of NFL games or sporting contests and the other prohibitions listed within this . . .
four-page document.").)

**Defendants' Statement No. 50:**

In 2009, the NCAA amended its "Championship Policy," which previously prohibited
NCAA championships in states with legalized sports wagering, to allow championships in states
"that may offer parlay betting, lottery tickets, or sports pools/pull tabs."  Slocum Decl. Exhibit
43 (NCAA Championships Policy [Plaintiffs' 00001841]).

Plaintiffs' Response:

**Disputed**.  As described in the document cited by Defendants, the prior

"championships policy" precluded NCAA championship events "in metropolitan areas with

legal wagering that is based on the outcome of any event (i.e., high school, college or professional) in a sport in which the NCAA conducts a championship." (Plaintiffs' 00001841.)

The amended policy is as follows: "No predetermined or nonpredetermined session of an NCAA championship may be conducted in a state with legal wagering that is based on single-game betting on the outcome of any event (i.e., high school, college or professional) in a sport in which the NCAA conducts a championship." (*Id.*) The amended policy "does not apply to states that may offer parlay betting, lottery tickets or sports pools/pull tabs" because "the integrity of the game is most clearly at risk when single-game betting occurs, with heightened possibilities for point-shaving schemes and other methods of directly affecting the outcome of a game." (*Id.*; *see also* Hernandez Certif. Ex. 1 (NCAA 30(b)(6) Dep.) at 109:16-110:10 ("None of our point shaving scandals have involved a lottery ticket or have involved parlay betting or have involved sports pools or pull tabs, and while not impossible, that is farther removed and would be much more difficult to impact the actual game itself than obviously just the single game betting would be. So that's where the committee's focus and concern lie.").)

**Defendants' Statement No. 51:**

From 2011 to the present, the NCAA has permitted various Division I conferences, including the Pac-12, Mountain West Conference, Western Athletic Conference, and West Coast Conference, to hold basketball conference championships in Las Vegas. Slocum Decl. Exhibit 13 (NCAA 30(b)(6) Dep. 113:13-23, 114:6-20).

Plaintiffs' Response:

**Disputed**. The NCAA has not "permitted" any conference championships to take place in Las Vegas, because such tournaments are not within the NCAA's purview and thus the NCAA does not have authority over the conduct of those tournaments, including where they take place. *See* Hernandez Certif. Ex. 1 (NCAA 30(b)(6) Dep.) at 109:12-15 ("Q: Does the

NCAA's championship policy apply to conference championships?  A: No.  Those aren't our championships, the NCAA's championships."); *id.* at 112:6-13 ("Our rules do not govern how championships are conducted by conferences, how a conference chooses or where a conference chooses to conduct their championship.  We've chosen not to for many of the reasons that we've already talked about today.  But we have no control or authority to be able to tell a conference they cannot post a championship or game [in Las Vegas].").

**Defendants' Statement No. 52:**

The NCAA has not experienced any sports gambling-related problems related to NCAA Division I basketball conference championships in Las Vegas. *Id.* (NCAA 30(b)(6) Dep. 114:21-115:8).

Plaintiffs' Response:

**Disputed**.  While the NCAA is unaware of any specific sports gambling-related problems directly related to Division I basketball conference championships in Las Vegas, the NCAA has experienced sports-gambling related problems and is aware that game fixing and other improper activity related to sports gambling occur with respect to NCAA games. Plaintiffs refer to and incorporate their Responses to Defs'. SUMF ¶¶ 28, 31-32. *See also* Hernandez Certif. Ex. 1 (NCAA 30(b)(6) Dep.) at 115:8-16 (stating that no sports gambling related problems from the WAC and WCC conference tournaments "have come to light").

**Defendants' Statement No. 53:**

The NBA allows its players to engage in casino gambling and betting on non-NBA sports in places where it is legal.  Slocum Decl. Exhibit 34 (NBA Anti-Gambling Pamphlet "Three Point Play" [Plaintiffs' 00001838-39]); *id* Exhibit 12 (NBA 30(b)(6) Dep. 142:14-143:4 ("If its legal, then you're permitted to do it.")).

Plaintiffs' Response:

**Not disputed.**

**Defendants' Statement No. 54:**

The NHL does not prohibit its players from gambling on other sports.  Slocum Decl. Exhibit 44 (Player's Contract and Standard Club Rules [Plaintiffs' 00001884]); *id.* Exhibit 19 (Bettman Dep. 84:18-23, 86:16-87:3 ("We're not prudes on the subject.")).

Plaintiffs' Response:

**Not disputed**, subject to the clarification that players are permitted to engage in

such gambling to the extent that it is legal.  (Hernandez Certif. Ex. 9 (Bettman Dep.) at 87:21-

88:2.)

**Defendants' Statement No. 55:**

Although Major League Baseball reserves the right to use its "best interest clause" to address non-MLB sports gambling, its rules do not prohibit players from legally gambling on other sports.  Slocum Decl. Exhibit 9 (Selig Dep. 82:17-83:21 ("[T]he gambling I'm most concerned with is the gambling on our sport.")); *id.* Exhibit 10 (MLB 30(b)(6) Dep. 162:14-22 ("We do not have a specific rule about that . .")).

Plaintiffs' Response:

**Not disputed.**

**Defendants' Statement No. 56:**

██████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

Plaintiffs' Response:

████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████

**Defendants' Statement No. 57:**

The NHL has "liberalized" its gambling policies. ████████████

████████████████████████████████████

**Plaintiffs' Response:**

**Disputed**.  The Statement is overly broad and ambiguous. ██████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████

48

**Defendants' Statement No. 58:**

The NFL allows gambling operators without sportsbooks to sponsor NFL clubs under certain conditions. Slocum Decl. Exhibit 16 (NFL 30(b)(6) Dep. 110:12-111:2 ("there is permission granted to our clubs to have sponsorship by either lotteries or certain casinos as long as they don't have a sportsbook . . . .")).

Plaintiffs' Response:

**Disputed**.  NFL clubs cannot accept advertisement from all forms of "gambling operators" as Defendants suggest. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

; *see also id*. Ex. 3 (NFL 30(b)(6)

Dep.) at 110:12-111:2.)  For the 2012 and 2013 NFL seasons only, NFL clubs are permitted to

accept certain forms of "general advertising" from "casinos and other state-licensed gambling

related establishments" in the form of NFL club-controlled print, radio, and in-stadium signage

inventory, provided that those establishments *do not have* a sportsbook.  (Slocum Decl. Ex. 15

at Plaintiffs' 00003112-13.)  Aside from the specific parameters of such advertising set by the

NFL, NFL clubs are not permitted to accept advertising from casinos even if those casinos do

not operate sports books.  (*Id.*)

**Defendants' Statement No. 59:**

    MLB teams have sponsorship agreements with casinos that do not have sportsbooks.
Slocum Decl. Exhibit 10 (MLB 30(b)(6) Dep. 177:6-11).

Plaintiffs' Response:

    **Disputed**.  Some – but not all – MLB teams have such sponsorship agreements

with casinos, but only with casinos that do not have sportsbooks (Hernandez Certif. Ex. 4 (MLB

30(b)(6) Dep.) at 177:6-11), and those agreements are subject to MLB restrictions and

regulations concerning the form and nature of such sponsorship.  (*Id*. at 177:12-178:7 ("It's a

little complicated but, in summary, there are certain advertisements, sponsorships and

promotions that are acceptable and there are certain ones that are not.  We draw lines in that

area.").)

**Defendants' Statement No. 60:**

    MLB allows Las Vegas Convention and Visitors Association, whose duties in part
include representing casinos, to advertise with MLB teams. *Id.* (MLB 30(b)(6) Dep. 184:7-25).

Plaintiffs' Response:

    **Not disputed**, subject to the clarification that the 30(b)(6) witness stated that

"this is something we have considered and we have not specifically prohibited that organization

from advertising," in part because that organization "doesn't represent only casinos in Las

Vegas; it represents all of entertainment in the entire Las Vegas area." (Hernandez Certif. Ex. 4

(MLB 30(b)(6) Dep.) at 183:17-184:6.)

**Defendants' Statement No. 61:**

MLB has changed their rules to allow clubs to accept sponsorship money from scratch
off lottery tickets.  Slocum Decl. Exhibit 9 (Selig Dep. 85:13-86:12).

Plaintiffs' Response:

**Disputed**.  The Statement is not supported by the cited testimony.

Commissioner Selig testified that he was "not sure" that scratch-off lotteries were "previously

prohibited.  But we look at each one.  And if we don't feel it infringes upon the very thing we're

trying to protect, we let them do it . . . and we're very tough on approval." (Hernandez Certif.

Ex. 5 (Selig Dep.) at 85:13-86:12.)

**Defendants' Statement No. 62:**

In 2011, following voters' approval of an amendment to the New Jersey Constitution,
the New Jersey Legislature legalized sports wagering in New Jersey casinos and racetracks and
provided for a comprehensive system of regulation of sports wagering.  *See* N.J.S.A. § 5:12A-1
*et seq.* ("the Sports Wagering Law").

Plaintiffs' Response:

**Disputed.**  The New Jersey Legislature has not "legalized" sports wagering in

New Jersey casinos and racetracks, but has only purported to do so; New Jersey's attempt to

legalize such wagering by passing the Sports Wagering Law violates PASPA – a point

conceded even by Defendants' counsel:

> A:     … You are now trying to allow sports betting to be legal
> in your state.  It's now currently against the law, correct?
>
> Q:     Correct.

(Hernandez Certif. Ex. 6 (Goodell Dep.) at 63:3-7.)

Plaintiffs further object to Defendants' characterization of a "comprehensive

system of regulation of sports wagering" as self-serving, ambiguous, and without support.

Whatever regulatory apparatus the State of New Jersey purports to apply to its desired sports wagering scheme, Defendants provide no assurances that such regulation will be successful in preventing or detecting game fixing or other improper sports gambling-related activity, or that New Jersey's contemplated regulatory system will be effective in eliminating the risk of harm to Plaintiffs from the State's legalization and sponsorship of gambling on Plaintiffs' games. *See, e.g.*, *id.* Ex. 10 (Mullin Dep.) at 36:17-37:9 (discussing the interrelation between legal and illegal sports gambling activity); *id.* Exs. 19 and 32 (noting that in October of this year, 25 people, including Michael Colbert, "a prominent Las Vegas sports book director" – who oversaw the legal sports book for numerous Las Vegas casinos and who had previously contended that he and others in the legal sports gaming community could ensure the integrity of the sports betting process through legalized gaming (*see id.* Ex. 18 at Plaintiffs' 00004189) – were indicted for alleged involvement in an illegal sports gambling ring alleged to have exceeded $50 million).  Plaintiffs refer to and incorporate their Responses to Defs.' SUMF ¶¶ 33-34.

**Defendants' Statement No. 63:**

Under the Sports Wagering Law, a casino or racetrack may offer sports wagering only if it obtains a license from the State specifically authorizing such wagering.  *See id* § 5:12A-2.

Plaintiffs' Response:

It is **not disputed** that the Sports Wagering Law purports to require casinos or racetracks to obtain licenses before they may offer sports wagering.  The Statement is **otherwise disputed** because the Sports Wagering Law and sports wagering activities by casinos or racetracks violate PASPA.

**Defendants' Statement No. 64:**

New Jersey has subsequently promulgated regulations establishing a regulatory framework for a legalized wagering market in New Jersey.  *See* 44 N.J.R. 2374(a).

Plaintiffs' Response:

It is **not disputed** that the New Jersey Division of Gaming Enforcement has promulgated regulations that purport to establish a regulatory framework for legalized sports wagering. The Statement is **otherwise disputed** insofar as the Sports Wagering Law and regulations promulgated thereunder violate PASPA. Plaintiffs further dispute that New Jersey's regulations would address, let alone would be effective in eliminating, the risk of harm to Plaintiffs from the State's legalization and sponsorship of gambling on Plaintiffs' games. *See supra* Responses to Defs.' SUMF ¶¶ 33-34, 62.

**Defendants' Statement No. 65:**

These regulations authorize examination of accounts and records by state officials, *id.* § 13:69N-3.1(d); mandate production of reports on sports wagering activities, *id.* § 13:69N-3.1(a); prohibit placing a bet on behalf of another person, *id.* § 13:69N-2.1; and prohibit wagering by individuals under 21 years old, *id.* § 13:69N-2.2(f).

Plaintiffs' Response:

**Disputed**. Defendants' characterization of the regulations is incomplete. The regulations promulgated by the Division of Gaming Enforcement purport to: (1) "permit duly authorized representatives of the Division to examine the operator's accounts and records for the purpose of certifying gross revenue" (§ 13:69N-3.1(d)); and (2) require "totalisator" computer reports with respect to nine enumerated types of information. § 13:69N-3.1(a). Plaintiffs do not dispute that the regulations purport to prohibit placing bets on behalf of other people and wagering by individuals under 21 years old.

Plaintiffs further dispute the Statement to the extent that it implies such a system would address, let alone be effective in eliminating, the risk of harm to Plaintiffs from the State's legalization and sponsorship of gambling on their games. *See supra* Responses to Defs.' SUMF ¶¶ 33-34, 62.

**Defendants' Statement No. 66**:

Casinos or racetracks offering sports wagering in New Jersey are required to "file with the Division [of Gaming Enforcement] internal controls for all aspects of sports wagering operations," and "shall not commence sports pool wagering until internal controls have been approved by the Division." *Id.* § 13:69N-1.11.

Plaintiffs' Response:

It is **not disputed** that the New Jersey Division of Gaming Enforcement has

promulgated regulations that purport to require sports pool operators to file with the Division

"internal controls for all aspects of sports pool wagering operations" and obtain Division

"approval." § 13:69N-1.11. The Statement is **otherwise disputed** to the extent it implies such

a system would address, let alone be effective in eliminating, the risk of harm to Plaintiffs from

the State's legalization and sponsorship of gambling on their games. *See supra* Responses to

Defs.' SUMF ¶¶ 33-34, 62.

**Defendants' Statement No. 67**:

The internal controls at New Jersey casinos and racetracks must "detail the reconciliation of assets and documents contained in the wagering cashier's drawers" and "provide for the reporting of any overage or shortage." *Id* § 13:69N-2.2(d).

Plaintiffs' Response:

It is **not disputed** that the New Jersey Division of Gaming Enforcement has

promulgated regulations that purport to require "[e]ach wagering operator's accounting internal

controls [to] detail the reconciliation of assets and documents contained in the wagering cashier

drawers" and "provide for the reporting of any overage or shortage." § 13:69N-2.2(d). The

Statement is **otherwise disputed** to the extent it implies such regulatory steps – which are

tantamount to a cashier or bank teller "truing up" their drawer – would address, let alone be

effective in eliminating, the risk of harm to Plaintiffs from the State's legalization and

sponsorship of gambling on their games, particularly in light of the fact that such documents

need only be "forwarded to casino accounting or a racetrack's accounting department." (*Id.*);

*see supra* Responses to Defs.' SUMF ¶¶ 33-34, 62.

**Defendants' Statement No. 68**:

New Jersey will not issue any sports wagering licenses before January 9, 2013. *See* Dkt. 49, Letter from Attorney General Jeffrey A. Chiesa to the Hon. Lois H. Goodman, U.S.M.J. (Oct. 15, 2012).

Plaintiffs' Response:

**Not disputed**, insofar as Plaintiffs accept Defendants' representation to the

Court that, pursuant to the parties meet-and-confers, no sports wagering licenses will be issued

by Defendants prior to January 9, 2013.

**Defendants' Statement No. 69**:

On August 7, 2012, Plaintiffs filed their Complaint in this action, seeking a declaration that the Sports Wagering Law and accompanying regulations "violate PASPA." Compl. ¶ 35.

Plaintiffs' Response:

**Not disputed**.

**Defendants' Statement No. 70**:

Plaintiffs seek an injunction barring anyone from "implementing or enforcing" the law or the regulations and "from sponsoring, operating, advertising, promoting, licensing or authorizing" any sports-betting system. *Id.*

Plaintiffs' Response:

**Disputed**.  Plaintiffs seek an injunction "enjoining Defendants, and all other

acting on their authority, instruction, and behalf, or under the authority of their respective

offices, from implementing or enforcing the Sports Gambling Law and the Sports Gambling

Regulations, and from sponsoring, operating, advertising, promoting, licensing, or authorizing

any lottery, sweepstakes, or other betting, gambling, or wagering scheme based, directly or

indirectly, on one or more competitive games in which amateur or professional athletes

participate, or are intended to participate, or on one or more performances of such athletes in

55

such games." (Compl. ¶ 35; *see also* Dkt. 10 (Notice of Motion for Summary Judgment, and, If

Necessary to Preserve the Status Quo, a Preliminary Injunction).).

**Defendants' Statement No. 71:**

In their Complaint, Plaintiffs asserted the Sports Wagering Law would harm them in two
ways: (1) by increasing the risk of match-fixing and thereby undermining the integrity of their
games and (2) by "fostering suspicion that individual plays and final scores of games may have
been influenced by factors other than honest athletic competition." Compl. ¶ 6.

Plaintiffs' Response:

**Disputed**. In the Complaint, in addition to the categories of harm that

Defendants identify, Plaintiffs also assert, among other things, that: (1) "[g]ambling on amateur

and professional sports threaten the integrity of those sports and is fundamentally at odds with

the principle – essential to the success of Plaintiffs – that the outcomes of collegiate and

professional athletic contests must be determined, and be perceived by the public as being

determined, solely on the basis of honest athletic competition;" (2) sports gambling

"undermines the public's faith and confidence in the character of amateur and professional team

sports;" and (3) sports gambling "compromise[s]" Plaintiffs' reputations and goodwill, and will

irreparably injure "the bonds of loyalty and devotion between fans and teams." (Compl. ¶¶ 5-6.)

Plaintiffs object to the extent that Defendants construe Plaintiffs' allegations of

harm in the Complaint unreasonably narrowly so as to not encompass the various forms of harm

that Plaintiffs allege. In support of Plaintiffs' motion for a preliminary injunction, the League

Commissioners and the NCAA President submitted declarations that enumerated numerous

forms of harm – and the increase in risk of such harm – that would arise from Defendants'

attempt to implement its sports wagering scheme in New Jersey. (*See, e.g.*, Dkt Nos. 10-3

through 10-7.) When deposed, Plaintiffs' 30(b)(6) witnesses rejected Defendants' attempts to

confine their allegations of harm to Defendants' narrow and incomplete interpretation of the

Complaint.  *See, e.g.*, Hernandez Certif. Ex. 3 (NFL 30(b)(6) Dep.) at 46:24-49:7 ("[Those

paragraphs] essentially summarized the themes.  They can be expressed in several ways, but the

threat to the integrity of the game, the threat to our fans' perception of our game as reflected in

those paragraphs are at the core of the issue."); *id.* Ex. 4 (MLB 30(b)(6) Dep.) at 43:18-44:3,

45:7-10; 45:21-53:10 (discussing multiple harms).

Defendants also improperly narrow Plaintiffs' allegations of harm to "game

fixing" without also recognizing other forms of activity arising from sports gambling that can

affect the integrity of the games.  *See supra* Response to Defs.' SUMF ¶ 28.

**Defendants' Statement No. 72:**

Through discovery, Plaintiffs are now asserting injury on the basis of three theories: (a)
the Sports Wagering Law will increase the risk of match fixing; (b) the Sports Wagering Law
will lead to an increase in public perception that game fixing is occurring; and (c) the increased
prevalence of sports wagering will undermine the bonds of loyalty between fans and teams, by
causing fans to root based on their own financial self-interest rather than a pure interest in team
loyalty.  *See, e.g.,* Slocum Decl. Exhibit 12 (NBA (30)(b)(6) Dep. 44:24-45:6 ("[T]here is
certainly more of a chance for the influence of gambling to result in other kinds of conduct like
actions in the nature of game-fixing.")); *id.* Exhibit 3 (Goodell Dep. 34:23-35:5 (Public
confidence in the NFL is threatened because "the threat that gambling could occur in the NFL
or fixing of games or that any outcome could be influenced by the outside could be very
damaging to the NFL...")); *id.* Exhibit 9 (Selig Dep. 44:24-45:4 ("[F]an loyalty would diminish
as many fans would focus less on their allegiance to certain teams, players or cities and instead
focus more on the outcome of individual bets.")).

Plaintiffs' Response:

**Disputed**.  Plaintiffs refer to and incorporate their Response to Defs.' SUMF ¶

71, and specifically note that the Complaint referenced injury to "the bonds of loyalty and

devotion between fans and teams."  (Compl. ¶ 6.)

**Defendants' Statement No. 73:**

Plaintiffs also have claimed standing on the basis of a section of PASPA providing that
"[a] civil action to enjoin a violation of section 3702 may be commenced in an appropriate
district court of the United States by the Attorney General of the United States, or by a
professional sports organization or amateur sports organization whose competitive game is
alleged to be the basis of such violation."  28 U.S.C. § 3703; *see* Compl. ¶ 18.

Plaintiffs' Response:

      **Disputed**.  Defendants misstate the nature of Plaintiffs' position as to why they have standing in this action, which is set forth in Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss (Dkt. 39), as well as the summary judgment papers submitted concurrently with these Responses.

**Defendants' Statement No. 74:**

      Plaintiffs' allegations of harm are based on their subjective beliefs, opinions, views of "common sense," and interpretation of history. Slocum Decl. Exhibit 9 (Selig Dep. 30:15 (articulating belief that "gambling is deadly"); *id.* at 25:14-27:11 ("With all due respect, after 50 years in this sport, sir, I don't have to do an empirical study."); *id.* at 56:4-20 (no other evidence to support allegations of harm)); Slocum Decl. Exhibit 11 (Mullin Dep. 53:24-54:5 (MLB has not performed any studies regarding the impact or potential impact of legalized sports gambling in New Jersey or the United States)); *id.* Exhibit 10 (MLB 30(b)(6) Dep. 7:22-8:11, 59:8-60:4, 61:25-62:12 (characterizing experience as "ongoing study and survey" and stating match fixing will increase because it will create greater numbers of gamblers and because MLB's Department of Investigations believes it)); *id.* Exhibit 13 (NCAA 30(b)(6) Dep. 61:3-16 (NCAA has no surveys, analyses, or other empirical evidence: "I'm just relying on conversations and my job responsibilities.")); *id.* Exhibit 12 (NBA 30(b)(6) Dep. 45:7-13 (NBA's basis for alleging that the New Jersey Sports Wagering Law will increase game fixing is common sense as informed by experience in the industry)); *id.* Exhibit 3 (Goodell Dep. 36:6-17 (expressing "strongly held view" that gambling is a "threat")); *id.* Exhibit 16 (NFL 30(b)(6) Dep. 51:19-52:9 (NFL believes that an increased "threat" of game fixing will occur as a result of the Sports Wagering law because "it would directly increase the amount of gambling."))).

Plaintiffs' Response:

      **Disputed.**  Plaintiffs object to the Statement as argumentative.  While Plaintiffs' position that wagering on their own sporting events is harmful is certainly supported by common sense, Defendants only dismiss Plaintiffs' position as "subjective beliefs" by disregarding large portions of the record.  In fact, Plaintiffs have proffered a variety of bases, including "empirical evidence," for demonstrating how they are harmed, whether by increased risk of game fixing and other improper activities, damage to the public perception of Plaintiffs' games, disruption of the bonds of loyalty that bind fans to players and teams, or placing players and student-athletes at risk.  These bases include:

(1) Historical precedent, such as prior sports gambling scandals that significantly harmed Plaintiffs. *See, e.g.*, Hernandez Certif. Ex. 2 (Emmert Dep.) at 13:17-14:9 ("[T]here has been throughout the history of both intercollegiate and professional athletics in America a significant number of scandals involving gambling that have eroded [the] confidence people have in the games, and the institutions that have been involved in those games, and the individuals that have been involved in those games, that have suffered significant damage before from that activity."); *id.* at 16:19-17:16 (referring to prior instances where gambling influenced athletic performances, which "cast a huge shadow over those games and people's confidence in intercollegiate athletics or professional sport"); *id.* Ex. 9 (Bettman Dep.) at 81:2-21 (discussing how the Rick Tocchet scandal harmed the NHL); *id.* Ex. 8 (Stern Dep.) at 66:21-67:13 (noting reports after Donaghy scandal of fans saying they would no longer watch NBA games); *id.* Ex. 5 (Selig Dep. at 7:10-11 ("[t]his sport almost died in 1919 as a result of the Black Sox scandal"); *id.* Ex. 4 (MLB 30(b)(6) Dep.) at 46:9-19, 51:7-17 (discussing Black Sox scandal); ████████████████████████████████████████████████████. In addition, Plaintiffs have pointed to the experience of other sports leagues in jurisdictions where sports gambling is legal. *See, e.g. id.* Ex. 3 (NFL 30(b)(6) Dep.) at 96:19-97:9 (discussing the association of horse racing with gambling and the related decline in popularity); *id.* at 189:13-20 ("Other leagues and other sports where those sports have decided to align themselves with gambling, they did not have a very long period of success."); *id.* Ex. 1 (NCAA 30(b)(6) Dep.) at 53:12-19 ("Sports wagering is [legal][3] internationally, and that has not seemed to have had any impact on the number of scandals, match fixing incidents, spot fixing incidents that have

---

[3]    The transcript reads "illegal," but this is an errata.

occurred in the sports of international soccer, cricket, tennis, and even some of the Olympic events as well").

    (2) The reasoned business judgment of individuals with significant experience in the industry, including the League Commissioners and the NCAA President – who collectively have well over 100 years of experience in this field and who Defendants' own expert recognized act "rationally enough for them to avoid doing something which they think actually hurts them" (Hernandez Certif. Ex. 31 (Willig Dep.) at 140:20-141:4) – all of whom agree that the further spread of sports gambling presents a serious risk to their businesses and their players/student-athletes, and should be opposed.  *See, e.g.*, Dkt Nos. 10-3 through 10-7 (Declarations of President Emmert and the four commissioners); Hernandez Certif. Ex. 9 (Bettman Dep.) at 29:17-30:2 (contrasting gambling atmosphere with NHL's desire to create an atmosphere "conducive to families and children"); *id.* at 33:2-7 (describing opinion, based on 32 years of experience, that "possible perception that comes from betting on games compromises" the league's goals); *id.* Ex. 8 (Stern Dep.) at 41:6-21 (describing gambling atmosphere around NBA games in the 1950s and 1960s, noting "It's disruptive, it's not a basis upon which you can build a [fan base]");[4] *id.* at 30:25-31:5 ("I'm certain beyond certain, based upon my experience with gambling, that when you give people the opportunity to gamble and the State supports it, advertises it and profits from it, it will happen."); *id.* Ex. 5 (Selig Dep.) at 30:16-17 ("I know how the Pete Rose [betting issue negatively] affected things and so on"); *id.* Ex. 2 (Emmert Dep.) at 36:17-37:9 ("[w]e know from all of our experiences, from all of the communications we've always had around gambling, *from all of the surveys that we have done and data we've gathered from our own student athletes*, we know that the spread of gambling causes [the]

---

[4]  The transcript reads "basis," but this is an errata.

erosion [of] confidence in the games, increased pressure on our student athletes, and undermines the basis on which people are fans for universities as a whole") (emphasis added); *id.* at 39:4-25 (noting that state-sponsored sports gambling communicates the message that sports gambling "is not only all right, it's approved and indeed encouraged," it creates a likelihood that sports gambling will increase); *id.* Ex. 7 (NBA 30(b)(6) Dep.) at 110:15-25 (describing NBA's view of harm from sports gambling as "the sort of informed view of people that have . . . worked at the league office for a lot of years"); *id.* Ex. 1 (NCAA 30(b)(6) Dep.) at 71:23-72:13, 72:22-73:10 (experience with NCAA has revealed public perceptions that game fixing may be occurring due to gambling); *id.* Ex. 4 (MLB 30(b)(6) Dep.) at 60:9-18 (claim that legalization will lead to increased sports gambling is in part based on MLB's Department of Investigation's "belief and their experience over their entire careers . . . I believe every one of them has the same opinion."); *id.* Ex. 10 (Mullin Dep.) at 16:9-17:23 (describing his experience in the New York Police Department investigating attempts by sports gamblers to get inside information); *id.* Ex. 3 (NFL 30(b)(6) Dep.) at 78:10-25 (describing wrestling and jai alai as "good example" of "where an affiliation and identity that is too closely associated with gambling . . . [proved] disastrous to the League's health and financial security.").

(3) Studies conducted by Plaintiffs concerning sports gambling. These show, for example, the impact of sports gambling on student-athletes. *See, e.g.*, *id.* Ex. 15 at Plaintiffs' 00002845-46 (NCAA study showing that 1.5% of men's basketball players and 1.6% of football players knew of teammate who took money to play poorly, 1.2% of men's basketball players and 2.8% of football players provided inside information to outside sources, 2.1% of men's basketball players and 2.3% of football players were asked to affect the outcome of a game "because of gambling debt," and 1% and 1.4%, respectively, actually did so); *id.* Ex. 22 at Plaintiffs' 00003038-39 (follow-up NCAA study showing: 3.8% of men's basketball players,

3.5% of football players and 1.4% of all other student-athletes were contacted by outside sources to provide inside information, and 0.9%, 1.1%, and 0.7%, respectively actually did so; 1.6% of men's basketball players, 1.2% of football players, and 1.1% of all other student-athletes were asked to affect the outcome of a game)); *id.* Ex. 1 (NCAA 30(b)(6) Dep.) at 117:20-25 ("This would be a study that supports the statement that our student athletes are heavily involved in sports wagering, and that we have concerns related to them being approached to affect the outcome of a game.")  Other studies demonstrate the impact that sports gambling has on perceptions of each Plaintiff. *See supra* Plaintiffs' Response to Defs.' SUMF ¶ 39 (incorporated herein); ███████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████

      (4) The rational finding of Congress, after holding hearings and receiving statements from both proponents and opponents of legalized sports gambling, including representatives from the Plaintiffs, that "[s]ports gambling threatens the integrity of, and public confidence in, amateur and professional sports," and its "policy judgment that sports gambling should be strictly contained."  (*Id.* Ex. 24 (Senate Report 102-248) at Plaintiffs' 00000247, 00000252.)

      (5) The finding of the Third Circuit Court of Appeals that expanding state-sponsored sports gambling "would engender the very ills that PASPA sought to combat," including injury to the integrity of professional sports. *Office of the Comm'r of Baseball v. Markell*, 579 F.3d 293, 304 (3d Cir. 2009).

(6) New Jersey's own recognition of such harms caused by sports wagering, as evidenced by its prohibition under the Sports Wagering Law of wagering on collegiate sporting events taking place in New Jersey or involving New Jersey colleges.  N.J. Const. Art. IV Sect. VII.2.D; N.J. Stat. 5:12A-1.

**Defendants' Statement No. 75:**

Plaintiffs do not have any estimates of the amount of illegal sports wagering currently occurring in New Jersey. Slocum Decl. Exhibit 5 (Stern Dep. 15:10-14 (" Q: [W]ould it be fair to say that there's some people in the State of New Jersey who are currently betting on NBA games? A: Yes")); *id.* Exhibit 16 (NFL 30(b)(6) Dep. 55:6-10, 56:10-19 (NFL has no studies regarding amount of sports gambling on NFL in New Jersey or the United States)); *see also* Slocum Decl. Exhibit 12 (NBA 30(b)(6) Dep. 37:16-18 (the NBA does not know how much illegal sports gambling occurs in New Jersey)); *id.* Exhibit 10 (MLB 30(b)(6) Dep. 26:5-14 ("Clearly we're aware that there is illegal betting going on . . . . There's no question there's illegal betting going on.")); *id.* Exhibit 11 (Mullin Dep. 29:22-30:3 (no studies on sports gambling in New Jersey, but "I would say hundreds of millions of dollars")).

Plaintiffs' Response:

**Disputed.**  Defendants cite to, and quote directly from, deposition testimony that directly contradicts the Statement: "I don't have anything based on a study.  But based upon prosecutions and indictments like the one that occurred last month, I would say hundreds of millions of dollars."  (Hernandez Certif. Ex. 10 (Mullin Dep.) at 29:23-30:3.)

The Statement is ambiguous and misleading to the extent Defendants contend that a purported lack of such "estimates" suggests that Plaintiffs would not be harmed by New Jersey's legalization of sports gambling.  Irrespective of such "estimates," Plaintiffs have presented ample evidence to demonstrate this harm.  In this connection, Plaintiffs refer to and incorporate their Response to Defs.' SUMF ¶ 74.

**Defendants' Statement No. 76:**

Plaintiffs have no empirical evidence demonstrating that the Sports Wagering Law will increase the total number of people involved in sports wagering (both legal and illegal). Slocum Decl. Exhibit 8 (Emmert Dep. 68:4-21 ("[T]he burden of proof, to me, ought to be on those who are legalizing gambling, demonstrate that, in fact, this diminishes gambling activity, and I don't

think that's something that can be done."); *id* at 18:22-19:24, 26:14-19 (NCAA has no studies and relies on experience and threat of increase)); Slocum Decl. Exhibit 13 (NCAA 30(b)(6) Dep. 36:21-37:6 (It is "common sense that if you provide additional opportunities, there's going to be an increase in the number of people participating."); *id.* at 42:19-43:1-24, 47:10-49:7, ██████ ████████████████, 243:7-11 (NCAA relies on "common sense" extrapolations from student athlete studies none of which address the impact of New Jersey Sports Wagering Law on amount of gambling on NCAA games)); Slocum Decl. Exhibit 16 (NFL 30(b)(6) Dep. 59:5-61:15, 66:25-68:4 (NFL relies on experience, common sense, and law enforcement testimony to support its belief that the Sports Wagering Law will increase the number of people involved in sports gambling; it has no economic analysis or other studies in support)); *id.* Exhibit 5 (Stern Dep. 27:24-29:21 (NBA has not conducted any studies to determine effect of the Sports Wagering Law on amount of gambling on NBA games; instead NBA relies on logic that increased availability results in increased activity)); *id.* Exhibit 12 (NBA 30(b)(6) Dep. 29:9-30:23 (relying on legislative history of PASPA and unspecified articles); *id.* at 37:8-15 ("[There would, overall, be more gambling . . . I couldn't tell you how much."); *id.* at 37:24: 38:3 (no NBA studies on increased illegal sports gambling in New Jersey as a result of the Sports Wagering Law)); Slocum Decl. Exhibit 10 (MLB 30(b)(6) Dep. 31:10-19, 36:8-18 (No empirical data to support this allegation, just "tremendous amount of information about the world of gambling and the effects of gambling.")); *id.* Exhibit 11 (Mullin Dep. 35:17-23 ("I think it's a valid assumption that the numbers of legal baseball gamblers would increase.")); *id.* Exhibit 19 (Bettman Dep. 42:20-43:5 (NHL has no estimate or study on the alleged possible increase in gambling from the Sports Wagering Law)).

Plaintiffs' Response:

      **Disputed.**  This statement is ambiguous and misleading insofar as it refers to

"empirical evidence" and people "involved in sports wagering."  In fact, there is ample evidence

in the record that demonstrates that further legalization of sports gambling likely would lead to

an overall increase in the number of people that participate in sports gambling – a point

conceded even by Defendants' own expert, Mr. Willig.  (Slocum Decl. Ex. 1 (Willig Report), ¶

10(b) ("The incremental effect of legalizing sports wagering in New Jersey . . . could stimulate a

certain amount of sports wagering that would not otherwise occur.  Such new (legal) wagering

would result in an overall increase in total (legal plus illegal) sports wagering").)  Mr. Willig is

not alone in this assessment.  *See, e.g.*, Hernandez Certif. Ex. 24 (Senate Report 102-248) at

Plaintiffs' 00000249 (citing testimony by a retired agent of the FBI's gambling unit and a report

from the former Director of New Jersey's Division of Gaming Enforcement, that "most law

enforcement professionals agree that legalization has a negligible impact on, and in some ways enhances the illegal markets"); *id.* Ex. 10 (Mullin Dep.) at 36:17-37:9 ("I think it's also far more common that the lines are blurred, that you have people that bet legally and illegally."). Indeed, Mr. Willig cites to "historical experience with lotteries and horserace wagering" to support the notion that the "total amount of sports wagering" would "increase." (Slocum Decl. Ex. 1 (Willig Report) ¶ 32(b); *see also* Hernandez Certif. Ex. 8 (Stern Dep.) at 30:25-31:5 ("I'm certain beyond certain, based upon my experience with gambling, that when you give people the opportunity to gamble and the State supports it, advertises it and profits from it, it will happen."); *id.* Ex. 2 (Emmert Dep.) at 39:7-25 (noting that state-sponsored sports gambling communicates the message that sports gambling "is not only all right, it's approved and indeed encouraged," thus creating a likelihood that sports gambling will increase).)

Defendants narrowly and incorrectly frame the Statement by referring only to "empirical evidence" concerning the effect of the New Jersey Sports Wagering Law.  It is not disputed that Plaintiffs have no studies that specifically addressed the effects of the New Jersey Sports Wagering Law – a law that has yet to be implemented and that Plaintiffs have sought to enjoin because it violates federal law.  But Defendants have not asserted – nor is there any basis for asserting – that the effect of sports wagering in New Jersey would be qualitatively different from the effects of sports wagering elsewhere in the United States.  *See* Hernandez Certif. Ex. 2 (Emmert Dep.) at 38:2-9 (discussing how experience and studies outside New Jersey can be extrapolated to predict results in New Jersey); *id.* at 19:25-21:2 ("Whether it's in New Jersey or Montana or Nebraska, the, there's nothing that I've ever seen that suggests that our -- the student athletes in the universities in New Jersey are different than any other state of the union. So while we have never done a study in New Jersey per se, common sense, social science says

65

if you do a study in, that covers the whole country, that those things are very likely to apply to

New Jersey as well.").

       To the extent Defendants contend that the purported lack of "empirical evidence"

that New Jersey's legalization would "increase" sports wagering suggests that Plaintiffs not

shown harm from such legalization, Plaintiffs note that they have presented ample evidence to

demonstrate that harm, and in this connection, refer to and incorporate their Response to Defs.'

SUMF ¶ 74, among others.

### Defendants' Statement No. 77:

     Plaintiffs have no estimates of the financial loss they contend will result from the Sports
Wagering Law. Slocum Decl. Exhibit 16 (NFL 30(b)(6) Dep. 97:18-98:2, 98:16-99:5 ("We're
unable to quantify that other than our understanding and belief that it will negatively
impact . .. .")); *id.* Exhibit 13 (NCAA 30(b)(6) Dep. 84:7-85:14 (NCAA has no studies
regarding any estimated financial loss; nor does the NCAA allege that New Jersey's legalization
of sports gambling would result in fewer viewers, lower attendance, or lower TV ratings)); *id.*
Exhibit 10 (MLB 30(b)(6) Dep. 92:10-23 ("I don't know of any particular studies. I can tell you,
though, we feel and fear that legalization of gambling in New Jersey would risk undermining
the foundation of the sport and undermine what we are selling....")); *id.* Exhibit 12 (NBA
30(b)(6) Dep. 112:4-13, 113:10-13, 114:17-20, 115:14-17 (NBA has no empirical data on
potential impact of the Sports Wagering Law on NBA attendance, ticket sales, television ratings,
broadcast revenue, or team revenue)).

### Plaintiffs' Response:

       **Disputed**.  The Statement is ambiguous and misleading.  As Defendants are well

aware, Plaintiffs have sought injunctive relief because the harms caused by sports gambling are

irreparable – that is, cannot be measured or calculated (much less compensated) in monetary

damages.  *See* Dkt. No. 1 (Complaint), at ¶ 34; Dkt. No. 10-2 (Plaintiffs' Memorandum of Law

in Support of Plaintiffs' Motion for Summary Judgment, and, if Necessary to the Preserve the

Status Quo, a Preliminary Injunction), at 17-20.  The fact that Plaintiffs do not have "estimates"

of their financial loss does not mean that Plaintiffs' allegation of harm is not supported by the

evidence.  In this connection, Plaintiffs refer to and incorporate their Response to Defs.' SUMF

¶ 74, among others. ████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████.

The testimony from the NFL's 30(b)(6) witness cited by Defendants makes clear

that the harm at issue is not quantifiable in the form that Defendants incorrectly presume is

required:

> Q: The NFL is not alleging that New Jersey's legalization of
> sports gambling will result in any financial loss to the NFL,
> correct?
>
> [Objection omitted]
>
> A.   We absolutely are.  And as I've explained, if New Jersey is
> permitted to violate the federal law, that will result in an increase
> in sports gambling, period.  That increase will have not only
> resulted in the increased threat of match-fixing which we've
> discussed -- and that threat and that risk is  a very real one and
> one that, as a business, the NFL needs to factor into its decision as
> to whether this is good or bad or this could be harmful or not.
>
> But the increase in sports gambling and the fact that New Jersey
> would now be telling its citizens and its youth that sports
> gambling is okay and is not a forbidden or prohibited activity
> changes the perception of our sport.  As soon as that law -- as
> soon as New Jersey begins granting casino licenses, that
> fundamentally changes the nature of our relationship with our
> fans and what our sport represents to the citizens of New Jersey.
>
> On our long-term basis, that will impact -- and on a short-term
> basis that will deleteriously impact our relationship with our fans.
> That is based upon our experience, upon our business model, you
> know, suffice it to say that.
>
> *              *              *              *
>
> Q: Is the NFL alleging that the legalization of sports gambling in
> New Jersey would result in financial loss to the NFL?
>
> [Objection omitted]
>
> A.   Yes, for the reasons that I just went through in my long-
> winded answer.  The impact of our fans we can't quantify, but it

will change the relationship based upon our experience as a league and the defense of our shield. That relationship has resulted in the League increasing its income in each and every year for the past several decades.

By analogy, you can look at industries and sports that closely affiliated themselves with gambling and became identified solely with gambling such as those that are set forth in PASPA itself-- the horse racing industry which incidentally is now at a point where, my understanding, the New Jersey law is designed to save the horse-racing industry in New Jersey because of its relationship with gambling. It used to be one of the most watched events in America; and over the course of decades, as the NFL has increased in popularity because it's viewed as a sport and athletic competition, horse racing has declined in every state in which it's offered.

And I would submit to you, and this is not based on a study but based on experience, that it is known just as a vehicle for gambling; Jai Alai, dog racing. That history and that experience is upon what we base our assertion that allowing New Jersey to violate the federal law would negatively impact our bottom line.

Q.   The NFL doesn't have any estimates of financial loss that it contends would result from New Jersey's legalization of sports gambling, correct?

A.    We're unable to quantify that other than our understanding and belief that it will negatively impact our relationship with our fans and will negatively impact our long-term growth.

Q.   Is the NFL alleging that New Jersey's legalization of sports gambling would result in decline of TV ratings to the NFL?

A.    For the reasons that I've previously answered and the negative impact on our fans' perception, it will -- and our belief is that it will negatively impact the long-term growth of our sport and the long-term popularity of our sport which will consequently impact viewership. We aren't able to quantify it. We don't believe it's good and healthy for the League, which is why we're doing what we're doing here.

Q.   So the NFL does not have any estimate of how specifically New Jersey's legalization of sports gambling would affect its TV ratings, correct?

[Objection omitted]

A.     We're unable to quantify to what extent New Jersey's violation of the federal law will impact our sports -- our broadcast ratings.  However, for all the reasons I've previously testified to, we believe that it will negatively impact our ratings and our relationship with our fans, our long-term relationship with our fans.

(*Id.* Ex.3 (NFL 30(b)(6) Dep.) at 94:14-99:5; *see also id.* Ex. 9 (Bettman Dep.) at 82:6-14 (observing that, although NHL revenues did not appear to decline as a result of Rick Tocchet sports betting scandal, the league may have achieved greater revenues without the scandal); *id.* Ex. 8 (Stern Dep.) at 66:21-67:14 (discussing how Donaghy sports betting scandal likely hurt NBA attendance, but explaining difficulty in quantifying the scope of that harm).)

The Statement is also overly narrow and misleading insofar as it refers only to "estimates" concerning the financial loss from the New Jersey Sports Wagering Law, as opposed to further legalization of sports gambling generally.  It is not disputed that Plaintiffs have no estimates that specifically address the effects of the New Jersey Sports Wagering Law – a law that has yet to be implemented and that Plaintiffs have sought to enjoin because it violates federal law.

**Defendants' Statement No. 78:**

Plaintiffs have no empirical evidence that viewership has been negatively impacted by legalized sports gambling in Las Vegas. Slocum Decl. Exhibit 16 (NFL 30(b)(6) Dep. 99:6-16 (no information on television ratings)); *id.* Exhibit 12 (NBA 30(b)(6) Dep. 111:19-23, 112:10-13, 115:8-10 (NBA has no empirical data on impact of currently legal sports gambling on attendance, tickets sales; television ratings, or team revenue)); *id.* Exhibit 13 (NCAA 30(b)(6) Dep. 84:7-85:14 (NCAA has no studies regarding any estimated financial loss; nor does the NCAA allege that New Jersey's legalization of sports gambling would result in fewer viewers, lower attendance, or lower television ratings)); *id.* Exhibit 3 (Goodell Dep. 43:2-10, 51:15-21 (Despite legalized sports gambling in Las Vegas, the NFL believes that its fans and the public have confidence in the integrity of NFL games)); *id.* Exhibit 10 (MLB 30(b)(6) Dep. 84:2-10, 86:7-22 ("[T]here really isn't anybody out there who believes our games are fixed.  We believe right now our game, our sport, is perceived as pure and honest and great competition."); *id.* at 90:17-91:18 (MLB has experienced no diminishment in fan loyalty over the past 20 years)).

Plaintiffs' Response:

      **Disputed**.   The Statement is ambiguous and misleading, including in its (1) references to "empirical evidence" and "viewership that has been negatively impacted," and (2) restriction to the impact of "legalized sports gambling in Las Vegas."  Plaintiffs refer to and incorporate their Response to Defs.' SUMF ¶ 77.

      In addition, many of Defendants' citations to support the Statement are inapposite, either because they are wholly unrelated to Las Vegas (*see, e.g.* Hernandez Certif. Ex. 1 (NCAA 30(b)(6) Dep.) at 84:7-85:14) or because they simply demonstrate that Plaintiffs view the public as believing in the honesty and integrity of Plaintiffs' games.  *See, e.g.*, *id.* Ex. 6 (Goodell Dep.) at 43:2-10; *id.* Ex. 4 (MLB 30(b)(6) Dep.) at 90:17-91:18.  The questions and answers are inapt for the further reason that they only focus on the success of Plaintiffs over the past 20 years, which is the timeframe following the enactment of PASPA and in which the success of Plaintiffs naturally would be expected.  *See, e.g.*, *id.* Ex. 4 (MLB 30(b)(6) Dep.) at 90:17-91:18; *id.* Ex. 7 (NBA 30(b)(6) Dep.) at 111:10-23.

**Defendants' Statement No. 79:**

      The Leagues have no empirical evidence that the Sports Wagering Law will undermine their anti-gambling education efforts.  Slocum Decl. Exhibit 8 (Emmert Dep. 52:9-53:16 ("I'm making assumptions about, about human behavior that you may disagree with . . ..")).

Plaintiffs' Response:

      **Disputed**.  The Statement is ambiguous and misleading.  Defendants' improper restriction to empirical evidence is misleading as to the nature of the record concerning  the educational efforts of the NCAA, which was as follows:

      Q   [M]y question is what evidence do you have that the passage
      and implementation of the New Jersey statute will significantly
      undermine the efforts of the NCAA staff.

A   … Have I conducted a scientific survey about whether or not having two conflicting messages delivered to somebody doesn't dilute those messages?  No, I haven't done that.

But I think, again, most anyone would recognize that if you are trying to commune -- again, I'm making assumptions about, about human behavior that you may disagree with -- but the fact is, we are telling our student athletes what should or should not occur around gambling activity.  We are supportive of the congressional law that says this is only legal in one place, and even there we don't like it and don't condone it and don't want our student athletes to participate in it.

To add to that, then, another message from a state government that says, no, no, no, don't pay attention to that, the opposite is true, the fact is, that gambling on college sports is perfectly appropriate, we even encourage you to do it, how can that not diminish the value of the message that we're trying to deliver?

Q   But that, again, is a conclusion that you draw. You have no evidence of that.

A   It is absolutely, it is absolutely a conclusion that I draw and I think anyone else would.

(Hernandez Certif. Ex. 2 (Emmert Dep.) at 52:9-53:16; *see also id.* at 50:1:-51:11 ("If we are explaining to students why this is problematic, why it's inappropriate, why we oppose gambling, and then the State of New Jersey is communicating exactly the opposite, saying it's not only appropriate, we encourage gambling on intercollegiate athletic events, that certainly sends a message that's completely the opposite of what the message that we send."); *id.* at 51:18-52:3 ("The mere fact that the, that the State of New Jersey has taken a position that establishes that this activity is legal and encouraged here in this state sends a very clear message . . . [that] what the NCAA is telling us is just wrong, and, and we're going to, we're going to follow the laws of the State of New Jersey.").)

Plaintiffs further dispute the Statement as overly narrow and misleading insofar as it refers only to empirical evidence concerning educational efforts being undermined

71

specifically from the New Jersey Sports Wagering Law, as opposed to further legalization of sports gambling generally.  It is not disputed that Plaintiffs have no empirical studies that specifically address the effects of the New Jersey Sports Wagering Law – a law that has yet to be implemented and that Plaintiffs have sought to enjoin because it violates federal law.

**Defendants' Statement No. 80:**

The Leagues have no plans to modify or change their anti-gambling rules should sports gambling be legalized in New Jersey. Slocum Decl. Exhibit 3 (Goodell Dep. 32:17-33:6 (currently has no plans to implement any additional procedures or rules should the Sports Wagering Law be implemented)); *id.* Exhibit 8 (Emmert Dep. 85:20-24 (same)); *id.* Exhibit 9 (Selig Dep. 43:16-21 (same)).

Plaintiffs' Response:

**Disputed.**  The Statement is misleading.  The cited testimony makes clear that: (1) Plaintiffs have not yet formulated plans to modify or change their policies because they do not believe that New Jersey will succeed in its attempts to violate federal law; and (2) if New Jersey were to succeed in doing so, Plaintiffs would then address the situation as necessary.  *See, e.g.*, Hernandez Certif. Ex. 6 (Goodell Dep.) at 32:5-33:8 ("Well, we'd have to take that into consideration if it occurs.  We don't believe it's going to occur and we don't think it should occur."); *id.* Ex. 2 (Emmert Dep.) at 84:24-86:3 ("We don't have any plans right now, because, again, we are waiting for the outcome of this lawsuit to ascertain the speed with which this would be implemented if it's allowed to go forward," but noting that "it would deserve some consideration and discussion"); *id.* Ex. 9 (Bettman Dep.) at 25:19-26:22 (noting NHL will revisit its policies if law is upheld).  Finally, with respect to the NCAA, Defendants disregard the fact that the NCAA has already taken action in response to New Jersey's attempt to implement sports gambling by withdrawing NCAA championship events from the State (pursuant to its Championships Policy) as of the effective date of the Sports Gambling Regulations.  *See* Hernandez Certif. Ex. 25 at Plaintiffs' 00002812.

Plaintiffs further object insofar as Defendants refer to the "Leagues" but provide not testimony from witnesses from the NHL or NBA.

**Defendants' Statement No. 81:**

There is no empirical evidence demonstrating that the Sports Wagering Law will harm student athletes. Slocum Decl. Exhibit 8 (Emmert Dep. 23:6-17, 72:2-73:19 (relying on history, extrapolation of studies on student athletes, and common sense for basis of argument)); *id.* Exhibit 13 (NCAA 30(b)(6) Dep. 79:6-17 ("The more avenues and opportunities [for student athletes to participate in gambling], the more concerned we are about that having a negative impact on their welfare.")).

Plaintiffs' Response:

**Disputed.** Plaintiffs refer to and incorporate their Responses to Defs.' SUMF ¶¶ 31-32, 74, and 79.

**Defendants' Statement No. 82:**

There is no empirical evidence demonstrating that an increase in legal gambling would result in increased match fixing. Slocum Decl. Exhibit 12 (NBA 30(b)(6) Dep. 45:7-46:2 (Common sense dictates that "if there's more gambling . . there's at least the possibility that you would have a greater chance of game-fixing."); *id.* at 44:16-23 (Match fixing is not the NBA's primary concern with gambling)); Slocum Decl. Exhibit 13 (NCAA 30(b)(6) Dep. 61:3-16 ("So I'm just relying on conversations and my job responsibilities.")); *id.* Exhibit 9 (Selig Dep. 21:1419, 25:14-27:11 ("[W]ith all due respect, after 50 years in this sport, sir, I don't have to do an empirical study.")); *id.* Exhibit 11 (Mullin Dep. 44:2-13 (no MLB studies or estimates of game fixing that allegedly would occur if the Sports Wagering Law is implemented)); *see also* Slocum Decl. Exhibit 8 (Emmert Dep. 18:22-19:24, 26:14-19, 37:10-39:25, 67:1-11 (relying on common sense, experience, and idea that more gambling "enhances the threat")); *id* Exhibit 16 (NFL 30(b)(6) Dep. 24:17-25, 51:19-52:9, 59:5-61:15 (no economic analysis)); *id.* Exhibit 10 (MLB 30(b)(6) Dep. 36:8-18 ("Again, our department of investigations believes there would be a very large increase .. .")).

Plaintiffs' Response:

**Disputed.** The Statement is ambiguous and misleading insofar as it refers to "empirical evidence" and focuses only on actual "match fixing" to the exclusion of other effects from legalized sports gambling on the integrity of Plaintiffs' games. Plaintiffs further object insofar as Defendants focus on an actual increase in match fixing as opposed to the increased *risk* of match fixing that would result from an increase in sports gambling, which Plaintiffs have

amply demonstrated.  In this connection, Plaintiffs refer to and incorporate their Responses to

Defs.' SUMF ¶¶ 31-32, 74, 76, and 79.

**Defendants' Statement No. 83:**

The NCAA has not been contacted by members of the public concerned about match-
fixing for years.  Slocum Decl. Exhibit 13 (NCAA 30(b)(6) Dep. 246:6-16).

Plaintiffs' Response:

**Disputed.**  Defendants' sole support for the Statement is the testimony of the

NCAA's 30(b)(6) witness that she had in the past received "emails from the public expressing a

view that match fixing could be occurring or could be a problem," but that she personally hasn't

"received one" in years.  (Hernandez Certif. Ex. 1 (NCAA 30(b)(6) Dep.) at 246:6-16.)

However, the witness was only testifying in her personal capacity and not on behalf of the

NCAA; contacts from the public concerning match-fixing was not a 30(b)(6) Topic.

Even if the Statement were true, that the NCAA has not been "contacted by

members of the public concerned about match fixing" does not mean that match fixing is not

occurring or that the public's perception of the integrity of NCAA games is not affected by

sports gambling.  *See supra* Responses to Defs.' SUMF ¶¶ 31-32, 39 and 74.

**Defendants' Statement No. 84:**

An individual inclined to engage in match fixing would prefer an illegal betting
operation because there is a far greater likelihood of avoiding detection by police and the
Leagues.  Slocum Decl. Exhibit 1 (Willig Report ¶ 68).

Plaintiffs' Response:

**Disputed**.  To the extent that Defendants mean to imply that match fixing

activity is less likely to occur in a jurisdiction where sports gambling is legal (or through a state-

authorized gaming operation in that jurisdiction) than through illegal gambling, Defendants

have absolutely no support for that proposition.  The cited paragraph from the Willig Report

that "the gambler is most likely to make [a] wager" in an illegal outlet such as a local or

offshore bookmaker rather than a legal outlet because of "advantages" that the illegal channels

have is merely a recitation of bald third-party hearsay statements (Willig Report ¶ 68, n. 89) and

is thus inadmissible.  *See* General Objection No. 3.  Indeed, the evidence in the record,

including prior sports gambling scandals and testimony from individuals with personal

experience dealing with the sports gambling industry, supports the contrary position – i.e., that

legalization of sports gambling will not reduce game fixing activity and that game fixing

activity has occurred through legalized wagering.  In this connection, Plaintiffs refer to and

incorporate their Responses to Defs.' SUMF ¶¶ 33-34.

**Defendants' Statement No. 85:**

Legalizing sports gambling would be more likely to expose attempts to fix games.  *Id.*
(Willig Report ¶¶ 72-76, 103-108).

Plaintiffs' Response:

**Disputed**.  Plaintiffs refer to and incorporate their Responses to Defs.' SUMF ¶¶

33-34.

**Defendants' Statement No. 86:**

Legal bookmakers have an incentive to deter and detect match fixing in order to
preserve the viability of their business, and have proven effective in helping root out corruption
when it has occurred.  *Id.* (Willig Report ¶¶ 104-108).

Plaintiffs' Response:

**Disputed**.  The only "support" in the Willig Report for the position that

bookmakers have "incentive" to detect match fixing is a bald quotation from a third-party article.

As such, the Statement is based on nothing more than inadmissible hearsay.  *See* General

Objection No. 3.  With respect to the claim that such bookmakers "have proven effective in

helping root out corruption," Plaintiffs refer to and incorporate their Responses to Defs.' SUMF

¶¶ 33-34.

**Defendants' Statement No. 87:**

Someone interested in engaging in match fixing, but not willing to bet illegally, would be able to bet legally in Nevada. *Id.* (Willig Report ¶ 69).

Plaintiffs' Response:

**Disputed**.  Plaintiffs object to this statement as a mere hypothetical that is both

speculative and nonsensical.  Since forms of sports gambling are legal in the State of Nevada,

anyone who meets Nevada's legal requirements "would be able to bet legally" there –

regardless of whether they are "interested in engaging in match fixing" or "not willing to bet

illegally."  The paragraph of the Willig Report cited by Defendants is nothing more than Mr.

Willig's wholly unsupported speculation that legalization of sports gambling in New Jersey

would not "have a material impact *on the amount wagered*" by gamblers engaged in match-

fixing and that "[a]dding locations in New Jersey would not materially improve the ability to

employ a bet spreading strategy."  (Willig Report ¶ 69(a) (emphasis added).)

**Defendants' Statement No. 88:**

MLB has not taken any external action to deter illegal sports wagering in the United States. Slocum Decl. Exhibit 9 (Selig Dep. 12:2-5 (Major League baseball has "only" worked with its "own people" to deter illegal sports gambling)).

Plaintiffs' Response:

**Disputed**.  The phrase "external action" is ambiguous and misleading (and never

used in the cited testimony from Commissioner Selig).  Indeed, it is unclear what "external

action to deter illegal sports wagering" relates to or would entail.  MLB, like the other Plaintiffs

in this action, has taken a variety of steps to protect against the threat that sports gambling poses

to the goodwill and integrity of its sport, including: (1) creating the first Office of the

Commissioner in direct response to the 1919 "Black Sox" game-fixing scandal; (2) instituting highly restrictive policies related to gambling; (3) educating its personnel about gambling-related issues; and (4) vigorously opposing the spread of legalized sports gambling in the United States – including this lawsuit.  *See, e.g.* Dkt. 10-7 (Selig Decl.) at ¶¶ 11-12; Slocum Decl. Ex. 31 (MLB Rule 21); Hernandez Certif. Ex. 11 at Plaintiffs' 00000042-49 (MLB testimony before Congress in support of PASPA); *id.* Ex. 26 at Plaintiffs' 00000432-36 (same); *id.* Ex. 27  at Plaintiffs' 00001239 (joint letter submitted to Congress on behalf of all Plaintiffs in support of UIGEA); *id.* Ex. 28  at Plaintiffs' 00000721 (MLB's written opposition to legalization of sports gambling in New York).

**Defendants' Statement No. 89:**

       The NBA is not sure if it is harmed by legal sports gambling in Las Vegas.  Slocum Decl. Exhibit 5 (Stern Dep. 45:19-46:9).

Plaintiffs' Response:

              **Disputed**.  In the cited testimony, when asked whether "in your view . . . the NBA [is] harmed by the presence of legalized gambling in Nevada," Commissioner Stern responded "Probably . . . I think that some of that illegal gambling that you referred to finds its way back to Las Vegas and gets its impetus from the setting of lines in Las Vegas.  So it's – on balance, if there were no gambling in Las Vegas, I would be happier for the League."

(Hernandez Certif. Ex. 8 (Stern Dep.) at 45:19-46:9.)

**Defendants' Statement No. 90:**

       The NCAA does not know whether match fixing is more or less likely in a legal and regulated or an illegal and unregulated market.  Slocum Decl. Exhibit 8 (Emmert Dep. 62:4-63:9).

Plaintiffs' Response:

> **Disputed**.  The phrase "does not know" is ambiguous, misleading, and
argumentative, and Plaintiffs object to the Statement as presenting an incomplete hypothetical
(making assumptions about the nature of the "market" at issue) that was never asked of the
NCAA witnesses.  In the cited testimony, NCAA President Emmert – who was not a 30(b)(6)
witness – was asked "If I'm going to fix a match and then gamble on it, wouldn't it be
preferable for me to do so in a market that's not regulated than one that is regulated?"
(Hernandez Certif. Ex. 2 (Emmert Dep.) at 62:19-23.)  NCAA President Emmert replied, "I
suppose it depends on the context completely.  I mean, I really don't know the mechanics of
game fixing.  I haven't spent much time looking at it.  Again, you had an expert [the NCAA's
30(b)(6) witness] in front of you yesterday." (*Id.* at 63:6-11.)  The NCAA's 30(b)(6) witness
testified as to the basis for the NCAA's contention that New Jersey's legalization of sports
gambling would in fact result in the increased risk of match fixing.  ██████████████████
█████████████████████████████████████████████████████████████████.

> To the extent Defendants are contending that match fixing is less likely in
markets where sports gambling is legal, Plaintiffs refer to and incorporate their Responses to
Defs.' SUMF ¶¶ 33-34.

**Defendants' Statement No. 91:**

> After states began re-adopting legal lotteries starting in 1964, illegal lotteries —
"numbers games" — run by organized crime largely disappeared.  Slocum Decl. Exhibit 1
(Willig Report ¶¶ 27-28).

Plaintiffs' Response:

> **Disputed**.  Defendants' reliance on the Willig Report is improper insofar as that
report relies on inadmissible hearsay that Mr. Willig copied wholesale from articles by third

parties.  (Willig Report, ¶¶ 27-28 (footnotes 25-32).)  *See* General Objection No. 3.  Plaintiffs

further dispute the Statement because the phrase "largely disappeared" is ambiguous.

**Defendants' Statement No. 92:**

Over the past sixty years, the increase in legal wagering outlets for horseracing has led
to a reduction in illegal wagering on horseracing. *Id.* (Willig Report ¶¶ 29-31).

Plaintiffs' Response:

**Disputed**.  Defendants' reliance on the Willig Report is improper insofar as that

report relies on inadmissible hearsay that Mr. Willig copied wholesale from third parties,

including, for example, quotes from unidentified individuals in a newspaper article (Willig

Report at n. 41) and an anecdote from an online blog.  (*Id*. at n. 40.)  *See* General Objection No.

3.  Plaintiffs further note that the increase in legal wagering for horse racing has coincided with

the ruin of the horse racing industry in New Jersey, which was the very reason why horse racing

entities in the State lobbied for the authorization of sports gambling at racetracks in the state.

*See* Hernandez Certif. Ex. 29 (Dec. 9, 2010 Public Hearing before New Jersey Senate Economic

Growth Committee) at Plaintiffs' 00001532-33 (State Senator Robert Singer expressing

appreciation of "the fact that you included the tracks in this. As you know, we're struggling in

the horse racing industry. This would be, I think, a tremendous boon for them.").

**Defendants' Statement No. 93:**

NCAA President admitted that an opinion not based on empirical data or research is no
better than anyone else's opinion.  Slocum Decl. Exhibit 8 (Emmert Dep. 93:20-94:12 (refusing
to credit opinion of former chairman of Nevada's Gaming Control Board because "this isn't
based on any empirical study that I'm aware of.  I don't think he's conducted that research, and
I have no reason to believe that his opinion is better or worse than anybody else's.")).

Plaintiffs' Response:

**Disputed**.  Plaintiffs object to the Statement as argumentative and misleading.

NCAA President Emmert made no such "admission" at his deposition.  President Emmert was

asked specifically whether he had "any reason to believe" that the following written statement

by William Bible, former chairman of Nevada's Gaming Control Board, was "true:" "Not one

college sports scandal is the result of legal sports wagering.  To the contrary, legal sports

wagering in Nevada has assisted athletic leagues in their enforcement activities aimed at

preventing game fixing and point shaving."  (Hernandez Certif. Ex. 2 (Emmert Dep.) at 93:20-

94:6.)  President Emmert did note the lack of any reference to an empirical study by Mr. Bible,

but within the context of a broader series of answers that Mr. Bible provided absolutely no basis

for his opinion:

> Well, I don't know Mr. Bible.  And as we've established a
> number of times, this isn't based on any empirical study that I'm
> aware of.  I don't think he's conducted that research, and I have
> no reason to believe that his opinion is better or worse than
> anybody else's.
>
> *          *          *          *
>
> I don't know what he is referencing . . .  I have no idea where he
> gets that argument, what his basis in fact is.  He offers nothing
> other than his opinion on it. He then says, "On the contrary, sports
> wagering has assisted athletic leagues in their enforcement
> activities at preventing game fixing and point shaving." I don't
> know that he can point to a game [fix] that's been avoided.

(*Id*. at 94:7-12; 95:2-15.)

Plaintiffs further dispute the Statement to the extent that Defendants seek to draw

an equivalency between Mr. Bible's conclusory statement and Plaintiffs' well-founded and

properly support allegations of harm in this lawsuit.  *See supra* Plaintiffs' Responses to Defs.'

SUMF ¶¶ 33, 74.

### Defendants' Statement No. 94:

There is no empirical evidence to suggest that legalizing sports gambling in New Jersey
would negatively change perceptions of the legitimacy of sporting events. Slocum Decl. Exhibit
3 (Goodell Dep. 34:2-35:5; 40:18-41:4 (NFL has no studies; instead basis for belief is "very
strongly held view . . . that the threat that gambling could occur . . . could be very damaging");

*id.* at 41:5-42:16 (common sense and concern of threat supports belief that legalized sports gambling increases suspicion and cynicism toward every on-the-field event); *id.* at 14:25-15:8, 49:12-24 (games in countries where sports gambling is legal do not harm perception of NFL integrity because "people understand that we have very strong policies and that we protect outside influences from our game")); Slocum Decl. Exhibit 16 (NFL 30(b)(6) Dep. 80:21-81:7 (NFL has no studies demonstrating NFL fans' public perception based on legalized gambling in Las Vegas); Slocum Decl. Exhibit 9 (Selig Dep. 19:16-20:14, 27:16-25, 30:10-16, 36:4-24, 39:2-40:5 (basis for the statement that sports betting in New Jersey would damage public confidence in MLB is Commissioner Selig's opinions, "thoughts on gambling," "the threat of gambling," the risk of "creat[ing] more threat," and Selig's knowledge of "how sports fans feel.")); *id* Exhibit 10 (MLB 30(b)(6) Dep. 84:2-10, 93:22-94:25, 95:18-25 ("If there's a formal study, you would have had it."); *id.* at 83:3-13 ("We think that's at least a risk.")); Slocum Decl. Exhibit 11 (Mullin Dep. 22:16-20, 23:2-7, 44:12-16 (no MLB studies regarding the impact of sports gambling or the Sports Wagering Law on MLB or public perception of the MLB)); *id.* Exhibit 8 (Emmert Dep. 16:17-17:16, 31:20-32:5, 34:3-19, 38:15-19, 72:2-17 (NCAA has no studies and instead relies on common sense and common parlance to support argument that increased legal gambling would lead to more public suspicion)); *id.* Exhibit 13 (NCAA 30(b)(6) Dep. 71:13-22 (no NCAA studies regarding public perception of match fixing or impact on that perception of New Jersey law)); *id* Exhibit 12 (NBA 30(b)(6) Dep. 74:18-75:5 (NBA representative stating "I don't know [if the percentage of the public with the perception that NBA games are not completely legitimate would increase]. I only know that . . . more gambling can only—the only possibility is that there will be more of that kind of perception. But I don't know for sure.")); *id.* Exhibit 19 (Bettman Dep. 19:21-20:9, 27:24-28:5, 33:20-35:7 (no NHL studies on public reputation: "[i]t's really based on my judgment"); *id* at 30:3-7 ("No, that is my opinion"); *id.* at 30:20-21 ("It's my judgment that betting puts a cloud on our game."); *id.* at 81:22-82:13 (no evidence that Tocchet gambling incident affected NHL's reputation or revenues)).

Plaintiffs' Response:

        **Disputed.** Plaintiffs have presented ample evidence that the further legalization

of sports gambling would increase the risk that the public's perception of Plaintiffs' sporting

events would be negatively affected. In this connection, Plaintiffs refer to and incorporate their

Responses to Defs.' SUMF ¶¶ 39 and 74.

**Defendants' Statement No. 95:**

<span style="background:black">███████████████████████████████████████████████████</span> Slocum Decl.
Exhibit 16 (NFL 30(b)(6) Dep. 76:13-77:3 ("[I]t is our present position that there is not a belief among our fans that our games are fixed. Our fans believe that what they're watching on the field is honest competition. That is the appeal of our sport.")); *id.* Exhibit 10 (MLB 30(b)(6) Dep. 84:2-10 ("[T]here really isn't anybody out there who believes our games are fixed. We believe right now our game, our sport, is perceived as pure and honest and great competition.")).

Plaintiffs' Response:

**Disputed**. ██████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████

While it is not disputed that the NFL and MLB do not believe that any

appreciable portion of their fans believe that their games are "fixed," Plaintiffs' concerns about

sports gambling's effects on the public's perception of the integrity of the games extend beyond

simply manipulation of the final scores of those games, ████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████

**Defendants' Statement No. 96:**

████████████████████████████████████████████████

Plaintiffs' Response:

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████

██████████████████████ *See supra* Plaintiffs' Responses to Defs.' SUMF ¶¶ 28, 39, and 74.

**Defendants' Statement No. 97:**

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



Plaintiffs' Response:

**Defendants' Statement No. 98:**

Plaintiffs' Response:

**Defendants' Statement No. 99:**

Plaintiffs' Response:

**Defendants' Statement No. 100:**

Plaintiffs' Response:

**Defendants' Statement No. 101:**

██████████████████████████████████████████████
████████████████████████████████████████

Plaintiffs' Response:

████████████████████████████████████
██████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████

████████████████████████████
████████████

████████████████████████████
██████████

██████████████████████
████████████████████████
██████████████
██████████████████████
████████████████████████████████
████████████████████

**Defendants' Statement No. 102:**

██████████████████████████████████████████

Plaintiffs' Response:

[REDACTED]

**Defendants' Statement No. 103:**

There is no empirical evidence demonstrating that the Sports Wagering Law will erode
fan loyalties to teams or players. Slocum Decl. Exhibit 9 (Selig Dep. 44:24-45:3, 45:14-21
(basis for alleged decrease in fan loyalty is Commissioner Selig's "knowledge of fans and how
they think and how offended they are by gambling")); Slocum Decl. Exhibit 11 (Mullin Dep.
49:4-22 (MLB has not studied fan loyalty and gambling and believes it is possible for a fan to
have loyalty and also want to win a bet)); *id.* Exhibit 3 (Goodell Dep 53:17-54:4 ("common
sense" is basis for allegation of decreased fan loyalty); *id.* at 54:20-55:4 ("We don't do studies
on common sense. We make that analysis. We think we have enough experience that we
understand this."); *id.* at 56:8-21 (NFL cannot answer whether NFL fans who also bet on NFL
games have an allegiance to a team)); Slocum Decl. Exhibit 16 (NFL 30(b)(6) Dep. 84:5-10,
85:1686:2, 186:18-21 (NFL cannot estimate how many fans currently watch NFL games due to
financial rather than rooting interest but it "guess[es] some" sports gamblers may watch the
games they bet on)); Slocum Decl. Exhibit 8 (Emmert Dep 46:4-47:18, 79:12-80:23 (NCAA has
no studies; instead, basis for NCAA's allegation of decreased fan loyalty is "view of human
nature")); *id.* Exhibit 13 (NCAA 30(b)(6) Dep. 83:4-13 (The NCAA has no studies, surveys, or
analyses comparing the number of people who have a rooting interest because of team loyalty to
those who have a rooting interest because of sports wagering)); *id.* Exhibit 5 (Stern Dep. 13:18-
14:11, 34:20-35:22, 43:3-8 (NBA has no studies; instead, basis for statement that fan loyalty
will be affected is "46 years of experience as NBA Commissioner, general counsel, executive
vice president and a fan"); *id.* at 33:8-12 (NBA does not know how sports gambling in China
affects interest of fans in China); *id.* at 42:23-43:2 ("I'm not sure that I should have to prove it
[that legalized sports gambling will prevent future fans from establishing team allegiances]. I'd
like the State to prove that it doesn't.")); Slocum Decl. Exhibit 12 (NBA30(b)(6) Dep. 110:6-25
(although the NBA's primary concern regarding sports gambling is the possibility of damaging
its relationship with fans, it relies on "informed view of people that have, you know, worked at
the league office for a lot of years . . . ."); *id.* at 154:23-155:4 (no evidence that NBA teams'
advertising relationships with legal gaming establishments has harmed fan loyalty); [REDACTED]

███████████████████

Plaintiffs' Response:

      **Disputed.**  The Statement is ambiguous and misleading.  Plaintiffs have

presented ample evidence that the further legalization of sports gambling would harm Plaintiffs,

including by eroding fan loyalties to teams and players.  In this connection, Plaintiffs refer to

and incorporate their Responses to Defs.' SUMF ¶¶ 39 and 74.

**Defendants' Statement No. 104:**

      The increased availability of legalized sports gambling may *increase* fandom.  Slocum
Decl. Exhibit 1 (Willig Report, ¶¶ 82-88 (growth of fantasy sports leagues in the U.S. provides
evidence that legalized wagering in New Jersey could promote fan interest in the professional
leagues); *id.,* ¶ 95 (Fan interest in the NCAA's post-season basketball championship
tournament — now commonly known as "March Madness" — has been enhanced by the
growth of tournament pools (or "brackets") by drawing fans into the tournament that would
otherwise have little interest and enhancing the interest of basketball fans)); *see also* Slocum
Decl. Exhibit 8 (Emmert Dep. 43:23-25, 47:5-14, 79:12-23 (disclaiming existence of any study
that could prove argument that legalized sports gambling negatively affects fan loyalty and
relying on opinion of human nature)); *id.* Exhibit 3 (Goodell Dep. 53:19-54:4 (relying on
common sense)); *id.* Exhibit 9 (Selig Dep. 36:4-37:4 ("I have all the evidence I need. I know
how people feel about gambling. I know how sports fans feel.")).

Plaintiffs' Response:

      **Disputed.**  The Statement is ambiguous and misleading insofar as it refers to

"fandom" and states that an event "may" occur.  Plaintiffs do not dispute that the availability of

legalized sports gambling could conceivably result in additional individuals taking an interest in

the outcome of sporting events for the purpose of following their bets, but Defendants provide

no support for the notion that such interest translates into "fandom," much less "fandom" of the

sort that: (1) Plaintiffs want to encourage or be associated with; or (2) is beneficial to the long-

term financial growth and success of Plaintiffs' businesses.  In fact, the sort of interest that

legalized sports gambling would encourage is *detrimental* to Plaintiffs' businesses in the long

term.  *See, e.g.*, Dkt 10-3 (Emmert Decl.) at ¶ 7 ("The core entertainment value of fair and

honest competition that is reflected in NCAA competition could be replaced by the bettor's interest, based not on team or player performance, but on the potential financial impact of each NCAA athletic competition."); Dkt 10-4 (Stern Decl.) at ¶ 4 (rooting interests will change from team-based to point spread-based); Dkt 10-5 (Goodell Decl.) at ¶ 6 (describing how rooting interest will change from teams and players to winning the bet); Dkt 10-6 (Bettman Decl.) at ¶ 7 ("[t]he very nature of the sport is likely to change for the worse"); Dkt 10-7 (Selig Decl.) at ¶ 8 (explaining that bets "forever alter the relationship between teams and their fans"); Hernandez Certif. Ex. 30 (Apr. 28, 1992 Bettman statement on behalf of NBA to the New Jersey Assembly) at Plaintiffs' 00002151-52 (describing concerns about the "point spread fan"); *id.* Ex. 2 (Emmert Dep.) at 42:15-44:23 (explaining why the entertainment value of intercollegiate athletics is diminished by sports gambling); *id.* Ex. 3 (NFL 30(b)(6) Dep.) at 85:7-15 (explaining that fans with team loyalty are more likely to buy team merchandise).

        At all events, to the extent that the Statement claims that public interest in Plaintiffs' games will *likely* increase as a result of legalized sports gambling, it is not supported by the testimony to which Defendants cite.  Paragraphs 82-88 of the Willig Report discuss the growth of fantasy sports leagues in the United States, but lack any basis to draw an equivalency between fantasy sports and sports gambling.  In this connection, Plaintiffs refer to and incorporate their Response to Defs.' SUMF ¶ 19.  Paragraph 95 of the Willig Report concludes – without any support – that participation in March Madness "pools" "draws fans into the tournament who would otherwise likely have little interest" and "enhances interest of 'regular' fans," which in turn "benefits the NCAA."  In the following paragraph, Mr. Willig simply recites inadmissible hearsay, quoting a "trade press article from 2008" that in turn quotes broadcasting and advertising executives.  (Willig Report ¶ 96.)  *See* General Objection No. 3.

Defendants also mischaracterize the nature of the deposition testimony to which they cite, implying that the League Commissioners and President Emmert are merely speculating, when that is not the case. *See* Hernandez Certif. Ex. 2 (Emmert Dep.) at 47:9-14 (acknowledging that he did not conduct a "psychological analysis of gamblers" but discussing a number of reasons why he was "enormously confident in the statement that betting on a game change the way you look at a game"); *id.* Ex. 6 (Goodell Dep.) at 53:19-55:4 (explaining that the NFL does not "do studies on common sense" propositions that people who place bets will be interested in the outcome of those bets, but that "we think we have enough experience that we understand this"); *id.* Ex. 5 (Selig Dep.) at 36:4-37:4 ("I've walked every Major League park in most every park in America" and referring to "50 years of experience").

**Defendants' Statement No. 105:**

The NFL Network broadcasts fantasy sports analysis that, among other things, labels football players as "Trash or Treasure," which NFL believes is consistent with the essence of sports debate. Slocum Decl. Exhibit 16 (NFL 30(b)(6) Dep. 254:19-256:24).

Plaintiffs' Response:

**Disputed**. The witness was never shown the broadcasted fantasy sports analysis at issue, so he was not in a position to determine whether it was consistent with the essence of sports debate. At deposition, the witness was shown a printout of a website that included a written statement that "Fantasy guru, Michael Fabiano, joins NFL AM to share which Week 1 surprise fantasy studs are trash and which are treasure." (Hernandez Certif. Ex. 3 (NFL 30(b)(6) Dep.) at 254:19-255:11.) The witness stated that he did not know "who Mr. Fabiano is and I don't want to speculate" as to what he was doing. (*Id.* at 255:20-256:2.) The relevant exchange at deposition was as follows:

> Q:    If someone on the NFL Network is referring to NFL
> football players as trash, is that consistent with developing the
> bonds of loyalty between a fan and his team?

> A:     I think any time you put on sports radio a debate about
> which players are better than others is the essence of sports and
> what sports fans do.  They debate who is the best, you know, wide
> receiver of all time, who's the best quarterback of all time, other
> sports' pitchers.  The essence of sports is healthy competition not
> only among teams but, as I've alluded to, fantasy football
> enhances fans' understanding and appreciation of individual
> athletes on teams other than those they normally would follow
> geographically.  So the  fact there would be a debate about which
> player's better than others and despite the hyperbole and the
> words "trash" and "treasure," that's consistent with the essence of
> a sports debate.

(*Id*. at 256:3-24.)

**Defendants' Statement No. 106:**

There is no empirical evidence suggesting that the New Jersey Sports Wagering Law will lessen the amateur nature of NCAA athletics.  Slocum Decl. Exhibit 8 (Emmert Dep. 78:1-79:11 (no empirical studies on irreparable harm potentially caused by New Jersey Sports Wagering Law)).

Plaintiffs' Response:

**Disputed**.  The Statement is vague and misleading.  It is not clear what

Defendants mean by "lessen the amateur nature of NCAA athletics."  The testimony cited in

support of the Statement is simply irrelevant; President Emmert acknowledged that the NCAA

has "not done empirical studies on the impact of the New Jersey law on illegal gambling in the

State of New Jersey," while also explaining in detail why that law would irreparably harm the

NCAA.  (Hernandez Certif. Ex. 2 (Emmert Dep.) at 78:1-79:11.)  To the extent that the

Statement implies that the New Jersey Sports Wagering Law would not harm student-athletes,

Plaintiffs refer to and incorporate their Responses to Defs.' SUMF ¶¶ 74 and 81.

Dated:  December 7, 2012               Respectfully submitted,

                                 **MCCARTER & ENGLISH, LLP**

By:    *s/William J. O'Shaughnessy*
        William J. O'Shaughnessy
        Richard Hernandez
        Four Gateway Center
        100 Mulberry St.
        Newark, New Jersey 07102
        (973) 622-4444
        woshaughnessy@mccarter.com
        rhernandez@mccarter.com

        Jeffrey A. Mishkin
        Anthony J. Dreyer
        **SKADDEN ARPS SLATE MEAGHER & FLOM LLP**
        Four Times Square
        New York, NY 10036
        (212) 735-3000
        jmishkin@skadden.com
        adreyer@skadden.com

        Paul D. Clement
        Erin E. Murphy
        **BANCROFT PLLC**
        1919 M Street, N.W., Suite 470
        Washington, DC 20036
        (202) 234-0090
        pclement@bancroftpllc.com
        emurphy@bancroftpllc.com

        *Attorneys for Plaintiffs*
        *National Collegiate Athletic Association,*
        *National Basketball Association, National*
        *Football League, National Hockey League,*
        *and Office of the Commissioner of Baseball,*
        *doing business as Major League Baseball*