# Exhibit 2

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
NATIONAL COLLEGIATE ATHLETIC    )
ASSOCIATION, an unincorporated  )
association, NATIONAL BASKETBALL )
ASSOCIATION, a joint venture,   )
NATIONAL FOOTBALL LEAGUE, an    )
unincorporated association,     )
NATIONAL HOCKEY LEAGUE, an      )
unincorporated association, and )
OFFICE OF THE COMMISSIONER OF   )
BASEBALL, an unincorporated     )
association doing business as   )
MAJOR LEAGUE BASEBALL,          )
                                )
          Plaintiffs,           )
                                )
      -vs-                      ) CIVIL ACTION NO.
                                ) 3:12-cv-04947-MAS-LHG
CHRISTOPHER J. CHRISTIE,        )
Governor of the State of        )
New Jersey, DAVID L. REBUCK,    )
Director of the New Jersey      )
Division of Gaming Enforcement, )
and Assistant Attorney General  )
of the State of New Jersey, and )
FRANK ZANZUCCKI, Executive      )
Director of the New Jersey      )
Racing Commission,              )
                                )
          Defendants.           )
```

VIDEOTAPED DEPOSITION OF MARK EMMERT, Ph.D.
The deposition upon oral examination of MARK
EMMERT, Ph.D., a witness produced and sworn before
me, Tamara J. Brown, CSR, RMR, CRR, Notary Public in
and for the County of Marion, State of Indiana,
taken on behalf of the Defendants, at the offices of
Ice Miller, One American Square, Indianapolis,
Marion County, Indiana, on the 31st day of October,
2012, pursuant to the Federal Rules of Civil
Procedure with written notice as to time and place
thereof.

---

Page 2

1        A P P E A R A N C E S
2   FOR THE PLAINTIFF(S):
3        Mr. Anthony J. Dreyer
         Mr. Jordan Feirman
4        SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
         Four Times Square
5        New York, NY 10036
         (212) 735-3097
6        anthony.dreyer@skadden.com
         jordan.feirman@skadden.com
7
         Ms. Naima M. Stevenson
8        Mr. Donald M. Remy
         NCAA
9        P.O. Box 6222
         Indianapolis, IN  46206-6222
10       (317) 966-9358
         nstevenson@ncaa.org
11       dremy@ncaa.org
12
13
14  FOR THE DEFENDANT(S):
15       Mr. William Wegner
         Mr. Tim Loose
16       GIBSON DUNN & CRUTCHER, LLP
         1050 Connecticut Avenue N.W.
17       Washington, D.C.  20036-5306
         (202) 955-8500
18       wwegner@gibsondunn.com
         tloose@gibsondunn.com
19
20  ALSO PRESENT:  Andrew Connor, CLVS
21
22
23
24
25

---

Page 3

1        I N D E X   O F   E X A M I N A T I O N
2                                              PAGE
3   DIRECT EXAMINATION . . . . . . . . . . . . . .6
        Questions by Mr. William Wegner
4
5        I N D E X   O F   E X H I B I T S
6                                              PAGE
    Deposition Exhibits:
7
    Exhibit 27  Public hearing . . . . . . . . . 22
8               transcript, 9-26-1
    Exhibit 28  Statement of William A. . . . . . 91
9               Bible
10  Previously Identified Exhibits:
11  Exhibit  4  Complaint . . . . . . . . . . . . 10
    Exhibit  5  Declaration of Mark  . . . . . . . 32
12              Emmert
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 4

1
2           THE VIDEOGRAPHER:  We are now on the
3   record.  Please note that the microphones are
4   sensitive and may pick up whispering and private
5   conversations.  Please turn off all cell phones
6   or place them away from the microphones as they
7   can interfere with the deposition audio.
8   Recording will continue until all parties agree
9   to go off the record.
10          My name is Andrew Connor, representing
11  Veritext.  The day today is October 31, 2012,
12  and the time is approximately 10:50 a.m.
13          This deposition is taking place at the law
14  firm of Ice Miller, located at One American
15  Square, Suite 2900, in Indianapolis, Indiana.
16  It is being taken by counsel for the defendant.
17          The caption of the case today is National
18  Collegiate Athletic Association, et al., versus
19  Christopher J. Christie, et al.  The case is
20  filed in the U.S. District Court, District of
21  New Jersey, Civil Action No.
22  3:12cv04947-MAS-LHG.
23          The name of the witness today is Dr. Mark
24  Emmert.
25          At this time the attorneys present in the

Page 5

```
 1    room and attending remotely will identify
 2    themselves and the parties they represent.
 3         MR. DREYER:  For the plaintiffs, Anthony
 4    Dreyer, with the law firm of Skadden Arps,
 5    Slate, Meagher & Flom, LLP.
 6         MR. FEIRMAN:  Jordan Feirman from Skadden
 7    Arps, for the plaintiff.
 8         MS. STEVENSON:  Naima Stevenson, associate
 9    general counsel, NCAA.
10         MR. REMY:  Donald Remy, general counsel,
11    NCAA.
12         MR. WEGNER:  Bill Wegner, counsel for the
13    defendants, from Gibson Dunn and Crutcher,
14    Los Angeles.
15         MR. LOOSE:  Timothy Loose, also with Gibson
16    Dunn.
17         THE VIDEOGRAPHER:  Our court reporter, Tami
18    Brown, representing Veritext, will now swear in
19    the witness, and we can proceed.
20         (Witness sworn.)
21
22
23
24
25
```

Page 6

```
 1              MARK EMMERT, PH.D.,
 2    having been duly sworn to tell the truth, the whole
 3    truth, and nothing but the truth relating to said
 4    matter, was examined and testified as follows:
 5    DIRECT EXAMINATION,
 6         QUESTIONS BY MR. WILLIAM WEGNER:
 7    Q    Good morning.
 8    A    Morning.
 9    Q    As I, as you just heard, I'm Bill Wegner.  Do
10         you prefer to be called President or, or Doctor?
11    A    Mark, Mark is fine.
12    Q    I'm, I'm afraid that's a little too informal for
13         a man of your position.
14    A    Dr., Dr. Emmert is fine.
15    Q    Dr. Emmert, then.  Dr. Emmert, could we please
16         start with you describing your employment from
17         the time -- well, just start with your
18         undergraduate degree.  I don't want to spend too
19         much time with this because we have limited
20         amount of time --
21    A    Sure.
22    Q    -- for which we're appreciative that you gave us
23         the time today.
24              But if you could go through from your
25         undergraduate degree, and, and your employment.
```

Page 7

```
 1         I think earlier before we went on the record you
 2         referred to it as your around the world, around
 3         the country --
 4    A    And my lap of America with my family.
 5    Q    With your family.
 6    A    Well, I attended and graduated from the
 7         University of Washington and then went to
 8         graduate school at Syracuse University and took
 9         my master's and Ph.D. there, came up through the
10         faculty ranks.
11    Q    What did you get the Ph.D. in?
12    A    Public administration.
13    Q    Okay.
14    A    And my undergraduate degree was in political
15         science, then had a variety of academic
16         appointments, came up through the faculty ranks
17         at the University of Colorado, moved into
18         administrative positions from there; and went to
19         Montana State University as provost, University
20         of Connecticut as provost and chancellor; and
21         then chancellor of LSU, and president of the
22         University of Washington; and then finally to
23         this job in 2010.
24    Q    Doctor, could you explain the, sort of the
25         transition that you went through from academia
```

Page 8

```
 1         when you were president of the University of
 2         Washington and, and then became the, the
 3         president of the NCAA; how did that happen?
 4    A    How did I come to take the position?
 5    Q    Yes, sir.  I mean, in other words, what was the
 6         connection that then led you to that position on
 7         this lap of America.
 8    A    Oh.  Well, in, in each of my administrative
 9         positions I had been engaged in intercollegiate
10         athletics on our campuses, largely because, of
11         course, the athletic department reported to me
12         in two of those positions, and I worked very
13         closely with it, in the, in two of the others,
14         and had established a reputation as someone who
15         cared deeply about intercollegiate athletics,
16         saw the virtues that it had for, for the
17         universities that I worked with and for the
18         student athletes, and similarly saw the
19         challenges around intercollegiate athletes when
20         things didn't work as well as they should.
21              The NCAA had previously hired the former
22         president of Indiana University, Miles Brand.
23         It was the first time that the NCAA had, had in
24         fact hired a, a university president to lead the
25         association in its hundred-year history.
```

Page 9

```
 1          I, like most everyone in my position, was
 2     very pleased that an, that a university leader
 3     was in charge, and, and so when, when the
 4     position opened up, I was approached by many of
 5     my colleagues about interest in it.  And, and
 6     then I met with the executive committee, which
 7     is an, a board of presidents of the association,
 8     university presidents from across the
 9     association, and they offered me the opportunity
10     to take the job and I did.
11  Q  Doctor, as you know, we're here because the NCAA
12     and various leagues have sued Governor Christie
13     and the State of New Jersey over their plan to
14     implement what was called the gambling law, the
15     New Jersey gambling law.  And you're familiar
16     with that?
17  A  I am.
18  Q  And a complaint was filed in this action.  And
19     it is Exhibit 4 from yesterday.  We had a member
20     of your staff here, Ms. Baker was here.
21  A  Um-hmm.
22  Q  And so I'd like you to take a look at what was
23     Exhibit 4, which is the complaint in this
24     action.
25          THE REPORTER:  They're in reverse order.
```

Page 11

```
 1     also plaintiffs in the action?
 2  A  No, I did not.
 3  Q  Did you review the complaint before it was
 4     filed?
 5  A  I was briefed on it by, by Mr. Remy and his
 6     colleagues, but I did not review the details of
 7     the language, but, but was briefed on the
 8     overview of the, of the complaint.
 9  Q  And ultimately were satisfied that the NCAA
10     should sue the State of New Jersey --
11  A  Yes.
12  Q  -- over its gaming law?
13  A  Yes, very much so.
14  Q  Okay.  If we go to the complaint, then,
15     Exhibit 4 -- and Doctor, I'm going to move, move
16     along, but I don't want to deprive you of an
17     opportunity for you to read carefully any part
18     of this you want to.
19  A  Okay.
20  Q  It's not very long, but I'm going to go
21     specifically to paragraph 5.  But if you want to
22     review as you get there, you're free to do that.
23  A  Okay.
24  Q  Okay.  On paragraph 5, Exhibit 4, it states
25     "Gambling on amateur and professional sports
```

Page 10

```
 1     Just go all the way to the bottom.
 2          MR. WEGNER:  What?
 3          THE REPORTER:  They're in reverse order,
 4     all the way to the bottom.
 5          MR. DREYER:  They'll give you a copy and
 6     I'll have a copy.
 7  Q  Doctor, before we begin to -- and in your
 8     capacity as president of the NCAA -- did you
 9     have to authorize the filing of this complaint?
10  A  I did.  I was aware of the, of the actions that
11     were being taken.  Of course, it was handled by
12     our legal counsel, both in-house staff, Dr. Remy
13     and his colleagues, and, and then, of course,
14     with the assistance of outside counsel.
15  Q  Okay.  But ultimately you had to, as the
16     president, authorize the filing of the complaint
17     against New Jersey?
18  A  When, when was this filed, this precise date,
19     this filing was?
20  Q  August of 2012.
21  A  So yes, of course, on behalf of our portion of
22     these, of, of this case, yes, I was involved in
23     the, in the approval of that.
24  Q  Did you have discussions with the, the
25     commissioners of the various leagues that are
```

Page 12

```
 1     threatens the integrity of those sports and is
 2     fundamentally at odds with the principle -
 3     essential to the success of plaintiffs - that
 4     the outcomes of collegiate and professional
 5     athletic contests must be determined" -- and
 6     let's skip that -- "solely on the basis of
 7     honest athletic competition."
 8          Do you see that statement?
 9  A  Um-huh.
10  Q  What basis do you have for supporting that
11     statement?
12  A  Well, it's, at, at the core, one of the most
13     fundamental principles of intercollegiate
14     athletics, that intercollegiate athletics is a,
15     is a part of the educational enterprise, and
16     that our, our core interest is in making sure
17     that our games are conducted with, with as high
18     a level of integrity as possible, and that
19     there's no doubt among, among any of those
20     either competing in the game or involved in the
21     game as fans, or the institutions that sponsor
22     those games, that they are being conducted in
23     any fashion that would undermine the integrity
24     of those games or the notion that gambling,
25     wagering of any kind, is having some impact on
```

Page 13

1   the outcome of the game.
2       We have obviously over history had a number
3   of, of gambling and wagering scandals in
4   intercollegiate and professional athletics, and
5   so there's a track record that demonstrates the
6   threat that this poses to the integrity of
7   college sport and professional sport.
8  Q  And, Doctor, you went right to the word that I'd
9   like you to focus on.  And, and my question
10   again is, what support do you have for this
11   statement?  What support is there for the
12   statement that gambling on amateur and
13   professional sports threatens the integrity of
14   sports?
15      MR. DREYER:  Objection, asked and answered.
16   You can answer.
17  A  Well, again, there has been throughout the
18   history of both intercollegiate and professional
19   athletics in America a significant number of
20   scandals involving gambling that have eroded
21   the, the confidence people have in the games,
22   and the institutions that have been involved in
23   those games, and the individuals that have been
24   involved in those games, that have suffered
25   significant damage before from that activity.

Page 15

1   reputations, to the individuals that are
2   involved in those contests, to the, the
3   fundamental beliefs in amateur athletics, in, in
4   intercollegiate athletics, that undergirds
5   everything that the NCAA and college sports
6   stands for.
7  Q  How about -- well, let's move to paragraph 6.
8   Well, let me, before we do, Doctor, let me stay
9   on 5 for a second.
10      Other than the historic perspective that
11   you've described, do you have any other evidence
12   that gambling on amateur and professional sports
13   threatens the integrity of those sports?
14  A  Well, we certainly have studies that reflect
15   behaviors of our own student athletes.  So we
16   routinely survey our student athletes to
17   determine what their behaviors are on a whole
18   range of issues.  And one of those that we ask
19   about is, of course, wagering and gambling.  And
20   we know there are a sizable number, if not large
21   percentages of student athletes that admit to
22   gambling on their own games, and, and even being
23   approached by those who engage in, in point
24   shaving schemes, or a variety of other ways to
25   throw a game.

Page 14

1      And so simply looking at the historical
2   experience of the role of gambling in, in
3   sport -- and again, particularly in
4   intercollegiate athletics, the part that I know
5   best -- the damage is self-evident.  When an
6   institution is caught up in a gambling scandal
7   it, it obviously erodes the integrity in
8   everyone who's been participating in that
9   particular contest or for that institution.
10  Q  I assume, then -- or what is your answer to the
11   question -- what other evidence, or what
12   evidence do you have that the gambling on
13   amateur professional sports threatens the public
14   perception of sports?
15  A  I think one would only have to look at some of
16   the most famous examples, the Chicago Black Sox
17   Scandal that caused a, a fundamental shift in
18   sports in America to, to see the, the impact.
19      If you look at any of the scandals that
20   have occurred around college athletics, the,
21   whether it's the, you know, City of New York
22   case in the '50s, or Arizona State, or
23   Northwestern, or as recently as last year with
24   the University of San Diego, you, you see the
25   damage that is caused to those institutional

Page 16

1      So the fact that we know this goes on, and
2   the public knows that this goes on, clearly is
3   a, is a very fundamental, again, a very
4   fundamental threat to the whole notion that this
5   is part of an educational process, and, and
6   something that's intended to develop values, not
7   to undermine them.
8  Q  Okay.  Let's take paragraph 6, where it says, in
9   part, "The sponsorship, operation, advertising,
10   promotion, licensure, and authorization of
11   sports gambling in New Jersey would irreparably
12   harm amateur and professional sports by
13   fostering suspicion that individual plays and
14   final scores of games may have been influenced
15   by factors other than honest athletic
16   competition."
17      What evidence do you have to support that
18   statement in the complaint, Doctor?
19  A  Well, first of all, I -- we, we know that,
20   again, there, there have been incidences in the
21   past of gambling influencing and interfering
22   with fair competition on the field.  We know
23   that there have been circumstances where
24   competitors have been involved with gamblers.
25   And that has cast a huge shadow over those games

Page 17

1  and people's confidence in intercollegiate
2  athletics or professional sport, for that
3  matter.
4      So common sense simply dictates that if you
5  have more of that activity going on, obviously
6  it would enhance the, the suspicion that people
7  have that the games are, are being influenced.
8      We, we hear it now, we read it in the
9  newspapers.  It's common parlance in the
10  country, oh, the fix is in on this game or that
11  game.  If we have more legal gambling, and the
12  gambling activity increases and there's more
13  attention on gambling, then the natural outcome
14  of that is more people suspecting that, that
15  the, the games aren't, aren't being held fairly,
16  that they're being rigged.
17 Q  Doctor, are you aware that in one of the studies
18  that was captured in a PowerPoint, it was a 2008
19  study done by the NCAA, the PowerPoint
20  recognizes that illegal gambling in this country
21  is at least a, a 300 if not more billion dollar
22  a year business; are you aware of that?
23      MR. DREYER:  Just, objection to the form of
24  the question and the characterization of the
25  study.  But you can answer the question.

Page 18

1 A  Yes, I'm, I'm not familiar with that study
2  precisely, but I'm aware of those kinds of
3  estimates.
4 Q  That, in other words, the illegal gambling
5  market in this country is a hundred billion
6  dollar industry annually?
7 A  I, I can't say whether I know the precise size
8  of it, and I'm not sure anyone, of course, can
9  do that, but obviously it's a very significant
10  activity.
11 Q  Okay.  And so going back to paragraph 6, which
12  specifically talks about the authorization of
13  gambling which would be provided by the
14  New Jersey gambling law would irreparably harm
15  amateur and professional sports.
16      What evidence do you have that the addition
17  of New Jersey as a venue for sports gambling
18  would irreparably harm amateur and professional
19  sports?
20      MR. DREYER:  Objection, asked and answered.
21  You can answer the question.
22 A  Well, the, the notion that, that increasing the
23  volume of gambling activity would diminish that
24  threat is farfetched at best.  The notion that
25  we have another venue making the argument that

Page 19

1  gambling is not only okay, it's legal and
2  appropriate, is something that is completely
3  contrary to the messages we give to all of our
4  student athletes and on our campuses.
5      The notion that legalization of, of
6  gambling wouldn't enhance the volume of
7  gambling, I think is, is an unprovable argument.
8  That there's -- the fact that something's going
9  on illegally doesn't mean to me that if you make
10  it legal, it's going to be diminished, it means
11  it's going to be enhanced in volume.
12      Our argument all along has always been
13  within the NCAA, long before I took this
14  position, that we are opposed to all forms of
15  sports wagering.  The, the reasons for that are,
16  as I said earlier, that this is clearly a threat
17  to the integrity of intercollegiate athletics.
18      We have a, a significant amount of
19  experience, over decades, to demonstrate that
20  that's the case.  And to create more of it
21  simply enhances the threat that it poses to the
22  integrity of games, to the impact that it has on
23  our student athletes, and to university
24  reputations.
25 Q  Doctor, has the NCAA conducted any studies or

Page 20

1  surveys to determine if the implementation of
2  the New Jersey gambling law would in fact
3  irreparably harm the NCAA?
4 A  The studies that we've conducted are on, again,
5  as I mentioned earlier, on the behavior of our
6  student athletes.  Those surveys include
7  students who compete in New Jersey and who go to
8  school in New Jersey.
9      What we know now is that a significant
10  number of student athletes participate against
11  our rules, and, and I'm sure in some cases
12  illegally, they participate in, in wagering on
13  games, including games that they participate in,
14  and have even been approached by individuals who
15  would like to throw those games.
16      Anything that increases that number
17  inherently threatens the integrity of our games.
18  Whether it's in New Jersey or Montana or
19  Nebraska, the, there's nothing that I've ever
20  seen that suggests that our -- the student
21  athletes in the universities in New Jersey are
22  different than any other state of the union.
23      So while we have never done a study in
24  New Jersey per se, common sense, social science
25  says if you do a study in, that covers the whole

Page 21

```
1        country, that those things are very likely to
2        apply to New Jersey as well.
3    Q   Well, Doctor, let's stay with this point,
4        though, for a second, because I think it's
5        important.
6            The complaint alleges that -- in other
7        words the, this is not an action against
8        gambling in the United States.  It's an action
9        against the State of New Jersey, trying to
10       prevent the implementation of a statute that was
11       passed by the voters of New Jersey.
12           And so I'm trying to learn from you what
13       evidence you have to support the notion that
14       there will be an incremental increase in
15       irreparable harm to the NCAA if the statute is
16       implemented in New Jersey.
17           MR. DREYER:  Objection, asked and answered.
18   A   Well, obviously, obviously the voters in
19       New Jersey and the legislators thought it would
20       because they banned the implementation of it on
21       their own universities.  So I, I guess I would
22       turn that question around and say why is it that
23       the voters and the legislature and the governor
24       believe this is good for the universities and
25       student athletes in 49 states but not good for
```

Page 22

```
1        their students.  Their own statute, I think,
2        answers the question.
3    Q   Okay.  Let's do this, then, Doctor.  I'd like to
4        mark as the next in number this exhibit, which
5        would be what?
6            MR. DREYER:  27.
7            MR. WEGNER:  22?
8            MR. DREYER:  27.
9            MR. WEGNER:  27.
10           THE REPORTER:  Give me a chance to put a
11       sticker on it.
12           (A discussion was held off the record.)
13           (Deposition Exhibit 27 was marked for
14       identification.)
15   Q   Doctor, before I go to this next exhibit, I take
16       it from your answer that you say that the
17       language in the statute itself which exempts
18       amateur athletic activities on New Jersey teams
19       from the statute is evidence that the
20       implementation of the statute would do
21       irreparable harm to amateur sports; is that
22       right?
23   A   It certainly suggests that the citizens and
24       leadership of New Jersey felt so.
25   Q   Okay.  Do you have any other evidence to support
```

Page 23

```
1        that notion?
2    A   Again, the things that I pointed to, history,
3        studies of our student athletes, and the common
4        sense notion that increasing gambling activity
5        in New Jersey will increase those risks.
6    Q   Okay.  But history, that history doesn't
7        necessarily establish support for the notion
8        that the implementation of the New Jersey
9        statute is going to threaten amateur sports --
10   A   No, but one would have to assume that New Jersey
11       and its universities and its citizens are
12       somehow unique relative to the rest of the
13       United States to assume otherwise.  And I've
14       never seen evidence that New Jersey citizens,
15       New Jersey students, New Jersey, New Jersey
16       universities are in any way fundamentally
17       different from those in any other state.
18   Q   Okay.  So that I'm clear, that I understand your
19       answer, you're saying the history of the effects
20       of gambling throughout the country are your
21       support for the notion that the implementation
22       of the New Jersey statute would irreparably harm
23       the NCAA?
24           MR. DREYER:  Objection to the form of the
25       question.  You can answer.
```

Page 24

```
1    A   That's certainly one of, one of the assertions,
2        yes.
3    Q   Okay.  And what is the other one?
4    A   Well, the, the fact that --
5            MR. DREYER:  Object to the form of the
6        question.  Go ahead.
7    A   Okay.  The fact that, that we have surveyed our
8        student athletes, we know that our student
9        athletes -- especially in Division 1, but
10       throughout the association -- engage in gambling
11       behavior, and we work very diligently to
12       minimize that gambling behavior, but anything
13       that increases opportunity for or legitimizes
14       the view that gambling on intercollegiate
15       athletics is, is an appropriate kind of behavior
16       for our students and others to engage in, again,
17       common sense suggests that those, the volume of
18       that activity will increase.  It's hard to
19       imagine how you could conclude otherwise.
20   Q   So, again, so your answer then is that common
21       sense is your support for the notion that
22       implementation of the New Jersey statute --
23   A   And data from our student athletes themselves.
24   Q   Okay.  On those, the, the data you're referring,
25       referring to, is any of that data, data directed
```

Page 25

```
 1       towards the State of New Jersey statute?
 2   A   We conduct random surveys of our student
 3       athletes.  They come from all of our states,
 4       much as anyone who's doing a poll does when
 5       they're, when they're finding public opinion
 6       data.  We, we do it anonymously, so we don't
 7       know all the states that the students come from.
 8           But again, one would have to believe and
 9       assert that the students in New Jersey are
10       somehow different than the rest of the nation's
11       students.  And I've never seen anything to
12       suggest that the case, that's the case.
13   Q   Yesterday -- and counsel can correct me if I got
14       this wrong, I don't think I do -- the 30(b)(6)
15       witness, Ms. Baker --
16   A   Uh-huh.
17   Q   -- for the NCAA testified that there were no
18       specific studies conducted by the NCAA directed
19       to the impact of the New Jersey statute on
20       sports gaming in amateur athletics; is that
21       correct?
22           MR. DREYER:  Objection.  The testimony
23       speaks for itself.  But you can answer as to
24       your understanding.
25   A   Well, I think I understand the question.  So you
```

Page 26

```
 1       mean if we have conducted a survey just of
 2       New Jersey students, if we have conducted our
 3       reviews only of New Jersey, the answer to that
 4       is, is Ms. Baker is correct, nothing has been
 5       done specifically to this statute.
 6           But obviously, again, surveying of and
 7       gathering data from, and garnering the history,
 8       historical record from these experiences across
 9       the United States certainly makes clear what
10       will transpire in New Jersey, unless one can
11       make an argument, again, that New Jersey
12       university students and citizens are somehow
13       different than those in the other 49 states.
14   Q   Okay.  But let me ask you this, then.  Has the
15       NCAA ever conducted a survey to determine
16       whether there would be any incremental,
17       incremental increase in gambling, as a result of
18       the implementation of the New Jersey statute?
19   A   No.
20   Q   Now, Doctor, a moment ago you talked about how
21       the language of the statute the citizens of
22       New Jersey passed itself was, in your view,
23       support for the notion that New Jersey
24       recognized that gambling on amateur sports was
25       obviously a harmful activity because it exempted
```

Page 27

```
 1       out New Jersey amateur teams from the, the
 2       statute, correct?
 3   A   Yes.
 4   Q   Okay.  Did the NCAA participate -- that's a, a
 5       loaded word -- let me withdraw the question.
 6           Did the NCAA have discussions with senate
 7       representatives of New Jersey about the, the
 8       New Jersey gaming law before it was enacted?
 9   A   No staff members at the NCAA did so that I'm
10       aware of at all.
11   Q   Did you have any discussions with any of the --
12   A   No.
13   Q   -- senators involved?
14   A   No.
15   Q   Let me then show you Exhibit 27 now.
16           MR. DREYER:  We just need this marked by
17       the court reporter.
18           MR. WEGNER:  It is marked.  Here.
19           MR. DREYER:  Oh, okay.  Is this -- this may
20       have attorney work product on it, yeah, so if
21       you want to --
22           MR. WEGNER:  Can you give me another 27
23       sticker and not charge me extra for it?
24           MR. DREYER:  You're covering lunch, so you
25       can cover this.
```

Page 28

```
 1           MR. WEGNER:  Okay.  It's the least we can
 2       do.
 3           MR. DREYER:  A freebie.  There we go.
 4       Okay.
 5   Q   Doctor, this is a transcript from a public
 6       hearing before the State Senate Government
 7       Wagering, Tourism, and Historic Preservation
 8       Committee of New Jersey, and the committee
 9       received testimony, it says here, on the
10       importance of authorizing sports wagering for
11       the gambling industry in New Jersey.
12           Do you see that --
13   A   Yes.
14   Q   -- at the top of the document.
15   A   Yes.
16   Q   If you turn to page 4, you'll see that this
17       is -- and you can look at the earlier pages if
18       you'd like to, Doctor -- that this is a
19       transcript from those proceedings.
20   A   Um-huh.
21   Q   And the portion that I'm going to direct your
22       attention to are comments made by Senator
23       Raymond Lesnas --
24           MR. DREYER:  Lesniak.
25   Q   -- Lesniak, who's the chairman, who -- I'm
```

Page 29

```
 1      sorry -- was on the committee, which was chaired
 2      by Chairman Wayland.
 3          If you'll look at page 4 --
 4    A  Um-huh.
 5    Q  -- of the testimony, let me read the bottom of
 6      that to you, if you, if you get to like
 7      paragraph 8 from the top.  I may -- this is the
 8      senator speaking -- he says, "I may add one
 9      thing that we talked about earlier.  This
10      referendum would not allow gambling on
11      New Jersey based college teams wherever they
12      play, or any colleges game in the state.  The
13      NCAA has made that request.  I believe that's a
14      legitimate request.  But at the same time,
15      Auburn playing Ohio State for the national
16      championships would bring a lot of folks to
17      Atlantic City and other areas of the state."
18          Do you see that?
19    A  I do.
20    Q  Do you know if that statement's true?
21    A  It's certainly not, to the best of my knowledge.
22      I, I have never talked to any member of the NCAA
23      staff who was involved in this conversation.  I
24      know of no one that had this kind of
25      conversation.  And moreover, I can't imagine why
```

Page 31

```
 1    A  No, not at all.  On, on what, on what basis
 2      would you say that this, this, from our vantage
 3      point, significantly harmful activity be applied
 4      to 49 states but we would exempt one group from
 5      it?  I mean, that, that would be utterly
 6      inconsistent, and make, simply make no sense
 7      whatsoever from our vantage point.
 8    Q  Well, Nevada is exempted from the federal law
 9      that --
10    A  But certainly not by our request, and in fact
11      over our objections.  Our strong position has
12      always been, and will remain, that we're opposed
13      to sports wagering on intercollegiate athletics,
14      and athletics period.
15          We didn't, we didn't agree to have Nevada
16      exempted.  That was something that, a decision
17      that Congress made that, that we would have
18      preferred happen in a different way, and
19      testified to that extent.
20    Q  Okay.  Well, Doctor, if I understand, then, it
21      is -- is it your position that as long as there
22      is sports wagering in the United States, illegal
23      or legal, that poses a threat to the NCAA's
24      mission of maintaining integrity in the NCAA's
25      athletic activities?
```

Page 30

```
 1      they would.
 2    Q  So you, you have no knowledge of any NCAA
 3      official making this request of the committee;
 4      is that correct?
 5    A  That's correct.
 6    Q  Okay.  Do you have any reason to believe that
 7      the senator is mischaracterizing what happened
 8      here?
 9    A  I have no idea what the senator's speaking of.
10      But I do know that no one of my senior staff had
11      any conversation to this effect, nor would they.
12      It's simply incongruous to me or to anyone else
13      in the NCAA that you would allow this kind of
14      behavior as, as the senator points out, for
15      Auburn and Ohio but say you can't have that for
16      Rutgers or Princeton.  That makes absolutely no
17      sense, given our values, given what we stand
18      for, given what we have consistently for a
19      hundred years argued.
20    Q  If the State of New Jersey was going to pass and
21      implement a gaming statute that affected amateur
22      sports, wouldn't the NCAA prefer that if that's
23      going to happen, at least there'd be some
24      exception that limited the amount of that
25      gaming?
```

Page 32

```
 1    A  Yes.
 2    Q  Okay.  Do you have any studies that would
 3      demonstrate the difference between legal and
 4      illegal gambling in that regard?
 5    A  Not that I'm aware of.
 6    Q  Okay.  Doctor, let's go to what would be
 7      Exhibit, yesterday was Exhibit 5, which is your
 8      declaration in this matter.
 9      Thank you.
10    Q  Now, Doctor, are you familiar with your
11      declaration?
12    A  I am.
13    Q  I thought you would be.
14          Okay.  Then let's skip the preambles
15      that introduces you.
16    A  That would be useful.
17    Q  And let's just go to paragraph 5.  Okay.  In
18      paragraph 5, you state, in part, in the second
19      sentence, "An increase in state promoted sports
20      betting would wrongly and unfairly engender,
21      engender suspicion and cynicism toward every
22      NCAA event that affects the betting line."
23          That's your statement, correct?
24    A  Yes.
25    Q  What support do you have for that statement?
```

Page 33

```
1   A   Well, again, the same issues that we were
2       talking about earlier.  We, we know from, from
3       historical incidences where there have been
4       point shaving schemes, where there have been
5       attempts to throw games, whether in football or
6       basketball or others, that those events add a
7       level of cynicism and suspicion around college
8       sport and sport in general that often permeates
9       close games.
10          We, we have all sat in, in conversions
11      where someone said, oh, you know, he missed the
12      shot or dropped the ball, or the call was made
13      by the official, that, that was the result of
14      some, some gambling engagement.  And any time
15      that you increase the volume of gambling
16      activity, any time that you especially endorse
17      it and say this is not only common, this is a, a
18      government endorsed activity, so that you
19      increase the attention on gambling rather than
20      on the contest itself, you, you change the
21      nature of, of why people watch the game, how
22      they engage in the game, who they root for and
23      why they root for them.  And, and all of that
24      activity, of course, increases the, the
25      suspicion that undermines the notion that this
```

Page 34

```
1       is a game that's being played fairly and, and on
2       a fair footing among the teams.
3   Q   Doctor, have you performed, has the NCAA
4       performed any studies to demonstrate that an
5       increase -- and this is important in state
6       promoted or state authorized gambling -- would
7       wrongly and unfairly engender suspicion and
8       cynicism toward every NCAA event --
9   A   Yeah --
10  Q   -- that affects the betting line?
11  A   No, as I said, we have not conducted any studies
12      that differentiate between the, the impact of
13      gamble, legal or illegal gambling, whether state
14      sponsored or otherwise.
15  Q   Okay.  So your support for this statement in
16      your declaration in paragraph 5 is that gambling
17      exists in the United States and that it's bad
18      for athletics?
19  A   Yes.
20          MR. DREYER:  Objection, mischaracterizes
21      the testimony.
22          THE WITNESS:  Sorry, sorry.
23          MR. DREYER:  That's all right.
24          THE WITNESS:  I'll give you time.
25          MR. DREYER:  You, you got it all, right?
```

Page 35

```
1           THE WITNESS:  Yes.
2           MR. DREYER:  We'll try and -- and counsel
3       had mentioned this -- but we'll all try as best
4       as we can not to speak over each other --
5           THE WITNESS:  Of course.
6           MR. DREYER:  -- so our court reporter has a
7       clean transcript.
8           MR. WEGNER:  Actually, I don't --
9           THE WITNESS:  Am I doing okay?  We doing
10      all right?  We giving you time?
11          THE REPORTER:  You, you're, you're all
12      talking so fast --
13          THE WITNESS:  All right.  I'll slow down.
14          THE REPORTER:  -- I can barely keep up.
15          MR. WEGNER:  Well, actually I didn't
16      because while they were setting up he had
17      indicated that the court videographer already
18      knew you, apparently, you have been on screen a
19      lot --
20          THE WITNESS:  I have.
21          MR. WEGNER:  -- so I figured I didn't need
22      to go through --
23          THE WITNESS:  All court reporters know me.
24      It's, it's part of my charm.
25          MR. WEGNER:  The doctor's coming today?  He
```

Page 36

```
1       said, "Yeah, he is."  So I didn't go through the
2       usual formalities.
3           THE WITNESS:  It's quite all right.  So I'm
4       sorry, could you repeat your question?
5           MR. WEGNER:  Well, let me, let me just
6       rephrase it.  I think it'd be easier.
7   Q   It's important, I think, for us to focus -- and,
8       and I'm making no secret of my line of
9       questioning, Doctor -- what I'm trying to get at
10      is the actual evidence and support that the NCAA
11      has to support the notion that New Jersey
12      implementing its statute and legalizing sports
13      wagering in New Jersey is harmful to the NCAA
14      directly.  That, that --
15  A   Right.
16  Q   -- direct point.
17  A   I, I understand the question.  And, and the
18      answer is yes, we know from all of our
19      experiences, from all of the communications
20      we've always had around gambling, from all of
21      the surveys that we have done and data we've
22      gathered from our own student athletes, we know
23      that the spread of gambling causes the, the
24      erosion of, of confidence in the games,
25      increased pressure on our student athletes, and
```

Page 37

1  undermines the basis on which people are fans
2  for universities as a whole rather than a
3  betting line, rather than an individual player,
4  rather than whether or not someone's going to
5  hit a free throw or not.
6      The, the fact I, that this is a New Jersey
7  specific statute doesn't change, in my mind, or
8  in anyone's mind in the NCAA, the applicability
9  of those principles across the entire country.
10 Q  Okay.  But again, other than what I hear you
11 saying is, is it's just common sense that, that
12 the, it's applicable, what specific evidence do
13 you have to support the conclusion that you've
14 come to that an increase in gambling will occur
15 if New Jersey passes the statute?  What support
16 do you have for the conclusion -- not the
17 conclusion itself -- the conclusion that that
18 will harm the NCAA?
19     MR. DREYER:  Objection, asked and answered.
20 You can answer.
21 A  Again, the -- we do not have, nor do I believe
22 anyone has surveys that are specific solely to
23 New Jersey and solely to the statute.  The
24 statute hasn't been in place long enough for one
25 to ascertain, you know, what a study like that

Page 38

1  would look like.
2      But again, we don't have to conduct that
3  experiment to know how it has played out in
4  other venues, how it has affected games cross
5  the country, how it has impacted institutions.
6      We know what that, what that result is.
7  And there's utterly no reason to believe that
8  the result wouldn't be the same in New Jersey as
9  it has been in other, other venues.
10 Q  But other than that, you have no evidence that
11 the implementation of the New Jersey statute
12 will harm the NCAA?
13 A  Again, we haven't done any specific studies
14 about New Jersey or the New Jersey statute.
15 Q  Have you done any studies that would, that would
16 discern between the impact on the NCAA from
17 legal versus illegal gambling in the
18 United States?
19 A  No.
20 Q  Okay.  Let's go to paragraph 6 of your
21 declaration, Doctor.  And the part I want to
22 discuss with you is, is where you say in
23 paragraph 6 of Exhibit 4, I think this is, "The
24 expansion of state sponsorship of sports betting
25 will only serve to increase the likelihood of

Page 39

1  future betting scandals and the likelihood of
2  attempts to involve student athletes in these
3  scandals."
4      Now, same question:  Other than what you've
5  already testified to, do you have any support
6  for that statement?
7  A  Well, just the simple notion that sheer volume
8  increases these activities.  So if you, if you
9  have government sponsorship of gambling more
10 broadly than we have today, if you have more
11 gambling activity going on, if you have more
12 focus on gambling, if you are communicating to
13 our athletes, to our fans, to students in
14 general, to anyone, that gambling is not on --
15 on collegiate sport -- is not only all right,
16 it's approved and indeed encouraged, I assume
17 New Jersey wants to have gambling on sports to
18 increase that activity since they want to
19 generate revenue out of it -- one can only
20 assume that's the reason for doing this -- then,
21 then, again, it's, it doesn't require a study to
22 say if there's more volume of these activities,
23 there's a higher likelihood that we'll have
24 negative impacts on our students and on our
25 institutions.

Page 40

1  Q  Doctor, do you have any evidence that the
2  implementation of the New Jersey statute would
3  in fact increase the volume of sports wagering
4  in, in the United States?
5  A  You know, we have heard -- and, and I don't
6  have, I can't cite chapter and verse on this --
7  but we have heard from those involved in these
8  activities that, you know, the notion that it
9  would supplant, that legal gambling supplants
10 illegal gambling, is, is unviable because
11 illegal gambling has some significant advantages
12 that gamblers enjoy, most notably they don't pay
13 taxes on it, they can get credit lines, they
14 could do it by telephone, they can, they can get
15 extensions of, of loans and roll over the bet if
16 they want to.
17     Illegal gambling has some inherent
18 advantages for, advantages for gamblers that
19 aren't going to be diminished by the fact that
20 you have legal gambling.  There will still be a
21 significant amount of, amount of illegal
22 gambling, whether there is legal gambling or
23 not.
24     Again, I assume that this whole notion is
25 about increasing gambling activity on college

Page 41

```
 1        sports because that's how you make money on the
 2        gambling, and that is, I assume, the basic
 3        intention of this statute.
 4    Q   But again, the NCAA has no direct evidence that
 5        would demonstrate that the implementation of the
 6        New Jersey statute would increase gambling on,
 7        on the NCAA's activities?
 8        MR. DREYER:  Objection, asked and answered.
 9        Answer.
10    A   Well, I think I did answer it.  I, I answered
11        the basis on which we, we have drawn, drawn that
12        conclusion.
13    Q   Okay.  Let's go to paragraph 7 of your
14        declaration, where you say, in part, "The core
15        entertainment value of fair and honest
16        competition that is reflected in NCAA
17        competition would be replaced by the bettor's
18        interest based not on term, on team or player
19        performance, but on the potential financial
20        impact of each NCAA athletic competition."
21            Do you see that?
22    A   I do.
23        MR. DREYER:  I think there was a slight
24        misreading.  It's "competition could be replaced
25        by the bettor's interest."  Just to clarify.
```

Page 42

```
 1        MR. WEGNER:  Let me just read it again,
 2        then --
 3        MR. DREYER:  Sure.
 4        MR. WEGNER:  -- so the record is clear.
 5    Q   Paragraph 7 of your declaration, Doctor, you
 6        say, "The core entertainment value of fair and
 7        honest competition that is reflected in NCAA
 8        competition would" -- would -- "could be
 9        replaced by the bettor's interest based on, not
10        on team or player performance, but on the
11        potential financial impact of each NCAA athletic
12        competition."
13            Do you see that?
14    A   Um-huh.
15    Q   Okay.  What evidence do you have to support that
16        statement specifically that the entertainment
17        value of fair and honest competition would be
18        diminished as a result of the implementation of
19        the New Jersey statute?
20    A   One of the distinctions of intercollegiate
21        athletics is the attachment it provides for
22        people to a, a given university.  People aren't
23        typically just a fan of Ohio State or Alabama or
24        UCLA.  They, they derive from that an attachment
25        to that overall institution.  It becomes a very
```

Page 43

```
 1        important, in business parlance, brand
 2        development vehicle for a university.
 3            Universities don't engage in college
 4        athletics for the same reasons that, that other
 5        people engage in business activities.  These are
 6        not, with less than 20 exceptions, these are not
 7        financially viable financially attractive
 8        propositions.  They're propositions that serve
 9        the interest of a, of an academic community, of
10        a university, of its students, of the student
11        athletes, of its alumni.
12            The, when you go to, when you go to a
13        college basketball game or football game, people
14        are cheering for a team, for a community, for a
15        university.  When you have gambling, then, of
16        course, the, the whole notion of, of gambling is
17        that you're, you're not worried about whether a
18        team wins or loses, you're worried about whether
19        or not they beat or didn't beat the spread, or
20        whether or not an individual player had some
21        specific performance, or whether or not the, the
22        field goal kicker made the the, last kick.
23            And, and so it shifts by -- again, by
24        common sense.  Do I have a study that proves
25        this?  No.  This is what gambling's about.  This
```

Page 44

```
 1        is what you bet on.  This is what the betting
 2        lines are all about.
 3            If people have money at stake, they're
 4        worried about the outcome of the, of the bet,
 5        not the outcome of the game, not what does this
 6        mean for my university, or what does it mean for
 7        this community.  It's not about, about that
 8        notion at all any longer.  It's simply about
 9        what does that mean for my bet.
10            That has a significant impact on the
11        universities themselves, who in fact engage in
12        these activities and rely on the university, on
13        the athletic program as an extension of
14        themselves, something that reflects their
15        values, reflects who they are, what they
16        represent, brings in their alumni, attaches them
17        to the school.
18            If they believe that game is fixed, or they
19        believe that they lost a, a bet, whether their
20        team won or lost, it completely changes the
21        relationship between a fan, and, and that, that
22        team and that university.  It's a very, very
23        different environment.
24    Q   Doctor, I think we all understand the concern
25        that you're articulating, but my question is
```

Page 45

```
 1    what evidence do you have that the core
 2    entertainment value of fair and honest
 3    competition that is reflected in NCAA
 4    competition would be replaced.  Now that's
 5    important, "replaced."  So the entertainment
 6    value is replaced by the bettor's interest,
 7    based not on a team's player's performance or
 8    the team's performance, but on the potential
 9    financial impact of each NCAA athletic
10    competition; what evidence do you have that it's
11    going to replace that?
12  A  I, I've never known anybody to go to a
13    racetrack, make a bet on a horse, and then not
14    cheer for that horse.  I've never known anybody
15    who has placed a bet on a Super Bowl game who --
16    I, I don't know people who bet on Super Bowl
17    games -- but I'm assured that, I'm sure in my
18    confidence that when somebody places a bet on an
19    over, under spread, whatever they bet on, that
20    they're going to be interested in the outcome of
21    that bet.  I mean, why would they place the
22    wager otherwise?
23         The, the notion that that somehow changes
24    the way one looks at a game, changes the way one
25    experiences that game, to me is -- I mean, I
```

Page 46

```
 1    don't even know that I have to make the
 2    argument -- of course it would.  How could it
 3    not?
 4  Q  Well, Doctor, couldn't folks bet on teams that
 5    they support?  For instance, you know, I would
 6    feel sort of bad if I was betting against a team
 7    that was a school that I went to.  So I, let's
 8    say I place a bet on my team.  Is that
 9    diminishing the entertainment value of the
10    outcome of that, of that game?
11  A  It certainly does if you're not really betting
12    on the team, you're betting on the spread that
13    they have.  You're saying, well, it'd be great
14    for good old State U to win, but they'd better
15    not win by more than two points because I've got
16    a bet on that.  And, and, you know, and all a
17    sudden some kid throws for a touchdown, and now
18    you're mad at the kid because he threw for a
19    touchdown and you missed your bet.  Of course it
20    changes the nature of the, the relationship at
21    all.
22         I'm sure people bet on their, on their home
23    teams.  I'm sure they also bet against their
24    home teams.  I'm sure they bet on spreads.  I'm
25    sure they bet on the, the number of different
```

Page 47

```
 1    events that occur inside that game.  It happens
 2    all the time in, in the illegal and the legal
 3    betting world, and it surely affects the way
 4    people participate and think about that game.
 5  Q  And that's my question, Doctor.  What evidence
 6    do you have for that last statement, it affects
 7    the way that they think about the game?
 8         MR. DREYER:  Objection, asked and answered.
 9  A  Yeah, I, I haven't done a psych, psychological
10    analysis of gamblers.  I, I'm enormously
11    confident in the statement that betting on a
12    game changes the way you look at a game.  I, I
13    can't imagine human nature being, being
14    different.
15  Q  But that's just your view of human nature?
16  A  Absolutely, my view of human nature, and I
17    suspect it's supported by virtually everybody
18    that you want to talk to.
19  Q  Well, not necessarily, Doctor.  We wouldn't be
20    here if everybody agreed with that statement.
21  A  Well --
22         MR. DREYER:  It's not a question.
23         MR. WEGNER:  Not a question.  It's a
24    gratuitous comment, Doctor.
25         MR. DREYER:  There's a period at the end of
```

Page 48

```
 1    that statement.
 2         MR. WEGNER:  Not a question mark, not a
 3    question mark, that's true.
 4  A  The State of New Jersey must have thought it was
 5    problematic or they wouldn't have prohibited it
 6    on their campuses.
 7  Q  Well, except -- Doctor, I'm not going to argue
 8    with you, this is a deposition, not an
 9    argument -- but there's already evidence in the
10    record that you may not agree with that, that
11    the carve-out for New Jersey in its statute was
12    at the request of the NCAA.
13  A  That's --
14         MR. DREYER:  Objection to the form of the
15    question.  There's no evidence in the record,
16    hearsay or otherwise.
17  A  Yeah, there -- that's just wrong.
18  Q  You're sure that it's, it's wrong?
19         MR. DREYER:  We've asked you for evidence.
20    You haven't produced anything.
21         MR. WEGNER:  I think you've got it in front
22    of you now.
23         MR. DREYER:  You've got a hearsay statement
24    from the senator, who, by the way, even though
25    there was a request, said it was legitimate, so
```

Page 49

```
1       that there actually --
2            MR. WEGNER:  So in other words, the -- if
3       it's a, if it's a record of, of a legislative
4       proceeding of the State of New Jersey as opposed
5       to congress, that's hearsay, but Congress isn't?
6            MR. DREYER:  I'm just, we've asked you for
7       what proof supports this statement.  You don't
8       have any.  But, you know, counsel, let's not
9       quibble --
10           MR. WEGNER:  Let's not get into it.
11           MR. DREYER:  I don't want to take up time.
12  Q    All right, Doctor.  Let's go to paragraph 9 of
13      your declaration.
14  A    Oh, paragraph 9, I'm sorry.
15  Q    Paragraph 9.  I'm sorry.  There isn't -- no, you
16      don't have nine pages.  Therefore --
17  A    I, I was looking for page 9 and --
18  Q    You don't have nine.  It's paragraph 9 on page 4
19      where you say, "In addition, permitting
20      legalized gambling in New Jersey will
21      significantly undermine the efforts of NCAA
22      staff that are dedicated to educating our member
23      institutions and student athletes regarding the
24      harms of gambling."
25           What's your support for that statement?
```

Page 51

```
1       they have legal sports wagering, that they will
2       encourage customers to come in and, and gamble
3       on intercollegiate athletics, that they will do
4       everything they can to maximize the revenue from
5       that, from that activity, while simultaneously,
6       simultaneously we are trying to communicate
7       exactly the opposite message to our student
8       athletes.  The two things are completely
9       orthogonal.
10           I, I don't see how they do anything but
11      conflict in a very fundamental fashion.
12  Q    Well, because of the state, of the
13      statute that New Jersey has implemented, is a
14      message -- if there is one -- is delivered from
15      the State of New Jersey, not the NCAA.  It's
16      not, it's not the NCAA adopting New Jersey's
17      position.
18  A    The mere fact that the, that the State of
19      New Jersey has taken a position that establishes
20      that this activity is legal and encouraged here
21      in this state sends a very clear message to
22      anyone that pays attention to this significant
23      corner of the country that this activity's
24      appropriate, and what the NCAA is telling us is
25      just wrong, and, and we're going to, we're going
```

Page 50

```
1   A    Well, first of all, today we engage in a wide
2       range of educational activities with our student
3       athletes, both directly with the NCAA's national
4       office staff and indirectly through all of the
5       athletic departments in the country, about what
6       the rules are pertaining to gambling, what the
7       risks are, how to handle circumstances when
8       you're, if and when you're approached by someone
9       who is trying to get you to throw a game; how
10      to, how to interact with other students who
11      might be interested in gambling on games.
12           We have a very extensive communication and
13      educational program around those, those issues.
14      If we are explaining to students why this is
15      problematic, why it's inappropriate, why we
16      oppose gambling, and then the State of
17      New Jersey is communicating exactly the
18      opposite, saying it's not only appropriate, we
19      encourage gambling on intercollegiate athletic
20      events, that certainly sends a message that's
21      completely the opposite of what the message that
22      we send.
23           I can only assume -- again, I don't have
24      evidence of it -- but I can only assume that the
25      State of New Jersey will actually advertise that
```

Page 52

```
1       to follow the laws of the State of New Jersey.
2            I don't, I don't see how a young person or
3       anyone else doesn't see those as two contrary
4       messages.
5   Q    Isn't that contrary message, if it is contrary,
6       already being delivered by Nevada?
7   A    Yes, it is, and we're opposed to it there as
8       well.
9   Q    But the question isn't are you opposed to it, my
10      question is what evidence do you have that the
11      passage and implementation of the New Jersey
12      statute will significantly undermine the efforts
13      of the NCAA staff.
14  A    If -- so did -- have I conducted a scientific
15      survey about whether or not having two
16      conflicting messages delivered to somebody
17      doesn't dilute those messages?  No, I haven't
18      done that.
19           But I think, again, most anyone would
20      recognize that if you are trying to commune --
21      again, I'm, I'm making assumptions about, about
22      human behavior that you may disagree with -- but
23      the fact is, is, we are telling our student
24      athletes what should or should not occur around
25      gambling activity.  We are supportive of the
```

Page 53

```
 1        congressional law that says this is only legal
 2        in one place, and even there we don't like it
 3        and don't condone it and don't want our student
 4        athletes to participate in it.
 5              To add to that, then, another message from
 6        a state government that says, no, no, no, don't
 7        pay attention to that, the opposite is true,
 8        the, the fact is, is that gambling on college
 9        sports is, is perfectly appropriate, we even
10        encourage you to do it, how can that not
11        diminish the value of the message that we're
12        trying to deliver?
13   Q    But that, again, is a conclusion that you draw.
14        You have no evidence of that.
15   A    It is absolutely, it is absolutely a conclusion
16        that I draw and I think anyone else would.
17   Q    Okay.  You've already established that illegal
18        gambling in the United States is a multibillion
19        dollar industry every year, correct?
20              MR. DREYER:  Objection to the form of the
21        question, and lack of foundation.  You can
22        answer.
23   A    It, it's a very large enterprise.  I, I don't
24        know the volume of it.
25   Q    Has the NCAA undertaken any activities to
```

Page 54

```
 1        eliminate illegal gambling in the United States?
 2   A    We work very hard to, to control those things
 3        that are under our purview, which, of course, is
 4        the behavior of our, our students and coaches
 5        and all those who work in, in intercollegiate
 6        athletics.  And in that sense we have worked
 7        very hard to control the, the spread of, of
 8        illegal gambling within the Association.
 9   Q    But my question is has the NCAA undertaken to,
10        anything to eliminate or reduce illegal gambling
11        in the United States?
12              MR. DREYER:  Objection, asked and answered.
13   A    I think I just answered that.
14   Q    I mean, what I heard your answer is -- let, let
15        me see if I can rephrase the question -- other
16        than having programs that are delivered to NCAA
17        institutions about the problems with gambling
18        and the evils of gambling, has the NCAA done
19        anything to reduce the amount of illegal
20        gambling, other than education of the, in the
21        institutions, to reduce the level of illegal
22        gambling that's available in the United States?
23   A    Sure.  Whenever we have evidence of any gambling
24        activity among the members of the Association,
25        students, coaches, anyone involved in college
```

Page 55

```
 1        sport in any fashion that falls within the
 2        purview of the Association, we aggressively
 3        pursue those issues.  We have sanctioned people
 4        involved in gambling.  We have given people show
 5        cause orders who've been involved in gambling,
 6        which makes it very difficult for them to work
 7        in the enterprise.
 8              We engage in those kind of activities
 9        constantly, and we're constantly conducting
10        investigations.  We have live and open
11        investigations right now involved in, in
12        gambling enterprises.
13              So it's something that we are extremely
14        sensitive to, something that we work very hard
15        at, all the time.
16   Q    Doctor, is it, is it true that most of the time
17        that, when you're involved in these activities,
18        it's when some illegal gambling activity is
19        brought to the attention of the NCAA, correct?
20   A    Well, I'm not, I'm not sure I understand your
21        question.  I'm sorry.
22   Q    Well, I'm going to put it this way.  Illegal
23        gaming is not regulated, correct?
24              MR. DREYER:  Objection, foundation.  You
25        can answer.
```

Page 56

```
 1   A    Yeah, pretty much by definition.
 2   Q    Okay.  And therefore illegal gaming is more
 3        difficult to detect than the existence of legal
 4        gaming, which is regulated, correct?
 5              MR. DREYER:  Objection, foundation.  You
 6        can answer.
 7   A    I assume so, sure.
 8   Q    Therefore --
 9   A    I haven't done a study on it, but I assume
10        that's true.
11   Q    Therefore, isn't it so that illegal gambling is
12        a more difficult activity to detect than legal
13        gambling?
14              MR. DREYER:  Objection, lack of foundation.
15        You can answer.
16   A    Again, I assume so.
17   Q    Has the NCAA worked with gaming officials in
18        Nevada to uncover or to investigate purported
19        acts of illegal sports wagering?
20   A    Yes.
21   Q    And why is that?
22   A    Well, the -- because they -- they are willing to
23        talk to us occasionally.  And they, I'm sure,
24        have their own motivations.  I can't speak to
25        their motivations as to why they would do so.
```

Page 57

```
 1    And we're trying to make the best of a bad
 2    situation.
 3         We, as I've stated clearly, would strongly
 4    prefer that there not be legal gambling on
 5    intercollegiate athletics anywhere, that we
 6    don't want gambling, legal or otherwise,
 7    anywhere.
 8         But since it exists in, in Las Vegas and in
 9    Nevada in general, we attempt to garner as much
10    information about them, just as we do about,
11    about illegal gambling.
12  Q  And has that proved helpful to the NCAA, in, in
13    uncovering illegal wagers?
14  A  I'm, I'm probably not the best person to answer
15    that question.  You, you deposed someone
16    yesterday who is more knowledgeable about the
17    details of those investigations.
18         But I'm sure it's been useful in some
19    inquiries, if for no other reason than to
20    understand the dynamics of the gambling
21    activity.
22  Q  Doctor, are you aware of any instance where
23    legalized gambling caused a point shaving
24    situation?
25  A  I don't know the, the details of the myriad of
```

Page 58

```
 1    gambling scandals that have occurred involving
 2    sport in general well enough to, to answer it
 3    with any, with any definitive nature.  So I, so
 4    I can't, I can't provide you information one way
 5    or another.
```



Page 59



Page 60



---

Page 63

```
 1    point shaving scheme in a market that, gambling
 2    market that is regulated and transparent, as
 3    opposed to one that isn't?
 4         MR. DREYER:  Objection as to foundation.
 5    You can answer.
 6  A  I, I suppose it depends on the context
 7    completely.  I mean, I really, I really don't
 8    know the mechanics of, of game fixing.  I
 9    haven't spent much time looking at it.
10         Again, you, you had an expert in front of
11    you yesterday.  So anything that I would offer
12    would be sheer speculation and not of particular
13    value.
14         MR. WEGNER:  Do you want to take a short
15    break, then?  We've been going about an hour.
16         THE WITNESS:  Yeah, that'd be fine, if you
17    don't mind.
18         MR. WEGNER:  Sure.
19         THE VIDEOGRAPHER:  We're off the record.
20    Local time is 11:53 a.m.
21         (A recess was taken.)
22         THE VIDEOGRAPHER:  We're back on the record
23    at 12:06 p.m.
24  Q  So, Doctor, let's talk a little bit more about
25    Nevada and Las Vegas.  And we were talking
```

---

Page 62

```
 1    [redacted]
 2    [redacted]
                           * * *
 4  Q  Okay.  Would you agree that if you were a, the
 5    sort of person who would do the despicable and
 6    try to fix a match, especially an amateur match,
 7    wouldn't you prefer to do that in a market that
 8    was unregulated and undisclosed and
 9    undiscoverable, to some extent, than in a legal
10    market?
11         MR. DREYER:  Objection, calls for
12    speculation.
13  A  You didn't like my assumptions earlier, now you
14    want my assumptions?
15  Q  No.  It actually wasn't your assumption, it was
16    your conclusions that I didn't like, not your
17    assumptions.
18  A  I, I have no idea.  I really don't.
19  Q  Well, let me, let me make it more pointed then.
20         If I'm going to fix a match and then gamble
21    on it, wouldn't it be preferable for me to do so
22    in a market that's not regulated than one that
23    is regulated?
24  A  I, I honestly don't know.
25  Q  Do you know this?  Is it easier to detect a
```

---

Page 64

```
 1    before the break about the efforts of the NCAA
 2    staff to educate people about problems with
 3    gambling.
 4         Does the NCAA do anything differently in
 5    schools that are in Nevada in terms of the
 6    educational programs on gambling?
 7  A  Well, first of all, we, we have -- this isn't
 8    directly in answer to your question -- but we
 9    have policies that prohibit any of our
10    tournament play, post season play, that's NCAA
11    play in the state of Nevada.
12         So if those institutions that are in Nevada
13    want to host events, they have to do it in a
14    different state, they can't do it in their home
15    state on their home turf.  That in and of itself
16    sends a pretty powerful message to those
17    institutions as to what is or is not permissible
18    by NCAA rules.
19         Those schools -- and I have to speak a
20    little bit historically, because I don't know
21    the current leadership of those schools -- but
22    having known some of the previous leadership of
23    those schools, I know they make a particular
24    effort to, to educate their student athletes,
25    because in fact there's such ready access to, to
```

```
 1        gambling, and the concern that they have about
 2        the prominence in, in those, in those cities
 3        that, that have universities.
 4             So the educational effort and the, the
 5        message is communicated very loud and clearly
 6        that this is a challenge for those universities.
 7   Q    Now, this educational effort, Doctor, that the
 8        NCAA has undertaken, does it draw any
 9        distinction with the students and the staff or
10        the coaches between illegal or legal gaming?
11   A    You know, I can't answer that.  The, the
12        policies -- because I don't know the details of,
13        you know, all the educational materials that are
14        provided -- the policies don't differentiate.
15        So I assume they don't.  But again, I don't know
16        the details of when, when we have educational
17        activities before one of our tournaments, for
18        example, whether or not there's differentiation.
19   Q    Do you think there should be?
20   A    Well, certainly they, they need to understand
21        that when we're talking about gambling
22        prohibitions, we're talking about all forms of
23        gambling on sports wagering, and that that needs
24        to be made clear, and so in that sense, no,
25        there shouldn't be any differentiation at all.
```

```
 1   Q    Okay.  So let's start with match fixing.  Do you
 2        have any evidence at all, not just a study but
 3        any evidence, to support the proposition that
 4        the implementation of the New Jersey gaming law
 5        would increase match fixing on NCAA matches and
 6        tournaments?
 7             MR. DREYER:  Objection, asked and answered.
 8        You can answer.
 9   A    Well, it -- the, the contrary is certainly true,
10        that there's no evidence that it would diminish
11        it.  Since we, we know in Europe, for example,
12        there's legal sports wagering, and the, and the
13        incidence of, of especially very dramatic, very,
14        very large sports match fixing activities have
15        gone on with professional soccer, for example,
16        Italy being the most notorious of late.
17             And, and at the same time, the, the
18        assumption is -- and I think it's a very valid,
19        valid assumption -- that increased gambling
20        activity increases the probability of those
21        kinds of behaviors occurring.  You have more
22        people gambling, more at stake, more people
23        attentive to it, more people believing that this
24        is appropriate behavior, and therefore the, the
25        probability of, of engagement around, around
```

```
 1             If there's extent to which there's a need
 2        to make sure students understand that, that
 3        there's different ways to participate, different
 4        ways to be taken advantage of, different ways
 5        to, to be approached, then I assume that should
 6        be part of the educational process.
 7   Q    I'd like to, Doctor, to move things along, to
 8        list what, in listening to your testimony this
 9        morning, I understand to be your concerns as the
10        president of the NCAA about the implementation
11        of legalized gambling and sports wagering in
12        New Jersey.  And let me just get them out, and
13        then we'll talk about them one at a time.
14             One is match fixing or point shaving.
15   A    Um-huh.
16   Q    Two is public perception and erosion of
17        confidence in the game.
18   A    Yes.
19   Q    Three is harm to student athletes.
20   A    Um-huh.
21   Q    And then four is fan loyalty?
22   A    Yes, in general, yes.
23   Q    Or we could call that an impact on the fanship.
24   A    No, no, that's okay.  You -- I understand
25        your -- I understand what you mean.
```

```
 1        fixing the match goes up just because there's
 2        more people involved in the activity, in the
 3        gambling activity itself.
 4   Q    Okay.  Well, what evidence do you have that
 5        there'll be more people involved in the gaming
 6        activity if gaming is legalized in New Jersey?
 7             MR. DREYER:  Objection, asked and answered.
 8   A    Yeah, just the, the assertions of people who
 9        have been involved in the activity that I've,
10        that I've heard from, that the, the nature of
11        illegal gambling -- gambling doesn't, doesn't
12        change fundamentally when you add legal gambling
13        on top of it.  Illegal gambling has some things
14        that those people who engage in those kind of
15        behaviors find attractive, that, that isn't
16        matched by, by legal gambling.
17             And so the -- I -- the burden of proof, to
18        me, ought to be on those who are legalizing
19        gambling, demonstrate that, in fact, this
20        diminishes gambling activity, and I don't think
21        that's something that can be done.
22   Q    Okay.  Well, you're not a lawyer, and we're
23        not --
24   A    I'm not.
25   Q    -- getting into a legal debate about that.
```

Page 69

1      But as plaintiff, actually, the burden is
2  on you.
3  A  Oh, I understand that.
4  Q  And so what I, what I hear you saying is, in the
5  answer to my question about evidence that match
6  fixing would be increased by the implementation
7  of the New Jersey statute, what you're saying is
8  there's no evidence that it wouldn't be
9  diminished.
10 A  I'm saying that --
11     MR. DREYER:  Forgive me.  The witness's, it
12 is mischaracterizing the witness's testimony
13 over the last hour and a half.  So you can
14 answer the question.
15 A  Yeah, the, the notion is that legal gambling
16 will increase overall gambling activity, and
17 anything that increases overall gambling
18 activity increases the probability of, of match
19 fixing.
20     Anytime you also legalize and legitimize
21 that activity, the, the logical restraints on
22 engaging in that activity go down.  Again, I
23 assume that's why you, you do this.  And, and
24 the nature of the, of the restraint that someone
25 might feel against engaging in those kind of

Page 70

1  activities probably goes down along with it.
2      As I talked about extensively, we're trying
3  to educate student athletes about not
4  participating in gambling, about not being
5  involved in, in fixing games, about not being
6  involved in organized gambling activities.  And
7  when a state comes in and legalizes that
8  activity, it sends exactly the opposite message,
9  and it erodes the, the position that the NCAA
10 has historically taken.
11     That in and of itself is likely to provide
12 greater opportunities for match fixing.
13 Q  Okay.  Doctor, let me just break down what you
14 said.  Because I -- and, and I don't mean to be
15 disrespectful of the answer, and counsel said
16 it's been asked and answered several times, but
17 I'm actually trying to get a specific answer,
18 and I haven't gotten it yet.  And that is
19 that --
20     MR. DREYER:  Objection to the speeches,
21 counsel.  Let's just ask questions, please.
22     MR. WEGNER:  That's fine.
23 Q  In, in answer to my question about having
24 evidence that the implementation of the
25 New Jersey gaming statute would increase match

Page 71

1  fixing on NCAA tournaments and competitions, you
2  said that there's no evidence it wouldn't, it
3  would diminish it, it's probably, it's logic,
4  it's a conclusion and it's likely.
5      Okay.  What I need to know, though, is, is
6  what evidence do you have, what empirical data,
7  evidence, studies, focus groups, anything, do
8  you have to support the proposition that
9  implementing the New Jersey statute would
10 increase point shaving in NCAA matches?
11     MR. DREYER:  Counselor, this has been
12 covered repeatedly.  The witness has talked
13 about studies.  I --
14 A  The, the --
15     MR. DREYER:  -- so you have our objection
16 again.  We're replowing old territory.
17 A  Yeah, I mean, the -- and I think I said this
18 before, if not, I'll say it again -- there are
19 no studies that I'm aware of that look at the
20 State of New Jersey exclusively, the New Jersey
21 statute, and verify or disprove what you're
22 saying.
23     So if that's your question, the answer is
24 no, that there have been no empirical studies
25 that demonstrate that in the State of New Jersey

Page 72

1  that I'm aware of.
2  Q  Okay.  Let's go to public perception, same
3  question.  Now, what evidence do you have to
4  support the notion that the implementation of
5  the New Jersey gaming statute would harm the
6  public's perception of the NCAA and its matches?
7      MR. DREYER:  Objection, asked and answered.
8  You may answer the question.
9  A  Again, if you're asking are there empirical
10 studies that focus on the State of New Jersey
11 and the New Jersey statute, then, then the
12 answer is those do not exist.  I don't believe
13 it is required to have a scientific study to
14 ascertain that increased gambling activity has
15 those, those effects that you're describing.
16 And, and if you're asking me is that common
17 sense, then, yeah, that's common sense.
18 Q  Doctor, let's talk about No. 3, which is the
19 implementation of the New Jersey statute, gaming
20 statute, would cause harm to student athletes.
21     Could you describe what you mean by that?
22     MR. DREYER:  Objection, asked and answered.
23 A  Yeah, we spent a good bit of time the first hour
24 discussing this.
25     Now the, the position of the NCAA has

Page 73

1    always been that, that gambling first and
2    foremost erodes the integrity of intercollegiate
3    athletics. I, I take that as a given, given a,
4    a hundred years worth of history, and having
5    seen impacts that gambling has on college sport.
6    I'm sure somebody's written a dissertation on
7    it, but we haven't dug it up. We just know the
8    facts and know the history.
9         And, and this has been widely reported in
10   the media for, again, decades. And we know it's
11   true also in professional sport, well
12   established in the common parlance of American
13   society, that when people are gambling on games,
14   their attitudes toward those game change, and
15   they, the potential for and indeed the, the
16   realities of games being fixed occurs.
17        That's -- I, I can't point to a study that
18   proves that in New Jersey book, but I'm accepting
19   that as a given in American society.
20        The, the recognition of that by students
21   and our ability to in fact dissuade students
22   from engaging in inappropriate behavior around
23   gambling when the state or states are saying
24   that this is appropriate and legal behavior that
25   we think people should be allowed to engage in

Page 74

1    if you're of an appropriate age, then, you know,
2    that completely erodes the underpinning of that
3    notion. It exposes students to a dramatically
4    increased level of pressure.
5         Every -- when there's sports wagering,
6    legal sports wagering on a game -- everyone
7    knows there is X amount of money riding on this
8    game in the State of New Jersey book, and some
9    kid has to go up and kick a field goal, and he
10   kicks, and he misses a field goal, and somebody
11   can say, wow, that just cost people X million
12   dollars, because they're all betting on that, on
13   that kick.
14        You know, that's exposure that we don't
15   want our student athletes to have. We don't
16   want student athletes to have the, the reality
17   of fans sitting in the stands with money riding
18   on that game, everyone talking about the money
19   riding on that game, everyone saying from
20   announcers on down, well, here goes -- and the
21   guys writing in the sports pages -- well, here
22   goes a kid to the line to shoot for a million
23   dollar bet, you know, that we've all, we all
24   know is riding on this game.
25        That's the kind of exposure that we don't

Page 75

1    want for our student athletes. I think that's
2    the kind of harm that is, is waiting for them in
3    these circumstances. And, and I think the State
4    of New Jersey recognized it when they forbid
5    their own institutions from being exposed to
6    this, this kind of pressure.
7    Q   Doctor, actually, I can understand why your
8    counsel may have thought it was an asked and
9    answered question, but your answer actually
10   helped to sort of focus it.
11        What I was -- on, on item 3, which is harm
12   to students, I didn't mean the general harm -- I
13   mean, in other words, what is the harm to
14   students at NCAA institutions that will result
15   from New Jersey implementing the statute?
16        By that I mean -- you used the word
17   pressure -- what additional pressure will there
18   be on students, student athletes, as a result of
19   the implementation of the New Jersey gaming
20   statute?
21        MR. DREYER: Same objection, asked and
22   answered.
23   A   I think I just answered that.
24   Q   Okay. So that is the answer. In other words,
25   the, the pressure is that, the pressure is that

Page 76

1    because there is wagering on any particular
2    sporting activity, that that athlete's
3    performance gets called into question?
4         MR. DREYER: Counselor, I think that was a
5    part of the witness's answer, so I don't want --
6         MR. WEGNER: That was the question.
7         MR. DREYER: -- the record to reflect
8    that's -- the answer had more points than that.
9    So I think you've mischaracterized his answer in
10   total. I think you pulled out a part of it. So
11   I just want the record to be clear.
12        MR. WEGNER: Which is me just trying to
13   focus it. So, Doctor, am I, am I clear on the
14   question? You want me to try to, try it again?
15        THE WITNESS: No, no.
16   A   So, so clearly what you just described is a
17   piece of that, without doubt. But again, the,
18   the notion of, of the entire intercollegiate
19   enterprise being eroded by and damaged by the
20   loss of integrity in those games, the notion
21   that the sport is becoming increasingly
22   professionalized, that it is becoming not a
23   collegiate event but a, venue for gambling,
24   that it is becoming increasingly one where the
25   outcomes of the game are, are the focus of, of

```
 1        a, a betting line rather than engagement with
 2        that program, fundamentally changes the nature
 3        of college sport.  And there's, there's just no
 4        question about the fact that it changes the
 5        nature of that sport.
 6            And for our student athletes it changes
 7        their con -- their participation in that sport.
 8        It, it clearly impinges upon the notion of
 9        amateurism.  It clearly impinges upon the fact
10        that they're competing in these games as
11        students.  It makes them much more akin to a
12        deck of cards.
13   Q    So, Doctor, we've already established this
14        morning that illegal gaming on sports wagering
15        is a very large industry in this country and has
16        been for a long time, correct?
17   A    Yes.
18   Q    And that, I would expect your position is that
19        the existence of that gaming sports wagering
20        creates the kinds of pressures and harm to the
21        students you've been describing, correct?
22   A    It can.
23   Q    Okay.
24   A    It's one of the reasons we oppose it and work
25        hard to, to minimize it.
```

```
 1   Q    And what evidence do you have to support the
 2        notion that there will be an increase or
 3        irreparable harm to the NCAA as a result of
 4        New Jersey implementing its gaming statute?
 5            MR. DREYER:  Objection, asked and answered.
 6   A    Because, first of all, if it is, if it is
 7        legalized, it will become much more broadly
 8        discussed in the media.  It will be the point of
 9        a -- of, of a great deal of advertising.  It
10        will be a point of a great deal of recruitment
11        of people to come and participate in these games
12        as gamblers, not as, not as individuals.  It
13        will, in, in the most fundamental ways, codify
14        and legitimatize behavior that we, I think as
15        you agreed, see as, as damaging to
16        intercollegiate athletics.
17            And so if you're legitimatizing that, I
18        mean, one can, one can make the same argument
19        about legalizing any illegal activity.  Well, it
20        won't be illegal anymore, but will it have
21        diminished?  No, of course not.
22            In this particular case, it'll, it'll
23        simply make it a greater topic of conversation
24        in and around the athletic competition, and in
25        and around the lives of our student athletes.
```

```
 1   Q    Okay.  But, Doctor, those are all conclusions
 2        that I know you firmly hold, but my question is,
 3        do you have any focus groups, studies, any
 4        empirical data to support those conclusions?
 5            MR. DREYER:  Same objection.  You can
 6        answer.
 7   A    Yeah.  I, you know, as I've said before, you --
 8        no, we have not done empirical studies on the
 9        impact of the New Jersey law on illegal gambling
10        in the State of New Jersey.  And I don't believe
11        those exist.
12   Q    Okay.  Let's go to No. 4, then, which is that
13        the implementation of the New Jersey gaming law
14        or gambling law would adversely impact fan
15        loyalty of NCAA fans.
16            Same question:  What evidence do you have
17        to support that?
18   A    Well, I answered that quite extensively in the
19        first hour.  And again, I assume the nature of
20        your question is do I have, or does anyone have
21        empirical studies about this impact in
22        New Jersey, by the New Jersey law, and the
23        answer is no, those don't exist.
24   Q    Okay.  And I assume it's the same answer for the
25        notion that the implementation of the New Jersey
```

```
 1        gaming statute would erode public confidence in
 2        games?
 3            MR. DREYER:  Objection, asked and answered.
 4        You can answer.
 5   A    Yes.
 6   Q    Okay.  Thanks, Doctor, thank you.
 7            Doctor, this wasn't one that you listed, so
 8        I'm -- it's not yours -- but I'm going to ask
 9        you if this is one of your concerns about harm
10        to the NCAA as a result of the implementation of
11        the New Jersey law.
12            And that is, is, do you believe that there
13        will be a dropoff in attendance of NCAA events
14        as a result of the implement, implementation of
15        the New Jersey statute?
16   A    I don't know the answer to that.  I don't, I
17        don't make an assumption one way or another on
18        it.  I think it's unclear.
19   Q    So you don't know?
20   A    I don't know.
21   Q    What about revenues to the institutions that are
22        a part of the NCAA?
23   A    I think it's highly variable.  You know, if, if
24        an institution is, is exposed to a gambling
25        scandal, it can have profound impacts on their
```

Page 81

```
 1        revenues, on their reputation, on their
 2        particular competitive position as an athletic
 3        department.  So I think it is unpredictable.
 4   Q    Doctor, you mentioned scandals.  Unfortunately,
 5        we've experienced in amateur athletics and
 6        collegiate athletics in the last several years a
 7        lot of different scandals that have been, some
 8        of them, heart-rendering.
 9             And is it, is it correct you're concerned
10        about, you know, the loss in revenue and so
11        forth, that those scandals have an adverse
12        effect?  By scandals, I'm talking about
13        pedophile scandals -- I don't, don't think I
14        need to list all of them to you, that list --
15        that are non-gambling related intercollegiate or
16        collegiate scandals.  Do you know what I'm
17        talking about when I say that?
18   A    I obviously know of the scandals.  I'm not sure
19        what the question is, though.
20   Q    The question is, is that, is it your view that
21        those scandals are harmful to the NCAA
22        institutions?
23   A    Yes.
24   Q    And would it affect the public's perception of
25        those institutions?
```

Page 82

```
 1   A    Of course.
 2   Q    And the revenues?
 3   A    Depends.
 4   Q    And fan loyalty?
 5   A    Depends.
 6   Q    When you say "depends," what do you mean,
 7        Doctor?
 8   A    It depends on the circumstance.  Each one is
 9        unique and distinctive.  And I think it would be
10        difficult to generalize.
11   Q    And the NCAA has in place rules and regulations
12        that are designed to protect students from these
13        sorts of scandals, correct?
14   A    Um-huh, and the institutions and coaches and
15        everyone involved, yes.
16   Q    And just as with any rule and regulation, it's
17        not foolproof?
18   A    Of course.
19   Q    It still happens?
20   A    Of course.
21   Q    And the NCAA has regulations in place that
22        prohibit athletes and coaches and staff from
23        participating in gambling, legal or illegal,
24        illegal, correct?
25   A    Of course.
```

Page 83

```
 1   Q    Okay.  And in your view, do those regulations,
 2        are they effective?
 3   A    Well, we certainly think so.  We hope they are.
 4        But we also know that there are individuals who
 5        engage in that behavior, and I'm sure there are
 6        some that don't get caught and some that do.
 7   Q    But is, is it your view that the regulations
 8        that the NCAA has in place about sports wagering
 9        are as effective as they could be now?
10   A    I, I don't know the answer to that.  It's a
11        hypothetical question that I, you know, we --
12        that I can't answer with great specificity.
13             The, the policies that we have in place
14        right now are established to try and minimize
15        and mitigate the impacts of gambling, legal and
16        illegal.  And can they be better?  Sure, I'm
17        sure they could.  Could we have more resources
18        available for the policing of those activities?
19        Of course.  But one strikes a balance, just as
20        you do in any regulatory environment, around all
21        those issues.
22   Q    So in your view, the current, both regulations
23        and organization staffing within the NCAA to
24        monitor -- excuse me -- monitor and prevent
25        wagering on NCAA activities is as good as it can
```

Page 84

```
 1        be now?
 2             MR. DREYER:  Objection to the form of the
 3        question.
 4   A    No.  It's, it's appropriate, it's an appropriate
 5        balance, given the other demands placed on the
 6        Association and the interests of the, of the
 7        membership.
 8   Q    And the balance you've struck is -- in your view
 9        now as the president of the NCAA -- is, is
10        adequate for where the NCAA is today, correct?
11             MR. DREYER:  Objection to the form of the
12        question.  You can answer.
13   A    It -- we -- we have an appropriate balance right
14        now, again, given the resources that we have on
15        enforcement across all of those various issues
16        that you described.
17             We've had, because we've had -- well,
18        especially over the past several years -- a
19        variety of, of bylaw violations and scandals, if
20        you will, in other areas.  Again, we're
21        constantly juggling and figuring out where we
22        need to deploy those resources.  And we have the
23        appropriate balance for the time being.
24   Q    Okay.  Does the NCAA have any plan in place now
25        to implement different procedures if the
```

1  New Jersey gaming law is implemented next year?
2  A  Not at this time.
3  Q  Is there any plan to do that?
4  A  We haven't had any discussions of it.
5  Q  In your view, would such a plan be necessary?
6  A  I don't know, but it would deserve some
7  consideration and discussion.
8  Q  As you sit here today, there is no plan or
9  anything --
10  A  No.
11  Q  -- in, in place to, to react or respond, if you
12  will, to the implementation of the New Jersey
13  statute?
14  A  We're wait --
15  MR. DREYER:  Other than this lawsuit?
16  THE WITNESS:  Yeah.
17  MR. DREYER:  I'm sorry.
18  A  I was, I was going to say, we're waiting for the
19  outcome of the lawsuit obviously.
20  Q  Okay.  But if in fact the statute is able to be
21  implemented in New Jersey, the NCAA does not
22  have any plan in place now to change its
23  educational programs, correct?
24  A  We don't have any plans right now, because,
25  again, we are waiting for the outcome of this

1  contracts that we have.
2  Q  Okay.  But that, does that result in NCAA games
3  being broadcast in Las Vegas booking venues?
4  A  Well, if someone wanted to turn a game on in,
5  one of our championship games on in Las Vegas,
6  they certainly could do so anywhere that,
7  anywhere that the cable, cable's distributed,
8  they can get access to it.
9  Q  Okay.  Let's go back to an area that we covered
10  some before, but I just want to be real precise
11  about this.
12  Does the NCAA, in its educational programs
13  and prevention programs that it has with
14  athletes, have a different program for
15  institutions in Nevada than it does in the rest
16  of the country?
17  A  Well, I think what I said was the, that the, the
18  institutions are well aware of the heightened
19  risk in those states at those institutions.  So
20  they have -- and again, I'm speaking from past
21  experience, not current experience -- but I know
22  from, from previous leadership of those
23  institutions, with significant encouragement,
24  they have made sure that they have very vigorous
25  educational programs around gambling.

1  lawsuit to ascertain the speed with which this
2  would be implemented if it's allowed to go
3  forward.
4  MR. WEGNER:  Okay.  Let's go off the
5  record, if that's agreeable to you, counsel, for
6  a minute.
7  MR. DREYER:  Sure.
8  THE VIDEOGRAPHER:  We're off the record.
9  Local time is 12:32 p.m.
10  (A recess was taken.)
11  THE VIDEOGRAPHER:  We're back on the record
12  at 12:47 p.m.
13  Q  Okay, Doctor.  Does the NCAA license its
14  telecast to Las Vegas sports books?
15  A  We license our telecast to CBS Turner and ESPN.
16  We only hold the media rights to our
17  championships, not to the regular season games
18  or conference championships, conference
19  tournaments.
20  So we, we have sold our media rights to,
21  for an extended period of time, to, first of
22  all, CBS Turner for the men's basketball
23  tournament, and then all the other television
24  rights for other championships go to, to ESPN.
25  And then we have radio rights.  Those are the

1  We communicate to the student athletes that
2  come out of those, those schools, just as we
3  would any other student athlete when they are
4  involved in one of our championships, for
5  example, and then we also don't host any, any
6  events, whether they're predetermined or
7  non-predetermined championship sites, in the
8  state of Nevada.  And the, the message for that
9  is loud and clear to the student athletes that
10  we don't, we don't condone or support gambling,
11  therefore you cannot host on your home court or
12  your home field an NCAA post-season event,
13  championship event.
14  And they all know that, because they --
15  well, because they have to, they have to have
16  home team, home games away from the state of
17  Nevada -- so the, the message is quite clear.
18  Q  I understand the message is clear, and that the
19  other institutions may have their own programs.
20  My question is does the NCAA have a different
21  set of programs, educational programs, for
22  students in schools in in, in Nevada?
23  A  Yeah, I, I don't know.
24  Q  Don't know.
25  Let's go back to the complaint, which is

1    Exhibit 4, NCAA 4.  And, Doctor, in Exhibit 4,
2    if you look at paragraph 19, it talks about
3    PASPA, P-A-S-P-A.
4  A  Um-huh.
5  Q  Are you familiar with that?
6  A  I am.
7  Q  Okay.
8  A  In general.  I don't have it committed to
9    memory, but I know the law, of course.
10 Q  All right.  And the complaint in paragraph 19
11   refers to the fact that there was a third
12   exception that provided a one-year window from
13   January 1, 1993, to January 1, 1994, during
14   which New Jersey was afforded the opportunity to
15   authorize sports betting.  Do you see that?
16 A  I do.
17 Q  Okay.  Would you agree that that was an
18   acknowledgment by congress when it passed PASPA,
19   that at least there was a point in time when it
20   was acceptable to congress to have New Jersey
21   have betting within its borders, sports betting?
22       MR. DREYER:  Objection as to foundation.
23   You can answer.
24 A  Well, I don't, I don't know the legislative
25   history or the legislative intent, so I can't

1    answer that question.
2  Q  Okay.  But from this, the language of the
3    statute itself, if New Jersey had implemented,
4    taken the opportunity to implement sports
5    betting within its borders in the time
6    prescribed here from January 1, 1993, to January
7    1, 1994, that would have been okay with congress
8    and within the purview of this law, correct?
9        MR. DREYER:  Same objection.  You can
10   answer.
11 A  I, I assume so.  Again, I don't know the
12   legislative history nor the intent, nor the
13   specific language of, of the bill, when it was
14   being passed during that time frame.  So my
15   reading of it isn't any better informed than
16   anyone else's.
17 Q  Okay.  And, Doctor, I understand from your
18   answer in the last session that right now the
19   NCAA is waiting to see what happens with this
20   litigation.  But in your view, if the litigation
21   permits or results in New Jersey being able to
22   implement its, its statute, what do you think
23   the NCAA will need to do in response to that?
24       MR. DREYER:  Objection, calls for
25   speculation.  You can answer.

1  A  Yeah, I -- well, I -- I don't know, but
2    obviously we need to, we need to look at the,
3    the facts, and determine whether or not we need
4    to take appropriate steps to, to mitigate
5    impacts.
6  Q  Now, Doctor, you're aware that, that the Nevada
7    statute had a similar, what we call "carve-out"
8    for Nevada teams, amateur teams in Nevada,
9    that's similar to the one that is proposed in
10   the New Jersey statute, correct?
11 A  I'm vaguely aware of that.
12 Q  And are you aware that it was implemented, it
13   was in play for some time, and then about 2003
14   or '4 it was taken out, it was repealed, that
15   provision?
16 A  I'm, I'm aware of that general fact, yes.
17 Q  Did the NCAA do anything to oppose that?
18 A  I don't know what was done at that time.
19       MR. WEGNER:  All right.  Let's mark as next
20   in order Exhibit 28.
21       (Deposition Exhibit 28 was marked for
22   identification.)
23       MR. WEGNER:  Here you go, Doctor.
24       THE WITNESS:  Thank you.
25 Q  Doctor, I have --

1        MR. DREYER:  Counselor, I'm sorry, give me
2    a second.
3        MR. WEGNER:  To look through it?
4        MR. DREYER:  Yeah.  This may be an
5    incomplete document.
6        MR. WEGNER:  Oh, it is.  I was going to
7    explain the foundation of the document.
8        MR. DREYER:  Yeah, well, why don't, why
9    don't we start with your representation as to --
10       MR. WEGNER:  Okay.
11       MR. DREYER:  -- what this is, and if I need
12   to object on the record I will.
13 Q  So this Exhibit 28 is -- are two -- or is two
14   pages out of an appendix to the record of the
15   congressional hearings on -- let me get to it --
16   so Exhibit 28 is two pages out of an appendix of
17   the National Gambling Impact Study Commission
18   report that was commissioned by United States
19   Congress in 1999.
20       And the two pages that are Exhibit 28 are
21   statements from one of the commission's members,
22   William A. Bible, who is a former chairman of
23   Nevada's gaming control board and a member of
24   the National Gambling Impact Study Commission.
25       And I'd like you to take a minute and look

Page 93

1    at Exhibit 28, please.
2         MR. DREYER:  I will state for the record,
3    while the witness is doing that, that while I'm
4    not sure where this is going, we do object to
5    using this out of context.
6         MR. WEGNER:  When you say "out of context,"
7    you mean out of --
8         MR. DREYER:  Divorced of the committee's
9    conclusions on, among other things, the impact
10   that gambling has on the integrity of
11   professional sports.
12        MR. WEGNER:  Your objection is noted.  It
13   is a hundred, multiple, hundred-page study.  If
14   you'd like me to go through the whole thing, we
15   could do that.
16        MR. DREYER:  You have our objection.  It's,
17   it's your deposition.  I just need to preserve
18   our objection.
19  A  Okay.
20  Q  So, Doctor, I wanted to direct your attention to
21   the second-to-last paragraph on Exhibit 28,
22   where William Bible, Mr. Bible, makes this
23   statement:  "No one college sports scandal is
24   the result of legal sports wagering.  To the
25   contrary, legal sports wagering in Nevada has

Page 94

1    assisted athletic leagues in their enforcement
2    activities aimed at preventing game fixing and
3    point shaving."
4         Do you have any reason to believe that that
5    statement wasn't true when it was made by
6    Mr. Bible?
7   A  Well, I don't know Mr. Bible.  And as we've
8    established a number of times, this isn't based
9    on any empirical study that I'm aware of.  I
10   don't think he's conducted that research, and I
11   have no reason to believe that his opinion is
12   better or worse than anybody else's.
13  Q  Okay.  Let's talk about the statement, though,
14   that he makes here, and just use it as a
15   starting point, that enforcement activities have
16   prevented game fixing and point shaving.
17        You testified earlier that the NCAA does
18   cooperate with gaming authorities in Nevada when
19   it comes to uncovering point shaving, or, or
20   match fixing schemes; is that correct?
21  A  I testified that we discuss, when appropriate,
22   with Las Vegas, the, the patterns that they may
23   see, the processes by which they think
24   gambling's going on, to better understand the
25   dynamics and to gain insight into the entire

Page 95

1    gambling process.
2         I don't know what he is referencing when he
3    states unequivocally that game fixing and point
4    shaving -- pardon me -- that, he says -- well,
5    first of all, he says, "Not one college scandal
6    is a result of legal sports wagering."  I have
7    no idea where he gets that argument, what his
8    basis in fact is.  He offers nothing other than
9    his opinion on it.
10        He then says, "On the contrary, sports
11   wagering has assisted athletic leagues in their
12   enforcement activities at preventing game fixing
13   and point shaving."
14        I don't know that, that he can point to a
15   game that's been avoided.  We certainly are
16   interested in learning information about them.
17   We certainly are interested in communicating
18   about those issues.  But I don't know of a game
19   that's been prevented by a conversation with
20   Mr. Bible's colleagues from being fixed.
21  Q  Okay.  Doctor, let's put aside Mr. Bible's
22   statement for a minute, and just talk about the
23   NCAA's current relationship with authorities,
24   gaming authorities in Nevada.
25  A  Um-huh.

Page 96

1   Q  We've already established that there is a
2    cooperation between the NCAA and these gaming
3    officials when it comes to investigating point
4    shaving or match fixing, alleged, correct?
5         MR. DREYER:  Objection to the form of the
6    question.  I think it mischaracterizes prior
7    testimony.  But you can answer.
8   A  We, as, as I think I said, we certainly try to
9    make the best of what we consider a bad
10   situation.  So we, we will try and garner as
11   much information from the Las Vegas -- well, the
12   Nevada gambling establishment -- as we can to
13   understand the behavior, understand the
14   dynamics, and try and discover anything that's
15   going on related to our games.
16  Q  Okay.  And how, how is that accomplished,
17   Doctor?  Is there, is there a permanent
18   relationship?  Is there a line of communication
19   between --
20  A  There's a line of communication that exists
21   between some of our staff and some of them.
22  Q  Okay.  And do you know who would initiate, if
23   there was a concern that there'd been point
24   shaving on an upcoming match, who would initiate
25   communication between the NCAA and the gaming

Page 97

```
1     authorities in Nevada, or vice versa?
2  A  I think the communications have gone -- but I'm
3     not quite positive of this, so this is my
4     operating knowledge, which could be flawed --
5     that the communications go in both directions.
6  Q  And would you agree with me that to the extent
7     that the Nevada gaming authorities are able to
8     assist the NCAA in this way is because game,
9     gambling is legalized, is legal in Nevada, and
10    therefore they are able to monitor betting
11    activities on sport activities in Nevada?
12       MR. DREYER:  Objection as to foundation.
13    You can answer.
14 A  I, I don't know all of their motivations about
15    their communications and cooperation with us.
16    I'm sure they're complex.  But since they, they
17    exist, they have little, probably little choice
18    but to cooperate with us.
19 Q  Well, my question is -- let me put it to you
20    this way, then, Doctor -- the NCAA doesn't have
21    the same sort of relationship with illegal
22    gaming bookers, do they, does it?
23       MR. DREYER:  Objection.  I think we've
24    covered this.  But you can answer.
25 A  Yeah, obviously not.
```

Page 98

```
1        MR. WEGNER:  Okay.  No further questions.
2        MR. DREYER:  No questions.
3        THE WITNESS:  Good.  Okay.
4        THE VIDEOGRAPHER:  This concludes today's
5     deposition.  We're off the record at 1:03 p.m.
6           AND FURTHER THE DEPONENT SAITH NOT.
```

Page 99

```
1        ACKNOWLEDGMENT OF DEPONENT
2        I, MARK EMMERT, PH.D., do hereby certify
3     that I have read the foregoing transcript of my
4     testimony, and further certify that it is a true
5     and accurate record of my testimony (with the
6     exception of the corrections listed below):
7     Page   Line              Correction
8     ___|____|_____|_____
9     ___|____|_____|_____
...
21           MARK EMMERT, PH.D.
22    SUBSCRIBED AND SWORN TO BEFORE ME
23    THIS _____ DAY OF _____, 20___.
25    (NOTARY PUBLIC)      MY COMMISSION EXPIRES:
```

Page 100

```
1  STATE OF INDIANA      )
2  COUNTY OF MARION      ) SS:
3        I, Tamara J. Brown, CSR, RMR, CRR, a
4  Notary Public in and for the County of Marion,
5  State of Indiana at large, do hereby certify
6  that MARK EMMERT, PH.D., the deponent herein,
7  was by me first duly sworn to tell the truth,
8  the whole truth, and nothing but the truth in
9  the aforementioned matter;
10       That the foregoing deposition was
11 taken on behalf of the Defendants, at the
12 offices of Ice Miller, One American Square,
13 Indianapolis, Marion County, Indiana, on the
14 31st day of October, 2012, commencing at the
15 hour of 10:50 a.m., pursuant to the Federal
16 Rules of Civil Procedure;
17       That said deposition was taken down
18 in stenograph notes and afterwards reduced to
19 typewriting under my direction, and that the
20 typewritten transcript is a true record of the
21 testimony given by the said deponent; and
22 thereafter presented to said deponent for
23 his/her signature;
24       That the parties were represented by
25 their counsel as aforementioned.
```

Page 101

```
 1              I do further certify that I am a
 2    disinterested person in this cause of action;
 3    that I am not a relative or attorney of either
 4    party, or otherwise interested in the event of
 5    this action, and am not in the employ of the
 6    attorneys for either party.
 7              IN WITNESS WHEREOF, I have hereunto
 8    set my hand and affixed my notarial seal this
 9    2nd day of November, 2012.
10
11              _____
12                    N O T A R Y   P U B L I C
13
14    My Commission Expires:
15    November 3, 2017
16    County of Residence:
17    Marion
18
19
20
21
22
23
24
25
```