**Exhibit 3**

Page 1

** HIGHLY CONFIDENTIAL **

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

Civil Action No. 3:12-cv-04947-MAS-LHG
----------------------------------------x
NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,
an unincorporated association; NATIONAL
BASKETBALL ASSOCIATION, a joint venture;
NATIONAL FOOTBALL LEAGUE, an unincorporated
association; NATIONAL HOCKEY LEAGUE, an
unincorporated association; and OFFICE OF
THE COMMISSIONER OF BASEBALL, an
unincorporated association doing business
as MAJOR LEAGUE BASEBALL,

                        Plaintiffs,

    -against-

CHRISTOPHER J. CHRISTIE, Governor of the
State of New Jersey; DAVID L. REBUCK,
Director of the New Jersey Division of
Gaming Enforcement and Assistant Attorney
General of the State of New Jersey; and
FRANK ZANZUCCKI, Executive Director of
the New Jersey Racing Commission,

                        Defendants.
----------------------------------------x
                        200 Park Avenue
                        New York, New York

                        November 5, 2012
                        10:15 a.m.


            30(b)(6) DEPOSITION OF
            NATIONAL FOOTBALL LEAGUE
            and its Representative
            LAWRENCE P. FERAZANI, JR.

---

Page 2

1
2
3
4
5
6
7        30(b)(6) DEPOSITION OF NATIONAL
8    FOOTBALL LEAGUE and its Representative
9    LAWRENCE P. FERAZANI, JR., taken by the
10   Defendants, pursuant to Notice, held at
11   the aforementioned time and place, before
12   Sherri Flagg, a Registered Professional
13   Reporter, Certified LiveNote Reporter,
14   and Notary Public.
15
16
17
18
19
20
21
22
23
24
25

---

Page 3

1
2    A P P E A R A N C E S :
3
     Attorneys on Behalf of Plaintiff(s):
4
     SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
5        Four Times Square
         New York, New York 10036
6    BY:  ANTHONY J. DREYER, ESQ.
         anthony.dreyer@skadden.com
7        JORDAN FEIRMAN, ESQ.
         jordan.feirman@skadden.com
8
9
     Attorneys on Behalf of Defendant(s):
10
     GIBSON DUNN & CRUTCHER
11       1050 Connecticut Avenue, N.W.
         Washington, D.C. 20036-5306
12   BY:  GEOFFREY M. SIGLER, ESQ.
         gsigler@gibsondunn.com
13       JENNIFER A. NELSON, ESQ.
         jnelson@gibsondunn.com
14
     -and-
15
         333 South Grand Avenue
16       Los Angeles, California 90071-3197
     BY:  WILLIAM E. WEGNER, ESQ.
17       wwegner@gibsondunn.com
18
19
20
21
22
23
24
25

---

Page 4

1
2    *   *   *
3    L A W R E N C E   P.   F E R A Z A N I,   J R,
4        first duly sworn/affirmed, was
5        examined and testified as follows:
6    EXAMINATION BY
7    MR. SIGLER:
8        Q.    Good morning, Mr. Ferazani.  My
9    name is Jeff Sigler.  I'm with Gibson Dunn &
10   Crutcher.  I'm defense counsel in this case.
11   You understand that you're here to testify in
12   the case NCAA versus Christie, correct?
13       A.    Yes, I do.
14       Q.    And you are here as a
15   representative of the NFL?
16       A.    Yes.
17       Q.    You understand that the NFL is a
18   Plaintiff in the case?
19       A.    Yes.
20       Q.    What is your position at the NFL,
21   Mr. Ferazani?
22       A.    My title is senior labor litigation
23   counsel.
24       Q.    What are your job responsibilities?
25       A.    I am a member of the legal

Page 5

```
 1       HIGHLY CONFIDENTIAL - L. FERAZANI
 2   department.  Generally I represent the League
 3   and its member clubs and actions under the CBA
 4   and generally against our union having
 5   everything to do with the grievance process,
 6   the conduct and steroid and drug policies.
 7   But I also serve as liaison for outside
 8   litigation.  Part of the duties under the
 9   policies I'm also responsible for are gambling
10   policy.
11       Q.    And you said something about the
12   CBA.  That's the collective bargaining
13   agreement with the NFL Players Association.
14       A.    That's correct, yes.
15       Q.    And as liaison for outside
16   litigation, does that encompass litigation not
17   just for labor-related matters but also other
18   litigation for the NFL?
19       A.    Yes.  For example, the bounty-gate
20   cases, the concussion litigation and this
21   case.
22       Q.    And, Mr. Ferazani, you mentioned
23   that you have responsibility for the NFL's
24   gambling policy.  Is that the policy with
25   respect to player conduct?
```

Page 7

```
 1       HIGHLY CONFIDENTIAL - L. FERAZANI
 2       Q.    How long have you been in your
 3   current role?
 4       A.    Just over five years.  Well, I've
 5   been with the League for just over five years.
 6   I started as a labor relations counsel,
 7   recently promoted.
 8       Q.    So how long have you been in your
 9   current position?
10       A.    Since March of this year.
11       Q.    You've been at the NFL since
12   sometime in 2007?
13       A.    That's correct, roughly October
14   2007.
15       Q.    And when you started at the NFL in
16   October of 2007, were you in a position of
17   labor relations counsel?
18       A.    That's correct.
19       Q.    What were your responsibilities as
20   labor relations counsel?
21       A.    Not much different from my
22   responsibilities as -- my present position.
23   I -- when I came into the League, obviously I
24   started primarily focused on grievance process
25   and litigation involving players under the
```

Page 6

```
 1       HIGHLY CONFIDENTIAL - L. FERAZANI
 2       A.    That's correct.
 3       Q.    Do you have any other
 4   responsibilities that relate to gambling?
 5       A.    Not that I think of, as I sit here
 6   today.  The gambling policy, just to be clear,
 7   also encompasses League employees, ownership
 8   as well.
 9       Q.    Do you have responsibility relating
10   to infractions of the gambling policy?
11       A.    Yes.
12       Q.    So if a player or a League employee
13   or an official violates the policy, that would
14   fall into your area?
15       A.    Yes.  The Commissioner ultimately
16   would issue a discipline and if there's a
17   challenge to the discipline, I would represent
18   the League in a hearing to determine if the
19   discipline was warranted.
20       Q.    Who do you report to?
21       A.    Ultimately Jeff Pash and
22   Commissioner Godell.  Jeff Pash is the general
23   counsel for the National Football League.  In
24   between Mr. Pash and myself, I also report to
25   Adolpho Birch and Dennis Curran.
```

Page 8

```
 1       HIGHLY CONFIDENTIAL - L. FERAZANI
 2   collective bargaining agreement.  I also
 3   shortly thereafter started to represent the
 4   League in its -- in hearings involved or
 5   arising under the conduct policy and the drug
 6   and steroid policies.
 7       Q.    Have your responsibilities included
 8   the gambling policy the entire time you've
 9   been at the NFL?
10       A.    No.  The gambling policy was added
11   with the new position in March of this year.
12       Q.    Okay.  So your responsibilities
13   relating to the gambling policy started in
14   March of this year and it continued through
15   the present?
16       A.    Correct.
17       Q.    Mr. Ferazani, do you have job
18   responsibilities that relate to NFL.com?
19       A.    I do not.
20       Q.    And NFL.com is owned by the NFL,
21   correct?
22       A.    Yes.
23       Q.    Is there a separate legal
24   department for NFL.com?
25       A.    No.  Their legal department
```

Page 9

```
 1          HIGHLY CONFIDENTIAL - L. FERAZANI
 2   generally has two sides:  the game side which
 3   is the old management counsel, which is the
 4   group that I'm a part of; and then the
 5   business side, which was the old traditional
 6   legal department.
 7          Obviously, the legal department
 8   generally has probably around 15 attorneys so
 9   there's a lot of overlap and consultation.
10   But NFL.com and the business ventures would be
11   more in the traditional legal department.
12      Q.    So the business side of the NFL's
13   legal department service is NFL.com?
14      A.    Generally.  NFL.com -- the folks on
15   the business side are specialists, you know,
16   in transactional work, broadcasts, contracts
17   and the like.
18      Q.    Are employees of NFL.com subject to
19   the NFL's employee policies?
20          MR. DREYER:  Objection to the form
21          of the question, assumes facts not in
22          evidence.  You can answer.
23      A.    Yes, generally.
24      Q.    Do your job responsibilities
25   include any responsibilities relating to the
```

Page 11

```
 1          HIGHLY CONFIDENTIAL - L. FERAZANI
 2      A.    No.
 3      Q.    How long were you an Assistant
 4   United States Attorney?
 5      A.    Roughly three-and-a-half years.
 6      Q.    So from 2004 through October 2007?
 7      A.    I think March of 2004 through 2007.
 8      Q.    And before you were an Assistant
 9   United States Attorney, what was your
10   position?
11      A.    I was a special agent of the
12   Federal Bureau of Investigation.
13      Q.    Where were you located?
14      A.    In New York.
15      Q.    How long did you have that
16   position?
17      A.    From August of '99 through the time
18   with the U.S. Attorney's Office.
19      Q.    So as a special agent for the FBI,
20   did you investigate any gambling-related
21   cases?
22      A.    I worked generally on organized
23   crime cases to the extent that those involved
24   gambling but no specific gambling cases, no.
25      Q.    And what was your position before
```

Page 10

```
 1          HIGHLY CONFIDENTIAL - L. FERAZANI
 2   NFL Network?
 3      A.    The NFL Network is a stand-alone
 4   entity.  It's owned by the NFL, housed out in
 5   Los Angeles.  I've had no interaction with the
 6   NFL Network, but they are within the NFL
 7   umbrella.
 8      Q.    Are employees of the NFL Network
 9   subject to the NFL's employee policies?
10      A.    Yes.
11      Q.    Before you joined the NFL in
12   October of 2007, what was your position?
13      A.    I was Assistant United States
14   Attorney in the Eastern District of New York.
15      Q.    How long did you have that
16   position?
17      A.    Roughly three-and-a-half years.
18      Q.    Were you part of a division or
19   group within that office?
20      A.    I was in the criminal division
21   while I was there, I was in general crimes,
22   violent crimes and terrorism, and also the
23   Long Island division.
24      Q.    Did you investigate or prosecute
25   any gambling-related cases?
```

Page 12

```
 1          HIGHLY CONFIDENTIAL - L. FERAZANI
 2   you became an FBI in agent in August of '99?
 3      A.    I was an associate at a law firm in
 4   Boston called Burns & Levinson.
 5      Q.    How long did you have that
 6   position?
 7      A.    It was roughly two years.
 8      Q.    What did you do before that?
 9      A.    I was an Assistant District
10   Attorney in the Bronx.
11      Q.    How long did you have that
12   position?
13      A.    Just under three years.
14      Q.    Did you prosecute or investigate
15   any gambling-related cases?
16      A.    Not in the Bronx, no.
17      Q.    And what did you do before that?
18      A.    I was in law school.
19      Q.    Where did you go to law school?
20      A.    Suffolk University Law School in
21   Boston.
22      Q.    Other than your law degree, do you
23   have any other post-graduate degrees?
24      A.    I do not.
25      Q.    Do you have any special training or
```

Page 13

```
1        HIGHLY CONFIDENTIAL - L. FERAZANI
2   education in gambling?
3        A.    No.
4        Q.    Have you ever conducted research on
5   gambling?
6        A.    No.
7        Q.    Have you ever written any papers or
8   analyses on gambling?
9        A.    No.
10       Q.    Mr. Ferazani, I'm guessing you have
11  been deposed before?
12       A.    Shockingly, no.
13       Q.    Really?
14       A.    I've been very fortunate up until
15  now.
16       Q.    This is your first deposition?
17       A.    The first, yes.  I've testified in
18  criminal cases, but I've never been deposed.
19       Q.    How many times have you testified
20  in court?
21       A.    Twice.
22       Q.    And was that when you were an FBI
23  agent?
24       A.    Yes.
25       Q.    Those were criminal cases?
```

Page 14

```
1        HIGHLY CONFIDENTIAL - L. FERAZANI
2        A.    Yes, they were.
3        Q.    Well, Mr. Ferazani, you understand
4   that you're testifying here today under oath
5   just as if you were testifying in court,
6   correct?
7        A.    Yes, I do.
8        Q.    And I'm sure Mr. Dreyer's explained
9   this to you, but just to be clear, we need to
10  make sure that we are making a clear record
11  here for the court reporter.  So we're going
12  to try to talk as slowly as possible and
13  please make sure you understand the question
14  that I ask before you answer the question.
15  Okay?
16       A.    Yes.
17       Q.    Now, Mr. Ferazani, you understand
18  that you're here today as the NFL's
19  representative to testify on certain topics
20  relevant to this case, correct?
21       A.    Yes.
22       Q.    Have you ever served as -- strike
23  that.
24            (Exhibit 1: 30(b)(6) Notice of
25       Deposition, was marked for
```

Page 15

```
1        HIGHLY CONFIDENTIAL - L. FERAZANI
2        identification.)
3   BY MR. SIGLER (continuing):
4        Q.    Mr. Ferazani, you've been handed a
5   document marked NFL Exhibit 1.  Can you please
6   review this document and tell me whether you
7   recognize it.
8        A.    I do.
9        Q.    You recognize this as the notice
10  summarizing topics on which you're here to
11  testify about today, correct?
12       A.    I do.
13       Q.    And if you could turn with me,
14  please, to pages 4 and 5 of the document, do
15  you see that it lists five topics numbered 1
16  through 5 on pages 4 and 5?
17       A.    I do.
18       Q.    And are you prepared to testify
19  today as the NFL's designee on each of these
20  five topics?
21       A.    I am.
22       Q.    And you understand that this means
23  you must testify about information known or
24  reasonably known to the NFL on these topics,
25  correct?
```

Page 16

```
1        HIGHLY CONFIDENTIAL - L. FERAZANI
2        A.    That's correct.
3        Q.    What did you do to prepare for your
4   deposition here today, Mr. Ferazani?
5        A.    Well, I met with counsel, discussed
6   the topics that were covered by the 30(b)(6)
7   notice, reviewed various documents including
8   our submissions in the case, reviewed our
9   gambling policy generally.
10       Q.    Anything else?
11       A.    Spoke with certain individuals
12  regarding information about the gambling
13  policy.
14       Q.    Who did you speak with?
15       A.    Adolpho Birch.
16       Q.    What is Adolpho Birch's position?
17       A.    He is a senior vice president and I
18  don't know the exact title but he oversees all
19  of the policies -- the drug, steroid.  He was
20  the person who used to be responsible for the
21  gambling policy.
22       Q.    So Adolpho Birch had responsibility
23  for the gambling policy before you took over
24  responsibility for it in March of this year?
25       A.    That's correct.
```

Page 17

HIGHLY CONFIDENTIAL - L. FERAZANI

1
2   Q.    Is Adolpho Birch in the legal
3   department?
4   A.    He is.
5   Q.    So you spoke to Mr. Birch about the
6   gambling policies?
7   A.    Correct.
8   Q.    Did you speak to him about anything
9   else?
10  A.    No.
11  Q.    What did you learn from Mr. Birch?
12      MR. DREYER:  I think we're
13      potentially getting into privileged areas
14      here.  I spoke with respect to facts that were
15      not discussed for purposes of rendering
16      or receiving legal advice, that's
17      permissible.  And I think you know the
18      grounds for privilege but just I want to
19      refresh them.
20         So I just want to instruct the
21      witness not to disclose any attorney-
22      client communication.
23  Q.    Let me ask a question that might
24  cut through this.  When you spoke to
25  Mr. Birch, were you speaking with him in

Page 18

HIGHLY CONFIDENTIAL - L. FERAZANI

1
2   preparation for this deposition or to get
3   legal advice?
4   A.    For this deposition.
5   Q.    What did you speak to Mr. Birch
6   about?
7       MR. DREYER:  Same instruction.  You
8       can answer.
9   A.    Generally just reviewing the
10  timeline by which the gambling policy was
11  brought under one umbrella.  There's one
12  gambling policy that applies for ownership,
13  players, employees and advertising.
14  Q.    And what is that timeline?
15  A.    It was brought under one umbrella
16  I believe in August of this year.
17  Q.    So before August of this year,
18  there were separate policies for players and
19  owners; and as of August of this year, there's
20  one single gambling policy?
21  A.    No.
22      MR. DREYER:  Object to the form of
23      the question.  You can answer.
24  A.    Sorry.  No, the policies from the
25  Constitution and Bylaws were always the same.

Page 19

HIGHLY CONFIDENTIAL - L. FERAZANI

1
2   There was an absolute prohibition.  Where
3   those policies appeared were in different
4   documents, so what we did was in August there
5   was one gambling policy where you found all
6   the information for one-stop shopping or
7   one-stop review, I guess.
8   Q.    Did you speak to Mr. Birch about
9   anything else?
10  A.    No.
11  Q.    Other than Mr. Birch, did you speak
12  to anyone else in preparation for this
13  deposition, other than counsel?
14  A.    I spoke with Doug Palletti.
15  Q.    Thank you.  Who is Mr. Palletti?
16  A.    Doug Palletti is a lawyer on the
17  business side of the legal department.
18  Q.    And did you speak to Mr. Palletti
19  to get legal advice or in preparation for the
20  deposition?
21  A.    In preparation for the deposition.
22  Q.    And what did you learn from
23  Mr. Palletti?
24      MR. DREYER:  Same instruction as to
25      any potential privileged conversations.

Page 20

HIGHLY CONFIDENTIAL - L. FERAZANI

1
2   You can answer.
3   A.    With Mr. Palletti I asked and
4   attempted to glean a timeline by which the
5   sponsorship amendments have been passed
6   regarding advertising with regard to gambling,
7   lotteries, et cetera.
8   Q.    When you said "sponsorship
9   amendments," what did you mean by that?
10  A.    The League, in 2007 I believe,
11  authorized state lotteries sponsorship with
12  certain restrictions, including a lottery's
13  not allowed to have a sports gambling
14  component to it.
15  Q.    So the amendments you referred to
16  were amendments to the NFL's bylaws?
17  A.    They were.
18  Q.    Did you speak to Mr. Palletti about
19  anything else?
20  A.    No.
21  Q.    Did you speak with anyone else in
22  preparation for your deposition today?
23  A.    No, other than counsel.
24  Q.    Did you speak to anyone in the
25  NFL's marketing or research groups in

Page 21

1    HIGHLY CONFIDENTIAL - L. FERAZANI
2    preparation for the deposition today?
3        A.    Not in preparation for the
4    deposition today, no.
5        Q.    Have you spoken to people in the
6    NFL's marketing or research groups at all in
7    connection with this litigation?
8        A.    Yes, I have.
9        Q.    For what purpose did you speak to
10   them?
11       A.    For the document production.
12       Q.    So you spoke to them in connection
13   with gathering documents to produce in the
14   case?
15       A.    That's correct.
16       Q.    Were you responsible, Mr. Ferazani,
17   for gathering documents responsive to our
18   document requests in the case?
19       A.    Yes, I was.
20       Q.    And did you turn documents you
21   received from the marketing and research group
22   over to counsel at Skadden Arps?
23       A.    I did.
24       Q.    Mr. Ferazani, did you speak to
25   Roger Godell in preparation for this

Page 22

1    HIGHLY CONFIDENTIAL - L. FERAZANI
2    deposition today?
3                MR. DREYER:  You can answer yes or
4        no.
5        A.    No.
6        Q.    Have you spoken to Mr. Godell at
7    all in connection with this litigation?
8                MR. DREYER:  You can answer yes or
9        no.
10       A.    Yes.
11       Q.    For what purpose did you speak to
12   Mr. Godell?
13               MR. DREYER:  Again, I think we're
14       getting to areas of privilege here, given
15       Mr. Ferazani's position as in-house
16       counsel to the NFL.  So I would again
17       instruct the witness in answering the
18       question not to disclose the content of
19       any attorney-client communication.
20       A.    Primarily -- well, our conversation
21   was to discuss scheduling this deposition and
22   explaining why he was being deposed.
23       Q.    Other than scheduling this
24   deposition, have you spoken to Mr. Godell at
25   all about this litigation?

Page 23

1    HIGHLY CONFIDENTIAL - L. FERAZANI
2        A.    I have not.
3        Q.    Mr. Ferazani, if you could turn to
4    topic 2 on the list of topics, do you see that
5    topic 2 concerns the impact or potential
6    impact of sports gambling on you and your
7    member teams?
8        A.    Yes.
9        Q.    In connection with this topic, did
10   you do anything to assure yourself that you'd
11   reviewed any studies, analyses or surveys in
12   the NFL's possession on this topic?
13       A.    I reviewed the documents, several
14   of the documents that we produced.
15       Q.    You reviewed the studies that the
16   NFL produced in this litigation about fantasy
17   football?
18       A.    Yes.
19       Q.    Does the NFL have any studies in
20   its possession regarding the impact or
21   potential impact of sports gambling on the
22   NFL?
23       A.    The NFL has studied the issue.  I'm
24   not sure what you mean by studies
25   specifically.

Page 24

1    HIGHLY CONFIDENTIAL - L. FERAZANI
2        Q.    How has the NFL studied the issue?
3        A.    The NFL's primary purpose since its
4    foundation was to develop our fan loyalties
5    and increase our brand favorability rating, to
6    increase ticket sales, attendance, revenues
7    and viewership ratings.  So from the inception
8    of the League to the present, everything we do
9    is designed with those principles in mind and
10   with that goal in mind, to protect the shield.
11       Q.    When you say "protect the shield,"
12   you're referring to the NFL logo?
13       A.    Right.  That's something that's
14   drilled into you early on as one of your most
15   important duties as an employee for the
16   National Football League.
17       Q.    Has the NFL conducted any consumer
18   surveys or analyses regarding the impact of
19   sports gambling on the NFL?
20       A.    The NFL has not conducted any such
21   studies that I'm aware of.
22       Q.    Has the NFL conducted any focus
23   groups regarding the impact of sports gambling
24   on the NFL?
25       A.    No, not that I'm aware of.

Page 25

```
1         HIGHLY CONFIDENTIAL - L. FERAZANI
2       Q.    Has the NFL conducted any studies
3   or surveys regarding the impact or potential
4   impact of legalizing sports gambling in New
5   Jersey on the NFL?
6       A.    Well, again, going back to the '92
7   law, my understanding was there were studies
8   presented to Congress, there was testimony
9   submitted to Congress including testimony from
10  the Commissioner of the NFL at the time,
11  Commissioner Tagliabue, regarding the
12  detrimental impact that sports gambling would
13  have generally on the NFL and its interests.
14            That was corroborated by law
15  enforcement and I think other scientific
16  studies that were presented to Congress.
17  Those studies and the principles behind the
18  analysis and conclusions of the NFL would
19  apply to New Jersey or any other state, I
20  would imagine.
21      Q.    Does the NFL have any studies
22  regarding the impact or potential impact of
23  legalizing sports gambling in New Jersey on
24  the NFL?
25            MR. DREYER:  Objection to the form
```

Page 26

```
1         HIGHLY CONFIDENTIAL - L. FERAZANI
2   of the question.  You can answer.
3       A.    Again, I believe that the studies
4   and the analysis conducted in '92 would apply
5   to New Jersey.  I don't see anything that's
6   unique or unusual about New Jersey where these
7   harms would not result from New Jersey passing
8   a law allowing -- authorizing sports gambling.
9       Q.    Does the NFL have any of the
10  studies from 1992 that you're referring to?
11      A.    We have the legislative history
12  from its passage and we have the testimony
13  submitted by Commissioner Tagliabue at the
14  time.  We have testimony from the New Jersey
15  Commissioner of Gambling, and we have the
16  testimony from the FBI supervisory special
17  agent who testified in support of PASPA's
18  passage.
19            MR. DREYER:  And it's P-A-S-P-A.
20      Q.    And, Mr. Ferazani, you've referred
21  to various congressional testimony that the
22  NFL has, correct?
23      A.    Yes.
24      Q.    Does the NFL have any of the
25  studies or surveys that may be been
```

Page 27

```
1         HIGHLY CONFIDENTIAL - L. FERAZANI
2   discussed in that congressional testimony?
3       A.    We have -- and I've reviewed
4   Commissioner Tagliabue's testimony and I've
5   reviewed the legislative history of the law.
6   I have not reviewed the specific other
7   documents that were referenced in the
8   legislative history of the law, but they're
9   summarized in the legislative history.
10      Q.    So the NFL has the congressional
11  testimony that was given in 1991 and '92 but
12  not the underlying studies that were done,
13  correct?
14      A.    I have not seen them, correct.
15      Q.    Mr. Ferazani, a number of the
16  topics in this deposition notice, as you can
17  see, concern sports gambling.  Correct?
18      A.    That appears to be, yes.
19      Q.    How do you define sports gambling?
20      A.    Gambling on sports?
21            MR. DREYER:  I'm sorry, the
22  question is vague.  Are you referring to
23  Mr. Ferazani or the NFL?  I'm not trying
24  to coach.  I just want to make sure we
25  have a clear record.  When you say "you,"
```

Page 28

```
1         HIGHLY CONFIDENTIAL - L. FERAZANI
2   I think it's a little vague.  You can
3   answer.
4       A.    The NFL would view this as gambling
5   on the outcome of our games.
6       Q.    So that's how the NFL would define
7   sports gambling?
8       A.    As it pertains to the NFL, yes.
9       Q.    And how do you define gambling?
10  Strike that.
11            How does the NFL define gambling?
12      A.    Placing a wager on the outcome of a
13  specific sporting event in the hopes of
14  receiving more money in return than what you
15  wagered.
16      Q.    And you said from the NFL's
17  perspective, sports gambling would be gambling
18  on the outcome of games, correct?
19            MR. DREYER:  I think you
20  mischaracterized the testimony.  But you
21  can answer.
22      A.    Repeat the question, sorry.
23      Q.    Strike that.
24            Mr. Ferazani, you said that the NFL
25  views sports gambling as gambling on the
```

Page 29

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2  outcome of the NFL's games, correct?
 3        A.    As a broad overview of that
 4  definition.  I'm sure it certainly encompasses
 5  other subsets of the game, but that is a broad
 6  definition of what sports gambling is to us.
 7        Q.    Would sports gambling include
 8  gambling on a particular player's statistics
 9  in an individual game?
10        MR. DREYER:  Objection, incomplete
11  hypothetical.  You can answer.
12        A.    I'm not sure how that would appear.
13  Gambling on player's statistics?  I'm lost as
14  to -- if you could refine that a bit.
15        Q.    If I were to bet you $20 that Tom
16  Brady will throw three touchdowns, is that a
17  sports gamble?
18        A.    And you would win more than $20 if
19  you threw three or more and I would have to
20  pay you?
21        Q.    If I were to bet you $20 -- so if
22  he throws 20 touchdowns -- or if he throws
23  three touchdowns, I get the $20; if he doesn't
24  throw three touchdowns, you get the $20.  Is
25  that a sports gamble?
```

Page 30

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2        A.    I believe that would fit that
 3  definition, sure.
 4        Q.    And would gambling on a player's
 5  statistics over the course of an entire season
 6  constitute sports gambling?
 7        MR. DREYER:  Same objection.  You
 8  can answer.
 9        A.    Meaning if you bet me that
10  Mr. Brady completed 100 passes in a season,
11  you would get $100 and, if not, you'd pay me a
12  hundred dollars?
13        Q.    Correct.
14        A.    A financial transaction based upon
15  an athletic contest or an individual
16  achievement, I think that would satisfy the
17  definition.
18        Q.    So betting on an individual
19  player's statistics throughout the course of a
20  season would constitute sports gambling,
21  correct?
22        A.    Again, I'm more comfortable with a
23  more specific example.  Betting on statistics
24  generally I'm kind of having a difficult time
25  wrapping my head around.  But if you were
```

Page 31

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2  making a wager like you first described, I
 3  think that would be a sports gamble or a
 4  sports bet.
 5        Q.    And, Mr. Ferazani, is sports
 6  gambling the same thing as sports wagering
 7  from the NFL's perspective?
 8        MR. DREYER:  Objection to the form
 9  of the question.  You can answer.
10        A.    As I sit here, I can't think of a
11  distinction.
12        Q.    I can't either.  So for our
13  purposes today, if I say sports wagering or
14  sports gambling, I mean the same thing, okay?
15        A.    Fair enough.
16        Q.    Mr. Ferazani, some sports gambling
17  is legal and some is illegal, correct?
18        MR. DREYER:  Objection to the form
19  of the question.  You can answer.
20        A.    There's -- in Nevada, there's
21  sports gambling that is legal by operation of
22  PASPA.  There's certain states that have
23  limited and specific types of wagers on
24  athletic contests that is legal.  If you want
25  to expand the definition of sports to horse
```

Page 32

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2  racing, Jai Alai and dog racing as PASPA does,
 3  then, yes, there are some that is legal.  The
 4  vast majority of sports wagering is illegal.
 5        Q.    So some sports gambling is legal
 6  but a vast majority is illegal, correct?
 7        MR. DREYER:  Objection, asked and
 8  answered.  You can answer.
 9        A.    There are different restrictions in
10  different ways based on sport, geography.  But
11  as I testified, yes, some sports and in some
12  locations it's legal and some -- the vast
13  majority of places, it's not legal.
14        Q.    Does the NFL know how much illegal
15  sports gambling occurs in the United States?
16        A.    I couldn't even guess.
17        Q.    Does the NFL have any studies,
18  analyses or estimates of how much illegal
19  sports gambling occurs in the United States?
20        A.    I don't know how anyone would have
21  that.  But we don't, no.
22        Q.    Mr. Ferazani, are you familiar with
23  the National Gambling Impact Study Commission
24  Report?
25        A.    Is it the one from the late '90s?
```

Page 33

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2      Q.    Yes.
 3      A.    I believe we produced something
 4   with that definition.  If you want me to look
 5   at it, I'd be happy to.
 6           (Exhibit 2: Chapter 2, Gaming in
 7        U.S., was marked for identification.)
 8        MR. DREYER:  If you're going to use
 9   this document, I'm going to make an
10   objection.
11        MR. SIGLER:  Let me just make a
12   representation before you speak and you
13   can make your objection.  This is an
14   excerpt from the report which is a very
15   lengthy document.  As you can see, at the
16   top left-hand corner this is chapter 2 of
17   the longer document.  It also does not
18   have the Bates stamp at the bottom I see.
19   But I will represent to you that this is
20   a copy of chapter 2 from the Gambling
21   Impact Study Commission Report.
22        MR. DREYER:  Counsel, I appreciate
23   the representation.  But in order to
24   preserve the record, I'll object to the
25   use of the document in that it's not been
```

Page 34

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2   produced by either side.  We can proceed.
 3   You have my objection.
 4   BY MR. SIGLER (continuing):
 5      Q.    Mr. Ferazani, looking at this
 6   document, is this a portion of the Gambling
 7   Impact Study Commission Report that you are
 8   familiar with from the NFL's files?
 9      A.    I think I am familiar with the
10   subset of this.  I don't recall the Figure 21
11   and 22.
12        MR. DREYER:  And so the record is
13        clear, the witness is referring to the
14        figures that appear on page 2-2 on NFL
15        Exhibit 2.
16      Q.    If you could turn with me, please,
17   to the page number that has 2-14 in the bottom
18   right corner, please.
19      A.    Right.
20      Q.    Are you familiar with this page of
21   the commission report?
22      A.    Let me just read it because I know
23   that some of the other pages are new to me.
24   But let me read this.
25           (Examining document.)
```

Page 35

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2           I am familiar with that page, yes.
 3      Q.    When did you see this page of the
 4   Study Commission Report?
 5      A.    I believe I first reviewed this
 6   when we were in litigation with Delaware for
 7   their sports lottery, which was a few years
 8   ago.
 9      Q.    Does the NFL have a copy of this
10   Study Commission Report?
11      A.    What I saw, I think, may well be
12   pages -- as I said, a subset, maybe even --
13   certainly page 2-14.
14      Q.    So you believe that the NFL has at
15   least page 2-14 of the commission report in
16   its files, correct?
17        MR. DREYER:  Objection,
18        mischaracterizes the witness' testimony.
19        You can answer.
20      A.    As I said, I believe I've seen this
21   page before.
22      Q.    And, Mr. Ferazani, looking at the
23   left-hand side of the page, the paragraph
24   toward the bottom that starts with "According
25   to Russell Guindon"; do you see that
```

Page 36

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2   paragraph?
 3      A.    I do.
 4      Q.    And do you see the estimate by
 5   Nevada's Gaming Control Board of sports
 6   wagering, $2.3 billion, in Nevada's legalized
 7   sportsbooks in fiscal 1998?
 8      A.    I see that, yes.
 9      Q.    Does the NFL have a view on whether
10   that estimate is accurate?
11        MR. DREYER:  Objection, lack of
12        foundation.  You can answer.
13      A.    I have no way to confirm or refute
14   Mr. Guindon's claim or this report of
15   Mr. Guindon, G-U-I-N-D-O-N.
16      Q.    Does the NFL have any different
17   estimates regarding the amount of sports
18   wagering in Nevada in fiscal 1998?
19      A.    None.
20      Q.    Does the NFL have any estimates at
21   all of the amount of sports wagering in
22   Nevada's legalized sportsbooks for any year?
23      A.    None.
24      Q.    If you look on the right side of
25   the page at the top, do you see the estimate
```

Page 37

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2   of 80 billion to 380 billion annually?
 3        A.    I see that estimate.
 4        Q.    And do you see that that refers to
 5   an estimate for the scope of illegal sports
 6   betting in the United States?
 7        A.    That's what that says, yes.
 8        Q.    Is the NFL familiar with that
 9   estimate?
10        MR. DREYER:  Objection to the form
11   of the question.  You can answer.
12        A.    Are we familiar in that I've seen
13   this page before?  Yes.  I can't tell you if
14   it's accurate or inaccurate.  It's a pretty
15   massive range.
16        Q.    Does the NFL have any different
17   estimates regarding the scope of illegal
18   sports betting in the United States?
19        MR. DREYER:  Objection as to
20   foundation.  You can answer.
21        A.    And I don't know where this
22   estimate came from, but the NFL has no other
23   estimate nor would I know how we would make
24   such an estimate.
25        Q.    Has the NFL ever cited or relied on
```

Page 38

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2   this Study Commission Report, to your
 3   knowledge?
 4        A.    I believe it's referenced in -- I'd
 5   like to look at either Commissioner Tagliabue
 6   or Commissioner Godell's statements.  I'm not
 7   sure.
 8        Q.    Mr. Ferazani, is the NFL aware that
 9   there is a multibillion dollar legal sports
10   gambling market in Las Vegas?
11        MR. DREYER:  Objection as to
12   foundation.  You can answer.
13        A.    I'm sorry, is the NFL aware that
14   there is sports gambling in Las Vegas?  We're
15   absolutely aware that there's sports gambling
16   in Las Vegas in their casinos, as authorized
17   under PASPA.  The dollar value of that we
18   don't monitor and we don't have studies, we
19   don't receive reports from the casinos.
20        Q.    So the NFL does not monitor
21   publicly available information regarding the
22   scope of the legal sports gambling market in
23   Nevada?
24        MR. DREYER:  Objection as to
25   foundation.  You can answer.
```

Page 39

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2        A.    As far as the dollar figures
 3   wagered, as I sit here today, I don't know.
 4        Q.    And apart from the dollar figures
 5   wagered, does the NFL monitor the scope of the
 6   legal sports gambling market in Nevada at all?
 7        A.    Again, by "scope" -- we understand
 8   it exists, we understand that there's -- what
 9   wagers are permitted.  I would be guessing if
10   I told you what the numbers are or how much,
11   you know, they generate every year.
12        Q.    And the NFL is aware that there is
13   a substantial illegal sports gambling market
14   as well, correct?
15        MR. DREYER:  Objection to the form
16   of the question.  You can answer.
17        A.    Are we aware that there's illegal
18   sports gambling that goes on?  Yes.  The scope
19   of that market, as I've said, by its very
20   nature, I think it would be impossible to
21   hazard a guess as to how much is wagered in
22   that way.
23        Q.    And the NFL is aware that, as part
24   of that illegal sports gambling market,
25   persons bet on NFL games, correct?
```

Page 40

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2        MR. DREYER:  Objection as to
 3   foundation.  You can answer.
 4        A.    As part of the illegal sports
 5   gambling -- are people making illegal bets on
 6   NFL games in states in which that is illegal
 7   to do so?  We're aware of that, yes.
 8        (Reporter interruption.)
 9        Q.    Mr. Ferazani, is the NFL aware
10   that, as part of the illegal sports gambling
11   market in the United States, people bet
12   illegally on NFL games?
13        MR. DREYER:  Same objection as to
14   foundation.  You can answer.
15        A.    Obviously the NFL does not have
16   first-hand information about people making
17   illegal bets on NFL games.  However, given the
18   media coverage of arrests for such activity,
19   we are aware generally that people will make
20   illegal wagers on NFL games.
21        Q.    Mr. Ferazani, if you could turn
22   with me, please, back to Exhibit 1 which is
23   the deposition notice.  Do you see that the
24   first topic listed on page 4 is your alleged
25   standing to seek relief in this action?
```

Page 41

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2     A.     Yes.
 3     Q.     Do you know what "standing" is?
 4        MR. DREYER:  Objection to the
 5     extent it calls for a legal conclusion.
 6     He can answer as to his understanding.
 7     A.     As to my understanding, yes, I
 8  believe I have a grasp of this but something I
 9  did not review until this case.
10     Q.     Maybe not since law school, right?
11     A.     Maybe not since law school.  That's
12  a fair statement.
13     Q.     What is your understanding of what
14  standing is?
15     A.     As it relates to this case, there's
16  probably two components:  First is that PASPA,
17  in the text of the law, has provided the
18  sports leagues -- granted them authorization
19  to seek judicial intervention in instances in
20  which states seek to violate the law.
21        Equally or actually more
22  importantly, there's Article III standing
23  which is the party needs to have a claim or
24  controversy for which they can present to the
25  courts independent of or in conjunction with
```

Page 42

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2  the law.
 3     Q.     And, Mr. Ferazani, do you
 4  understand that as part of Article III
 5  standing, the NFL needs to demonstrate that it
 6  has been harmed or would be harmed by New
 7  Jersey's sports gambling law?
 8        MR. DREYER:  Same objection.
 9     Ultimately the Court will tell us what we
10     need or don't need.  But Mr. Ferazani can
11     answer as to his understanding.
12     A.     And, you know, to be entirely
13  candid--which I have been from the beginning--
14  the interplay between the Article III standing
15  and the statutorily granted standing is
16  something that is a little bit unclear to me.
17  But I understand generally that a scintilla of
18  harm must be established or should be
19  established or what we're seeking to establish
20  for purposes of this case.  But whether or not
21  that's required or not, I'm going to defer to
22  the much better educated gentleman to my left
23  here.
24     Q.     And so to be clear, Mr. Ferazani,
25  you understand that the NFL is alleging that
```

Page 43

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2  it would be harmed by New Jersey's
 3  legalization of sports gambling, correct?
 4     A.     That is correct, yes.
 5     Q.     And one of the topics that you're
 6  prepared to testify today relates to that
 7  alleged harm, correct?
 8     A.     Yes.
 9     Q.     Now, what did you do to
10  specifically prepare for this topic relating
11  to standing, topic number 1?
12     A.     I can't say that I can distinguish
13  topic by topic what I did to prepare for this
14  deposition.  As I said, I generally reviewed
15  the documents that we produced and met with
16  counsel, I spoke with the folks that I
17  indicated, I was involved in the Delaware
18  litigation, and I've been involved in this
19  case from the beginning so...
20     Q.     Are there any documents that the
21  NFL is relying on to support its standing in
22  this case?
23        MR. DREYER:  Objection as to legal
24     strategy in the case.  The witness is
25     here to testify as to facts, not legal
```

Page 44

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2     strategy.  So you can answer as best as
 3     you're able to without disclosing any
 4     attorney-client privilege.
 5     A.     I don't know where to begin on that
 6  one.  I know that we produced documents to
 7  counsel.  I know that they have been working
 8  diligently on filing papers against your
 9  papers and what they're citing to.  I'm not
10  sure what documents are more important or less
11  important.
12        (Exhibit 3:  Complaint for
13     Declaratory & Injunctive Relief, was
14     marked for identification.)
15  BY MR. SIGLER (continuing):
16     Q.     Mr. Ferazani, you've been handed a
17  copy of the document marked Exhibit 3.  Please
18  feel free to review the entire document.  I
19  will tell you in advance I will have a couple
20  of questions that relate specifically to
21  paragraphs 5 and 6 on page 3.
22     A.     Okay.
23     Q.     But please feel free to review the
24  entire document.
25     A.     I'm familiar with this document.
```

Page 45

```
1          HIGHLY CONFIDENTIAL - L. FERAZANI
2     Q.    What is this document?
3     A.    This is the Complaint that we filed
4  against Governor Christie, Mr. Rebuck and
5  Mr. Zanzuccki, Z-A-N-Z-U-C-C-K-I, seeking to
6  stop New Jersey's sports gambling law.
7     Q.    Did you review this Complaint
8  before it was filed?
9     A.    I did.
10    Q.    Did you help prepare this
11 Complaint?
12         MR. DREYER:  You can answer yes or
13    no.
14    A.    Yes, I guess.
15    Q.    How did you help prepare it?
16         MR. DREYER:  Counsel, you're
17    getting awfully close to privilege here.
18    Can you give me a proffer as to where
19    you're going with this?
20         MR. SIGLER:  I'm just trying to
21    understand his familiarity with the
22    document.
23         MR. DREYER:  Just give me a second.
24    In answering --
25         MR. SIGLER:  Let me ask a different
```

Page 46

```
1          HIGHLY CONFIDENTIAL - L. FERAZANI
2     question that may avoid the concern.
3  BY MR. SIGLER (continuing):
4     Q.    Mr. Ferazani, did you help write
5  any part of this document, the Complaint?
6     A.    Not in any true sense, other than
7  everyone reviewed this as it went through.
8  But it was drafted by our outside counsel.
9     Q.    Okay.  But you approved this
10 Complaint before it was filed, correct?
11    A.    Yes.
12    Q.    Okay.  Let's turn to paragraphs 5
13 and 6 on page 3.  Are you familiar with these
14 paragraphs?
15    A.    Yes, I am.
16    Q.    Do these paragraphs accurately
17 summarize the harm that the NFL alleges in
18 this case would result from legalizing sports
19 gambling?
20         MR. DREYER:  Objection to the form
21    of the question.  You can answer.
22    A.    The assertions in paragraphs 5 and
23 6 are accurate, yes.
24    Q.    Do paragraphs 5 and 6 in the
25 Complaint summarize all of the harms that the
```

Page 47

```
1          HIGHLY CONFIDENTIAL - L. FERAZANI
2  NFL alleges would result from New Jersey's
3  legalization of sports gambling in this case?
4         MR. DREYER:  Objection to the form
5     of the question.  You can answer.
6     A.    (Examining document.)
7         It essentially summarized the
8  themes.  They can be expressed in several
9  ways, but the threat to the integrity of the
10 game, the threat to our fan's perception of
11 our game as reflected in those paragraphs are
12 at the core of the issue.
13    Q.    So at a high level at least, the
14 two harms that the NFL is alleging in this
15 case are to the integrity of the NFL's game
16 and to its fans' perception; is that right?
17         MR. DREYER:  Objection to the form
18    of the question.  Counsel we're playing
19    games here.  There's an entire
20    declaration from the NFL and you know it,
21    so I think this entire line of
22    questioning is imperfect, but you can
23    answer.
24    A.    As I said, the threat to the
25 integrity of the game, the core threat -- one
```

Page 48

```
1          HIGHLY CONFIDENTIAL - L. FERAZANI
2  of the core threats, which is the increase in
3  gambling that would result from New Jersey's
4  attempt to violate the federal law, would
5  result in threats to the actual integrity of
6  the game by way of increasing the chances of
7  match-fixing, corruption of officials and
8  players.
9         It would equally, importantly,
10 affect the very way our sport is perceived by
11 its fans, changing the sport -- the viewership
12 from watching the athletic contest for the
13 challenges of teams pitted against each other,
14 strategy, to whether or not they were going to
15 make money or lose money on a transaction; and
16 a threat to the perception of how our youth
17 view our sports and is sports something that
18 is made for a way to make money or is it
19 something that you can watch incredible
20 athletes perform at a level that defies
21 imagination.
22         Generally I think those concepts
23 are contained within paragraphs 5 and 6.  I've
24 seen it expressed in different ways.  I've
25 seen it expressed far more eloquently in
```

Page 49

HIGHLY CONFIDENTIAL - L. FERAZANI

1    HIGHLY CONFIDENTIAL - L. FERAZANI
2  Commissioner Tagliabue's testimony before
3  Congress for PASPA, I've seen it expressed in
4  Commissioner Godell's declaration.  But that
5  theme is, as captured -- as is captured in
6  paragraphs 5 and 6, is the essence of this
7  issue.
8    Q.    Is the NFL relying on Mr. Godell's
9  declaration in support of its standing in this
10  case?
11    MR. DREYER:  Counsel, again, we're
12  getting into questions of legal strategy.
13  So the witness can answer as to his
14  understanding, but we've gone fair afield
15  with facts which is what we're here for.
16    A.    I'm not sure if that was submitted
17  for the preliminary injunction, which is no
18  longer necessary, if it was submitted with
19  respect to the motion for summary judgment or
20  the motion to dismiss.  Frankly I am not sure,
21  you know, where that has been cited.
22    Q.    Mr. Ferazani, one of the alleged
23  harms that you mentioned concerned the
24  integrity of the game, correct?
25    A.    The integrity -- actual integrity

Page 50

1    HIGHLY CONFIDENTIAL - L. FERAZANI
2  of the game as well as the fan's perception of
3  the integrity of the game.
4    Q.    And we'll get to the fans'
5  perception in a minute.  But first I'd like to
6  talk about the harm to the integrity of the
7  game, okay?
8    A.    Sure, thank you.
9    Q.    Can you describe the harm to the
10  integrity of the game that would result, in
11  the NFL's view, from New Jersey's legalization
12  of sports gambling?
13    A.    Sure.  By virtue of -- if New
14  Jersey is permitted to violate the federal law
15  and condone State-sponsored gambling, it would
16  not simply be a green light to State-sponsored
17  gambling but economically -- the economic
18  reality is that you would have advertisement
19  for the casinos, possibly by the State,
20  seeking to increase the prevalence of gambling
21  across the country -- across the State and
22  generally.
23    When you've increased the amount of
24  money that's being wagered and the fans'
25  perception of that and the money that's

Page 51

1    HIGHLY CONFIDENTIAL - L. FERAZANI
2  actually -- I've seen a study, or I don't know
3  if it's an assertion from New Jersey, that you
4  were hoping to generate $10 billion worth of
5  gambling annually.  That's a giant amount
6  of -- or significant amount of money changing
7  hands based upon the outcome of our games.
8    As you increase the amount of money
9  that's dependent upon the outcome of the
10  games, by necessity you increase the chance or
11  the lure for organized crime or other
12  undesirable elements to try to fix our
13  matches, to try to offer cash to either
14  players or officials or others.  That could
15  influence -- or give a better gambler a
16  leverage or an advantage in making a bet which
17  would threaten the very integrity of our
18  games.
19    Q.    Does the NFL allege that New
20  Jersey's legalization of sports gambling would
21  result in an increase in match-fixing
22  activity?
23    A.    It would directly increase the
24  threat of match-fixing activity because it
25  would directly increase the amount of gambling

Page 52

1    HIGHLY CONFIDENTIAL - L. FERAZANI
2  that's occurring on our games.  And, again,
3  not to -- you cannot overemphasize this point:
4  The essence of what we sell our fans is honest
5  competition.  One cannot even begin to
6  estimate the impact that one match-fixing
7  scandal could have on our income, our fan
8  loyalty, and on the success of the National
9  Football League.
10    Q.    Mr. Ferazani, the NFL is alleging
11  that New Jersey's legalization of sports
12  gambling would directly increase the amount of
13  gambling on the NFL's games; is that correct?
14    A.    That's correct.
15    Q.    What's the basis for that
16  allegation?
17    MR. DREYER:  Objection, asked and
18  answered.  You can answer.
19    A.    As I indicated, by virtue of New
20  Jersey's own estimation, they are expecting
21  $10 billion a year in wagering on sports if
22  they're permitted to violate the federal law.
23  That would result from the -- not only the
24  State authorization but from the advertising
25  that would result from the State and casinos

Page 53

```
1         HIGHLY CONFIDENTIAL - L. FERAZANI
2    telling members of the public that sports
3    gambling is okay -- it's not only okay but
4    come on in and do it.  It would change that
5    from forbidden activity to permitted activity.
6              Without the prohibition -- without
7    sports gambling being illegal, there would be
8    nothing preventing kids in college from coming
9    in and placing a wager on a sport, which to
10   date has not been permitted.  So it's based
11   largely on commonsense and an understanding of
12   marketing and advertising, what the intent is,
13   and from New Jersey's own statements that they
14   intend to generate $10 billion annually from
15   this violation of federal law.
16       Q.    Where are you getting that $10
17   billion figure?
18       A.    I saw that, I believe, from either
19   an article or a statement or -- an article
20   referencing New Jersey's administrative
21   regulation passage, I believe.  I think it was
22   $1.3 billion expected to the state and 10
23   billion to the -- from a general handle.  It's
24   going from my recollection when this was the
25   history of the case as we were proceeding.
```

Page 54

```
1         HIGHLY CONFIDENTIAL - L. FERAZANI
2        Q.    So you're referring to a news
3    article?
4        A.    Quoting a New Jersey official or
5    something that New Jersey filed with the law.
6        Q.    Is the NFL relying on the estimate
7    of $10 billion in this case?
8            MR. DREYER:  Same objection as to
9        legal strategy.  You can answer as to
10       your understanding.
11       A.    $10 billion?  We're relying upon an
12   increase in the amount of gambling that would
13   occur in our game.  Whether or not New
14   Jersey's estimate is right or whether my
15   recollection about New Jersey's estimate is
16   right, we are relying upon a conclusion that
17   New Jersey's violation of the federal law
18   would increase the amount of gambling on our
19   game.
20       Q.    Does the NFL know how much sports
21   gambling on NFL's sporting events occurs in
22   the United States?
23       A.    Could you rephrase that?
24       Q.    Does the NFL know how much sports
25   gambling on the NFL's sporting events occurs
```

Page 55

```
1         HIGHLY CONFIDENTIAL - L. FERAZANI
2    in the United States?
3            MR. DREYER:  Objection as to
4        foundation.  You can answer.
5        A.    No.
6        Q.    Does the NFL have any studies,
7    analyses or estimates regarding how much
8    sports gambling on NFL sporting events occurs
9    in the United States?
10       A.    Not that I'm aware of, no.
11       Q.    Does the NFL have any information
12   about the number of bets, number of people,
13   number of dollars involved in gambling on NFL
14   sporting events in the United States?
15           MR. DREYER:  Objection as to form
16       and lack of foundation.  You can answer.
17       A.    Not that I'm aware.
18       Q.    Does the NFL have any studies,
19   analyses or other information about the amount
20   of sports gambling on the NFL's Super Bowl?
21           MR. DREYER:  Objection as to
22       foundation.  You can answer.
23       A.    Not that I'm aware.
24       Q.    Does the NFL know how much sports
25   gambling on NFL sporting events occurs in Las
```

Page 56

```
1         HIGHLY CONFIDENTIAL - L. FERAZANI
2    Vegas?
3        A.    Again, we're not in the gambling
4    business.  We don't have any such studies that
5    we have -- we have not commissioned any such
6    study and I'm not aware of any such study in
7    our possession.  I'm sure that the media has
8    reported on it but, you know, that's other
9    studies from other places.
10       Q.    Does the NFL have any studies,
11   analyses or other information regarding the
12   amount of sports gambling in New Jersey on NFL
13   sporting events?
14       A.    You mean illegal sports gambling?
15       Q.    Any sports gambling in New Jersey.
16       A.    I'm sorry.  Again, the NFL has not
17   commissioned any such studies.  We do not have
18   any studies that we've conducted in our
19   possession.
20       Q.    To the extent there is any illegal
21   sports gambling on NFL sporting events in New
22   Jersey, would you agree that legalizing sports
23   gambling might cause some of the illegal
24   sports gamblers to turn to legal sportsbooks?
25           MR. DREYER:  Objection as to
```

HIGHLY CONFIDENTIAL - L. FERAZANI
foundation and calls for speculation.
You can answer.
A. Again, without being able to tell you if there is -- or the amount of illegal sports gambling going on in New Jersey, the studies or the testimony from law enforcement when PASPA was passed in 1992, from FBI supervisory special agents and from New Jersey's Director of Gaming Enforcement, as well as from my own experience generally as an FBI agent, the -- there is no way for the State to compete with organized crime or the illegal enterprise in this. You are going to have the State condoning gambling and taking away the stigma associated with sports gambling. You're going to have the State and its casinos conducting advertising to entice more people to gamble. You're going to have kids who would not do something that's illegal now engaged in the activity because the State says it's okay.
But the State can't compete with organized crime for both the fact that when you win in the state casinos, your winnings

HIGHLY CONFIDENTIAL - L. FERAZANI
will be taxed. Illegal gambling I'm pretty sure does not tax their winnings.
Illegal gambling and bookies are able to offer perhaps better odds than the State's able to offer. Bookies and other unsavory characters can offer -- extend credit to those who may not be able to qualify for credit with a casino. And perhaps most importantly, the very ease of being able to place a bet in an illegal location would be something that the casinos and the horse-racing tracks in New Jersey would not be able to match.
So you would have the State increasing the amount of gambling generally, taking away the stigma and then the population going to find -- a certain percentage of the population going to find where it is most convenient to do so.
So there's absolutely nothing that I've seen from the testimony in '92 or subsequently that would indicate that the State would -- legalizing gambling would somehow reduce the amount of illegal gambling

HIGHLY CONFIDENTIAL - L. FERAZANI
going on and, in fact, I think the commonsense dictates that it would increase the amount of illegal gambling on.
Q. The NFL does not know whether legalizing sports gambling in New Jersey would reduce the amount of illegal sports gambling in New Jersey, correct?
A. I think by relying upon the testimony from law enforcement--and the only testimony that was submitted in 1992--as well as commonsense, I think that our belief is that it, in fact, will not improve that situation and, in fact, it will increase the amount of illegal gambling going on in New Jersey.
Q. The NFL believes that but doesn't know it, correct?
A. I don't understand the distinction between belief -- do I know that it's -- do I believe that the sun is going to come up tomorrow? Yes. Do we know it? No. I think that given -- relying upon the testimony from those that are in a better place than us, from law enforcement and from New Jersey's own

HIGHLY CONFIDENTIAL - L. FERAZANI
Director of Gambling Enforcement in 1992, I'm comfortable in -- that is our understanding. Could we be wrong? Sure. But that is our understanding and I think it's a well-founded belief.
Q. The NFL does not have any studies, analyses or surveys to support that belief, correct?
MR. DREYER: Objection to the form of the question.
A. The NFL has been studying this issue from its inception. So if you're talking about a piece of paper or a -- you know, some document based upon -- I'm not sure what you're looking for. If you're looking for a blind survey of New Jersey voters who aren't informed about the issue, no.
But based upon the experience of the National Football League, based upon the information we've obtained from law enforcement, it is our belief and understanding that New Jersey's efforts to violate the federal law will increase the amount of illegal gambling going on on our

Page 61

HIGHLY CONFIDENTIAL - L. FERAZANI

1  game.
2  game.
3      Q.    Does the NFL have any economic
4  analysis to support that belief?
5          MR. DREYER:  Objection to the form
6  of the question.  You can answer it.
7      A.    The only economic analysis that I
8  can give you is that the NFL has fought legal
9  sports gambling since its inception and has
10 grown from the fifth most popular sport to a
11 $10 billion-a-year industry.  And so by
12 analogy, what we are doing seems to be
13 working.  As far as what New Jersey is doing
14 in an illegal environment, we have no such
15 analysis.
16         MR. DREYER:  That was "illegal,"
17 correct?
18         (A discussion was held off the
19 record.)
20 BY MR. SIGLER (continuing):
21     Q.    Mr. Ferazani, the NFL has a game
22 each year at Wembley Stadium in London,
23 correct?
24     A.    That's correct.
25     Q.    And, in fact, the NFL has had a

Page 63

HIGHLY CONFIDENTIAL - L. FERAZANI

1  of the question.
2  of the question.
3      A.    Actually I know for a fact that
4  sports gambling in England is legal and
5  Wembley Stadium has a ticket booth to take
6  wagers at the stadium.  I can tell you
7  unequivocally that those ticket booths for
8  gambling are closed when our games are played
9  at Wembley Stadium.  So whether or not there's
10 gambling being done in other venues, I can't
11 tell you for sure.
12     Q.    Are you aware that bets are taken
13 at other venues close to Wembley Stadium?
14         MR. DREYER:  Objection to the form
15 of the question.  You can answer.
16     A.    I don't have any first-hand
17 information about that.
18     Q.    Other than the booths at Wembley
19 Stadium that are closed during the NFL's game,
20 does the NFL take any other steps to prevent
21 wagering on the NFL's game in London?
22     A.    I believe that our policies with
23 respect to that game in London are consistent
24 with our policies here in the United States
25 with regard to broadcast restrictions,

Page 62

HIGHLY CONFIDENTIAL - L. FERAZANI

1  game each year at Wembley Stadium since 2007,
2  game each year at Wembley Stadium since 2007,
3  correct?
4      A.    I believe so.  I know that we have
5  a game, we've had it for several years.
6  Before that we had it in other countries as
7  well.  But I will take your representation
8  that it's gone on since 2007.
9          MR. DREYER:  No need to do that.
10 But you can answer as to your
11 understanding.
12     Q.    Rather than taking my
13 representation, we will -- let me rephrase the
14 question.
15         The NFL has had a game at Wembley
16 Stadium in London for several years and is
17 continuing to do so in the future, correct?
18     A.    That is absolutely correct, yes.
19     Q.    Sports wagering is legal in London,
20 correct?
21     A.    To my understanding, yes.
22     Q.    And does the NFL acknowledge that
23 there is sports wagering on the NFL's game at
24 Wembley Stadium in London?
25         MR. DREYER:  Objection to the form

Page 64

HIGHLY CONFIDENTIAL - L. FERAZANI

1  advertising.  But beyond what we can control,
2  advertising.  But beyond what we can control,
3  I'm not sure that there's anything else.  We
4  control what we control and we do take steps
5  to make sure that those booths are closed and
6  that broadcast and sponsorship and the
7  advertising are consistent with the practice
8  followed in the United States.
9      Q.    So does the NFL have any
10 information about how much sports wagering on
11 the NFL game in London occurs?
12     A.    Not to my knowledge, no.
13     Q.    Has the NFL had any sports
14 gambling-related problems that have arisen
15 from its game in London?
16     A.    I'm not aware of any, no.
17     Q.    Have there been any instances of
18 match-fixing that have arisen from having the
19 game in London each year?
20     A.    Not that I'm aware of.
21     Q.    Does the NFL have any estimate of
22 how much sports gambling on NFL sporting
23 events would occur in the United States if New
24 Jersey moves forward with legalizing sports
25 gambling?

Page 65

HIGHLY CONFIDENTIAL - L. FERAZANI

2    MR. DREYER:  Objection, asked and
3  answered.  You can answer.
4    A.    There will be more sports gambling
5  if New Jersey is permitted to violate the
6  federal law.  There will be significantly
7  more.  Quantifying that, it's impossible to
8  do.
9    Q.    So the NFL does not have any
10  estimates, correct?
11    MR. DREYER:  Objection, asked and
12  answered.
13    A.    I can tell you unequivocally there
14  will be more sports gambling if New Jersey is
15  permitted to violate the federal law.  I'm not
16  able to quantify how much more that would be.
17    Q.    Is the NFL undertaking any analysis
18  to try to estimate what the impact would be on
19  the level of sports gambling if New Jersey
20  moves forward with legalizing sports gambling?
21    A.    No.  We're focusing our efforts on
22  stopping New Jersey's efforts, but we have not
23  commissioned any studies.
24    Q.    Does the NFL have any analyses or
25  estimates about how New Jersey's legalization

Page 66

HIGHLY CONFIDENTIAL - L. FERAZANI

2  of sports gambling would impact the legal
3  sports gambling in Las Vegas?
4    A.    No, not that I'm aware of.
5    Q.    Does the NFL know whether the
6  availability of legalized sports gambling in
7  New Jersey would cause the level of sports
8  gambling in Las Vegas to go down?
9    MR. DREYER:  Just give me a second.
10  Objection as to foundation.  You can
11  answer.  Do you need the question read
12  back?
13    THE WITNESS:  I'm reading.
14    MR. DREYER:  She can read it.  It's
15  probably a better practice.
16    (Requested portion read.)
17    A.    I think our belief is that it would
18  actually go up because if there's gambling --
19  if New Jersey's permitted to violate the
20  federal law and advertise sports gambling,
21  they're going to increase the amount of
22  gambling generally.  I think you will see an
23  increase in gambling everywhere and that
24  includes in Las Vegas.
25    Q.    So the NFL's belief is that by

Page 67

HIGHLY CONFIDENTIAL - L. FERAZANI

2  legalizing sports gambling in New Jersey, New
3  Jersey will actually help Las Vegas generate
4  more sports gambling?
5    MR. DREYER:  Objection to the form
6  of the question.  You have his answer.
7  But you can answer if you're able to.
8    A.    I think if you've taken away the
9  stigma involved with sports gambling
10  generally, if you've added advertising
11  extolling the virtues and the benefits of
12  sports gambling, you're going to increase the
13  amount of people that gamble on sports.  Where
14  they do that, I can't get into how much it's
15  going to increase in Las Vegas, but our belief
16  is that it will increase.
17    Q.    Does the NFL have any studies,
18  analyses or surveys to support that belief?
19    MR. DREYER:  Objection, asked and
20  answered.  You can answer.
21    A.    Other than, again, our experience,
22  the testimony provided in 1992, the
23  conclusions of the national -- of Exhibit 2
24  that an increase in gambling generally is
25  going to increase -- sports gambling generally

Page 68

HIGHLY CONFIDENTIAL - L. FERAZANI

2  will increase the prevalence of the population
3  that engages in that activity, there's nothing
4  specific analyzing New Jersey versus Nevada.
5    Q.    What part of Exhibit 2 are you
6  referring to that supports that belief?
7    MR. DREYER:  Objection.  I think he
8  referred to the Commission and not to
9  Exhibit 2 itself.
10    A.    I'm sorry, 1992 --
11    MR. DREYER:  You can answer.
12    A.    The 1992 testimony, I think it may
13  be referenced here in Exhibit 2 at page --
14    MR. DREYER:  I think the problem is
15  we have an incomplete exhibit so...
16    A.    I may be misremembering, if that's
17  a word.
18    Q.    Mr. Ferazani, are you referring to
19  testimony that was given to the Gambling
20  Impact Study Commission in connection with its
21  report?
22    MR. DREYER:  Again, I have to
23  interpose an objection because this is
24  part of the problem when --
25    MR. SIGLER:  Your objection is

Page 69

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2    noted.
 3          MR. DREYER:  Let me finish and make
 4    my objection, Counselor.  If you don't
 5    like it, that's fine.  But let me make
 6    the record.
 7          This is the problem when you mark
 8    an incomplete document.  And so I think
 9    the question's objectionable because the
10    witness hasn't been given the full
11    commission report.  But you can answer.
12          (Requested portion read.)
13    A.    I'm not sure what I'm referring to.
14    Q.    Does the NFL have any estimates of
15    how much legal sports gambling on NFL sporting
16    events would occur in New Jersey following New
17    Jersey's legalization of sports gambling?
18          MR. DREYER:  I think it was just
19    asked and answered.  But you can answer
20    it.
21    A.    Again, it is our understanding that
22    there will be more gambling on our sport if
23    New Jersey is permitted to violate the federal
24    law.  To quantify that, it's impossible.
25    Q.    And the NFL has not undertaken any
```

Page 71

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2    gambling is legalized in New Jersey, that
 3    there would be match-fixing?
 4          MR. DREYER:  Objection, asked and
 5    answered.  You can answer.
 6    A.    We contend that the threat to the
 7    integrity of the game, the threat for
 8    match-fixing, will increase substantially if
 9    New Jersey is allowed to violate the federal
10    law.
11    Q.    But the NFL has not had instances
12    of match-fixing despite a substantial legal
13    sports gambling market in Las Vegas for many
14    years, correct?
15          MR. DREYER:  Objection to the form
16    of the question, assumes facts not in
17    evidence.  You can answer.
18    A.    And, again, I'm not sure how
19    substantial or insubstantial the fact that
20    Nevada's permitted to have a sportsbook.  But
21    through our rigorous enforcement,
22    investigation and education of our players,
23    League employees, and the steps we've taken,
24    we have been fortunate not to have a
25    match-fixing scandal in our history, that I'm
```

Page 70

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2    effort to develop an estimate of that,
 3    correct?
 4    A.    I'm not sure how we would do that,
 5    but we have not.
 6    Q.    Mr. Ferazani, does the NFL know how
 7    much match-fixing occurs with respect to NFL
 8    sporting events in the United States?
 9          MR. DREYER:  Objection as to
10    foundation and to the form of the
11    question.  You can answer.
12    A.    We believe there's been no
13    match-fixing with regard to NFL games in the
14    United States or anywhere else.
15    Q.    What's the basis for that belief?
16    A.    Our own internal enforcement and
17    investigation.  We've never uncovered any --
18    any of our games that have been fixed due to
19    outside influences.
20    Q.    You've never had any instances of
21    match-fixing in the entire history of the NFL
22    league?
23    A.    To my knowledge, no.  Going back
24    decades.
25    Q.    Does the NFL contend that if sports
```

Page 72

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2    aware of.  Even one match-fixing scandal,
 3    though, would be disastrous to the success of
 4    our league.
 5    Q.    Apart from the NFL's belief that
 6    legalizing sports gambling in New Jersey would
 7    increase the level of sports gambling on NFL
 8    sporting events, is there any other basis for
 9    the NFL's belief that there would be an
10    increased risk of match-fixing?
11          MR. DREYER:  Objection, asked and
12    answered.  You can answer.  And I believe
13    the question mischaracterizes the
14    witness' prior testimony.  But you can
15    answer.
16    A.    Yes.  In addition to the fact that
17    you're going to have more sports gambling by
18    virtue of New Jersey's violation of the
19    federal law, advertising, et cetera, as
20    referenced in my prior answers, as I've also
21    alluded to in the past, Commissioner Tagliabue
22    testified quite eloquently about the general
23    threat of removing the stigma of sports
24    gambling.
25          You know, he testified about being
```

Page 73

HIGHLY CONFIDENTIAL - L. FERAZANI

1    HIGHLY CONFIDENTIAL - L. FERAZANI
2    a young college basketball player and going to
3    camp, I believe; and at the camp with other
4    elite players, there were people that were
5    offering money to the other campers, other
6    elite basketball players.  And he said he
7    didn't even consider it because gambling was
8    illegal, sports gambling was illegal, and he
9    would not associate with such a stigma.  That
10   was what kept him from going down a path that
11   other players chose not to and actually who
12   took money, eventually were embroiled in a
13   scandal.
14           Removing the social stigma from
15   sports gambling would result in a substantial
16   increased threat because once you take away
17   that stigma, there would be no more deterrents
18   for players or officials to associate with
19   gamblers or bookies or that segment of
20   society.
21   Q.    Is it the NFL's contention that
22   there is currently a social stigma associated
23   with sports gambling?
24   A.    I think there's a bright line that
25   we're allowed -- that we have with our players

Page 74

1    HIGHLY CONFIDENTIAL - L. FERAZANI
2    who understand that gambling is illegal,
3    sports gambling is illegal and gambling on our
4    game is forbidden, and associating with those
5    that gamble on our game is forbidden.
6    Q.    And that bright line would remain
7    in place whether New Jersey legalizes sports
8    gambling or not, correct?
9    A.    Well, currently those that gamble
10   except in Nevada are criminals.  So that
11   bright line would be erased if New Jersey's
12   permitted to violate the federal law and the
13   federal law then is stricken.  So what is a
14   nice bright line for people engaged in
15   criminal activity versus those not engaged in
16   criminal activity goes away.
17   Q.    So does that bright line exist
18   today in Las Vegas?
19   MR. DREYER:  Objection to the form
20   of the question.  You can answer.
21   A.    Well, Las Vegas which is known as
22   sin city, I'm not quite sure if that stigma's
23   been removed there, either.  It markets itself
24   as I guess, you know, appealing to any vice
25   you want to engage in.  I can't tell you

Page 75

1    HIGHLY CONFIDENTIAL - L. FERAZANI
2    what -- you know, what goes on in Las Vegas.
3    I can just tell you that the fact that this
4    activity is illegal in the vast majority of
5    states assists us in protecting our game.
6    Q.    Mr. Ferazani, one of the harms that
7    the NFL alleges in this case is that
8    legalizing sports gambling in New Jersey will
9    affect the public's perception of the
10   integrity of the game.  Correct?
11   A.    It will change the public's
12   perception in many ways:  One of the ways that
13   it will change it is that folks that are now
14   engaged in State-sanctioned sports gambling
15   will be viewing our contests in a different
16   way.  They'll be viewing them as financial
17   transactions.  That would be at the forefront
18   of many of our fans' perceptions of the game.
19           In any athletic contest, we see
20   missed calls, we see dropped passes, missed
21   field goals, we see coaching decisions which
22   at present are debated on sports radio and by
23   our fans on the merits of the play, on the
24   ability of the athlete to make the play and
25   whether or not the official blew a call.  You

Page 76

1    HIGHLY CONFIDENTIAL - L. FERAZANI
2    don't see a debate -- the forefront of the
3    debate is not is the game fixed or not.
4            If our fans' perception changes to
5    the debate about whether or not an official is
6    corrupt or an athlete is on the tank, you've
7    materially and irreparably changed our fans'
8    perceptions of our game.
9    Q.    Does the NFL have any studies or
10   analyses regarding the extent to which fans
11   currently have the perception that NFL matches
12   are being fixed?
13   A.    As I've alluded to in the past, our
14   focus and our purpose as a league is to
15   protect the shield and to have a general
16   understanding of our fans' beliefs.  And we
17   read the media reports about our games and our
18   athletes, and it is our present position that
19   there is not a belief among our fans that our
20   games are fixed.  Our fans believe that what
21   they're watching on the field is honest
22   competition.  That is the appeal of our sport.
23   Q.    So the NFL's belief is that its
24   fans currently do not have the perception that
25   games are being fixed, correct?

HIGHLY CONFIDENTIAL - L. FERAZANI

1
2      A.    That is our belief and
3  understanding.
4      Q.    Do you have any studies or analyses
5  to support that belief and understanding?
6           MR. DREYER:  Objection, asked and
7      answered.
8      A.    Again, that's our purpose as far as
9  making sure that our fans have a healthy
10 perception of our games.  As far as a
11 telephone survey of fans, I don't have
12 anything like that.  I do know that our media
13 folks and the Commissioner's first duty is to
14 make sure that the fans' perception of our
15 games and the actual games themselves are
16 honest and fair competition.
17          If we became aware of a perception
18 that there our games was fixed, that would be
19 a huge issue and we would be seeking to
20 address it immediately.
21     Q.    But the NFL doesn't have any
22 studies or analyses regarding the extent to
23 which its fans have a perception that NFL
24 games are being fixed, correct?
25     A.    Again, I think we're going back and

HIGHLY CONFIDENTIAL - L. FERAZANI

1
2  forth a bit about studies or analyses.  So I'm
3  telling you that the League's purpose every
4  day is to analyze and study our fans and what
5  is on the media.  You know, our Commissioner
6  interacts with fans on a daily basis.  The
7  owners of our teams interact with our fans, we
8  monitor the message boards, we read the media
9  accounts.
10          And we know that for the past, you
11 know, several decades we've grown steadily,
12 and our fans' relationship with the League and
13 the clubs has increased steadily to its
14 present point which is now a $10 billion plus
15 a year business.  If our fans believed that
16 what they were watching was something akin to
17 wrestling or Jai Alai, we would not be the
18 most popular sport in America.
19          Indeed those are good examples as
20 far as experience of a league, knowledge of
21 the executives that run the League, where an
22 affiliation and identity that is too closely
23 associated with gambling--in fact, Jai Alai's
24 purpose is gambling--would be disastrous to
25 the League's health and financial security.

HIGHLY CONFIDENTIAL - L. FERAZANI

1
2      Q.    Mr. Ferazani, you know what a
3  consumer survey is, correct?
4      A.    My understanding it can have
5  several forms:  telephone, in-person, mail.
6  Just questions that are asked to members of
7  the population.
8      Q.    The NFL has a -- does the NFL have
9  a consumer research group?
10     A.    We outsource that.  There's a
11 person that is charged with figuring out if we
12 need to have certain studies done, yes.
13     Q.    Who is that person?
14     A.    Alicia Rankin, R-A-N-K-I-N.
15     Q.    Has the NFL commissioned any
16 consumer surveys regarding the extent to which
17 its fans have a perception that its matches
18 are being fixed?
19     A.    To the extent we've outsourced and
20 had a random telephone sampling done of our
21 fans, the answer is no.  But the true study
22 and the experience of the League from the
23 executives of the League, marketing, teams,
24 clubs, is that our fans do not believe our
25 sport is fixed.  And that is the ultimate goal

HIGHLY CONFIDENTIAL - L. FERAZANI

1
2  and duty and responsibility of the
3  Commissioner.
4           So we wouldn't need to do a study
5  because that issue would be at the core of our
6  existence.  We wouldn't need to have a phone
7  study done for us to realize that there was a
8  real problem with our connection with our
9  fans.  I would submit to you that the NFL,
10 perhaps better than any other organization, is
11 in tune with our fans' perception of our
12 shield because that is all we are selling our
13 fans, is the integrity of the NFL shield, the
14 honesty and purity of the sport we put on.
15 That's what brings them back.  We're not
16 selling them cars or anything else.
17          So it's something that is at the
18 forefront of consciousness of our executives,
19 but there is no study commissioned from a
20 third party that I'm aware of.
21     Q.    Has the NFL conducted any consumer
22 surveys regarding the extent to which the
23 NFL's fans have a perception that is
24 influenced based on the legalized sports
25 gambling market in Las Vegas?

Page 81

HIGHLY CONFIDENTIAL - L. FERAZANI

1
2    A.    I'll never remember.
3        MR. DREYER:  I -- objection to the
4    form of the question.  You can answer if
5    you understand it.  She can read it back.
6        (Requested portion read.)
7    A.    Not that I'm aware of.
8    Q.    Has the NFL done any consumer
9    surveys regarding its fans' perceptions
10   generally about the integrity of the game?
11   A.    And, again I --
12       MR. DREYER:  Just let me interpose
13   an objection because I think we may be
14   going far off of the 30(b)(6) topics.  So
15   with that objection, you can answer.
16   A.    And, again, our fans' perception of
17   the integrity of our game is at the forefront
18   of what we do every day.  It's something that
19   we understand based upon all of our
20   executives' interactions with our fans, our
21   Commissioner's interactions with our fans, the
22   club interactions with the fans and players'
23   interactions with the fans.
24       If there was any indication that
25   our fans were concerned about the integrity of

Page 82

HIGHLY CONFIDENTIAL - L. FERAZANI

1
2    our sport, that would be brought to the
3    attention of the Commissioner immediately and
4    we would take steps to address it.
5        So in the fact that we do it every
6    day, that's our job, we have -- we study that.
7    But to the extent have we had a telephone
8    survey done of our fans or -- not to my
9    knowledge.
10       MR. DREYER:  We've been going about
11   an hour and a half.  If we're going to
12   move to another topic, can we take a
13   short break.
14       MR. SIGLER:  Fair enough.  Give me
15   a second.  All right.  Let's take a
16   break.
17       (Recess taken 11:43-11:56 a.m.)
18   BY MR. SIGLER (continuing):
19   Q.    Mr. Ferazani, one of the alleged
20   harms that you referred to this morning
21   related to consumers' interest in the games
22   because of a financial interest.  Correct?
23   A.    It was replacing the fans' interest
24   in our games for the athletic contest, the
25   sport, for a way or means to an end

Page 83

HIGHLY CONFIDENTIAL - L. FERAZANI

1
2    financially; in other words, doing it as a
3    financial transaction where you place a wager
4    on one team or the other rather than watching
5    a team, watching an athlete, developing an
6    affinity for the club and team and having a
7    long-term relationship with the League and the
8    club.
9    Q.    And how does it harm the NFL if
10   someone is watching a game because of a
11   financial interest rather than a rooting
12   interest in a team?
13   A.    There's a host of ways:  First, if
14   a fan is no longer -- a fan that's watching it
15   purely for a financial interest, if the wager
16   that they place goes the wrong way, it may
17   cause them to resent their team, may cause
18   them to blame their team for the financial
19   issues that they're having.  That does not
20   lead to a long-term relationship.
21       What the NFL is focused upon is
22   developing a long-term relationship with its
23   fans and a broad-based relationship where a
24   fan has an affinity for a specific team or a
25   series of teams or specific athletes and goes

Page 84

HIGHLY CONFIDENTIAL - L. FERAZANI

1
2    to games, purchases merchandise and develops a
3    very long-term relationship with teams and
4    athletes and the sport.
5    Q.    Does the NFL have any consumer
6    surveys or research about the number of fans
7    who currently watch NFL games because of a
8    financial interest rather than a rooting
9    interest?
10   A.    Not to my knowledge.  And the
11   financial interest being those that watch for
12   gambling purposes?
13   Q.    Well, the NFL's concern is that it
14   does not want people watching its games
15   because of a financial interest, correct?
16       MR. DREYER:  Objection,
17   mischaracterizes testimony.  You can
18   answer.
19   A.    Our concern is that if you put
20   wagering at the forefront of the reason for
21   the relationship, that materially changes the
22   nature of that relationship where a fan who's
23   purely watching for a financial transaction,
24   if that transaction goes poorly for the fan,
25   they lose their bet, they may then blame the

Page 85

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2   Giants if they paid 50 bucks on the Giants and
 3   the Giants play poorly.  They may then get
 4   angry and turned off and are much more quickly
 5   to stop supporting a team if they lose money
 6   because of that team.
 7              Our focus are for the fans that
 8   we're looking to develop, and the fans that
 9   benefit us are those that develop an affinity
10   for the team, watch the team through thick and
11   thin, identify with certain athletes.  Those
12   fans will go each and every week, they'll buy
13   merchandise, they'll attend games, watch TV,
14   watch our broadcasts.  And it's the type of
15   fan we're seeking to develop.
16        Q.    Does the NFL have any consumer
17   surveys or research regarding the number of
18   people who watch NFL games because of a
19   financial interest in the outcome of the game?
20              MR. DREYER:  Objection.  I think
21        this was asked and answered.  But you can
22        answer.
23        A.    Can we quantify the number of
24   people who are watching it purely because of a
25   financial interest?  I don't have any studies
```

Page 87

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2   or not.  But what I searched for when we did
 3   our document response was specifically
 4   gambling-related studies.  I'm not sure if
 5   other such studies exist that aren't related
 6   to the topics covered in the 30(b)(6) notice
 7   or the document request.
 8        Q.    The NFL would like its fans to
 9   develop a long-term interest and to watch
10   games to develop that interest, correct?
11        A.    Yes.
12        Q.    Does the NFL have any consumer
13   surveys or research about the number of fans
14   who have that long-term interest?
15              MR. DREYER:  Same objection with
16        respect to the 30(b)(6) topics.  But you
17        can answer as to your understanding.
18        A.    Other than an understanding from
19   our business model and the fact that the sport
20   has grown in popularity each year, I don't
21   know that -- I'm not comfortable, I'm not
22   comfortable answering about studies beyond the
23   scope of gambling or financial interest.
24
25
```

Page 86

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2   to that effect.
 3        Q.    Does the NFL have any consumer
 4   research or studies about why people watch NFL
 5   games?
 6              MR. DREYER:  Objection.  I think
 7        we're beyond the 30(b)(6) topic.  But you
 8        can answer as to your understanding.
 9        A.    I'm not sure what -- you know, I'm
10   not sure where you're heading.  Why people
11   watch?  I'm not sure -- maybe you could
12   rephrase that.
13        Q.    Sure, let me try.
14              Does the NFL have any consumer
15   research or studies about the reasons why its
16   fans watch particular games?
17              MR. DREYER:  Same objection.  You
18        can answer.
19        A.    We may.  I'm -- I don't know off --
20   as I sit here today specifically.  I don't
21   know if I'm understanding your question or not
22   but --
23        Q.    You said you're not understanding
24   my question?
25        A.    I don't know if I'm understanding
```

Page 88

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2   (HIGHLY CONFIDENTIAL PORTION:)
 3   BY MR. FERAZANI (continuing):
 4        Q.    Mr. Ferazani, earlier today I think
 5   you said that the NFL is a $10 billion-
 6   per-year industry.  Do I have that right?
 7        A.    Roughly right, give or take a few
 8   hundred million either way.
 9        Q.    Is that $10 billion figure a
10   revenue figure?
11              MR. DREYER:  Let me just mark this
12        section "Highly Confidential."  We'll
13        review it.  I'm not sure how much of this
14        is public or nonpublic. So in an
15        abundance of caution, let's go to "Highly
16        Confidential" designation as of 87:7.
17        A.    And my answer is based upon public
18   reports of $10 billion a year in revenue.
19   That's my understanding.
20        Q.    Much of that comes from TV
21   contracts, correct?
22        A.    Yes.
23        Q.    And the reason the NFL can command
24   such significant TV contracts is because its
25   games are watched by lots of people, correct?
```

Page 89

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2        A.    Not only that but the fact that our
 3   games are things that people want to watch
 4   live and it's very well positioned, with
 5   Sunday afternoons being like what most of the
 6   games are.  It's becoming not just a game
 7   but it's an event that people build their day
 8   around.  But certainly it's part of the fact
 9   -- it reflects the popularity of the League
10   and the sport.
11        Q.    The NFL benefits from its high TV
12   ratings regardless of the reason why people
13   are watching those games, correct?
14        MR. DREYER:  Objection to the form
15        of the question.  You can answer.
16        A.    Well, certainly the dollar value of
17   those contracts reflect the ratings that our
18   games generate.
19        Q.    And those ratings are beneficial to
20   the NFL regardless of why people are watching
21   the games.  Correct?
22        MR. DREYER:  Objection to the form
23        of the question.  You can answer.
24        A.    Well, again, you know, I think it's
25   important to note that as a league, from the
```

Page 91

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2   in interest in the NFL?
 3        MR. DREYER:  Objection as to
 4        foundation.  You can answer.
 5        A.    I would be -- I don't want to guess
 6   as far as what impact it's had.  We've been
 7   profitable.  We've done better each year, but
 8   I'm not -- I can't tell you what impact
 9   Nevada's or Las Vegas' decision has made.
10        Q.    Does.  The NFL take any steps to
11   discourage its fans from watching games
12   because of financial self-interest rather than
13   a rooting interest?
14        A.    I think the NFL markets itself
15   based upon the purity of its sport, the
16   healthy athletic competition and the fact that
17   you're able to watch athletes perform feats
18   that regular folk can't do.  So our focus with
19   our relationship with our fans is on those --
20   those aspects of the game.
21        Q.    Mr. Ferazani--and please feel free
22   to refer to the Complaint--I'd like to make
23   sure I'm tracking the harms that the NFL is
24   alleging in this case.  You've mentioned that
25   New Jersey's legalization of sports gambling
```

Page 90

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2   Commissioner on down, our intent and focus is
 3   on long-term success and long-term building of
 4   the game.  There's always choices that a
 5   league could make or that the NFL could have
 6   made for a quick, you know, spike in profit at
 7   the expense of the long-term profit.  And our
 8   League and the cornerstone of our League is
 9   looking and planning for long-term success and
10   sustainable profit and increase in
11   percentages.
12        So I disagree with the premise
13   that, you know, if there was something we
14   could do with respect to -- if there was
15   something we could do to spike one year, to
16   spike our attendance for one year but would
17   lead to a long-term decline in our fan -- in
18   our relationship with our fans, that would not
19   be beneficial to the League.  We're not here
20   for one year; we're here for the long-term
21   duration.  So in any business transaction, I
22   think you need to weigh risks, benefits and we
23   look long term.
24        Q.    Has the legal sports gambling
25   market in Las Vegas led to a long-term decline
```

Page 92

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2   could affect the integrity of the NFL's games
 3   by resulting in match-fixing or increasing the
 4   risk of match-fixing; you've referred to the
 5   impact on perceptions of consumers about the
 6   integrity of the game; and most recently we've
 7   discussed the NFL's concern that legalized
 8   sports gambling will cause people to watch
 9   games because of a financial self-interest
10   rather than a rooting interest.
11        Are there any other harms that the
12   NFL is alleging that result from New Jersey's
13   legalization of sports gambling?
14        MR. DREYER:  Objection, asked and
15        answered.  You can answer.
16        A.    And to be clear, it's the threat of
17   all of those harms that is at the cornerstone
18   of the League's fight against New Jersey's
19   attempt to violate the federal law.  But the
20   list that you've provided coupled with the
21   Complaint--and, again, the themes in both your
22   question and the Complaint can be expressed in
23   many different ways--but generally that is at
24   the cornerstone of our issue.
25        Q.    Are there any other harms you can
```

Page 93

```
1         HIGHLY CONFIDENTIAL - L. FERAZANI
2    think of that the NFL is alleging would result
3    from New Jersey's legalization of sports
4    gambling?
5              MR. DREYER:  Objection, asked and
6         answered.  You can answer.
7         A.    The threat to the success of the
8    shield or to the perception of the shield both
9    by actual match-fixing -- the threat of actual
10   match-fixing is a substantial concern.  If
11   even one game is found to have been fixed,
12   that would be -- would irreparably damage our
13   relationship with our fans, it would make fans
14   change the way that they view our games, and
15   it would lead -- it would be disastrous for
16   our long-term relationship with our fans.
17             The perception of our fans not only
18   would be impacted from actual match-fixing but
19   if the games -- if the focus of our fans
20   changed from watching football games for the
21   purity of the sport and healthy competition
22   and for the contests themselves to a financial
23   transaction and changed the fundamental nature
24   of the relationship with our fans, that would
25   also be -- irreparably damage our long-term
```

Page 94

```
1         HIGHLY CONFIDENTIAL - L. FERAZANI
2    relationship with our fans.
3              Those threats could manifest
4    themselves in many different ways, but that I
5    think -- we may be saying the same thing, but
6    I just want to be clear that, as I sit here
7    today, that's the cornerstone of our issue.
8         Q.    Are there any other harms that the
9    NFL is alleging in this case?
10             MR. DREYER:  Objection, asked and
11        answered.  You can answer.
12        A.    I think that's the list, you know,
13   incorporated in the Complaint.
14        Q.    The NFL is not alleging that New
15   Jersey's legalization of sports gambling will
16   result in any financial loss to the NFL,
17   correct?
18             MR. DREYER:  Objection,
19        mischaracterizes the witness' prior
20        testimony.  You can answer.
21        A.    We absolutely are.  And as I've
22   explained, if New Jersey is permitted to
23   violate the federal law, that will result in
24   an increase in sports gambling, period.  That
25   increase will have not only resulted in the
```

Page 95

```
1         HIGHLY CONFIDENTIAL - L. FERAZANI
2    increased threat of match-fixing which we've
3    discussed -- and that threat and that risk is
4    a very real one and one that, as a business,
5    the NFL needs to factor into its decision as
6    to whether this is good or bad or this could
7    be harmful or not.
8              But the increase in sports gambling
9    and the fact that New Jersey would now be
10   telling its citizens and its youth that sports
11   gambling is okay and is not a forbidden or
12   prohibited activity changes the perception of
13   our sport.  As soon as that law -- as soon as
14   New Jersey begins granting casino licenses,
15   that fundamentally changes the nature of our
16   relationship with our fans and what our sport
17   represents to the citizens of New Jersey.
18             On our long-term basis, that will
19   impact -- and on a short-term basis that will
20   deleteriously impact our relationship with our
21   fans.  That is based upon our experience, upon
22   our business model, you know, suffice it to
23   say that.
24        Q.    Okay.  In case any of us cannot
25   recall, the question was actually about
```

Page 96

```
1         HIGHLY CONFIDENTIAL - L. FERAZANI
2    financial loss.  Let me ask it again.
3         A.    All right.
4         Q.    The NFL is -- well, let me ask it a
5    different way.  Strike that.
6              Is the NFL alleging that the
7    legalization of sports gambling in New Jersey
8    would result in financial loss to the NFL?
9              MR. DREYER:  Objection, asked and
10        answered.
11        A.    Yes, for the reasons that I just
12   went through in my long-winded answer.  The
13   impact of our fans we can't quantify, but it
14   will change the relationship based upon our
15   experience as a league and the defense of our
16   shield.  That relationship has resulted in the
17   League increasing its income in each and every
18   year for the past several decades.
19             By analogy, you can look at
20   industries and sports that closely affiliated
21   themselves with gambling and became identified
22   solely with gambling such as those that are
23   set forth in PASPA itself--the horse racing
24   industry which incidentally is now at a point
25   where, my understanding, the New Jersey law is
```

Page 97

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2   designed to save the horse-racing industry in
 3   New Jersey because of its relationship with
 4   gambling.  It used to be one of the most
 5   watched events in America; and over the course
 6   of decades, as the NFL has increased in
 7   popularity because it's viewed as a sport and
 8   athletic competition, horse racing has
 9   declined in every state in which it's offered.
10        And I would submit to you, and this
11   is not based on a study but based on
12   experience, that it is known just as a vehicle
13   for gambling; Jai Alai, dog racing.  That
14   history and that experience is upon what we
15   base our assertion that allowing New Jersey to
16   violate the federal law would negatively
17   impact our bottom line.
18        Q.    The NFL doesn't have any estimates
19   of financial loss that it contends would
20   result from New Jersey's legalization of
21   sports gambling, correct?
22        A.    We're unable to quantify that other
23   than our understanding and belief that it will
24   negatively impact our relationship with our
25   fans and will negatively impact our long-term
```

Page 98

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2   growth.
 3        Q.    Is the NFL alleging that New
 4   Jersey's legalization of sports gambling would
 5   result in decline of TV ratings to the NFL?
 6        A.    For the reasons that I've
 7   previously answered and the negative impact on
 8   our fans' perception, it will -- and our
 9   belief is that it will negatively impact the
10   long-term growth of our sport and the
11   long-term popularity of our sport which will
12   consequently impact viewership.  We aren't
13   able to quantify it.  We don't believe it's
14   good and healthy for the League, which is why
15   we're doing what we're doing here.
16        Q.    So the NFL does not have any
17   estimate of how specifically New Jersey's
18   legalization of sports gambling would affect
19   its TV ratings, correct?
20        MR. DREYER:  Objection to the form
21   of the question.
22        A.    We're unable to quantify to what
23   extent New Jersey's violation of the federal
24   law will impact our sports -- our broadcast
25   ratings.  However, for all the reasons I've
```

Page 99

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2   previously testified to, we believe that it
 3   will negatively impact our ratings and our
 4   relationship with our fans, our long-term
 5   relationship with our fans.
 6        Q.    Does the NFL have any information
 7   about how the legal sports gambling market in
 8   Nevada has impacted the NFL's TV ratings?
 9        A.    Do we have any information about
10   that impact?  Not that I'm aware of.
11        Q.    Does the NFL have any studies or
12   analyses showing that the legal sports
13   gambling market in Nevada has driven down the
14   NFL's TV ratings?
15        A.    I am not aware of any such studies,
16   no.
17        Q.    The NFL's most recent TV contracts
18   are substantially more advantageous to the NFL
19   than their previous contracts, correct?
20        MR. DREYER:  Objection to the form
21   of the question.  You can answer.
22        A.    I believe we generate more revenue
23   from them.
24        Q.    The NFL's most recent TV contracts
25   are billions of dollars larger than the
```

Page 100

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2   previous TV contracts, correct?
 3        MR. DREYER:  Objection as to
 4   foundation and, again, beyond the scope
 5   of the 30(b)(6) topics.  But you can
 6   answer.
 7        A.    Over the course of those
 8   extensions, there are billions of dollars more
 9   that will be going to the NFL from those TV
10   contracts reflecting the NFL's enhanced
11   popularity.
12        Q.    And the NFL has been able to get
13   those contracts despite the illegal sports
14   gambling market in Las Vegas, correct?
15        MR. DREYER:  Objection to the form
16   of the question.  You can answer.
17        A.    I would say the NFL has been able
18   to get those contracts due to the NFL and the
19   other sports leagues' successful fight against
20   sports betting in the country so that our fans
21   and our long-term relationship with our fans
22   has continued to increase.
23        Fans view NFL games for the purpose
24   of the sport, the athletic contests and the
25   unbelievable feat of our athletes.  It is
```

Page 101

HIGHLY CONFIDENTIAL - L. FERAZANI

1
2   because of that that the NFL has committed the
3   resources it has, not just in PASPA back in
4   1992 but in defending the law in Delaware and
5   here in a couple instances and also fighting
6   for the Unlawful Gambling Internet Act.
7           The NFL is a revenue-generating
8   business.  If the NFL believed that sports
9   gambling would allow it to increase its
10  revenue, the NFL would engage in that
11  activity.  Based upon our studies and
12  analysis, we know that that will negatively
13  impact our long-term relationship with our
14  fans, negatively impact our bottom line and
15  revenue and negatively impact the perception
16  of our sport across the country.
17          So I don't think that -- I believe
18  your question may be viewing it from the -- we
19  would disagree with the vantage point from
20  which your question was presented.
21          (Exhibit 4: Constitution and Bylaws
22          (#PLAINTIFFS' 00001858-1861), was marked
23          for identification.)
24  BY MR. SIGLER (continuing):
25      Q.   Mr. Ferazani, you've been handed a

Page 103

HIGHLY CONFIDENTIAL - L. FERAZANI

1
2   whatever we produced to counsel was the most
3   recent revision.  I'm not sure of June 1,
4   2010.  I gave him all of our copies.  I'm not
5   trying to be difficult.  I just -- I believe
6   it is, but I will defer if we produced
7   something more recently.
8       Q.   Is the Constitution and Bylaws of
9   the NFL the governing document for the NFL?
10          MR. DREYER:  Objection to the form
11      of the question.  You can answer.
12      A.   This is -- at the part of the NFL
13  there is also a collective bargaining
14  agreement with some of our unions.  But with
15  regard to the rules that are at the core of
16  the NFL, the Constitution and Bylaws would be
17  at the core.
18      Q.   Can you turn with me, please, to
19  the page that has the number on the bottom
20  right corner 1860.
21      A.   Sure.
22      Q.   So I'll read it into the record.
23  The complete Bates number is Plaintiffs'
24  00001860.  Do you see subpart (c) towards the
25  top of the page?

Page 102

HIGHLY CONFIDENTIAL - L. FERAZANI

1
2   copy of the document marked Exhibit 4.  Please
3   review this document and tell me whether you
4   recognize it.
5       A.   (Examining document.)
6           This is the Constitution and Bylaws
7   of the National Football League as revised by
8   June 1, 2010.
9       Q.   Is this the current -- well, strike
10  that.
11          First let me clarify:  This is a
12  portion of the Constitution and Bylaws,
13  correct?
14      A.   That's correct.
15      Q.   And I'll represent that this was
16  the portion that was produced by Plaintiffs in
17  the litigation.  Is this the current version
18  of this portion of the Constitution and
19  Bylaws?
20          MR. DREYER:  I'm not sure it's
21      intentional, but I think your
22      representation was inaccurate.  But you
23      can answer the question.
24      A.   I believe -- the only reason I'm
25  hesitating is I'm not sure if there was a --

Page 104

HIGHLY CONFIDENTIAL - L. FERAZANI

1
2       A.   Yes, I do.
3       Q.   What is this provision?
4       A.   Broadly, this is the antigambling
5   provision and the Constitution and Bylaws
6   granting the Commissioner the authority and
7   charging him with the responsibility to
8   prevent that those connected with or employed
9   by the League don't engage in sports gambling
10  or football gambling in our sport.
11      Q.   Does this provision apply to all
12  NFL players, coaches and officials?
13      A.   It does.
14      Q.   Does it also apply to employees of
15  the NFL?
16      A.   It does.
17          (Exhibit 5: NFL Constitution and
18      Bylaws excerpt (#PLAINTIFFS' 00003261-
19      264), was marked for identification.)
20          MR. SIGLER:  Can we go off the
21      record for a second.
22          (A discussion was held off the
23      record.)
24          MR. SIGLER:  I'd just like to
25      clarify something for the record.  We

Page 105

1    HIGHLY CONFIDENTIAL - L. FERAZANI
2    just had a discussion off the record
3    between counsel and the previous exhibit
4    which was Exhibit -- the previous
5    exhibit, Exhibit 4, was a portion of the
6    Constitution and Bylaws that was produced
7    in the litigation but not the only
8    portion.
9        Let's go off the record.
10       (A discussion was held off the
11   record.)
12   BY MR. SIGLER (continuing):
13   Q.   Mr. Ferazani, you've been handed a
14   copy of a document marked Exhibit 5.  Please
15   review this document and tell me whether you
16   recognize it.
17   A.   I do.
18   Q.   What is this document?
19   A.   It appears to be the Constitution
20   and Bylaws of the National Football League of
21   2006, a portion of it.
22   Q.   And turning to the page with the
23   Bates number 3263 at the bottom, this is the
24   same provision that we just reviewed in the
25   2010 version, correct?

Page 106

1    HIGHLY CONFIDENTIAL - L. FERAZANI
2    A.   Yes.
3    Q.   And this provision gives the
4    Commissioner authority to impose penalties on
5    NFL employees, players and officials for
6    violating the League's gambling policy,
7    correct?
8    A.   Yes, it does.
9    Q.   Are you aware of any other versions
10   of this provision, subpart (c), during the
11   period 2006 through the present?
12   A.   I'm not, no.
13       (Exhibit 6: (Withdrawn)
14       (#PLAINTIFFS' 00001858-863), was marked
15   for identification.)
16   BY MR. SIGLER (continuing):
17   Q.   Mr. Ferazani --
18       MR. DREYER:  I'm sorry, is this the
19   same document?
20       MR. SIGLER:  This is Exhibit 6.
21       MR. DREYER:  Here's my issue.  They
22   start with the same Bates number, they
23   have different Bates numbers that follow.
24   So I don't know if you prepared
25   compendium or if there are issues in the

Page 107

1    HIGHLY CONFIDENTIAL - L. FERAZANI
2    production, but they both start with 1858
3    and they then have different pages that
4    follow.  So I'm not sure what the issue
5    is, but I want to flag it.
6        MR. SIGLER:  Can I see the witness'
7    copy?  Because my copy doesn't have that.
8    The previous document you're saying, the
9    previous exhibit, Exhibit 5, has the same
10   Bates number?
11       MR. DREYER:  So Exhibit 4 and
12   Exhibit 6 have as the cover page
13   Plaintiffs' 1858, the first page of the
14   exhibit.
15       MR. SIGLER:  Oh, yeah, I see that.
16       MR. DREYER:  And then what follows
17   are different pages and different
18   excerpts from the constitution, so it's a
19   little unclear what we have here.  And I
20   obviously don't have our full production
21   in front of me, but it may just be that
22   when you prepared Plaintiffs' 6, you
23   copied the cover page.  But without the
24   production in front of me, I can't be
25   sure what the issue is.

Page 108

1    HIGHLY CONFIDENTIAL - L. FERAZANI
2        MR. SIGLER:  All right.
3        MR. WEGNER:  There are different
4    years.  In other words, it's the same
5    cover page but it's for different years.
6    The one that is 3261 is the '70 and the
7    one that is 1858 is the 2010.  I think
8    that may be --
9        MR. SIGLER:  Let's go off the
10   record.
11       (A discussion was held off the
12   record.)
13       MR. SIGLER:  So for the record,
14   Counsel have just had a discussion off
15   the record.  We are withdrawing Exhibit 6
16   and are going to proceed to Exhibit 7.
17       (Exhibit 7: Constitution and Bylaws
18   excerpt Article IX (#PLAINTIFFS'
19   00004171-178), was marked for
20   identification.)
21   BY MR. SIGLER (continuing):
22   Q.   Mr. Ferazani, you've been handed a
23   document marked Exhibit 7, and please review
24   this document and my first question is going
25   to be whether you recognize it.

Page 109

```
1              HIGHLY CONFIDENTIAL - L. FERAZANI
2        A.    (Examining document.)
3              This appears to be a portion of our
4   Constitution and Bylaws.
5        Q.    Do you know whether this is a
6   portion of the current edition of the
7   Constitution and Bylaws?
8        A.    I'm sorry, I don't.  I --
9              MR. DREYER:  Counsel, if it helps,
10  I can represent on the record that it's
11  our understanding that this is the
12  current Article IX from the current
13  Constitution and Bylaws, and I believe
14  this was produced last Friday.
15             MR. SIGLER:  Thank you.
16             THE WITNESS:  What he said.
17       Q.    Mr. Ferazani, can you turn with me,
18  please, to the second page of this document
19  which has the Bates number 4172 in the bottom
20  right-hand corner.
21       A.    Okay.
22       Q.    Please review subpart (6) if you
23  need to, and I will have a couple of questions
24  about it.
25       A.    (Examining document.)
```

Page 110

```
1              HIGHLY CONFIDENTIAL - L. FERAZANI
2              Okay, thank you.  I've read it.
3        Q.    Is this subpart (6) a summary of
4   conduct that the League prohibits?
5        A.    Subpart (6) addresses a portion
6   of -- or it sets forth our rules regarding
7   sponsorship, club sponsorship by gambling or
8   lottery enterprises.  A similar document is
9   either enhanced or repeated in the gambling
10  policy which is also a standalone document but
11  reflects the same principle.
12       Q.    Does the NFL permit some
13  advertising by gambling operators at NFL
14  sporting events?
15       A.    I think it -- the NFL distinguishes
16  between sports gambling and operators that
17  permit gambling on sporting events versus
18  those that are engaged in traditional
19  casino-type gambling such as roulette, Black
20  Jack or other cards.  The NFL is concerned and
21  restricts sports gambling.  There are
22  permission -- there is permission granted to
23  our clubs to have sponsorship by either
24  lotteries or certain casinos as long as they
25  don't have a sportsbook, and there are also
```

Page 111

```
1              HIGHLY CONFIDENTIAL - L. FERAZANI
2   other restrictions contained in paragraph 6.
3        Q.    To your knowledge, is this
4   provision in subpart (6) the current version
5   of the NFL's policy about advertising
6   gambling?
7        A.    Yes.
8        Q.    Does this policy apply to employees
9   of the NFL?
10       A.    It applies to employees of the NFL
11  and employees of our member clubs.
12             (Exhibit 8: NFL Constitution and
13             Bylaws 2006 Article IX (#PLAINTIFFS'
14             00003266-268), was marked for
15             identification.)
16  BY MR. SIGLER (continuing):
17       Q.    Mr. Ferazani, you've been handed a
18  copy of a document marked Exhibit 8.  Please
19  review this document and tell me whether you
20  recognize it.
21       A.    It appears to be the Constitution
22  and Bylaws of the NFL as of 2006.
23       Q.    This is a portion of Article IX
24  which is the same part that we were looking at
25  in the previous exhibit, Exhibit 7.  Correct?
```

Page 112

```
1              HIGHLY CONFIDENTIAL - L. FERAZANI
2        A.    I'm sorry, can you rephrase that or
3   repeat that?
4        Q.    Sure.  Let me break it down for
5   you.  If you turn to the second page of this
6   document?
7        A.    Yes.
8        Q.    This is labeled Article IX
9   Prohibited Conduct, correct?
10       A.    Um-hmm, yes.
11       Q.    And Article IX is the same part of
12  the constitution that we were reviewing in the
13  previous exhibit, Exhibit 7, correct?
14       A.    Yes.  And you're missing a page.
15  Exhibit 8 goes from page 37 to 39.
16       Q.    Yes, that's how it was filed.
17             MR. DREYER:  Counsel, if there's a
18  question about that, I'm happy to address
19  it but it's your deposition.
20             MR. SIGLER:  Are you offering to
21  address it?
22             MR. DREYER:  Sure.
23             MR. SIGLER:  Why?
24             MR. DREYER:  What I think has been
25  marked as NFL 8 is the portion of the
```

Page 113

HIGHLY CONFIDENTIAL - L. FERAZANI
1
2    Constitution and Bylaws that were
3    appended to Commissioner Godell's
4    declaration in the Markell case.  I
5    believe that to be so because of the
6    Pacer stamp on the top of the document
7    with the Case No. 09 CV 00538-GMS.
8         And so I believe that what has been
9    marked as NFL 8 was produced in this case
10   as a portion of Commissioner Godell's
11   declaration in the Markell case.
12   BY MR. SIGLER (continuing):
13   Q.   Mr. Ferazani, this portion of the
14   Constitution and Bylaws lists prohibited
15   conduct including gambling-related conduct
16   that the NFL prohibits.  Correct?
17   A.   Are you on Exhibit 7 or 8?
18   Q.   Exhibit 8.  So let me go back and
19   reask the question.
20        Mr. Ferazani, Exhibit 8 contains a
21   portion of the NFL's constitution that lists
22   types of prohibited conduct, correct?
23   A.   It lists types of prohibited
24   conduct, yes, it does.
25   Q.   And these prohibitions apply to NFL



Page 115

HIGHLY CONFIDENTIAL - L. FERAZANI

Page 114

1    HIGHLY CONFIDENTIAL - L. FERAZANI
2    employees, players and officials, correct?
3    A.   Yes.





Page 116

HIGHLY CONFIDENTIAL - L. FERAZANI







Page 120

HIGHLY CONFIDENTIAL - L. FERAZANI



```
8      Q.   So as of 2009, NFL clubs can enter
9  into sponsorship arrangements with state
10 lotteries?
11     A.   With the prohibitions that the
12 lottery cannot be dependent on the outcome of
13 NFL games or sporting contests and the other
14 prohibitions listed within this three-page
15 document -- sorry, four-page document.
```




HIGHLY CONFIDENTIAL - L. FERAZANI



HIGHLY CONFIDENTIAL - L. FERAZANI



HIGHLY CONFIDENTIAL - L. FERAZANI

8          (Exhibit 11: NFL Player Contract
9     (#PLAINTIFFS' 00001864-872), was marked
10    for identification.)
11    BY MR. SIGLER (continuing):
12        Q.    Mr. Ferazani, you've been handed a
13    copy of a document marked Exhibit 11.  Please
14    review this document and tell me whether you
15    recognize it.
16        A.    I do.
17        Q.    What is this document?
18        A.    This is the standard NFL player
19    contract which is used in every -- it's the
20    form of every NFL player contract in the
21    League today.  It's attached to our collective
22    bargaining agreement with the NFL Players
23    Association.  But every player, then, has a
24    contract with their name and dollar figure set
25    up according to this form.  Some of them may

1        HIGHLY CONFIDENTIAL - L. FERAZANI
2     also have additional sections or roster
3     bonuses or the like.  But the essence of every
4     contract is reflected in this Appendix A.
5         Q.    Is this the current version of the
6     NFL player contract?
7         A.    I believe it is.
8         Q.    Do you know how long this version
9     of the NFL player contract has been in effect?
10        A.    I'm not -- the specific version?
11    Many years but I'm not sure.  I'd be guessing
12    as far as how long.
13        Q.    Can you turn with me, please, to
14    the page with the Bates number 1869 in the
15    bottom right-hand corner.  Do you see
16    provision 15 at the bottom of the page,
17    Integrity of Game?
18        A.    I do.
19        Q.    Toward the middle part of that
20    paragraph, it refers to knowingly associating
21    with gamblers or gambling activity.  Do you
22    see that?
23        A.    I do.
24        Q.    Is that prohibited conduct for NFL
25    players?

Page 125

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2      A.   Yes, it is.
 3      Q.   And are they prohibited from
 4   associating with gamblers or gambling activity
 5   other than sports gambling?
 6      A.      They are prohibited from using
 7   their images and likeness to market regular
 8   casinos.  They are prohibited from attending
 9   even charitable casino nights.  So, yes, they
10   are prohibited from associating with gambling
11   or knowingly associating with gamblers or
12   gambling activity, yes.
13      Q.   And that prohibition applies beyond
14   sports gambling to all types of gambling,
15   correct?
16      A.   It does.
17      Q.   Why does the NFL not make the same
18   distinction in its player contract that it
19   makes elsewhere between sports gambling and
20   non-sports gambling?
21        MR. DREYER:  Objection to the form
22      of the question.  You can answer.
23      A.   Actually, see this is a little more
24   difficult to answer.  A player would be
25   permitted to go into a casino off-season that
```

Page 127

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2   paragraph 15, it's clear about the prohibition
 3   for NFL players as far as engaging and betting
 4   on NFL games.  The association with gamblers
 5   or gambling activities is enforced as those
 6   who would participate in sports betting versus
 7   regular card betting.
 8      Q.   Regular card betting would be
 9   permitted, correct?
10      A.   If it's legal and not on NFL
11   property.  They're prohibited from that and
12   any sort of gambling in the NFL clubhouses and
13   on NFL trips.
14      Q.   So regular card betting would be
15   permitted if it is legal and it is not on NFL
16   property, correct?
17        MR. DREYER:  Objection to the form
18      of the question.  But you can answer.
19      A.   Correct.
20        (Exhibit 12: NFL Gambling Policy
21      September 2008 (#PLAINTIFFS' 00003276-
22      281), was marked for identification.)
23   BY MR. SIGLER (continuing):
24      Q.   Mr. Ferazani, you've been handed a
25   document marked Exhibit 12.  Please review
```

Page 126

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2   didn't have a sportsbook, they're prohibited
 3   from gambling on sports.  They're not
 4   prohibited from going into a Nevada casino
 5   where there would be legal gambling or I guess
 6   they would not be prohibited from going into a
 7   New Jersey casino with regular gambling.
 8        So that's just to clarify that
 9   issue between using their image to promote
10   such activity versus what they're entitled to
11   do on their own time.  So I just wanted to
12   clarify that.  So in clarifying that, I lost
13   your question.  I'm sorry.
14        (Requested portion read.)
15        MR. DREYER:  Same objection to the
16      form of the question.
17      A.   I guess we do by the manner in
18   which we enforce it.
19      Q.   So the NFL enforces this provision
20   paragraph 15 in a way that makes the
21   distinction between sports gambling and
22   non-sports gambling?
23        MR. DREYER:  Objection to the form
24      of the question.  You can answer.
25      A.   Well, it -- as within the text of
```

Page 128

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2   this document and tell me whether you
 3   recognize it.
 4      A.   (Examining document.)
 5        This would be the NFL gambling
 6   policy apparently in existence in September
 7   2008.
 8      Q.   Is this policy still in place
 9   today?
10      A.   The essence of the policy is.
11   However, as I've mentioned, we brought all of
12   the policies under one umbrella and
13   essentially I think it's a cosmetic change in
14   that they're all in one spot.  But the essence
15   of this policy is still in effect, yes.
16      Q.   At the top of the page, there is a
17   line that refers to an Administrative Business
18   Operations, League Rules and Policies.  Do you
19   see that?
20      A.   Yes.
21      Q.   What is that?
22      A.   There is a Business Operations
23   Manual with many different sections and
24   components.  This is a section of that manual.
25      Q.   What's the relationship between the
```

Page 129

HIGHLY CONFIDENTIAL - L. FERAZANI

1  HIGHLY CONFIDENTIAL - L. FERAZANI
2  Business Operations Manual and the
3  Constitution and Bylaws.
4      A.    I guess it would best be described
5  as this is the manner in which we enact the
6  principles reflected in the Constitution and
7  Bylaws.
8          MR. DREYER:  And so the record is
9      clear, when the witness referred to
10     "this," I believe he was referring to
11     Exhibit 12.
12         THE WITNESS:  Correct.
13     Q.    Exhibit 12 is part of the Business
14 Operations Manual that you've been discussing,
15 correct?
16     A.    Correct.
17     Q.    Where does the Business Operations
18 Manual reside?
19         MR. DREYER:  Objection to the form
20     of the question.  You can answer.
21     A.    I believe there's an electronic
22 version on our League Secretary, it's called.
23 It's an internal computer home page.
24     Q.    Is it distributed to teams and
25 players?

Page 130

1  HIGHLY CONFIDENTIAL - L. FERAZANI
2      A.    It's not distributed to players.
3  It is distributed to teams and obviously
4  League employees.
5      Q.    At the top of the first page, it
6  says:  League policy strictly prohibits
7  associations with gambling in any form.
8          Do you see that?
9      A.    I see that.
10     Q.    Does this prohibition apply to all
11 types of gambling, including non-sports
12 gambling?
13     A.    It -- players are permitted to go
14 to casinos in the off-season that don't have a
15 sportsbook and are not allowed to bet on NFL
16 games.  League employees are similarly
17 permitted to go to legal casinos.  The sports
18 prohibition is set forth farther down the
19 page.
20     Q.    You may have already said this, but
21 when was this version of the policy in effect?
22     A.    My read from the face of Exhibit 12
23 is that this was published as of September
24 2008.  My suspicion is that it preceded that
25 but I don't...

Page 131

1  HIGHLY CONFIDENTIAL - L. FERAZANI
2      Q.    Do these policies apply to all NFL
3  players, teams and employees?
4          MR. DREYER:  Objection to the form
5      of the question.  You can answer.
6      A.    The policies reflected in the
7  administrative business operations apply to
8  League employees and club employees.  The same
9  principle applies to players, but that reaches
10 them, for lack of a more artful term, through
11 the collective bargaining agreement and the
12 restrictions contained in their NFL player
13 contract.
14         (Exhibit 13: NFL Owner Involvement
15     in Gambling-Related Businesses, was
16     marked for identification.)
17 BY MR. SIGLER (continuing):
18     Q.    Mr. Ferazani, you've been handed a
19 document marked Exhibit 13.  Please review
20 this document and tell me whether you
21 recognize it.
22     A.    I do.
23         MR. DREYER:  Counsel, this doesn't
24     have a Bates number on it.  Was this
25     produced by our side of the case?

Page 132

1  HIGHLY CONFIDENTIAL - L. FERAZANI
2          MR. SIGLER:  I think it was an
3      attachment to the declaration.
4          MR. DREYER:  Okay.  To Commissioner
5      Godell's declaration, correct?
6          MR. SIGLER:  Yes.
7  BY MR. SIGLER (continuing):
8      Q.    So, Mr. Ferazani, do you recognize
9  this document, Exhibit 13?
10     A.    It appears to be a section --
11 different section of the Administrative and
12 Business Operations Manual, a different part
13 of the same document that is reflected in
14 Exhibit 12.
15     Q.    Can you put Exhibits 12 and 13 next
16 to each other, please.  In Exhibit 12 flip to
17 the page that has the Bates number 3279 in the
18 bottom right-hand corner.
19     A.    Yes.
20     Q.    Is this portion of Exhibit 12
21 starting at 3279 the same policy that is
22 reflected in Exhibit 13?
23     A.    If you like, I can read and just
24 track both of them together.
25         MR. DREYER:  I think the documents

Page 133

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2     speak for themselves.  But you can answer
 3     as to your understanding.
 4        A.    (Examining document.)
 5        Q.    And just to be clear, Mr. Ferazani,
 6     I'm not asking you to do a word-for-word
 7     comparison.  I'm just trying to understand if
 8     they're the same policy.  And I'll point out,
 9     by the way, that in the bottom left-hand
10     corner, Exhibit 13 seems to say 10-11 and
11     Exhibit 12 says 9-08.  So they very well may
12     be different in some minor way.
13           But having said all of that, I'm
14     just trying to find out whether this is the
15     same policy about owner involvement in
16     gambling-related businesses.
17        A.    This is addressing the same issue
18     which is owner involvement in gambling-related
19     issues.  I believe you also have within our
20     production -- this is what I was discussing as
21     far as the cosmetic change when everything was
22     brought under one roof under gambling policy,
23     which has essentially the same prohibitions
24     and restrictions.
25        Q.    Is Exhibit 13 a newer version of
```

Page 134

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2     what is reflected in Exhibit 12?
 3        A.    It's either an identical version or
 4     a newer version.  And I'm basing that upon the
 5     date in the lower left versus lower right
 6     corners of Exhibits 12 and 13.
 7        Q.    On Exhibit 13 the date reflected in
 8     the lower-hand corner is October of 2011; is
 9     that right?
10        A.    That's what I interpret that to
11     mean, yes.
12           (Exhibit 14: NFL Gambling Policy
13           (#PLAINTIFFS' 00003110-116), was marked
14           for identification.)
15     BY MR. SIGLER (continuing):
16        Q.    Mr. Ferazani, you've been handed a
17     document marked Exhibit 14.  Please review
18     this document and tell me whether you
19     recognize it.
20        A.    Yes, I do.
21        Q.    What is this document?
22        A.    This is the new gambling policy
23     that I've alluded to in the past that was
24     presented on September 1, 2012.
25        Q.    Is this part of the Business
```

Page 135

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2     Operations Manual that we were discussing in
 3     connection with Exhibits 12 and 13?
 4        A.    No.  This is -- as I said, the
 5     change in 2012 was that we brought --
 6     revisited the gambling policy, clarified it,
 7     and brought it under one standalone document
 8     which is this document, Exhibit 14.
 9        Q.    So this document is not part of the
10     Business Operations Manual?
11        A.    It's a standalone document.  It's
12     also found on the Secretary and distributed to
13     all the League and club employees as the
14     Business Operations Manual.  Honestly, I'm not
15     sure if the Business Operations Manual which,
16     you know, past day was actually a written
17     document, you know, hard paper, if that still
18     exists or, via the Internet, we've changed.
19        Q.    Is this policy, Exhibit 14,
20     distributed to players?
21        A.    The language in this document is
22     distributed to players but there's posters in
23     the locker rooms, it's reflected in their
24     sports contract, and I believe they have a
25     smaller insert which every club is required to
```

Page 136

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2     distribute to players reflecting this
 3     information.  It may just look different.
 4        Q.    Is this actual document,
 5     Exhibit 14, distributed to players?
 6        A.    I don't know.
 7        Q.    Why did the NFL prepare this
 8     document in September of 2012?
 9        A.    Well, it was prepared over the
10     course of months leading up to September 2012.
11     It reflected the fact that our gambling policy
12     was reflected in several different sections
13     and manuals, both the NFL player contract and
14     the Business & Operations Manual.  I believe
15     that the parties that were responsible for
16     this, such as Mr. Birch and Mr. Palletti,
17     reviewed all of the policies and attempted to
18     make a more coherent and consistent policy.
19        Q.    What prompted them to decide that
20     they needed to put together a comprehensive
21     gambling policy?
22           MR. DREYER:  Objection to the form
23           of the question.  You can answer.
24        A.    I think Mr. Birch was promoted to a
25     -- in his role, it became a broader role with
```

Page 137

HIGHLY CONFIDENTIAL - L. FERAZANI

1    player engagement.  I believe that they were
2    receiving more phone calls for clarification
3    about both what players were permitted to do
4    and not permitted to do and what clubs were
5    permitted to do and not permitted to do.  And
6    there was some uncertainty because the policy
7    was housed in several different spots, and it
8    may have been somewhat antiquated in some of
9    the language.  So they set about revising it,
10   tightening it and putting it in one document.
11       Q.    Did NFL team owners approve this
12   document, Exhibit 14?
13       A.    This was approved by the
14   Commissioner.
15       Q.    It was approved by the Commissioner
16   but not the teams?
17       A.    Correct.
18       Q.    So how does this policy,
19   Exhibit 14, apply to players?
20           MR. DREYER:  Objection to the form
21           of the question.  You can answer.
22       A.    The same way that any rule applies
23   to players.  You know, for example, on page 2
24   of this exhibit, it more clearly defines what

212-267-6868          VERITEXT REPORTING COMPANY          516-608-2400
                        www.veritext.com

Page 138

HIGHLY CONFIDENTIAL - L. FERAZANI

1    a player may or may not do in-season versus
2    off-season.  It further defines gambling
3    associations in a way that actually is more
4    easily understandable in today's environment.
5           It defines more fully gambling-
6    related advertisement and it defines and sets
7    forth what players are allowed to do, and it
8    essentially sets forth what employees are
9    allowed to do.
10       Q.    Did this policy, Exhibit 14, change
11   the NFL's gambling policy or simply combine
12   the NFL's existing policies into a single
13   document?
14           MR. DREYER:  Objection to the form
15           of the question.  You can answer.
16       A.    It's a difficult question to answer
17   because it further defines certain aspects of
18   the policy.  I would submit that it didn't
19   materially change anything but it did, you
20   know, for example, better define what players
21   can do.  When it says you are prohibited from
22   associating with known gamblers, that's more
23   well defined in Exhibit 14.
24       Q.    This document, Exhibit 14, contains

212-267-6868          VERITEXT REPORTING COMPANY          516-608-2400
                        www.veritext.com

Page 139

HIGHLY CONFIDENTIAL - L. FERAZANI

1    a definition of gambling, correct?
2        A.    Yes, it does, page 1.
3        Q.    Is this the NFL's official policy
4    regarding the meaning of gambling?
5        A.    The NFL gambling policies, yes,
6    this is.
7        Q.    Prior to this document in September
8    1st of 2012, did the NFL have an official
9    definition of gambling?
10       A.    I'm not sure that it was set forth
11   in any specific document.  I would imagine
12   that it was consistent with what is reflected
13   on page 1, but I'm not sure that it was ever
14   set forth in a specific place.
15       Q.    What was the source for this
16   definition of gambling?
17       A.    I don't know.
18       Q.    Do you agree with the definition of
19   gambling set out in Exhibit 14?
20           MR. DREYER:  Are you asking for his
21           personal view as opposed to the NFL's
22           view?
23           MR. SIGLER:  I'm just asking for
24           his -- yes, his personal view, yes.

212-267-6868          VERITEXT REPORTING COMPANY          516-608-2400
                        www.veritext.com

Page 140

HIGHLY CONFIDENTIAL - L. FERAZANI

1           MR. DREYER:  You can answer if
2           you're able to.
3        A.    This appears to be a good
4    definition of gambling, yeah.
5           MR. SIGLER:  Let's go off the
6           record for a minute.
7           (Lunch recess taken:  1:16 p.m.)

212-267-6868          VERITEXT REPORTING COMPANY          516-608-2400
                        www.veritext.com

Page 141

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2        A F T E R N O O N   S E S S I O N
 3           (Resumed:  2:00 p.m.)
 4           (Exhibit 15: 2011 League Policies
 5        for Players excerpt (#PLAINTIFFS'
 6        00001854-857), was marked for
 7        identification.)
 8   CONTINUED EXAMINATION
 9   BY MR. SIGLER:
10        Q.   Mr. Ferazani, you've been handed a
11   document marked Exhibit 15.  Please review
12   this document and tell me whether you
13   recognize it.
14        A.   I do.
15        Q.   What is this document?
16        A.   It's the 2011 League Policy For
17   Players, a portion of that.  This is the
18   portion regarding the gambling policy for
19   players.
20        Q.   Is the League Policies for Players
21   in a book or notebook or something that is
22   passed out to players?
23        A.   Yes.
24        Q.   And is it distributed to players at
25   the beginning of each season?
```

Page 143

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2   question from the union about it.  I'm not
 3   sure in what form it was distributed to the
 4   players.  I know that this League policy book
 5   is distributed with their play books when
 6   camps open, which is typically at the end of
 7   July.
 8        So I know this wasn't rolled out
 9   until September 1, I know this was after that.
10   So I'm not sure the form in which it was sent
11   to the union, but I know it was because the
12   union had questions about this policy.
13        MR. DREYER:  Just so the record's
14     clear, the witness is referring to both
15     Exhibits 14 and 15.
16        Q.   And you said that the union had a
17   question about this policy, meaning
18   Exhibit 14?
19        A.   Correct.
20        Q.   What was the question?
21        A.   It had to do with the -- I think
22   the definitional sections or it had to do with
23   the scope.
24        Q.   Do you remember what the question
25   was?
```

Page 142

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2        A.   It is, usually with their play
 3   books.
 4        Q.   Is there a 2012 version of the
 5   League Policies for Players?
 6        A.   I believe the 2000 and -- there is.
 7   I'm not sure if it was a -- they just reset
 8   the same policy.  I know that the 2012
 9   overriding gambling policy was issued after
10   camp, so I'm not sure what was disseminated to
11   the players reflecting that policy.
12        Q.   But there was a 2012 book
13   containing League Policies for Players that
14   was distributed to players at the beginning of
15   the season, correct?
16        A.   I believe so, because this also
17   covers the drug and steroid policy and various
18   other aspects of their employment.
19        Q.   Okay.  And you said that the new
20   NFL gambling policy, which is Exhibit 14, was
21   not part of the 2012 League Policies for
22   Players that was distributed to players,
23   correct?
24        A.   I know this was distributed in some
25   form to the players because I know we had a
```

Page 144

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2        A.   No.  It was directed to Mr. Birch.
 3   It might have been how it was going to be
 4   distributed.  I'm not sure.
 5        MR. SIGLER:  Anthony, while I'm
 6     thinking about it, I would like to
 7     request a copy of the 2012 League
 8     Policies for Players.
 9        MR. DREYER:  That's fine.  It would
10     be helpful to have it in writing, but I
11     understand the request.  If we haven't
12     produced it and it exists, we'll make it
13     available.
14        MR. SIGLER:  Okay.
15   BY MR. SIGLER (continuing):
16        Q.   Turn with me, please, to the second
17   page of this document with the Bates number
18   1855 in the bottom right-hand corner.  Is this
19   a gambling policy that is included in the
20   League Policies for Players distributed to
21   players?
22        A.   It certainly was in 2011.  I'm not
23   sure if the same form was in 2012.  I just
24   don't know the answer to that.
25        Q.   Okay.  And in the middle of this
```

Page 145

1          HIGHLY CONFIDENTIAL - L. FERAZANI
2    page, there's a notice that this document says
3    is posted in every NFL locker room.  Do you
4    see that?
5          A.    On page 1855?
6          Q.    Correct.
7          A.    I know that it is.  I just can't
8    find the reference here.  Oh, I'm sorry, yes,
9    at the end of the first paragraph, yes.
10         Q.    So the notice in the middle of this
11   page is posted in every NFL locker room?
12         A.    The prohibition on bribes and
13   gambling, yes.
14         Q.    Do you know whether the notices
15   posted in every NFL locker room have been
16   changed with the new September 2012 gambling
17   policy?
18         A.    I do not know that.
19         Q.    Can you turn to the next page,
20   please, 1856.
21         A.    Yes.
22         Q.    Is this section, Frequently Asked
23   Questions, also part of the League Policies
24   for Players book?
25               MR. DREYER:  Objection to the form

Page 146

1          HIGHLY CONFIDENTIAL - L. FERAZANI
2    of the question.
3          A.    In 2011 it was.  I think it was
4    actually -- 2011 it was.
5          Q.    And do you know whether Frequently
6    Asked Questions are included in the 2012
7    version of League Policies for Players?
8          A.    I'm not sure.
9          Q.    When there was a question about the
10   new September 2012 gambling policy,
11   Exhibit 14, why did that question go to
12   Mr. Birch?
13               MR. DREYER:  Objection to the form
14   of the question.  You can answer.
15         A.    Before -- well, he was the person
16   that was working on consolidation.
17         Q.    And the question came in from the
18   union, you said?
19         A.    Yes.  That's why I know it was sent
20   out to the union and players.  There was an
21   issue and I'm not sure of the specifics but it
22   was directed to Mr. Birch.
23         Q.    Do you know whether the NFL
24   gambling policy, Exhibit 14, went to all of
25   the players or just union representatives?

Page 147

1          HIGHLY CONFIDENTIAL - L. FERAZANI
2          A.    It would have been distributed to
3    all the players.
4          Q.    And how do you know that?
5          A.    The essence -- well, that would be
6    the practice.
7          Q.    How does something get distributed
8    to all of the players, as a typical practice?
9          A.    Materials will be sent to each
10   individual club with the direction that it
11   must be sent, must be distributed to players
12   by a specific date and time.  We also have
13   certain, as you referenced from prior
14   questions, certain posters and signage which
15   are required to be in every NFL locker room.
16               In addition to the gambling policy,
17   the drug and steroid policy posters are
18   required to be there.  There's signage about
19   concussions.  So those are how we send the
20   message.
21               (Exhibit 16: 2009 League Policies
22         for Players (#PLAINTIFFS' 00003273-274),
23         was marked for identification.)
24   BY MR. SIGLER (continuing):
25         Q.    Mr. Ferazani, you've been handed a

Page 148

1          HIGHLY CONFIDENTIAL - L. FERAZANI
2    document marked Exhibit 16.  Please review
3    this document and tell me whether you
4    recognize it.
5          A.    Yes, I do.
6          Q.    Is this the 2009 version of the
7    League Policies for Players?
8          A.    The gambling portion of the League
9    policies, yes.
10         Q.    Thank you.
11               Were there frequently asked
12   questions included in the 2009 League Policies
13   for Players?
14         A.    I suspect there were, but I can't
15   tell you definitively.
16               (Exhibit 17: Frequently Asked
17         Questions, was marked for
18         identification.)
19   BY MR. SIGLER (continuing):
20         Q.    Mr. Ferazani, you've been handed a
21   document marked Exhibit 17.  Can you review
22   this document and tell me whether you
23   recognize it.
24               MR. DREYER:  While the witness is
25         doing that, I notice this doesn't have a

Page 149

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2    Bates number.  Was this something
 3    produced in the litigation?
 4         MR. SIGLER:  It's something we
 5    found on the Internet.  I think it may be
 6    something that should have been produced,
 7    but that's how we found it.
 8         MR. DREYER:  All right.  Was it
 9    produced by your side?
10         MR. SIGLER:  Look, Anthony, we've
11    had our e-mail exchange on this.  If you
12    want to make an objection, go ahead and
13    make it.  We don't need to make a record
14    now.
15         MR. DREYER:  I'll make a record
16    that it is the Plaintiffs' position that
17    use of this document violates the court
18    order.  So we object to its use in the
19    deposition.
20         Is this a complete copy of the
21    document, Counsel?
22         MR. SIGLER:  This is a complete
23    copy of what we found.  I'm waiting to
24    hear from the witness, why don't we
25    handle it that way.  Rather than you
```

Page 150

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2    questioning me, why don't we --
 3         MR. DREYER:  I'm just trying to
 4    understand this document because it looks
 5    like the first portion of the document
 6    has been removed, so I was trying to get
 7    some clarity on the issue.
 8         MR. SIGLER:  We did not make any
 9    modifications to the document.
10         MR. DREYER:  Okay.
11    BY MR. SIGLER (continuing):
12         Q.   Do you recognize this document?
13         A.   I can't say that I've ever seen
14    this document before.  And I'm reading from
15    the preamble; I'm not sure who would draft
16    something like this.  It certainly seems to
17    reflect components of the new policy, but I
18    can't tell you who drafted it.
19         Q.   Okay.  Do you see in the second
20    paragraph, it says:
21         As part of that evaluation, the
22    staff reviewed the policies and practices
23    of the other major sports leagues,
24    conducted extensive fan research,
25    analyzed the likely impact of recent
```

Page 151

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2    gambling-related legislative developments
 3    at both the state and federal level and
 4    surveyed all of their clubs.
 5         A.   I see that paragraph.
 6         Q.   Recognizing that you said you don't
 7    recognize this document, do you know what that
 8    sentence could refer to?
 9         A.   Other than what it's describing?
10         Q.   Do you know what extensive fan
11    research this paragraph is referring to?
12         A.   To my knowledge, other than our
13    understanding of our fans based upon our daily
14    operations, my understanding there were no new
15    studies commissioned, no new studies
16    commissioned.
17         Q.   Do you know whether there was a
18    survey of the NFL's clubs as referred to in
19    this paragraph?
20         A.   To the extent there was any survey,
21    most likely there were lawyers working for the
22    Business Ventures Committee having a
23    conversation with the members of the different
24    clubs to figure out what the different clubs
25    were doing.  But to my understanding and
```

Page 152

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2    knowledge, there was no specific formal survey
 3    conducted.
 4         Q.   Can you turn to the last page of
 5    this document, please.
 6         A.   Yes.
 7         Q.   Do you see the subpart (g) at the
 8    top of the document?
 9         A.   Yes.
10         Q.   And do you see that it refers to a
11    payment to the NFL of 5 percent of the total
12    amount being paid by the advertiser?
13         A.   I see that reference.
14         Q.   Are you aware of that practice or
15    policy?
16         MR. DREYER:  Objection to the form
17    of the question, lacks foundation.  You
18    can answer.
19         A.   I'm aware that 5 percent of the
20    total amount is supposed to be paid to fund
21    the League's gambling education and other
22    related programs, yes.
23         Q.   So 5 percent of the amount paid by
24    a gambling-related advertiser to a particular
25    team needs to be paid to the NFL?
```

Page 153

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2        A.    5 percent of a non-sports gambling-
 3   related advertiser's revenue to a team must be
 4   given to the NFL and passed through the NFL
 5   for which it will be used to fund a specific
 6   purpose, which is gambling education to
 7   prevent our players, coaches, officials and
 8   other club and league employees from gambling
 9   on sports.
10        Q.    Is that a recent development?
11        A.    Yes.
12        Q.    Mr. Ferazani, I would like to talk
13   about fantasy football.  Can you please
14   describe what fantasy football is.
15              MR. DREYER:  Objection to the form
16        of that question.  But you can answer.
17        A.    Fantasy football --
18              MR. SIGLER:  What's the objection?
19   To the form of the question?
20              MR. DREYER:  Are you talking about
21        fantasy football generally or what the
22        NFL does?  It's a broad and I think
23        open-ended question, but he can answer it
24        as best he understands it.
25        Q.    Go ahead and answer the question.
```

Page 155

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2   of the question.
 3        A.    Well, I think the outcome is each
 4   week one fantasy football player's team
 5   competes against another person from his
 6   league's team or her league's team and
 7   whichever team's players perform best on the
 8   field for that week, that team will win in the
 9   fan -- that fantasy contest.  So it's based
10   upon how well the team -- players an
11   individual selects perform.  I guess that's
12   based upon statistical analysis.
13        Q.    And with respect to the participant
14   in the fantasy football league who signs up
15   and drafts his players at the beginning of a
16   season, the outcome of the fantasy football
17   season will, in part, be determined based on
18   chance, correct?
19              MR. DREYER:  Objection to the form
20        of the question as well as I think we're
21        past the witness' 30(b)(6) topics.  You
22        can answer if you understand it.
23        A.    I'm not -- I guess it's -- there's
24        a point or points assigned for each category
25        and how your players perform on a given week
```

Page 154

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2        A.    Fantasy football is a game in which
 3   fantasy players draft or select a team at the
 4   beginning -- usually at the beginning of the
 5   season or prior to the start of the season.
 6   And they follow that team, and each player on
 7   the team that they selected gets certain
 8   points for how that player performs in real
 9   live football games, be it yardage for
10   receivers or running backs, touchdowns,
11   points.  I believe in some iterations, players
12   can select defenses and get points based upon
13   what the defenses do.
14              And the points are all accumulated
15   and each individual fantasy football team
16   competes against other individuals who have
17   their own teams for leagues, and whoever has
18   the most points at the end of the day wins a
19   specific game and then they play that through
20   the course of the League.  I did it very
21   poorly, but I think that's the general gist.
22        Q.    And the outcome of a fantasy
23   football league is determined, at least in
24   part, by chance, correct?
25              MR. DREYER:  Objection to the form
```

Page 156

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2   is what's going to determine whether or not
 3   your team beats the other fantasy team you're
 4   playing against.
 5              To the extent chance -- I guess I
 6   don't understand what you mean by chance has
 7   some role in that.  Does weather affect a
 8   player's ability to perform in a given week?
 9   Sure.  An injury could occur.  I guess if
10   that's what you mean by chance, then there's
11   certainly -- no one knows what anybody's going
12   to do in any given week.
13        Q.    The outcome of a fantasy football
14   season is uncertain at the time someone signs
15   up and drafts their players, correct?
16        A.    Yes.
17        Q.    Mr. Ferazani, in some fantasy
18   football leagues, there is a financial prize
19   for the winner, correct?
20              MR. DREYER:  Objection to the form
21        of the question.  And the witness'
22        knowledge as to fantasy football games
23        generally, again, is beyond the scope of
24        the 30(b)(6).  You can answer as to your
25        understanding.
```

Page 157

HIGHLY CONFIDENTIAL - L. FERAZANI

1
2     A.     The fantasy football games that I'm
3  aware of, there's a prize but not a financial
4  prize.  We have them in our NFL.com, but those
5  are you win a trip, I believe.
6     Q.     And the trip has value, correct?
7     A.     To our fans, sure.  I think it's a
8  Super Bowl, a Pro Bowl trip.
9     Q.     And are you aware of there being
10  fantasy football leagues where people play for
11  financial prizes?
12     A.     Not personally, no.
13     Q.     And I just want to be clear:  You
14  say "not personally."  Are you aware of any
15  fantasy football leagues where people play for
16  financial prizes?
17     A.     No.  I don't play fantasy football.
18  I know what we offer so I'm not -- I can't
19  tell you that there are others, other places
20  that you can go to and somehow win cash
21  playing fantasy football.  The ones I'm
22  familiar with are run by us and you're either
23  playing for a prize but mostly you're playing
24  for bragging rights against the people against
25  whom you play.

Page 158

HIGHLY CONFIDENTIAL - L. FERAZANI

1
2     Q.     Is the NFL aware that there are
3  fantasy football leagues that are played for
4  financial prizes?
5     A.     The NFL is aware of the fantasy
6  football leagues that we run.  I think that's
7  the extent of what I'm comfortable to testify
8  to.
9     Q.     Are any of the fantasy football
10  leagues that the NFL runs for financial
11  prizes?
12     A.     No.
13     Q.     Are you aware that in some fantasy
14  football leagues, there is an entrance fee
15  paid by participants?
16          MR. DREYER:  Objection to the form
17     of the question.  You can answer.
18     A.     Our fantasy football leagues that
19  we run there is absolutely no entry fee.
20     Q.     I'm not sure you answered my
21  question.
22     A.     I'm not familiar with other
23  leagues.  I'm familiar with our leagues, the
24  ones that we run.
25     Q.     So you're not aware of fantasy

Page 159

HIGHLY CONFIDENTIAL - L. FERAZANI

1
2  football leagues where the participants pay
3  entrance fees?
4          MR. DREYER:  Objection; asked and
5     answered, lack of foundation.  You can
6     answer.
7     A.     No.  And it would strike me as odd,
8  given that you could play on our forum for
9  nothing, why you would pay an entrance fee
10  somewhere else.
11     Q.     Well, are you aware of fantasy
12  football leagues where the participants pay an
13  entry fee that goes into a pool and the winner
14  gets the proceeds from the pool?
15          MR. DREYER:  Objection; lack of
16     foundation, asked and answered.  You can
17     answer.
18     A.     I'm familiar with our leagues which
19  are not operated that way.  I'm not familiar
20  with your example.
21     Q.     Let's talk about the NFL's
22  involvement in fantasy football.  When did
23  NFL.com begin to offer fantasy football?
24     A.     My belief--and I may not be exactly
25  certain on the specific year--but my

Page 160

HIGHLY CONFIDENTIAL - L. FERAZANI

1
2  understanding is that in '02 or '03 we took
3  over our -- the NFL.com.  I think that's when
4  we began to offer fantasy football.
5     Q.     And during the period 2002 or 2003
6  to present, has the NFL offered any fantasy
7  football leagues involving a financial prize
8  to the winner?
9     A.     No.
10     Q.     Has the NFL offered any fantasy
11  football leagues by which participants pay an
12  entrance fee?
13     A.     No.
14     Q.     Prior to 2002 or 2003, did the NFL
15  license use of its marks to other fantasy
16  football sites?
17     A.     I believe CBS ran our online
18  offering.
19     Q.     And how far back did that go?
20     A.     I don't know.
21     Q.     Does the NFL license other fantasy
22  football sites today?
23     A.     Not to my knowledge.
24     Q.     And the NFL hosts today its own
25  fantasy football leagues on NFL.com, correct?

## Page 161

HIGHLY CONFIDENTIAL - L. FERAZANI

2    A.    That's correct, yes.
3    Q.    Does the NFL make revenue from its
4  fantasy football leagues on NFL.com?
5    A.    There's no entry fee, but I believe
6  that fantasy football, as offered by the NFL,
7  can serve to enhance our fan experience and
8  increase the loyalty of our fans.  So to the
9  extent of that engagement, there's a benefit,
10  a financial benefit, to the League.
11        (Exhibit 18: Fantasy Industry
12    Trends (#PLAINTIFFS' 00003511-557), was
13    marked for identification.)
14  BY MR. SIGLER (continuing):
15    Q.    Mr. Ferazani, you've been handed a
16  document marked Exhibit 18.  Please take a
17  look at this document and tell me whether you
18  recognize it.
19    A.    (Examining document.)
20        I don't.
21    Q.    You don't recognize it?
22    A.    (Examining document.)
23    MR. SIGLER:  Anthony, can you tell
24  me whether this came from NFL's files or
25  any of your --

212-267-6868        VERITEXT REPORTING COMPANY        516-608-2400
                    www.veritext.com

## Page 162

HIGHLY CONFIDENTIAL - L. FERAZANI

2    MR. DREYER:  I don't think he
3  answered your last question.  But it was
4  from the NHL's files.
5  BY MR. SIGLER (continuing):
6    Q.    Mr. Ferazani, can you turn with me,
7  please, to the page in the presentation with
8  the Bates number 3548 in the bottom corner.
9    A.    Yes.
10    Q.    Do you see that this page reflects
11  a survey of what motivated consumers to start
12  playing fantasy sports?
13    A.    That's what it says, yes.
14    Q.    And do you see that number 5 is:
15  I thought I could win money?
16    A.    That's what it says, yes.
17    Q.    Does that surprise you?
18    MR. DREYER:  Objection, lack of
19  foundation, to the form of the question.
20    A.    I don't know what to tell -- I know
21  that they can't win money through the fantasy
22  football that we offer on our platform.
23    Q.    Mr. Ferazani, what did you do to
24  familiarize yourself with the NFL's fantasy
25  football offerings for purposes of your

212-267-6868        VERITEXT REPORTING COMPANY        516-608-2400
                    www.veritext.com

## Page 163

HIGHLY CONFIDENTIAL - L. FERAZANI

2  deposition today?
3    A.    I spoke with Cory Mummery, who is
4  in charge of our fantasy football offerings,
5  and spoke with Alicia Rankin, who's our fan
6  engagement or survey person who coordinates
7  that; reviewed legal documents about fantasy
8  football and went on our website and looked to
9  see what it was that we offered.
10    Q.    Who's Cory Mummery?
11    A.    He's an employee of NFL.com who
12  coordinates our fantasy football offerings.
13    Q.    And what did you speak to Cory
14  Mummery about?
15    A.    I asked him for an outline of what
16  it is that we offered, the rules of our games.
17  I asked him to produce certain documents.  I
18  asked him for a general history of our fantasy
19  football offerings.
20    Q.    And did he provide that to you?
21    A.    He did.
22    Q.    Did he create a document for you,
23  or did he give you a package of preexisting
24  documents?
25    A.    We had a telephone call in which he

212-267-6868        VERITEXT REPORTING COMPANY        516-608-2400
                    www.veritext.com

## Page 164

HIGHLY CONFIDENTIAL - L. FERAZANI

2  provided me an overview of the information and
3  then he produced documents to me which I
4  forwarded to our counsel that potentially were
5  or were not responsive.
6    Q.    Before preparing for this
7  deposition, had you dealt with Mr. Mummery at
8  all previously?
9    A.    Never.
10    Q.    Do any of your job responsibilities
11  involve fantasy football?
12    A.    I will -- the first time I had to
13  involve myself with fantasy football was to
14  prepare for the document production in this
15  case.
16    Q.    Can you turn with me, please, to
17  the page of the study with the Bates number
18  3550 in the bottom corner.
19    A.    Okay.
20    Q.    And do you see that this page
21  refers to how fantasy sports affect consumers?
22    A.    That's what it says, yes.
23    Q.    And do you see the second row from
24  the bottom says:  I am more loyal to my
25  fantasy teams than my favorite professional

212-267-6868        VERITEXT REPORTING COMPANY        516-608-2400
                    www.veritext.com

Page 165

HIGHLY CONFIDENTIAL - L. FERAZANI

1
2      teams?
3          A.    I see that's what it says, yes.
4          Q.    And the percentage agreeing with
5      that statement was 28 percent in 2006 and 26
6      percent in 2011?
7          A.    That's what it says.
8          Q.    Now, does this sentiment being
9      expressed by users of fantasy football concern
10     the NFL?
11             MR. DREYER:  Objection, lack of
12         foundation.
13         A.    I'm not sure what this represents
14     as far as who was sampled, ages, demographics,
15     how the questions were presented.  I really
16     can't comment on this, having looked at it for
17     the first time.
18         Q.    Does the NFL acknowledge that some
19     of the users of NFL.com fantasy football may
20     be more loyal to their fantasy teams than to
21     their favorite professional teams?
22         A.    I'm not sure that I've ever seen
23     any information to that effect.
24         Q.    You haven't seen the information
25     one way or the other on that, correct?

Page 167

HIGHLY CONFIDENTIAL - L. FERAZANI

1
2      were not so myopic only for the Broncos
3      players, but they had an appreciation for
4      other players across the League and they had a
5      really deep understanding of who else was
6      playing there and who was playing well and not
7      playing well.  And it really helps to enhance
8      and develop our fantasy football folks'
9      appreciation for the individual athletes.
10             So I don't know that this, in and
11     of itself, is cause for concern.  I can't tell
12     you if it's true or not but...
13         Q.    Does it concern you if people are
14     playing fantasy sports to win money and they
15     are more loyal to their fantasy sports teams
16     than their professional teams?
17             MR. DREYER:  Same objection.  You
18         can answer.
19         A.    If the only purpose of a person is
20     to -- is you're in the game to earn money for
21     whatever reason, be it he's playing fantasy
22     football and his only reason to watch or play
23     fantasy football is for cash without an
24     appreciation of the game, that does not
25     transfer to long-term fan affiliation and

Page 166

HIGHLY CONFIDENTIAL - L. FERAZANI

1
2          A.    I don't recall seeing information
3      one way or the other on that, no.
4          Q.    If that is the case, is that a
5      concern to the NFL?
6              MR. DREYER:  Objection; incomplete
7          hypothetical, calls for speculation.  You
8          can answer.
9          A.    Well, I don't think, in and of
10     itself, it would cause a concern.  I think
11     that fantasy football serves a great purpose.
12     It allows our fans to further connect with
13     individual athletes.  Typically our game is a
14     team sport and fans are related to a specific
15     team.  For the individual athlete, fantasy
16     football changes the focus somewhat in that it
17     allows the fan to appreciate the efforts of an
18     individual athlete.
19             I can tell you that John Elway,
20     whose Super Bowl winning in quarterback MVP
21     for the Denver Broncos a year ago or two years
22     ago, was put in charge of the football
23     operations for the Broncos.  And one of the
24     first things he did was require his front
25     office to play fantasy football so that they

Page 168

HIGHLY CONFIDENTIAL - L. FERAZANI

1
2      success.  If you don't appreciate the game for
3      the game's sake and it turns into a financial
4      transaction, that is not good for the long-
5      term health of our League.
6          Q.    Mr. Ferazani, the example you gave
7      of the Broncos having a fantasy sports
8      requirement from Mr. Elway?
9          A.    Maybe encouragement would be a
10     better.
11         Q.    Fair enough.  Did the Broncos join
12     fantasy leagues on NFL.com or in other site?
13         A.    I would hope it would be NFL.com.
14     It was reported to me by their former Director
15     of Operations.
16         Q.    Do you know whether there was an
17     entrance fee for the League that the Broncos
18     joined?
19         A.    No.  There was absolutely no
20     entrance fee for the individuals to play.  It
21     was -- as fantasy football, it was designed to
22     be on our NFL.com platform which is there was
23     no financial -- there was no money changing
24     hands.  It was for bragging rights, it was to
25     gain a greater appreciation for players on

Page 169

```
1        HIGHLY CONFIDENTIAL - L. FERAZANI
2   other teams.
3        Q.    Did the Broncos run their fantasy
4   football league by the NFL before joining it?
5        A.    There would be no reason for them
6   to do so as long as there was no gambling or
7   financial component to it.  In fact, when the
8   NFL -- my understanding when the NFL started
9   and rolled out fantasy football on NFL.com,
10  many of our executives were asked to play and
11  did, in fact, play.
12       Q.    Did Mr. Mummery search his files
13  for studies or analyses regarding the impact
14  of fantasy football on the NFL?
15       A.    I directed him to, yes.
16       Q.    And he produced to you all
17  responsive documents?
18       A.    He told me he did, yes.
19            (Exhibit 19: Fantasy Sports Trade
20       Association, was marked for
21       identification.)
22       MR. DREYER:  Once again, since this
23  is a document not produced in this
24  litigation by counsel and you persist in
25  violating the Court's order in this case,
```

Page 170

```
1        HIGHLY CONFIDENTIAL - L. FERAZANI
2   we're objecting to the use of this
3        document and all questions related to it.
4   BY MR. SIGLER (continuing):
5        Q.    Mr. Ferazani, you've been handed a
6   document marked Exhibit 19.  Do you recognize
7   this document?
8        A.    I don't.
9        Q.    Do you know what the Fantasy Sports
10  Trade Association is?
11       A.    I don't have the faintest idea.
12       Q.    Can you turn with me, please, to
13  the third-to-last-page in the document.  It
14  says Meet the Organization at the top.
15       A.    The third-to-the-last page?
16       Q.    Yes.  Looking for the page with
17  Meet the Organization at the top.
18       A.    Fourth from last?
19       Q.    Fourth from last.  We are on the
20  same page with Meet the Organization at the
21  top, correct?
22       A.    Yes, I have that in front of me.
23       Q.    Do you see that Cory Mummery is
24  listed second from the bottom on the far
25  right?
```

Page 171

```
1        HIGHLY CONFIDENTIAL - L. FERAZANI
2        A.    I see that.
3        Q.    In your discussions with
4   Mr. Mummery, did he mention that he was part
5   of this Fantasy Sports Trade Association?
6        A.    He did not.
7        Q.    Did Mr. Mummery search his files
8   for all documents regarding studies on fantasy
9   football and their impact on the NFL whether
10  they were commissioned by the NFL or not?
11       MR. DREYER:  Objection to the form
12       of the question, mischaracterizes the
13       document request.  But you can answer.
14       A.    Yes.
15       Q.    Can you turn with me, please, to
16  page 8 of the document.  And unfortunately the
17  document does not have page numbers.
18       MR. DREYER:  Or Bates numbers
19       but...
20       Q.    The top left-hand corner says:
21  Meet the fantasy sports market.
22            Do you see that?
23       A.    I do.
24       Q.    And do you see that the box in the
25  middle of the page shows that 34 million U.S.
```

Page 172

```
1        HIGHLY CONFIDENTIAL - L. FERAZANI
2   adults are playing fantasy sports?
3        A.    That's what it says, yes.
4        Q.    Are you familiar with that figure?
5        A.    I'm not.
6        Q.    And then at the bottom of that same
7   chart, it says 21 percent of U.S. males aged
8   18 to 34 play fantasy sports.  Do you see
9   that?
10       A.    That's what it says, yes.
11       Q.    Are you familiar with that figure?
12       A.    I'm not, no.
13       Q.    And then if you could turn to the
14  next page of the document, do you see the box
15  in the middle of the page that says:  Which
16  fantasy games to they play?
17       A.    I see that, yes.
18       Q.    And it says football 72 percent?
19       A.    I do see that that's what it says,
20  yes.
21       Q.    Are you familiar with that figure?
22       A.    I'm not familiar with that figure,
23  no.
24       MR. DREYER:  I believe the copy
25       that we were provided by counsel is
```

Page 173

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2     missing pages, so I would request on the
 3     record that we be given a complete copy
 4     of the document that was shown to the
 5     witness.  Again, this is one of the many
 6     reasons why this entire approach is
 7     improper.
 8        MR. SIGLER:  Anthony, there's a
 9     copy.
10        (Exhibit 20: Fantasy Sports Trade
11     Association Industry Demographics, was
12     marked for identification.)
13  BY MR. SIGLER (continuing):
14     Q.   Mr. Ferazani, you've been handed a
15  copy of a document marked Exhibit 20.  Can you
16  take a look at this and tell me whether you
17  recognize it.
18        MR. DREYER:  And while the witness
19     is reviewing Exhibit 20, let me state
20     that this is yet another violation of the
21     Court's order by the Defendants in this
22     case.  This is a document that was not
23     provided in accordance with the Court's
24     order, and we're seeing this for the
25     first time in violation of the Court's
```

Page 175

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2     Q.   And right below that it refers to
 3  League fees of $36 per player accumulating to
 4  $1.8 [verbatim] billion U.S. market share?  Do
 5  you see that?
 6     A.   I see that.
 7        MR. DREYER:  Same objection.
 8     Q.   And are you familiar with that
 9  figure?
10     A.   I'm not familiar with that figure,
11  no.
12     Q.   Have you heard any figures about
13  the market share of fantasy football in the
14  United States?
15     A.   What do you mean by "market share"?
16     Q.   Well, this is a market share figure
17  of $1.18 [verbatim] billion reflected in this
18  document, and I'm just asking whether you've
19  heard any figures regarding the U.S. market
20  share for fantasy sports.
21     A.   I don't even know -- that's the
22  U.S. market share of what?  Of the total
23  fantasy market worldwide or...?
24     Q.   Have you heard any dollar figures
25  or numbers of people associated with the size
```

Page 174

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2     order.
 3        MR. SIGLER:  And, Anthony, since
 4     you keep saying this, I feel compelled to
 5     respond that we disagree with your
 6     position on this.  We've had e-mail
 7     exchanges about it, you've made this
 8     objection in the past.  So I'll just
 9     repeat that for the record.
10        MR. DREYER:  Okay.  We'll get a
11     warrant from the Court after today's
12     deposition.
13  BY MR. SIGLER (continuing):
14     Q.   Mr. Ferazani, do you see at the
15  bottom of the page there's a bullet point that
16  says:  On average, fantasy sports players
17  spend $95 on League-related costs,
18  single-player challenge games and
19  League-related materials over a 12-month
20  period.
21        MR. DREYER:  Objection, lack of
22     foundation.  He can answer.
23     A.   I see that's what it says.
24     Q.   Are you familiar with that figure?
25     A.   No, I'm not.
```

Page 176

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2     of the fantasy football market in the United
 3     States?
 4     A.   I have not, no.
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 177

HIGHLY CONFIDENTIAL - L. FERAZANI



Page 179

HIGHLY CONFIDENTIAL - L. FERAZANI



Page 178

HIGHLY CONFIDENTIAL - L. FERAZANI



Page 180

HIGHLY CONFIDENTIAL - L. FERAZANI

Page 181

HIGHLY CONFIDENTIAL - L. FERAZANI



Page 183

HIGHLY CONFIDENTIAL - L. FERAZANI



Page 182

HIGHLY CONFIDENTIAL - L. FERAZANI



7    Q.    And the NFL likes to stimulate use

8  of NFL.com, correct?

9    A.    I think so, yes.

10    Q.    Do you know why the NFL likes to

11  stimulate use of NFL.com?

12    A.    NFL.com, in addition to hosting the

13  fantasy sites, has numerous articles about our

14  players, interesting games, leads to continued

15  fan involvement in the game and education.

16  I'm not sure honestly on the .com side if we

17  receive income per click or not.  It's beyond

18  my area of expertise.  But I think for those

19  reasons, if not also for the direct

20  financials.

Page 184

HIGHLY CONFIDENTIAL - L. FERAZANI



Page 185

HIGHLY CONFIDENTIAL - L. FERAZANI



8    Q.    And the NFL wants its fans to watch
9  games for other teams in addition to their
10  favorite team, correct?
11    A.    For the purpose of appreciating the
12  sport and appreciating the efforts of the
13  athletes on the other teams and for enhancing
14  the fan experience and deepening our ties with
15  that fan, yes, we do.



22    Q.    One would expect that a bettor
23  would want to watch the game that he or she
24  bet on, correct?
25         MR. DREYER:  Objection, calls for

Page 187

HIGHLY CONFIDENTIAL - L. FERAZANI



Page 186

HIGHLY CONFIDENTIAL - L. FERAZANI

1    HIGHLY CONFIDENTIAL - L. FERAZANI
2  speculation.  You can answer.
3    A.    Not necessarily.  A bettor -- and
4  that's going back to our initial premise.  A
5  bettor is viewing our game purely as a
6  financial transaction.  The bettor isn't
7  concerned with the artistry of the sport, the
8  effort of the individual athlete.  All the
9  bettor cares about is if his team covered the
10  spread or not.
11         To determine if he covered the
12  spread or not, he would just need to open up
13  the sports page the day after the game.  It
14  actually is opposite to what the fantasy
15  football player would be interested.  So I
16  disagree with the premise, but it's
17  speculative.
18    Q.    So you don't think that bettors
19  watch the games that they bet on?
20    A.    I guess some may.  I'm not sure.
21  It's entirely speculation.



Page 188

HIGHLY CONFIDENTIAL - L. FERAZANI



Page 189

HIGHLY CONFIDENTIAL - L. FERAZANI



13          A.    I would say our focus is developing

14    fans for watching games for the right reasons

15    because that leads to the long-term success,

16    as we discussed.  Other leagues and other

17    sports where those sports have decided to

18    align themselves with gambling, they did not

19    have a very long period of success.  And,

20    again, going back to Jai Alai, horse racing.

Page 191

HIGHLY CONFIDENTIAL - L. FERAZANI



Page 190

HIGHLY CONFIDENTIAL - L. FERAZANI



Page 192

HIGHLY CONFIDENTIAL - L. FERAZANI



Page 193

HIGHLY CONFIDENTIAL - L. FERAZANI



Page 195

HIGHLY CONFIDENTIAL - L. FERAZANI



Page 194

HIGHLY CONFIDENTIAL - L. FERAZANI



Page 196

HIGHLY CONFIDENTIAL - L. FERAZANI



16    Q.    What's Field Pass?
17    A.    I believe it was the equivalent of
18  a pay service that allowed you to watch
19  out-of-network games from cable providers and
20  provide -- you paid an extra subscription and
21  were able to get either a feed of radio from
22  games that weren't in your market.
23          So, for example, if you lived in
24  New York and you were originally from Boston
25  and you wanted to listen to the Patriots radio

Page 197

```
1          HIGHLY CONFIDENTIAL - L. FERAZANI
2    call, you could get Field Pass.
3        Q.   Was it a service through NFL.com?
4        A.   I'm not sure.  I'm not sure who --
5    where it was housed.
```



```
17            MR. SIGLER:  Can we go off the
18   record for a minute, please.
19            MR. DREYER:  Before we do, though,
20   I actually object to counsel's
21   characterization of the document which
22   speaks for itself.
23        We can go off the record.
24            MR. SIGLER:  Okay.
25            (A discussion was held off the
```

---

Page 199

```
1          HIGHLY CONFIDENTIAL - L. FERAZANI
```



```
18            MR. SIGLER:  I disagree with your
19   characterization but --
20            MR. DREYER:  I don't know why you
21   can because you haven't seen the
22   document.
23            MR. SIGLER:  I disagree with your
24   characterization of the Court order and
25   the category that we negotiated.  And
```

---

Page 198

```
1          HIGHLY CONFIDENTIAL - L. FERAZANI
2    record.)
```



---

Page 200

```
1          HIGHLY CONFIDENTIAL - L. FERAZANI
2    we've had our e-mail exchange and our
3    correspondence about this.  I continue to
4    object.  I'd like to reiterate the
5    request that you rectify this now so we
6    don't waste our time later.
7            MR. DREYER:  I have the court order
8    so what did I mischaracterize about the
9    court order?
10           MR. SIGLER:  Well, I sent you an
11   e-mail last night about it.
12           MR. DREYER:  I understand.  But you
13   directed me today to produce anything in
14   these documents related to fantasy
15   football.  That's not as broad as your
16   request you drafted and not as broad as
17   the court order.
18           The court order says:  Documents
19   regarding the impact or potential impact
20   of sports gambling, fantasy sports and/or
21   March Madness pools on consumer
22   perceptions or loyalties, competition,
23   integrity, ticket sales, attendance,
24   revenues or viewership ratings.
25   that's --
```

Page 201

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2            MR. SIGLER:  Look, we're not going
 3   to waste more time on the record about
 4   this.  I sent you an e-mail last night
 5   about it.  We're going to move on.  I
 6   object.  I think we're entitled to the
 7   entire document, and we're going to move
 8   on.  I take it you're refusing to produce
 9   the entire document now, right?
10            MR. DREYER:  Correct.
11
```


Page 203

HIGHLY CONFIDENTIAL - L. FERAZANI



Page 202

HIGHLY CONFIDENTIAL - L. FERAZANI



Page 204

HIGHLY CONFIDENTIAL - L. FERAZANI



Page 205

HIGHLY CONFIDENTIAL - L. FERAZANI



Page 207

HIGHLY CONFIDENTIAL - L. FERAZANI



Page 206

HIGHLY CONFIDENTIAL - L. FERAZANI



Page 208

HIGHLY CONFIDENTIAL - L. FERAZANI



Page 209

1       HIGHLY CONFIDENTIAL - L. FERAZANI



Page 211

1       HIGHLY CONFIDENTIAL - L. FERAZANI



Page 210

1       HIGHLY CONFIDENTIAL - L. FERAZANI



12      MR. DREYER:  We've been going for
13  about an hour and a half.  If you're
14  going to move on, could we take a break.
15      MR. SIGLER:  Let me do one more
16  document.

Page 212

1       HIGHLY CONFIDENTIAL - L. FERAZANI



5      MR. SIGLER:  Okay.  Let's take a
6  break.
7      (Recess taken:  3:27-3:40 p.m.)

Page 213

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15        (Exhibit 26: Fantasy Football
16    Offering NFL.com (#PLAINTIFFS' 00003136-
17    3150), was marked for identification.)
18  BY MR. SIGLER (continuing):
19        Q.    Mr. Ferazani, you've been handed a
20  document marked Exhibit 26.  Please take a
21  look at this document and tell me whether you
22  recognize it.
23        A.    I believe we produced this in
24  response to the document request.
25        Q.    And what is this?
```



Page 214

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2        A.    It appears to be our fantasy
 3  football offering for 2012.
 4        Q.    This is the fantasy football
 5  offering on NFL.com, correct?
 6        A.    Yes, correct.
 7        Q.    And how does fantasy football work
 8  on NFL.com?
 9        MR. DREYER:  Objection to the form
10  of the question.  You can answer.
11        A.    My understanding is you sign up for
12  the service either as an individual or a team
13  and join an existing league, or you can create
14  your own league using the platform on NFL.com.
15        Q.    And participants draft players for
16  their fantasy football team, correct?
17        A.    That's correct, yes.
18        Q.    And then they set their lineups
19  throughout the season and accumulate points,
20  correct?
21        A.    Correct.  Depending on how their
22  lineups perform in actual games, correct, yes.
23        Q.    And then the winner of the fantasy
24  football league on NFL.com is determined by
25  how many points are accumulated throughout the
```

Page 215

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2  season, correct?
 3        A.    That's correct, yes.
 4        Q.    At the time a participant drafts
 5  his or her team at the beginning of the
 6  season, the outcome of the fantasy football
 7  game is uncertain, correct?
 8        A.    True, yes.
 9        Q.    And NFL.com offers a prize to the
10  winner of its fantasy football game, correct?
11        A.    Several prizes, I believe, yes;
12  grand prize, first prize, et cetera, yes.
13        Q.    And turning to page 12 of the
14  document with the Bates number 3147 at the
15  bottom right-hand corner, there's a list of
16  prizes, correct?
17        A.    Yes.
18        Q.    And the grand prize is a package of
19  items valued at $16,600.  Correct?
20        A.    Well, it's a trip to the Super Bowl
21  and various other elements including a
22  tailgate party and gift bags and other events
23  and material related to the National Football
24  League, yes.  And there's a retail value
25  listed on that of $16,600.
```

Page 216

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2        Q.    And can you turn back to the first
 3  page of the slide, 6136.
 4        A.    Yes.
 5        Q.    Do you see that there is an all-
 6  capital paragraph under Official Rules that
 7  starts with the statement:  No purchase or
 8  payment of any kind.  Do you see that?
 9        A.    I do see that, yes.
10        Q.    And do you see that the second
11  sentence of that paragraph says:  This
12  promotion may not be used to conduct,
13  advertise or promote any form of gambling?
14        A.    I see where it says that.
15        MR. DREYER:  I'm sorry, I think
16  unless I'm looking at a different page, I
17  don't think that's quite what the
18  document says but it's close.
19        MR. SIGLER:  What does it say,
20  Anthony?
21        MR. DREYER:  The third sentence
22  you're talking about:  This game may not
23  be used to conduct, advertise or promote
24  any form of gambling?  Are we looking at
25  the same place?
```

Page 217

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2          MR. SIGLER:  Mine says "this
 3     promotion."  We're looking at a different
 4     paragraph.
 5          MR. DREYER:  Okay.
 6   BY MR. SIGLER (continuing):
 7     Q.    Look at the all-caps paragraph.
 8   The second line of the all-caps paragraph
 9   says:  This promotion may not be used to
10   conduct, advertise or promote any form of
11   gambling.
12          MR. DREYER:  Thank you, yeah, I've
13        got it.
14     Q.    So we're all there now.
15   Mr. Ferazani, are you there?
16     A.    I was there earlier.
17     Q.    Okay.  Why does the NFL include
18   this statement on its fantasy football league
19   website?
20          MR. DREYER:  I would caution the
21        witness, in answering that, not to
22        disclose any attorney-client
23        communications or any legal advice
24        received by counsel.  You can answer the
25        question if you're able to.
```

Page 218

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2     A.    I'm not sure of the purpose of the
 3   -- why do we include that?  I'm uncertain if
 4   there's certain restrictions or warnings that
 5   should be included.  But I think it's also
 6   self-explanatory; it's not designed to use
 7   this device to conduct, advertise or promote
 8   any form of gambling.
 9     Q.    And is the NFL concerned that
10   without this statement people would use
11   NFL.com to conduct gambling?
12     A.    I'm not sure I can answer that.  I
13   don't know.
14     Q.    Does the NFL think that including
15   that statement will prevent people from
16   conducting gambling?
17          MR. DREYER:  Objection to the form
18        of the question.
19     A.    Certainly they've been instructed
20   not to use it to do so.
21     Q.    Do you see on the left-hand side of
22   the page there are three gray rectangles.  One
23   says General Rules, one says NFL Managed
24   Leagues and one says Custom Leagues?
25     A.    I see that.
```

Page 219

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2     Q.    What are custom leagues?
 3     A.    My understanding is that that would
 4   be if you wanted to run your own league with
 5   specific points.  There's a variable within
 6   fantasy football if you want to promote
 7   passing versus running.  My understanding is
 8   that you can point -- the points assigned for
 9   different activities can vary from league to
10   league.
11     Q.    So is it the case that the NFL.com
12   site provides two types of leagues: one
13   that's managed by the NFL and one that is
14   managed by a participant in the "League"?
15     A.    I'm not sure that "managed" is the
16   right term.  I think some of the leagues on
17   NFL.com are made up or populated of players
18   who come in and just want to pick their own
19   team and don't necessarily have a group of
20   other friends that they want to play against,
21   and they can play against a league that's run
22   against the people they don't know run by the
23   League, by the NFL.
24          I think in other instances there
25   can be a group of people that come in with a
```

Page 220

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2   predetermined amount of folks and they want to
 3   set up their own league and assign specific
 4   points for certain offense or defense or
 5   perhaps differently from what the NFL's
 6   standard league has set up.
 7     Q.    So if a group of ten people wants
 8   to get together and have its own league, they
 9   could do so through this custom league option?
10     A.    I believe that's the manner in
11   which they would do so, yes.
12     Q.    Do you think that a grand prize of
13   $16,600 is sufficient to create a financial
14   interest in someone?
15          MR. DREYER:  Objection to the form
16        of the question.
17     A.    I think you've mischaracterized the
18   prize as we've discussed and as it's reflected
19   in Exhibit 26.  The prizes, all three prizes
20   actually, that are reflected under this
21   Fantasy section are directly related to our
22   game and appreciation of the game.  A trip to
23   the Super Bowl, a trip to the parties around
24   the Super Bowl, airfare; they're all game-
25   centric prizes.  They're all designed to
```

Page 221

HIGHLY CONFIDENTIAL - L. FERAZANI

2  deepen the winning fan's relationship and
3  appreciation of the sport.
4        The second prize, a trip to London
5  for the London game, the same thing; it's
6  focused on the game.  It's focused on a unique
7  game that we have, an international aspect of
8  our game.
9        And the third prize which is listed
10  -- the second prize, a credit to buy NFL
11  merchandise.  So it's not a cash prize; it is
12  designed to, again, deepen that winning fan's
13  relationship with the League and clubs and the
14  sport.



Page 222

1        HIGHLY CONFIDENTIAL - L. FERAZANI

9        Q.   So the NFL provides these leagues
10  and these prizes to encourage people to watch
11  more football, correct?
12        MR. DREYER:  Objection to the form
13     of the question.
14        A.   And to deepen their relationship
15  with each individual fan because it educates
16  each individual fan about players, not
17  necessarily on their own teams.  It allows
18  them a greater understanding of the game.
19        And going back to the answer from
20  earlier today, in the analogy given with the
21  Denver Broncos and John Elway, it allows for a
22  fan to develop their understanding and
23  appreciation of the game more deeply.  That
24  leads to a better fan for the NFL, a more
25  committed fan, a more involved fan, a fan more

Page 223

1        HIGHLY CONFIDENTIAL - L. FERAZANI

2  likely to avail themselves of the various
3  products that the League offers.
4        Q.   And the League wants to deepen its
5  fans' interest in the NFL so that they watch
6  more football and participate in other NFL
7  products of the type you just mentioned,
8  correct?
9        MR. DREYER:  Objection to the form
10     of the question.  You can answer.
11        A.   I would say the interest and
12  appreciation and understanding of the game.
13  With that clarification, yes.
14        Q.   You want them to have an
15  appreciation of the game so that they will
16  watch the game, correct?
17        MR. DREYER:  Objection,
18     mischaracterizes the witness' testimony.
19     You can answer.
20        A.   That's a fair characterization.
21  The more that you appreciate the sport and the
22  game, we believe you will have more of an
23  appreciation which will lead you to watch it
24  more often.
25        (Exhibit 27: NFL.com website, was

Page 224

1        HIGHLY CONFIDENTIAL - L. FERAZANI

2     marked for identification.)
3        MR. DREYER:  Again, I just object
4     to the use of a document not previously
5     produced and it violates the court order
6     in this case.
7        MR. SIGLER:  Objection noted and
8     disagree.  We'll move on.
9  BY MR. SIGLER (continuing):
10        Q.   Mr. Ferazani, you've been handed a
11  copy of a document marked Exhibit 27.  Please
12  take a look at this document and tell me
13  whether you recognize it.
14        A.   I don't.  I can see what it appears
15  to be.
16        Q.   And I will represent that we
17  printed this from the NFL.com website because
18  we wanted to understand more about how the
19  products work.
20        Can you turn with me, please, to
21  the second page of the document.  Do you see
22  towards the top of the document, it says:
23  What is the Fees link reference near the top
24  of the League Home Page?  Isn't NFL.com
25  Fantasy Football 2012 totally free?

Page 225

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2            Do you see that?
 3     A.   Yes.
 4     Q.   And then below that do you see:  In
 5  custom NFL.com fantasy leagues, the League
 6  manager can calculate and track fees
 7  associated with his or her league through the
 8  Fees tool.  The option exists for custom
 9  league managers to set up, at their
10  discretion, fees for the following:  player
11  ads, trades and initial league fees.
12            The Paid and Balance columns help
13  League managers convey current fees owed to
14  all team owners.  Access the Fees tool by
15  navigating to Fees in the League Home Page.
16  From this page, team owners can view current
17  fees and balances and league managers can edit
18  these values?
19            Do you see all of that?
20        MR. DREYER:  Will you read the
21     entire paragraph, since you're going to
22     read it, for the complete record.
23     Q.   The last sentence says:  To
24  reiterate, all NFL.com fantasy football
25  leagues are free to join, create and play.
```

Page 227

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2     A.   I don't know what that means or why
 3  there would be a league fee for something that
 4  is, as it says in the last sentence, free to
 5  join, create and play.
 6     Q.   Well, do you understand that what
 7  this is saying is that a league manager could
 8  decide to set a fee for participants in the
 9  league to pay when they enter the league?
10        MR. DREYER:  Same objection.  You
11     can answer.
12     A.   And I'm at a disadvantage.  As I
13  said, I don't play fantasy football or I've
14  never gone through our site to set up a game
15  or team so I'm not sure what that refers to.
16  I can read it along with you.  I can't give
17  you any more information as far as what this
18  means.
19     Q.   But you understand what this is
20  saying, just reading it with me, that the Fees
21  page allows a league manager to set an initial
22  league fee for a fantasy football league.
23  Correct?
24        MR. DREYER:  Objection; foundation,
25     asked and answered.
```

Page 226

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2            Do you see that?
 3     A.   I see all that, yes.
 4     Q.   So are you familiar with the Fees
 5  page on NFL.com?
 6     A.   I'm not.
 7     Q.   Do you see that the Fees page is
 8  available to track fees for custom fantasy
 9  leagues?
10     A.   I see that.
11     Q.   And do you see that one type of fee
12  that the Fees page is set up to track is the
13  initial league fees?
14     A.   I'm not sure what that means.
15     Q.   Well, do you see that it says that?
16     A.   The option exists for custom league
17  managers to set up, at their discretion, fees
18  for the following:  player ads, trades and
19  initial league fees.  I see that.
20     Q.   And so do you understand that that
21  means that, in a custom league on NFL.com, the
22  League manager can set up an initial league
23  fee for the fantasy football league?
24        MR. DREYER:  Objection as to
25     foundation.  You can answer.
```

Page 228

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2     A.   And, again, I don't know what that
 3  means as far as an initial league fee since
 4  it's free to join, create and play.  I don't
 5  know what it means.
 6     Q.   Well, NFL.com is free to use,
 7  correct?
 8     A.   That's correct.
 9     Q.   But if ten friends set up a fantasy
10  football league, the ten friends could agree
11  to put in an initial fee, correct?
12        MR. DREYER:  Object as to
13     foundation.
14     A.   Again, I'm not -- what ten people
15  decide to do, they could do anything they
16  wanted to do, I imagine.  I don't play this, I
17  don't know what this means.
18     Q.   And according to this provision,
19  NFL.com would allow a group of ten people to
20  get together, set up a league and put in an
21  initial league fee.  Correct?
22        MR. DREYER:  Same objection as to
23     foundation.
24     A.   According to this provision,
25  there's an option for a custom league manager
```

Page 229

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2   to set up an initial league fee.
 3        Q.   And are you familiar with any kind
 4   of fantasy football league that involves an
 5   initial league fee?
 6        A.   I'm sorry, I'm not.
 7        Q.   Do you know what would happen to an
 8   initial league fee in a league like this that
 9   involves an initial league fee?
10        MR. DREYER:  Objection.  There's
11        absolutely no foundation.  Are you just
12        asking the witness to guess?  You have
13        the objection.
14        A.   I don't know how that league fee
15   would be collected, would be assigned or what
16   it would be for.  I know that to play NFL.com
17   fantasy football, it's free to join, create
18   and play.  That's the extent of my
19   understanding.
20        Q.   Do you know whether NFL.com tracks
21   the fees set by participants on NFL.com?
22        A.   I don't know.
23        Q.   Do you know whether there's any
24   limit on the fees that can be set by a league
25   manager on NFL.com?
```

Page 231

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2   and the winner of the league would win the
 3   pool?
 4        A.   I'm not sure if that meets the
 5   legal definition for criminal gambling.  I'm
 6   not sure.
 7        Q.   What about your definition?
 8        A.   I'd have to go back and --
 9        Q.   You may be looking for Exhibit 14.
10        A.   Thank you, yes.
11        Q.   This is the NFL's definition of
12   gambling, correct?
13        A.   Um-hmm.
14        Q.   So if a fantasy football league
15   were established on NFL.com where the
16   participants paid an initial league fee into a
17   pool and the winner of the league won the
18   pool, would that qualify as gambling under the
19   NFL's definition?
20        A.   (Examining document.)
21             I don't know.  I don't believe it
22   would, given that our definition folks on a
23   specific event with uncertain outcome
24   [verbatim].
25             Fantasy football has to do with --
```

Page 230

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2        A.   I don't know.
 3        Q.   What do you think an initial league
 4   fee would be for if not for a pool from which
 5   a prize could be drawn?
 6        MR. DREYER:  Objection; calls for
 7        speculation, lack of foundation.
 8        A.   I'd be guessing.
 9        Q.   Do you see anything in this
10   provision or anything else that you've seen on
11   NFL.com that would prevent a league manager
12   from setting up a pool with initial league
13   fees and paying a prize to the winner?
14        MR. DREYER:  Objection, asked and
15        answered.  The rules speak for
16        themselves.  But you can answer.
17        A.   Again, I'm not sure if that would
18   constitute gambling and, if so, under the
19   first page of Exhibit 26, if it is gambling,
20   it would violate what is set up in the first
21   page the NFL.com Fantasy 2012 Official
22   Rules.
23        Q.   Would it be gambling if a
24   participant in a fantasy football league paid
25   an initial league fee that went into a pool
```

Page 232

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2   by the -- in the hypothetical that you've just
 3   presented, with members of a league, each who
 4   would have their own teams engaging in
 5   transactions over the course of that season,
 6   tracking individual players that they retain
 7   or choose to discard against other players
 8   making similar decisions based on the relative
 9   skill levels of the players from whom they can
10   select.
11        Q.   At the time someone drafts their
12   fantasy football team and enters the fantasy
13   football league, the outcome of that league is
14   uncertain, correct?
15        A.   That's correct.
16        Q.   So how is a fantasy football league
17   not an event that involves an uncertain
18   outcome?
19        MR. DREYER:  Objection to the form
20        of the question, incomplete hypothetical.
21        You can answer.
22        A.   Both points are gathered over the
23   course of an entire season which would be at
24   least 16 games for players, each individual
25   player -- you know, it's a series of events,
```

Page 233

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2   so to speak, and it's a game in which the
 3   winner is determined by points over that
 4   entire series, not based upon one of our
 5   games, one of our events.  By "our" I mean NFL
 6   contests.
 7        Q.   So are you saying that an NFL
 8   fantasy football league does not constitute
 9   gambling under the NFL's policy because it
10   involves multiple games as opposed to a single
11   game?
12        MR. DREYER:  Objection to the form
13     of the question, mischaracterizes prior
14     testimony.  You can answer.
15        A.   Because it's not a wager on a
16   specific incident or specific event in which
17   the outcome of that wager is determined by
18   that specific event.  I also know that I
19   believe under Yu-Gi-Oh! [phonetic], by the
20   legal definition of what is gambling, the
21   hypothetical you presented is not gambling.
22   But that's straying into legal opinion.
23        Q.   Earlier today I asked you whether,
24   if you and I placed a wager on how many yards
25   or touchdown passes Tom Brady would have
```

Page 234

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2   through the entire season, that would
 3   constitute sports gambling.  Do you recall
 4   that?
 5        A.   I remember that somewhat.
 6        Q.   And you agreed with me that if we
 7   were to place a wager on that, that it would
 8   involve sports wagering, correct?
 9        A.   Whether Mr. Brady made X amount of
10   touchdowns or not, yes.
11        Q.   So how is the situation we're
12   talking about now with fantasy football any
13   different in terms of involving multiple games
14   as opposed to a single game?
15        MR. DREYER:  Objection to the
16     extent it calls for a legal conclusion
17     and mischaracterizes the witness'
18     testimony.
19        A.   Fantasy football is based upon the
20   performance of numerous players who are
21   playing in numerous real games scattered over
22   the course of a season.  What you alluded to
23   in your hypothetical is whether or not one
24   player, over the course of a season, can hit a
25   specific predetermined number of whatever
```

Page 235

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2   statistical total.
 3        That's different from fantasy
 4   football as defined under the Unlawful
 5   Internet Gambling Act and as also defined, in
 6   my understanding, by federal law.  Fantasy
 7   football has enough variables where there's so
 8   many players on each individual team where
 9   you're accumulating points that it's not
10   dependent upon the performance of one specific
11   player or one specific -- or the outcome of
12   one specific game.
13        Q.   So to be considered gambling under
14   the NFL's gambling policy, the wager would
15   need to involve a single game or a single
16   player?
17        MR. DREYER:  Objection,
18     mischaracterizes the witness' testimony.
19     He was not testifying as to the NFL's
20     policy.  But he can answer.
21        A.   Under our policy broadly, a gamble
22   or a bet is a financial transaction in which
23   the winner or loser is determined by the
24   outcome of a specific event such as a wager on
25   a game, for a specific occurrence such as who
```

Page 236

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2   scores first, or a specific single player's
 3   performance over the course of a season.
 4   Fantasy football is not that.
 5        The analogy you're attempting to
 6   make between gambling and betting and fantasy
 7   football is not apt.  Fantasy football is
 8   dependent upon the performance of numerous
 9   players on different teams as compared to the
10   performance of other players on other teams as
11   they perform each week in and out.
12        It's also dependent upon the
13   decisions made by each individual team owner,
14   and team owner in quotes as far as the fantasy
15   football team owner.  And at the end of the
16   day, at the end of the season, whichever team
17   owner has made the selections which result in
18   the highest number of points, after all of
19   those variables are calculated, is the winner.
20   That's different from a bet dependent upon a
21   single game, a single event or a single
22   player.
23        Q.   Is there something in the NFL's
24   gambling policy, Exhibit 14, that you think
25   supports the distinction you're making between
```

Page 237

HIGHLY CONFIDENTIAL - L. FERAZANI

1
2  a wager on a single event and fantasy football
3  which involves an entire season?
4          MR. DREYER:  Just note my objection
5      because the questions are going back and
6      forth between federal law and the NFL's
7      policy, and I'm not sure they're clear
8      anymore.  But you can answer.
9          MR. SIGLER:  For the record, I've
10     only been asking him about Exhibit 14,
11     I'm still only asking about Exhibit 14.
12     He's made reference to the policy once or
13     twice, but our discussion right now is in
14     the context of Exhibit 14.
15 BY MR. SIGLER (continuing):
16     Q.    Just to be clear, is there
17 something in Exhibit 14 that supports the
18 distinction you're making between wagering on
19 a single game versus a fantasy football league
20 which involves an entire season?
21     A.    I would say that the Section 3,
22 Chance, the use or exercise of skill, strategy
23 and/or knowledge, it completely negates the
24 element of chance and does not convert an
25 activity into something other than gambling.

Page 239

HIGHLY CONFIDENTIAL - L. FERAZANI

1
2  supported by the fact that fantasy football
3  involves skill, strategy or knowledge?
4      A.    I think primarily the distinction
5  is that the federal law has said that fantasy
6  football is not gambling.
7          (Exhibit 28: Title 31 - Money &
8      Finance, was marked for identification.)
9  BY MR. SIGLER (continuing):
10     Q.    Mr. Ferazani, you've been handed a
11 copy of a document marked Exhibit 28.  This is
12 a printout of the part of the federal code
13 that incorporates a prohibition on funding of
14 unlawful Internet gambling.
15         Is this the federal law that you
16 were referring to?
17         MR. DREYER:  Same continuing
18     objection with respect to documents not
19     previously produced in accordance with
20     the Court order.  You can answer.
21     A.    (Examining document.)
22         Again, I'm not sure.  I know that
23 we had outside counsel review the fantasy
24 football offering prior to it being presented.
25 And my understanding is the opinion reached

Page 238

1      HIGHLY CONFIDENTIAL - L. FERAZANI
2      Q.    And how does that provision support
3  the distinction you're making?
4      A.    I believe that that is the
5  distinction made as far as why fantasy
6  football is considered a permitted activity
7  versus a gambling event or a bet.
8      Q.    Do you think that the use of skill,
9  strategy or knowledge in playing fantasy
10 football completely negates the element of
11 chance?
12     A.    I believe that, as it's applied to
13 fantasy football, that is why fantasy
14 football's not interpreted to be gambling
15 under our policy or under law.
16     Q.    But no matter how much skill you
17 have in playing fantasy football, your best
18 player could be injured due to chance,
19 correct?
20         MR. DREYER:  Objection,
21     argumentative.  You can answer.
22     A.    Presumably a successful manager of
23 a fantasy football team has a deep enough
24 bench to overcome that.
25     Q.    So the distinction you believe is

Page 240

1      HIGHLY CONFIDENTIAL - L. FERAZANI
2  was that fantasy football is not gambling.
3  It's an opinion that I have due to the fact
4  that it's readily available throughout the
5  Internet and from the studies you've shown me
6  that explain the distinction between fantasy
7  football and sports wagering as to the extent
8  that impacts the National Football Colleague
9  where the National Football League has
10 embraced fantasy football and is fighting
11 sports gambling.
12     Q.    So you think the distinction
13 between sports gambling and fantasy football
14 is that the NFL has decided to make that
15 distinction?
16         MR. DREYER:  Objection,
17     mischaracterizes the witness' testimony.
18     A.    That's not what I said.
19     Q.    Can you explain what you meant when
20 you said that the National Football League has
21 embraced fantasy football and is fighting
22 sports gambling?
23     A.    Yes.  As I've explained, the
24 distinction between fantasy football and
25 gambling is set forth in federal law.  Again,

Page 241

```
 1       HIGHLY CONFIDENTIAL - L. FERAZANI
 2   that's relying upon other outside counsel's
 3   opinion rendered before we offered --
 4            MR. DREYER:  Again, just I'd
 5        caution the witness not to disclose any
 6        attorney-client communication.
 7       A.   My understanding being that fantasy
 8   football is not gambling pursuant to federal
 9   law.  The distinction between fantasy football
10   and gambling, as it impacts the National
11   Football League, is that fantasy football
12   serves a purpose to deepen our roots and our
13   relationship with our fans and with our most,
14   quote, diehard, unquote, fans.
15            Gambling is detrimental to that
16   relationship, to a relationship with our fans,
17   and does not lead to a long-term relationship
18   with fans as fantasy football does.
19       Q.   Mr. Ferazani, you have in front of
20   you Exhibit 14 which is the NFL gambling
21   policy, you have Exhibit 28 which is the
22   statute that you referred to.  I'd just like
23   to make sure that I understand the distinction
24   that you're making between fantasy football
25   and sports gambling.
```

Page 243

```
 1       HIGHLY CONFIDENTIAL - L. FERAZANI
 2   BY MR. SIGLER (continuing):
 3       Q.   Mr. Ferazani, you've been handed a
 4   document marked Exhibit 29.  Please take a
 5   look at this document and tell me whether you
 6   recognize it.
 7       A.   I do.
 8       Q.   What is this document?
 9       A.   This appears to be the fantasy
10   football offering under our NFL Rush program,
11   which is geared more to the youth.
12       Q.   And it looks like from the
13   Eligibility section on the first page of this
14   document, that children between ages of 6 to
15   15 are eligible to participate in this fantasy
16   football game.  Correct?
17       A.   Correct.
18       Q.   And do you see the statement right
19   above that in bold that says:  This game may
20   not be used to conduct, advertise or promote
21   any form of gambling?
22       A.   I see that.
23       Q.   Is the NFL concerned that, if not
24   for that statement, seven-year-olds would be
25   gambling?
```

Page 242

```
 1       HIGHLY CONFIDENTIAL - L. FERAZANI
 2            Apart from the NFL's interests, why
 3   is fantasy football any different than sports
 4   gambling?
 5            MR. DREYER:  I think now you're
 6        asking for the witness to offer legal
 7        conclusions.  You've gone beyond 30(b)(6)
 8        territory.  The witness can answer as to
 9        his understanding without disclosing any
10        attorney-client communications.
11       A.   Just to clarify, I'm not sure that
12   what's been marked as Exhibit 28 is what we
13   relied upon in reaching the conclusion.  I
14   know from the documents that you've shown me
15   as well as from the fact that NFL.com offers
16   fantasy football, it is not illegal gambling;
17   it is authorized under federal and state law.
18            Sports gambling, betting on NFL
19   games, is illegal in every state but those
20   exempted under PASPA.  That is the distinction
21   on which we rely.
22            (Exhibit 29: Fantasy football
23        offering NFL Rush program (#PLAINTIFFS'
24        00003174-3181), was marked for
25        identification.)
```

Page 244

```
 1       HIGHLY CONFIDENTIAL - L. FERAZANI
 2       A.   I'm not sure if there's a legal
 3   requirement for that to be on the rules
 4   section or not.
 5       Q.   Do you know what the history is
 6   behind the NFL's offering of a product
 7   targeting 6- to 15-year-olds for fantasy
 8   sports?
 9            MR. DREYER:  Objection to the form
10        of the question.  You can answer.
11       A.   I'm not sure what you mean by "the
12   history."  Meaning how long it's been offered?
13       Q.   Yes.
14       A.   I'm not sure.
15       Q.   Is the purpose of this product, NFL
16   Rush, to try to engage children between the
17   ages of 6 and 15 years old at an early age?
18       A.   Engage them in the NFL, the League
19   and our athletes, yes.
20       Q.   Can you turn with me, please, to
21   the page with the Bates number of 3179 in the
22   bottom right-hand corner.
23       A.   Yes.
24       Q.   And do you see the Prizes section
25   that refers to a grand prize that includes all
```

---

Page 245

HIGHLY CONFIDENTIAL - L. FERAZANI

```
 1           HIGHLY CONFIDENTIAL - L. FERAZANI
 2   of the following?  I'm not asking you to read
 3   the whole section.
 4        A.    Um-hmm.
 5        Q.    Do you see that the first part of
 6   the grand prize is a $10,000 scholarship, in
 7   quotes, awarded in the form of a check?
 8        A.    I see that.
 9        Q.    Do you know why the word
10   "scholarship" is in quotes?
11        A.    I would guess that it's a
12   specifically defined term or -- I'm not sure
13   why they would put it in quotes.
14        Q.    Could it be because it's being
15   issued in the form of a check that could be
16   used for any purpose regardless of whether
17   it's a scholarship?
18        A.    Honestly I'm not sure.
19        Q.    Do you think that a $10,000
20   scholarship would create a financial interest
21   in the outcome of this fantasy football
22   league?
23        A.    If it's a scholarship, it's
24   consistent with the other principles of NFL
25   Rush, which is developing youth or enhancing
```

---

Page 247

HIGHLY CONFIDENTIAL - L. FERAZANI

```
 1           HIGHLY CONFIDENTIAL - L. FERAZANI
 2        A.    I'm not sure what you -- is a
 3   $10,000 scholarship something that someone
 4   would want?  Yes, I would imagine they would
 5   want that.  That's probably why it's a prize.
 6        Q.    And the parents would want it, too,
 7   in addition to the seven-year-olds who are
 8   participating, correct?
 9        A.    As the father of three daughters,
10   yes, I would like that as well.
11        Q.    Is the NFL concerned that
12   participants in this NFL Rush fantasy football
13   league will be watching NFL games because of
14   their interest in collecting a $10,000 check
15   rather than in deepening the bonds of loyalty
16   between the fans and their teams?
17        A.    First it is a $10,000 scholarship.
18   The money is used to -- and I'm interpreting
19   the term "scholarship" to mean for the
20   continuing education of the winning
21   participant.
22
23
24
25
```

---

Page 246

HIGHLY CONFIDENTIAL - L. FERAZANI

```
 1           HIGHLY CONFIDENTIAL - L. FERAZANI
 2   youth's athletic endeavors and educational
 3   opportunities.
 4        Q.    The winner of this NFL Rush fantasy
 5   football league gets $10,000, correct?
 6             MR. DREYER:  Objection,
 7        mischaracterizes the rules.
 8        A.    They receive a $10,000 scholarship
 9   awarded in the form of a check.
10        Q.    The winner gets a check that says
11   $10,000, correct?
12        A.    I'm not sure.
13        Q.    Well, they get a $10,000
14   scholarship awarded in the form of a check,
15   correct?
16             MR. DREYER:  The rules speak for
17        themselves.  You can answer.
18        A.    They receive a $10,000 scholarship
19   awarded in the form of a check, yes.
20        Q.    So is a $10,000 scholarship awarded
21   in the form of a check a large enough prize to
22   create a financial interest in the outcome of
23   this fantasy football league?
24             MR. DREYER:  Objection to the form
25        of the question.  You can answer.
```

---

Page 248

HIGHLY CONFIDENTIAL - L. FERAZANI

```
 1           HIGHLY CONFIDENTIAL - L. FERAZANI
 2
 3
 4
 5             So it is for all those reasons that
 6   we want to have younger players to engage in
 7   fantasy football to develop a deep bond that
 8   will last into their -- for the rest of their
 9   lives during which they will continue to
10   consume our product.
11        Q.    So the NFL's not concerned about
12   the possibility that children will be watching
13   their games for the wrong reasons?
14             MR. DREYER:  Objection, asked and
15        answered.
16        A.    If they're watching the games for
17   the reasons I've just outlined, those are the
18   right reasons.
19        Q.    Mr. Ferazani?
20        A.    Yes, sir.
21        Q.    The NFL Network has shows that
22   focus on fantasy football, correct?
23        A.    I believe it does, yes.
24        Q.    Are you familiar with the show
25   called NFL Fantasy Live?
```

Page 249

HIGHLY CONFIDENTIAL - L. FERAZANI

1
2      A.   I believe I've seen it.
3      Q.   Are you familiar with the segment
4  on the show called That Helps No One?
5      A.   No, I'm not.
6           (Exhibit 30: NFL.com NFL Fantasy
7      Live, was marked for identification.)
8           MR. DREYER:  Same objection with
9      respect to documents not produced -- use
10     of documents not produced in accordance
11     with the Court's order.
12  BY MR. SIGLER (continuing):
13     Q.   Mr. Ferazani, you've been handed a
14  copy of a document marked Exhibit 30.  This is
15  a printout from NFL.com discussing NFL Fantasy
16  Live.  Do you see that?
17     A.   That's what this appears to be,
18  yes.
19     Q.   The big black box in the middle is
20  where the video is displaying on line which
21  obviously does not print out.  But do you see
22  right underneath the black box, the statement
23  that says:  Adam Rank and the NFL Fantasy Live
24  crew go through the players in Week 4 that
25  helped no one by stealing touchdowns from your

Page 250

HIGHLY CONFIDENTIAL - L. FERAZANI

1
2  starters"?
3      A.   That's what that says, yes.
4      Q.   Do you know what that means?
5      A.   I don't know.
6      Q.   Do you know who Adam Rank is?
7      A.   I do not.
8      Q.   Do you understand what it would
9  mean for a player to steal a touchdown from
10  someone's starters?
11          MR. DREYER:  Objection, asked and
12     answered.
13     A.   I can speculate, but that's what
14  that would be.
15     Q.   How would you speculate on that?
16          MR. DREYER:  Objection, calls for
17     speculation in the form of the question
18     that was asked.
19          MR. SIGLER:  I'll withdraw the
20     question.
21     Q.   Do you understand that what this is
22  saying, Mr. Ferazani, is that persons who
23  aren't starters on someone's fantasy football
24  leagues when they score touchdowns are, in
25  effect, stealing touchdowns?

Page 251

HIGHLY CONFIDENTIAL - L. FERAZANI

1
2           MR. DREYER:  Objection.  Mr.
3      Sigler, now you're testifying.  The
4      witness has no foundation for this
5      document.  But you can answer if you're
6      able to.
7      A.   If I was to speculate, that would
8  be the direction in which I would speculate.
9      Q.   Does this sentiment that a player
10  is stealing a touchdown from another player
11  deepen the bonds of loyalty between the NFL's
12  fans and its teams?
13     A.   I think it's consistent with the
14  premise of fantasy football where a fantasy
15  football owner has players that he's selected
16  across the League on various teams and he
17  wants to do well so that he can get points for
18  his team that week.  The essence of the NFL
19  both in our actual games and in fantasy
20  football is competition, so I don't believe
21  that this is inconsistent with that premise.
22          (Exhibit 31: NFL.com NFL Fantasy
23     Live, was marked for identification.)
24  BY MR. SIGLER (continuing):
25     Q.   Mr. Ferazani, you've been handed a

Page 252

HIGHLY CONFIDENTIAL - L. FERAZANI

1
2  document marked Exhibit 31.  This is --
3           MR. DREYER:  Let me once again
4      renew my objection to documents being
5      used by Defendants that have not been
6      previously produced.
7  BY MR. SIGLER (continuing):
8      Q.   Mr. Ferazani, this is a printout
9  from NFL.com that also concerns NFL Fantasy
10  Live.  Do you see that?
11     A.   This is what this appears to be.
12     Q.   And it specifically relates to a
13  segment on NFL Fantasy Live that says Show Me
14  the Money?
15     A.   That's what it says, yes.
16     Q.   Underneath that it says:  Actor
17  Jerry O'Connell and the NFL Fantasy Live crew
18  explained which slacking players need to step
19  up and prove they are legitimate starters in
20  fantasy leagues.
21          Do you see that?
22     A.   That's what it says, yes.
23     Q.   So based on that statement, do you
24  have an understanding of what "show me the
25  money" means?

Page 253

```
 1          HIGHLY CONFIDENTIAL - L. FERAZANI
 2          MR. DREYER:  Objection; lack of
 3     foundation, calls for speculation.  You
 4     can answer.
 5     A.     I don't know why it's labeled "show
 6  me the money."
 7     Q.     Does the statement "show me the
 8  money" in connection with fantasy football
 9  suggest that fantasy football participants
10  have a financial interest in the outcome?
11          MR. DREYER:  Objection; lack of
12     foundation, calls for speculation.
13     A.     Not to me, no.
14     Q.     What does it suggest to you?
15     A.     There's a movie--I'm not sure if
16  Jerry O'Connell was in it--with Tom Cruise
17  about an agent.  And when the player did
18  really well, it was "show me the money, show
19  me the money," because he had a great season.
20  My guess is that would be a reference to that
21  movie, which I am embarrassed to admit I
22  forget the name of right now.
23          MR. DREYER:  Let the record reflect
24     the witness is referring to Jerry
25     McGuire.
```

Page 254

```
 1          HIGHLY CONFIDENTIAL - L. FERAZANI
 2          THE WITNESS:  Thank you, Jerry
 3     McGuire.
 4     Q.     And in the Jerry McGuire movie, the
 5  player who wants to be shown the money wants a
 6  big contract, correct?
 7     A.     That's correct.
 8     Q.     He wants, in effect, a financial
 9  prize for his performance, correct?
10          MR. DREYER:  Objection to the form
11     of the question.
12     A.     He wants a contract as a result of
13  his efforts for the year, yes.
14          (Exhibit 32: NFL.com article, was
15     marked for identification.)
16          MR. DREYER:  Same objection with
17     respect to use of documents not produced
18     by counsel.
19     Q.     Mr. Ferazani, you've been handed a
20  document marked Exhibit 32.  This also is a
21  printout from NFL.com.  And do you see the
22  statement in the middle of the document that
23  says:  Fantasy - trash or treasure?
24     A.     Yes, I see that.
25     Q.     Do you know what that refers to?
```

Page 255

```
 1          HIGHLY CONFIDENTIAL - L. FERAZANI
 2     A.     Reviewing this for the first time
 3  as I sit here today, I'm guessing.  I don't
 4  want to guess.
 5          MR. DREYER:  Don't guess.
 6     Q.     Do you see the statement underneath
 7  Fantasy - trash or treasure, that says:
 8  Fantasy guru, Michael Fabiano, joins NFL AM to
 9  share which Week 1 surprise fantasy studs are
10  trash and which are treasure?
11     A.     That's what that says, yes.
12     Q.     And you understand that that means
13  that Mr. Fabiano is going to discuss the
14  players who scored a lot of fantasy points
15  during week one?
16          MR. DREYER:  Objection; lack of
17     foundation, calls for speculation.
18     Q.     Do you understand that?
19     A.     I would be speculating.
20     Q.     Do you understand that Mr. Fabiano
21  is going to be labeling some NFL football
22  players as trash and some as treasure?
23          MR. DREYER:  Same objection; lack
24     of foundation, calls for speculation.
25     A.     I don't know who Mr. Fabiano is and
```

Page 256

```
 1          HIGHLY CONFIDENTIAL - L. FERAZANI
 2  I don't want to speculate.
 3     Q.     If someone on the NFL Network is
 4  referring to NFL football players as trash, is
 5  that consistent with developing the bonds of
 6  loyalty between a fan and his team?
 7     A.     I think any time you put on sports
 8  radio a debate about which players are better
 9  than others is the essence of sports and what
10  sports fans do.  They debate who is the best,
11  you know, wide receiver of all time, who's the
12  best quarterback of all time, other sports'
13  pitchers.
14          The essence of sports is healthy
15  competition not only among teams but, as I've
16  alluded to, fantasy football enhances fans'
17  understanding and appreciation of individual
18  athletes on teams other than those they
19  normally would follow geographically.  So the
20  fact there would be a debate about which
21  player's better than others and despite the
22  hyperbole and the words "trash" and
23  "treasure," that's consistent with the essence
24  of a sports debate.
25     Q.     Mr. Ferazani, has there ever been a
```

Page 257

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2   violation of the League's gambling policy that
 3   involved fantasy football?
 4        A.    Not to my knowledge.
 5        Q.    Was there an instance several weeks
 6   ago where a replacement referee told LeSean
 7   McCoy that he wanted him to perform well for
 8   the replacement referee's fantasy football
 9   team?
10        A.    I'm not aware of such episode at
11   all.
12             (Exhibit 33: Slide deck
13        Professional League Sports Wagering
14        Summit September 2012 (#PLAINTIFFS'
15        00002301-318), was marked for
16        identification.)
17   BY MR. SIGLER (continuing):
18        Q.    Mr. Ferazani, you've been handed a
19   document marked Exhibit 33.  Please take a
20   look at the document and tell me whether you
21   recognize it.
22        A.    Generally I do, yes.
23        Q.    What is this document?
24        A.    This was a slide deck presented at
25   the Professional League Sports Wagering Summit
```

Page 258

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2   held in September of 2012.  I believe this was
 3   presented by the NCAA.
 4        Q.    Were you present at that summit?
 5        A.    I was present for parts of that
 6   summit, yes.
 7        Q.    It was a two-day summit; is that
 8   correct?
 9        A.    It was, yes.
10        Q.    Were you present for one of the two
11   days or parts of the two days?
12        A.    Part of one day.  I did not attend
13   the day held at baseball.
14        Q.    So you were present for September
15   12th; is that correct?
16        A.    Part of that day.  Part of the
17   benefit of having it in the National Football
18   League office means I could bounce upstairs if
19   I needed to.
20        Q.    And you were present for the NCAA
21   presentation that's reflected in Exhibit 33?
22        A.    I believe I was present for part of
23   this, yes.
24        Q.    Did you get a copy of this
25   document, Exhibit 33, at the summit?
```

Page 259

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2        A.    I think we did receive it.  I'm not
 3   sure.  I know it was presented by slides.
 4        Q.    Who else from the NFL was present
 5   at the summit?
 6        A.    There were people that were
 7   present, again, for parts of the summit: Jeff
 8   Pash, our general counsel gave the opening
 9   remarks.  That's P-A-S-H.  Dave Gardi was
10   present, G-A-R-D-I, was present for part of
11   the summit.  Dina Garner, G-A-R-N-E-R, from
12   our player engagement group was present for
13   part of the summit or most of the summit.
14   Adolpho Birch was present for part of the
15   summit.
16             I believe there may have been other
17   members of our security department there as
18   well.
19        Q.    Did someone from the NFL give a
20   presentation, other than Mr. Pash's opening
21   remarks?
22        A.    I did.
23        Q.    And what did you give a
24   presentation on?
25        A.    The Delaware sports case.
```

Page 260

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2        Q.    Did you have a written PowerPoint
 3   presentation?
 4        A.    I believe I did.
 5        Q.    Do you still have it?
 6        A.    If I did, I would, yes.
 7        Q.    Did anyone give any presentations
 8   at the summit that incorporated any consumer
 9   surveys or studies about sports gambling and
10   the impact on fans?
11        A.    I know the -- and I haven't gone
12   through these slides in a while.  The NCAA
13   was, when I was present, the only group that
14   gave any -- reported on any studies.
15   Everything else was anecdotal or policy
16   driven.
17        Q.    Can you turn with me, please, to
18   the page with the Bates number 2307 at the
19   bottom.
20        A.    Yes.
21        Q.    And do you see that this page
22   reflects results of the NCAA's study regarding
23   fantasy sports participation?
24        A.    I see that.
25        Q.    Do you recall this part of the
```

Page 261

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2   NCAA's presentation?
 3        A.   I do not.
 4        Q.   Do you see at the bottom of the
 5   page there's a list of fantasy sports played
 6   by student athletes that reported
 7   participation in the last 12 months?
 8        A.   I see that slide, yes.
 9        Q.   And do you see that, of the males,
10   64.4 percent reported playing the NFL?
11        A.   I see that, yes.
12        Q.   Has the NFL ever had any
13   discussions with the NCAA about fantasy
14   football and its impact on student athletes?
15        A.   Not that I'm aware of.
16        Q.   At this summit did the NCAA raise
17   any concerns about fantasy football and its
18   impact on student athletes?
19        A.   Not to me and not to my knowledge.
20   I'm not sure what the spoken aspect to these
21   slides were, but nothing that I can recall.
22        Q.   Are you aware that the NCAA views
23   fantasy football as a violation of its
24   gambling policies?
25             MR. DREYER:   Objection to the form
```

Page 262

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2   of the question.
 3        A.   I was not aware of that, no.
 4             MR. SIGLER:   Let's take a break.
 5             MR. DREYER:   Sure.
 6             (Recess taken:  4:43-4:56 p.m.)
 7             (Exhibit 34: Merriam-Webster
 8        dictionary definition of "gamble", was
 9        marked for identification.)
10   BY MR. SIGLER (continuing):
11        Q.   Mr. Ferazani, you've been handed a
12   copy of a document marked Exhibit 34 which is
13   a printout from Merriam-Webster Online of the
14   definition of the word "gamble."  Please take
15   as much time as you need to review it.  My
16   first question is going to be whether you
17   agree with the definition.
18             MR. DREYER:   My objection is to the
19        use of documents not previously produced.
20        I'm not sure what 30(b)(6) topic this is
21        relevant to.  The witness can testify as
22        to his understanding.  I'm not sure what
23        the relevance is either, but that's
24        another issue.  You can answer as you're
25        able.
```

Page 263

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2        A.   As I've explained, I think to play
 3   a game for money or property as set forth in
 4   the first section is not specific enough or
 5   broad enough.  You know, I accept this, what
 6   Merriam-Webster defines gambling as.  It's a
 7   different standard as to what's legal versus
 8   illegal.  Fantasy football has been found not
 9   to be -- or pursuant to federal law and state
10   law, is not illegal gambling.
11        Q.   Some gambling is legal and some is
12   illegal, correct?
13        A.   True, yes.
14        Q.   So let me ask my question again
15   just to make sure we're not talking past each
16   other:  Do you agree or disagree with the
17   definition of gamble set forth here from
18   Merriam-Webster?  And let's focus on the 1(a)
19   definition.
20             MR. DREYER:   Objection to the form
21        of the question.  Agree or disagree with
22        the definition?  I don't even know what
23        that means.  You can answer.
24        A.   I don't know.
25        Q.   What don't you understand about the
```

Page 264

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2   question?
 3        A.   This is what Merriam -- I will take
 4   your representation that this is how Merriam-
 5   Webster defines gambling.
 6        Q.   Do you agree with this definition?
 7             MR. DREYER:   Objection to the form
 8        of the question.
 9        A.   To play a game for money or
10   property.  No, because that also fits the
11   definition of what our football players do:
12   They play football for money.  So to that
13   extent, they are not gambling.  I don't think
14   this definition is specific enough for this
15   context.
16        Q.   Do you agree with the 1(b)
17   definition of gamble to bet on an uncertain
18   outcome?
19             MR. DREYER:   Same objection.
20        A.   To bet on an uncertain outcome.
21   Well, since the word "bet" is contained within
22   the definition, this is kind of a circular
23   exercise.  Bet and gamble in my world are
24   synonymous.
25        Q.   All right.  What about definition
```

Page 265

```
1         HIGHLY CONFIDENTIAL - L. FERAZANI
2    number two, to stake something on a
3    contingency?
4         MR. DREYER:  Objection to the form
5         of the question.
6    A.    To stake something on a
7    contingency. I'm not sure what that means.
8         Q.    Mr. Ferazani, other than the
9    studies we've discussed today, are you aware
10   of any other studies by the NFL regarding the
11   impact of sports gambling on the NFL or its
12   teams?
13        MR. DREYER:  Objection to the form
14        of the question. You can answer.
15   A.    In addition to the studies and the
16   ongoing study that the NFL engages in in
17   making any business decision, none that I can
18   recall as I sit here at the end of the day.
19        Q.    Are you aware of any other written
20   studies regarding the impact of sports
21   gambling on the NFL or its teams?
22        MR. DREYER:  Same objection. You
23        can answer.
24   A.    As I sit here today, I can't
25   provide any other list, although to be honest,
```

Page 267

```
1         HIGHLY CONFIDENTIAL - L. FERAZANI
2    other state is no different. The fact that
3    New Jersey is seeking to violate federal law
4    by permitting sports gambling which would, by
5    New Jersey's own representation, involve
6    advertising, promoting sports gambling which
7    would logically increase the amount of
8    gambling on our games, is detrimental to our
9    relationship with our fans for all the reasons
10   I've previously testified.
11        Q.    The NFL does not have any written
12   studies or analyses regarding the impact or
13   potential impact of legalized sports gambling
14   in New Jersey on the NFL or its teams,
15   correct?
16        A.    I would contend that the, you know
17   -- we've reduced this to writing by our
18   statements in support of PASPA, by our
19   testimony in support of that law, by the
20   Complaint that we filed in Delaware, by the
21   Complaint that we filed in this case. Those
22   are all reflective of the ongoing
23   understanding of the NFL's business model and
24   the relationship we have with our fans.
25        If there is -- if you're asking is
```

Page 266

```
1         HIGHLY CONFIDENTIAL - L. FERAZANI
2    I'm not sure that I can recite every study
3    that we discussed or every document we've
4    discussed for the past five hours and change.
5    But I can't add anything to the list off the
6    top of my head right now.
7         Q.    The NFL does not have any studies
8    regarding the impact or potential impact of
9    legalized sports gambling in New Jersey on the
10   NFL or its teams, correct?
11        MR. DREYER:  Objection, asked and
12        answered.
13   A.    As we discussed at the beginning of
14   this deposition when I was much fresher, every
15   day the NFL makes decisions based upon its
16   experience, both from observations of other
17   leagues, its own history and its analysis of
18   its business model, which is protecting the
19   shield, ensuring the integrity of our game and
20   making decisions based upon potential events
21   or activity which may or may not present a
22   risk to the integrity of our game and our
23   relationship with our fans.
24        So New Jersey is no different. In
25   the analysis regarding New Jersey versus every
```

Page 268

```
1         HIGHLY CONFIDENTIAL - L. FERAZANI
2    there a report summarizing data that we
3    collected from New Jersey voters or those that
4    do not have a stake in the NFL and its game, I
5    don't have any such study. But I would submit
6    that our activity in this case and our history
7    shows we have studied the issue and that our
8    study has resulted in the conclusion that it
9    is detrimental to our game.
10        Q.    Mr. Ferazani, have you issued hold
11   notices to the people at the NFL most likely
12   to have relevant information?
13   A.    Yes, I did.
14        Q.    And are you aware of any relevant
15   documents being destroyed or deleted or thrown
16   away?
17   A.    No. That would be in violation of
18   the hold notice and our practice.
19        Q.    Did you gather documents from
20   everyone in the research group that includes
21   Ms. Rankin?
22        MR. DREYER:  Objection to the form
23        of the question. You can answer.
24   A.    Yes. And I discussed with
25   Ms. Rankin what we were seeking and made sure
```

## Page 269

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2   that she canvassed sufficiently.
 3        Q.   Did you get documents from
 4   Mr. Mummery?
 5        MR. DREYER:  Counselor, let me just
 6   make it clear because I know you didn't
 7   participate in any discussions with the
 8   Court.  There was a 30(b)(6) topic on
 9   data collection and we objected, the
10   judge struck it.  So I'll give you a
11   little bit of leeway without waiving any
12   privilege.
13        But, again, this is another area
14   the court has foreclosed.  So you have
15   our objection.
16   A.   Yes, I did.
17        MR. SIGLER:  Okay.  I think we're
18   done, with the proviso that we reserve
19   our right to revisit the deposition, to
20   continue the deposition in light of the
21   deficiencies that we've identified as
22   well as any we haven't yet identified in
23   the NFL's document production.
24        But having said that, we're done
25   for the day today.
```

VERITEXT REPORTING COMPANY
212-267-6868    www.veritext.com    516-608-2400

## Page 270

```
 1        HIGHLY CONFIDENTIAL - L. FERAZANI
 2        MR. DREYER:  Just so you have our
 3   position, which is that the NFL has
 4   complied with its obligations and there
 5   are no deficiencies, discovered or
 6   undiscovered, in connection with this
 7   case.  We can go off the record with
 8   that.
 9        (Time noted:  5:06 p.m.)
10
```

VERITEXT REPORTING COMPANY
212-267-6868    www.veritext.com    516-608-2400

## Page 271

```
 2   STATE OF NEW YORK  )
 3                      )  ss:
 4   COUNTY OF NEW YORK )
 5
 7        I, LAWRENCE P. FERAZANI, JR., the
 8   witness herein, having read the foregoing
 9   testimony of the pages of this deposition, do
10   hereby certify it to be a true and correct
11   transcript, subject to the corrections, if any,
12   shown on the attached page.
16        _____
              LAWRENCE P. FERAZANI, JR.
18   Sworn and subscribed to
19   before me this _____ day
20   of_____ 2012.
22   _____
          NOTARY PUBLIC
```

VERITEXT REPORTING COMPANY
212-267-6868    www.veritext.com    516-608-2400

## Page 272

```
 2              I N D E X
 3   EXAMINATION OF
     LAWRENCE P. FERAZANI, JR.          PAGE
 4   By Mr. Sigler...........................   4
 5   AFTERNOON SESSION......................  141
 6   "HIGHLY CONFIDENTIAL" REQUEST(S)
 7   (Page:Line):  88:2, 176:8
 8   INSTRUCTIONS BY COUNSEL NOT TO ANSWER
     (Page:Line):  (NONE)
 9   REQUEST FOR DOCUMENTS/INFORMATION
10   (Page:Line):  144:5
12            E X H I B I T S
     NFL
     EXHIBIT         DESCRIPTION        PAGE
13   Exhibit 1: 30(b)(6) Notice of        14
                Deposition
14   Exhibit 2: Chapter 2, Gaming in U.S. 33
15   Exhibit 3:  Complaint for Declaratory 44
16              & Injunctive Relief
17   Exhibit 4: Constitution and Bylaws   101
                (#PLAINTIFFS' 00001858-1861)
18   Exhibit 5: NFL Constitution and      104
19              Bylaws excerpt
                (#PLAINTIFFS' 00003261-264)
20   Exhibit 6: (Withdrawn)               106
21              (#PLAINTIFFS' 00001858-863)
22   Exhibit 7:                           108
24   Exhibit 8: NFL Constitution and      111
25              Bylaws 2006 Article IX
                (#PLAINTIFFS' 00003266-268)
```

VERITEXT REPORTING COMPANY
212-267-6868    www.veritext.com    516-608-2400

## Page 273

```
 1
 2   EXHIBITS (continued):
 3   Exhibit 9:   ███████████████████   114
 4
 5   Exhibit 10:  ███████████████████   118
 6
 7   Exhibit 11: NFL Player Contract      123
               (#PLAINTIFFS' 00001864-872)
 8   Exhibit 12: NFL Gambling Policy      127
               September 2008
 9             (#PLAINTIFFS' 00003276-281)
10   Exhibit 13: NFL Owner Involvement in 131
               Gambling-Related Businesses
11
12   Exhibit 14: NFL Gambling Policy      134
               (#PLAINTIFFS' 00003110-116)
13   Exhibit 15: 2011 League Policies for 141
               Players excerpt
14             (#PLAINTIFFS' 00001854-857)
15   Exhibit 16: 2009 League Policies for 147
               Players
16             (#PLAINTIFFS' 00003273-274)
     Exhibit 17: Frequently Asked         148
17             Questions
18   Exhibit 18: Fantasy Industry Trends  161
               (#PLAINTIFFS' 00003511-557)
19
     Exhibit 19: Fantasy Sports Trade     169
20             Association
21   Exhibit 20: Fantasy Sports Trade     173
               Association Industry
22             Demographics
23   Exhibit 21:  ██████████████████     176
24
25
```

## Page 274

```
 1
 2   EXHIBITS (continued):
 3   Exhibit 22: ████████████████   192
 4
 5   Exhibit 23: ████████████████   195
 6
 7   Exhibit 24: ████████████████   201
 8
 9   Exhibit 25: ████████████████   210
10   Exhibit 26: Fantasy Football Offering 213
               NFL.com
11             (#PLAINTIFFS' 00003136-3150)
12   Exhibit 27: NFL.com website          223
13   Exhibit 28: Title 31-Money & Finance 239
14   Exhibit 29: Fantasy football offering 242
               NFL Rush program
15             (#PLAINTIFFS' 00003174-3181)
16   Exhibit 30: NFL.com NFL Fantasy Live 249
17   Exhibit 31: NFL.com NFL Fantasy Live 251
18   Exhibit 32: NFL.com article          254
19   Exhibit 33: Slide deck Professional  257
               League Sports Wagering
20             Summit September 2012
               (#PLAINTIFFS' 00002301-318)
21
22   Exhibit 34: Merriam-Webster          262
               dictionary definition of
23             "gamble"
24
25
```

## Page 275

```
 1                    ERRATA SHEET
               VERITEXT REPORTING COMPANY
 2                   1250 BROADWAY
               NEW YORK, NEW YORK 10001
 3                   800-362-2520
 4   CASE: NCAA, ET AL. VS. CHRISTIE, ET AL.
     DEPOSITION DATE: NOVEMBER 5, 2012
 5   DEPONENT: LAWRENCE P. FERAZANI, JR.
 6   PAGE LINE(S)   CHANGE         REASON
 7   ____|____|_____|_____
 8   ____|____|_____|_____
 9   ____|____|_____|_____
10   ____|____|_____|_____
11   ____|____|_____|_____
12   ____|____|_____|_____
13   ____|____|_____|_____
14   ____|____|_____|_____
15   ____|____|_____|_____
16   ____|____|_____|_____
17   ____|____|_____|_____
18   ____|____|_____|_____
19   ____|____|_____|_____
20
21          LAWRENCE P. FERAZANI, JR.
22   SUBSCRIBED AND SWORN TO BEFORE ME
23   THIS _____ DAY OF _____, 20___.
24
25   (NOTARY PUBLIC)    MY COMMISSION EXPIRES:
```

## Page 276

```
 1
 2          C E R T I F I C A T I O N
 3
 4        I, Sherri Flagg, a Registered
 5   Professional Reporter, Certified LiveNote
 6   Reporter, and a Notary Public, do hereby certify
 7   that the foregoing witness, LAWRENCE P. FERAZANI,
 8   JR., was duly sworn on the date indicated and
 9   that the foregoing is a true and accurate
10   transcription of my stenographic notes.
11        I further certify that I am not
12   employed by nor related to any party to this
13   action.
14        Dated this 7th day of November, 2012.
15
16
17        _____
18        Sherri Flagg, RPR, CLR
19
20
21
22
23
24
25
```