**Exhibit 5**

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - -

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION, an unincorporated
association; NATIONAL BASKETBALL
ASSOCIATION, a joint venture;
NATIONAL FOOTBALL LEAGUE, an
unincorporated association;
NATIONAL HOCKEY LEAGUE, an
unincorporated association; and
OFFICE OF THE COMMISSIONER OF
BASEBALL, an unincorporated        Case No.
association, doing business as     3:12-cv-04947-MAS-
Major League Baseball,             LHG
                 Plaintiffs,
          vs.

CHRISTOPHER J. CHRISTIE, Governor
of the State of New Jersey; DAVID
L. REBUCK, Director of the New
Jersey Division of Gaming
Enforcement and Assistant Attorney
General of the State of New
Jersey; and FRANK ZANZUCCKI,
Executive Director of the New
Jersey Racing Commission,

                 Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - -

VIDEOTAPED DEPOSITION OF:  ALLAN H. SELIG

TAKEN AT:  MAJOR LEAGUE BASEBALL HEADQUARTERS

LOCATED AT:  777 East Wisconsin Avenue, Suite 3060
             Milwaukee, Wisconsin
             November 9, 2012
             11:30 a.m. to 2:13 p.m.

REPORTED BY:  VICKY L. ST. GEORGE, RMR.

- - - - - - - - - - - - - - - - - - - - - - - - -

Page 2

1            A P P E A R A N C E S
2   SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP, by
       MR. JEFFREY A. MISHKIN
3   MS. KAREN LENT
       Four Times Square
4   New York, New York 10036
       (212) 735-2510
5   jeffrey.mishkin@skadden.com
    karen.lent@skadden.com
6   Appeared on behalf of the Plaintiffs.

7   GIBSON DUNN & CRUTCHER, LLP, by
8   MR. WILLIAM E. WEGNER
    MR. MATTHEW A. HOFFMAN
9   MR. TIMOTHY W. LOOSE
       333 South Grand Avenue
10  Los Angeles, California 90071-3197
       (213) 229-7000
11  wwegner@gibsondunn.com
    mhoffman@gibsondunn.com
12  tloose@gibsondunn.com
    Appeared on behalf of the Defendants.
13
14  ALSO PRESENT:  THOMAS OSTERTAG, General Counsel for Major
    League Baseball; CESAR RIOS, videographer, Veritext.
15
16            I N D E X
17  EXAMINATION BY:                          PAGE
18  MR. WEGNER                                  4
19
20            R E Q U E S T S
21            (No requests made.)
22
23  (Original transcript was delivered to Attorney Wegner.)
24
25

Page 3

1            TRANSCRIPT OF PROCEEDINGS
2            THE VIDEO OPERATOR:  Good morning.  My
3   name is Cesar Rios of Veritext.  The date today is
4   November 9th, 2012.  The time is approximately 11:43
5   a.m.  The deposition is being held in the office of
6   the Commissioner of Major League Baseball located at
7   777 East Wisconsin Avenue, Milwaukee, Wisconsin
8   53202.
9            The caption of this case is NCAA, et al.,
10  versus Christopher Christie, et al., in the United
11  States District Court, District of New Jersey.  And
12  the name of the witness is Allan Selig.
13           At this time the attorneys will identify
14  themselves and the parties they represent after
15  which the court reporter, Vicky St. George of
16  Veritext, will swear the witness, and we can
17  proceed.
18           MR. MISHKIN:  For the plaintiffs Jeffrey
19  Mishkin, Skadden, Arps, Slate, Meagher and Flom.
20           MS. LENT:  Karen Lent, Skadden Arps for
21  the plaintiffs.
22           MR. OSTERTAG:  Thomas Ostertag, Major
23  League Baseball, for the plaintiffs.
24           MR. WEGNER:  Bill Wegner of Gibson, Dunn
25  and Crutcher for the defendants.

Page 4

1            MR. HOFFMAN:  Matt Hoffman from Gibson
2   Dunn and Crutcher for the defendants.
3            MR. LOOSE:  Timothy Loose from Gibson Dunn
4   and Crutcher also for the defendants.
5            ALLAN  H. SELIG called as a witness
6   herein, after having been first duly sworn on oath,
7   was examined and testified as follows:
8                    EXAMINATION
9   BY MR. WEGNER:
10  Q.   Good morning, Commissioner.
11  A.   Good morning.
12  Q.   Would you please state your full name for the record?
13  A.   Allan H. Selig.
14  Q.   Have you been deposed before?
15  A.   Many times.
16  Q.   Also, is it okay with you if I refer to you as
17       Commissioner throughout the day?
18  A.   It certainly is.
19  Q.   Okay.  On these depositions that you've had before,
20       have any of them been in connection with the MLB's
21       anti-gambling policies?
22  A.   No.
23  Q.   Have you testified in court?
24  A.   In other matters, yes.
25  Q.   So have any of those testimonies involved enforcing

Page 5

```
1       MLB's anti-gambling policies?
2   A.  No.
3   Q.  How about arbitration proceedings, same question?
4   A.  No.
5   Q.  Commissioner, did you speak with anyone about today's
6       deposition?
7           MR. MISHKIN:  Other than counsel.
8   BY MR. WEGNER:
9   Q.  Other than counsel.
10  A.  No.
11  Q.  Have you spoken with any of the commissioners of the
12      other leagues?
13  A.  On other subjects but never on this.
14  Q.  Commissioner, because we need to have a record in
15      this case, would you mind giving us a brief
16      description of your history with Major League
17      Baseball?
18  A.  It's a rather lengthy one.  I really started in 1964,
19      '65.  The braves left for Atlanta, and I became the
20      head of a group to bring baseball back here.  It was
21      the first time I was in court as a matter of fact.
22          But anyway, in 1970 we bought the Seattle
23      Pilots and brought them to Milwaukee.  I was the
24      president of the Brewers and its major stockholder
25      from 1970 to actually into 2002.  But I became
```

Page 6

```
1       chairman of the executive council, and Fay Vincent
2       resigned in September of 1992, became the
3       Commissioner in -- on July 8th or 9th of 1998.  So
4       I've been in this position for actually the past 20
5       plus years.
6   Q.  Commissioner, what are your responsibilities as the
7       Commissioner of Major League Baseball?
8   A.  Well, they're varied and hard I think to articulate
9       the specific manner.  But overall I would say
10      obviously is to run the sport, particularly the
11      central offices of the sport and central revenues.
12      But I would guard this job, the most important part
13      of this job, clearly, is to protect the integrity of
14      the sport.
15          And I'm a great student of history.  I
16      wanted to be a history professor, so I will review,
17      as Mr. Ostertag and the clubs know, talk about this
18      at meetings all the time, the retrospect of history,
19      and the longer you're in this business and certainly
20      the longer you're in a position like this and you
21      understand that the integrity of the sport is a thing
22      that is something that is sacred to the sport and one
23      that you must on a daily, hourly basis protect.
24  Q.  Commissioner, could you talk about your specific
25      duties with Major League Baseball concerning its
```

Page 7

```
1       anti-gambling policies?
2   A.  Well --
3   Q.  Maybe I can be more specific, Commissioner.
4   A.  Well, I don't know that I -- you know, we certainly
5       have always had an anti-gambling policy.  We've had
6       one since 1921.  I mean I could take you through
7       chapter and verse of things that have been done by my
8       predecessors as well as myself.  There is no question
9       about it.
10          After all, this sport almost died in 1919
11      as a result of the Black Sox scandal, and Kenesaw
12      Mountain Landis, this office was created because of
13      gambling and the Black Sox.  And if you really study
14      the history of the sport, you understand that as
15      tough as Landis was, and he was tough, remarkably
16      tough, it was really Babe Ruth that saved baseball.
17      It was that bad.  Baseball was dying as a result.
18          And so as you study the history, whether
19      it was Bill Cox in Philadelphia who was suspended,
20      Leo Derosier who got suspended in 1947 I think it was
21      because associating with gamblers, you go up the line
22      to the Pete Rose situation, you understand that I
23      said my job was to protect the integrity of the
24      sport.  And that's every manifestation of that
25      because I've often said to people, especially during
```

Page 8

```
1       the Rose situation, one of my predecessors, Bart
2       Giamatti who happened to be one of my best friends in
3       the world.  If there is a scintilla of doubt from one
4       of these millions of people who goes to games in
5       Milwaukee or Pittsburgh or St. Louis or New York or
6       LA, 75 million plus I'm happy to say this year, we
7       have no sport left.  So integrity becomes the
8       overriding concern of every Commissioner.
9           I know you're going to talk to the other
10      three who are friends of mine but understand the same
11      thing.  You can't be strict enough, and you can't
12      -- serious incentive to understand that if heaven
13      forbid there is any situation that there is the
14      slightest equivocation on a game, you have no sport
15      left.  And we don't have any Babe Ruths left here to
16      save it.
17          And so when it comes to gambling, I say
18      this not facetiously, you may think I'm going to but
19      I'm not, we can't afford to create any Arnold
20      Rothsteins.  We can't afford to do that because there
21      would be no sport.
22  Q.  Commissioner, you mentioned the 1919 Black Sox
23      scandal.  Has there been a game-fixing scandal in
24      Major League Baseball since then?
25  A.  No, not to my knowledge because we've had such a
```

1    tough policy.  Leo Derosier, sitting in I think it
2    was Havana, Cuba if my memory -- meant to look it up
3    last night.  But Leo Derosier always fascinated me,
4    for all the wrong reasons I may add, sitting with
5    gamblers, sitting with them.
6              Now, Happy Chandler said, you know, he was
7    worried he was consorting with them.  And maybe he
8    was.  I don't know.  We would have to bring Happy
9    back to make that judgment.  But that's how strict
10   our policy has been.  You don't equiv -- I said
11   before, very carefully, you don't equivocate.  So if
12   one as a history buff, someone teaching courses in
13   history now, if you don't learn from what's
14   happening, well, then that's your fault.
15 Q.  Commissioner, in 1919 when the Black Sox scandal
16      occurred, sports wagering was not legal in the United
17      States, correct?
18 A.  I guess that's right, yeah.
19 Q.  In fact, sports --
20 A.  But frankly, that's -- I mean I would have to say to
21      you that's a so what.  Let me try to, if I may, just
22      to get back because I know we're going to talk
23      about -- maybe I can shorten everybody's day.
24              I often refer in many speeches on a daily,
25   weekly basis, everybody has heard, every writer who

1    why while I'm the Commissioner we would never put a
2    team in Las Vegas.  Don't even want to be close to
3    that.
4  Q.  Commissioner, so I'm clear, I'm not talking about
5      legal gambling in --
6  A.  Talking about illegal.
7  Q.  I'm talking about illegal throughout the United
8      States.
9  A.  That's fine.  But it's -- gambling is so sensitive,
10      we do every -- we have a Department of Investigation.
11      We watch everybody very carefully.  We created a
12      Department of Investigation from my friend Senator
13      George Mitchell back during the whole steroid
14      situation.  But we were very cautious.  And we had
15      people long before that in the last 70, 80, 100 years
16      that are watching.  But yeah, a lot of things going
17      on illegally.  But yes, I do understand that.
18 Q.  Has Major League Baseball done anything to try to
19      deter or eliminate illegal gambling in the United
20      States?
21              MR. MISHKIN:  Object to the form of the
22      question.  All illegal gambling?
23              MR. WEGNER:  Yes.
24              MR. MISHKIN:  On sports or on --
25              MR. WEGNER:  Let me rephrase the question.

1    covers me, I start out by saying, and maybe it's the
2    professor in me that I wanted to be, but that
3    baseball is a social institution.  I believe that.  I
4    also believe it's a quasi-public institution.  But
5    it's a social institution with really important
6    social responsibility.
7              Now, we're like everybody else in life,
8    you know, we have our ups and downs.  But we try to
9    always do because we are a social institution.  And I
10   don't know how much more candidly I can say it.
11   Gambling doesn't fit into a social institution,
12   especially one that's a quasi-public institution in
13   which people count on the integrity of the sport.
14 Q.  Commissioner, are you aware that there is a
15      multi-million dollar -- I'm sorry, multi-billion
16      dollar illegal gaming industry in the United States?
17              MR. MISHKIN:  Object to the form of the
18      question.  I think it lacks a foundation, but you
19      can answer the question.
20              THE WITNESS:  I know that gambling in Las
21      Vegas and other places is huge, yes.  I'm aware of
22      it.
23 BY MR. WEGNER:
24 Q.  But I mean I'm not --
25 A.  By the way, if -- as long as you bring it up, that's

1  BY MR. WEGNER:
2  Q.  Has Major League Baseball done anything that you're
3      aware of to deter illegal sports wagering in the
4      United States?
5  A.  Only with our own people.
6  Q.  And then --
7  A.  Only with our own people.
8  Q.  And what is that, sir?
9  A.  Well, I often tell a story that my first time I
10      walked in a Major League Clubhouse was in May of
11      1958.  Just a kid in those days.  And we kept people
12      out of clubhouses, you had to have -- we still do,
13      very careful who we keep out.  And the first thing I
14      saw was a big sign up on the board signed by Ford C.
15      Frick, then Commissioner of Baseball.  Talked about
16      illegal gambling.  And I remember carefully reading
17      it and talking to people.
18              So everybody that comes into baseball
19      understands the threat of gambling right from day
20      one, there is no excuse.  Every clubhouse has this,
21      everybody talks about it.  And so all I can say, I
22      mean I can't -- I don't know what society has done.
23      After all, I have enough trouble running baseball.  I
24      haven't been elected to do anything else yet.  But we
25      do everything we can to make sure people understand

Page 13

1 the evil of gambling.
2 Q. Commissioner, you're aware that sports wagering is
3 legal in Canada?
4    MR. MISHKIN:  Object to the form of the
5 question.
6    THE WITNESS:  That I -- I'm not familiar
7 with the Canadian laws, so I can't really comment on
8 that.
9 BY MR. WEGNER:
10 Q. So you're not aware that sports wagering is legal in
11 Canada?
12 A. I'm not sure that I am.  I may be, but I haven't paid
13 any attention to it.  But I am aware of what the Blue
14 Jays do and what the Expos did when they were there.
15 Q. And what is that, sir?
16 A. Same thing that we do everywhere.  You teach people
17 from the day they set foot and they start their
18 career that gambling is, above all, the most serious
19 thing that can confront baseball.
20 Q. Whether illegal or legal?
21 A. Either way.
22 Q. Has Major League Baseball done anything when there
23 were teams in Canada, did Major League Baseball do
24 anything to eliminate legalized gambling in Canada?
25 A. I don't think that's in our domain or purview.

Page 14

1 Q. So that's a no?
2 A. No.
3 Q. Commissioner, I'd like to show you previously marked
4 MLB exhibits here, are sequential in -- sequential in
5 number.  And of course we took a deposition,
6 deposition of your general counsel recently.  So this
7 is a previously marked exhibit.  Number 13.
8    Commissioner, do you need a minute to look
9 at your declaration?
10 A. No, I've looked through it.
11 Q. When was the last time you saw that document?
12 A. It's on my desk.  I can take you back there and show
13 you.
14 Q. Did you draft it yourself?
15 A. No, I wouldn't say I drafted it, but there isn't
16 anything here I disagree with.
17 Q. All right.
18 A. On the contrary.  Quite confident, very well done.
19 Q. Other than --
20 A. The only person -- the only thing that you may want
21 to quibble with, I'm over 18, that we can't;
22 competent to make this declaration.  There may be
23 some people that want to quarrel about that.
24 Q. Well, I'm not going to quarrel with that.
25 A. Thank you.

Page 15

1 Q. Other than I would like to talk about your foundation
2 and the evidence that you have to support the
3 declaration.  But certainly I'm not going to quibble
4 with your competency, Commissioner.
5    MR. MISHKIN:  Object to the form of that
6 statement.
7    MR. WEGNER:  You're not arguing that he's
8 not competent.
9    MR. MISHKIN:  No, I'm not.
10 BY MR. WEGNER:
11 Q. Commissioner, if you -- let me ask you this, sir.
12 Did anyone present you with any documents to support
13 this declaration --
14 A. Well, they didn't have to.  I've lived -- this has
15 been my career the last 50 years.  As I told you, I
16 think I'm probably as well as anybody now left on the
17 face of the earth, maybe with the exception of our
18 historian, I've gone back, I've studied all these
19 issues, not just now but I have no -- there isn't
20 anything in here that I haven't lived.  So I'm not
21 sure I need too many people to explain things to me.
22 Q. Let's go through it then because I'd like to walk
23 through your declaration, sir, and talk about some of
24 the statements that you make in your declaration.  If
25 I could direct your attention to paragraph 5 on page

Page 16

1 2.
2 A. 5.
3 Q. There, Commissioner, you say that your most important
4 responsibility is working to maintain the integrity
5 of MLB and to preserve public confidence in our
6 sport.
7 A. I believe I've said that earlier today.
8 Q. Yes.  What threats are there to the integrity of
9 Major League Baseball?
10 A. What --
11 Q. Threats are there to the integrity of Major League
12 Baseball?
13 A. Gambling.
14 Q. Any other ones?
15 A. Well, there could be other things.  I mean when we
16 had the steroid business, I was greatly concerned
17 about that.  But we did what we had to do with the
18 help of Senator Mitchell and others.  And I was very
19 proud of the fact that sport got cleaned up quickly.
20    Different case, however, because gambling
21 on a sport, on any sport but on this sport is what
22 you want to talk to me about, is I think the
23 deadliest of all things that can happen.  It's evil,
24 it creates doubt and destroys your sport.  So it's
25 different from all the other things that you have.

1       So are there other things that could
2  create some -- hasn't, and I'm happy to say that, but
3  gambling always does.  There can be no doubt about
4  the effect of gambling, none.
5  Q.  Commissioner, then, so I've got two then.  Gambling
6      in terms of threats to Major League Baseball,
7      gambling and performance enhancing drugs, may I call
8      it that?
9  A.  No -- yeah.  Let me just explain the steroid or
10     performance enhancing drugs.  The only thing one can
11     say is well, the playing field wasn't level because
12     some people used them and some people didn't.  Now,
13     there are a lot of people that disagree with that,
14     but I'm very sensitive on this subject.  Could it
15     create the same kind of threat of gambling, not even
16     close.  Not even close.
17 Q.  Why is that, sir?
18 A.  If a -- if you're going to a game today and somehow
19     there has been comments somewhere in the paper or
20     some story is breaking that players have been
21     gambling on the outcome of that game, on the outcome
22     of the game, that's a stain, as Bart Giamatti said in
23     the Pete Rose situation, that can't be removed.
24        Steroids -- all sports have performance
25     enhancing things and other things, but that's why you

1  clean them up, you recognize it, you understand that
2  that's your job.  But we don't know who did it, we
3  don't know how, there is no attempt to throw a game
4  or no attempt to do something to a game.  So I'm kind
5  in the answer to say that the only thing that could
6  create some doubt, fortunately we haven't had any,
7  there is nothing on a par with gambling.  And I
8  believe that.  I believe that from the first day I
9  walked in this business.
10       And I guess I would have to say to you
11     candidly I don't understand how this is even a
12     question.  I don't even understand how anybody who
13     understands sports what it means to people; and then
14     people who gamble on a game who are participants in
15     that game, whether they're participating in that game
16     or gambling on another game and talking to other
17     people, it's the end of your sport.  How would you
18     defend that?  And who would believe the next time it
19     isn't happening again and again and again?  That's
20     what happened in 1919.
21 Q.  Commissioner, would you say that from 1919 to the
22     present that MLB has been successful in building the
23     integrity of the sport?
24 A.  No question.
25 Q.  And is that in part because of the policies that MLB

1  put in place after the 1919 scandal?
2  A.  Absolutely.
3  Q.  So would you say that the policies of MLB from 1919
4      to the present have been successful in preventing
5      game fixing in MLB?
6  A.  So far.  So far.  But remember I said you have to
7      watch this on a daily basis, on an hourly basis.  The
8      fact that we protected it now, but if something in
9      the near future happened, all that would be in
10     jeopardy.
11 Q.  Commissioner, could you please now look at paragraph
12     6.
13 A.  6, um-hum.
14 Q.  Of Exhibit 13 which is your declaration.
15 A.  Yes.
16 Q.  I'd like to ask you if you would focus on the first
17     sentence of paragraph 6 in which it states that the
18     spread of sports betting, including the introduction
19     of sports betting in New Jersey, would threaten to
20     damage irreparably the integrity of and public
21     confidence in Major League Baseball.
22 A.  Um-hum.
23 Q.  What is your basis for that statement, sir?
24 A.  My thoughts on gambling, my thoughts on how important
25     it is as a social institution to make sure that we

1  maintain integrity at all parts, and the idea that we
2  make -- we create mechanisms, we create mechanisms
3  that increase gambling, increase producing maybe
4  another Arnold Rothstein are to me not only
5  inexcusable but I'm -- I say this not disrespectfully
6  because I really don't mean it that way, I'm offended
7  by that.  I know, and I'm probably going to go on
8  more than I want to here, I know states need money.
9  I really mean that.  I understand all the problems.
10 Federal government needs money, going over a cliff,
11 cities need money.  Chris Christie needs money.
12      But gambling is so -- the threat of
13     gambling and to create more threat is to me -- I'm
14     stunned.  When you told me I was going to do this and
15     all this was going on, my first reaction is -- was
16     and is, and again, I don't mean to be disrespectful,
17     I know that people need sources of revenue, but you
18     can't -- this is corruption in my opinion.  You have
19     one incident as a result of somebody going gambling
20     on a game, and it spreads its tentacles to, after
21     all, Philadelphia is close by, New York is close by,
22     on and on and on.  Who knows, could be anyone.
23      Why would you do that.  Why would you do
24     that to one of the most really important social
25     institutions in America.  I know the other

Page 21

```
 1      commissioners feel their sports are, and they're
 2      right, they are.  But people live and die with
 3      baseball games.  It's their life.  The more you're in
 4      this sport, the more you understand that, how
 5      important it is to so many different people.  Why
 6      would you do this.  I'm just -- guess I have to say
 7      to you I'm appalled.  I'm really appalled.
 8              And if anybody doesn't understand it, then
 9      it's -- it's beyond belief.  After all, you don't
10      have to be a student of American history.  But I'll
11      go back to 1919, if somebody -- we should be trying
12      to reduce the risk of this, not increase the risk of
13      it.
14   Q. Commissioner, has MLB conducted any studies to
15      support the notion that the implementation of New
16      Jersey's new gaming law would increase the risk of
17      game fixing in the MLB?
18   A. I don't know -- no, the answer is we haven't -- we
19      don't have to.  Obvious.  I mean for all the things
20      I've already told you, I wouldn't put a team in Las
21      Vegas just because I don't want our people around
22      that kind of atmosphere.  There is a lot of things
23      that we do -- we do a lot of things to avoid this.
24      To have a state create gambling on our games in which
25      the chance, chance, who knows what, of somebody
```

Page 22

```
 1      betting money, and then it spreads to a player or
 2      two, is so -- is so appalling and so -- again, we go
 3      back to history.  We've protected this.
 4              And I guess I would wonder if that
 5      particular mechanism, the one you're talking about,
 6      New Jersey, ever led to this.  And I believe it
 7      certainly would increase the chance.  I wonder then
 8      how the Governor and other people, I wonder how they
 9      would feel then.
10   Q. Well, Commission --
11   A. You want to get into destroying social and American
12      institutions, that's fine.  If this is that
13      important, fine.  But it isn't important.  And we'll
14      fight it with every fiber of energy we have.
15   Q. I appreciation that, Commissioner.  I'm just trying
16      to get at the bottom of what evidence you have to
17      support the conclusion that -- I'm going to frame a
18      question about that.
19   A. I've already given you Bill Cox, Leo Derosier, Pete
20      Rose, 1919.  We can go on and on and on.  I don't
21      know how many more you want.
22          MR. MISHKIN:  Mr. Wegner, frame a
23      question.  I have an objection to -- we have a
24      dispute perhaps, I'm sure we do, as to what
25      constitutes evidence and what does not.  But that's
```

Page 23

```
 1      for you and me to argue in court, not to ask the
 2      witness about.  You can ask the witness factual
 3      questions and he'll, I know he will give you an
 4      answer.
 5          MR. WEGNER:  So do you have an objection?
 6          MR. MISHKIN:  Yes, I do.  I'm not
 7      directing him not to answer the question.
 8          MR. WEGNER:  I think I should rephrase the
 9      question because I think it got lost in our
10      discussion.
11   BY MR. WEGNER:
12   Q. All of the examples of scandals, if you will,
13      involving gambling that you just mentioned after 1919
14      did not involve game fixing, did it?
15   A. No.  But -- well, we have to take them one by one.
16      In Leo Derosier's case, he was consorting with
17      gamblers according to Happy Chandler and properly so,
18      and we're not going to take any chances on that.
19      Doing anything with gambling, consorting with
20      whatever, whether it's gamblers or this type of
21      mechanism, can only do harm and evil to this sport.
22      It can't do any good.  The potential for evil is
23      pretty high.
24   Q. Commissioner, is it MLB's position that sports
25      wagering in the United States is a threat to the
```

Page 24

```
 1      integrity of the games in terms of game fixing?
 2   A. Well, you're talking about gambling in Las Vegas, is
 3      that what you're talking about?
 4   Q. I mean gambling, whether it's legal or illegal.
 5   A. Look, we can only control what we control.  And do I
 6      think that gambling is helpful to anything, no.  But
 7      I think taking and having more options to gamble,
 8      creating more options to gamble isn't helpful.  And
 9      in fact, yes, I think that it increases the chance of
10      some type of tragic, unfortunate incident.
11   Q. Increases the chance.  But again, since 1919, and
12      we've already acknowledged that there is a huge
13      illegal gambling market in the United States, there
14      hasn't been a game-fixing scandal in the MLB since
15      1919.
16          MR. MISHKIN:  The question has been asked
17      and answered.  You can answer it again.
18          THE WITNESS:  Because we have been very
19      vigilant back starting with Landis and going up
20      through Happy Chandler and Ford Frick and on to the
21      present by these incidents I've given you, and Bart
22      Giamatti with Pete Rose and so on and so forth.  But
23      it was another -- the Pete Rose situation was
24      tragic, tragic thing that, as Bart said, the
25      fateful day that he suspended him was a stain on
```

Page 25

1    this sport and on that.  So yes, we're very, very
2    protective.
3  BY MR. WEGNER:
4  Q.   The Pete Rose scandal didn't involve game fixing, did
5       it?
6            MR. MISHKIN:  Again, asked and answered.
7       You can answer it again.
8            THE WITNESS:  I -- Pete Rose situation was
9       a tragic, sorry situation where he gambled.  A
10      manager of a Major League ball club gambling on
11      games.  I'll let you draw your own conclusions.  How
12      good do you think that was for the sport?
13 BY MR. WEGNER:
14 Q.   Commissioner, I have in my notes that your answer to
15      the question about the increase in the likelihood of
16      game fixing as a result of legalizing gambling in New
17      Jersey is that it represents a threat or a risk or a
18      chance; is that correct?
19           MR. MISHKIN:  Object to the form of the
20      question.  Mr. Wegner, really, I think your attempt
21      to characterize the testimony which is already in
22      the record and not characterized it precisely in the
23      words that the Commissioner used is objectionable.
24      So I object.
25           If you can answer the question, he can

Page 26

1    answer it.  But I object to the way that question
2    was asked.
3            THE WITNESS:  I think I have answered it
4       already.  I said to create another gambling
5       mechanism is a threat and a serious one in my
6       opinion.
7  BY MR. WEGNER:
8  Q.   Other than the threat, do you have any other evidence
9       that the implementation of the New Jersey gaming
10      statute would increase game fixing in the MLB?
11           MR. MISHKIN:  Objection.  Again, his
12      answer clearly has gone beyond game fixing.  You
13      keep -- you're fixated on game fixing even though
14      his answer has gone way beyond that.  So I object to
15      the form of your question.
16           MR. WEGNER:  Okay.
17           THE WITNESS:  I think I've answered this
18      question about seven different ways.  But the only
19      thing I will say to you is to create another
20      mechanism where gambling could become pervasive in
21      Major League Baseball is something that we can't and
22      shouldn't tolerate and has potential to do big harm,
23      you bet.
24 BY MR. WEGNER:
25 Q.   Okay.  Just so we can move on, Commissioner, is it

Page 27

1    your testimony that to your knowledge the MLB has not
2    performed, conducted, any empirical studies to
3    confirm that the implementation of a New Jersey
4    gaming statute would increase the threat of game
5    fixing to the MLB?
6  A.   With all due respect, after 50 years in this sport,
7       sir, I don't have to do an empirical study.  I think
8       the answer is so obvious that even your Governor
9       probably understands that.
10 Q.   So that's a no, sir?
11 A.   No.
12 Q.   All right, Commissioner, let's go, again, with the
13      same exhibit that you have in front of you, the next
14      sentence in paragraph 6 on page 2.
15 A.   Um-hum.
16 Q.   Please look at the next sentence where it says:  The
17      more pervasive the sports gambling culture and the
18      more that culture is actively promoted by
19      governments, the more likely it is that games will be
20      perceived by the public with increased cynicism.
21           Sir, what support do you have for that
22      statement?
23 A.   I think that's absolutely -- the support is my
24      practical experience all these years, talking to
25      fans, talking to people, you bet.  What positive

Page 28

1    relationship could gambling and people participating
2    in gambling, what do you -- what positive could that
3    be for the sport and its fans.  Of course it promotes
4    cynicism.  Of course it does.
5  Q.   Commissioner, would you agree with me though that the
6       spectatorship in Major League Baseball has increased
7       over the last 20 years?
8  A.   Oh, dramatically.  Very proud of it.  You bet.
9  Q.   And that is in a market where illegal gambling is
10      pervasive?
11           MR. MISHKIN:  Object to the form of the
12      question.
13           THE WITNESS:  That is what?
14 BY MR. WEGNER:
15 Q.   In a market, the United States, where illegal gaming
16      is a reality.
17 A.   That's irrelevant.  That's irrelevant because illegal
18      gambling, undercover gambling, there isn't anything
19      we can do about it.  We don't know about it.  Only
20      thing we know is to have our Department of
21      Investigation from spring training on watch people,
22      watch carefully.  Restaurants are sometimes out of
23      bounds.  They watch all of the spots in every Major
24      League city.  We do a lot of work.  We have for many,
25      many years.

Page 29

```
 1              And their -- but to then now create
 2    another entity, legal, as it may be, to promote
 3    gambling on our sport? I want to repeat what I said
 4    to you earlier, and I only have 50 years of
 5    experience in this sport, would be -- it does
 6    increase cynicism. And it's -- well, I'm appalled
 7    you guys are even here. I have to tell you that.
 8    That's how -- that's how having been raised by people
 9    in this sport about gambling is for a state to come
10    in and do this is -- I'm sorry. I find this just
11    absolutely startling.
12 Q.  Commissioner, you stated that a moment ago, and
13    Counsel will correct me if I get this wrong, that you
14    don't see how there could be any possible benefit to
15    baseball from gambling, correct?
16 A.  Yeah, that's true.
17 Q.  Would you agree with me that there is a possibility
18    there is an increased interest in baseball as a
19    result of gambling?
20 A.  I don't believe that, not in our sport, no, no. I
21    would hope not. No. No, I don't feel that way.
22    Number one, you know, we don't have lines, and we
23    don't do other things. We -- we're very, very
24    cautious. No, I don't believe -- if gambling
25    disappeared today, we'll draw more than 75 million
```

Page 30

```
 1    people next year, and we'll hit my goal of 80 million
 2    if all gambling disappears tomorrow morning at 10:00.
 3 Q.  And what basis do you have for making that statement?
 4 A.  Because I don't think -- because I know our fans, I
 5    know the sport, I know how families come to games.
 6    And there is, in my judgment, gambling plays no role
 7    at all. Now, maybe the next guy with 50 years of
 8    experience will have a different conclusion. I don't
 9    think so.
10 Q.  Commissioner, has Major League Baseball conducted any
11    focus groups or surveys to determine what the
12    public's perception of baseball is with or without
13    gambling in the United States?
14 A.  Look, I know how people feel about the gambling
15    situation. People know that gambling is deadly. I
16    don't have to conduct focus groups. I mean I know
17    how the Pete Rose affected things and so on and so.
18    Believe me, that's -- I've walked ball parks since
19    the time I was a kid. I think I know exactly how
20    people are.
21              There isn't any fan anywhere who would say
22    boy, I wish we could gamble on this game. Maybe we
23    can get Ryan Braun. He's a Milwaukee left fielder.
24    My God, maybe -- are you kidding? Where would
25    gambling possibly help us? Nowhere. Zero. Doesn't
```

Page 31

```
 1    help us draw, doesn't help us -- but anything, I
 2    meant what I said before, that affects an
 3    institution's integrity or even the thought of that
 4    integrity being challenged is deadly.
 5              I would say to you, and I would say to the
 6    people there, if you want to believe it, you ought to
 7    go back and read -- I had a historian, Jerome
 8    Holtzman, who passed away, famed baseball writer from
 9    -- Hall of Fame writer who was my historian for
10    years. And I had him go back and restudy the
11    Shoeless Joe Jackson, Buck Weaver, all -- I spent
12    hours. He was extraordinary. And the more you read
13    it, the more painful it is, even for me.
14              And the God forbid that you would always
15    have as a team owner is that a player -- you got a
16    call from the Commissioner's Office or a player
17    walked into your office, said look, you know, I met
18    this guy, Rothstein, keep bringing up his name, and,
19    why, your world just collapsed. Your world just
20    collapsed. So why would a sport that's such an
21    important part of society, why would you even allow
22    the threat of that.
23              You can sit here all day and say well,
24    you're not 100 percent sure. Of course not. But
25    you've increased the risk. Who wants to be part of
```

Page 32

```
 1    increasing the risk.
 2 Q.  Commissioner, just so I can move on, we're clear, so
 3    the -- Major League Baseball has conducted no
 4    consumer surveys or focus groups to determine whether
 5    the implementation of New Jersey's gaming statute
 6    would increase a negative perception by the public of
 7    professional baseball?
 8         MR. MISHKIN: It's been asked and
 9    answered. And for whatever it's worth, Mr. Wegner,
10    we've been asked to produce any such studies. We
11    have not produced them because they don't exist.
12    You can continue to ask the witness the same
13    question if you'd like, but I think we both know
14    that those studies, if they had been done, would
15    have been produced. We don't have them.
16         But again, with the objection that the
17    question has been asked and answered, and
18    Commissioner, if you still have -- surprisingly have
19    the question in mind, you can answer it again.
20 BY MR. WEGNER:
21 Q.  Would you like to have it read back, Commissioner?
22 A.  No, I don't think I have to. I mean I just happened
23    to think here, and my friend Commissioner Goodell,
24    this is going to be in his domain, but I remember in
25    1962 here when Horning and Karras, Alex Karras who
```

Page 33

```
 1        just died, and Paul Horning who was the golden boy of
 2        the Green Bay Packers, were suspended for gambling.
 3        Why, there was a shockwave.  Vince Lombardi has said
 4        over and over, it was the loneliest, saddest day of
 5        his life.  Gambling on sports in a state which set up
 6        legal gambling, people are asking me why would you
 7        feel this way?  The only people that could ask me
 8        that are people who haven't been involved in sports
 9        or aren't sports fans, with all due respect.
10   Q.   Commissioner, are you aware that Las Vegas legalized
11        sports gambling in 1951?
12   A.   Yeah, sure am.
13   Q.   And that business expanded into the casinos because
14        of change in federal law in 1974?
15   A.   Fine.
16   Q.   Have there been any gambling scandals involving Major
17        League Baseball since 1974?
18   A.   No.  But there is no team in Las Vegas either for
19        that reason.
20   Q.   I didn't limit my question to teams in Las Vegas.
21   A.   What happens in Las Vegas is at that time.  But I
22        remember, and I'll be very candid, we played an
23        exhibition game, a couple of them in 1984 I think.
24        '83 maybe I think.  And Commissioner Kuhn had a fit
25        about it, called me.  And he and I happened to be
```

Page 34

```
 1        very close.  And he was right.  And I said I promise
 2        you Bowie, we'll never come back there again, and we
 3        didn't.  But okay, if that's a culture, fine.  But it
 4        is not a culture consistent with a sport that depends
 5        on 100 percent integrity.
 6             So, you know, people would ask why isn't
 7        there a team in Las Vegas, because baseball is too
 8        concerned with integrity -- not too concerned, but
 9        always consumed by it.  And I wouldn't place our
10        players in that kind of atmosphere.  So what that
11        culture has done is fine.  Doesn't make it right, and
12        it certainly doesn't -- it's not where a social
13        institution that's a quasi-public institution should
14        be.
15   Q.   Commissioner, since 1974 though isn't it true that
16        there have been no gambling-related scandals with
17        Major League Baseball that resulted from legalized
18        gambling in Las Vegas?
19   A.   That's -- but that's quite irrelevant.
20   Q.   Well, can we just start with an answer to my
21        question?  Has there been one?
22   A.   Fortunately no, because of our attitude and all the
23        things that we've done.
24   Q.   And that's why you say it's irrelevant that there
25        hasn't been one?
```

Page 35

```
 1   A.   Yeah, it is irrelevant because we watch, what happens
 2        in Las Vegas, is, you know, whether I approve that or
 3        not, and I really don't -- I really don't disapprove.
 4        That's their business.  But it is not consistent with
 5        an American sport that is a quasi-public institution.
 6   Q.   Has Major League Baseball considered having a
 7        franchise in Las Vegas?
 8   A.   No.
 9   Q.   Never?
10   A.   Oh, I think -- I think that people talked about it.
11        But as I said, as long as I'm Commissioner, there
12        will be no franchise in Vegas.  We won't even
13        consider it.
14   Q.   So you have never considered --
15   A.   No.  And by the way, since I've been doing this
16        since -- for a long time and before that, no, that
17        was never any really serious consideration a
18        franchise in Vegas, at all.  At least I can't
19        remember since 1970.  Now, maybe somebody did it in
20        1912.
21   Q.   Commissioner, let's take a look, again, at the
22        exhibit that's in front of you, Exhibit 13.  On page
23        3 let's look at paragraph 6 again.
24   A.   What paragraph?
25                 MR. MISHKIN:  Over --
```

Page 36

```
 1                 THE WITNESS:  6.
 2                 MR. MISHKIN:  You're fine.
 3   BY MR. WEGNER:
 4   Q.   In your declaration at that point, Commissioner, you
 5        state:  Specifically plays, coaching decisions and
 6        umpiring calls would be questioned by fans who
 7        suspect that the fix is in.  If fans suspect that
 8        plays, decisions and umpiring are in any way
 9        influenced by sports gambling, they will more likely
10        disengage from what they perceive to be a tainted
11        sport rather than continue to invest their energy in
12        it.
13             Other than what you've testified to so
14        far --
15   A.   Yeah.
16   Q.   -- Mr. Commissioner, do you have any other evidence
17        to support that statement?
18   A.   I have all the evidence I need.  I know how people
19        feel about gambling.  I know how sports fans feel.  I
20        know how they feel, the players.  I said I have --
21        I've walked every Major League park in most every
22        park in America.  I know how they feel.  And there is
23        no good, I'll say it again, that creating more
24        opportunities for people to gamble on baseball.
25   Q.   And that's your opinion, sir?
```

Page 37

1          MR. MISHKIN:  Object.
2          THE WITNESS:  I think it's more than an
3     opinion.  I think it's an expert opinion based on 50
4     years of experience.
5  BY MR. WEGNER:
6  Q.   So do you plan to testify in this case as an expert?
7          MR. MISHKIN:  Objection, objection.
8     That's a question for counsel, not for the witness.
9          MR. WEGNER:  Well, I don't want to
10    inconvenience the Commissioner by having to take his
11    deposition again.  If he's going to be testifying as
12    an expert, I should know this now so we can --
13         MR. MISHKIN:  Mr. Wegner, I think you know
14    our position with all of its testimony.  Every one
15    of these depositions is irrelevant, unnecessary.
16    The case will be decided without any further factual
17    development necessary.  The Commissioner is here as
18    the Commissioner of Baseball.  I think in that
19    capacity, you should ask whatever questions you
20    want.
21         MR. WEGNER:  As you know, Counsel, there
22    is a difference between the line of questioning that
23    I would engage in based upon the Commissioner's
24    personal perception as opposed to his rendering an
25    expert opinion, which would have to be qualified

Page 38

1     under Daubert, and I want to know at least as of
2     today --
3          MR. MISHKIN:  No, that's wrong.
4          MR. WEGNER:  -- is he testifying as an
5     expert or as a --
6          MR. MISHKIN:  He's testifying as the
7     Commissioner of Baseball.  And whatever weight that
8     gives to his testimony, it gives.  He's not here
9     under any other title or any other capacity except
10    as the Commissioner of Baseball.
11         MR. WEGNER:  Okay.
12         MR. MISHKIN:  And a witness that you've
13    called.
14         MR. WEGNER:  So when you say his capacity,
15    I can proceed today with the expectation that he is
16    not an expert qualified under Daubert?
17         MR. MISHKIN:  Absolutely not.  You can
18    proceed to question the Commissioner of Major League
19    Baseball.  Whatever weight as with any witness,
20    because lay witnesses can give expert opinions
21    wholly apart from Daubert.  So whatever weight the
22    factfinder chooses to give this testimony because
23    he's Commissioner, because of his experience, the
24    factfinder will give.  You are -- this is your
25    witness.  Proceed as you choose.

Page 39

1  BY MR. WEGNER:
2  Q.   Commissioner, let me ask you this then.  Other than
3       the testimony that you've provided so far, okay,
4       which is based upon your experience.
5  A.   Um-hum.
6  Q.   And your opinion.
7  A.   Um-hum.
8  Q.   And your concerns.
9  A.   Yes.
10 Q.   Do you have any other evidence that would support the
11      allegations in your declaration concerning the
12      adverse impact the implementation of the New Jersey
13      gambling law would have on Major League Baseball?
14         MR. MISHKIN:  It's been asked and answered
15    repeatedly.  Go ahead.
16         THE WITNESS:  As I said, and I'll say it
17    again, I have 50 years of experience in this sport.
18    And I have been through a lot with many issues.  And
19    on this subject I feel quite confident of my
20    position.
21 BY MR. WEGNER:
22 Q.   But you've articulated for us today so far in your
23      deposition all of the bases of that opinion, correct?
24         MR. MISHKIN:  Objection, argumentative.
25    You can answer the question, Commissioner.

Page 40

1          THE WITNESS:  I think I've articulated my
2       position as clearly as I can.
3  BY MR. WEGNER:
4  Q.   As completely as you can?
5  A.   I think so, yeah.
6  Q.   Let's take a look at paragraph 7 of your declaration
7       on page 3.  You state that beyond increased suspicion
8       of underhanded dealing, increased sports gambling
9       also makes it more likely that people will actually
10      attempt to fix games or obtain inside information.
11         Is the basis, your basis for that statement
12      the same as you have testified to so far in your
13      deposition?
14 A.   It is, absolutely.
15 Q.   Do you have anything to add to that?
16 A.   No.  Creating another mechanism to create gambling I
17      think is just -- is not only objectionable but has
18      the potential to do great evil.  I've said that.
19 Q.   Just to be clear about this, and I'll move off this
20      one, Commissioner, has Major League Baseball
21      conducted any analysis, never mind studies but
22      analysis, that there would be a likelihood that more
23      people will attempt to fix games if gambling is
24      promoted or authorized in New Jersey?
25         MR. MISHKIN:  Object to the form of the

1    question.

2            THE WITNESS:  To create more opportunities

3    for people to gamble creates more opportunities for

4    people to do bad things.

5    BY MR. WEGNER:

6    Q.   So it increases the threat?

7    A.   Of course it does.

8    Q.   Anything else?

9    A.   No.

10   Q.   Commissioner, the Blue Jays are a Canadian team,

11        correct?

12   A.   Last time I looked.

13   Q.   Is there a greater likelihood that there will be game

14        fixing on Blue Jays games in Canada where sports

15        wagering is legal than in the United States?

16           MR. MISHKIN:  Object to the form of the

17        question only because it's confined in certain ways.

18        It's not -- many things about sports gambling are

19        not legal in Canada.

20           MR. WEGNER:  Then the Commissioner can

21        answer the question.

22           THE WITNESS:  I don't know that.  The only

23        thing I know is that my friend, Mr. Paul Beeston who

24        is the president of the Blue Jays, has the same

25        feelings about gambling and baseball that I do.

1    Concern, limit as much as you can of the

2    opportunity, and just as sensitive about everything

3    I've testified today that I do.

4    BY MR. WEGNER:

5    Q.   Commissioner, let's take a look at paragraph 8.

6    A.   8.

7    Q.   Of your declaration.

8    A.   Yeah.

9    Q.   And there you state, sir, that another likely result

10        of sports gambling is that fan loyalty would diminish

11        as many fans would focus less on their allegiance to

12        certain teams, players or cities and instead focus

13        more on the outcome of individual bets.

14           Do you have any evidence to support that

15        statement other than what you've given to me so far

16        today?

17   A.   I'm trying here to be thoughtful and not give you a

18        smart alecky answer, but these questions are -- you

19        can't be serious.  The threat of gambling or the

20        threat of -- the average sports fan not only

21        understands it, it would be stunning.  Of course they

22        understand it.

23           If I took you to Miller Park today and sat

24        you down with four people and said gee, what do you

25        think, would you be offended if you knew Brewer

1    players were gambling on their team?  I mean we spend

2    all this effort to make sure that our sport is -- has

3    great integrity, has never, as I said earlier, there

4    is never a scintilla of doubt about its outcome.

5    There is no question that that's accurate, no

6    question.

7    Q.   Commissioner, you just said that if players were

8        betting on the games.

9    A.   Somebody got to the players obviously.  I hate to

10        bring up Arnold Rothstein again, but you keep giving

11        me that opportunity.  So you create a mechanism,

12        people are gambling on a sport, and ultimately, as

13        happened, has happened in another sport, created

14        another mechanism in which a gambler then gets to a

15        player.

16   Q.   Commissioner, if the New Jersey statute is

17        implemented, that's not going to change MLB's rules

18        against gambling, is it?

19   A.   No, no.

20   Q.   So those rules would remain in place?

21   A.   That's correct.

22   Q.   And they have been effective in deterring game fixing

23        since 1919?

24   A.   So you would tell me that you could justify a state

25        going to gambling on sporting events with potential

1    to do harm, and that's really a good thing.  Is that

2    what you're saying to me?

3    Q.   What I'm trying to say, sir, is there is no evidence

4        so far --

5    A.   Oh.

6    Q.   -- as to why it is harmful.

7    A.   Well, you may think so.

8            MR. MISHKIN:  I object.

9            THE WITNESS:  I violently disagree with

10        you.

11   BY MR. WEGNER:

12   Q.   I apologize, Commissioner.  It's really not

13        appropriate for me to be answering questions from you

14        to me because then they're argumentative.

15           THE WITNESS:  Leave it to my attorney.

16           MR. MISHKIN:  Let's stop the argument, put

17        a factual question, and I assure you you will get a

18        factual answer as best as the Commissioner can give

19        it to you, which I think that as you can see from

20        his answer, he believes he has done repeatedly

21        already.

22           THE WITNESS:  Maybe 50 times already.

23   BY MR. WEGNER:

24   Q.   So let's focus on this paragraph we're discussing,

25        Commissioner, where you say that another likely

Page 45

```
 1        result of sports gambling is that fan loyalty would
 2        diminish as many fans would focus less on their
 3        allegiance to certain teams, players or cities and
 4        instead focus more on the outcome of individual bets.
 5                Let me ask you this.  Is it your testimony
 6        that fans, baseball fans in this country, do not bet
 7        on baseball games?
 8   A.   I don't know whether they do or they don't.  I do
 9        know that if they think the integrity of the sport is
10        being impugned, those same people would be offended
11        out of their minds, and our sport would suffer
12        irreparable damage and harm.
13   Q.   I think everyone would be offended by that,
14        Commissioner.  My question though is are fans, this
15        is -- this specifically addresses in your declaration
16        a diminution of fan loyalty as a result of the New
17        Jersey statute being --
18   A.   I believe so.  I believe that that's accurate.
19   Q.   On what do you base that belief, sir?
20   A.   I base it on my knowledge of fans and how they think
21        and how offended they are by gambling.
22   Q.   So it's your view that gambling can in no way
23        increase fan loyalty?
24   A.   No, I don't think it -- look, we have the most loyal
25        fans in the world, and I don't think gambling plays
```

Page 47

```
 1   A.   If you're telling me today that in New Jersey's lust
 2        for cash, they're going to set up a gambling
 3        mechanism is helpful to baseball, then that's so
 4        farfetched that I don't know what else to say about
 5        it.  And I mean that sincerely.  That is beyond -- I
 6        know people rationalize behavior a lot.  I know
 7        people rationalize a lot of things they do.  But if
 8        you're telling me that the Governor really wants to
 9        help baseball by doing this, it's so farfetched that
10        I'm -- it's absurd.
11   Q.   But other than your opinion, Commissioner --
12             MR. MISHKIN:  Objection.  Mr. Wegner,
13        please.
14             MR. WEGNER:  Yes.
15             MR. MISHKIN:  That's a
16        mischaracterization.  It's not just his opinion.
17        He's been very, very clear about what the basis of
18        his testimony is, and you keep saying other than
19        your opinion.  That's objectionable.
20   BY MR. WEGNER:
21   Q.   Commissioner, let's be clear about that then.  Do you
22        have anything other than your opinion that the
23        implementation of the New Jersey gaming statute would
24        be harmful to Major League Baseball other than your
25        opinion?
```

Page 46

```
 1        any role.  I believe I've testified to that already.
 2        None.  Zero.  If you take all gambling away, I'll
 3        repeat this again, we'll draw 75 million people next
 4        year, and they won't be any less loyal.
 5   Q.   And what is the basis for that assumption, sir?
 6   A.   My own 50 years of experience.
 7   Q.   Have you done any actual studies --
 8   A.   I know why we draw fans, I know how we draw fans, and
 9        I see no role of gambling whatsoever.
10   Q.   Commissioner, that's a pretty specific number though.
11        Have you actually --
12   A.   75 million is what we drew this year.
13   Q.   Okay.
14   A.   I'm sorry, there is nothing specific about it.  We
15        did it.
16   Q.   But you think you would increase your
17        spectatorship --
18   A.   I didn't say that.  I said it won't affect our
19        attendance negatively.  In fact, I expect we will
20        have a bigger year next year because we have a lot of
21        things working which is neither here nor there in
22        this discussion.
23   Q.   But that spectatorship and those numbers, it is your
24        testimony you do not know whether those fans are or
25        are not betting on teams, baseball teams?
```

Page 48

```
 1   A.   I think I have history on my side, too, as well as my
 2        opinion.  I have history.  I know what we do.  I know
 3        how insidious gambling is.  I know how immoral it is.
 4        I know how unethical it is.  And I know from having
 5        been an owner, a fan first of all, a fan to this day,
 6        its Commissioner, I know that.  There is no good that
 7        can come from it, only bad and evil.  I don't know, I
 8        can't be any clearer, can I?
 9   Q.   Can you be any more complete?  Is that it, or is
10        there more?
11   A.   No.
12   Q.   All right, Commissioner, let's look at paragraph 12
13        on page 4 of your declaration.
14        Geez, almost done with this thing?  Holy mackerel.
15             MR. MISHKIN:  Almost done.
16             THE WITNESS:  Yes, sir.
17   BY MR. WEGNER:
18   Q.   You state, quote:  In 1991, along with other major
19        sports leagues, MLB was an active and vocal proponent
20        of PASPA, P A S P A.
21   A.   Yup.
22   Q.   Lending its strong support to that bill which
23        ultimately passed the Senate by an 88 to 5 vote.
24             Do you know who came up with the idea for
25        PASPA?
```

Page 49

1  A.   I do not.
2  Q.   Do you know who drafted the language?
3  A.   I do not.
4  Q.   Did Major League Baseball make campaign contributions
5       to PASPA sponsors?
6  A.   I have no idea.  I was not the Commissioner in those
7       days.
8  Q.   Then you also probably wouldn't know if Major League
9       Baseball proposed the exemption for Nevada.
10      Actually --
11 A.   Do not know, I would not -- you would have to --
12      can't go back to Bart Giamatti, he's not with us
13      anymore, so I don't know.
14 Q.   Do you have an opinion about why there is an
15      exemption for Nevada in PASPA?
16 A.   I have no idea.
17 Q.   All right.
18           MR. WEGNER:  If you would like, this is a
19      good place to take a break because we finished with
20      your declaration, Commissioner.
21           THE VIDEO OPERATOR:  Time is 12:46 p.m.  I
22      want to put this on the record, the camera is one
23      hour ahead.  It is actually 12:46.
24           (Recess taken.)
25           THE VIDEO OPERATOR:  Time is 1:02.  We are

Page 50

1       now back on the record.  The camera states the
2       correct time now.
3  BY MR. WEGNER:
4  Q.   Commissioner, just to wrap up, and then we'll move on
5       to the complaint which shouldn't take long.  Would
6       you find it offensive that fans, baseball fans, bet
7       on Major League Baseball teams in Las Vegas?
8  A.   Look, our fans have to do what they want to do.  I
9       think I know the demographics of our fans.  I know
10      the type of families that come in.  When I ran the
11      Brewers here, I knew every season ticket holder.  I
12      used to walk the park, sometimes to bitch and grumble
13      about the way the team was playing, but other than
14      that, just to talk to people, understand why they
15      were there, how they were there.
16           So when I said to you earlier that I
17      really have an understanding of our fans, I do.  I do
18      that in ball parks I go to.  I try to visit most
19      every franchise in the course of a year, and I think
20      I really, I do understand our fans.  And so the
21      question you asked me would surprise me.  Would I be
22      offended, no.  Everybody in life has to do what they
23      want to do.  But knowing the demographics of our
24      fans, knowing how families come to games and how they
25      do things, that would surprise me greatly.

Page 51

1  Q.   Okay.  My question then is let's talk about the
2       illegal gambling market.  Would you find the fact
3       that fans, if they do, are betting on Major League
4       Baseball teams in the illegal gambling market, would
5       you find that offensive?
6  A.   Well, when you say fans, how many, what are we
7       talking about.  I mean that's -- it's just -- again,
8       I'll repeat to you, knowing the demographics of our
9       fans, knowing where they come from, knowing sitting
10      here in Milwaukee, Wisconsin, I would be very
11      surprised.  And I meant what I said to you before
12      very sincerely, gambling could do no good for this
13      sport.  It can only do harm and evil.
14 Q.   Would you consider a fan of Major League Baseball
15      that bets on Major League Baseball games to be a less
16      desirable fan that one that doesn't?
17 A.   I don't make those kind of comments.  I, you know, if
18      somebody wants to do something, we all have to live
19      our lives the way we want to live them.
20 Q.   Let me see if I can be more specific then.  Would you
21      find that a fan that bets on Major League Baseball
22      games is one that is harming Major League Baseball?
23 A.   You know how I feel about gambling, so I don't think
24      I have to go back on that.  And I don't believe any
25      high percentage or even low percentage of our fans

Page 52

1       gamble on games.  But if there are people out there
2       that do that, there is nothing I can do about it, and
3       there is no way to know that.
4            But I want to repeat again, I know how
5       people come to games.  I know who comes.  We study,
6       study patterns.  And I -- that statement, that would
7       surprise me, and I believe it's in error.
8  Q.   Well, Commissioner, if there are fans who are betting
9       on Major League Baseball games in a legal or an
10      illegal market, are those fans harming Major League
11      Baseball?
12 A.   The threat of gambling harms baseball.  I won't say
13      those fans are doing -- I don't know that there are
14      any who do that.  This is just a hypothetical that
15      you're raising, frankly, without any -- without any
16      back up.  So I don't know that that's the case.  I
17      just don't know that.
18 Q.   So is that a no?
19 A.   I -- any gambling that has any relationship with
20      baseball, there can -- no good can come from that.
21      That's my answer to that question.
22 Q.   So then to be clear then, is it your testimony that a
23      fan who gambles on Major League Baseball teams is
24      harming Major League Baseball?
25 A.   I stand on the answer that I gave.

Page 53

```
1              MR. MISHKIN:  It's been asked and
2      answered.
3              THE WITNESS:  Yeah.  I stand on that
4      answer.
5  BY MR. WEGNER:
6  Q.   Is that a yes then?
7  A.   Any relationship of gambling --
8              MR. MISHKIN:  It's been asked and
9      answered.
10             THE WITNESS:  -- cannot help baseball but
11     can only hurt.
12 BY MR. WEGNER:
13 Q.   So fans gambling on Major League Baseball harms Major
14     League Baseball?
15             MR. MISHKIN:  Objection, it's been asked
16     and answered.
17 BY MR. WEGNER:
18 Q.   You can answer it.
19 A.   No, I think I've answered it frankly.  I think I've
20     answered it quite well as a matter of fact.
21 Q.   Commissioner, in the Las Vegas AAA league there is a
22     Las Vegas team the 51s; is that correct?
23 A.   Um-hum, that's correct.
24 Q.   And that team is based in Las Vegas?
25 A.   Um-hum, it is.
```

Page 54

```
1  Q.   And is it true that occasionally pro players
2      recovering from an injury or something will play on
3      that minor league team?
4  A.   Yeah.  I think it was a Dodger farm club.  I'm not
5      sure who it is now.  Maybe it is.  Dodgers?
6  Q.   Yes.  Mets?
7  A.   Is it the Mets now?  That's right, the Dodgers went
8      back down.  Yes, I'm sure everybody sends injured
9      players to AAA to rehab, yeah.
10 Q.   And there is a AAA team in Las Vegas?
11 A.   Yes, there is.
12 Q.   Do you have a problem with that?
13 A.   Not happy about it, but we -- you know, it's tough to
14     find good AAA franchises with ball parks and things.
15     So I'm not surprised.
16 Q.   Commissioner, let's show you Major League Baseball
17     exhibit previously marked 3 which is the complaint in
18     this matter.
19 A.   Good.  Have I seen that?
20             MR. MISHKIN:  No, you haven't.  You can
21     take one.
22 BY MR. WEGNER:
23 Q.   Commissioner, have you had a chance to look at that
24     document, Exhibit 3?
25 A.   No, I haven't seen this before.
```

Page 55

```
1  Q.   You haven't seen it before?
2  A.   No, sir.
3  Q.   Are you aware that it's the complaint in this action?
4  A.   Well, it says it, so I guess I'm aware of it.
5  Q.   As Commissioner of Baseball, did you have to
6      authorize the lawsuit against New Jersey?
7  A.   Talked to our counsel, Mr. Ostertag, who, of course,
8      is here today and --
9  Q.   Commissioner -- please, proceed.
10 A.   And the answer is yes, I did.
11 Q.   You authorized --
12 A.   Through Mr. Ostertag, yes.  Very strongly as a matter
13     of fact.
14 Q.   Did you talk to --
15 A.   Without equivocation which isn't often the case with
16     Mr. Ostertag, right, Tom?  Okay.
17 Q.   Did you talk with anyone else at the other leagues
18     about the decision to sue New Jersey?
19 A.   I have not.
20 Q.   Have you talked with anyone else at the other leagues
21     since the suit has been filed against New Jersey?
22 A.   I have talked to them but not about this.
23 Q.   Commissioner, could you take a moment and look at
24     paragraph 5 on page 3 of Exhibit 3.
25 A.   5.
```

Page 56

```
1              (Witness peruses document.)
2  A.   I've just read it, and I agree with it
3      wholeheartedly.
4  Q.   And do you have any evidence to support the
5      allegations in that complaint other than what you've
6      testified to so far today?
7  A.   Not other than what I testified to.
8  Q.   This is going to be easy, Commissioner.  Let's go to
9      the next paragraph.
10 A.   Okay.
11 Q.   Paragraph 6, take a moment and read that, please.
12             (Witness peruses document.)
13 A.   I agree with that.
14 Q.   Do you have any evidence, other than what you've
15     testified to today, that supports paragraph 6 in the
16     complaint, Exhibit 3?
17 A.   Well, I believe I've already testified to it.
18 Q.   I'm just asking do you have anything else that
19     supports that allegation?
20 A.   No, sir.  No, sir.
21 Q.   Then we're done with that, sir.
22             MR. MISHKIN:  We're finished with that
23     document.
24             THE WITNESS:  We're done?
25             MR. MISHKIN:  With that document.
```

1    THE WITNESS:  That document.  Got all
2    excited.
3    MR. MISHKIN:  Not sure whether we're done,
4    but maybe we're close.
5    THE WITNESS:  Thank God that we didn't do
6    what we did in the first document, or we would be
7    here until -- well, you might have been here, I
8    would be gone by that point.
9    MR. MISHKIN:  Let's see what else we have.
10   BY MR. WEGNER:
11   Q.  Commissioner, at one point did Major League Baseball
12       operate the Montreal Expos?
13   A.  We did, yes, sir.
14   Q.  When was that, sir?
15   A.  Well, let's see, Montreal got a team in 1969.  Now
16       this is -- test my memory.  And we kept it there
17       through the '03 or '4 season.
18   Q.  And during that time period, Commissioner, was sports
19       gambling lawful in Canada?
20   A.  I said I didn't know the Canadian law, but they were
21       there, yeah.
22   Q.  Do you know if legal bets were placed on the MLB's
23       Montreal Expos in Canada any time from 1969 to 2003
24       or '4?
25   A.  I have no idea.

1    Q.  Did the Expos have an online casino as a main
2        sponsor?
3    A.  I don't know that.  I don't remember that now.  They
4        have been gone a long time.
5    Q.  Has the MLB in the past say five, six years,
6        reassessed its positions with respect to casinos and
7        advertising?
8    A.  Yes, we've talked about that.  We have, um-hum.
9    Q.  And what is the MLB's position on that?
10   A.  Well, we take it one by one as Mr. Ostertag knows,
11       and we discuss it.  We discuss what type of
12       advertising and how they're going to do it, what
13       they're going to do.  I understand that clubs need
14       sponsorships and so on and so forth.  We do that.
15   Q.  Is it fair to say that that is a reevaluation of
16       MLB's prohibitions on associations with gambling?
17   A.  No.
18   Q.  Why not?
19   A.  Because, I know I've testified to this already, it's
20       one thing to have a sponsorship but another thing to
21       encourage gambling on sports events, on baseball
22       games, which is a huge difference.  And so no.  Is
23       our position on gambling as I have testified now many
24       times here today changed, no.
25   Q.  Did the Arizona Diamondbacks have a relationship with

1        Las Vegas?
2    A.  Well, I have a home, so I'm in Arizona a lot.  I
3        don't know of any relationship they have with Las
4        Vegas, directly with Las Vegas.
5    Q.  Are you aware that they have a link on their website
6        that allows viewers to link up with sportsbooks over
7        the internet?
8    A.  I am not.
9    Q.  If that is so, do you see that as a problem?
10   A.  I would have to look at it, yeah.  I would have some
11       concerns about that.  But we are not aware of that.
12       But yes, I would have concerns.  In fact, we'll do
13       that this afternoon.
14   Q.  Commissioner, have you made the statement concerning
15       the Diamondbacks' internet site on its home page that
16       their -- and the fact that it includes a page on
17       sportsbooks, that you found no trouble with but that
18       set-up even though the gaming guide appears side by
19       side with the Diamondbacks logo and home page and
20       that you think that there is still enough of a
21       firewall so that it doesn't affect our game or the
22       integrity or the integrity of the game played on the
23       field?
24   A.  Are you --
25       MR. MISHKIN:  The question is did you --

1        do you recall making that statement?
2        THE WITNESS:  No, no.  I have no
3    recollection of that at all, didn't know about it.
4    And I will tell you right now if that thing exists,
5    it won't by 3:00 this afternoon.  In fact, if you'll
6    finish up, I'll get it done by 2:00.
7    BY MR. WEGNER:
8    Q.  Commissioner, have you ever made the statement before
9        that the restrictions on gambling and baseball have
10       to be relaxed because, after all, gambling is legal
11       everywhere?
12   A.  No.
13   Q.  You never made that statement?
14   A.  No.
15   Q.  Do you think gambling is everywhere?
16       MR. MISHKIN:  Object to the form of the
17       question.
18       THE WITNESS:  I'm not -- you know, I'm not
19   an expert in gambling, so I can't -- that's -- you
20   know, we can sit here and talk about it all day
21   long.
22   BY MR. WEGNER:
23   Q.  Commissioner, does the Major League Baseball host
24       competitions for fans that award payouts based upon
25       the outcome of the game?

Page 61

```
1              MR. MISHKIN:  Object to the form of the
2    question.
3              THE WITNESS:  Do we what?
4    BY MR. WEGNER:
5    Q.   I'll restate the question.  Does Major League
6         Baseball host competitions for fans that award
7         payouts based on the outcome of the game?
8              MR. MISHKIN:  Object to the form of the
9    question.
10             MR. WEGNER:  Let me --
11             THE WITNESS:  I don't know what you're
12   talking about.  You'll have to be more specific.
13             MR. WEGNER:  All right.
14   BY MR. WEGNER:
15   Q.   I'll say it again because I'm not sure how you make
16        it more clear.  I'm asking if Major League Baseball,
17        that's you, hosts, supports, hosts, competitions for
18        fans that awards payouts based upon the outcome of
19        the game?
20             MR. MISHKIN:  The problem is -- at least
21   one of the problems is what do you mean the -- which
22   game?
23             MR. WEGNER:  A game.  Let's change it to a
24   game.
25             MR. MISHKIN:  A game.
```

Page 62

```
1              THE WITNESS:  To what form, what device?
2              MR. MISHKIN:  Actual Major League Baseball
3    game?
4              MR. WEGNER:  Exactly.  Let me restate the
5    question.
6    BY MR. WEGNER:
7    Q.   Does Major League Baseball host competitions for fans
8         that awards payouts based upon actual Major League
9         Baseball games?
10   A.   Not that I'm aware of.
11   Q.   Does Major League Baseball host competitions for fans
12        that award payouts based upon the outcome of a
13        particular at bat?
14   A.   I'd have to know what form.  This just is way too
15        general and too vague.  To what mechanism?  Where?
16        What?  I don't know what you're talking about.
17   Q.   Let's get more specific then, Commissioner.
18   A.   Yeah.
19   Q.   Does Major League Baseball endorse Fantasy Baseball?
20   A.   We think we have through our internet company and
21        others, I think we do, yes.
22   Q.   Why?
23   A.   Well, anything that will create interest in baseball
24        is fine.  They're welcome to do fantasy games are --
25        that's not real life.  So whatever they want to do
```

Page 63

```
1    with fantasy, they can do.  It's exactly what it is.
2    It's fantasy.
3    Q.   Okay.  Let's look at Major League Baseball Exhibit 4,
4         please.  Commissioner, I apologize for the small
5         print, that's how it was produced to us.
6    A.   It is small, and you know --
7    Q.   That's the only one we got from you guys.
8    A.   That's okay.  Yup.  MLB.com, yes.
9    Q.   Commissioner, I'm not going to ask you to read all of
10        it.  If it's agreeable to you, I'll just direct your
11        attention to some of the places on there.  Let's
12        start that in 2012 Major League Baseball sponsored a
13        Fantasy Baseball contest, right?
14   A.   Yes.
15   Q.   And there was a monetary prize?
16   A.   Um-hum.
17   Q.   If you go to -- there is a Bates stamp number on
18        this, Commissioner.  If you go to 4081 after all the
19        four zeros.  It's page 11.
20             MR. MISHKIN:  4081.  It's at the bottom.
21   Here is the number.  Right there, Commissioner.
22   BY MR. WEGNER:
23   Q.   It's in the center of the page, Commissioner.  Again,
24        it's hard to find.  But on page 11 under grand prize,
25        do you see that, Commissioner?
```

Page 64

```
1    A.   Yeah.
2    Q.   It says that there is a grand prize of $10,000.
3    A.   Yeah, yes.
4    Q.   Why did Major League Baseball sponsor this contest?
5    A.   Well, I think given the fantasy leagues and all the
6         things that go on in life and talk about creating
7         opportunities to make more fans and create more fans,
8         anything to do with baseball is helpful.
9              Fantasy fortunately is a lot different
10        than real life.  And so I don't have a problem with
11        picking players and doing things and competing.  They
12        do that in all sports, and they do that here.  And as
13        long as the word "fantasy," and I want to emphasize
14        that, so that there is no -- there is no threat of
15        gambling and its relationship to the games played on
16        the field, not fantasy, on the field, it's a huge
17        difference here.  This is helpful to the sport.
18   Q.   Why offer a monetary prize of $10,000?
19   A.   Well, you would have to talk to the people that run
20        that for us.  I don't think that's a great problem.
21        It doesn't affect the outcome of a game played on the
22        field.  Let's be as clear as we can be.  We can sit
23        here and talk about Fantasy Baseball or Fantasy
24        Basketball or football all day long.  I think it
25        helps.  I think it helps create more interest in the
```

Page 65

```
 1        sport.  And as long as it's fantasy and it doesn't in
 2        any way, shape, form or manner impact the game played
 3        on the field, I don't have a problem with it.
 4    Q.  But Fantasy Baseball is driven by the actual
 5        performance of the athletes on the field, correct?
 6            MR. MISHKIN:  Object to the form of the
 7        question.
 8    BY MR. WEGNER:
 9    Q.  You can answer that, Commissioner.
10    A.  Well, that has nothing to do with the performance on
11        the field.  It doesn't have anything to do with that.
12        Basically you're in a fantasy league, but it's
13        fantasy.  That's exactly what it is.  It's fantasy.
14    Q.  What is your understanding of Fantasy Baseball,
15        Commissioner?
16    A.  Well, my understanding of Fantasy Baseball is people
17        pick teams, they compete against each other.  I know
18        what they do.  In fact, our fans will often talk to
19        me about it.  But the fact that their performance on
20        the field, it isn't helpful to the player, it isn't
21        helpful to any team, it isn't helpful to anything but
22        to this right here.  But it doesn't in any way impact
23        the game being played on the field.
24    Q.  But Fantasy Baseball --
25    A.  Like gambling does.
```

Page 66

```
 1    Q.  But Fantasy Baseball, success or failure of a Fantasy
 2        Baseball player depends upon the actual performance
 3        of players.
 4    A.  Absolutely not -- yeah, but it has no relationship to
 5        a game being played on the field, none, zero.
 6    Q.  Other than the statistics that the players on the
 7        field are generating, correct?
 8    A.  Doesn't impact the game played on the field.  When
 9        the Mets played the Cubs, the Mets played the Cubs,
10        the game is over.  It doesn't affect anything.
11    Q.  Does MLB have any concern that Fantasy Baseball
12        players will want their teams to perform in
13        accordance with their predictions in Fantasy Baseball
14        as opposed to just fan loyalty?
15            MR. MISHKIN:  Object to the form of the
16        question.  Could you read it back?  I'd like to read
17        back.
18            MR. WEGNER:  Let me rephrase it.  It's
19        easier.
20    BY MR. WEGNER:
21    Q.  Is there any concern in Major League Baseball that
22        Fantasy Baseball players are more concerned with the
23        way that the team or team players perform in their
24        fantasy league than their actual performance on the
25        field?
```

Page 67

```
 1            MR. MISHKIN:  Again, object to the form of
 2        the question.  If you understand what's being
 3        asked --
 4            THE WITNESS:  No, I really don't
 5        understand it.  Look, I've said to you before and
 6        I'll say it again, Fantasy Baseball is exactly that.
 7        If Fantasy Baseball plays a role in helping,
 8        especially our younger fans, enjoy the game and pick
 9        out their favorites and see how they do against
10        somebody, fine.  It doesn't impact the game.  It
11        doesn't impact the game that we play on the field.
12        It doesn't have -- it helps us as opposed to
13        gambling which can only harm us and only create
14        evil.
15    BY MR. WEGNER:
16    Q.  And that, Commissioner, is because you believe that
17        having a financial stake in the outcome of a game is
18        harmful to the game?
19    A.  Well --
20            MR. MISHKIN:  Object to the form of that
21        question.  You can answer it.  Can you read it back,
22        please?
23            (Record read.)
24            THE WITNESS:  You're asking me if having a
25        financial -- on gambling on a game is harmful to the
```

Page 68

```
 1        game?  I don't know, go ask Shoeless Joe Jackson I
 2        guess if you can find him.  Of course it's harmful.
 3    BY MR. WEGNER:
 4    Q.  And isn't it correct that Fantasy Baseball players
 5        have a financial interest in the outcome of the
 6        performance of players in their fantasy league?
 7    A.  No, it is not true.
 8    Q.  Why not, sir?
 9    A.  It doesn't impact the game that we play on the field.
10        It might impact the game between you and Mr. Mishkin.
11        That's not -- that doesn't -- this is all fantasy.
12        This is all -- we're not dealing in fantasy when the
13        Yankees played the Red Sox.  There is a huge
14        difference.  No, I -- the whole fantasy concept is
15        just, it's irrelevant and not related to the real
16        world.
17    Q.  Commissioner, I'm trying --
18    A.  Not related to the real world.
19    Q.  Well, Commissioner, I'm trying to actually ask you
20        questions about where it is related to the real
21        world, and that has to do with fans' perception of
22        the game.  You talked earlier today about fans'
23        motivation.
24    A.  Right.
25    Q.  Fan loyalty.  Is it your view that Fantasy Baseball
```

Page 69

1    does not present a situation where a fan would have
2    divided loyalties for its team or for the particular
3    outcome of its fantasy team?
4  A.  No, it does not.  No.
5  Q.  Why not?
6  A.  There is no relationship how his fantasy team is
7    doing as opposed to the Milwaukee Brewers or the
8    Pittsburgh Pirates.  None.  In fact, it's so
9    farfetched, with all due respect, I'm not sure you're
10   serious.  There is no relation.
11  Q.  Well, let me see if I can give you an example where
12   there is.
13  A.  Yeah.
14  Q.  Let's say that you have -- I'm on a fantasy league,
15   and I have a certain pitcher.
16  A.  Um-hum.
17  Q.  And I want that pitcher to throw a certain number of
18   strikes in the game, okay.  And so I have an interest
19   in that pitcher, let's say it's a Dodger pitcher.
20  A.  Yeah.
21  Q.  But I'm a Giants fan.
22  A.  Yeah.
23  Q.  So at a game is it not correct that I have an
24   interest in my Dodger pitcher throwing a certain
25   number of strikes even if that harms my team which is

Page 71

1    pitcher, will throw in my fantasy league.  Are we
2    clear so far?
3  A.  Yeah.
4  Q.  And yet I am a Giants fan.  At a game where the
5    Dodgers are playing the Giants, is it not correct
6    that I, as a fan, have two different motivations on
7    the field at that time.  One, I want my pitcher, my
8    fantasy pitcher, to throw more strikes; and the
9    second is I want my Giants to win.
10       MR. MISHKIN:  Object to the form of the
11   question.
12       THE WITNESS:  It has nothing to do with
13   Clayton Kershaw's pitching in a game against the
14   Reds, the Giants or anybody else.  It's a fantasy
15   game that is unrelated, has no relationship to Major
16   League Baseball, has no relationship to anything.
17   All it does, the only potential is it increases
18   interest amongst some of our fans.
19  BY MR. WEGNER:
20  Q.  Commissioner, you're answering the question in terms
21   of the players' perspective.  I'm asking you about
22   the fans' perspective.
23  A.  I think I'm answering the game in the real world.
24   Fan -- the fans are enjoying themselves in a fantasy
25   league, and they're also enjoying themselves -- maybe

Page 70

1    the Giants?
2  A.  And what does that have to do with the real world
3    when Clayton Kershaw pitches against the Giants in a
4    game at Dodgers stadium?
5  Q.  I'm only trying to talk about fans' loyalty and
6    perceptions.
7       MR. MISHKIN:  I think at this point, Mr.
8    Wegner, you're arguing with the witness.  If you
9    wish to put a question to him that is not a
10   repetition of an earlier question, that's fine.  But
11   simply arguing with him as we can do with the Court,
12   but I don't think that's proper with the witness.
13   And I think that's what you're doing.
14       MR. WEGNER:  No, actually, I was trying to
15   refine the question because I didn't get an answer
16   to the question.  So let me try again.
17       MR. MISHKIN:  No, no, you got an answer to
18   the question.  And the answer, apparently you'd like
19   another one.  And so you're asking the question
20   again.
21       MR. WEGNER:  So I'll ask the question
22   again, and it's this.
23  BY MR. WEGNER:
24  Q.  Take my hypothetical, Commissioner, where I have an
25   interest in the strikes that my pitcher, Dodger

Page 72

1    create more interest in baseball, and they go to more
2    games.  That's all there is here.
3  Q.  Even if the fan loses money on its fantasy league?
4       MR. MISHKIN:  Objection.
5       MR. MISHKIN:  That's a question.
6       MR. MISHKIN:  With no foundation about
7    losing money.
8  BY MR. WEGNER:
9  Q.  Commissioner, are you aware that in Fantasy Baseball
10   people frequently bet money in the fantasy leagues?
11       MR. MISHKIN:  Objection.
12       MR. WEGNER:  I'm asking --
13       MR. MISHKIN:  No foundation.
14       MR. WEGNER:  I'm asking the foundation.  I
15   want to know if he's aware of that.
16       MR. MISHKIN:  Well, but aware of something
17   that doesn't exist perhaps.
18       MR. WEGNER:  Well, let me --
19       MR. MISHKIN:  Ask him the question.
20   Don't -- you have a premise in there.
21       MR. WEGNER:  The question is a
22   foundational question.  There is no premise.
23  BY MR. WEGNER:
24  Q.  Let me ask it again.  Are you aware that in Fantasy
25   Baseball leagues that participants in that league put

1    money into a pool that is in effect a bet on the
2    outcome of the fantasy league?
3  A.  Has nothing to do with the real world.
4  Q.  Sir, are you aware of that?
5  A.  I am not sure I am or I'm not.  I don't know.  I
6    don't play Fantasy Baseball.  I have enough to keep
7    my job, keeps me busy playing real baseball in the
8    real world.
9  Q.  And yet Major League Baseball runs a Fantasy Baseball
10    website?
11  A.  Okay.  I think it creates interest.  I said that
12    before.  I've answered it.
13        MR. MISHKIN:  Objection.
14        THE WITNESS:  I've answered it already.
15  BY MR. WEGNER:
16  Q.  Commissioner, if, just take this as a hypothetical,
17    if in fact money changes hands in the fantasy league
18    as a result of the performance of the players, does
19    that create a split loyalty between fantasy league
20    players and actual fans of the actual MLB games?
21        MR. MISHKIN:  Objection, lacks a
22    foundation.
23  BY MR. WEGNER:
24  Q.  You can answer, Commissioner.
25        MR. MISHKIN:  You can answer it if you

1    understand it.
2        THE WITNESS:  I'm not sure I understand
3    it.  No.  All it does, I've said it before, let me
4    say it to you again, fantasy league creates more
5    interest.  That's its only relationship to the real
6    world.
7  BY MR. WEGNER:
8  Q.  Did Major League Baseball conduct any studies
9    regarding the impact that the prize and its fantasy
10    league contest would have on match fixing?
11  A.  On what?
12  Q.  On match fixing, game fixing.
13        MR. MISHKIN:  Object to the form of the
14    question and also it lacks a foundation.
15        THE WITNESS:  I think I already testified
16    to that.  No, and I think we've -- the history of
17    this sport and other sports will tell you that we
18    know how deadly that could be.  And that's why we
19    have the policy against gambling that we do.
20        MR. MISHKIN:  Mr. Wegner, because we've
21    sort of pushed lunch now, about a half hour, if you
22    are close to concluding, then perhaps we should
23    press on.  If you're not, then maybe we should break
24    for lunch.
25        MR. WEGNER:  Let's go off the record and

1    talk about that then.
2        MR. MISHKIN:  Sure.
3        THE VIDEO OPERATOR:  The time is 1:32.
4    We're going off the record.
5        (Discussion off the record.)
6        THE VIDEO OPERATOR:  The time is 1:58.  We
7    are now back on the record.  This is the beginning
8    of disk No. 2.
9  BY MR. WEGNER:
10  Q.  Commissioner, I'd like to talk a little bit about the
11    policies and practices of Major League Baseball
12    concerning sports gambling.  Let's start with this,
13    the best interest of baseball power that you have.
14    What is the best interests of baseball power?
15  A.  Well, the best interest of baseball power gives me
16    the authority to protect the best interests of the
17    sport in every way, and that certainly includes
18    gambling and all the things that we've already
19    discussed today.  It's a broad power that fortunately
20    during my time they have enlarged it to some degree
21    to include some economic matters.
22        But overall, I look at the best interest
23    clause as simply in every way to do what's in the
24    best interest of baseball and to protect its
25    integrity at every level.

1  Q.  Are there any particular boundaries to that power,
2    Commissioner?
3  A.  Well, I mean of course, you know, we have to do it
4    within the constraints of the law.  But it's pretty
5    broad, pretty all-encompassing.  And the clubs have
6    been wonderful about it.  I say with me in the
7    last -- they have always been wonderful.  But in the
8    last 20 years, in times when we have things to do in
9    the best interests, we do them.
10  Q.  Commissioner, has the best interests of baseball
11    power ever been used to punish an athlete or umpire
12    or staff member for betting on baseball?
13  A.  Bart Giamatti, Pete Rose.  And I suppose if you go
14    back, Happy Chandler, the Leo Derosier thing.  I know
15    we talked about that today but the fact that he was,
16    quote and unquote, I think the term was used
17    consorting with gamblers, and so Happy Chandler
18    suspended him for a year which was, at the time, I
19    remember was quite the story.  And then, of course,
20    the Kenesaw Mountain Landis and what he did with the
21    Black Sox.
22  Q.  And, Commissioner, was that -- were those sanctions
23    imposed under the best interests of baseball power?
24  A.  Yes.  I mean that's the way I would use it.  I think
25    they were.  I think that that's -- yes.  The answer

Page 77

1     is yes.
2 Q.  Commissioner, is the best interests of baseball power
3     something that you used to initiate investigations
4     into specific anti-gambling affairs?
5 A.  Yes.
6 Q.  How does that work, sir?
7 A.  Well, it works when I -- if the Department of
8     Investigation or any of our people, Mr. Ostertag or
9     anybody, comes and says did you know that, and we're
10     investigating, first thing you would think of, of
11     course, is we must protect the integrity, that's the
12     best interest clause and go do what you have to do.
13 Q.  Let's talk just specifically though about sports
14     gambling and the best interest provision.  If it's
15     fair to say typically, how typically would a sports
16     gambling incident or potential incident be brought to
17     your attention under the best interest provision?
18 A.  Well, it would be brought to my attention, it could
19     be in a number of ways.  There are so many ways, I
20     don't know that I could sit here today and tell you.
21     If one of our people would hear something or
22     something that would -- club people, could be any --
23     newspaper people, anything, say did you hear that.
24     And I would immediately begin to investigate it under
25     the best interest clause.

Page 79

1     (b), Rule 21.  And Commissioner, while you're reading
2     it, it may be helpful, I'm going to ask you the same
3     question about that provision and following
4     provisions.
5         (Witness peruses document.)
6 A.  Yeah.
7 Q.  On how many occasions --
8 A.  None.  None that I recollect today.
9 Q.  Just for the record, let me -- I'll finish the
10     question so that we've got a clear record if that's
11     okay, Commissioner.
12         On how many occasions, if any, has Major
13     League Baseball stripped eligibility under this rule?
14 A.  Nobody that I've done it.  I don't know before,
15     before me, but nobody.
16 Q.  Okay.  Thank you, Commissioner.  Can you read Section
17     (c), the next section down.
18 A.  Yeah.
19         (Witness peruses document.)
20 A.  Okay.  I've read it so many times that I feel like I
21     can -- yes, sir.
22 Q.  Same question, Commissioner, and that's on how many
23     occasions, if any, has Major League Baseball stripped
24     eligibility under this rule?
25 A.  I have to go back and check.  There is one case that

Page 78

1 Q.  Commissioner, can you recall there ever being a time
2     when bookmakers in Las Vegas brought to your
3     attention the possibility that there was game fixing?
4 A.  No.
5 Q.  Commissioner, let's take a look at what's been
6     previously marked as Major League Baseball Exhibit 10
7     which is, I'm sure you're very familiar with, Rule
8     21.
9 A.  Right.
10 Q.  Looking at Exhibit 10, Commissioner, there is Section
11     (a).  And rather than my read it to you, I'm going to
12     ask you to read it.  I'm sure you have many times,
13     but could you, for purposes of your deposition, read
14     it one more time to yourself.
15 A.  Um-hum.
16         (Witness peruses document.)
17 Q.  So we're looking at Exhibit 10, Section (a).
18 A.  Yes, sir.
19 Q.  Commissioner, on how many occasions, if any, has the
20     MLB permanently stripped eligibility under this rule?
21 A.  Back -- before -- since Pete Rose, is that what
22     you're asking me?  Nobody.
23 Q.  Okay.  Let's take a look at Section (b).
24 A.  (b).
25 Q.  Yes, sir, of previously marked Exhibit 10, Section

Page 80

1     comes to mind about 10 or 12 years ago, but I don't
2     remember exactly what happened.  So --
3 Q.  Did it involve -- do you recall did it involve an
4     umpire?
5 A.  Umpire, yes, it did.
6 Q.  But you can't remember anything more about that as we
7     sit here?
8 A.  I would have to come back and recollect.
9 Q.  Do you recall if the -- if the umpire was stripped of
10     his ability to play --
11 A.  Let me -- I'd have to check the whole incident.
12 Q.  Okay.
13         MR. WEGNER:  Jeff, would you just mark a
14     place in the deposition if he has an answer to that
15     after this?
16         MR. MISHKIN:  We will take that request
17     under advisement.
18 BY MR. WEGNER:
19 Q.  How about same exhibit, Commissioner, Section (d)(1).
20         (Witness peruses document.)
21 A.  None.
22 Q.  And take a look at (d)(2).
23 A.  None.
24 Q.  (d)(3)?
25 A.  None.

Page 81

1  Q.  And when you say "none," that means there has been no
2      occasions where Major League Baseball has stripped
3      eligibility under this rule?
4  A.  Right, that's correct.
5  Q.  Let's take a look at -- that's it on that exhibit,
6      Commissioner.  Let's take a look at previously marked
7      Exhibit 11.
8          (Witness peruses document.)
9  A.  Um-hum.
10 Q.  Commissioner, according to this memorandum which is
11     Exhibit 11, section (d) of Rule 21 which you just
12     went over, it was amended in 2012; is that correct?
13 A.  That's correct.
14 Q.  And the name of the rule change from betting on ball
15     games to gambling; is that correct?
16 A.  That's correct.
17 Q.  Do you know why Major League Baseball renamed that
18     subsection?
19 A.  You know, I can't remember.  I know, I felt it was
20     appropriate, and John McHale who handles these
21     matters for me, and I discussed it, and we just moved
22     ahead.  I don't remember the specific reason now.
23 Q.  Commissioner, if you look at page 2 of that document
24     which is Bates number 2220 item No. 5.
25 A.  Yes.

Page 83

1      in Las Vegas, I would have that player in my office
2      tomorrow, and I would be very concerned.
3  Q.  Is it your read of this rule though, Commissioner,
4      that the rule permits Major League Baseball --
5  A.  No, no, I believe it's not in the best interest of
6      the sport.
7  Q.  So you would use best interest powers to prevent
8      that?
9  A.  I would, yes, sir.
10 Q.  But not necessarily this rule?
11 A.  I -- it doesn't matter what I use, but it would cover
12     it.  I could use the best interest clause, it would
13     be fine.
14 Q.  What about other forms of gambling, Commissioner?
15     Does Major League Baseball make any distinction
16     between sports gambling and other types of gambling?
17 A.  Like on what?  I don't -- I'm not sure I --
18 Q.  Casino gambling, for instance on roulette, cards?
19 A.  Well, I don't know.  We don't -- you know, the only
20     thing I can tell you is the gambling I'm most
21     concerned with is the gambling on our sport.  If
22     somebody goes in or goes to Las Vegas with his wife
23     and plays blackjack or something, it's something
24     they're entitled to do if they want.
25 Q.  Commissioner, under this same rule which was amended,

Page 82

1  Q.  That prohibits gambling with bookmakers.  And -- I'm
2      sorry, you have a chance to read it.
3          (Witness peruses document.)
4  A.  Yes, sir.
5  Q.  Why did Major League Baseball single out illegal
6      bookmakers?
7  A.  I don't remember.  But just again, and it says it in
8      here, too, part of our overall program to protect our
9      integrity.  And we try to be as vigilant, as I said a
10     couple hours ago now, as we can be.  And so I think
11     John McHale was just -- and our other people were
12     just bringing the thing up to date, that's all.
13 Q.  What about legal bookmakers in Las Vegas or overseas?
14 A.  Legal?
15 Q.  Yes, sir.
16 A.  In what form?
17 Q.  Well, can Major League Baseball players legally
18     gamble in other sports in Las Vegas?
19 A.  I would have to look at that under the best interest
20     clause.
21 Q.  But under this rule, on the amendment, can Major
22     League Baseball players legally gamble on other
23     sports other than baseball in Las Vegas?
24 A.  I would answer it the same way.  If I was confronted
25     today with an ex-player is gambling on another sport

Page 84

1      has Major League Baseball suspended anyone pursuant
2      to subsection (d) (3) of that rule?  Do you need to
3      look at it again, Commissioner?
4  A.  Maybe I better, but I think the answer -- well, let
5      me look at it.
6          (Witness peruses document.)
7  A.  No.
8  Q.  Okay.
9  A.  No, sir.
10 Q.  Let's take a look at previously marked Major League
11     Baseball Exhibit 12 which is the Major League
12     Constitution, Commissioner.
13 A.  Um-hum.  Thank you, Jeff.
14         (Witness peruses document.)
15 A.  Yes, sir.
16 Q.  If you look specifically, Commissioner, at what's
17     Bates numbered page 2228, section (4)(d).
18         MR. MISHKIN:  Page No. 12.
19         THE WITNESS:  12.
20 BY MR. WEGNER:
21 Q.  Page No. 12.
22 A.  Yes.
23 Q.  Where (4)(d) says:  The rights, privileges and other
24     property rights of a Major League Club may be
25     terminated involuntarily if the Club in question

Page 85

```
1    shall --
2  A.  Yes, sir.
3  Q.  -- offer, agree, conspire or attempt to lose any game
4      participated in by the Club; or fail to suspend
5      immediately any player, employee or officer who shall
6      be proved guilty of offering, agreeing, conspiring or
7      attempting to lose any such game or of being
8      interested in any pool or wager on any game in which
9      a Club participates.
10         Has Major League Baseball ever invoked this
11     section of the constitution to discipline --
12  A.  Not to my knowledge.  Certainly not in my term.
13  Q.  Commissioner, does Major League Baseball allow clubs
14     to engage in scratch-it lotteries?
15  A.  To engage in what?
16  Q.  You know, there is lotteries, Commissioner, where you
17     scratch off, you buy a ticket and then you scratch
18     off part of it.  If certain numbers are on the
19     ticket, you win?
20  A.  I'm not sure.
21  Q.  Commissioner, are you aware that the Red Sox have a
22     deal with Massachusetts, and the Nationals have a
23     deal with District of Columbia, Virginia lotteries
24     for scratch-its?
25  A.  Yeah, I've seen their advertising, yes.
```

Page 86

```
1  Q.  Was that conduct previously prohibited?
2  A.  Well, of course, those things have changed a lot over
3      the years, so I'm not sure previously prohibited.
4      But we look at each one.  And if we don't feel it
5      infringes upon the very thing we're trying to
6      protect, we let them do it.  And no team can do it
7      without our approval, and we're very tough on
8      approval.
9  Q.  So when the Red Sox deal with Massachusetts and the
10     Nationals deal with DC and Virginia lotteries, you're
11     okay with that?
12  A.  We've approved them, yes, sir.
13         MR. WEGNER:  No further questions.
14         THE WITNESS:  Thank you.
15         MR. MISHKIN:  Thank you.  I have no
16     questions.
17         THE WITNESS:  That's a good thing.
18         THE VIDEO OPERATOR:  It's 2:13, we're
19     going off the record.
20         (At 2:13 p.m., the deposition concluded.)
21
22
23
24
25
```

Page 87

```
1         ACKNOWLEDGMENT OF DEPONENT
2      I, ALLAN H. SELIG, do hereby certify
3   that I have read the foregoing transcript of my
4   testimony, and further certify that it is a true
5   and accurate record of my testimony (with the
6   exception of the corrections listed below):
7   Page   Line                Correction
8   ____|____|_____|_____
9   ____|____|_____|_____
10  ____|____|_____|_____
11  ____|____|_____|_____
12  ____|____|_____|_____
13  ____|____|_____|_____
14  ____|____|_____|_____
15  ____|____|_____|_____
16  ____|____|_____|_____
17  ____|____|_____|_____
18  ____|____|_____|_____
19  ____|____|_____|_____
20
21         _____
22               ALLAN H. SELIG
23  SUBSCRIBED AND SWORN TO BEFORE ME
    THIS _____ DAY OF _____, 20___.
24
25  _____      _____
    (NOTARY PUBLIC)       MY COMMISSION EXPIRES:
```

Page 88

```
1         C E R T I F I C A T E
2   STATE OF WISCONSIN )
                       ) SS
3   MILWAUKEE COUNTY   )
4      I, VICKY L. ST. GEORGE, Registered Merit
5   Reporter and Notary Public in and for the State of
6   Wisconsin, do hereby certify that the preceding deposition
7   was recorded by me and reduced to writing under my
8   personal direction.
9      I further certify that said deposition was
10  taken at MAJOR LEAGUE BASEBALL HEADQUARTERS, 777 East
11  Wisconsin Avenue, Suite 3060, Milwaukee, Wisconsin on
12  November 8, 2012, commencing at 11:30 a.m. and concluding
13  at 2:16 p.m.
14      I further certify that I am not a relative or
15  employee or attorney or counsel of any of the parties, or
16  a relative or employee of such attorney or counsel, or
17  financially interested directly or indirectly in this
18  action.
19      In witness whereof, I have hereunto set my hand
20  and affixed my seal of office at Milwaukee, Wisconsin,
21  this 12th day of November, 2012.
22
23         _____
               VICKY L. ST. GEORGE
24             Notary Public in and for the
               State of Wisconsin
25             Commission Expires 3/17/2013
```