# Exhibit 6

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

Civil Action No. 3:12-cv-04947-MAS-LHG
-------------------------------x
NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,
an unincorporated association; NATIONAL
BASKETBALL ASSOCIATION, a joint venture;
NATIONAL FOOTBALL LEAGUE, an unincorporated
association; NATIONAL HOCKEY LEAGUE, an
unincorporated association; and OFFICE OF
THE COMMISSIONER OF BASEBALL, an
unincorporated association, doing business
as MAJOR LEAGUE BASEBALL,

                              Plaintiffs,

        -against-

CHRISTOPHER J. CHRISTIE, Governor of the
State of New Jersey; DAVID L. REBUCK,
Director of the New Jersey Division of
Gaming Enforcement and Assistant Attorney
General of the State of New Jersey; and
FRANK ZANZUCCKI, Executive Director of
the New Jersey Racing Commission,

                              Defendants.

-------------------------------x
                        200 Park Avenue
                        New York, New York

                        November 12, 2012
                        12:12 p.m.

                DEPOSITION OF

                ROGER S. GOODELL

Page 2

1

2

3

4        DEPOSITION of ROGER S. GOODELL,

5   taken by the Defendants, held at the

6   aforementioned time and place, before Sherri

7   Flagg, a Registered Professional Reporter,

8   Certified LiveNote Reporter, and Notary

9   Public.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1

2   A P P E A R A N C E S:

3

    Attorneys on Behalf of Plaintiff(s):

4

    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
5        Four Times Square
         New York, New York 10036
6   BY:  JEFFREY A. MISHKIN, ESQ.
         jeffrey.mishkin@skadden.com
7        JORDAN FEIRMAN, ESQ.
         jordan.feirman@skadden.com
8

9

    Attorneys on Behalf of Defendant(s):
10

    GIBSON DUNN & CRUTCHER,
11       333 South Grand Avenue
         Los Angeles, California 90071-3197
12  BY:  WILLIAM E. WEGNER, ESQ.
         wwegner@gibsondunn.com
13       MATTHEW A. HOFFMAN, ESQ.
         mhoffman@gibsondunn.com
14       TIMOTHY W. LOOSE, ESQ.
         tloose@gibsondunn.com
15

16

17

18  A L S O   P R E S E N T:

19       Lawrence Ferazani, National Football

20  League

21

22

23

24

25

Page 4

1

2      *       *       *

3   R O G E R   S.   G O O D E L L,

4        first duly sworn/affirmed, was

5        examined and testified as follows:

6   EXAMINATION BY

7   MR. WEGNER:

8        Q.   Good afternoon, Commissioner.  And

9   is it okay if I call you Commissioner

10  throughout the deposition?

11       A.   You can call me Roger, sure.

12       Q.   I think I'll call you Commissioner.

13       A.   Okay.

14       Q.   But having said that, could you

15  please state your name for the record.

16       A.   Roger Goodell.

17       Q.   Okay.  Have you been deposed

18  before, Commissioner?

19       A.   Yes, sir.

20       Q.   How many times?

21       A.   Not sure.  Quite a few.

22       Q.   Have any of them been in connection

23  with the NFL's antigambling policies, any of

24  those depositions?

25       A.   I can't recall any in particular,

Page 5

```
 1              - R. GOODELL -
 2  no.
 3       Q.   Have you testified in court,
 4  Commissioner?
 5       A.   I don't think so.
 6       Q.   How about in arbitration
 7  proceedings?
 8       A.   I presume so.
 9       Q.   Have any of those proceedings
10  involved the enforcement of NFL's antigambling
11  policies?
12       A.   I don't believe so.
13       Q.   Commissioner, did you speak with
14  anyone about today's deposition?
15       MR. MISHKIN:  Other than counsel.
16       Q.   Other than counsel?
17       A.   Just counsel.
18       Q.   So we have it for the record in
19  this case, Commissioner, can you give us a
20  brief history of your relationship with the
21  NFL, if that's possible?
22       A.   It's not brief unfortunately,
23  Counselor.
24       Q.   Well --
25       A.   I'll just give -- I began as an
```

Page 7

```
 1              - R. GOODELL -
 2       Would what include the development?
 3       A.   I'm sorry.  Would your
 4  responsibilities include the development or
 5  modification of the policies?
 6       A.   Modification would be the proper
 7  term.  The policies have long been determined,
 8  and we have held to those -- the core of those
 9  policies for many decades.
10       Q.   Commissioner, do you have any
11  responsibilities concerning the detection of
12  policy violations?  And by policy violations,
13  I mean the NFL's antigambling policies?
14       A.   When you say "the detection," you
15  mean if there's a violation of the policy?
16       Q.   Yes, sir.
17       A.   It could come from our security
18  department or other sources.
19       Q.   What would those sources typically
20  be?
21       A.   The security department would be
22  the most likely, but it could come through the
23  media.
24       Q.   Could you describe for us what the
25  security department is?
```

Page 6

```
 1              - R. GOODELL -
 2  intern in 1982.  I spent one year with the
 3  Jets and then I've been in the NFL in a
 4  variety of positions, became chief operating
 5  officer around the year 2000 and Commissioner
 6  in 2006.
 7       Q.   Commissioner, what are your job
 8  responsibilities as Commissioner of the NFL?
 9       A.   My primary responsibility is the
10  integrity of the game and protecting the game
11  for the long term.  Obviously as part of that,
12  I have responsibilities for labor, television,
13  our business operations as well as the game
14  itself.
15       Q.   How about specifically,
16  Commissioner, what are your duties concerning
17  the NFL's antigambling policies for players,
18  referees, League staff?
19       A.   At the end of the day, it would be
20  enforcement of the policy and making sure that
21  the policy reflects the desires of the
22  ownership.
23       Q.   Would that include the development
24  of the policies?
25       MR. MISHKIN:  Object to the form.
```

Page 8

```
 1              - R. GOODELL -
 2       A.   NFL's security department, we have
 3  -- I don't even know the number, but let's
 4  call it a half dozen people that are working
 5  in our office on a full-time basis, and we
 6  have local representatives in each of our
 7  markets.
 8       Q.   If you know, Commissioner, what's
 9  the mechanism for bringing to the attention of
10  security a possible violation of the NFL's
11  gambling policies?
12       A.   I don't.  I know that they do their
13  job and they're very well connected to try to
14  understand if there's anything that would
15  cause us concern.
16       Q.   Commissioner, you mentioned the
17  media.  Is that another source of indications
18  that there may have been a violation of the
19  NFL's antigambling policies?
20       A.   It could be.  I just said it could
21  be.  You asked me if there were other sources.
22       Q.   I see.  Do any come to mind right
23  now where the media brought a possible
24  violation of the NFL's antigambling policies
25  to the attention of the NFL?
```

Page 9

- R. GOODELL -

1
2       A.    Of the NFL, no.
3       Q.    How about education, Commissioner?
4   Do you have any responsibilities concerning
5   the education of players and staff and
6   referees on the antigambling policies of the
7   NFL?
8       A.    Yes.  Our staff goes and meets with
9   each of those individuals or groups on an
10  annual basis to make sure they understand the
11  policy and make sure that they understand the
12  policy and that they abide by it.
13      Q.    Is that the same staff as the
14  security staff?
15      A.    Primarily.
16      Q.    And, Commissioner, are you
17  responsible ultimately for any sanctions that
18  are levied against someone for a violation of
19  the NFL's antigambling policies?
20      A.    I would be, yes.
21      Q.    What duties, if any, do you have,
22  Commissioner, concerning the policies of the
23  NFL for advertising relationships with
24  casinos?
25      A.    I'm sorry, I'm not sure I

Page 10

- R. GOODELL -

1
2   understand.
3       Q.    Well, does the NFL have any
4   advertising relationships with casinos?
5       MR. MISHKIN:  Do you mean the NFL
6       itself, its teams?
7       Q.    Let's just start with the NFL
8   itself.
9       A.    We have a policy that applies to
10  all 32 of our teams that gets modified from
11  time to time.  In fact, I think I recall this
12  spring we modified our policy in some fashion.
13  So that is done through a collective process
14  of our 32 teams.
15      Q.    And generally what is the NFL's
16  policy about teams advertising in casinos?
17      A.    That's a pretty difficult question
18  to answer generally.
19      MR. MISHKIN:  I'll object to the
20      form, Bill, only because it's a lengthy
21      written policy.  You've asked generally
22      so if you're able, Commissioner, to give
23      a general answer.
24      A.    It's not a short policy, it's
25  pretty extensive and we take it seriously.

Page 11

- R. GOODELL -

1
2   And as I say, we from time to time evaluate it
3   and from time to time modify it.  We can
4   certainly get you a copy of it.
5       Q.    I think we may get into that a
6   little bit later on, Commissioner.
7             What duties do you have regarding
8   contests taking place in areas where sports
9   gambling is legal, for instance, in Canada or
10  overseas?
11      MR. MISHKIN:  Would you just read
12      back the question.
13          (Requested portion read.)
14      MR. MISHKIN:  Object to the form of
15      the question, and I think it lacks a
16      foundation.  But if you understand the
17      question, you can answer it.
18      A.    I'll take my best shot at it.  The
19  -- we play a game in Toronto on an annual
20  basis and we play a game in London on an
21  annual basis.  I am aware, at least in the
22  U.K., the London game, they have various forms
23  of legalized sports betting.
24            We inform our teams before they go
25  that the policies in the NFL apply even in

Page 12

- R. GOODELL -

1
2   those circumstances.  So we go out of our way
3   to make sure they understand that it is not
4   permissible for them during that period of
5   time.
6       Q.    Let's stick within the London game,
7   then, Commissioner.  When that game is taking
8   place, it's in a country that permits sports
9   wagering, correct?
10      A.    Um-hmm.
11      Q.    Do you think that's harmful to the
12  NFL to have a game played in a country where
13  sports gaming is legal?
14      A.    Well, we're playing in their
15  country, we're coming to them.  And we're only
16  there for a short period of time, we're there
17  for two or three days.  It's not what we
18  choose, it's not what we believe is in the
19  best interest of sports, but we don't dictate
20  the rules or the laws.
21      Q.    Does the NFL put in place any extra
22  policies or any extra procedures for the
23  London game that would prevent match-fixing or
24  game-fixing?
25      A.    I'm not aware specifically, other

Page 13

- R. GOODELL -

1
2   than what I -- I know that they specifically
3   meet with the two teams in advance of those
4   games.
5       Q.   Do you think that the NFL playing
6   in a venue or a country that permits sports
7   wagering is harmful to the reputation of the
8   NFL?
9       A.   As I just said to you, I think
10  we're guests when we come over and play these
11  games.  We play by their rules and by their
12  laws, we're there for a very short period of
13  time so...
14      Q.   And I believe also that the NFL
15  plays in Canada; is that correct?
16      A.   Toronto, yes.
17      Q.   Toronto.  Commissioner, I want to
18  ask you the same questions about that.  How
19  many games does the NFL play in Toronto?
20      A.   In the past it's been one regular
21  season game and one pre-season game.  I
22  believe going forward it will be just one
23  regular season game.
24      Q.   Does the NFL have any particular
25  procedures in place for the game in Toronto to

Page 14

- R. GOODELL -

1
2   prevent game-fixing?
3       A.   I believe they're similar to what I
4   described in London.
5       Q.   Okay.  And is your answer the same
6   in terms of whether there is anything harmful
7   to the NFL's reputation that results from
8   playing a game in a country that permits
9   sports wagering?
10      A.   Again, we have to play by the rules
11  that are established and the laws.
12      Q.   My question, Commissioner, is:  In
13  your view, does that cause any harm to the
14  reputation of the NFL to have a game played in
15  a country that permits sports wagering?
16      A.   Our reputation where?
17      Q.   Reputation in the United States.
18      A.   I don't think the people in the
19  United States are aware of those laws.
20      Q.   Okay.  How about reputation in
21  Canada?
22      A.   I'm not sure.  A lot of our fans in
23  the United States are aware of the laws in
24  Canada.
25      Q.   How about Canadians, though?

Page 15

- R. GOODELL -

1
2       A.   What about Canadians?
3       Q.   Do you think it's harmful to the
4   NFL's reputation that it plays a game in a
5   venue that permits sports wagering?
6       A.   Well, again, it's their country.  I
7   think they're used to those laws and they
8   understand what the laws are.
9       Q.   Okay.  Commissioner, I'd like then
10  to show you what's been previously marked as
11  NFL 35.  This is a new one, I'm sorry.
12          (Exhibit 35: Declaration of Roger
13      Goodell, was marked for identification.)
14  BY MR. WEGNER (continuing):
15      Q.   Commissioner, have you had a chance
16  to look at the document which we have marked
17  as NFL 35?
18      A.   Sitting here?
19      Q.   Yes, sir.
20      A.   Yes, I see that.
21      Q.   Okay.  When was the last time you
22  saw that document?
23      A.   I looked at at least the top few
24  pages last week.
25      Q.   Did you draft that document

Page 16

- R. GOODELL -

1
2   yourself?
3       A.   No, Counsel did with my assistance.
4       Q.   Okay.  Without violating the
5   attorney-client privilege, what role did you
6   play in the drafting process of your
7   declaration?
8          MR. MISHKIN:  Well, I think that's
9       going to be very difficult to answer,
10      Bill, without intruding on the attorney-
11      client privilege.  I mean, if it was
12      created in a collaborative process with
13      counsel, I don't know how you can
14      separate out the Commissioner's role.  I
15      mean...
16          MR. WEGNER:  I understand.
17      Q.   And, Commissioner, I don't want you
18  to talk about any communications, confidential
19  communications you had with counsel.  But
20  outside of that, was there any aspect of your
21  role in the drafting of your declaration that
22  did not involve counsel?  And when I say
23  "involve counsel," I mean communications
24  between you and counsel and counsel and you.
25      A.   I'm not sure I understand the

Page 17

- R. GOODELL -

1
2  question.
3     Q.   I'll restate it then, Commissioner.
4  It was a complex question.
5          In terms of the drafting of your
6  declaration, which is Exhibit 35, NFL 35?
7     A.   Right.
8     Q.   Did you do anything to create that
9  document that did not involve a communication
10  between you and counsel or counsel and you?
11     A.   No.
12     Q.   So the entire process of the
13  drafting of the declaration was one that
14  involved counsel?
15     A.   That's correct.
16     Q.   During that process, did you review
17  any documents?
18     A.   I don't believe so.
19     Q.   Other than documents, were there
20  any other sources that you relied upon in
21  preparing your declaration, again, outside of
22  conversations with counsel?
23     A.   Other than the documents that are
24  submitted with this?
25     Q.   Correct.

Page 18

- R. GOODELL -

1
2     A.   I don't believe so.
3     Q.   Commissioner, if you could please
4  look at paragraph 3 on page 2 of Exhibit NFL
5  35.
6     A.   Um-hmm.
7     Q.   And there you state that your most
8  important responsibility is maintaining the
9  integrity of professional football and
10  preserving public confidence in the NFL.
11          What threats are there to the
12  integrity of pro football in the United
13  States?
14     A.   Gambling would be number one on my
15  list.
16     Q.   Other ones?
17     A.   We live in a competitive
18  marketplace so we're competing against other
19  sports, we're competing against other
20  entertainment.  We want people to believe in
21  what they see on the field and that those --
22  what they see is not being influenced by
23  anything outside of the actual competition of
24  the athletes.
25     Q.   Commissioner, in terms of threats

Page 19

- R. GOODELL -

1
2  to the integrity of professional football in
3  the United States, I've got gambling, you
4  mentioned other sports.  Are there any other
5  things that you consider a threat to the
6  integrity of the game?
7     A.   One that's a big issue publicly is
8  safety.
9     Q.   Is it fair to say that's a
10  concussion problem?
11     A.   It's beyond concussions.
12     Q.   Safety generally in the sport?
13     A.   Um-hmm.  Yes, excuse me.
14     Q.   How are concerns about safety
15  connected with the integrity of the NFL?
16     A.   Well, one that's gotten a lot of
17  attention is the bounty issue over the last
18  several months.  That has to do with the
19  integrity of the game.  It's a violation of
20  our rules.  The idea of targeting players and
21  rewarding players for injuring their opponents
22  is unacceptable in the NFL.  That not only has
23  to do with safety but it has to do with the
24  integrity of our game.
25     Q.   Not to belabor it, Commissioner,

Page 20

- R. GOODELL -

1
2  but with the integrity of the game, is that
3  because -- well, why is that?  Why does the
4  bounty problem that the NFL addressed, why is
5  that a threat to the integrity of the game?
6     A.   I think I just explained it to you.
7  It has a safety element and it has an element
8  that our fans don't expect to see from the
9  NFL.  They expect to see a standard where
10  players are out playing within a set of rules
11  and not offering rewards or incentives to
12  injure other players.
13     Q.   Thanks, Commissioner.
14          What about performance-enhancing
15  drugs, is that an issue?
16     A.   Sure.
17     Q.   That threatens the integrity?
18     A.   Yes.
19     Q.   And replacement referees, is that
20  an issue?
21     A.   No.
22     Q.   Why do you say that replacement
23  referees were not an issue concerning the
24  integrity of the NFL, Commissioner?
25     A.   I didn't say they weren't.  You

Page 21

```
 1              - R. GOODELL -
 2   asked me are they.  We don't have replacement
 3   officials.
 4        Q.    Were they when you had them,
 5   Commissioner?
 6        A.    No.  We felt that the officials
 7   were properly trained and that they were
 8   prepared to do the job they needed to do.
 9        Q.    Commissioner, with respect to the
10   integrity of professional football, have there
11   been any gambling-related incidents that have
12   called the integrity of professional football
13   into question?
14        A.    Yes.  It goes back into the '60s,
15   my predecessor Pete Rozelle, R-O-Z-E-L-L-E.
16   He suspended two high-profile players for a
17   year for their involvement in gambling and
18   threatened at least, in the case of Joe
19   Namath, sanctions.  I don't remember all the
20   details, but they were very high-profile.
21        Q.    On the Pete Rozelle one,
22   Commissioner, what was the gambling involved
23   in that incident?
24        A.    As I said, I don't remember all the
25   details but I know that two players -- when
```

Page 22

```
 1              - R. GOODELL -
 2   you say Pete Rozelle, he was a Commissioner.
 3        Q.    Commissioner, I mean, the incident
 4   you referred to the two players that Pete
 5   Rozelle addressed.
 6        A.    As I said, I don't remember all the
 7   specifics, but he suspended both players for a
 8   year.
 9        Q.    Were they involved in game-fixing?
10        A.    As I said, I don't remember all the
11   specifics.  We can get them for you.
12        Q.    Okay.
13        A.    It was 1963, I believe.  I was
14   four.
15        Q.    And what do you know about the Joe
16   Namath incident, Commissioner?
17        A.    Just that he was involved in a
18   nightclub/restaurant where there were -- at
19   least the allegations that I'm aware of were
20   that there was involvement with gamblers and
21   that entity, and that's impermissible by our
22   policy.
23        Q.    Do you know if that involved game-
24   fixing?
25        A.    This was a known association with
```

Page 23

```
 1              - R. GOODELL -
 2   gamblers.  That's against our policy.
 3        Q.    So that particular incident didn't
 4   involve game-fixing, did it?
 5        A.    Not that I'm aware of directly.  I
 6   think that's the fear.
 7        Q.    Now, we talked about two incidents,
 8   Commissioner.  Are you aware of any incidents
 9   involving the NFL on-field games that involved
10   game-fixing?
11        A.    Again, the only other thing I can
12   remember that involved a very high profile was
13   gambling with Art Schlichter, I think it's
14   S-C-H-L-I-S-T-E-R.
15        MR. MISHKIN:  We'll get you the
16        spelling.
17        Q.    What was that incident,
18   Commissioner?
19        A.    I don't know.  I know that --
20   again, that he had a -- some involvement with
21   gambling and it was something that Pete
22   Rozelle, who was then Commissioner, as all of
23   us would, took very seriously.
24        Q.    Do you know if the Art Schlichter
25   incident involved game-fixing?
```

Page 24

```
 1              - R. GOODELL -
 2        A.    I don't know the specifics behind
 3   it.
 4        Q.    All right.  So the three that we've
 5   identified, Commissioner, they either didn't
 6   or you don't know if they involved
 7   game-fixing.  Have there been any incidences
 8   that you're aware of where the NFL's games
 9   were violated by game-fixing resulting from
10   gambling?
11        A.    Those three incidents were
12   involving violations of our policy in
13   association with gambling.  And the reason we
14   have those is to make sure that game-fixing
15   doesn't occur.  They're preventative, they're
16   to avoid this.  That's a serious threat to our
17   game and to the integrity of our game.
18        Q.    What I'm trying to establish,
19   Commissioner, is I think--and I'll ask you if
20   this is true--that the NFL has not had a
21   recorded incident of game-fixing as a result
22   of gambling.  Is that true?
23        A.    I don't know.
24        Q.    Can you think of any incidents, as
25   the Commissioner of the NFL, where there has
```

Page 25

```
1              - R. GOODELL -
2    been game-fixing involved in an NFL game?
3         MR. MISHKIN:  It's been asked and
4    answered.  You can answer it again.
5         A.    I can't think of a specific
6    incident off the top of my head.
7         Q.    Is it fair to say that would be
8    sufficiently significant that you would
9    remember it if one had occurred?
10        MR. MISHKIN:  I object to the form
11   of the question.
12        A.    Again, I've been involved with the
13   NFL for 30 years, 30-plus years.  There's a
14   history that the NFL goes over 90 years now,
15   so there's a long history of the NFL prior to
16   my involvement.  I don't -- I can't speak to
17   all those issues.
18        Q.    But as you sit here today, you
19   can't recall any incident where there was
20   game-fixing in an NFL game?
21        MR. MISHKIN:  Asked and answered.
22        A.    I've given you my best answer.  I'm
23   sorry if that's not good enough.
24        Q.    No, it's not that it's not good
25   enough, Commissioner.  But the answer, I take
```

Page 27

```
1              - R. GOODELL -
2    public's confidence in the League."
3         How have the owners and players
4    protected the NFL's integrity during the last
5    90 years?
6         A.    By having a very strong policy that
7    would not permit sports betting and not allow
8    our players to be involved in any way with
9    gambling that could negatively influence the
10   people's perception of the sport, that the
11   outcomes could be anything based on clean
12   competition.
13        Q.    And, Commissioner, that would
14   involve antigambling policies that refer to
15   both legalized and illegal gambling; is that
16   correct?
17        MR. MISHKIN:  I just object to the
18        form.  It's the "that" -- read the
19        question back.  I think it may be a
20        little hard to understand what the "that"
21        was referring to.
22        (Requested portion read.)
23        MR. MISHKIN:  Could you reframe the
24        question just so we're clear what the
25        "that" is referring to.
```

Page 26

```
1              - R. GOODELL -
2    it then, is you can't recall any?
3         A.    That's correct.
4         Q.    Okay.  Would you attribute the
5    apparent lack of any game-fixing in the NFL
6    because you can't remember any instances of it
7    to the NFL's antigambling policies?
8         A.    I think that's clearly a very
9    strong factor, yes.
10        Q.    Any other factors?
11        A.    I think that's the most important.
12        Q.    Okay.  Commissioner, looking at the
13   same exhibit which is NFL 35, could you please
14   look at paragraph 4 also on page 2.  And feel
15   free to read the whole paragraph, but I'm
16   going to draw your attention to the end of
17   that paragraph.
18        A.    Okay.
19        Q.    Okay.  And specifically,
20   Commissioner, look at the part of the
21   paragraph where it states that:
22        "The NFL owners and players have
23        worked diligently since the League's
24        inception nearly 90 years ago to protect
25        the NFL's integrity and maintain the
```

Page 28

```
1              - R. GOODELL -
2         Q.    Okay.  Commissioner, the NFL's
3    antigambling policies apply to both legal and
4    illegal gambling, correct?
5         A.    Yes.  I mean, the policies are
6    clear.  You have a copy of the policies.
7         Q.    Right.  Commissioner, are you aware
8    of the estimates that are in the public domain
9    that illegal sports gambling in the United
10   States is between an 80 and $380 billion-a-
11   year market?
12        A.    I've read numbers before.  I can't
13   recall the specific numbers, but I know
14   they're big numbers.
15        Q.    They were in the range of perhaps
16   80 to $380 billion a year?
17        A.    Is that a question?
18        Q.    Yes, sir.
19        A.    I don't recall the specific number,
20   as I said before.
21        Q.    But they're very large numbers?
22        A.    Yes.  As I said, yes.
23        Q.    Would you agree that they're
24   billions of dollars?
25        MR. MISHKIN:  He doesn't recall.
```

Page 29

```
1              - R. GOODELL -
2         Well --
3         A.    I think it's fair to say it's a
4    billion dollars plus.
5         Q.    And, Commissioner, are you aware
6    that over the last 20 years at least, the
7    amount of both legal and illegal sports
8    gambling in the United States has increased?
9         MR. MISHKIN:  I'm going to object
10        to the question as lacking in foundation.
11   You can answer.
12        A.    What's increased?  The amount of
13   dollars?  The number of players?
14        Q.    The amount of dollars that
15   individuals in the country bet on sports
16   events.
17        A.    I'm not familiar with that but it
18   wouldn't surprise me.
19        Q.    Okay.  If it doesn't surprise you,
20   Commissioner, is it true that the NFL has been
21   able to protect the integrity of its games
22   notwithstanding the increase in both legal and
23   illegal sports wagering?
24        A.    Again, because we have very strict
25   rules to protect the integrity of the game and
```

Page 30

```
1              - R. GOODELL -
2    we enforce it very strictly and we work to
3    make sure that the right public policy is in
4    place also.
5         Q.    But today anyway the NFL has been
6    successful in using its policies to prevent
7    incidences that would harm the integrity of
8    the NFL, correct?
9         MR. MISHKIN:  Objection.  I think
10        that leaves out part of his answer, so I
11        object to the form of the question.
12        MR. WEGNER:  Actually, I'm not
13        incorporating his answer.  I'll ask the
14        question.  It's a standalone question.
15   BY MR. WEGNER (continuing):
16        Q.    So, Commissioner, in the face of an
17   increasing volume of sports wagering in this
18   country, both legal and illegal, the NFL has
19   been successful in protecting the integrity of
20   the NFL by the implementation of its policies
21   and also its policies against gambling,
22   correct?
23        MR. MISHKIN:  Well, it's a lack of
24        foundation.  I'm obviously I'm not going
25        to engage in a substantive debate on the
```

Page 31

```
1              - R. GOODELL -
2    basis of the question but I think, as you
3    asked it, it lacks a foundation.  That's
4    my objection.
5         If you'd like the question read
6    back, you can answer it.
7         MR. WEGNER:  Would you like it read
8    back?
9         (Requested portion read.)
10        A.    It's a constant battle to make sure
11   that we keep our game safe from any kind of
12   outside influences, whether that's gambling,
13   whether that's drugs.  We continually modify
14   our policies.  We continue to put focus on
15   this because once there is an incident, that's
16   irreparable harm and we want to prevent that
17   from happening.
18        So we make sure that we do
19   everything possible to make sure people
20   understand that this is a violation of a
21   policy that we take very seriously and it
22   should not be violated.
23        Q.    But to date, Commissioner,
24   concerning gambling, the NFL has been
25   successful in preventing any incidences
```

Page 32

```
1              - R. GOODELL -
2    involving gambling that would harm the
3    integrity of the NFL, correct?
4         A.    To date, yes.
5         Q.    Okay.  Commissioner, will the NFL
6    continue to implement the same measures that
7    it has in the past concerning sports gambling
8    if it is made lawful in New Jersey?
9         A.    That's a hypothetical question.
10   It's against the law, isn't it?
11        Q.    I said if it's made lawful in New
12   Jersey.
13        A.    That's a hypothetical question.  We
14   support the law, we think it's the correct
15   law, and we don't believe it should be lawful
16   and it's not.
17        Q.    Commissioner, let me ask it this
18   way, then:  If it ultimately is lawful to have
19   sports gambling in New Jersey, does the NFL
20   plan to implement any additional or new
21   procedures to protect the integrity of the
22   NFL?
23        A.    Well, we'd have to take that into
24   consideration if it occurs.  We don't believe
25   it's going to occur and we don't think it
```

Page 33

```
1                - R. GOODELL -
2    should occur.
3         Q.    As you sit here today, are you
4    having any contingency plans put in place at
5    the NFL in the event it is lawful?
6         A.    No, we don't, because we don't
7    believe it will be lawful.  It's not now and
8    it won't be in the future.
9         Q.    Commissioner, if we could now look
10   at the second part of your statement in the
11   last paragraph of paragraph 4.  You mentioned
12   public confidence.  Will you take a look at
13   that paragraph, please.
14        MR. MISHKIN:  The last sentence of
15   paragraph 4?
16        MR. WEGNER:  Yes.
17        A.    This is the same sentence you were
18   pointing to before; is it not?
19        MR. MISHKIN:  Yes, it is.
20        Q.    Commissioner, has the NFL performed
21   any analysis or studies or focus groups
22   regarding the public's confidence in the
23   League?
24        A.    When you say "public confidence,"
25   what do you mean by that?
```

Page 35

```
1                - R. GOODELL -
2    fixing of games or that any outcome could be
3    influenced by the outside could be very
4    damaging to the NFL and very difficult to ever
5    recover from.  That's why we take the
6    positions that we do with our policies and
7    education and make sure that people understand
8    that we'll enforce it vigorously.
9         Q.    Commissioner, other than the
10   concern about the threat, does the NFL have
11   any evidence that the legalization of sports
12   wagering in New Jersey will harm the integrity
13   of the NFL?
14        A.    Evidence in what sense?
15        Q.    Well, you mentioned it's a threat.
16   Is it fair to say that the threat of harm to
17   the integrity of the NFL is a concern?
18        THE WITNESS:  I'm sorry, could you
19        read that back.
20        (Requested portion read.)
21        A.    Of course, yes.
22        Q.    Okay.  Other than the concern about
23   the threat, does the NFL have any evidence to
24   support the assertion that legalizing gambling
25   in New Jersey will harm the integrity of the
```

Page 34

```
1                - R. GOODELL -
2         Q.    Has the NFL performed any studies
3    or analysis or focus groups to determine what
4    the public's perception of gambling and the
5    NFL is?
6         A.    I don't believe so.
7         Q.    Commissioner, again, looking at the
8    same exhibit, NFL 35, in the first sentence
9    here in paragraph 5, you say:
10           "The spread of sports betting
11        including the introduction of sports
12        betting as proposed by the State of New
13        Jersey, threatens the integrity of and
14        the integrity of and the public
15        confidence in NFL football."
16           Do you see that?
17        A.    I do.
18        Q.    On what do you base the statement
19   that the legalization of gambling in New
20   Jersey will threaten to damage irreparably the
21   integrity of the public confidence in NFL
22   football?
23        A.    It's a very strongly held view in
24   the NFL, it has been for decades, that the
25   threat that gambling could occur in the NFL or
```

Page 36

```
1                - R. GOODELL -
2    NFL?
3         MR. MISHKIN:  The question is any
4         other evidence?  You know, we have
5         testimony.
6         A.    We have a very strongly held view,
7    as I said, and other sports have adopted it
8    also.  It's not unique to the NFL.  I'm not
9    aware of a major professional sports league
10   that hasn't taken the threat of gambling very
11   seriously and all believe that it's
12   fundamental to what we do, and that a
13   violation of that is very damaging to the game
14   and may be irreparable for a very long period
15   of time.  If people lose public confidence in
16   our game, that is incredibly damaging and may
17   be irreparable.
18        Q.    So, Commissioner, other than the
19   NFL's concern about the threat that sports
20   wagering may have to the integrity of the NFL,
21   do you have any other evidence to support that
22   contention?
23        MR. MISHKIN:  Object to the form of
24        the question.
25        A.    I think I've answered it.  I'm not
```

Page 37

- R. GOODELL -

1
2    sure what else you're looking for.
3        Q.    I'm actually trying to close out
4    this questioning, Commissioner.  What I'm
5    asking is:  You've articulated a concern about
6    the threat that gambling, in your view, in the
7    NFL's view, presents to the integrity of the
8    NFL.  Do you have any other evidence to
9    support that assertion other than what you've
10   said so far?
11       A.    What we do in professional sports
12   and I do as Commissioner and the other
13   Commissioners do is make sure that we do
14   everything to protect that brand, to make sure
15   that nobody can damage that brand.  Gambling
16   is very high on that list.
17             You started off asking me what
18   other things can damage the brand and what
19   others can provide risk.  Illegal use of drugs
20   can have a tremendous impact whether it's
21   performance-enhancing or street drugs;
22   violations of rules like the bounty rule can
23   have a similar impact.  They impact on the
24   integrity of the game.  We are not going to
25   compromise on that.  That is the core of what

Page 38

- R. GOODELL -

1
2    makes us successful.
3        Q.    And, Commissioner, I'm just
4    focusing right now this particular question on
5    sports wagering and the NFL's belief that it
6    presents a threat to the integrity of the NFL.
7             Other than your belief, the NFL's
8    belief, that New Jersey's gaming statute
9    presents a threat to the integrity of the NFL,
10   do you have any other evidence to support that
11   contention?
12       MR. MISHKIN:  Object to the form of
13       the question.
14       A.    It's not just a belief of the NFL.
15   As I stated in my last answer, it's every
16   major sport has taken the same position.
17   Every Commissioner that I'm aware of, within
18   the period of time in which those leagues have
19   existed, have taken the same view because we
20   want to protect our game.  We're going to
21   protect it against any outside influences and
22   make sure that the people believe that what
23   they see is not influenced by anything from
24   the outside.  Gambling is at the heart of
25   that.

Page 39

- R. GOODELL -

1
2        Q.    So, Commissioner, other than your,
3    meaning the NFL's, belief and the belief of
4    other leagues that you've articulated here, do
5    you have any other evidence to support the
6    assertion that the legalization of sports
7    wagering in New Jersey will harm the integrity
8    of the NFL?
9        MR. MISHKIN:  Object to the form of
10       the question and it's been asked and
11       answered.
12       A.    As I've repeated to you, we will do
13   everything we can to protect the integrity of
14   the NFL and we monitor that closely, however
15   we can.  We do research, we do other facts
16   about the integrity of our game and that's
17   important to us.
18             And so we will continue to do
19   whatever we can to uphold that and make sure
20   people have confidence in our game but more
21   importantly believe that the NFL's doing the
22   right things.
23       Q.    Commissioner, I'm trying to tie the
24   concern that you've articulated about the
25   threat of the integrity to the NFL to the New

Page 40

- R. GOODELL -

1
2    Jersey gaming statute that's the issue in this
3    case.  Other than what you've articulated
4    today which is your concern and the concerns
5    of other leagues about the threat gambling
6    presents to the integrity of the sport, do you
7    have any other evidence to support the
8    assertion that legalizing gambling in New
9    Jersey will harm the integrity of the NFL?
10       MR. MISHKIN:  Asked and answered.
11       A.    We believe that that is -- we
12   believe that over the years, that this is very
13   clearly a threat to our game and to every
14   other professional sports league that
15   considers themselves credible and that that's
16   why we all have a very strong view towards
17   this position.
18       Q.    Just to move on, Commissioner, but
19   the NFL, I believe it's your testimony, has
20   not conducted any focus groups, independent
21   analysis, empirical studies to confirm the
22   NFL's concern that the legalization of sports
23   wagering in New Jersey will harm the integrity
24   of the NFL.  Is that correct?
25       MR. MISHKIN:  Object to the form of

Page 41

```
1                  - R. GOODELL -
2     the question.  You can answer it.
3         A.   I am not aware of any specific
4     research of New Jersey law.
5         Q.   Okay.  Now, to save some time,
6     Commissioner, if you look at the next sentence
7     in your declaration that states:
8              "An increase in State-promoted
9          sports betting would wrongly and unfairly
10         engender suspicion and cynicism toward
11         every on-the-field NFL play that affects
12         the betting line.  If gambling is freely
13         permitted on sporting events, normal
14         incidents of the game such as bad snaps,
15         drop passes, turnovers, penalties and
16         play-calling inevitably will fuel
17         speculation, distrust and accusations of
18         point-shaving or game-fixing."
19             Other than what you've testified to
20    so far, do you have any other evidence to
21    support that statement?
22        A.   I think it's very clear and
23    commonsense that if you interject gambling in
24    a way that would start to question the
25    athletes' ability on the field when they
```

Page 42

```
1                  - R. GOODELL -
2     perform and something happens on the field,
3     that's now causing people to question the
4     motives.  That's not -- our athletes are out
5     playing the best they can.  We do not want any
6     outside influence into that.  We do not want
7     anyone to perceive there's an outside
8     influence to that.  That's why we're opposed
9     to gambling.
10        Q.   Commissioner, do you have any
11    evidence other than what you've testified to
12    so far today to support this statement?
13             MR. MISHKIN:  It's been asked and
14        answered.  Commissioner, if there's
15        anything further you can add to that.
16        A.   I don't have anything further.
17        Q.   Okay.  Commissioner, this concern
18    that individuals speculate about normal
19    incidents of the game like play-calling and
20    that they're concerned that there's
21    point-shaving or game-fixing involved, that
22    exists today, doesn't it?
23        A.   What do you mean by play calling?
24    I'm sorry.  People call plays every -- that's
25    what the game of football is.
```

Page 43

```
1                  - R. GOODELL -
2         Q.   Well, in your view, Commissioner,
3     today is there a concern among the public that
4     certain plays may be called a certain way
5     because there's game-fixing or point-shaving
6     going on?
7         A.   No.  I believe that our fans--and
8     this goes to the public confidence--believe
9     that they are calling plays, to use your term,
10    in the best interests of winning that game.
11        Q.   Let me just talk about an example
12    or two, Commissioner, and get your view on
13    them.  You're familiar that on October 18th,
14    2012, the game between the San Francisco 49ers
15    and the Seattle Seahawks -- do you recall that
16    game?
17        A.   Not off the top of my head, no.
18        Q.   You've only got 36 teams to keep
19    track of.
20        A.   Thirty-two.
21        Q.   Thirty-two, okay.
22             Well, in that game--maybe this will
23    refresh your recollection--the 49ers declined
24    a penalty that would have given them a nine
25    point, two possession lead with 43 seconds to
```

Page 44

```
1                  - R. GOODELL -
2     go in the game.
3              MR. MISHKIN:  Can you read that
4         back?
5         Q.   All right.  I'll run it by you
6     again.  I went by fast.  Let's just withdraw
7     that question.
8              In this San Francisco 49ers-Seattle
9     Seahawk game on October 18 of 2012, the 49ers
10    declined a penalty that would have given them
11    a nine point, two possession lead with 43
12    seconds to go in the game.  Do you recall
13    that?
14             MR. MISHKIN:  A nine point lead
15        with two possessions?
16             MR. WEGNER:  Right.  Do you recall
17        that circumstance in that game?
18        A.   A little bit of that, yes.
19        Q.   And as a result, the 49ers won by
20    seven points instead of nine, correct?
21        A.   I don't know.  You tell me.  I
22    don't have the outcome in front of me.
23        Q.   Well, they did.
24        A.   Okay.
25        Q.   Are you aware that there were any
```

Page 45

```
1                  - R. GOODELL -
2  accusations that the 49ers' decision was
3  motivated by point-shaving?
4       A.    Accusations by whom?
5       Q.    The public.
6       A.    It wouldn't surprise me if some
7  people in the public made that accusation.
8       Q.    I think I know the answer to this
9  question, but did the NFL perform any
10 investigation to determine whether there was
11 some sort of point-shaving going on with the
12 declination of that penalty?
13      A.    Not that I'm aware.  But as I said,
14 our security department does their job and I
15 expect them to do their job and I'm not aware
16 of it.
17      Q.    But you're not aware of any, okay.
18            One last example, if you can recall
19 this one, Commissioner.  You're familiar that
20 in the end -- with the end of September -- let
21 me restate that.
22            The September 24, 2012 Monday Night
23 Football game between the Seattle Seahawks and
24 the Green Bay Packers, that is a game in which
25 replacement referees were umpiring the game or
```

Page 47

```
1                  - R. GOODELL -
2  motivated by game-fixing?
3            MR. MISHKIN:  Would you read that
4       back again?
5       Q.    Are you aware of any accusations by
6  the public that the outcome of that game was
7  motivated by game-fixing?  Not that they're
8  correct, Commissioner, but just that there
9  were accusations.
10      A.    "The public" is a broad term.  If
11 you're asking me did somebody out there think
12 that that -- they could have made that
13 accusation, they could have made that
14 accusation.
15      Q.    Commissioner, in your view has
16 legal sports gambling in Las Vegas fueled
17 speculation, distrust and accusations of
18 point-shaving or game-fixing based upon normal
19 incidents of the game such as bad snaps,
20 dropped passes, turnovers and call playing?
21      A.    I think you just referenced that
22 before, is that people out there will make
23 those accusations because of that influence.
24 One of the reasons that we believe that we are
25 beyond that is because we -- we enforce our
```

Page 46

```
1                  - R. GOODELL -
2  reffing the game, correct?
3       A.    Um-hmm.
4       Q.    It's also the game where there was
5  a call in the end zone that was later
6  determined by the NFL to be incorrect, that
7  the pass to the Seahawks which was considered
8  complete, in fact, was intercepted by Green
9  Bay.  Do you recall that?
10      A.    Yes, but you have your facts wrong
11 but...
12      Q.    How so, sir?
13      A.    We didn't say that that was an
14 incorrect call.  We said that it was a
15 judgment call.  We said that there was a pass
16 interference on the play.
17      Q.    Did the NFL perform any
18 investigation into that incident?
19      A.    Investigation to whom?
20      Q.    Into that particular call, did the
21 NFL review it?
22      A.    Yes, of course we did.  We review
23 every officiating call.
24      Q.    Are you aware that there were any
25 accusations that the outcome of that game was
```

Page 48

```
1                  - R. GOODELL -
2  policies very strictly to make sure that
3  people understand that is not permitted in the
4  NFL.
5            So we take that -- that's why we
6  keep a distance from gambling and we oppose
7  gambling and we think it's wrong for the game,
8  because that is a threat that we want to make
9  sure does not influence the outcome of our
10 games.
11      Q.    In your view, then, does the
12 legalization of sports gambling in Las Vegas
13 undermine the public's confidence in the
14 character of the games, the NFL games?
15      A.    We would certainly take the
16 position that we would rather not have it
17 happen, yes.
18      Q.    Because in your view, legalized
19 sports gambling in Las Vegas undermines the
20 public's confidence in the character of the
21 games?
22      A.    It creates more gambling, it
23 creates more gamblers, and it creates the more
24 likelihood that people are going to perceive
25 it as being an influence.
```

Page 49

```
1                   - R. GOODELL -
2        Q.     Has the NFL considered having a
3   franchise in Las Vegas?
4        A.     Not when I'm been Commissioner.
5        Q.     Are you aware if they ever have?
6        A.     I'm not aware of it, no.
7        Q.     Commissioner, has legal sports
8   gambling in Canada, in your view, fueled
9   speculation and distrust in the integrity of
10  the NFL games?
11       A.     We only play one game there.
12       Q.     I mean, does the existence of
13  gambling in Canada, in your view, harm the
14  integrity of the NFL?
15              MR. MISHKIN:  Well, if the witness
16       has a view.  Read the question back,
17       please.
18              (Requested portion read.)
19       A.     I haven't looked at it from the
20  Canadian perspective.  I look at it from the
21  NFL's perspective.  And I think people
22  understand that we have very strong policies
23  and that we protect outside influences from
24  our game.
25       Q.     Let me ask you this, then,
```

Page 51

```
1                   - R. GOODELL -
2   integrity of the game.
3        Q.     In the last 20 years, has
4   spectatorship at NFL games increased?
5        A.     At NFL games?
6        Q.     Yes.
7        A.     I don't know what our total
8   attendance is versus 20 years ago.  Stadium
9   size evolves and changes.
10       Q.     Let's just make it ten,
11  Commissioner.  Has spectatorship in NFL games
12  increased in the last ten years?
13       A.     It's roughly the same based on
14  stadium sizes.
15       Q.     In your view, Commissioner, in the
16  last let's stick with ten years, in your view
17  does the public have confidence in the
18  integrity of the NFL football games?
19       A.     Because we've -- yes, I believe
20  they do because we have worked hard to earn
21  that.
22       Q.     Let's look at the last sentence in
23  paragraph 5 on page 3 of your declaration
24  which is NFL 35.  In that paragraph you -- the
25  declaration states that you were aware that in
```

Page 50

```
1                   - R. GOODELL -
2   Commissioner:  In your view does illegal
3   sports gambling undermine the public's faith
4   and confidence in the character of the games?
5        A.     I do not think gambling is good for
6   professional sports.  I think it does
7   interject that fear that somebody could be
8   trying to get an outcome in a particular match
9   or game, and that's not good for professional
10  sports.
11       Q.     Let me see if I can lay a
12  foundation for this question, Commissioner.
13  We've already established this morning or this
14  afternoon that there is a large illegal
15  gambling market in the United States, correct?
16       A.     I think you did, yes.  You made
17  that point.
18       Q.     Okay.  In your view, does illegal
19  sports gambling undermine the public's faith
20  and confidence in the character of NFL games?
21       Q.     We think gambling in any form where
22  there could be the perception that a game is
23  influenced by some outside party is not in the
24  best interest of the game.  It can impact on
25  the public confidence in the game and the
```

Page 52

```
1                   - R. GOODELL -
2   the past, betting scandals related to illegal
3   sports betting have occurred both in the
4   United States and foreign countries.  Which
5   scandals are you referring to, Commissioner?
6        A.     I'm just saying that I'm aware in
7   the past there have been betting scandals.
8              (Reporter interruption.)
9        Q.     Commissioner, in this section of
10  the declaration where you say you're aware
11  that in the past betting scandals relating to
12  legal sports betting have occurred both in the
13  United States and in foreign countries, which
14  scandals are you referring to?  Are they
15  scandals other than scandals in the NFL?
16       A.     I'm just saying I'm aware.  I'm not
17  referring to anything in particular other than
18  the fact that I'm aware.
19       Q.     But no particular scandal?
20       A.     I wasn't in here, no.
21       Q.     Okay.  Commissioner, if you look at
22  the next paragraph which is paragraph 6 on
23  page 3, Commissioner, in that paragraph you
24  state that:
25              "The new sports gambling scheme
```

Page 53

```
- R. GOODELL -
 1          that New Jersey proposes would also
 2          greatly increase the likelihood that the
 3          allegiance of certain fans will be turned
 4          from team players and high-level athletic
 5          competition toward an interest first and
 6          foremost in winning a bet.
 7       A.    That was not correctly read, just
 8   for the record.
 9       Q.    Shall I read it again?  Why don't I
10   read it again.
11       A.    You can read it but that was not
12   correct.  It says "will be turned from teams,
13   players," not "team players."
14       Q.    Okay.  Let me withdraw the question
15   and restate it then.
16          In paragraph 6 on page 3 of your
17   declaration, you state that:
18          "The new sports gambling scheme
19          that New Jersey proposes would also
20          greatly increase the likelihood that the
21          allegiance of certain fans will be turned
22          from teams, players, and high-level
23          athletic competition, toward an interest
24          first and foremost in winning a bet."
```

Page 54

```
- R. GOODELL -
 1          What support do you have for that
 2   statement, Commissioner?
 3       A.    I think that's common sense.
 4       Q.    And common sense in what way?
 5          MR. MISHKIN:  Object to the form of
 6       the question.
 7       A.    I only know one with common sense
 8   but --
 9       Q.    Thomas Payne?
10          When you say common sense, connect
11   the dots for me, Commissioner, what do you
12   mean by common sense?
13       A.    If you're making a bet, you're
14   making a bet on a particular outcome, that's
15   what your interest is.  Right?
16       Q.    And that's the common sense?
17       A.    It may not be commons sense to you
18   but it is to me.
19       Q.    No, I'm not questioning that,
20   Commissioner.  I'm just trying to understand
21   it.  So has the NFL conducted, again, any
22   studies, empirical analysis or focus groups to
23   support this assertion?
24       A.    We don't do studies on common
```

Page 55

```
- R. GOODELL -
 1   sense.  We make that analysis.  We think we
 2   have enough experience that we understand
 3   this.
 4       Q.    Okay.  Commissioner, so that I'm
 5   sure I understand this, though, is it the
 6   NFL's position that if a spectator -- withdraw
 7   the question.
 8          Is it the NFL's position that a
 9   fan, an NFL fan, that bets on an NFL game
10   loses its allegiance to the team that it
11   supports?
12       A.    Well, there's conflicting
13   statements in there.  Is your support for
14   the -- what he's betting on or what he's
15   looking for as an outcome?
16       Q.    Well, let me break it down.  That's
17   fair, Commissioner.  Let me break it down.
18          So you have a fan, let's say that
19   it is a 49er fan and they've placed a bet on a
20   game.  And is it the NFL's position that a fan
21   betting on a game will eliminate that fan's
22   allegiance to their team?
23       A.    Let me state it the way I would
24   tell you.
```

Page 56

```
- R. GOODELL -
 1       Q.    Okay.
 2       A.    Because if you're a 49er fan, we
 3   want you rooting for the 49ers to win, not win
 4   by a certain number of points, not to lose but
 5   I win my bet.  We want you rooting for that
 6   team to win.
 7       Q.    Could I be rooting to have my team
 8   win, my 49ers win and also win my bet at the
 9   same time?
10       A.    That's a hypothetical but of
11   course.  If you -- if your bet is simply that
12   my team's going to win and you want your team
13   to win, those are consistent.
14       Q.    Let me ask you this hypothetical
15   then, Commissioner.  If given the size of the
16   illegal gambling market in the United States
17   there are a lot of NFL fans that are betting
18   on NFL games, is it your position that those
19   bettors don't have an allegiance to a team?
20       A.    I can't answer that question.
21       Q.    I think we're almost done with your
22   declaration but let's go -- let's do this,
23   Commissioner.  We've been going for more than
24   an hour.  I only have a paragraph or two more
```

Page 57

```
1              - R. GOODELL -
2   of your declaration.  Do you want to take a
3   little break right now?
4         A.    I don't but if you'd like to,
5   that's fine.
6              MR. WEGNER:  Let's go off the
7        record.  We'll take a five-minute break
8        then.
9              (Recess taken 1:12-1:24 p.m.)
10  BY MR. WEGNER (continuing):
11        Q.    Commissioner, again, referring to
12  NFL 35, I'd like to direct your attention to
13  paragraph 7 which is also on page 3.  In that
14  paragraph the declaration states that:
15              "State sponsorship of sports
16        gambling also trades unfairly on the
17        property and goodwill of the NFL."
18              Skipping a few lines, then it says:
19        "State sponsorship of sports gambling
20        threatens to confuse fans into believing
21        that the NFL supports sports gambling,
22        thereby allowing casino operators and
23        other sports-betting operations to trade
24        unfairly on NFL's goodwill and image of
25        fairness."
```

Page 59

```
1              - R. GOODELL -
2   supports gambling if gambling is legalized in
3   New Jersey?
4         A.    Well, the broader answer to your
5   question, this is about our brand.  We're very
6   disciplined in how people associate with our
7   brand.  As an example, if you're a sponsor or
8   a licensee, you have to have the license to do
9   that.  If you -- to carry NFL content, you
10  have to have a license to do that.
11              So we're very concerned about who
12  can associate themselves with our NFL brands.
13  And if a state is now going to say that we can
14  allow gambling here and it's approved by the
15  NFL, that's a form of association that we do
16  not permit.
17        But, Commissioner, I think this is
18  very clear so I'm not getting out of bounds
19  here when I say that there's nothing in the
20  New Jersey law that says -- if it's
21  implemented, that says that the NFL supports
22  wagering.  Correct?
23        A.    I don't know.  I haven't read it.
24              MR. MISHKIN:  And it hasn't
25        happened yet.
```

Page 58

```
1              - R. GOODELL -
2              Do you see that, sir?
3         A.    I do.
4         Q.    How is that so, in your view?
5         A.    I'd like to read the sentence that
6   you left out.
7         Q.    Take all your time.
8         A.    (Examining document.)
9              "How is that so" refers to the
10  entire paragraph, or are you breaking this
11  down?
12        Q.    Well, I'm trying to -- there's no
13  secret about it, Commissioner.  What I'm
14  trying to do is understand the connection
15  between state-sponsored gambling and your view
16  that fans will think that the NFL therefore
17  supports gambling.
18        A.    I'm sorry, I missed what you said
19  but that's not the question, so I don't think
20  I need your background, I just need your
21  question, right?
22        Q.    Right.  Let me start with some
23  easier ones which is:  Again, has the NFL
24  conducted any studies or surveys to determine
25  whether the public would think that the NFL
```

Page 60

```
1              - R. GOODELL -
2         A.    Right now you can't do it, it's
3   against the law.
4         Q.    But if, for instance, the law is
5   permitted to go forward in New Jersey, what is
6   the basis of your concern that somehow New
7   Jersey -- legalizing sports wagering in New
8   Jersey is the same thing as the NFL endorsing
9   sports wagering?
10              MR. MISHKIN:  Well --
11        A.    Well, you'd be betting on our
12  games, correct?  That's what you're trying to
13  do?
14        Q.    Correct.
15        A.    So you'll be saying you can come
16  bet on NFL games?
17        Q.    Right.
18        A.    That's trading on the NFL.
19        Q.    Well, my question is a little more
20  precise than that, Commissioner, and that is:
21  How does that equal the same thing as the NFL
22  endorsing sports wagering?
23        A.    I don't know if the average
24  consumer makes the distinction you're making.
25  The average consumer sees states are allowing
```

Page 61

```
              - R. GOODELL -
1
2    that.  That means the NFL must be endorsing
3    it.  That's the association that we do not
4    want to encourage.
5         Q.    I'm just trying to understand,
6    Commissioner -- and I'm not being
7    argumentative, but I'm trying to understand
8    the connection between the two.  There are
9    lots of things that states may authorize, and
10   that doesn't mean that the NFL endorses it
11   unless the NFL endorses it; isn't that right?
12             MR. MISHKIN:  Object to the form of
13        the question, and it's been asked and
14        answered.  If you want to try it again,
15        you can.
16        A.    I don't have anything else to offer
17   to you on this.  When you say there are lots
18   of things states authorize, that have to do
19   with football?
20        Q.    Yes.
21        A.    Like what?  Let me turn the tables
22   here.
23             MR. MISHKIN:  He doesn't have to
24        answer the question.  But it would
25        probably help you elicit an answer if you
```

Page 62

```
              - R. GOODELL -
1
2    could give him another example or two.
3    He's answered the question with respect
4    to, you know, the connection he sees
5    between if New Jersey were to have
6    gambling and the use of the NFL games.
7    Is there another example you want to give
8    him?
9         Q.    Let me be a little more specific
10   then.  If you'll bear with me, Commissioner,
11   if the statute in New Jersey is implemented
12   and there's wagering at casinos and racetracks
13   on sporting events and NFL games, that's
14   conduct permitted by the State of New Jersey,
15   correct?
16             MR. MISHKIN:  Well, hypothetically.
17        A.    That's what you're proposing.  It's
18   not what the law says.
19        Q.    Right.  But my hypothetical is that
20   if for whatever reason New Jersey is permitted
21   to go forward with the implementation of its
22   sports wagering law, then that will mean New
23   Jersey is condoning sports wagering on, among
24   other things, NFL games, correct?
25        A.    I don't think it's that -- I think
```

Page 63

```
              - R. GOODELL -
1
2    it's more specific to the fact that if -- and,
3    again, this goes to the hypothetical.  You are
4    trying to allow sports betting to be legal in
5    your state.  It's now currently against the
6    law, correct?
7         Q.    Correct.
8         A.    We support the fact that the law
9    that's in place now is in the best interest.
10   It depends what you get passed, I guess.  You
11   have to change the law, don't you?  Okay.
12        Q.    Well, I mean, Commissioner, the
13   answer is that there has been a law passed in
14   New Jersey.  It's not been implemented.  Part
15   of the reason that it's not been implemented
16   is because of this litigation.  My question is
17   just this:  If --
18             THE WITNESS:  Is that true?
19             MR. MISHKIN:  Just off the record
20        for a minute.
21             MR. WEGNER:  Sure, we'll go off the
22        record.
23             (A discussion was held off the
24        record.)
25   BY MR. WEGNER (continuing):
```

Page 64

```
              - R. GOODELL -
1
2         Q.    Let me start with a fresh question
3    then, Commissioner.  If for whatever reason
4    New Jersey at some point in time is permitted
5    to authorize and implement sports wagering in
6    New Jersey on NFL games, that does not mean
7    that the NFL endorses sports wagering, does
8    it?
9         A.    No, it certainly doesn't.  But that
10   doesn't mean that the consumer won't be left
11   with that impression.  As an example, if I
12   understand it, don't you -- aren't you
13   excluding college sports from this?
14        Q.    There is a carve-out of the statute
15   currently for amateur athletics, yes.
16        A.    So why would amateur athletics be
17   left out versus professional?
18        Q.    Well, now you turned the table on
19   me.  I'm not being deposed because I'm not
20   under oath and I could say just about
21   anything, Commissioner.
22        A.    Say whatever you like, I take your
23   word.
24        Q.    Well, let's go back to my question
25   to you.
```

Page 65

```
 1                    - R. GOODELL -
 2         A.    I think the point is is that it
 3    does have an impact and that's why you're
 4    excluding amateur athletics.
 5         Q.    The reason I'm focusing on this
 6    particular paragraph and this particular
 7    statement, Commissioner, is I'm trying to take
 8    these sort of in order and take them apart.
 9    What we have on deck right now, to use a
10    baseball term, is the assertion by the NFL
11    that the implementation of New Jersey's gaming
12    statute means that the NFL has endorsed sports
13    wagering.
14         MR. MISHKIN:   Again, I'm going to
15         object to the question as I think not
16         entirely accurately recounting what's in
17         the declaration.  I would prefer that you
18         use the language that the Commissioner
19         used when he made his declaration.
20         Q.    All right.  Then let's go with this
21    question then.  In paragraph 7 the declaration
22    states, in part:
23              "State sponsorship of sports
24         gambling threatens to confuse fans into
25         believing that the NFL supports sports
```

Page 66

```
 1                    - R. GOODELL -
 2         gambling, thereby allowing casino
 3         operators and other sports betting
 4         operations to trade unfairly on the NFL's
 5         goodwill and image of fairness."
 6         So my question is:  What evidence do
 7    you have to support the statement that state
 8    sponsorship of sports gambling threatens to
 9    confuse fans into believing that the NFL
10    supports sports gambling?
11         A.    This is why I was trying to use the
12    example before about licensing and
13    sponsorship.  People want to associate
14    themselves with the NFL without paying for it
15    and without having any association because
16    that's how they ambush, that's how they get
17    that association.  And this is an example of
18    it.
19         If you are allowed to have sports
20    gambling at any one of your facilities,
21    whether they be casinos or -- they will say
22    that the NFL -- you can come here and gamble
23    on the NFL.  That will appear to the consumer,
24    the average consumer, that we are sponsoring
25    that.  That is not in our best interest of the
```

Page 67

```
 1                    - R. GOODELL -
 2    National Football League.
 3         Q.    Well, there's nothing that prevents
 4    the NFL from making it very clear that it
 5    doesn't support gambling, correct?
 6         A.    So I have to spend money to now
 7    tell the consumers exactly what you're trying
 8    to get?
 9         Q.    Well, sports wagering, let's put
10    it, is permitted in Las Vegas, correct?
11         A.    Yes.
12         Q.    Do you have any evidence that
13    consumers believe that the NFL supports sports
14    wagering because it's legal in Las Vegas?
15         A.    We don't have a team there.  We are
16    very open about our position with respect to
17    gambling, and we have to work every day to try
18    to do that.  If it is now expanded to another
19    state and then potentially other states beyond
20    that, it is very difficult to keep that.
21         Q.    But as we sit here today, the NFL
22    has successfully made it clear that even
23    though sports wagering is legal in Las Vegas,
24    the NFL does not support sports wagering,
25    correct?
```

Page 68

```
 1                    - R. GOODELL -
 2         A.    I can't say that with every
 3    consumer.  That's an ongoing battle.  That's
 4    what we're fighting.  We're fighting to make
 5    sure people don't see that association.  I
 6    can't tell you that every consumer in the
 7    United States doesn't see it the way you're
 8    proposing.  There very well may be consumers
 9    that believe that.  That's why we have to work
10    every day to make sure they understand that is
11    not our position.
12         Q.    Commissioner, what is your basis
13    for believing that fans do think that State-
14    sponsored sports wagering means that the NFL
15    supports sports wagering?
16         A.    Again, because you will use that
17    association if it's permissible.  If it's the
18    law, you will use that to attract people into
19    your facilities to bet on our games.  That
20    will try to drive an association.  That's what
21    people do.  In the other instance when I was
22    describing the other commercial agreements,
23    that's what they try to do.
24         Q.    So if I understand the concern,
25    Commissioner, it's that some fans may think
```

Page 69

1                    - R. GOODELL -
2   that sports-sponsored [verbatim] wagering
3   means that the NFL endorses sports wagering?
4        A.    Let me try to say it another way:
5   A sports network that does not have the NFL
6   will cover the NFL.  They'll try to say:  We
7   have the best NFL information.  They'll try to
8   draw that distinction as if they have a
9   license to present the NFL.  They don't then
10  they'll try to draw that connection.
11             That is something that we protect
12  as best we possibly can.  We can't stop them
13  from covering the NFL with the news, but they
14  will draw that association as best they can.
15       Q.    Well, if in that example,
16  Commissioner, if someone, a network or
17  somebody, was using the shield, the NFL
18  shield, and affirmatively displaying to the
19  public what appeared to be an endorsement by
20  the NFL, the NFL would move to stop that,
21  wouldn't it?
22       A.    Sure, if they're using the shield.
23  But there are ways in which to talk about the
24  NFL without using the shield that we can't
25  stop.

Page 71

1                    - R. GOODELL -
2        A.    Our games are provided to our
3   networks and our other partners in their
4   broadcasts.  So, yes, they appear in
5   sportsbooks.
6        Q.    Does the NFL license team names to
7   be used on Las Vegas sportsbook betting
8   boards?
9        MR. MISHKIN:  Licenses to whom?
10       Q.    Licenses to be used by Las Vegas
11  sportsbooks on their betting boards?
12       A.    Not that I'm aware of.
13       Q.    Does the NFL license team logos to
14  be used in Las Vegas sportsbooks?
15       A.    Not that I'm aware of.
16       Q.    Commissioner, are you aware one way
17  or the other whether Las Vegas sportsbooks are
18  using the NFL shield in their sportsbooks?
19       A.    I don't know what you mean by that.
20       Q.    I'm just asking if you're aware
21  whether, in Las Vegas at the sportsbooks,
22  they're using the NFL shield.
23       A.    I'm not aware of that.
24       Q.    Okay.  Commissioner, let's move on
25  to paragraph 8, also on page 3 where the

Page 70

1                    - R. GOODELL -
2        Q.    Like a news network reporting on
3   games?
4        A.    Sure, and running highlights.
5        Q.    If I've asked this, I apologize,
6   Commissioner, but I just want to move off this
7   by making this clear.  The NFL has not
8   conducted any studies or focus groups or
9   empirical analysis to determine whether fans
10  would, as a result of New Jersey's gaming law
11  being implemented in New Jersey, connect that
12  with an endorsement by the NFL?
13       A.    We don't believe it's going to be
14  legal.  It's not legal in New Jersey and we
15  have not done that research.  There's no
16  reason for us to do that.
17       Q.    Okay.  Commissioner, does the NFL
18  have contractual arrangements to allow for
19  games to be shown in Las Vegas sportsbooks?
20       A.    I'm not sure I understand the
21  question.
22       Q.    Well, does the NFL have any
23  contracts, contractual arrangements, to allow
24  for games to be shown at Las Vegas
25  sportsbooks?

Page 72

1                    - R. GOODELL -
2   declaration states:
3             "The NFL cannot be compensated in
4        damages for the harm sports gambling
5        poses to the goodwill, character and
6        integrity of NFL football and to the
7        fundamental bonds of loyalty and devotion
8        between fans and team that the League
9        seeks to maintain."
10            Commissioner, do you have any
11  support for that statement, other than what
12  we've discussed so far today?
13       A.    I think we've been very clear on
14  that.  I think we've covered the core issue of
15  that.
16       Q.    Okay.  You'll be happy to know,
17  Commissioner, we're done with your
18  declaration.  You can put that away.
19       MR. MISHKIN:  Next.
20       Q.    Next.  Your counsel already knows
21  where I'm going.  This was previously marked
22  NFL Exhibit 3, Commissioner, which is the
23  Complaint in this action.
24            Commissioner, have you seen this
25  Complaint before, NFL 3?

Page 73

- R. GOODELL -

2    A.    I may have seen it briefly, but I
3  don't recall.
4    Q.    You understand that it's the
5  operative document where the Plaintiffs sued
6  New Jersey to stop the implementation of the
7  New Jersey gaming law?
8    A.    Yes, I do.
9    Q.    In order for the NFL to become a
10 Plaintiff in this action, did that require
11 your authorization as the Commissioner?
12   A.    Yes.
13   Q.    Commissioner, let me draw your
14 attention to paragraph 5 on page 3 of the
15 Complaint.  And so there's no surprise about
16 what I'm doing, Commissioner, I'm going to ask
17 you to read that paragraph and one other
18 paragraph in the Complaint and then ask if
19 there's any other support, other than what
20 we've discussed so far today, that you want to
21 advance for that Complaint.
22        So if you could just read paragraph
23 5 on page 3 of Exhibit 3.
24   A.    (Examining document.)
25   Um-hmm.

Page 75

- R. GOODELL -

2  testimony --
3    A.    It would be the answer I gave you,
4  Counselor.
5    Q.    Okay.  Well, let me ask you this:
6  Is there anything you would like to add to
7  your testimony to support the allegation in
8  paragraph 5 of the Complaint that you haven't
9  already given us today?
10   A.    Not at this time.
11   Q.    Okay.  Commissioner, if you could
12 read paragraph 6 of the Complaint which is
13 Exhibit 3.
14   A.    (Examining document.)
15   Okay.
16   Q.    Same question, Commissioner:  Do
17 you have any other testimony, other than what
18 you've provided today, to support the
19 allegations in paragraph 6 of the Complaint,
20 Exhibit 3?
21   A.    I would offer the same answer, that
22 that's a very broad question but that I think
23 we've touched on the core issues today.
24   Q.    Thank you, Commissioner.  We're
25 finished with that exhibit, then.

Page 74

- R. GOODELL -

2    Q.    Commissioner, other than the things
3  you've already testified to today, are there
4  any other ways that gambling in sports
5  threatens the integrity of NFL football?
6    MR. MISHKIN:  Based on his
7  understanding?
8    MR. WEGNER:  Yes.
9    A.    That's a very broad question.  Are
10 you asking specifically about paragraph 5 and
11 do I support paragraph 5?
12   Q.    I assume you support paragraph 5,
13 Commissioner.  It's a Complaint you authorized
14 to be filed against the State of New Jersey.
15 All I'm really trying to do is to determine,
16 other than what we've already testified to
17 today extensively, if you have any other
18 evidence in support of the allegations in
19 paragraph 5 of the Complaint other than what
20 you have testified to today.
21   A.    Again, that's a very broad
22 question.  I think we've gotten to the core of
23 the issue of why we oppose gambling so...
24   Q.    So would that be that, no, you
25 don't have any other -- other than your

Page 76

- R. GOODELL -

2    MR. WEGNER:  Let's go off the
3  record for a second.
4    (A discussion was held off the
5  record.)
6    (Recess taken 1:47-2:08 p.m.)
7  BY MR. WEGNER (continuing):
8    Q.    Commissioner, I'm now going to show
9  you what has been previously marked as NFL
10 Exhibit 14, which is the NFL gambling policy.
11 Do you recognize that document?
12   A.    I do.
13   Q.    What role, if any, did you have in
14 developing the NFL gambling policy that's
15 reflected in Exhibit 14?
16   A.    Very little, if any.  I think this
17 was established long before I was involved.
18   Q.    Well, at the bottom left-hand
19 corner of the exhibit, you see that it states
20 that the policy is effective September 1,
21 2012.  The NFL had a previous version of the
22 gambling policy before this September 2012
23 version; is that right?
24   A.    They had a policy the prior year,
25 yes.  I don't know how different it was.

Page 77

- R. GOODELL -

1

2    Q.    So do you know why the policy was

3    changed, if it was changed, in September of

4    2012?

5    A.    I don't know if there's any change

6    other than the date, is the point.

7    Q.    Commissioner, under the policy, if

8    you look at the middle of this first page of

9    Exhibit 14, you'll see that gambling is

10   defined as something that involves prize,

11   chance and consideration.  Is that correct?

12         MR. MISKIN:  Is the question is

13         that what it says?

14   Q.    Is that what it says?

15   A.    It says:  "Generally gambling

16   involves all three of these following

17   elements."

18   Q.    Do you know, Commissioner, how that

19   definition was developed?

20   A.    I don't.

21   Q.    In your view if any of these

22   elements--the prize, chance and consideration

23   --are missing from some activity, does that

24   mean that it's not gambling?

25   A.    If any of these are missing, does

Page 78

- R. GOODELL -

1

2    that mean it's not gambling, just so I'm

3    clear?

4    Q.    Yes, sir.

5    A.    I think by the words "generally

6    gambling involves all three of these following

7    elements," I think the "generally" gives some

8    leeway into that.

9    Q.    Okay.  Let's take, for example,

10   under the policy here, if there was

11   consideration and there was a prize but there

12   was no chance element, would that mean that

13   it's not gambling?

14   A.    That's a hypothetical.  I couldn't

15   answer that question.

16   Q.    Okay.  Let's look at page 2 of

17   Exhibit 14, Commissioner.

18   A.    Um-hmm.

19   Q.    You'll see on page 2 of Exhibit 14,

20   if you look at subpart 6 of item 2, it states

21   that it's against the policy to enter into

22   sportsbook at any time during the NFL playing

23   season.  Do you see that, sub 6 under 2 on

24   page 2, Commissioner?

25   A.    Yes, I do.

Page 79

- R. GOODELL -

1

2    Q.    Do you have any notion as to why

3    that policy is limited to the NFL playing

4    season?

5    A.    I don't.

6    Q.    Okay.  Do you know, Commissioner,

7    if NFL players can utilize sportsbooks during

8    the off season?

9          MR. MISKIN:  If you know.

10   A.    I don't because I think this

11   question it says, "entering into, utilizing or

12   otherwise visiting a sportsbook at any time

13   during the -- (INAUDIBLE.)

14         (Reporter interruption.)

15   A.    I'm sorry, I'm rereading 6.  I'm

16   reading the question.  I'd have to speak to

17   Jeff Pash about this who would operate this

18   policy.

19   Q.    Well, Commissioner, if you look at

20   the next paragraph that states:

21         "In part, fantasy football games

22         generally are not considered to be

23         gambling or gambling-related activity

24         provided there is no wagering on the

25         outcome."

Page 80

- R. GOODELL -

1

2    Do you see that?

3    A.    No, I don't.  I'm sorry.

4    Q.    Okay.  Take a moment then.

5          MR. MISKIN:  Is this the right

6    paragraph, Bill, the "in addition"?

7          MR. WEGNER:  Yes, sir.

8    A.    (Examining document.)

9          Um-hmm.

10   Q.    The policy commission uses the word

11   "generally" in stating that fantasy football

12   games are not gambling providing there is no

13   wagering on the outcome.  Are there examples

14   where fantasy football games would be

15   considered gambling even if there is no wager

16   on the outcome, in your view?

17   A.    We don't look at fantasy football

18   as gambling.

19   Q.    What about fantasy football leagues

20   that have an entry fee and pay a monetary

21   prize to the winner, would you say that that

22   violates this policy?

23   A.    Again, isn't that a hypothetical

24   question?  Wouldn't I have to have more

25   information to understand that?

Page 81

```
              - R. GOODELL -
 1
 2      Q.    It is a hypothetical question, but
 3  I'm asking hypothetically that if as an
 4  example there's a fantasy football league in
 5  which there was an entry fee and a monetary
 6  prize, would that violate the NFL's gambling
 7  policy?
 8      A.    Again, it's a hypothetical.  How
 9  much money are you talking about?
10      Q.    Well, the NFL has -- one of its
11  fantasy league games, it has a million dollar
12  prize?
13            (A discussion was held off the
14      record.)
15      Q.    Let me start over again.  As an
16  example, Commissioner, rather than a
17  hypothetical, if there was a fantasy league
18  where you had to pay into it and then there
19  was a monetary prize at the end of the season
20  for winning that league competition, would
21  that be a violation of the NFL's gaming
22  policy?
23      A.    If they paid into for a fee to
24  participate in the game?
25      Q.    Yes, sir.
```

Page 82

```
              - R. GOODELL -
 1
 2      A.    And what was the second piece?
 3      Q.    And then if they, for instance,
 4  won, that league, they would receive a
 5  monetary award, like the pool would be paid
 6  back to that participant in the fantasy
 7  league.  Would that violate the NFL's
 8  antigambling policy?
 9      A.    Of fantasy football?  I think it
10  would depend on the size of the numbers and
11  maybe some other factors, but it doesn't sound
12  like it would be.
13      Q.    Okay.
14      A.    But I'd have to check with our
15  counsel.
16      Q.    Commissioner, if a referee told a
17  player that he needed to have--this is during
18  a game.  If a referee told a player that he
19  needed the player to perform well for his
20  fantasy team, would that be a violation of the
21  NFL's antigambling policy?
22            MR. MISHKIN:  If you have a view on
23      that.
24      A.    Well, that's actually my next
25  question.  In that scenario, would that
```

Page 83

```
              - R. GOODELL -
 1
 2  concern you, that a referee made that
 3  statement to a player?
 4      A.    Yes.
 5      Q.    And going further, would you
 6  consider that to be a violation of the NFL
 7  gambling policy?
 8      A.    I think I'd be more concerned about
 9  the official and his judgment at that point in
10  time than I would about the gambling policy.
11      Q.    Commissioner, the next portion of
12  the policy where we are right now states that:
13            "NFL personnel may not, however,
14      accept prizes with a value in excess of
15      $250 on any fantasy football game."
16            Do you see that?  It's the next
17  sentence.
18      A.    I do.
19      Q.    Okay.  If you know, Commissioner,
20  do you have any idea why the NFL decided on
21  this $250 limit?
22      A.    I don't.  Other than what is stated
23  in the next sentence, by the way.
24      Q.    Which is that the policy is to
25  avoid any appearance of impropriety which may
```

Page 84

```
              - R. GOODELL -
 1
 2  result from participation in fantasy football
 3  games by individuals perceived to have an
 4  unfair advantage due to their preferential
 5  access to information?
 6      A.    It's prohibition, just to -- rather
 7  than policy, but yes.
 8      Q.    Commissioner, do you have any
 9  concerns that fans participating in fantasy
10  football games could create a threat of
11  game-fixing?
12      A.    No, I don't have that concern.
13      Q.    How about a concern that
14  participating in fantasy football games would
15  create point-shaving?
16      A.    I don't have that concern.
17      Q.    Is it your view that the level of
18  that threat is dependent upon the amount of
19  money at stake?
20      A.    Fantasy football's not based on the
21  outcome of a game; it's based on performance
22  of individuals that they select.  It could be
23  different teams.
24      Q.    Okay.
25            MR. WEGNER:  Commissioner, no
```

Page 85

```
1                    - R. GOODELL -
2        further questions.  Thank you.
3            THE WITNESS:  You're welcome.
4            MR. WEGNER:  Counsel, do you have
5        any?
6            MR. MISHKIN:  I do not.
7            (Time noted:  2:19 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

VERITEXT REPORTING COMPANY
www.veritext.com
212-267-6868                        516-608-2400

---

Page 87

```
1
2                    I N D E X
3    EXAMINATION OF
     ROGER S. GOODELL                        PAGE
4    By Mr. Wegner ...........................    4
5
6    RULINGS (Page:Line):  (NONE)
7
     INSTRUCTIONS BY COUNSEL NOT TO ANSWER
8    (Page:Line):  (NONE)
9
     REQUEST FOR DOCUMENTS/INFORMATION
10   (Page:Line):  (NONE)
11
12                  E X H I B I T S
13   NFL
     EXHIBIT            DESCRIPTION           PAGE
14
     Exhibit 35: Declaration of Roger          15
15              Goodell
16
17   EXHIBITS PREVIOUSLY MARKED/DISCUSSED:
18   NFL
     Exhibit 3................................   72
19
     Exhibit 14...............................   76
20
21
22
23
24
25
```

VERITEXT REPORTING COMPANY
www.veritext.com
212-267-6868                        516-608-2400

---

Page 86

```
1
2    STATE OF NEW YORK  )
3                       )  ss:
4    COUNTY OF NEW YORK )
5
6
7            I, ROGER S. GOODELL, the witness
8    herein, having read the foregoing testimony of
9    the pages of this deposition, do hereby certify
10   it to be a true and correct transcript, subject
11   to the corrections, if any, shown on the attached
12   page.
13
14
15
16       _____
             ROGER S. GOODELL
17
18
19   Subscribed and sworn to before me
20   this _____ day of _____, 2012
21
22   _____
23       NOTARY PUBLIC
24
25
```

VERITEXT REPORTING COMPANY
www.veritext.com
212-267-6868                        516-608-2400

---

Page 88

```
1                    ERRATA SHEET
             VERITEXT REPORTING COMPANY
2                    1250 BROADWAY
                NEW YORK, NEW YORK 10001
3                    212-279-9424
4    NAME OF CASE: NCAA VS. CHRISTIE
     DATE OF DEPOSITION: NOVEMBER 12, 2012
5    NAME OF DEPONENT: ROGER S. GOODELL
6    PAGE   LINE(S)      CHANGE        REASON
7    _____|_____|_____|_____
8    _____|_____|_____|_____
9    _____|_____|_____|_____
10   _____|_____|_____|_____
11   _____|_____|_____|_____
12   _____|_____|_____|_____
13   _____|_____|_____|_____
14   _____|_____|_____|_____
15   _____|_____|_____|_____
16   _____|_____|_____|_____
17   _____|_____|_____|_____
18   _____|_____|_____|_____
19   _____|_____|_____|_____
20   _____|_____|_____|_____
21                          _____
                               ROGER S. GOODELL
22
     SUBSCRIBED AND SWORN TO BEFORE ME
23   THIS____DAY OF _____, 20__.
24
25   (NOTARY PUBLIC)       MY COMMISSION EXPIRES:
```

VERITEXT REPORTING COMPANY
www.veritext.com
212-267-6868                        516-608-2400

```
                                                    Page 89
 1
 2              C E R T I F I C A T I O N
 3
 4         I, Sherri Flagg, a Registered
 5    Professional Reporter, Certified LiveNote
 6    Reporter, and a Notary Public, do hereby certify
 7    that the foregoing witness, ROGER S. GOODELL, was
 8    duly sworn on the date indicated and that the
 9    foregoing is a true and accurate transcription of
10    my stenographic notes.
11         I further certify that I am not
12    employed by nor related to any party to this
13    action.
14
15
      _____
16      Sherri Flagg, RPR, CLR
17
18
19
20
21
22
23
24
25
```