**Exhibit 10**

Page 1

```
UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

Civil Action No. 3:12-cv-04947-MAS-LHG
- - - - - - - - - - - - - - - - - - - -x
NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,
an unincorporated association, NATIONAL
BASKETBALL ASSOCIATION, a joint venture,
NATIONAL FOOTBALL LEAGUE, an unincorporated
association, NATIONAL HOCKEY LEAGUE, an
unincorporated association, and OFFICE
OF THE COMMISSIONER OF BASEBALL, an
unincorporated association doing business
as MAJOR LEAGUE BASEBALL,

                         Plaintiffs,

         -against-

CHRISTOPHER J. CHRISTIE, Governor of the
State of New Jersey, DAVID L. REBUCK,
Director of the New Jersey Division of
Gaming Enforcement and Assistant Attorney
General of the State of New Jersey, and
FRANK ZANZUCCKI, Executive Director of
the New Jersey Racing Commission,

                         Defendants.
- - - - - - - - - - - - - - - - - - - -x

                    November 19, 2012
                    1:26 p.m.

         Deposition of DANIEL T. MULLIN,
taken by attorneys for Defendants, pursuant to
Rule 30(b)(6) notice, held at the offices of
Gibson Dunn & Crutcher, 200 Park Avenue, New
York, New York, before Helen Mitchell, a
Shorthand Reporter and Notary Public.
```

VERITEXT REPORTING COMPANY
212-267-6868  www.veritext.com  516-608-2400

Page 2

```
 1
 2   A P P E A R A N C E S :
 3
 4       SKADDEN, ARPS, SLATE, MEAGHER
            & FLOM LLP & AFFILIATES
 5       Attorneys for Plaintiffs
            4 Times Square
 6          New York, New York 10036
         BY:  KAREN LENT, ESQ.
 7
 8
 9       GIBSON DUNN & CRUTCHER
         Attorneys for Defendants
10          333 South Grand Avenue
            Los Angeles, California 90071-3197
11       BY:  MATTHEW HOFFMAN, ESQ.
              (via videoconference)
12
13
14   ALSO PRESENT:
15       THOMAS J. OSTERTAG, MLB
16
```

VERITEXT REPORTING COMPANY
212-267-6868  www.veritext.com  516-608-2400

Page 3

```
 1
 2              D A N I E L   T.   M U L L I N,
 3   having been first duly sworn by the Notary
 4   Public (Helen Mitchell), was examined and
 5   testified as follows:
 6   EXAMINATION BY
 7   BY MR. HOFFMAN:
 8       Q    Good morning, Mr. Mullin, or
 9   afternoon, as the case may be for you.
10            My name is Matt Hoffman, and I
11   represent the defendants in this action.
12            Can I get your full name for the
13   record, please?
14       A    Daniel T. Mullin, M-u-l-l-i-n.
15       Q    Mr. Mullin, you work for Major
16   League Baseball; is that correct?
17       A    Yes.
18       Q    Can you tell me what your current
19   position is at Major League Baseball?
20       A    I'm a senior vice president in
21   charge of the Department of Investigations.
22       Q    And what are your job
23   responsibilities as senior vice president and
24   the head of the Department of Investigations?
25       A    Well, broadly speaking, to protect
```

VERITEXT REPORTING COMPANY
212-267-6868  www.veritext.com  516-608-2400

Page 4

```
 1                    D. MULLIN
 2   the integrity of the game, and we do everything
 3   from investigations involving performance
 4   enhancing drugs, corruption, gambling, we do
 5   corporate due diligence, we do age and identity
 6   fraud in Latin America, we do internal issues
 7   involving players.  Pretty broad -- anything you
 8   could think of that requires investigative
 9   resources, we supply those for Baseball.
10       Q    And how long have you been in your
11   current role?
12       A    I've been at Baseball for nine
13   years, my current role for four.
14       Q    And my understanding from
15   Mr. Ostertag's deposition is that the Department
16   of Investigations has actually only existed for
17   four years; is that correct?
18       A    That's correct.  There was a
19   security department, and after the Mitchell
20   report, Senator Mitchell recommended that we
21   create a stand-alone Department of
22   Investigations, so I was chosen to stand that up
23   and head it.
24       Q    So you were the very first head of
25   the Department of Investigations at Major League
```

VERITEXT REPORTING COMPANY
212-267-6868  www.veritext.com  516-608-2400

Page 5

```
 1                D. MULLIN
 2   Baseball?
 3       A    Correct.
 4       Q    And you mentioned that the
 5   Department of Investigations was created
 6   following a recommendation by George -- in the
 7   George Mitchell report; is that correct?
 8       A    Yes.
 9       Q    Do you recall why George Mitchell
10   recommended the creation of the Department of
11   Investigations?
12       A    Well, among the reasons for the
13   recommendation were he thought there might have
14   been conflicts of interest with other existing
15   departments.  The security department had some
16   responsibility for player protection at large
17   events, and he thought there might be a conflict
18   between trying to protect the players, their
19   physical security, and then investigating them,
20   and I think he also looked at our labor
21   relations department and realized that they had
22   a responsibility to be receptive to the players
23   union because of collective bargaining, so
24   they -- he recommended a stand-alone department
25   that reports to the president so that it
```

Page 6

```
 1                D. MULLIN
 2   wouldn't be susceptible to the pressures of
 3   labor and security and could be more focused.
 4       Q    Is it fair to say that the
 5   Department of Investigations was created
 6   primarily in response to the steroids
 7   performance enhancing drug scandals in Major
 8   League Baseball?
 9            MS. LENT:  Object to the form of
10       the question.
11            You can answer.
12       A    I would say that's not the sole
13   reason, but the primary reason, yes.
14       Q    And you said you've been at Major
15   League Baseball for nine years.  Prior to
16   becoming the head of the Department of
17   Investigations, what other roles did you play at
18   Major League Baseball?
19       A    Well, I was the senior director
20   for security, so I was the number two person in
21   the security department.
22       Q    And was that -- you held that
23   position for approximately five years?
24       A    Correct.
25       Q    Now, you mentioned one of your job
```

Page 7

```
 1                D. MULLIN
 2   responsibilities at the Department of
 3   Investigations has to do with gambling.
 4            Can you describe a little bit more
 5   what your job entails in terms of gambling?
 6       A    Well, since the Black Sox scandal,
 7   I guess, Baseball -- scandal has always been
 8   something that Baseball is focused on,
 9   preventing another scandal, and we're always
10   worried about the integrity of our game as it
11   relates to the dangers of gambling.  So within
12   our department we monitor gambling trends, we
13   monitor blogs, we monitor Twitter, we have a
14   hotline for tips, and we try to monitor what's
15   going on with gambling in sports.
16       Q    Now, you just mentioned you
17   monitor gambling trends.
18            How does the Department of
19   Investigations monitor gambling trends?
20       A    Well, I have several analysts.
21   One of my analysts puts out a monthly report
22   on -- an internal gambling newsletter to talk
23   about prosecutions, about arrests around the
24   country.
25            For example, there was an arrest
```

Page 8

```
 1                D. MULLIN
 2   in New York, a large-scale gambling ring was --
 3   a big indictment, so that would be something we
 4   would analyze in that report.
 5       Q    So it sounds like you monitor
 6   gambling trends, you're monitoring various
 7   sources of media for any news relating to sports
 8   wagering; is that fair?
 9       A    Partially, yes, that is fair,
10   yeah.
11       Q    And other than monitoring media
12   reports, what other sources do you look at in
13   terms of monitoring gambling trends?
14       A    Well, we stay in close contact
15   with law enforcement, both city, state and
16   federal law enforcement.
17       Q    As part of the monitoring of
18   gambling trends, does the Department of
19   Investigations talk to sports books in Las
20   Vegas?
21       A    Not directly.  We do annual
22   seminars with the other professional leagues,
23   the NCAA, and we do have speakers come to our
24   seminars from sports books to speak about sports
25   betting in Vegas.
```

Page 9

```
 1                    D. MULLIN
 2       Q     Other than those seminars, any
 3  other contact with Las Vegas sports books?
 4       A     No.
 5       Q     Now, you also mentioned that the
 6  Department of Investigations has a hotline for
 7  tips.  When was that set up?
 8       A     About six months after the
 9  formation of the department.
10       Q     And I'm not sure you can give me a
11  precise number, but do you have any estimate of
12  how many tips you've received via that hotline?
13             MS. LENT:  Object to the form,
14       vague.
15             You can answer.
16       A     I guess 20 or so.
17       Q     So approximately 20 tips in the
18  last, oh, three and a half to four years; is
19  that accurate?
20       A     Yes.
21       Q     Of those 20 tips, how many of
22  those has the Department of Investigations
23  actually investigated?
24       A     We investigate all of them.
25       Q     And for any of those tips you
```

Page 10

```
 1                    D. MULLIN
 2  received, did any of them involve alleged game
 3  fixing?
 4       A     No.
 5       Q     Can you generally describe what
 6  the -- what the tips involved if they didn't
 7  involve game fixing?
 8       A     General categories would be --
 9  probably the most common one is performance
10  enhancing drugs, and then after that I would say
11  improper player assignings, assigning players as
12  a competitive business, and we get tips on a
13  club that may have acted improperly in
14  recruiting or signing a player.
15       Q     Did any of the approximately 20
16  tips you referred to involve gambling?
17       A     No.  That really hasn't been the
18  focus of that hotline.  We have cards and
19  posters, and to this point the hotline has
20  really been focused more on performance
21  enhancing drugs than anything else.
22       Q     Now, aside from monitoring
23  gambling trends through the media and through
24  your law enforcement contacts, does the
25  Department of Investigations conduct any other
```

Page 11

```
 1                    D. MULLIN
 2  sort of research into gambling trends?
 3       A     Other than our analysts doing
 4  their research, no.
 5       Q     And the analysts who do the
 6  research -- I know you mentioned media, and I
 7  assume that those analysts also talk to law
 8  enforcement officials; is that correct?
 9       A     They do, and that's been the best
10  source of information.  We've had two fairly
11  large-scale gambling investigations that we've
12  done in the last several years, and both of
13  those came out of law enforcement contacts.
14       Q     I want to talk a little bit about
15  the two large-scale investigations you just
16  referred to.
17             What were those large-scale
18  investigations?
19             MS. LENT:  I'm just going to
20       caution the witness that -- certainly be
21       responsive, but if we need to designate
22       this as highly confidential, let me
23       know.
24             Matt, you also just be cautious
25       about confidentiality concerns.  If you
```

Page 12

```
 1                    D. MULLIN
 2       can ask more general questions, that
 3       would be better.
 4             MR. HOFFMAN:  Sure.
 5             Let's start on the general level,
 6       and then depending on what the answer is
 7       we can figure out whether or not we need
 8       to designate anything as highly
 9       confidential.
10             MS. LENT:  Great.
11             THE WITNESS:  Okay.
12       A     The first one I'll talk about came
13  from a law enforcement tip that was an organized
14  crime investigation in New York that was focused
15  on a large-scale organized crime back bookmaking
16  operation, and they were focusing on one figure
17  in particular, and his phones were being
18  wiretapped, and seven of our Major League scouts
19  were picked up gambling on a wiretap.
20       Q     So this first large-scale
21  investigation involved illegal gambling with
22  organized crime in New York?
23       A     Yes -- not in New York, no, in
24  different states on the east coast.  It was a
25  New York-based investigation, but it involved
```

Page 13

```
 1              D. MULLIN
 2  scouts in a number of different cities up and
 3  down the east coast, and it was all sports
 4  wagering.
 5       Q    And as part of that investigation
 6  were any of these scouts wagering on Major
 7  League Baseball games?
 8       A    Not that we found, no.
 9       Q    You mentioned a second large-scale
10  investigation. Tell me a little bit more about
11  that.
12            THE WITNESS: This would be more
13       highly confidential.
14            MS. LENT: Okay.
15       A    This would be more of the highly
16  confidential nature.
17            A club -- a team club house
18  manager -- actually, a club house manager,
19  traveling secretary, a lot of responsibility, we
20  found from a law enforcement source that he was
21  betting up to $30,000 a week -- a lot of
22  money -- and so we focused our resources on him.
23  His salary wouldn't support that kind of weekly
24  betting amount, and we found that he was
25  involved in wide-scale fraud. He was stealing
```

Page 14

```
 1              D. MULLIN
 2  and selling memorabilia, he was skimming, he was
 3  ticket scalping, and we found as part of that
 4  investigation that he was involved with some
 5  very prominent organized crime figures.
 6       Q    Did his gambling involve sports
 7  gambling or some other type of gambling?
 8       A    Mostly sports gambling, yes.
 9       Q    And --
10       A    But he also -- also horse racing,
11  pretty much, but predominantly sports wagering.
12       Q    So this team club house
13  manager/traveling secretary, did you uncover any
14  evidence that this person gambled on Major
15  League Baseball games?
16       A    Yes, we had an admission from him
17  that he did.
18       Q    Is this a he or a she?
19       A    A he.
20       Q    Did he gamble on games involving
21  the Major League Baseball team which he was
22  employed by?
23       A    No. Not that we found.
24       Q    So in the two large-scale
25  investigations we've just been discussing by the
```

Page 15

```
 1              D. MULLIN
 2  Department of Investigations, did those
 3  investigations turn up any evidence of game
 4  fixing?
 5       A    No.
 6       Q    Other than the two large-scale
 7  investigations we've just been talking about,
 8  have there been any other investigations into
 9  gambling by the Department of Investigations
10  during your time there?
11       A    Yes.
12       Q    Approximately how many?
13       A    Four.
14       Q    Did any of those investigations
15  involve allegations of game fixing?
16       A    No.
17       Q    Now, real briefly, I don't want to
18  belabor this, can you briefly tell me your
19  background prior to -- your work background
20  prior to joining Major League Baseball?
21       A    I spent 23 years with the NYPD, I
22  retired as a deputy chief, executive officer of
23  the Bronx. During my career I spent three years
24  as the head investigator -- the head of the
25  detective squad for the Manhattan district
```

Page 16

```
 1              D. MULLIN
 2  attorney's office for three years. I was the
 3  number two person in narcotics for three years.
 4  I worked in the police legal bureau for three
 5  years as an attorney, uniform patrol. I would
 6  say the largest portion of my career was
 7  investigations. So Manhattan DA and narcotics
 8  and detective work.
 9       Q    During your time with the New York
10  City Police Department did you have any -- were
11  you involved in any investigations into
12  gambling?
13       A    Yes.
14       Q    Approximately how many?
15       A    A dozen.
16       Q    Did any of those investigations
17  involve sports gambling?
18       A    Yes.
19       Q    Approximately how many?
20       A    Probably ten of the twelve; the
21  majority of them.
22       Q    Did any of those investigations
23  involve sports gambling on Major League Baseball
24  games?
25       A    Yes.
```

```
                                              Page 17
 1                  D. MULLIN
 2        Q     Again, approximately how many of
 3   those investigations involved gambling on Major
 4   League baseball games?
 5        A     I would say all of the large-scale
 6   gambling investigations I did with the NYPD all
 7   involved some aspect of gambling on baseball.
 8        Q     In any of those investigations
 9   were there any allegations or evidence of game
10   fixing?
11        A     No, there were not, but there were
12   discussions of trying to manipulate results and
13   get inside information, you know.
14              I think when you deal with
15   professional gamblers on a large scale, it's not
16   just a bright line between game fixing and not
17   game fixing; they also -- they look for an
18   inside edge, they look for inside information,
19   and -- any information that will make it a
20   better bet, to hedge their bet.  So in all of
21   those investigations there was a lot of
22   discussion about that, how you get the inside
23   track, how you get inside information.
24        Q     And real briefly, could you tell
25   me your educational background?
```

```
                                              Page 18
 1                  D. MULLIN
 2        A     Yeah, I have a BS from St. John's
 3   and a JD from New York Law School.
 4        Q     Have you received any special
 5   training on gambling investigations or
 6   enforcement?
 7        A     In the Police Department I did,
 8   yeah.  In the Police Department there's a lot of
 9   in-service training in every kind of specialized
10   investigation, so, yeah, I got some in the
11   Police Department.
12        Q     And have you personally conducted
13   any research on sports gambling?
14        A     No.
15        Q     Have you published any papers on
16   sports gambling?
17        A     No.
18        Q     Mr. Mullin, have you been deposed
19   before?
20        A     Yes.
21        Q     Approximately how many times?
22        A     I guess three or four.
23        Q     Were any of those depositions as a
24   representative of Major League Baseball?
25        A     No.
```

```
                                              Page 19
 1                  D. MULLIN
 2        Q     Did any of those depositions
 3   involve sports gambling?
 4        A     No.
 5        Q     Have you testified in court?
 6        A     Yes.
 7        Q     Approximately how many times?
 8        A     Twenty-five, 30, maybe more.
 9        Q     Not surprising given your long
10   career with the New York City Police
11   Department --
12        A     Yes.
13        Q     -- but did any of those court
14   appearances -- were any of those court
15   appearances as a representative of Major League
16   Baseball?
17        A     I think I made one appearance --
18   one appearance for Major League Baseball, yes.
19        Q     And did that appearance involve
20   sports gambling?
21        A     No.
22        Q     Now, I think there should be
23   somewhere on the table in there a copy of what's
24   been previously marked as Major League Baseball
25   Exhibit 1.
```

```
                                              Page 20
 1                  D. MULLIN
 2              Mr. Mullin, this is the 30(b)(6)
 3   notice to Major League Baseball.
 4              Have you seen this document before
 5   today?
 6        A     Yes.
 7        Q     Did you review that document in
 8   preparation for your deposition today?
 9        A     Yes.
10        Q     Now, I want to direct your
11   attention to -- there is a list of topics, I
12   think there's a list of five topics upon which
13   the 30(b)(6) designees are to testify, and I
14   just want to direct your attention to the first
15   two.
16        A     Okay.
17        Q     Now, are you prepared today to
18   testify as one of Major League Baseball's
19   designees on the first topic, which is Major
20   League Baseball's alleged standing to seek
21   relief in this action?
22        A     Yes.
23        Q     And do you understand what the
24   term "standing" means?
25        A     I do.
```

```
                                              Page 21
 1                D. MULLIN
 2        Q    What does that term mean to you?
 3        A    We have to be impacted in some
 4   way. We have to be impacted in some way by the
 5   possible passage of the law.
 6        Q    Are you also prepared today to
 7   testify as one of Major League Baseball's
 8   designees on the second topic, which is Major
 9   League Baseball's allegation that Major League
10   Baseball and/or one of Major League Baseball's
11   member teams will be irreparably harmed by the
12   New Jersey gambling law?
13        A    Yes.
14             MS. LENT: I'm going to object to
15        the form. You could read the topic, but
16        you inserted a lot of new words into
17        that topic.
18             MR. HOFFMAN: Sure, let me
19        rephrase.
20        Q    Are you prepared to testify as
21   Major League Baseball's designee on the second
22   topic, which is the allegation that you, meaning
23   Major League Baseball, and/or your, Major League
24   Baseball's member teams, will be irreparably
25   harmed by the New Jersey gambling law?
```

```
                                              Page 22
 1                D. MULLIN
 2             MS. LENT: I have the same
 3        objection. That's not what number two
 4        says. And in fact, I think the court --
 5             MR. HOFFMAN: You can answer.
 6             MS. LENT: I'm sorry.
 7             In fact, I think the court
 8        specifically stated that the 30(b)(6)
 9        deponents would not be testifying about
10        irreparable harm.
11             MR. HOFFMAN: Okay. Well, let's
12        do it this way.
13        Q    Are you prepared today,
14   Mr. Mullin, to testify about Major League
15   Baseball's alleged harm by the New Jersey
16   gambling law?
17             MS. LENT: I'm going to object
18        again.
19             I mean, number two says "the
20        impact or potential impact of sports
21        gambling," and it goes on. It's a
22        specific -- there is specific language
23        right here in front of us, so I don't
24        know why you're trying to paraphrase it.
25        You could just read it.
```

```
                                              Page 23
 1                D. MULLIN
 2             MR. HOFFMAN: Okay. I thought
 3        that was deposition topic number three,
 4        but -- do I have an old version of this?
 5             MS. LENT: You must. You must.
 6        What we're looking at --
 7             MR. HOFFMAN: My apologies.
 8             MS. LENT: -- is different.
 9        Q    Mr. Mullin, are you prepared to
10   testify as Major League Baseball's designee on
11   Major League Baseball's -- the impact or
12   potential impact of sports gambling on Major
13   League Baseball?
14        A    Yes.
15        Q    Now, you understand this means
16   that you must testify about information known or
17   reasonably available to Major League Baseball on
18   these topics; correct?
19        A    Yes.
20        Q    Other than conversations with
21   counsel, what did you do today to prepare for
22   your deposition?
23        A    Just reviewed some notes.
24        Q    And what notes were those?
25        A    I looked at the notes from our
```

```
                                              Page 24
 1                D. MULLIN
 2   recent gambling seminar.
 3        Q    Do you know if those notes were
 4   produced in this litigation?
 5        A    I believe they were.
 6        Q    Did you review any other
 7   documents, other than the notes you just
 8   referred to, in preparation for today's
 9   deposition?
10        A    No.
11        Q    Did you speak to anyone other than
12   counsel?
13        A    Well, both counsel -- I spoke to
14   in-house counsel also, Tom Ostertag, and Chris
15   Brumm.
16        Q    Other than your outside counsel
17   and your in-house counsel, did you speak to
18   anyone else about today's deposition?
19        A    No.
20        Q    Now, in terms of preparation for
21   today's deposition, did you find any studies by
22   Major League Baseball regarding the impact of
23   sports gambling on Major League Baseball?
24        A    No.
25        Q    Do you know if Major League
```

Page 25

```
 1                    D. MULLIN
 2   Baseball or the Department of Investigations has
 3   conducted any studies regarding the impact of
 4   sports gambling on Major League Baseball?
 5        A    No.
 6        Q    Has Major League Baseball or the
 7   Department of Investigations conducted any
 8   studies regarding the impact or potential impact
 9   of New Jersey's sports wagering law on Major
10   League Baseball?
11        A    No.
12        Q    Mr. Mullin, how would you define
13   sports gambling?
14        A    On a wide definition, it's betting
15   on any sporting event; baseball, football,
16   hockey, college -- college athletics, horse
17   racing, rugby, soccer.  Broad definition, any
18   sporting event at all.
19        Q    Is part of your definition, I
20   assume, then, a wager on an outcome of a game
21   would be considered sports gambling?
22        A    Yes.
23        Q    What about a wager on something
24   other than the outcome of the game?  For
25   example, a wager about whether a particular
```

Page 26

```
 1                    D. MULLIN
 2   player has more hits in a game than a player on
 3   the opposing team?  If one were to make that
 4   sort of wager, which isn't directly on the
 5   outcome of the game, would you consider that to
 6   be part of the definition of sports gambling?
 7        A    I would.
 8        Q    Now, Mr. Mullin, I'll represent to
 9   you that during his deposition Mr. Ostertag
10   stated that you, as the head of the Department
11   of Investigations, may have a good idea of how
12   much legal sports gambling occurs in Las Vegas.
13             Do you know how much legal sports
14   gambling occurs in Las Vegas?
15        A    Approximate amounts.  I think on
16   baseball it's somewhere between 300 and
17   $400 million.
18        Q    And where do those figures come
19   from?
20        A    From Las Vegas industry groups.
21        Q    When you say "Las Vegas industry
22   groups," what do you mean?
23        A    Well, it comes from a combination.
24   At the recent seminar, we had the FBI there, we
25   had the Las Vegas Gaming Board, we had a
```

Page 27

```
 1                    D. MULLIN
 2   representative from MGM Sports Book, so that's a
 3   number that they used and agreed upon.  It's an
 4   approximation, but that seems to be a number
 5   that the industry agrees on.
 6        Q    And does Major League Baseball or
 7   the Department of Investigations have any of
 8   their own studies regarding how much sports
 9   gambling on Major League Baseball games occurs
10   in Las Vegas?
11        A    No.
12        Q    Now, have these Las Vegas industry
13   groups ever assisted Major League Baseball in
14   identifying gambling incidents?
15        A    No.
16        Q    Does Major League Baseball's
17   Department of Investigations have any contacts
18   in Las Vegas for that purpose?
19        A    No.
20        Q    Now, I'm paraphrasing, but I
21   believe Mr. Ostertag testified in his deposition
22   that the Department of Investigations will
23   sometimes get a call or a tip from a legal
24   sports book in Nevada, but there's no formal
25   arrangement.
```

Page 28

```
 1                    D. MULLIN
 2             Would that be accurate?
 3             MS. LENT:  Object to the form.  I
 4        don't think the witness has seen his
 5        testimony.
 6             MR. HOFFMAN:  Okay.
 7             MS. LENT:  You can answer if you
 8        understand.
 9             MR. HOFFMAN:  You can answer.
10        A    Could you ask again?
11        Q    Sure.  Let me ask it this way.
12             My understanding is that the
13   Department of Investigation does not have a
14   formal arrangement with legal sports books in
15   Nevada regarding tips.  Is that fair?
16        A    That's fair, yes.
17        Q    Does the Department of
18   Investigations ever get a call or a tip from a
19   legal sports book in Nevada?
20        A    We have not.
21        Q    Mr. Mullin, do you know how much
22   legal sports gambling on Major League Baseball
23   games occurs in the United States?
24        A    Legal?
25        Q    Legal.  Yes, legal.
```

D. MULLIN

2 A  I imagine it's very close to the
3 number I cited before, because Vegas is the only
4 state where that -- sports gambling is legal.
5   Q  Now I'm going to switch gears a
6 little bit, I'm going to talk about illegal
7 sports gambling.  Okay?
8   A  Yes.
9   Q  Do you, Mr. Mullin, as the head of
10 the Department of Investigations, know how much
11 illegal sports gambling occurs in New Jersey?
12   A  I don't.
13   Q  Does the Department of
14 Investigations have any studies or surveys
15 regarding how much illegal sports gambling
16 occurs in New Jersey?
17   A  Studies, no, I do not.
18   Q  Does the Department of
19 Investigations have any estimate regarding how
20 much illegal sports gambling occurs in New
21 Jersey?
22   A  Based on anecdotal knowledge or on
23 a study -- I don't have anything based on a
24 study.  But based upon prosecutions and
25 indictments like the one that occurred last

D. MULLIN

2 month, I would say hundreds of millions of
3 dollars.
4   Q  In terms of illegal sports
5 gambling in New Jersey, which you just referred
6 to as being in the hundreds of millions of
7 dollars, does the Department of Investigations
8 have any sense of whether illegal sports
9 gambling in New Jersey is larger than legal
10 sports wagering in Nevada?
11     MS. LENT:  Object to the form.
12     You can answer.
13   A  Well, I think -- I think any study
14 you read, any expert would tell you that the
15 percentage of illegal gambling is greater than
16 the percentage of legal gambling.
17   Q  And is that true for -- I'm
18 focusing here just on New Jersey.  Would that be
19 true for the State of New Jersey as compared to
20 the State of Nevada?  And what I mean by that is
21 the amount of illegal sports gambling in New
22 Jersey that currently goes on as compared to the
23 amount of legal sports gambling in Nevada.
24   A  You're asking me to compare Nevada
25 to New Jersey?

D. MULLIN

2   Q  I'm asking you to compare -- if
3 you have any estimate or any basis for any
4 estimate comparing the amount of illegal sports
5 gambling that currently is going on in New
6 Jersey as compared to the amount of legal sports
7 gambling going on in Nevada.
8   A  I couldn't quantify it other than
9 to say that, again, any study would indicate
10 that the percentage of illegal gambling is
11 higher than the percentage of legal gambling.
12 So taking into consideration per capita and the
13 size of the state, I could say generally that
14 there is more illegal gambling -- higher amount
15 of illegal gambling than there is --
16 number-wise -- than there is legal in Las Vegas.
17   Q  Now, you mentioned that your
18 estimates of illegal sports gambling in New
19 Jersey are based on anecdotal evidence,
20 including some of the criminal investigations
21 that you referred to.
22     Is that estimate based on anything
23 else?
24   A  Such --
25     MS. LENT:  I'm going to object to

D. MULLIN

2 the form.  I think it misstates his
3 testimony a little bit.
4   Go ahead.
5   A  Such as?  Could you repeat it?
6   Q  Sure.  I'm just looking for -- I
7 know you referred to your estimate of illegal
8 sports gambling in New Jersey as being in the
9 hundreds of millions of dollars, and I believe
10 you testified that that was based on anecdotal
11 evidence regarding a number of criminal
12 investigations in New Jersey.
13   Is that fair?
14   A  Yes.
15   Q  My question is, aside from that
16 anecdotal evidence, any other basis for the
17 estimate of hundreds of millions of dollars of
18 illegal sports gambling in New Jersey?
19   A  No.
20   Q  Now, I'm going to focus beyond New
21 Jersey and focus now on illegal sports gambling
22 in the United States as a whole.
23   Okay?
24   A  Yes.
25   Q  Does the Department of

Page 33

```
 1                D. MULLIN
 2   Investigations have any studies or surveys
 3   regarding how much illegal sports gambling
 4   occurs in the United States as a whole?
 5        A    No.
 6        Q    Does the Department of
 7   Investigations have any estimate of how much
 8   illegal sports gambling occurs in the United
 9   States as a whole?
10        A    It's -- there is no exact number
11   on that. I mean, I think people cite, you know,
12   anywhere from ten to 50 times the legal volume,
13   but, no, I don't have any information based on a
14   study.
15        Q    The numbers that the -- the size
16   of the illegal sports gambling market in the
17   United States is ten to 50 times higher than the
18   legal sports gambling market in the United
19   States, where did you derive those numbers?
20        A    Well, there are multiple sources.
21   It's not an exact science, no one knows for sure
22   what the volume of illegal sports gambling is,
23   but experts have estimated that illegal gambling
24   is significantly higher than legal gambling, and
25   that's some of the numbers that are cited from
```

Page 34

```
 1                D. MULLIN
 2   law enforcement sources.
 3        Q    So when you referred to the
 4   experts estimated the size of the illegal sports
 5   gambling market, what are you referring to?
 6        A    Well, the FBI, other law
 7   enforcement sources. Again, it's an estimate
 8   because no one knows for sure.
 9        Q    And do you have any reason to
10   disagree with those estimates?
11        A    I can't say with certainty that
12   they're accurate or not. I have no information
13   to disagree with it, no. But I also have no
14   information to say that they're accurate. I
15   just don't know.
16        Q    Now, Mr. Mullin, do you know how
17   much legal sports gambling on Major League
18   Baseball games --
19             MR. HOFFMAN: Let me withdraw the
20        question, let me restate.
21        Q    Do you know how much legal sports
22   gambling on Major League Baseball games would
23   increase in the United States if New Jersey
24   implements its sports wagering law?
25        A    I think it would increase. By
```

Page 35

```
 1                D. MULLIN
 2   what percentage, I couldn't say.
 3        Q    And what do you base your
 4   statement that the amount of legal sports
 5   gambling would increase on?
 6        A    Could you repeat the -- the amount
 7   of legal sports gambling?
 8        Q    Sure. That was a poor question.
 9             Your testimony was that you
10   thought that legal sports gambling on Major
11   League Baseball games would increase in the
12   United States if New Jersey implements its
13   sports wagering law; correct?
14        A    Yes.
15        Q    And my question is, what is the
16   basis for that belief?
17        A    Well, if you look at the universe
18   of people that legally bet on baseball, that
19   occurs now only in Las Vegas, and if you add a
20   second state, New Jersey, where you could now
21   bet legally on baseball, I think it's a valid
22   assumption that the numbers of legal baseball
23   gamblers would increase.
24        Q    Other than your assumption,
25   anything else you're basing that on?
```

Page 36

```
 1                D. MULLIN
 2        A    No.
 3        Q    Slightly different question. Does
 4   the Department of Investigations know how much
 5   total sports gambling -- and when I say "total
 6   sports gambling" I mean legal and illegal sports
 7   gambling combined -- would increase in the
 8   United States following the implementation of
 9   New Jersey's sports gambling law?
10             MS. LENT: Objection,
11        hypothetical.
12             Go ahead.
13        A    I could say it would absolutely
14   increase. I can't give you a percentage.
15        Q    And again, what is the basis for
16   that belief?
17        A    Well, my experience with gamblers
18   is there are some subsector gamblers that
19   exclusively gamble legally, and I think you'd
20   recruit new gamblers who would have the
21   opportunity to gamble legally on sports. But I
22   think it's also far more common that the lines
23   are blurred, that you have people that bet
24   legally and illegally.
25             For example, I mentioned the club
```

Page 37

1            D. MULLIN
2  employee.  He bet substantial amounts of money
3  legally at race tracks, for example, but then he
4  also bet substantial amounts of money illegally.
5  I think there comes a point, when people gamble
6  a lot, that they do both.  So I think that
7  someone that would start with strictly legal
8  gambling, I think a percentage of those would
9  then also become illegal gamblers.
10      Q    Anything else upon which you base
11  that assertion other than your experience?
12      A    No.  Other than, I mean, I have
13  read studies that say sports gambling is a
14  gateway to other types of gambling.
15      Q    As you sit here today, do you know
16  the titles of any of those studies?
17      A    There was a government study, it
18  might have been the National Commission on the
19  Impact of Compulsive Gambling, I don't remember
20  the exact title.  That's one of them.  But
21  there's certainly more than one that have found
22  that sports gambling is a gateway to other kinds
23  of gambling.
24      Q    Does the Department of
25  Investigations have any studies of how much

Page 38

1            D. MULLIN
2  total sports gambling, both legal and illegal,
3  on Major League Baseball games would occur in
4  the United States if New Jersey's sports
5  gambling law is implemented?
6      A    No.
7      Q    Now, the same question, but --
8           MR. HOFFMAN:  Let me withdraw.
9      Q    Does the Department of
10  Investigations have any studies of how much
11  total sports gambling on Major League Baseball
12  games would occur in the United States if all
13  states were to legalize sports gambling?
14      A    No.
15      Q    Mr. Mullin, if New Jersey
16  implements its sports gambling law, what harm
17  are you alleging will occur to Major League
18  Baseball?
19      A    Well, certainly for one, the
20  danger of compromised outcomes of game fixing,
21  of unethical behavior, would increase.
22      Q    And any other harms?
23      A    And let me just -- maybe I could
24  explain that more completely.
25           You've asked a lot of questions

Page 39

1            D. MULLIN
2  about game fixing and, you know, outcome of the
3  game, but I'm also very concerned in my capacity
4  about lesser things that might impact the
5  integrity of a game.
6           For example, with baseball
7  wagering, a lot of baseball wagering, the
8  pitcher, for example -- who the starting pitcher
9  is is very important to how people wager in a
10  baseball game, so information about that pitcher
11  is valuable.  A person like a clubhouse manager
12  who has a gambling addiction, him supplying
13  information to gamblers about whether a
14  pitcher's arm is hurt so he's not feeling his
15  best, or he was out late night the before,
16  that's information that's extremely valuable to
17  gamblers.  That might not be game fixing per se,
18  but it's involvement in illegal gambling that
19  affects the integrity of the game, and that's
20  certainly what I'm concerned about.
21      Q    Other than the danger of game
22  fixing increasing and an increase in providing
23  what I'll call inside information, any other
24  harms?
25      A    Yeah, I think baseball more so

Page 40

1            D. MULLIN
2  than any other sport is tradition and devotion
3  to teams.  If you go to certain cities -- if you
4  go to St. Louis on opening day and see 50,000
5  people dressed in red, third or fourth
6  generation Cardinals fans, it's all about the
7  Cardinals.  When people become heavily involved
8  in sports gambling, their loyalty to their team
9  fades and they're more interested in winning
10  their bet than having their team win.  So I
11  think there's a danger that the tradition of
12  baseball could be adversely affected.
13      Q    So you've mentioned the risk of
14  game fixing, inside information and what I'll
15  call the potential diminishment of fan loyalty.
16  Any other harms?
17      A    Well, I think -- and I think fan
18  loyalty could translate into lower ticket sales,
19  fewer games being watched, so lower broadcast
20  numbers.  The more you diminish that passionate
21  fan loyalty, I think it has an effect on ticket
22  sales, broadcast viewership, team gear, wearing
23  hats and shirts; I think it impacts all those
24  things.
25      Q    So in terms of a potential

```
                                            Page 41
 1                    D. MULLIN
 2   diminishment of fan loyalty, what I hear you're
 3   saying is that could have a financial impact on
 4   Major League Baseball; correct?
 5        A      Correct.
 6        Q      So aside from the harms you've
 7   just testified to, any other harms?
 8        A      Well, just to expand on the first
 9   point, I think when gamblers become involved in
10   sports -- organized crime is extensively
11   involved in gambling, and people in organized
12   crime, in my experience, don't limit themselves
13   to one kind of crime.  Organized criminals are
14   involved in gambling and prostitution and any
15   kind of corrupt behavior you can think of.  So
16   whenever you increase the risk that -- when you
17   increase the risk of more gambling, you
18   encourage organized crime behavior, and
19   organized criminals bring with them all that
20   other bad behavior.
21        Q      Any other harms that you haven't
22   already mentioned?
23               MS. LENT:  I'm going to object,
24          that's a little vague.
25               Could you just be more specific in
```

```
                                            Page 42
 1                    D. MULLIN
 2          the question you're asking him?
 3               MR. HOFFMAN:  Sure.
 4        Q      Other than the harms that you've
 5   already testified to, is Major League Baseball
 6   alleging any other harm as the result of New
 7   Jersey implementing its sports gambling law?
 8               MS. LENT:  Object, that calls for
 9          a legal conclusion to the extent you're
10          asking him what we're alleging.
11               I think you can talk about how it
12          might impact Major League Baseball, but
13          he doesn't necessarily need to be
14          talking about our allegations.
15               MR. HOFFMAN:  Sure.  I can
16          restate.
17               MS. LENT:  Okay.
18        Q      Other than the impacts on Major
19   League Baseball that you've already testified
20   to, Mr. Mullin, any other impact to Major League
21   Baseball as a result of the implementation of
22   New Jersey's sports gambling law?
23        A      I think some -- it would invite
24   some skepticism about the results.  I think,
25   going back to baseball's tradition, people have
```

```
                                            Page 43
 1                    D. MULLIN
 2   such faith in the legitimacy in the outcome of
 3   games, I think the more gambling there is, the
 4   more fans would call into question umpires'
 5   calls and errors and strike-outs, thinking that
 6   there was some nefarious reason why things
 7   happened the way they did.
 8        Q      Any other impact that you haven't
 9   already testified about?
10        A      No.
11        Q      I'm going to try to break that
12   apart and let's talk about those.
13               I think the first one you talked
14   about, the danger of an increase of game fixing,
15   does the Department of Investigations know how
16   much game fixing on Major League Baseball occurs
17   in the United States?
18        A      In Major League Baseball?  Game
19   fixing on Major League Baseball?
20        Q      Correct.
21        A      None.
22        Q      Have there been any incidents of
23   game fixing in Major League Baseball since the
24   1919 Black Sox incident?
25        A      Not that I'm aware of.
```

```
                                            Page 44
 1                    D. MULLIN
 2        Q      Does the Department of
 3   Investigations have any studies or surveys of
 4   how much game fixing on Major League Baseball
 5   games would occur in the United States if New
 6   Jersey implemented its sports wagering law?
 7        A      No.
 8        Q      Does the Department of
 9   Investigations have any estimate of how much
10   game fixing on Major League Baseball games would
11   occur in the United States if New Jersey
12   implemented its sports wagering law?
13        A      No.
14        Q      I'm going to talk a little bit
15   about the last impact you talked about in your
16   list, which was, I think, skepticism -- public
17   skepticism about the results of Major League
18   Baseball games, or another way to put that would
19   be an increased public perception that game
20   fixing is going on; is that fair?
21               MS. LENT:  Object to the form.
22               Go ahead.
23        A      If I could, you keep on talking
24   narrowly about game fixing, but I would say for
25   us there are other issues.  You mentioned
```

```
                                          Page 45
 1                  D. MULLIN
 2    yourself before that there are different kinds
 3    of sports wagering, for example, betting on the
 4    number of hits a batter gets in a game, the
 5    number of hits a pitcher gives up in a game.
 6    There are all kinds of creative ways to gamble,
 7    and you can affect what happens in the game
 8    without necessarily affecting the outcome of the
 9    game.  So we're also concerned about that.  So
10    it's not just narrowly the game being fixed so
11    the outcome is different, there are things that
12    can happen within the game that affects a better
13    outcome that aren't necessarily a fix.
14         Q    Okay.
15         A    So my interest is a little bit
16    more broad.
17         Q    Understood.
18              Does the Department of
19    Investigations believe that New Jersey's sports
20    gambling law will lead to an increased public
21    perception that game fixing and other gambling
22    activities are occurring in Major League
23    Baseball?
24              MS. LENT:  Objection, vague.
25              Go ahead.
```

```
                                          Page 46
 1                  D. MULLIN
 2         A    Could you repeat it?  I'm sorry.
 3         Q    Sure.
 4              MR. HOFFMAN:  Actually, if the
 5         court reporter could read the question
 6         back.
 7              (Record read)
 8         A    Yes, I do.
 9         Q    And what is the basis for that
10    belief?
11         A    Well, with the widespread
12    knowledge that people are gambling on baseball,
13    I think necessarily people with that knowledge
14    would then call into question the results
15    because they know that people have a financial
16    stake in what's happening, a gambling stake in
17    what's happening.
18         Q    Does the Department of
19    Investigations have any studies of the public
20    perception of Major League Baseball regarding
21    game fixing or other gambling activities?
22         A    No.
23         Q    Now, do you believe that a
24    perception that game fixing is going on in Major
25    League Baseball already exists for some portion
```

```
                                          Page 47
 1                  D. MULLIN
 2    of the public?
 3         A    Not that I'm aware of.
 4         Q    Does the Department of
 5    Investigations have any estimate of what portion
 6    of the public would have a perception that Major
 7    League Baseball games are being fixed if New
 8    Jersey implements its sports gambling law?
 9              MS. LENT:  Objection.  I think
10         that's been asked and answered.
11              But you could try.
12         A    I don't.
13         Q    I think you referred to fan
14    loyalty earlier, and that you believe that the
15    implementation of New Jersey's sports gambling
16    law will damage the bonds of loyalty between
17    fans and teams.
18              Is that correct?
19         A    Yes.
20         Q    What is the basis for that belief?
21         A    Well, I think if you look at our
22    fans -- again, I'll use the Cardinals as an
23    example, but there are other teams -- it's a
24    generational thing, it's something they're born
25    with and they're loyal to that team no matter
```

```
                                          Page 48
 1                  D. MULLIN
 2    what.  The best fans are fans of their team even
 3    when the team is terrible, but I think once
 4    winning a wager becomes more important, rather
 5    than being blindly loyal to your team, whether
 6    they're good or bad, whether they win or lose,
 7    winning a wager becomes more important.  So if
 8    betting against your team, even though they're
 9    your team, is a better way to win, I think some
10    percentage of fans will do that.
11         Q    Mr. Mullin, what evidence do you
12    have as the basis for that belief?
13         A    Well, I know my interaction with
14    gamblers.  Gamblers care about winning.  If you
15    see gamblers that watch professional football,
16    their only interest in the outcome is whether
17    they win their bet or not.
18         Q    Gamblers who only care about
19    winning a bet, would you consider them to be
20    fans?
21         A    Would I consider them to be fans?
22    I guess if you enjoy watching the game, if
23    you're watching a game -- not my kind of fan,
24    but I guess they are a fan of some sort, yes.
25    My kind of fan is a 70-year-old lady who has
```

Page 49

D. MULLIN

been to her fiftieth Cardinals opening day;
that's my kind of fan.

Q  Is it possible, Mr. Mullin, that a fan could have both loyalty to his team and also want to win a bet?

MS. LENT: Objection. Object to the form.

A  Is that possible? Yes.

Q  Do you have any estimate of how many people who gamble on Major League Baseball are avid fans of Major League Baseball?

A  I don't.

MS. LENT: Matt, can we take a break?

MR. HOFFMAN: Sure.

(Recess taken)

BY MR. HOFFMAN:

Q  Has Major League Baseball conducted any research about why fans watch Major League Baseball games?

A  I can't -- not that I'm aware of.

MS. LENT: I'm going to object that that's outside the scope of the 30(b)(6).

Page 50

D. MULLIN

Q  Does Major League Baseball know what percentage of its fans watch games because they have a wager on a game?

A  I don't.

Q  Does Major League Baseball take any steps to discourage its fans from watching Major League Baseball games because of gambling interests?

A  No.

Q  Now, earlier we talked about a couple of investigations during your time as head of the Department of Investigations.

Are there any other gambling incidents that you've investigated during your time at the Department of Investigations that we have not already discussed today?

A  Yes.

Q  And how many additional investigations involving gambling are there that we have not discussed today?

A  Six or seven.

Q  Did any of those investigations involve allegations of game fixing or the provision of inside information?

Page 51

D. MULLIN

A  No.

Q  Can you tell me generally what those investigations were about?

A  One involved a Major League player who was in debt to an offshore online gambling site for a substantial amount of money.

Q  You mentioned six or seven investigations. Can you tell me generally what the other investigations were about?

A  The other one involved -- the other ones involved -- all involved Major League players who had associations with gamblers who had organized crime ties that we were concerned about.

Q  During your time at the Department of Investigations have any of your investigations involved legal gambling?

A  Only to the extent it came up in the context of a bigger investigation. For example, with the clubhouse manager I mentioned, he did some legal gambling, so his legal gambling activities came up in the context of the bigger investigation, but not an investigation solely focused on legal gambling,

Page 52

D. MULLIN

no.

We also have -- one I could -- I'll retract that. One I can think of, we did investigate legal gambling, is we do background checks on about 30 club employees per year for people with significant positions, and as part of that we do a financial background, and one of the things we look for is anomalies where a debt-to-credit ratio isn't supported by income. So we identified, I guess, three employees that had gambling problems based on the fact that they -- again, their debt-to-income was a red flag. And all three of those cases that come to mind, they were involved with legal gambling, just got over their heads.

Q  Is Major League Baseball relying on the specific investigations you've discussed today during your time at the Department of Investigations in support of its allegations that Major League Baseball would be impacted by New Jersey's sports gambling law?

MS. LENT: Objection. That calls for a legal conclusion. The witness is here to testify about facts, not the

Page 53

```
 1                D. MULLIN
 2      positions that the lawyers are taking in
 3      the case.
 4         Q    Let me ask it this way,
 5  Mr. Mullin.  In terms of the impact that you
 6  think the New Jersey sports gambling law will
 7  have on Major League Baseball, is your belief
 8  based upon the investigations you've conducted
 9  in your role as the head of the Department of
10  Investigations?
11         A    It's based on both.  It's based
12  upon my role as head of the Department of
13  Investigations, but also my law enforcement
14  career.
15         Q    To your knowledge, Major League
16  Baseball has not performed any studies regarding
17  the impact or potential impact of legalized
18  sports gambling in New Jersey on Major League
19  Baseball; correct?
20             MS. LENT:  Objection, asked and
21      answered.
22             Go ahead.
23         A    No.
24         Q    And to your knowledge, Major
25  League Baseball has not performed any studies
```

Page 54

```
 1                D. MULLIN
 2  regarding the impact or potential impact of
 3  legalized sports gambling in any state on Major
 4  League Baseball; correct?
 5         A    Correct.
 6             MR. HOFFMAN:  I have no further
 7      questions.
 8             MS. LENT:  I have no questions.
 9             Thanks.
10             THE WITNESS:  Thanks.
11             (Time noted: 2:35 p.m.)
12
13         _____
14             DANIEL T. MULLIN
15
16  Signed and subscribed to before me
17  this _____ day of _____, 2012.
18
19  _____
20             Notary Public
21
22
23
24
25
```

Page 55

```
 1
 2              C E R T I F I C A T E
 3
 4         I, HELEN MITCHELL, a Shorthand
 5    Reporter and Notary Public, do hereby
 6    certify:
 7         I reported the proceedings in the
 8    within-entitled matter, and that the
 9    within transcript is a true record of
10    such proceedings.
11         I further certify that I am not
12    related, by blood or marriage, to any of
13    the parties in this matter and that I am
14    in no way interested in the outcome of
15    this matter.
16         IN WITNESS WHEREOF, I have
17    hereunto set my hand this 21st day
18    of November, 2012.
19
20    _____
21             HELEN MITCHELL
22
23
24
25
```

Page 56

```
 1
 2  November 19, 2012
 3              I N D E X
 4  WITNESS              EXAMINATION BY          PAGE
 5  DANIEL T. MULLIN     Mr. Hoffman              3
 6
 7     REFERENCE TO PREVIOUSLY MARKED EXHIBITS
 8  EXHIBIT                  PAGE   LINE
 9  MLB Exhibit 1             19     22
```

```
                                              Page 57
 1                    ERRATA SHEET
                VERITEXT REPORTING COMPANY
 2                   1250 BROADWAY
                 NEW YORK, NEW YORK 10001
 3                   800-362-2520

 4   CASE: NCAA VS. CHRISTIE
     DEPOSITION DATE: NOVEMBER 19, 2012
 5   DEPONENT:  DANIEL T. MULLIN

 6   PAGE LINE(S)    CHANGE              REASON

 7   ____|_____|_____|_____

 8   ____|_____|_____|_____

 9   ____|_____|_____|_____

10   ____|_____|_____|_____

11   ____|_____|_____|_____

12   ____|_____|_____|_____

13   ____|_____|_____|_____

14   ____|_____|_____|_____

15   ____|_____|_____|_____

16   ____|_____|_____|_____

17   ____|_____|_____|_____

18   ____|_____|_____|_____

19   ____|_____|_____|_____

20

21             _____
                      DANIEL T. MULLIN
22
     SUBSCRIBED AND SWORN TO BEFORE ME
23   THIS _____ DAY OF _____, 20___.

24
     _____    _____
25   (NOTARY PUBLIC)         MY COMMISSION EXPIRES:
```