# Exhibit 7

*** HIGHLY CONFIDENTIAL ***

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

Civil Action No. 3:12-cv-04947-MAS-LHG
----------------------------------x

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, an unincorporated association; NATIONAL BASKETBALL ASSOCIATION, a joint venture; NATIONAL FOOTBALL LEAGUE, an unincorporated association; NATIONAL HOCKEY LEAGUE, an unincorporated association; and OFFICE OF THE COMMISSIONER OF BASEBALL, an unincorporated association, doing business as MAJOR LEAGUE BASEBALL,

Plaintiffs,

-against-

CHRISTOPHER J. CHRISTIE, Governor of the State of New Jersey; DAVID L. REBUCK, Director of the New Jersey Division of Gaming Enforcement and Assistant Attorney General of the State of New Jersey; and FRANK ZANZUCCKI, Executive Director of the New Jersey Racing Commission,

Defendants.

----------------------------------x

200 Park Avenue
New York, New York

November 15, 2012
9:35 a.m.

30(b)(6) DEPOSITION OF
NATIONAL BASKETBALL ASSOCIATION
and its Representative
RICHARD W. BUCHANAN

30(b)(6) DEPOSITION of NATIONAL BASKETBALL ASSOCIATION, and its Representative RICHARD W. BUCHANAN, taken by the Defendants, held at the aforementioned time and place, before Sherri Flagg, a Registered Professional Reporter, Certified LiveNote Reporter, and Notary Public.

A P P E A R A N C E S:

Attorneys on Behalf of Plaintiff(s):

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
Four Times Square
New York, New York 10036
BY: JEFFREY A. MISHKIN, ESQ.
jeffrey.mishkin@skadden.com
KAREN HOFFMAN LENT, ESQ.
karen.lent@skadden.com

Attorneys on Behalf of Defendant(s):

GIBSON DUNN & CRUTCHER,
333 South Grand Avenue
Los Angeles, California 90071-3197
BY: MATTHEW A. HOFFMAN, ESQ.
mhoffman@gibsondunn.com
TIMOTHY LOOSE, ESQ.
tloose@gibsondunn.com
WILLIAM E. WEGNER, ESQ.
wwegner@gibsondunn.com

ALSO PRESENT:

Daniel J. Spillane, NBA

HIGHLY CONFIDENTIAL - R. BUCHANAN

R I C H A R D W. B U C H A N A N,
first duly sworn/affirmed, was
examined and testified as follows:
EXAMINATION BY
MR. HOFFMAN:
Q. Good morning, Mr. Buchanan. My name is Matt Hoffman. I represent the Defendants in this action. Can we get your full name for the record, please.
A. Sure. Richard William Buchanan.
Q. Now, Mr. Buchanan, you work for the National Basketball Association; is that correct?
A. Yes.
Q. And that is one of the Plaintiffs in this matter?
A. Yes.
Q. Okay. Today if I refer to the National Basketball Association as the NBA, you'll understand what I mean, I assume?
A. Yes.
Q. Okay. Mr. Buchanan, what is your current position at the NBA?

Page 5

HIGHLY CONFIDENTIAL - R. BUCHANAN

A. Executive vice president and general counsel.

Q. How long have you been executive vice president and general counsel of the NBA?

A. I think 12 years.

Q. And did you hold another position at the NBA before you held the position of executive vice president and general counsel?

A. Yes. I was senior vice president and assistant general counsel, I believe.

Q. And how long did you hold those positions?

A. Approximately five years.

Q. Well, let's start with your current position at the NBA. Can you generally describe what your job responsibilities are.

A. I am responsible for the legal affairs of the NBA. That includes matters relating to collective bargaining with players and referees, relates to competition matters, relates to litigation, legislation, team matters, arena matters. It's rather broad.

Q. Okay. Out of that list, I just want to ask you real briefly when you refer to

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 6

HIGHLY CONFIDENTIAL - R. BUCHANAN

competition matters, what are you referring to?

A. I was referring to matters relating to play on the court so playing rules, disciplinary matters, things of that sort.

Q. Okay. Do your job responsibilities include gambling education to both players and other employees?

A. Yes.

Q. And what does your job entail in that regard?

A. I should mention -- let me back up one. I should mention that my other job responsibility is chief compliance officer, and so underneath either that umbrella or my umbrella as general counsel, I am responsible for ensuring that all team and league employees, including players, referees, staff, are aware of our antigambling rules.

Q. Okay. And how long have you been chief compliance officer?

A. Two years.

Q. And I think we'll talk more about this a little bit later, but was that a

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 7

HIGHLY CONFIDENTIAL - R. BUCHANAN

position that was created after the Tim Donaghy incident?

A. It was.

Q. And so if you had it for two years, were you the very first chief compliance officer for the NBA?

A. I was not.

Q. Do you know who the first chief compliance officer was?

A. Yes. Her name was Kim Berger.

Q. And just what year was the chief compliance officer position initiated?

A. It was either late 2008 or early 2009.

Q. And did you take over for Kim Berger?

A. I did.

Q. Okay. And when was that?

A. That was 2010.

Q. Okay. In your role as chief compliance officer, are you also responsible or do you oversee the enforcement of your antigambling policies?

A. I do.

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 8

HIGHLY CONFIDENTIAL - R. BUCHANAN

Q. And --

A. I should say I -- I am responsible. I want to be -- I want to distinguish between overseeing and being responsible. There are others I report to at the NBA who would have involvement in enforcement of those rules.

Q. And who would you report to in terms of enforcement?

A. The Commissioner of the NBA.

Q. Do you work at the NBA's headquarters here in New York?

A. I do.

Q. Do you know who had the job of executive vice president and general counsel before you took over 12 years ago?

A. I do.

Q. And who was that?

A. Mr. Jeff Mishkin.

Q. Now, I assume that in your role as a chief compliance officer, you have a staff devoted to the education and enforcement of your antigambling policies; is that correct?

A. I do.

Q. Is there a name that you have for

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 9

HIGHLY CONFIDENTIAL - R. BUCHANAN

that particular staff?

A. No.

Q. Do you have any person who reports directly to you or ultimately reports to you that's primarily devoted to gambling?

A. I have -- I have at least one, two people whose jobs include focusing on gambling matters.

Q. Okay. And who are those people?

A. One of them is Dan Spillane, sitting down at the end of the table. And he is an attorney at the NBA and has a fairly broad portfolio, but one of his responsibilities is to focus on gambling-related matters.

There's another gentleman by the name of Steven Angel, who is a member of our basketball operations department but has a title as a deputy compliance officer and focuses on gambling matters also.

Q. And do both Mr. Spillane and Mr. Angel report to you on gambling matters?

A. Mr. Spillane does and he has a solid line to me. I would say Mr. Angel has a

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 10

HIGHLY CONFIDENTIAL - R. BUCHANAN

dotted line to me.

Q. And when you say dotted line, what do you mean?

A. I mean that his supervisor, his direct supervisor is our executive vice president of basketball operations, and so he functionally reports to me on the gambling matters.

Q. Mr. Buchanan, when did you first join the NBA?

A. 1993.

Q. Okay. And what position did you hold at that time?

A. Assistant general counsel.

Q. How long did you hold that position?

A. I'd say five years.

Q. And did your job responsibilities as -- you said the assistant general counsel?

A. Correct.

Q. Did your job responsibilities at that time include the NBA's antigambling policies?

A. I would say yes, although on a

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 11

HIGHLY CONFIDENTIAL - R. BUCHANAN

sporadic basis. In other words, I was an attorney on staff that was available to function on anything I was assigned by others to do, which would include if we had a gambling issue.

Q. So I'm sorry, you said in 1993 assistant general counsel; you said you held that position for approximately five years?

A. Correct.

Q. What was your next position?

A. Well, I believe it was the position I mentioned earlier which would have been -- let me give you the chronology as best I have it: 1993 assistant general counsel, sometime later vice president and assistant general counsel, probably 1998; senior vice president and assistant general counsel 2000; executive vice president general counsel 2010, added chief compliance officer.

Q. Got it. And real briefly, can you give me your educational background.

A. Amherst College graduate 1985, Harvard Law School graduate 1988.

Q. Have you had any special training

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 12

HIGHLY CONFIDENTIAL - R. BUCHANAN

regarding gambling -- or let me rephrase that.

Have you had any formal training regarding gambling?

A. I'm not sure what you mean.

Q. Have you attended any formal classes/seminars regarding gambling?

A. I'm just trying to think. I can't recall any.

Q. Have you personally conducted any research on gambling?

A. Sure.

Q. What kind of research?

A. Well, I've -- over the course of the time I've been at the NBA, I've read a fair amount of material related to gambling, whether that would be legal cases that have been reported or legislative history or studies that have been conducted or policy papers. I mean, I've been in this area for a while, so I'm sure I've read a fair amount of material on the subject.

Q. Have you published any papers yourself on gambling?

A. I have not.

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 13

HIGHLY CONFIDENTIAL - R. BUCHANAN

Q. Mr. Buchanan, have you been deposed before?

A. Yes.

Q. Approximately how many times?

A. Five.

Q. On those occasions were you deposed as a representative of the NBA?

A. I may have been. I don't -- they were all in connection with the NBA.

Q. Did any of those depositions involve the subject of gambling?

A. I don't believe so.

Q. Have you testified in court before?

A. I don't think so. Well, in court, I mean, I've certainly testified in arbitration proceedings.

Q. Okay. So you don't recall whether you've testified in court but you have testified in arbitration proceedings?

A. Correct.

Q. And approximately how many times?

A. Ten.

Q. And have any of those arbitration proceedings involved gambling?

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 14

HIGHLY CONFIDENTIAL - R. BUCHANAN

A. No.

Q. Mr. Buchanan, you understand that you're here today as the NBA's representative to testify about certain topics?

A. Yes.

Q. I'm going to show you what we're going to mark as NBA Exhibit 1.

(Exhibit 1: 30(b)(6) Notice of Deposition, was marked for identification.)

BY MR. HOFFMAN (continuing):

Q. Mr. Buchanan, have you seen this document before today?

A. Yes.

Q. Did you review this document in preparation for today's deposition?

A. I did.

Q. And are you prepared to testify as the NBA's designee on all of these topics?

A. Yes.

Q. And you understand that this means you must testify about information known or reasonably available to the NBA on these five topics?

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 15

HIGHLY CONFIDENTIAL - R. BUCHANAN

MR. MISHKIN: Object to the form of the question. You can answer.

A. I understand that I'm supposed to testify and be knowledgeable about these topics, and I am.

Q. Now, I'm not looking for any communications with your counsel. But what did you do to prepare for today's deposition?

A. I reviewed some documents, including this document that you just put in front of me, and the Complaint in this matter and materials that we produced in this matter. And I spoke to several individuals who have information about some of these topics.

Q. Okay. Can you tell me which individuals you spoke to, again, apart from counsel.

A. Sure. I spoke to Shirin Malkani, S-H-I-R-I-N, M-A-L-K-A-N-I, who is an attorney at the NBA but also in our business affairs group and has some -- has responsibility for our fantasy game agreement.

I spoke to Jason Kaufman, who is a director of market research at the NBA, and I

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 16

HIGHLY CONFIDENTIAL - R. BUCHANAN

also spoke to -- I spoke to Bill Koenig, K-O-E-N-I-G, who is our general counsel for NBA Properties. And I spoke to him about our rules regarding gambling-related sponsorships and promotions. And I also spoke to Mr. Spillane, who, as I mentioned, has responsibility for gambling-related matters.

Q. Okay. Anyone else?

A. Other than counsel, no.

Q. You did not speak to Commissioner Stern?

A. Well, I spoke to -- I didn't speak to Commissioner Stern as a matter of preparing for this deposition.

MR. MISHKIN: We're going to have to be a little careful there. I mean, Mr. Buchanan also does function as counsel.

Q. I understand. I'm not looking for any privileged communications.

A. Right.

Q. Other than the 30(b)(6) notice you have in front of you, the Complaint and materials that the NBA produced in this

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 17

HIGHLY CONFIDENTIAL - R. BUCHANAN

action, were there any other documents that you reviewed in preparation for today's deposition?

A. No.

Q. Now, Mr. Buchanan, you'll see that -- you said you looked it up before today. You'll see a number of those topics refer to sports gambling. What constitutes sports gambling in the NBA's view?

A. Sports gambling is placing a bet on the outcome of a professional or amateur sporting event with the result being that the bettor either wins money or loses.

Q. What about would you consider bets on supporting events that aren't on the outcome, that aren't a bet on the outcome of the game, to be sports gambling? For example -- let me give you an example. If you bet on whether a player on a certain team is going to score more points than a player on the opposing team, for example, would you consider that to be sports gambling?

A. I'm aware that there are things called proposition bets, and that is

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 18

HIGHLY CONFIDENTIAL - R. BUCHANAN

considered sports gambling.

Q. Okay. I'll ask you something about that in just a minute.

So you would agree with me that there are different types of sports bets?

A. Yes.

Q. Do you know what straight bets or line bets are?

A. I don't.

Q. Okay. If I use the term "straight bets" or "line bets" and I give the following definition, those are bets made against the spread or line which is a number assigned by bookmakers which handicaps one team and favors another, is that a fair definition in your knowledge of a line bet or straight bet?

A. Well, I understand what you mean to bet against a spread, so I understand what that is, yes.

Q. If I use the term "spread bets" then, would that be better?

A. That's fine.

Q. Okay. And I assume, based on your earlier definition, you would include spread

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 19

HIGHLY CONFIDENTIAL - R. BUCHANAN

bets as part of your definition of sports gambling?

A. Yes.

Q. Now, does the NBA oppose legal spread bets on sports?

A. The NBA opposes the -- any expansion of legalized sports betting in that way. We understand that spread bets, as you call them, currently are legal in Nevada, for example, and we oppose any further spread of legalizing those kind of bets.

Q. Okay. But you're not currently opposed to legal spread bets in Nevada?

A. I'm not really sure what the question means to be opposed to it in that context.

Q. Does the NBA have the position that spread bets in Nevada should be illegal versus legal?

MR. MISHKIN: I object to the form of the question.

A. Well, the NBA would prefer that there be no spread bets in Nevada on NBA games. If we were -- if we were able to make

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 20

HIGHLY CONFIDENTIAL - R. BUCHANAN

that so, there would be no spread bets anywhere. But as you know, I'm sure, as part of the passage of the federal law in 1992, those bets were permitted to go forward on a legal basis.

Q. Now, I think in your answer you referred to spread bets on NBA games. What is the NBA's position on legal spread bets on non-NBA games in Nevada?

A. We don't have a position on betting on other sports. That's for other sports to represent. Our core issue is betting on our games.

Q. Earlier you used the term yourself "proposition bets." So if we use that term today, would you understand that term to denote a bet made regarding the occurrence or nonoccurrence during a game of an event not directly affecting the game's final outcome?

A. I understand a proposition bet to be a bet that is based on some occurrence that's part of the game but not necessarily the actual outcome of who wins and who loses.

Q. Okay. So the example I gave

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 21

HIGHLY CONFIDENTIAL - R. BUCHANAN

earlier of betting on whether one player scores more points than a player on the opposing team or betting on which team will score first, those in your mind would be examples of proposition bets?

A. Yes.

Q. Does the NBA oppose legal proposition bets on sports?

A. Same answer as before.

Q. Which is you oppose the expansion of legal proposition bets, correct?

A. Correct. The NBA opposes the expansion of sports gambling in any of its forms, whether it's based on a spread, a proposition bet or of any other kind of sports gambling beyond what is currently legal in this country.

Q. But I assume, then, that your answer would be the same on proposition bets regarding whether the NBA has a position on legal proposition bets on non-NBA sports in Nevada?

A. Correct. We just -- that's -- we don't have a position there. Our core

212-267-6868 VERITEXT REPORTING COMPANY www.veritext.com 516-608-2400

Page 22

HIGHLY CONFIDENTIAL - R. BUCHANAN

position has to do with betting on our games.

Q. Mr. Buchanan --

A. I should say that I think it goes without saying that many of the concerns that we have about betting on our games and the reasons that we oppose that tend to be the same ones that other sports organizations have with regard to betting on their games. But those are concerns for them to articulate.

Q. Okay. Are you familiar with the concept of parlays?

A. Yes.

Q. And do you understand that parlays involve multiple bets that usually reward successful bettors with a substantially larger payout?

A. Well, I understand parlays to be wagers based typically, in the context of sports gambling, on multiple games as opposed to a single game. As to the payout, that -- I'm not really familiar with that. I understood that a -- I've understood that a parlay bet could return the same amount as a single game bet; it's simply that the parlay

212-267-6868 VERITEXT REPORTING COMPANY www.veritext.com 516-608-2400

Page 23

HIGHLY CONFIDENTIAL - R. BUCHANAN

bet requires you to pick multiple games as opposed to just one.

Q. And does the NBA oppose legal parlay bets on sports?

A. Same answer as before. We oppose the expansion of sports gambling in any of its forms including parlay bet.

Q. Does the NBA oppose legal parlay bets on NBA games in Canada?

A. Yes, we would oppose the expansion of that beyond what's legal now.

Q. But, again, you understand that parlay bets are legal in Canada?

MR. MISHKIN: Object to the form of the question.

A. Yes. And we -- and you're correct. And we have -- we have a -- we currently have a contractual agreement with the province of Ontario that prohibits that government from including NBA games in the parlay game that is authorized there.

Q. Okay. A few more gambling terms and then we'll move on. Are you familiar with the term "future wagers"?

212-267-6868 VERITEXT REPORTING COMPANY www.veritext.com 516-608-2400

Page 24

HIGHLY CONFIDENTIAL - R. BUCHANAN

A. I'm not.

Q. Okay. If I use the term "future wagers," I mean that to be a bet that generally has a long-term or a -- yeah, a long-term horizon measured in weeks or months. So, for example, if I bet on who I think is going to win the NBA championship before the season starts, if I use the term a future wager, would you understand that bet to be something that is -- an occurrence that's weeks or months in the future?

A. I will for purposes of the deposition. I understand that you can bet on who will win the NBA championship and you can place that bet early.

Q. And, again, same question: Does the NBA oppose legal future wagers on sports?

A. Same answer as before.

Q. Now, Mr. Buchanan, are you familiar with the term "odds"?

A. Sure.

Q. What does that term mean to you?

A. Well, it means a factor that is applied by the person taking the bet that

212-267-6868 VERITEXT REPORTING COMPANY www.veritext.com 516-608-2400

Page 25

HIGHLY CONFIDENTIAL - R. BUCHANAN

could result in additional compensation coming to the person wagering as a measure of the likelihood of whatever the outcome is.

So in the context of sports, two to one odds that some team is going to win means if you place $10 down, you'll get $20 if you're right.

Q. Okay. Now, in sports wagering, do you know if the odds lock at the time you place a bet? In other words, if you put your $10 down and the odds at the time you put your $10 down are two to one, do you know if the odds can change after that point or whether they're locked at two to one?

MR. MISHKIN: Mr. Hoffman, you're speaking very generally and not -- which is your prerogative, and not providing a particular context for, you know, who's organizing these bets.

But with that understanding that you're speaking very generally and without a specific context so I object to the form, the witness can answer the question.

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 26

HIGHLY CONFIDENTIAL - R. BUCHANAN

A. I actually don't. I would say that my assumption is that they do, but I know that the gambling -- the world of gambling is -- and betting is changing, and so I can't say for certain whether that's always the case now.

Q. Okay. Well, let me ask you this way: Do you know if that can be the case?

A. I don't.

Q. Okay. Mr. Buchanan, in the United States there's both legal and illegal sports gambling on sports, correct?

A. That's correct.

Q. One example of legal sports gambling would be someone who is over 21 placing a bet at a sportsbook in Las Vegas. Would you agree with that?

A. Well, I would agree that there is -- you can place bets on sporting events legally in Nevada. Exactly what the eligibility requirements are and the amounts and things of that nature, I'm not familiar.

Q. And is it your understanding that illegal sports gambling would include someone

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 27

HIGHLY CONFIDENTIAL - R. BUCHANAN

betting with a bookie outside of Nevada in the United States, correct?

A. Well, again, I understand that the same bet that you would place in Nevada for the Knicks to beat some other team in the game, if you tried to place that bet in any other state, it would be illegal.

Q. And if I use the term "bookie," that typically means someone who is illegally taking bets as opposed to a legal sportsbook in a casino. Is that --

A. Well, if it -- we can agree to use terms that are -- make it easier to get through the questioning, I guess I'm not aware that -- bookie is short for bookmaker, at least I thought so; and bookmakers, depending on where they're located, can either be taking legal bets or illegal bets.

Q. Now, in Nevada there's legal gambling on NBA games, correct?

A. Yes, I believe there is.

Q. Does the NBA know how much legal sports gambling on NBA games occurs in Nevada?

A. No.

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 28

HIGHLY CONFIDENTIAL - R. BUCHANAN

Q. Does the NBA have any estimate of how much legal sports gambling on NBA games would occur in New Jersey if New Jersey sports gambling law is implemented?

MR. MISHKIN: I'll object as hypothetical. But with that objection, you can answer.

A. No.

Q. Does the NBA have any estimate of how much legal sports gambling on NBA games would occur in the United States, as a whole, if New Jersey sports gambling law is implemented?

A. I'm sorry, can you just --

MR. MISHKIN: Do you want the question read back?

A. Give me the verb.

Q. Sure. I'll restate the question, no problem.

A. Thank you.

Q. Does the NBA have any estimate of how much legal sports gambling on NBA games would occur in the United States, as a whole, if New Jersey's sports gambling law is

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 29

HIGHLY CONFIDENTIAL - R. BUCHANAN

implemented?

A. Right, I was looking for the word "estimate." I -- the only thing I would say is more. I think it's fair when you ask me for an estimate, our estimate is it would be more. If you're asking me for a specific number, we don't have that.

Q. And what does the NBA base its contention that there would be more gambling?

A. Based that on -- based that on the fact that I have read, over the course of time, the views of a number of people, including experts, who are of the view that legalizing gambling will not simply result in the transference of illegal gambling to legal gambling, because there are a number of advantages or perceived advantages to gamblers from betting illegally. And as a result, legalizing gambling will inevitably create additional gamblers so there will be more.

Q. As you sit here today, can you tell me who -- any of these experts that you read regarding this?

A. I -- the only one that I really was

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 30

HIGHLY CONFIDENTIAL - R. BUCHANAN

sort of refreshed to recall was I recall that there was such testimony in connection with the passage of PASPA.

Q. Okay.

A. And I recall that because I looked at the legislative history in connection with preparing for the deposition.

Q. Anything outside -- you're referring to the passage of PASPA in 1992?

A. That's correct.

Q. Okay. Anything other than the testimony provided in 1992 that you recall reading?

A. Well, I can't -- I couldn't cite you a particular article or a particular name, but I know that I have read that view at various points in my time at the NBA. As I testified earlier, I have had the occasion to read, whether it's news articles or policy papers or other writings about gambling, and I've seen that view repeated on numerous occasions.

Q. Have you ever read any articles that take the contrary view that they don't

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 31

HIGHLY CONFIDENTIAL - R. BUCHANAN

know whether or not there will be an increase in gambling overall through the legalization of gambling?

A. I don't recall ever having read that.

Q. I think in part of your answer, one of your earlier answers, you referred to advantages to gamblers who bet illegally. Can you tell me, in your view, what those advantages are?

A. Yeah. One that strikes me as particularly relevant is the fact that the winnings, if any, are not taxed. Since someone is betting illegally, I think it is fair to assume that they are not going to report their winnings to the government and so they won't have to pay income taxes on them. That's an advantage.

Another advantage is that typically I understand that illegal bookmakers offer credit, which is not always offered in Nevada, for example.

I understand that sometimes the odds are better from -- in an illegal context

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 32

HIGHLY CONFIDENTIAL - R. BUCHANAN

than they are in Nevada, and then there's also oftentimes a familiarity or a convenience factor. If you have someone who's been betting illegally with his trusted bookie, it's not clear that he would then want to find someone else to gamble with.

Q. Okay. Now I'm going to shift a little bit from focusing on gambling on NBA games to gambling on all sports, okay?

Does the NBA know how much legal sports gambling on all sports occurs in Nevada?

A. The answer generally is no. When you say do we know, I don't -- I couldn't say that we know. I believe I have read estimates from time to time, although I recall those estimates to be quite -- to be citing a very broad range.

Q. As you sit here today, do you recall what those estimates were?

A. I remember them being a fairly large amount of money, but I don't remember the specifics.

Q. Okay.

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 33

HIGHLY CONFIDENTIAL - R. BUCHANAN

A. But it's a lot.

Q. Does the NBA have any studies regarding how much legal sports gambling occurs in Nevada?

A. By study, do you mean -- what do you mean by "study"? That would help me a little bit.

Q. Has the NBA taken upon itself to do a formal study or analysis of the amount of legal sports gambling that occurs in Nevada?

A. No.

Q. Has the NBA hired any other consultants to do such a study?

A. No.

Q. Does the NBA have any estimate of how much legal sports gambling would occur in New Jersey if New Jersey's sports gambling law is implemented?

A. I'm sorry, did you say estimate again?

Q. I did.

MR. MISHKIN: I'm going to just -- I won't do this repeatedly but just so it's clear on the record, talking about

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 34

HIGHLY CONFIDENTIAL - R. BUCHANAN

what might or might not happen if New Jersey were permitted to violate law is hypothetical.

But with that objection, which I will not keep repeating in everyone's mind, you can answer the question.

A. It's the same answer I gave before. I would say we think it will be -- I don't have a specific number, but clearly there will be more -- there will be more gambling than there is today. Other than that, I don't have a particular number for you.

Q. Okay. Same answer, I assume, but let me ask: Does the NBA have any estimate of how much legal sports gambling would occur in the United States, as a whole, if New Jersey's sports gambling law is implemented?

A. Yes, same answer.

Q. Now I'm going to shift from legal sports gambling to illegal sports gambling. Okay?

A. Um-hmm.

Q. And actually I'm going to focus specifically on illegal sports gambling on NBA

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 35

HIGHLY CONFIDENTIAL - R. BUCHANAN

games now, okay?

A. Okay.

Q. Does the NBA know how much illegal sports gambling on NBA games occurs in the United States?

A. Again, I don't have a specific number for you. I know that there -- there are estimates that there is illegal sports gambling on NBA games and I believe those estimates are -- they're in the millions.

Q. Okay. Do you know if those estimates on the amount of illegal sports gambling on NBA games is smaller or larger than the amount of legal sports gambling on NBA games?

A. I believe the estimates are larger.

Q. As you sit here today, do you know any estimate of how much larger the illegal market of gambling on NBA games is?

A. I don't recall.

Q. Does the NBA have--again, same definition--formal studies or analyses? Does the NBA have any studies regarding how much illegal sports gambling on NBA games occurs in

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 36

HIGHLY CONFIDENTIAL - R. BUCHANAN

the United States?

A. No.

Q. Does the NBA have any estimate of how much illegal sports gambling on NBA games would occur in the United States if New Jersey implements its sports gambling law?

A. No, other than, again, what I said before about the word "estimate." We would estimate that the total amount of gambling that would include both illegal and legal would be greater than it is today. But I don't have a specific number with respect to the illegal portion of that.

Q. Does the NBA know how much illegal sports gambling on NBA games occurs in New Jersey?

A. No.

Q. Now I'm going to focus on illegal sports gambling on all sports, not just illegal gambling on the NBA.

Does the NBA know how much illegal sports gambling occurs in the United States?

A. No. The same answer as before, I've seen these estimates. I couldn't give

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 37

HIGHLY CONFIDENTIAL - R. BUCHANAN

you the figures. But I don't -- I don't have a specific number for you.

Q. Does the NBA have any studies regarding how much illegal sports gambling occurs in the United States?

A. No.

Q. Does the NBA have any estimate of how much illegal sports gambling would occur in the United States if New Jersey implements its sports gambling law?

A. Again, same answer as before. It's -- there would, overall, be more gambling but there would be -- the illegal portion of it, I could not -- I couldn't tell you how much.

Q. Does the NBA know how much illegal sports gambling occurs in New Jersey?

A. No.

Q. Does the NBA have any studies regarding how much illegal sports gambling occurs in New Jersey?

A. No.

Q. Does the NBA have any estimate of how much illegal sports gambling would occur in New Jersey if New Jersey implemented its

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 38

HIGHLY CONFIDENTIAL - R. BUCHANAN

sports gambling law?

A. Again, the same answer. That particular question is interesting. I'm not sure I entirely understand it. If you legalize sports gambling in New Jersey, how much illegal sports gambling would go on. I'm not even sure I understand.

So that would be, I guess, just people who don't meet whatever eligibility requirements would exist in the hypothetical world or don't report or don't go to authorized places or something.

Q. Do you know whether or not there is -- currently in the state of Nevada, whether or not illegal sports gambling occurs despite the fact that it's legal in Nevada to gamble on sports?

A. I don't know.

Q. Okay. Mr. Buchanan, do you know what standing is?

A. I do.

Q. Can you tell me what that means to you?

A. In the legal context and in the

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 39

HIGHLY CONFIDENTIAL - R. BUCHANAN

context I'm assuming you're asking it, it means the legal entitlement to bring a lawsuit.

Q. Do you understand that, to satisfy standing requirements, the NBA is required to show that it has been harmed or would be harmed by the New Jersey sports gambling law?

MR. MISHKIN: Object to the form of the question. You can answer.

A. Well, I'm not sure, to be honest with you. I think this is a legal issue that's subject to some dispute in this case. And so that's the answer.

Q. Okay, fair enough.

Mr. Buchanan, what harm does the NBA contend it will suffer as a result of the New Jersey sports gambling law?

A. Well, the principal issue for the NBA is that legalizing sports gambling would have the effect of damaging the relationship that we have with our fans. Our fans currently come to games and we hope they come to games to root for the team of their choice, to support the home team; or if they happen to

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 40

HIGHLY CONFIDENTIAL - R. BUCHANAN

be a fan of some away team, if they're a displaced fan, to support that team and to do that on the merits of the outcome of the game.

Legalizing sports gambling in New Jersey or expanding sports gambling beyond its current state in this country, expanding legalized sports gambling beyond its current state in this country would have the effect of damaging that relationship because more fans would be rooting for the outcome of their bet as opposed to the outcome of the game. And that would -- that would change the nature of our business, it would change the nature of what we're trying to do with our fans and would damage our brand, our goodwill, and harm us irreparably in a way that I'm not sure we could come back from.

And that's the reason that we worked so hard to get the 1992 law passed and it's the reason that we have opposed the expansion of sports gambling for as long as we have.

I would say, in addition, that that last point that I mentioned, the fact that we

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 41

HIGHLY CONFIDENTIAL - R. BUCHANAN

have devoted a substantial amount of time, effort and money to not allowing sports gambling in this country to expand legally beyond Nevada, that all of those efforts would be undermined; and if New Jersey were allowed to have legalized sports betting--notwithstanding the law, in other words--we would be harmed because all of this effort and expense that we went to would be thrown out the window. So on that basis, too, there would be harm to the NBA from expanding sports gambling to New Jersey.

And another point that I considered as I thought about this issue was we are a league that tends to skew a little younger in terms of our demographic than some of the other sports leagues. We have a particular relevance with young fans. And the studies that I've read over the course of time about the effect of gambling on young people make us particularly concerned about the impact of gambling on the NBA.

Q. Okay. Other than the harms you just articulated, any other harm that the NBA

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 42

HIGHLY CONFIDENTIAL - R. BUCHANAN

contends it will suffer as a result of New Jersey's sports gambling law?

A. Well, certainly if I didn't -- I probably should have started by saying that whatever is in the Complaint obviously is harms that we are contending would occur here. But the ones that I articulated are the ones that I am primarily focused on.

Q. Any other harms, as you sit here today, that you contend the NBA will suffer as a result of New Jersey's sports gambling law, other than what you just testified to and whatever is in the Complaint?

A. Not that I can think of at the moment. I suspect as we discuss this, if you have further questions about it, it may come that those harms are articulated in a slightly different way. But I think those are the fundamental ones that I've identified.

Q. Okay. Does the NBA contend that sports gambling causes participants in the NBA to become involved in match-fixing or point-shaving?

MR. MISHKIN: I object to the form

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 43

HIGHLY CONFIDENTIAL - R. BUCHANAN

of the question. Do you need it read back? I just want to read it.

(Examining document.)

MR. MISHKIN: Do you have the question in mind?

A. I do but let me ask so I make sure I have it right. The question was whether gambling causes I think you said participants --but by that you mean players--to become involved with -- I've forgotten the last thing.

Q. In either match-fixing or point-shaving?

A. Match-fixing or point-shaving. Well, it's sort of interesting, I guess, the way you phrased it. I mean, I don't know why anyone would become involved in match-fixing or point-shaving if there wasn't gambling.

Q. Okay.

A. So I -- there wouldn't be an advantage to doing it.

Q. Can you define what game-fixing means to you?

A. Yeah. It means acting in a game in

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 44

HIGHLY CONFIDENTIAL - R. BUCHANAN

a way that is -- that causes the game to be decided other than on its merits. That's sort of a backwards way of defining it, but it essentially means that you're not -- you're not -- you're conducting yourself in the game, if you're a player, with some goal in mind other than winning the game. And in this context, it usually means to have the game decided in a way that's favorable for some betting interest.

Q. Is it the NBA's contention in this case that if sports gambling is implemented in New Jersey, this would increase the incidence of game-fixing in the NBA?

A. Well, the NBA's primary concern in this case is the one that I articulated at the top in response to the first question you asked me, which is that our primary concern about gambling, if gambling were to be legalized in New Jersey, is that we would find ourselves with many more point spread fans and that would damage our business.

There is -- with additional gambling on our games which we believe would

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 45

HIGHLY CONFIDENTIAL - R. BUCHANAN

be the result of legalized gambling in New Jersey, there is certainly more of a chance for the influence of gambling to result in other kinds of conduct like actions in the nature of game-fixing.

Q. And what is the NBA's basis for that contention?

A. Common sense.

Q. Anything else?

A. Well, I guess I should expand. Common sense as informed by experience in the industry over the course of years. The -- as I said earlier, it -- I'm not aware that game-fixing -- I've never seen game-fixing occur in the absence of gambling. And when I say I've never seen, what I mean by that is I certainly am familiar with game-fixing scandals that have occurred in other sports. I followed those incidents when they occur, and they always occur in the context of gambling.

And so if there's more gambling, it stands to reason that there's at least the possibility that you would have a greater

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 46

HIGHLY CONFIDENTIAL - R. BUCHANAN

chance of game-fixing.

Q. In the game-fixing incidents you just referred to that you've learned about over the years, do you know if any of those involved legalized gambling as opposed to illegal sports gambling?

A. I don't know.

Q. Does the NBA know how much game-fixing on NBA games occurs in the United States?

A. Well, I think the answer would be that we know there is none because this is an area that we police and pay some attention to; and as a result, we are reasonably confident that there is no game-fixing in the NBA.

Q. So as we sit here today, the NBA is not aware of a confirmed incident of game-fixing in its history. Is that accurate?

A. I wish I could say I was an encyclopedia on this, but we've been around for 60 years and there was a number of those years before I came to the NBA and so I wouldn't want to say that definitively. But as I sit here today, I couldn't cite you one.

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 47

HIGHLY CONFIDENTIAL - R. BUCHANAN

Q. Okay. Well, let me ask it this way. I think you said you've been in the NBA since 1993, correct?

A. That's correct.

Q. During your time at the NBA, are you aware of any confirmed incident of game-fixing in the NBA?

A. I am not.

Q. Okay. I'm going to introduce what we're going to mark as NBA Exhibit 2, which is something I think you'll probably be familiar with. It's the Pedowitz report.

(Exhibit 2: Pedowitz report 10/1/08 (#PLAINTIFFS' 00003354-486), was marked for identification.)

BY MR. HOFFMAN (continuing):

Q. Mr. Buchanan, have you seen this report prior to today?

A. I have.

Q. Do you know when the last time you saw this report was?

A. Well, I believe I at least flipped through it in preparation for the deposition because it was something that we produced.

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 48

HIGHLY CONFIDENTIAL - R. BUCHANAN

Q. Okay. And can you briefly describe what this report is?

A. Yes. It's an independent review performed by Larry Pedowitz and the Wachtell Lipton firm relating to an incident in 2007 in which NBA referee, Tim Donaghy, was found by the FBI and ultimately the U.S. Attorney's Office to have engaged in illegal gambling on NBA games and sharing of information about NBA games to gamblers. And it is also a forward-looking risk review of our officiating program and gambling rules relating to that.

Q. Was this report commissioned by the NBA?

A. It was.

Q. If I could have you turn to Executive Summary 2, it's marked ES 2. The Bates number is Plaintiffs' 00003358.

A. I have ES at 59.

Q. I'm sorry, it's 59, my mistake.

A. Got it.

Q. And you'll see at the bottom of the page, there's a section called Factual Findings and then number 1 says: "Gambling or

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

HIGHLY CONFIDENTIAL - R. BUCHANAN
misuse of confidential information by other referees." And I just want to direct you to that first sentence following that heading which states:

"We have discovered no information suggesting that any NBA referee other than Tim Donaghy has bet on NBA games or leaked confidential NBA information to gamblers."

Mr. Buchanan, do you know if that statement still holds true today?
A. Well, just the way you've asked the question, the statement is that Larry Pedowitz has discovered no information suggesting --
Q. Let me rephrase the question, then.
To date, has the NBA discovered any information suggesting that any NBA referee, other than Tim Donaghy, has bet on NBA games or leaked confidential NBA information to gamblers?
A. Since this report was issued, we have no information that any other -- any referee has gambled on games or leaked confidential information to gamblers.

HIGHLY CONFIDENTIAL - R. BUCHANAN
Q. Okay. If you could turn the page to ES 3 which has the Bates number that ends in 3360.
A. Yes.
Q. Okay. And I want to direct your attention to the middle of the page under the paragraph with the heading 2, Review of Donaghy Games. And the statement I wanted to point you to is the one that says that:

"Donaghy has denied intentionally making calls designed to manipulate games and the Government has said that it found 'no evidence that Donaghy ever intentionally made a particular ruling during a game in order to increase the likelihood that his gambling pick would be correct.' Based on our review and with the information we have available, we are unable to contradict the Government's conclusion."

Similar question is: Up to the present day, has the NBA acquired any other information that would contradict the Government's conclusion in this sentence?

HIGHLY CONFIDENTIAL - R. BUCHANAN
A. Again, you're -- well, the question you asked is -- and the way you asked it is focused on Mr. Donaghy. And I don't have any information, since this review, that would contradict the Government's conclusion about Mr. Donaghy.
Q. Okay. So let me rephrase it another way. In other words, as we sit here today, does the NBA have any evidence that Mr. Donaghy ever intentionally made a particular ruling during a game in order to increase the likelihood that his gambling pick would be correct?
A. We have no evidence, as stated here, that -- as of today, that contradicts the Government's conclusion in that regard.
Q. Okay. Could you please turn to Executive Summary 5 which ends in the Bates number 3362.
A. Okay.
Q. And you'll see at the bottom of the page, the last full paragraph, one of the recommendations made in this report was the hiring of a full-time compliance officer who

HIGHLY CONFIDENTIAL - R. BUCHANAN
will be responsible for assuring enforcement by appropriate personnel of the League's compliance policies and procedures and overseeing the League's antigambling efforts.
And I think we covered this earlier, but, Mr. Buchanan, you are currently the NBA's compliance officer, correct?
A. I am.
[HIGHLY CONFIDENTIAL PORTION FOLLOWING:]

Page 53

HIGHLY CONFIDENTIAL - R. BUCHANAN

[HIGHLY CONFIDENTIAL:]

BY MR. HOFFMAN (continuing):

Q. Okay. Have there been any violations of the NBA's antigambling policies and procedures since the Donaghy incident?

MR. MISHKIN: I don't know the answer, but we can designate the record as "Highly Confidential" if there's anything that would necessitate such a designation. So, you know, for the moment let me designate this response, whatever it's going to be, as highly confidential. We can withdraw it if there's no reason to keep it highly confidential.

A. Yes.

Q. How many incidents -- how many violations of the NBA's antigambling policies and procedures have occurred since the Donaghy incident?

A. I want to say three, but I may not -- it's in that range.

Q. Okay. Do these incidents involve players, referees, both?

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 54

HIGHLY CONFIDENTIAL - R. BUCHANAN

A. Neither. They involve team staff.

Q. Okay. Do any of these incidents involve allegations of game-fixing or point-shaving? Well, actually let me withdraw the question. Obviously it wouldn't involve point-shaving if no player's involved, I assume.

Do any of these incidents involve the sharing of confidential information that could contribute to game-fixing?

A. Well, these incidents involve --

MR. MISHKIN: I'm going to object to the form of that question I think for obvious reasons. But I object to the form.

A. These incidents involved circumstances in which team personnel were found to be gambling on NBA games. And in that context, it is always a concern that they either have inside information or are disclosing inside information which could potentially lead to some kind of fixing of the games.

In none of these circumstances did

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 55

HIGHLY CONFIDENTIAL - R. BUCHANAN

we find that there was game-fixing, which is consistent with what I testified to earlier, that I'm not aware of any fixing of NBA games.

Q. Okay. Did any of these incidents involve -- you said they involved team staff. Did any of these incidents involve team staff gambling on games of the team they were employed with?

A. Yeah.

Q. How many of those incidents, if you recall, involved --

A. At least one, at least one.

MR. HOFFMAN: Let's go off the record real quick.

(A discussion was held off the record.)

BY MR. HOFFMAN (continuing):

Q. I just have a couple more questions related to the three incidents of gambling on NBA games that you referred to before the break.

Do you know where the bets were placed for those three incidents?

MR. MISHKIN: Object to the form of

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 56

HIGHLY CONFIDENTIAL - R. BUCHANAN

the question. Where? What sense?

Q. Let me rephrase.

Do you know with whom those bets were placed?

A. Well, I guess I'll answer it this way: Two of the incidents I referred to involve placing bets and I don't know specifically or I don't remember where those bets were placed. One of the incidents involved taking bets.

Q. Okay. So the two incidents that involved placing bets, you say you don't remember with whom those bets were placed. Do you know whether those bets were placed legally or illegally?

A. I'm reasonably certain they were placed illegally.

Q. Okay. And the incident taking bets obviously would be illegal?

A. Correct.

Q. So, again, just to confirm, all three of the incidents we've been talking about all involved illegal sports gambling?

A. Right. Although one of the three,

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 57

HIGHLY CONFIDENTIAL - R. BUCHANAN

my recollection is that the amounts were small enough that one could make arguments as to whether it rose to the level of illegal gambling. In other words, that's -- let me clarify that.

Any gambling in NBA games, no matter what the amount, is illegal other than in connection with Nevada. But the point I'm making is that one of the matters looked like it may have involved a friendly wager between colleagues in an office so...

Q. Okay.

A. Technically illegal.

Q. Okay. Let's go ahead and turn to --

MR. MISHKIN: Mr. Hoffman, can we -- are we off this topic?

MR. HOFFMAN: Do you want to go off the record for a second?

(A discussion was held off the record.)

BY MR. HOFFMAN (continuing):

Q. For these three incidents we've been talking about, were any sanctions

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 58

HIGHLY CONFIDENTIAL - R. BUCHANAN

imposed?

A. Yes.

Q. And what were those?

A. In one incident there was -- the employee at issue was terminated and disqualified from further association with the NBA or its teams. And the other incident the other employees were terminated, and in the third no action was taken.

Q. And when we say the third no action was taken, which incident was that? Was that the incident of taking bets, or was that the incident you referred to where the monetary value was relatively low?

A. It was the incident where it appeared to be -- it ended up being a wager between colleagues.

Q. Okay.

MR. HOFFMAN: We can go off the record now.

(A discussion was held off the record.)

MR. MISHKIN: Let's just note on the record that we can end the "Highly

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 59

HIGHLY CONFIDENTIAL - R. BUCHANAN

Confidential" designation at this point.

[END OF HIGHLY CONFIDENTIAL PORTION.]

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 60

HIGHLY CONFIDENTIAL - R. BUCHANAN

BY MR. HOFFMAN (continuing):

Q. Mr. Buchanan, if I could have you turn to the same document which is NBA Exhibit 2, to page Executive Summary 6. It ends in the Bates number 3363.

A. Yeah.

Q. And I want to direct your attention to the last full paragraph on that page. And I'm pointing to the last full paragraph on that page that starts with "The League."

A. Yes.

Q. So that paragraph says:

"The League has arranged to obtain information on a regular basis from individuals and entities involved in the gambling business about unusual movements in the betting lines and rumors concerning confidential NBA information such as player injuries and referee assignments. Flagging games for the League to investigate may help the League detect gambling or misuse of confidential information."

Mr. Buchanan, do you know who are

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 61

HIGHLY CONFIDENTIAL - R. BUCHANAN

the individuals and entities involved in the gambling business that are referred to in this paragraph?

A. Yes.

Q. And who are those individuals and entities?

A. One is Las Vegas Sports Consultants, which is an entity in Las Vegas that supplies betting lines to many, if not all, of the casinos that have sportsbooks in Nevada. And another is a gentleman named Mark Goldman who formerly or currently--I don't recall which--was in charge of the -- running the sportsbook at one of the major casinos in Las Vegas, I believe Caesars.

Q. Any other individuals or entities referred to in this paragraph that you haven't already mentioned?

A. No.

Q. In the first sentence, it states: "The League has arranged to obtain information on a regular basis." How has the League arranged to obtain information on a regular basis from those entities?

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 62

HIGHLY CONFIDENTIAL - R. BUCHANAN

A. With respect to LVSC, which is Las Vegas Sports Consultants, we obtain the lines that are transmitted to the sportsbooks directly from them so that we can -- and we receive that on a frequent basis, and it allows us to determine if there is any unusual movement in that -- in those lines.

Q. The question may be fairly obvious but both the Las Vegas Sports Consultants and Mr. Goldman, they're both involved in legal gambling in Las Vegas, correct?

A. That's correct.

Q. The last sentence -- well, let me ask this: Do you agree with the statement that flagging games for the League to investigate may help the League detect gambling or misuse of confidential information?

A. Yes, it may. That's the reason that we -- that we have these relationships. One of our rules that we impose on staff, players, referees, et cetera, is no tipping. Tipping is the misuse of confidential information for gambling purposes about

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 63

HIGHLY CONFIDENTIAL - R. BUCHANAN

players or teams, and it may help us uncover circumstances where information was supplied to gambling interests.

If there is an unusual movement in the line and we can match that up to some issue with the team, whether that might be an injury, whether it might be some other circumstance that hadn't been publicly disclosed, we would then have a basis to believe that someone was tipping information which might then lead us to investigate and find a violation of our rules.

Q. Okay. To date, has the Las Vegas Sports Consultants and Mr. Goldman helped the League detect gambling or misuse of confidential information?

A. Well, I would say that we haven't -- we haven't had investigations that have resulted from information that they have supplied to us as of yet. But obviously we agree with this recommendation in the Pedowitz report. We agree that information of that kind could be helpful in certain circumstances. It has yet to be but it could

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 64

HIGHLY CONFIDENTIAL - R. BUCHANAN

be.

Q. So in other words, the Las Vegas Sports Consultants and Mr. Goldman have provided the NBA information but the NBA has not -- that has not resulted in the NBA taking any disciplinary action or determining that there have been any violations of the NBA's antigambling policies?

A. Correct. But broader I think would be it hasn't yet resulted in us identifying an incident that even led to an investigation, per se.

Q. Okay. And now if you could turn to it's page 7. We're going to move off the executive summary and go to page 7, which ends in Bates number 3372.

A. I'm sorry, say it again.

MR. MISHKIN: We're past executive summary.

A. Thank you, sorry.

Q. Sure. And I'm going to direct your attention to the first full paragraph at the top of the page where it says:

"Finally, we spoke to various

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

HIGHLY CONFIDENTIAL - R. BUCHANAN

experts. For example, we consulted with gambling experts and representatives of Las Vegas sportsbooks."

I just want to confirm in that sense, again, is that referring only to the Las Vegas Sports Consultants and Mr. Goldman?

A. I don't -- I don't know. The Pedowitz report and the investigation conducted by Mr. Pedowitz was independent of the NBA. And while I was certainly involved in this matter and the investigation generally, it may have been that Larry or his colleagues spoke to others other than ones that I've mentioned that I'm not aware of.

Q. Okay. Do you know why Mr. Pedowitz spoke to gambling experts and representatives of Las Vegas sportsbooks as part of his investigation of the Donaghy incident?

A. I would be speculating. But within the realm of that, I think he simply wanted to get educated about this area of sports gambling as part of his report and review.

Q. Could you please turn to page 27, which is Bates number 3392 of NBA Exhibit 2.

HIGHLY CONFIDENTIAL - R. BUCHANAN

A. Yes.

Q. And I want to direct your attention to the last full paragraph on the page which states:

"Second, the NBA security department which has numerous contacts in law enforcement through Bernie Tolbert, the head of security and a former FBI agent, has never received any information suggesting that other referees have gambled on NBA games or provided confidential information to gamblers."

Do you know if, as of the present date, whether the NBA security department has ever received any information suggesting that other referees have gambled on NBA games or provided confidential information to gamblers?

A. It has not.

Q. If you'd turn to page 28 which is Bates numbers 3393 of NBA Exhibit 2. I direct your attention to the paragraph that starts with:

"Fifth, we spoke to gambling consultants in Las Vegas who run major

HIGHLY CONFIDENTIAL - R. BUCHANAN

sportsbooks and have regular contacts with bookies in major cities throughout the United States. They have told us they uncovered no information suggesting that any other referees have bet on NBA games or have provided confidential information to individuals betting on NBA games."

Do you know who the gambling consultants in Las Vegas referenced in this paragraph refers to?

A. I don't exhaustively. I believe that they included LVSC and Mark Goldman, but they may have included others as well.

Q. If you could turn to page 100 now and that is Bates number 3465 of NBA Exhibit 2.

A. Okay.

Q. And I want to direct your attention to Section XII (a), Gambling and Confidential Information Recommendations.

A. Yes.

Q. And the first two sentences there state:

HIGHLY CONFIDENTIAL - R. BUCHANAN

"Sports gambling is big business. In 2006 the Nevada State Gambling Control Board reported 2.4 billion in legal sports wagering, 635.4 million of that total was bet on basketball (college and NBA combined)."

Mr. Buchanan, would you agree with that estimate?

A. I don't have an independent basis for agreeing or disagreeing. I certainly don't disagree. And this was one of the references that I mentioned earlier that I have recalled seeing numbers in the past; I just didn't recall what they were.

Q. And if you could turn the page, I think we can skip the next couple sentences, and then the first full paragraph on page 101 which is Bates number 3466 states:

"By some estimates, total volume of sports betting in the United States is 325 to 400 billion with less than 1% of this betting taking place legally in Nevada."

Any reason for you to disagree with

Page 69

HIGHLY CONFIDENTIAL - R. BUCHANAN

those estimates?

A. Well, again, this is -- I guess this is Larry reporting on -- by some estimates. So I don't have any reason to agree or disagree.

Q. Would you agree that a relatively small percentage of the total volume of sports betting in the United States takes place legally in Nevada?

MR. MISHKIN: I object to the form of the question that it lacks a foundation.

A. I agree that that's what this sentence says and, as I said, I don't have an independent basis to agree or disagree.

Q. Do you have an independent basis for believing that the illegal sports gambling market in the United States is larger than the legal sports gambling market in the United States?

A. I certainly would assume it is. I just -- I don't -- as I said, you asked me earlier whether we had conducted our own independent studies or research or anything of

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 70

HIGHLY CONFIDENTIAL - R. BUCHANAN

that nature and we haven't. Nevada's one state; there are 49 others. It stands to reason that there's probably more illegal betting than there is legal at this moment.

Q. If you can turn now to page 113 which is Bates number 3465 -- no, 3478, sorry. Page 113, Bates number 3478. And it's the paragraph under the heading Gambling Monitors:

"The League has now arranged to obtain information on a regular basis from individuals and entities involved in the gambling business who can provide the League with information about unusual movements in the betting lines, rumors about such things as injury reports or referee schedules or where the 'smart money' is being wagered."

Again, are the individuals and entities involved in the gambling business that are referred to in this paragraph exclusively the Las Vegas Sports Consultants and Mark Goldman?

A. Yes.

Q. And then at the end of that

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 71

HIGHLY CONFIDENTIAL - R. BUCHANAN

paragraph, there's a parenthetical that states:

"We note that this system has been working properly as certain games were brought to the League's attention during the 2007-2008 season. After further review, the League determined that nothing improper had occurred."

Does that sentence, does that reflect your earlier testimony about the Las Vegas Sports Consultants and Mr. Goldman providing information to the NBA about betting lines but that the League determined that nothing improper had occurred?

A. Yes. My recollection is that we -- they had -- on one or more occasions, they had told us that there was an unusual movement in a line, and then we looked into it in terms of the timing of when information about an injury or the team had been publicly disclosed and determined that there was nothing unusual about the line movement.

Q. And, again, this paragraph refers to obtaining information on a regular basis.

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 72

HIGHLY CONFIDENTIAL - R. BUCHANAN

Do you know how often the Las Vegas Sports Consultants and Mr. Goldman have contacted the NBA since you implemented this system?

A. Well, I believe LVSC is contacting us daily in the sense that they provide us with the lines. So we're getting the basic data every day from them. I believe the arrangement is also that we will get -- we will be contacted when there is something unusual that comes to their attention, and that happens only when there is something unusual so it is more periodic.

Q. Now, I apologize if I've already asked this. But during your time at the NBA, there have been no confirmed game-fixing incidents in the NBA; is that correct?

A. That's correct.

Q. Are there any other specific instances of point-shaving in the NBA caused by sports gambling that you're aware of?

MR. MISHKIN: I think it's been asked and answered. But you can answer it again.

A. I think your question was are there

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

HIGHLY CONFIDENTIAL - R. BUCHANAN

any other and I don't think I testified that there were any. So I'm not aware of any circumstances of point-shaving.

Q. Okay, fair enough.

Now, is one of the alleged harms that -- or one of the harms that the NBA alleges that legalizing sports gambling in New Jersey will increase the perception by the public that NBA games are not completely legitimate? Is that --

A. Well, as I think I testified earlier, the primary focus that we have is on the nature of our relationship with the fans and the way in which legalized gambling would affect that relationship. It's also alleged in the Complaint that there is a concern about the perception of the game that fans may have, and we certainly support what's in the Complaint in that regard.

Q. Okay. I want to focus now on the public perception allegations. Would you agree with me that the perception that NBA games are not completely legitimate already exists for some portion of the public?

HIGHLY CONFIDENTIAL - R. BUCHANAN

A. Unfortunately, I would.

Q. Do you know why that is?

MR. MISHKIN: Object to the form of the question.

Q. As you sit here today, do you know why the public -- why some portion of the public perceives NBA games as not being completely legitimate?

MR. MISHKIN: Again, object to the form of the question.

A. I don't -- I don't know specifically why. We've -- we have conducted market research from time to time, and I believe we have produced these studies to you that reflect a perception in that regard from a certain percentage of our fan base.

Q. Is it the NBA's contention that the percentage of the public with the perception that NBA games are not completely legitimate would increase or would go up if New Jersey implements its sports gambling law?

MR. MISHKIN: Object to the form of the question. You can answer.

A. I don't know. I only know that, as

HIGHLY CONFIDENTIAL - R. BUCHANAN

I said earlier, it's in the same -- more gambling can only -- the only possibility is that there will be more of that kind of a perception. But I don't know for sure.

Q. Mr. Buchanan, do you know if some portion of the public perceives that the league office itself fixes games?

A. I know that in our -- in the market research we have done, that there is a perception amongst some that the league office is involved with referees in influencing the outcome of games.

Q. Do you know why the public perceives that the league office, in conjunction with League referees, influences the outcome of games?

A. No. I only know what the data says, which is that there is that perception.

MR. HOFFMAN: I'm going to show you what's been marked as NBA Exhibit 3.

(Exhibit 3: NBA Gambling Survey (#PLAINTIFFS' 00002263-268), was marked for identification.)

HIGHLY CONFIDENTIAL - R. BUCHANAN

[HIGHLY CONFIDENTIAL]

BY MR. HOFFMAN (continuing):

Q. By the way, if you need to take time to review the document, let me know.

Do you recognize this document?

A. Yes.

Q. What is this document?

A. It's a document entitled NBA Las Vegas Gambling Survey conducted on 7-16-07 by Harris Quick Query.

Q. Do you know why this survey was conducted?

A. Yes. My recollection is that in this time period, the NBA owners were considering Las Vegas as a potential market for an NBA team; in other words, considering whether we would potentially relocate one of our teams if it wanted to move to Las Vegas.

And in that connection, a committee of owners was formed to study that issue and league office staff, including myself, assembled information to -- for their review. And one of the pieces of information that we provided to them was the result of this

HIGHLY CONFIDENTIAL - R. BUCHANAN

survey.

And we do market research on a consistent basis, as most companies of our kind do; and there was a survey panel that was available to us, because of our relationship with Harris, where we could easily provide some questions and get some answers. And that's how -- that's what we did.

Q. Do you know if the NBA owners are still considering the possibility of moving or having a team move to Las Vegas at some point?

A. It's not under active consideration at this moment.

Q. What is the NBA's position regarding a team possibly moving to Las Vegas?

MR. MISHKIN: Object to the form of the question.

A. Well, because it's not under active consideration, I'm not sure we have a position at this time. I would say that there is no prohibition or bar toward consideration of that market. It's a market that the owners would think about.

But the way things work with





HIGHLY CONFIDENTIAL - R. BUCHANAN

respect to the location of teams in the NBA--and I think it's true in other leagues--is that you have to have a team that actually wants to move unless you're interested in expansion, which we are not at the moment. So as a result, it's not -- at the current time, there is no team that is actively looking to move, that at least has formally said they want to move. So as a result, it's not part of our active consideration.

Q. Back in 2007 when this survey was conducted, did the NBA have a position regarding the potential for a franchise to move to Las Vegas?

A. The primary issue or a primary issue that the committee was considering was whether or not Las Vegas was a commercially viable market for an NBA team. And views were positive in that regard at the time, that it was commercially viable. And so the committee was, at the time, actively considering and I believe it would have been willing to potentially move a team there, again, assuming





HIGHLY CONFIDENTIAL - R. BUCHANAN

that we had a team that wanted to move there.

But there are -- this is one of the greatest puzzles that sports leagues face because there are so many moving pieces in this kind of a situation, principally in Las Vegas, relating to the construction of an arena which doesn't currently exist. And as a result, it was sort of a hypothetical exercise at that point until an arena is constructed.

Since this committee met in July of '07, the economic circumstances in this country and in Las Vegas changed rather radically, and therefore I think any additional consideration of the market would probably start anew now.

Q. During those discussions back in 2007, did the topic of legalized gambling in Nevada come up?

A. Gambling in Las Vegas was discussed as part of the committee's consideration.

Q. And was that a concern to the committee?

A. Yes.

Q. Why so?





HIGHLY CONFIDENTIAL - R. BUCHANAN

A. Well, for a variety of reasons. One reason is that we don't have a team currently located in any jurisdiction in which gambling is legal, and there were concerns expressed about that issue.

Proximity of gamblers to the team, its staff, its players, raised the issue of confidential information being passed more easily and therefore problems relating to tipping, problems relating potentially to game-fixing; those were discussed.

In addition, gambling is a -- sports and non-sports gambling is an issue that leads to problems with some people, including addiction to gambling. And there was concern expressed with having one of our teams based in an environment like that where gambling is legal and therefore easy to become engaged in and, whether it's a player or a team staff member, that that could become a problem as well. So those issues were discussed.

Also discussed was the question of what perception fans might have in respect of

HIGHLY CONFIDENTIAL - R. BUCHANAN

locating a team there, and, again, the proximity to gambling, some of which was addressed in this survey.

Q. A couple pieces there. During these discussions, if you can recall, was the issue of legal gambling in Las Vegas -- would that have precluded the move of any NBA team to Las Vegas?

A. Potentially. In other words, it was discussed whether -- one issue that was discussed was whether, if a team moved to Las Vegas, we would require that the NBA games be taken off of the sportsbook in Las Vegas as a condition to move there. That was discussed. So that issue was one that the committee was dealing with.

And, again, this is a committee of owners and not the full board, so it's a subset of the group. The way we work is to have committees handle some issues and make recommendations to the full board. But it didn't reach the stage of having the full board deal with a potential move because, as I said, the practicalities were not in place for

HIGHLY CONFIDENTIAL - R. BUCHANAN

that.

Q. Okay. If you could turn to NBA Exhibit 3, it's Bates number 2264. You mentioned that one of the issues that was discussed by the committee of owners was the public perception of a sports team in Las Vegas. If you look in the middle of the page there, there's a question that was put forward in the survey: "If a professional sports league launched a team in Las Vegas, how would it impact your attitude towards the league?"

If you see there the first was "It would negatively affect my attitude" received 9 percent; it would improve my attitude 4 percent; and then it would not change my attitude towards the League 87 percent.

Do you know, did the NBA view these numbers favorably or unfavorably?

MR. MISHKIN: I object to the form of the question. You can answer if you understand it.

A. Well, I just -- I would say neither. It's just data.

Q. I'm going to show you what we're

HIGHLY CONFIDENTIAL - R. BUCHANAN

going to mark as NBA Exhibit 4 now.

(Exhibit 4: Harris Interactive Quick Query 2007 study (#PLAINTIFFS' 00002292-2300), was marked for identification.)

BY MR. HOFFMAN (continuing):

Q. Mr. Buchanan, do you recognize this document?

A. Yes.

Q. Can you tell us what this document is.

A. This is another Harris market research study performed in December of 2008 that is of the same nature as Exhibit 3, which was done in 2007. And this document, Exhibit 4, has a comparison of the results in December 2008 to the results in 2007.

Q. And do you know why this particular survey was conducted?

A. This was conducted, by my recollection, simply to -- because we had a baseline now in the questions that we asked in '07, it seemed to us that it was sensible to carry that forward to see how perceptions may

HIGHLY CONFIDENTIAL - R. BUCHANAN

have changed over time.

Q. Do you know whether any of the -- let me ask this: This study was conducted after the Tim Donaghy incident first became public; is that correct?

A. The Exhibit 4, yeah. So Donaghy became public actually in I believe August of '07, my recollection, or September of '07. So Exhibit 3 was done pre-Donaghy in December '08; Exhibit 4 was done post-Donaghy.

Q. Do you know whether the Donaghy incident was a reason that this particular survey was conducted?

A. I don't specifically. I assumed it was in the mix but, again, it was more focused on the fact that we had this earlier survey and it was relevant to the work that the committee was doing at that time. And we simply wanted to carry it forward, to have the data.

Q. Okay. Can I have you turn to the page that ends in Bates number 2293. And, again, this was conducted in December 2008. So by December 2008, according to this

Page 85

HIGHLY CONFIDENTIAL - R. BUCHANAN

graphic, approximately 68 percent of the public associated the NBA with gambling. Am I looking at this correctly?

A. I believe so.

Q. And so 68 percent of the public associated the NBA with gambling and this was in the absence of any legalized gambling in the state of New Jersey; is that right?

A. Well, I guess just to be a little more precise, I think that the survey population here is not the general public. My recollection is that it's people who have some sports interest, so it's a subset. I'd have to look more particularly at one of the documents, but I think it's -- you're looking for a pool of people who actually follow sports, you could call them sports fans.

But out of that group, 68 percent of that group associated the NBA with gambling when this was done.

Q. And if you could turn the page to 2294, and here this graphic shows that -- I'm sorry, not the graphic. If you look at the bullet point, it states that the percentage of

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 86

HIGHLY CONFIDENTIAL - R. BUCHANAN

the respondents who associated the NBA with gambling, a great deal or a fair amount rose from 34 percent in July 2007 to 45 percent in 2008 when the survey was taken?

(Court Reporter interruption.)

Q. So in December 2008 according to this survey, 45 percent of the respondents, the people responding to the survey, associated the NBA with gambling, quote, "a great deal" or a, quote, "fair amount," up from 34 percent in July of 2007. Is that correct?

A. Yes. This was not a good trend.

Q. Okay. But if you turn to Plaintiffs' 2295, if you look at the first line in the white section, it says: "Like most sports, trust levels in the NBA have improved since July of 2007."

Did I state that accurately?

A. That's what it says.

Q. Okay. So during the same time period that the percentage of respondents associating the NBA with gambling rose, during that same time period trust levels in the NBA

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 87

HIGHLY CONFIDENTIAL - R. BUCHANAN

actually improved. Am I looking at that accurately?

A. That's what it says. I guess I would only note that one of the things I -- when I mentioned I had met with Jason Kaufman, who's our director of market research, to understand a little bit to be refreshed in this stuff, one of the things he mentioned to me was the 3 percentage points in roundabout sort of within the margin of error.

So I agree with you that's certainly what the slide says, but I guess I would note that 56 to 59 you're sort of still in the same ballpark.

Q. Okay. So even if you include the margin of error, this graphic on page 2295 would show that trust levels in the NBA did not decrease between July 2007 and December 2008?

A. I'm not going to argue with you. I mean, the slide says what it says and it says at the top "Like most sports, trust levels have improved, however, since July 2007." My only point is I just sort of take a little bit

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 88

HIGHLY CONFIDENTIAL - R. BUCHANAN

movements of this small magnitude with a grain of salt.

And so your question, for example, it's theoretically possible that the 56 number in July of '07 could have been 59 and the 59 number in December of '08 could have been 56. I'm not a market research guy, okay. But the slide says what it says.

Q. So, again, based on what this slide says, trust levels in the NBA actually improved after the public learned of the Donaghy incident during the summer of 2007?

MR. MISHKIN: I object to the form of the question given the previous answers, and I think you're just arguing with the witness. But you can answer the question.

A. Again, the slide says what it says. I must say, you know, I -- I would need to understand a little more about what trust means in this context to have a real good sense of how it relates to the question that you asked.

Q. If you could turn to now 2300, so I

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

HIGHLY CONFIDENTIAL - R. BUCHANAN

think it's the last page of this survey. And underneath the bar graphs, it states:

"39% of people stated that NBA referees frequently give preferential treatment to star players, the highest among professional sports officials."

Was this statistic a concern to the NBA?

A. Well, what I would say is the issue of star calling or favorable calls to star players is an issue that concerns the NBA. This data from December of 2008 in the sense that it raised the issue was not news to us for reasons that are complex and would take up way more time than either of us wants to take.

For some reason, this -- the NBA has more of a problem in this regard than other leagues, notwithstanding the fact that it's actually not true. So it's something to do with the nature of our sport, it's something to do with the way in which officiating is viewed as impacting our sports by fans. It's something we are concerned about and continue to work at.

HIGHLY CONFIDENTIAL - R. BUCHANAN

Q. Does the NBA think this particular statistic reveals that a certain percentage of the public perceives that NBA games are not completely legitimate?

MR. MISHKIN: I just want to object to the form of the question about what the NBA thinks. You haven't really defined -- the NBA involves an awful lot of people. So subject to certain vagueness about who you're referring to, the witness can answer.

A. I don't agree with this statement that you made about that NBA games are not legitimate. I'm not sure I know what it means. I know that there is an issue that people -- that there is a perception among some portion of our fans that star players in the NBA get more favorable treatment from referees than non-star players, and that's of concern to us.

It also is not true and, as a result, we take steps and are committed to trying to change that perception. Whether we will ever be successful in doing so with the

HIGHLY CONFIDENTIAL - R. BUCHANAN

type of avid fans that we have and the nature of our game where foul calls occur in milliseconds and partisans will believe what they want, I don't know.

I will tell you that one of the things that is irrelevant to why we're here but I will say it anyway, that I'm constantly amazed by is how often our officials get it right when you really look at it. And NBA basketball is played at such a high speed and it's an unbelievable sport, and these guys are unbelievable athletes. And our best officials, they get stuff right all the time that when you see it bang, bang, you think they'd be guessing and they get it right. So fans don't think so, but they do.

Q. I'm going to now show you what we're going to mark as NBA Exhibit 5.

(Exhibit 5: Harris Interactive Quick Query 2009 study (#PLAINTIFFS' 00002273-2286), was marked for identification.)

BY MR. HOFFMAN (continuing):

Q. And, Mr. Buchanan, do you recognize

HIGHLY CONFIDENTIAL - R. BUCHANAN

this document?

A. Yes.

Q. What is this document?

A. It's another Harris study, this time done in the fall of 2009 similar in nature to the last two exhibits that we looked at.

Q. And did you review this document during your preparation for your deposition today?

A. I did. I looked at this.

Q. If I could have you turn to page -- it's page 9, Bates number 2281.

A. Yes.

Q. And so the respondents of this survey, they were asked to indicate their top three concerns about professional sports. And you'll see that game-fixing -- 18 percent of the respondents ranked game-fixing as one of their top three concerns in professional sports. Do you see that?

A. I do.

Q. Okay. And then down at the bottom, 8 percent of the respondents indicated

Page 93

HIGHLY CONFIDENTIAL - R. BUCHANAN

gambling as one of their top three concerns in professional sports.

Now, you would agree with me that if you focus on game-fixing, that was ranked below steroids, performance-enhancing drugs, player salaries, off-court behavior, officiating and on-court behavior?

MR. MISHKIN: Counselor, that's what the document shows, but what's your question?

Q. I'm just getting confirmation. Is that what the document shows?

A. That's what the document shows.

Q. Now, do you know whether the respondents who indicated that game-fixing was among their top three concerns attributed their concern to game-fixing associated with gambling as opposed to game-fixing by the League itself?

A. I don't know. I don't know. But I -- again, I -- it's -- these are difficult things to deal with. I don't know whether in someone's mind when they talk about -- you don't typically see in the discussions which

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 94

HIGHLY CONFIDENTIAL - R. BUCHANAN

make us -- don't make us happy, but you typically don't see concerns about the League office's agenda talked about in terms of fixing. You see it talked about in terms of the conspiracy between the league office and the officials or something of that nature. I don't know what respondents have in their mind when they answered the question.

Q. All right. I'm going to now show you what we're going to mark NBA Exhibit 6.

(Exhibit 6: NBA Integrity Survey 4/16/10 (#PLAINTIFFS' 00002231-248), was marked for identification.)

BY MR. HOFFMAN (continuing):

Q. Mr. Buchanan, do you recognize this document?

A. Yes.

Q. And what is this document?

A. This is results from another Harris survey, this time in March of 2010.

Q. Did you review this document during your preparation for your deposition today?

A. I did, I looked through this.

Q. If you could just look at page 1

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 95

HIGHLY CONFIDENTIAL - R. BUCHANAN

there which is Bates 2231, the second-to-the-last bullet point on that page states:

"Nearly twice as many people believe the NBA has game-fixing problems (30%), then the next most likely sport (college basketball 26%)" --

A. I hate to cut you off.

Q. It's the fourth bullet point, second from the bottom, my apologies.

MR. MISHKIN: Just because this document is itself marked "Highly Confidential," as are all of these surveys, I probably have been remiss in not designating the questions about these highly confidential.

So if it's all right with you, Mr. Hoffman, sort of nunc pro tunc I would like to designate the portion of the transcript from the point at which you began marking any document that's "Highly Confidential" I guess beginning with NBA 3.

MR. WEGNER: That's, of course, fine. And I would suggest, Jeff, that at

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 96

HIGHLY CONFIDENTIAL - R. BUCHANAN

one of the breaks at the end, she's very good at skimming back to make sure that you get a chance to look at it to make sure it's satisfactory to you before we leave.

MR. MISHKIN: Thank you very much. But I would like to make that designation retrospectively. Thank you.

MR. HOFFMAN: Understood.

BY MR. HOFFMAN (continuing):

Q. So the fourth bullet point on page 1 starts "Nearly twice as many people."

A. Yes.

Q. That bullet point states:

Nearly twice as many people believe the NBA has game-fixing problems (30%), then the next most likely sport college basketball at 16% or the next most likely professional league NFL at 14%. While game-fixing isn't a top concern overall in professional sports, clearly the NBA 'owns' this problem.

Mr. Buchanan, why do you think the respondents of this survey believed that the

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

NBA -- or actually, let me restate the question.

Why do you think Harris Interactive concluded that the NBA owns the game-fixing problem?

A. I don't -- I don't know. My interpretation of the statement, which may not be correct, is that what was meant is -- by owning it, is that among the leagues, we're the one that has the highest number so we stand apart from the other leagues in that regard and are singular in that way. That's what I took it to mean.

Q. And similar to my earlier question on the other survey, do you have any idea whether this survey reflects the belief that game-fixing is a result of gambling as opposed to NBA office behavior?

A. I don't know. I would also just note that -- well, strike that.

Q. If you could turn to page 12 now.

A. Yes.

Q. Which is Bates number 2242, and I want to refer you to -- there's a heading that

says "League Executive and Game-Fixing." Do you see that?

A. Yes.

Q. And then it states:

"40% of respondents believe that the NBA league office influences the outcome of games to benefit its business, slightly more than the NCAA and its conferences (37% ) NFL (33%) and MLB (33%)."

Do you know what the NBA is doing to address those concerns?

A. Yes.

Q. And what is that?

A. Well, as I referenced earlier, we -- the fact is that there is no influence on the outcome of games or any attempt to steer referees to make calls or to favor certain teams. And the only way to -- that we know of to try to communicate that fact to the public is by being as transparent as we can in the way that we train our officials, the way that we monitor our officials, the way in which they make calls and what the process of

officiating is.

And so we have dedicated ourselves over time, but maybe even more so in the last five years or so coming off of the Tim Donaghy matter, to communicating all of that to the public. And so we allow the media into our referee training camp, we try to communicate as clearly as we can exactly what the process is for how calls are made. We're much more transparent now in decision-making in review of calls.

As an example, it really wasn't the practice of the office prior to the last few years to acknowledge that calls were missed in critical contexts. And now we typically will make an announcement from the league office that this call was missed. We think that's in the interest of transparency and having people understand that we're all trying to get to the goal where calls are made very accurately. You see a call, you make a call.

And so that's what we're doing and that's the only thing we really can think to do because, as I said before, the fact is the

league office does not influence the outcome of games to benefit our business. We don't do that. So we figure if we ventilate the truth, eventually that will become the perception as well.

Q. And then the next bullet point says:

"Avid NBA fans (49%) are even more likely than the general population to believe that the NBA league office influences the outcome of game to benefit business."

Do you have any idea why avid NBA fans as opposed to more run-of-the-mill NBA fans would be more likely than the general population to believe that the NBA league office influences the outcome of games to benefit business?

A. My surmise is it's because they are -- they care more. They're more passionate and more rabid and more partisan about their teams so when their teams lose, they typically look for reasons other than the strength or weakness of their team to explain why that

Page 101

HIGHLY CONFIDENTIAL - R. BUCHANAN

happened.

(There was an interruption in proceedings.)

A. So I was going to continue with that answer. I'm not sure if I finished it and I apologize for my phone going off.

The sum of it is I believe that the more passionate the fan, the more likely that fan is to think that an undesired outcome in a game--in other words, if that fan's team loses--is due to officiating or due to some imagined conspiracy between the league office and the referees as opposed to actually that the team wasn't good enough to win.

Q. And do you have an opinion as to whether it's harder to change the perceptions of avid fans as opposed to your regular NBA fan?

A. I don't have an opinion in that regard. I don't. I would be hopeful that our efforts to make clear how officiating works in the NBA would be convincing to anyone.

Q. I'm now going to have you take a look at what we're going to mark as NBA

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 102

HIGHLY CONFIDENTIAL - R. BUCHANAN

Exhibit 7.

(Exhibit 7: NBA Integrity Survey 12/7/09 (#PLAINTIFFS' 00002249-2262), was marked for identification.)

BY MR. HOFFMAN (continuing):

Q. Mr. Buchanan, do you recognize this document?

A. I do.

Q. And what is this document?

A. This is a document reflecting results from another Harris Interactive survey, this time dated December 2009.

Q. Did you review this document during the preparation for your deposition?

A. I did.

Q. On page 1 which is Plaintiffs' 2249, I direct your attention to paragraph 5 which states:

"There is an important distinction that needs to be made between poor officiating and the perception of game-fixing. Obviously bad officiating can lead to perceptions of game-fixing, but if it is viewed as the result of

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 103

HIGHLY CONFIDENTIAL - R. BUCHANAN

human error and not part of a league office master plan, fans can accept it as part of the game.

"The NBA's strong associations with game-fixing and gambling and the fact that the majority of our avid fans believe that our referees grant preferential treatment to certain players and teams are what can be most damaging to our product."

Do you know why the majority of avid fans believe NBA referees grant preferential treatment to certain players?

MR. MISHKIN: I think it's been asked and answered. You can answer it again.

A. Yeah, I think it's the very last answer that I gave.

Q. Other than these surveys that we've been discussing, does the NBA have any studies indicating why people might get the perception that NBA games are being fixed? So maybe it would be helpful if I rephrase.

These studies show, you know, raw

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 104

HIGHLY CONFIDENTIAL - R. BUCHANAN

data, as I think you testified to earlier. But does the NBA have a study as to why people might get the perception that NBA games are being fixed?

A. Well, I guess I would only say that we have these studies and I don't -- I'm not aware of anything else that we have that's like these studies because if we had it, we would have produced it to you.

So in terms of the "why," there may be some answers to those questions in these studies which I'm not a -- I don't have memorized, but there's nothing beyond these that I'm aware of.

Q. I'm going to show you what we're going to mark as NBA Exhibit 8, and you'll be happy to know this is the last survey we'll be discussing.

(Exhibit 8: NBA Integrity Survey 2011 (#PLAINTIFFS' 00002287-2291), was marked for identification.)

BY MR. HOFFMAN (continuing):

Q. Mr. Buchanan, do you recognize this document?

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 105
HIGHLY CONFIDENTIAL - R. BUCHANAN

A. I do. It is another Harris study, this time spring of 2011.

Q. And did you review this document during the preparation for your deposition today?

A. I did.

Q. Could I have you turn to page 3 which is Bates number 2289.

A. Yes.

Q. And if you look at -- there's a row that says Game-Fixing, and my understanding, again, this shows percentage of respondents to the survey who marked or who listed these issues listed in the first column as one of their top three concerns in professional sports. Did I state that accurately?

A. That's my understanding also.

Q. And if you look at game-fixing, which is the fourth row from the bottom, it appears that in November 2009 it starts with percentage of the respondents who listed game-fixing as a top three concern was 17 percent; and in June 2011 the percentage of respondents who listed game-fixing as a top

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 106
HIGHLY CONFIDENTIAL - R. BUCHANAN

three concern was 14 percent. Did I get that right?

A. I see that.

Q. Okay. And during that same time period, if you go to the second row from the bottom which lists gambling, the same numbers went from 8 percent in November 2009 to 5 percent in June 2011. Did I get that right as well?

A. I see that.

Q. Okay. And then the sentence above the last sentence there above the table says that "Officiating and gambling had significant decreases in fan concern during the regular season."

Do you know, to what does the NBA attribute that decrease?

MR. MISHKIN: Well, to the extent that question is -- it refers to professional sports. I don't know, there's no particular NBA reference here so what are you asking Mr. Buchanan?

Q. Do you know why the respondents in this survey, the percentage of respondents in

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 107
HIGHLY CONFIDENTIAL - R. BUCHANAN

the survey -- let me restate the question.

The conclusion of this Harris survey is that gambling had significant decreases in fan concern during the regular season. And my question is: Do you know what that is attributed to, if you know?

A. Yeah, it's -- it's difficult to say. This one's a little hard in a number of ways. I mean, one is even the statement you read me about the regular season is sort of curious considering that the data collection period for this was June 6th through June 13th. So I'm just -- I'm having a hard time mapping that statement about the regular season.

And then the other piece is all of these -- all of the data points that relate to top three issues of course end up being relative to one another. And so if one of the items shifts its positions, it could well be because there was some topical problem with respect to one of the other issues.

And so here I see player salaries, steroids and off-court behavior being the top

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 108
HIGHLY CONFIDENTIAL - R. BUCHANAN

three. It may be that during this particular period, there was an issue about those or about some others that moved its relative rank. So those are just -- that's really just surmise so I don't know.

Q. Okay. If you could turn to the next page, page 4, Bates number 2290, again the third bullet point there states:

"Compared to the 2009-2010 season, opinions that gambling and game-fixing were problem areas for the NBA have significantly decreased."

And the same question: Do you know why that is, why those opinions significantly decreased?

A. Yeah, it's the same -- it's the same answer I gave. It's a -- you know, on a relative basis to these other issues, so I don't know. You know, it's curious in the page before and this one, too, you know, you see these numbers move around in odd ways.

So in this -- on 2290 on the gambling line, the final percentage is 27 percent in June of '11, it was 24 percent in

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 109

HIGHLY CONFIDENTIAL - R. BUCHANAN

March of '11 so it went up. You know, I don't really -- I don't know.

MR. HOFFMAN: Off the record.

[END OF HIGHLY CONFIDENTIAL PORTION.]

(Lunch recess taken 12:10 p.m.)

212-267-6868 VERITEXT REPORTING COMPANY www.veritext.com 516-608-2400

Page 110

HIGHLY CONFIDENTIAL - R. BUCHANAN

A F T E R N O O N S E S S I O N

(Resumed: 12:47 p.m.)

CONTINUED EXAMINATION

BY MR. HOFFMAN:

Q. Mr. Buchanan, earlier I think you said the principal issue in terms of harm that the NBA was concerned about was that the legalization of sports gambling in New Jersey would--and I don't want to misquote you--but I think you essentially said that it would damage your relationship with fans. Am I saying that correctly?

A. Yes.

Q. Does the NBA have any studies or surveys regarding how sports gambling might damage the NBA's relationship with fans?

A. Well, if you mean by studies or surveys market research or polls or things of that nature, the answer is no. If you mean by study the sort of informed view of people that have, you know, worked at the league office for a lot of years, then the answer is we think we do, we think we have a fair basis to believe that that would be the result.

212-267-6868 VERITEXT REPORTING COMPANY www.veritext.com 516-608-2400

Page 111

HIGHLY CONFIDENTIAL - R. BUCHANAN

Q. Has the NBA seen any diminishment in fan loyalty over the past 20 years?

MR. MISHKIN: Object to the form of the question. I mean, if you want to leave it at that level of generality, you can. But you can answer.

A. Okay. You know, I don't -- I don't know. I don't know.

Q. Okay. Do you know if NBA attendance has increased or decreased over the past 20 years?

A. Well, I would say total attendance has increased and, of course, the number of teams that we have in the League has also increased, which is part of the reason for that. We used to have 22 and now -- when I first joined, and now we have 30.

Q. Any studies or surveys of the impact of legal gambling on attendance or ticket sales in the NBA?

A. Again, nothing -- no empirical data of that kind that we have commissioned.

Q. Any empirical data of the impact of illegal gambling on attendance or ticket sales

212-267-6868 VERITEXT REPORTING COMPANY www.veritext.com 516-608-2400

Page 112

HIGHLY CONFIDENTIAL - R. BUCHANAN

in the NBA?

A. No.

Q. Any empirical data of the impact that New Jersey's sports gambling law would have on NBA attendance or ticket sales?

A. No. I guess that would have required us to have done something in the last whatever nine months or so, and so no.

Q. Any studies or surveys of the impact of legal gambling on NBA's television ratings?

A. No.

Q. Any studies or surveys of the impact of illegal gambling on the NBA's television ratings?

A. Again, in the sense of sort of empirical data, no. In the sense of you said the word "study"; my view is that when you look at a problem over the course of years and develop some familiarity and expertise with it, that that's a study of a kind. And in that regard, I believe we have studied the problem and believe that we would get more point spread fans and that would be the

212-267-6868 VERITEXT REPORTING COMPANY www.veritext.com 516-608-2400

result.

Q. I think my question was specific to television ratings. Do you think -- well, let me ask it this way: Any empirical data of the impact of illegal gambling on the NBA's television ratings?

A. Yeah, again, with respect to the empirical data, no.

Q. Any empirical data of the impact that New Jersey's sports gambling law would have on the NBA's television ratings?

A. No empirical data.

Q. Do you know if the NBA's television ratings have increased or decreased over the past 20 years?

A. Well, yeah, again, the ratings of virtually every form of entertainment have decreased over the past 20 years due in part to the fragmentation of the television marketplace and the number of offerings that are available. So I think the answer would be that our ratings, like the ratings of other professional sports, have decreased in that period.

Q. Same question, different time frame: Do you know if the NBA's TV television ratings have increased or decreased over the past ten years?

A. Same answer.

Q. Do you have any empirical data or does the NBA have any empirical data of the impact of legal gambling on the NBA's broadcast revenue?

A. No, I don't believe we have such empirical data.

Q. Any empirical data of the impact of illegal gambling on the NBA's broadcast revenue?

A. No.

Q. Any empirical data of the impact that New Jersey's sports gambling law would have on the NBA's broadcast revenue?

A. No.

Q. Has the broadcast revenue for the NBA increased or decreased over the past 20 years?

A. It has increased in part because, in addition to the fact that television rights

are more valuable, we also broadcast our names on many more television outlets than we did previously. We're now available in 245 countries, so we have a lot more television distributors and television networks that are paying us for the rights.

Q. Any empirical data of the impact of legal gambling on total team revenue?

A. No.

Q. Any empirical data of the impact of illegal gambling on total team revenue?

A. No.

Q. Any empirical data of the impact that New Jersey's sports gambling law would have on total team revenue?

A. No.

Q. And has total team revenue increased or decreased over the past 20 years?

A. It has increased. And just so I'm clear, total team revenue would be the collective revenue of -- all of the local revenue of the teams combined. And it has increased.

Q. Other than what you've testified

about today and what's in the Complaint in this action, is there anything else that the NBA's relying upon in support of standing or harm?

A. Well, I think there might be. I mean, in other words, that's quite a broad question. I'm sure our lawyers will have arguments and cases and other things to argue, to rely upon in connection with their arguments about standing. So --

Q. Fair enough. Let me -- it was probably a poor question. Let me rephrase the question.

Any other evidence that you're relying upon, that the NBA's relying upon, in support of standing or harm?

A. Well, I think I mentioned it previously but, of course, the findings in the federal antigambling law are an important part of that issue. And I believe I mentioned that earlier, but that's another source of material related to that.

Q. Anything else?

A. Well, and, again, I think I've

HIGHLY CONFIDENTIAL - R. BUCHANAN

mentioned this, too, but we're -- the -- with due respect, the context of this deposition is us pointing to pieces of paper or surveys or things of that nature when, of course, there is the accumulated experience of all the people who have worked at the NBA for quite a long period of time, including myself, including the Commissioner of the NBA who has been working on NBA matters for decades.

And I think that that experience provides a basis for a reasonable view as to the outcome of -- or the impact of gambling on our game. So I think I have testified to that previously so that would be included. But in case I did not, I wanted to make it clear.

Q. Okay. Anything else?

A. Not that I can think of right now.

Q. What is the NBA's official position on the use of odds or point spreads in sports media outlets?

MR. MISHKIN: Objection to the form of the question, lacking in foundation.

A. I'm not sure that we have an official position in that regard. We -- we

HIGHLY CONFIDENTIAL - R. BUCHANAN

are aware that point spreads or odds are published with respect to our games in countless outlets, whether they be newspapers or Internet sites or on broadcasts. And we don't -- I don't think we are in a position to control that.

Q. Does the NBA actively discourage sports media from posting odds or point spreads?

A. We do not because it would be -- it would be pointless. We'd be -- there's a great deal of that, publication of that information, and we would not be successful in any effort to persuade people not to do that.

Q. I want to talk a little bit about fantasy sports. How would you define fantasy sports?

A. Fantasy sports is an enterprise where an individual will select members of a hypothetical sports team from players who participate on various teams in the league, in our league or some other sport; assemble this hypothetical team of players and then track their performances over the course of a

HIGHLY CONFIDENTIAL - R. BUCHANAN

season; accumulate points as a result of their performances and based on the number of points accumulated, compete against other players who are doing the same thing.

Q. Would you agree with me that some fantasy sports leagues have entry fees?

A. I'm aware that some have entry fees.

Q. Would you agree with me that there are often monetary prizes for winning fantasy leagues?

A. I'm not sure I would agree about often because I don't have a view of the entire world of fantasy. But I know that there are some that have prizes.

Q. Okay. Would you agree that success in fantasy sports tends to be a combination of both skill and luck?

A. Well, I am not a fantasy player myself and so I don't have a great sense of that. But if -- I think there are elements of both involved because certainly if you assemble a team that includes players who become subject to injury or have some other

HIGHLY CONFIDENTIAL - R. BUCHANAN

misfortune befall them and if you call that luck in the sense of it being chance, I guess that's true, then there are elements of both.

Q. I want to show you what's going to be marked as NBA Exhibit 9.

(Exhibit 9: Fantasy Industry Trends (#PLAINTIFFS' 00003511-557), was marked for identification.)

BY MR. HOFFMAN (continuing):

Q. Mr. Buchanan, do you recognize this document?

A. I do not.

Q. If you need to take a moment to take a look, let me know when you're ready.

A. (Examining document.)

Q. But I will tell you I'm going to focus on pages 39 and 40.

A. Okay.

Q. This document is -- it looks like it's a publication or a presentation by the Fantasy Sports Trade Association entitled Fantasy Industry Trends. And if you turn to page 39 which is Bates number 3549, if you see there, this is a chart of how fantasy sports

Page 121

HIGHLY CONFIDENTIAL - R. BUCHANAN

affects consumers and there's a number of propositions, and then it shows a percentage of the respondents who agreed in 2006 and percentage of respondents who agreed in 2007. Is that fair?

MR. MISHKIN: Well, the witness said he can't identify the document. If you're asking him to -- what's on the page, I'd object to the question. But he can tell you what he sees on the page.

A. Yeah, I am a little uncomfortable testifying about something that I've never seen. I've never even heard of the Fantasy Sports Trade Association before, but the page you've directed me says: "How fantasy sports affects consumers" and has the table with 2006 agree, 2007 agree.

Q. Okay. Why don't you go ahead and turn to page 40 then.

A. Okay.

Q. Which is Bates numbers 3550. And if you look at the third row, it states: "I have rooted for my fantasy sport player playing against my favorite professional

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 122

HIGHLY CONFIDENTIAL - R. BUCHANAN

team." And in 2006 it appears to be that 68 percent of respondents agreed with that and in 2007, 65 percent of the respondents agreed with that.

And my question is: Hypothetically assume that that's true, that those numbers are accurate, accurate and represent the percentage of respondents who responded that way. Is that something that would concern the NBA?

A. Well, again, I would feel more comfortable answering the question in the context of the more general statement. So if the issue is does it concern the NBA that a fan who is playing an NBA fantasy game would say that he has -- he or she has rooted for my fantasy sport player playing against my favorite professional team, that would not necessarily concern me because it seems to me that it's possible to do that while also rooting for your team to win because in fantasy, it's only one player.

And so, for example, if your fantasy team is comprised of a number of

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 123

HIGHLY CONFIDENTIAL - R. BUCHANAN

players and one of those is a Boston Celtics player and you're an LA Lakers fan, then when the Celtics play the Lakers, it's certainly possible for you to root for that Boston Celtics player to have a good game while also rooting for the Lakers to win.

So, you know, the point of fantasy is it's a product that's designed for our sort of most avid fans who want to have a deeper connection with the League as a whole in addition to their particular team, and it's sort of an additive component of the way that we try to relate to these people. And so in that example, that wouldn't necessarily concern me.

Q. So feel free to disagree, but what I think you're saying is that there are scenarios where if you're rooting for a player from your fantasy team and your favorite team, rooting for those things may not be mutually exclusive. Is that fair?

A. Correct. Yeah, correct.

Q. Does the NBA have any empirical data on the impact of fantasy sports on

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 124

HIGHLY CONFIDENTIAL - R. BUCHANAN

attendance or ticket sales?

A. Not that I'm aware of.

Q. Does the NBA have any empirical data on the impact of fantasy sports on television ratings?

A. Not that I'm aware of.

Q. Does the NBA have any empirical data on the impact of fantasy sports on broadcast revenue?

A. No.

Q. And does the NBA have any empirical data on the impact of fantasy sports on total team revenue?

A. No.

Q. Does the NBA sponsor fantasy basketball?

A. Yeah. We have a -- we have a game that we make available to fans through NBA.com that is in conjunction with Yahoo Sports. So the NBA's game that we have is, as they say, powered by Yahoo.

Q. Now, does the NBA have any concern about NBA players participating in fantasy sports?

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 125

HIGHLY CONFIDENTIAL - R. BUCHANAN

A. No.

Q. And does that include NBA players participating in fantasy basketball?

A. That's not something that is currently prohibited by our rules.

Q. Does the NBA have any concern about NBA players participating in fantasy basketball if there is an entry fee or monetary prize for winning the fantasy league?

A. Again, it's -- fantasy is a -- it's a legal activity and something that our players are not prohibited currently from participating in.

Q. Is the NBA concerned that participation in fantasy sports could be a steppingstone to legal sports betting?

A. No, not presently.

Q. Is the NBA concerned that participation in fantasy sports can be a steppingstone to illegal sports betting?

A. Same answer.

Q. And why is the NBA not concerned with those things?

MR. MISHKIN: Object to the form of

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 126

HIGHLY CONFIDENTIAL - R. BUCHANAN

the question of why you're not. But you can answer.

A. I just -- we just understand fantasy to be different. Fantasy is a legal activity, it grew up in a -- you know, as a social way of connecting fans who were interested in a deeper connection to sports. It's something that's relatively small. It's not a big part of what we do.

We have a game available but it's not a particularly large driver or anything. It's just a -- it's an extra offering that we make to people who live, breathe and eat NBA basketball. And, you know, we don't see it leading anywhere else.

Q. Okay. I'm going to show you what we're going to mark as NBA Exhibit 10.

(Exhibit 10: NBA.com/Yahoo Sports Fantasy Basketball (#PLAINTIFFS' 00004037-4042), was marked for identification.)

BY MR. HOFFMAN (continuing):

Q. Now, this appears to be a printout of a website and it appears to be the NBA.com

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 127

HIGHLY CONFIDENTIAL - R. BUCHANAN

fantasy offering in conjunction with Yahoo Sports that you were referring to earlier; is that correct?

A. It is.

Q. Okay. Do you know when the NBA first began partnering with Yahoo Fantasy Basketball?

A. I don't. I think it's relatively recent. I think it's maybe the last couple years, I believe.

Q. Does the NBA partner with any other fantasy sports outlet?

A. No, we don't.

Q. What revenue or licensing fees does the NBA earn from its partnership with Yahoo?

A. I believe the -- I believe the agreement is -- there's a small rights fee in the nature of a couple of hundred thousand dollars, I think, in connection with this game; and then there's an advertising split depending on the ads that are sold against the game.

Q. And does the NBA provide any information to Yahoo for this website?

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 128

HIGHLY CONFIDENTIAL - R. BUCHANAN

A. You know, I'm not 100 percent sure, but I would think that we would. I mean, certainly, I mean, on here as an example, they wouldn't have the right to use these photos or the footage without us providing the authorization so...

Q. Do you know if there are any NBA employees who provide fantasy analysis for the website?

A. I'm not. I don't know. But I mean, I see on here just as an example, there's a link to -- on the second page to the Czar's fantasy advice, the Czar being Mike Fratello, who is a color commentator on NBA games. He's not an NBA employee but I don't know.

Q. The Czar of the telestrator, right?

A. Yes.

Q. Okay. If you could turn to page 3 of that document, it's Bates number 4039. And you'll see there appear to be -- under What's New In Fantasy Basketball 2012, there's an icon there for the pro leagues. Do you see that?

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 129

HIGHLY CONFIDENTIAL - R. BUCHANAN

A. Yes.

Q. In this particular league, participants can compete to win cash prizes in a public head-to-head or rotisserie league and there is an entry fee of $20 or $100. Do you see that?

A. I do.

Q. Okay. Does the emphasis on money here concern the NBA?

A. Well, I would say two things about this: First of all, that particular pro league reference, that's not our game, that's Yahoo's game.

Q. Okay.

A. And that's just to make the record clear in that regard.

With respect to your question, no, it's -- again, within the context of what fantasy sports has become, you know, a low-stakes entry fee of this nature or a prize of some nature has become -- appears in some fantasy leagues that I'm aware of, as I testified earlier. And I don't view that and the NBA doesn't view that as being a problem.

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 130

HIGHLY CONFIDENTIAL - R. BUCHANAN

Q. And any concern on the part of the NBA that a fantasy basketball contest would damage the bonds of loyalty and devotion between fans and teams?

A. Well, again, no. But I mean, in order to explain that, just because this is radically different than sports gambling, I mean, no one here is -- you know, the entry fee is not someone's rent and as far as I'm aware, people don't become addicted to playing fantasy basketball, at least as far as I'm aware.

And so this is -- fantasy, again, it's an additive product, it's a small audience of people who are particularly avid fans that want to do this or their avidity is already demonstrated. And it doesn't concern us that their loyalty to the NBA and their passion for the NBA is going to be directed entirely toward their fantasy experience.

They got into this in the first place because they were crazy NBA fans and presumably and likely with some particular team that they are crazy about. And we don't

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 131

HIGHLY CONFIDENTIAL - R. BUCHANAN

have a concern that this is going to overwhelm their loyalty.

Q. Now, are you aware that sometimes NBA teams have promotions where food items or other gifts are given away if a team scores a certain amount of points at a game?

A. Yes.

Q. For example, I think in Los Angeles at Lakers games, if the Lakers score a hundred points, you get two Jack-in-the-Box tacos.

A. Yes.

MR. MISHKIN: If you want to define that as prize. I object.

MR. HOFFMAN: Fair point, Mr. Mishkin.

BY MR. HOFFMAN (continuing):

Q. Any concern that fans will be disappointed if their home team wins but they don't win -- if they don't reach a certain number of points?

A. No. I mean, is it the case that some fans might be disappointed in that regard? I wouldn't say that it's -- it never happens, but I think it's at such a de minimus

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 132

HIGHLY CONFIDENTIAL - R. BUCHANAN

level, it's not going to stop them in the Lakers example from being a Lakers fan.

Q. I'm going to shift gears now and talk about the NBA's policies and practices regarding sports gambling. And I first want to ask a few questions about Las Vegas. We touched on this earlier, but I just want to confirm a few things.

Does the NBA have any issue with legal gambling in Las Vegas?

MR. MISHKIN: Well, object to the form of the question. You can answer it.

A. Well, I think the term "an issue" can be interpreted a lot of different ways. We would prefer that there not be legalized gambling on our games, and if it had been the case that in 1992 when the federal law was passed there was no such history of legalized gambling anywhere and the Congress said there would be a complete ban, we would have been pleased with that result.

But that was not the case and as a result of the history in Las Vegas, it was grandfathered. And therefore we -- we live in

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

HIGHLY CONFIDENTIAL - R. BUCHANAN

that world where there is legal gambling in Las Vegas and Nevada and we deal with that and there's illegal gambling everywhere else.

Q. I'm going to show you what we're going to mark as NBA Exhibit 11.

(Exhibit 11: Constitution and Bylaws NBA 11/1/08 (#PLAINTIFFS' 0001909-914), was marked for identification.)

BY MR. HOFFMAN (continuing):

Q. And, Mr. Buchanan, I assume you've probably seen this document before.

A. Indeed I have.

Q. And what is this document?

A. This is the Constitution and Bylaws of the National Basketball Association dated November 1st, 2008.

Q. If I can have you turn to Bates number 1910.

A. Yes.

Q. So it's the first page.

MR. MISHKIN: Page 32.

Q. Yes. And that article looks like Article 35 entitled Misconduct. And I want to

HIGHLY CONFIDENTIAL - R. BUCHANAN

point you to Subsection (b) which states that:

"The Commissioner shall direct the dismissal and perpetual disqualification from any further association with the Association or any of its members of any player found by the Commissioner after a hearing to have been guilty of offering, agreeing, conspiring, aiding or attempting to cause any game of basketball to result otherwise than on its merits."

Mr. Buchanan, do you know how many times this rule has been invoked?

A. I don't. I will tell you that in my time at the NBA since 1993, I don't believe we've ever invoked it.

Q. During your time at the NBA, have there been any suspected violations of Article 35 (b)?

A. No.

Q. If you could turn the page to 1911, and I'm going to direct your attention to Subsection (f) which states:

"Any player who directly or

HIGHLY CONFIDENTIAL - R. BUCHANAN

indirectly wagers money or anything of value on the outcome of any game played by a team in the League operated by the Association shall, on being charged with such wagering, be given an opportunity to answer such charges after due notice and the decision of the Commissioner shall be final, binding and conclusive and unappealable. The penalty for such offense shall be within the absolute and sole discretion of the Commissioner and may include a fine, suspension, expulsion and/or perpetual disqualification from further association with the Association or any of its members."

How many times has this Subsection (f) of Article 35 been invoked?

A. Again, since I've been with the NBA, we have not issued any penalties under this Section (f).

Q. And during your time at the NBA, have there been any suspected violations of Article 35 (f)?

A. Well, I don't recall any specific

HIGHLY CONFIDENTIAL - R. BUCHANAN

investigations focused on gambling on NBA games. There have been investigations of players that related to gambling generally in which questions may have been asked in this space, but I wouldn't say that we had any investigations that were targeted toward this conduct.

Q. Okay. Do you know how the NBA would detect violations of this rule?

A. Well, I can imagine. I mean, you know, it's -- as with anything, information can come from anywhere. So we would be -- we would be possessed of information or an assertion or an allegation that a player was betting on NBA games and that could come to us from, you know, almost anyone for almost any reason.

Q. Can you please turn the page to 1912, and this is now Article 35 (a), Misconduct of Persons Other Than Players. And I want to direct your attention to Subsection (b) which states:

"The Commissioner shall direct the dismissal and perpetual disqualification

from any further association with the Association or any of its members of any person found by the Commissioner after a hearing to have been guilty of offering, agreeing, conspiring, aiding or attempting to cause any game of basketball to result otherwise than on its merits."

Do you know how many times this rule has been invoked?

A. Again, since I've been with the NBA, 1993, I don't recall that we've had any circumstances where we have found somebody to have violated this rule.

Q. And during your time at the NBA, are you aware of any suspected violations of Article 35 (a), Subsection (b)?

A. I'm not.

Q. Okay. If you could turn the page to 1913, Subsection (g). This one's a little bit longer, so why don't you go ahead and take a minute to read that.

A. Right.

(Examining document.)

Okay.

Q. Do you know how many times Article 35 (a) Subsection (g) has been invoked?

A. Well, one thing I should say is that the (g) as written here is different and more comprehensive in the way it's written than was the case prior to the Donaghy situation. One of the recommendations from the Pedowitz report was to be somewhat more explicit in the rules that we have about -- that prohibit tipping, gambling on our games, et cetera. And so this iteration of the rule is relatively new.

But in answer to your question, this rule would be the one that would be relevant to the three instances I testified to earlier where we've conducted investigations of team personnel who were involved with gambling on NBA games.

MR. MISHKIN: Off the record.

(A discussion was held off the record.)

BY MR. HOFFMAN (continuing):

Q. Other than the three incidents you

referenced, any other incidents that would fall under Article 35 (a) Subsection (g), as it's currently drafted?

A. No.

Q. And if you know, prior to the Donaghy incident, how was this particular rule or Article 35 (a) Subsection (g) different?

A. I couldn't give you all the specifics. I would say in general that my recollection is that we had either it all rolled up under a rule that prohibited prejudicial or detrimental conduct without being more specific about gambling-related conduct, or it may have been that we simply had a sort of no-gambling rule on NBA games without a lot of the detail and specifics that this rule now lays out.

And so generally speaking, I think it would have been our view that the substance of the rules were materially the same, but they weren't specifically spelled out that way. We think this has a better deterrent effect and a better notice effect for people to understand what it is we're focused on.

Q. Are the rules we just discussed out of the Constitution and Bylaws, were there any previous version of these rules that also prohibited gambling on non-NBA games?

A. No. Well, not during my time. I mean, we've always -- the focus has been gambling on our games, that's what we are concerned about.

Q. I'm going to show you what we're going to mark as NBA Exhibit 12.

A. I'm sorry, can I go back and maybe you're going to give it to me but I do -- there are -- we do have some rules that are broader, for example, with respect to referees. And you're maybe about to show me something like that so --

Q. I am. And it's going to be after this document. I think you're referring to, for example, the work rules for NBA officials?

A. Correct. And so there are some -- some of our employees we are somewhat broader than just gambling on NBA games.

Q. Okay. We'll talk about that next.

(Exhibit 12: Antigambling Rules

Page 141

HIGHLY CONFIDENTIAL - R. BUCHANAN

(#PLAINTIFFS' 00001838-1839), was marked for identification.)

BY MR. HOFFMAN (continuing):

Q. And, Mr. Buchanan, are you familiar with this document or have you seen this document before?

A. I am.

Q. And what is this document?

A. This is a brochure--black and white does not do it justice--that sets forth our antigambling rules, no betting, no fixing, no tipping; and tries to do so in a concise and colorful way, although you would not be able to tell that from this. And it is distributed to as many people within the League as we can possibly distribute it to.

Q. Do you know when the NBA started distributing that pamphlet?

A. Well, it was post the Donaghy situation, so I would say 2008 or 2009, in that time frame.

Q. And so on the first page which is Plaintiffs' 1838, under Personal Conduct it says: "All forms of illegal gambling are

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 142

HIGHLY CONFIDENTIAL - R. BUCHANAN

prohibited." And it says:

"This includes, for example, online gambling which is generally considered illegal in the United States even if the website is located outside the United States. You may engage in casino gambling and betting on non-NBA sports in places where it is legal. For example, playing Blackjack while at a casino in Las Vegas would not violate NBA rules. Betting on horse races where such betting is legal is also permitted."

Why does the NBA allow players to bet on non-NBA sports games?

A. Because of the -- primarily because of what I've testified to previously, our focus is on betting on NBA games and the effect of betting on NBA games on our relationship with our fans, our -- and our product with respect to players. It's inappropriate for them to do that because it would suggest conflict of interest and therefore lead to fans believing that players have divided loyalties.

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 143

HIGHLY CONFIDENTIAL - R. BUCHANAN

But with respect to legal gambling on other sports, it's not really our concern. If it's legal, then you're permitted to do it.

Q. Other than this pamphlet, are there other ways that the NBA educates its players about the NBA's antigambling policies?

A. Yes. We have at various times online training about our gambling rules where you have to take a -- you have to read some material and take a quiz. We have in-person training when we send instructors out to meet with teams to describe the antigambling rules.

Every year there are team awareness meetings which are meetings held with each team at periodic points throughout the year and different topics are addressed in those meetings; gambling is one of the topics that's addressed in that context.

And then we have a rookie transition program where players coming into the League have to come and participate for four days, I believe, and be trained on a whole variety of issues that would affect their NBA careers, including our antigambling

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 144

HIGHLY CONFIDENTIAL - R. BUCHANAN

rules.

There are posters that appear in locker rooms, there are any number of ways. Whatever other things we can think of to make sure that it's top of mind for them, we do.

Q. And if you look to the left of the Personal Conduct box, it says Report Any Suspicious Activity. And under that it states:

"If someone asks you to bet on NBA games, fix the outcome of a game or disclose confidential information that could affect the outcome of the game, you must immediately report this contact to Rick Buchanan." I won't list your phone number or your e-mail address.

Since the NBA first distributed this pamphlet, how many reports of suspicious activities have you received?

A. Well, we certainly received the reports that led to the several investigations that I testified to previously, and I recall that at least one of those came directly to my attention. It may be that all three of them

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 145

HIGHLY CONFIDENTIAL - R. BUCHANAN

did; but in some form or fashion, they were all reported to our office. And I think that's it. I believe it's the three.

Q. Okay. I'm going to show you now what's marked as NBA Exhibit 13.

(Exhibit 13: 2012-2013 Work Rules for NBA Officials (#PLAINTIFFS' 00003504-3506), was marked for identification.)

BY MR. HOFFMAN (continuing):

Q. And I'd like you to turn to page 2 -- well, first let me ask: Are you familiar with this document?

A. I am.

Q. And did you review this document in preparation for today's deposition?

A. I don't remember if I -- I don't think I did, but I certainly am familiar with it.

Q. Okay. And what is this document?

A. This is a portion of the work rules that apply to NBA referees that are in effect for the 2012-2013 season.

Q. If I could have you turn to page 2,

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 146

HIGHLY CONFIDENTIAL - R. BUCHANAN

Plaintiffs' 3505.

A. Yes.

Q. And focus you on Roman Numeral II, Integrity of the Game, Section (c), which is:

"You must not bet directly or indirectly on any professional or collegiate sport other than de minimus bets with friends or family members."

Why are referees prohibited from betting on sports but players are not?

A. Well, it's -- it's because referees have a particular position in the game as being neutral participants who regulate the play on the court, et cetera. And it just strikes us as leading to perceptions that they may not be neutral if they were seen betting on professional or college sports other than in any context in Las Vegas. It's just not an image that we think is consistent with the one that we want fans to have of the officials.

Q. And then Section II (e) states that:

"You must not bet directly or indirectly at a casino or a racetrack or

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 147

HIGHLY CONFIDENTIAL - R. BUCHANAN

an off-track betting establishment during the season. If you bet at a casino, a racetrack or an off-track betting establishment during the off-season, you must report this conduct to Jim Cawley"-- I assume that's senior vice president but --"SVP Security, in advance or within 24 hours of having placed a bet."

Again, why are referees prohibited from betting at casinos during the season but players are not?

A. It's the same issue. It's not -- we just don't want fans associating referees with gambling and having images of them at casinos where a sportsbook may be, you know, 40 feet down the hall. It's just not -- we just don't think it's consistent with the image of neutrality that we want the referees to have.

Q. This paragraph references Jim Cawley. What are Jim Cawley's responsibilities?

A. Jim Cawley is in charge of our security department.

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 148

HIGHLY CONFIDENTIAL - R. BUCHANAN

Q. And do you know how many reports have been sent by NBA referees to Mr. Cawley from Subsection II (e)?

A. I don't. I'm reasonably confident there have been some, but I don't know how many.

Q. Okay.

A. And this contemplated a circumstance where, for example, I remember one of these situations which is a referee in the off-season is taking a cruise and, you know, he's off on a cruise with his wife in the off-season or something like that, and I think we've had a report: Okay, I was in the casino on the cruise ship or something. That's how that would come up.

Q. Okay. During your time in the NBA, have there been any violations of these rules?

A. Well, interesting question, I guess. I mean, in other words, these rules technically are rules for '12-'13 so there hasn't been any violations this season. Going backwards, it was always the case that referees were not permitted to gamble on NBA

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

games and Tim Donaghy did, so that's an example of a situation where the rules were violated.

Other than the Donaghy case, I'm not aware of any circumstances like that.

Q. Well, are you aware in I think October 2007, it became public that more than half of the League's 56 referees had violated NBA policies regarding casino gambling?

A. Well, the Pedowitz report talks about the fact that our prohibitions at that time were broader than these (indicating). And the result was that we had certain referees who had been -- who had been at casinos and had participated in casino gaming.

With respect to whether it was half or anything, I don't recall the numbers. But it certainly was the case that we -- as written, the rules were not enforced to prohibit referees from playing Blackjack or craps, for example. And Mr. Pedowitz learned of that and one of his recommendations was to revise the rules to focus more explicitly on the issues that -- what we wanted to occur and

what we didn't want to occur.

Q. And for those officials, again, whatever the number was, that had been involved in casino gambling back in October 2007, do you know if any of those referees were punished by the NBA?

A. No. And I believe it was -- again, it was in the Pedowitz report. My recollection may not be accurate, but that the decision was not to do that and that was in part in the context of a clarification of what those rules really should have been prohibiting.

Q. Let me show you what we're going to mark as NBA Exhibit 14.

(Exhibit 14: Operations Manual 2010-2011 (#PLAINTIFFS' 00003496-3503), was marked for identification.)

BY MR. HOFFMAN (continuing):

Q. Mr. Buchanan, have you seen this document before?

A. Yes.

Q. And what is this document?

A. This is material from our

Operations Manual, and our Operations Manual is a compendium of rules that govern all different facets of team and League operations across a very wide spectrum. And they are consolidated and summarized into a single book, which is the Operations Manual.

Q. If I could direct your attention to page 467, Plaintiffs' 3501 of NBA Exhibit 14.

A. Um-hmm.

Q. It looks like it's Section 7 which is entitled Team Tie-Ins with Gaming Establishments and Lotteries. So it appears here that the NBA rules allow teams to make advertising arrangements with legal gambling establishments as long as the establishment does not offer, and I quote, "offer any form of online betting on any sporting event or contest." Do you see that in 7(a)(1)?

A. Yes.

Q. I just want to be clear: What does the expression "any form of online betting" mean?

A. Well, I think this is a little inartful. I think what it's supposed to mean

is that you can accept an advertisement from a gaming establishment that, even if it engages in legal sports betting and it's written in the -- sort of in the reverse and there's a -- I think there's part of it that's actually missing. But online betting is illegal so if you were -- if you are -- if you're engaging in an advertising relationship with an establishment that's offering online sports betting, then that's illegal and that's the reason you can't.

And then the other piece that's missing is that, of course, you couldn't accept advertising from a gaming establishment that was offering a physical sportsbook outside of Nevada, which would also be illegal.

Q. Sure. Okay. I think you've cleared it up. I was unclear about whether online actually meant Internet gambling versus some reference to the line. I just wanted to clear that up.

A. That's correct, Internet, yes.

Q. Do you know if there have been any

Page 153

HIGHLY CONFIDENTIAL - R. BUCHANAN

violations of this portion of the NBA Operations Manual?

A. Well, violations. So I -- I don't know, but I -- the way this works is that advertising or promotions of this nature are subject to review by the league office and they go through sort of a business review process whereby if they don't comply with the rules, they will need to be modified or dealt with.

And so there may well have been circumstances where advertisements were submitted that didn't comply and then they were told they don't comply and you need to fix them. I'm sure there were.

Q. Does the NBA league office itself have any partnerships with casinos?

A. I'm not aware that we do.

Q. And do you know how many NBA teams have advertising arrangements with gaming establishments?

A. I don't know the precise number. I know there certainly are some that do.

Q. For those NBA teams that do have

212-267-6868 VERITEXT REPORTING COMPANY www.veritext.com 516-608-2400

Page 154

HIGHLY CONFIDENTIAL - R. BUCHANAN

advertising arrangements with gaming establishments, are they required to report any profits related to those advertising arrangements to the NBA league office?

A. I just want to make sure I understand your question. You're asking whether profits relating to the advertising.

Q. Correct.

A. Sure, in the sense that the teams report all of their local revenue to the league office. In other words, we have -- in order to consolidate the financial statements for all the League entities, we have to see that.

MR. MISHKIN: The question was about profits; the answer was about revenue. I don't know if that matters to you but...

MR. HOFFMAN: That's fine.

A. We see revenue, we see expense, sure.

Q. Has there been any reported decrease in fan loyalty based on the advertising relationships between NBA teams

212-267-6868 VERITEXT REPORTING COMPANY www.veritext.com 516-608-2400

Page 155

HIGHLY CONFIDENTIAL - R. BUCHANAN

and gaming establishments?

A. I have no information on that one way or the other.

Q. Now, the NBA also has a women's pro league called the WNBA; is that correct?

A. That is correct.

Q. And there's a WNBA team that plays inside a casino; is that correct?

MR. MISHKIN: Plays inside a casino. Well, that's the question.

A. Well, first of all, you probably just heard my counsel object on the grounds that I'm not here representing the WNBA, which the WNBA is not a Plaintiff in this case and so I'm not 100 percent sure why I would be testifying about that.

But subject to that objection which he just made, inside of a casino. The team is owned by the Mohican Sun. The Mohican Sun has a casino and it also has an arena in which it plays games. I think those are adjacent to each other or connected to each other or part of the same gigantic structure, that is true.

Q. Did the NBA have any concern about

212-267-6868 VERITEXT REPORTING COMPANY www.veritext.com 516-608-2400

Page 156

HIGHLY CONFIDENTIAL - R. BUCHANAN

naming a WNBA team after a casino? My understanding is the team's name is the Connecticut Sun, I believe.

A. Connecticut Sun, that's true.

Q. Was there any concern naming the WNBA team after a casino?

A. I think that question would be better directed to WNBA officials than me.

Q. Okay. If you'd now look at Section 7(a)(2), Promotions.

A. Yes.

Q. Now, it appears that NBA teams may enter into agreements with gaming establishments for promotional events or giveaways as long as the promotion does not relate to gambling activities. Is that correct?

A. Right. It doesn't relate to any betting or other gambling activities or facilities.

Q. So does this rule allow for promotional events with gaming establishments that conduct sports betting?

A. Well, again, the -- what the rule

212-267-6868 VERITEXT REPORTING COMPANY www.veritext.com 516-608-2400

HIGHLY CONFIDENTIAL - R. BUCHANAN

means is that, for example, there could be a promotional event between a team and a Nevada casino property that would say if you win the promotion, you get a free hotel stay at the casino property's hotel. And if that casino property has a sportsbook, that would not be prohibited.

Q. If you'd turn the page to page 468, Plaintiffs' 3502.

A. Yes.

Q. Section (b) entitled Lotteries. And here it states that:

"Teams may accept advertising and promotional arrangements with state lotteries or provincial lotteries in the case of Canada provided that such promotional arrangement does not refer to or promote lottery games based on sports betting unless otherwise approved by the League."

Have any exceptions allowing references to sports betting been approved by the League?

A. No.

HIGHLY CONFIDENTIAL - R. BUCHANAN

Q. Do you know how many licenses to use team logos have been granted by the National Basketball Players Association?

A. No, I have no idea. Well, I'm sorry, let me back up.

Q. In conjunction with the lotteries, I should say.

A. Yeah, maybe you want to -- I'm not sure you asked the question the way you want to ask it. I think you said granted by the National Basketball Players Association.

MR. MISHKIN: The letters NBAP do not refer to the Players Association.

MR. HOFFMAN: It makes sense. I reversed the P and the A.

Q. What does NBAP stand for?

A. NBAP is NBA Properties which is --

Q. That makes more sense.

A. -- which is the marketing and licensing arm of the NBA. So it's our sister commercial company.

Q. So let me -- now that I've clarified that, how many licenses to use team logos have been granted by the NBAP?

HIGHLY CONFIDENTIAL - R. BUCHANAN

A. I can't give you a precise number but there are some.

Q. And if you go down, there's three subsections 1, 2 and 3 and there is some additional abbreviations used there. Since I already messed up one, why don't I just make sure I understand what the other ones mean. What does TMBO stand for?

A. TMBO is team marketing and business operations. That is a department of the NBA league office that functions as a -- essentially a consulting firm for team business operations in order to help them maximize revenue.

Q. And what IS the TPP system?

A. That one I'm not going to be able to help you with other than to say that I believe it is the computer system through which promotions are submitted by teams for approval.

Q. And do you know, has the NBA rejected any lottery arrangements pursuant to this, under this rule?

A. I don't know. I don't know.

HIGHLY CONFIDENTIAL - R. BUCHANAN

Q. I'm going to show you what we're going to mark as NBA Exhibit 15.

(Exhibit 15: Meeting minutes Board of Governors 10/24/07-10/25/07 (#PLAINTIFFS' 00002271-2272), was marked for identification.)

BY MR. HOFFMAN (continuing):

Q. Have you seen this document before?

A. I have.

Q. And what is this document?

A. This is an excerpt from the minutes of the annual meeting of our Board of Governors that was held in 2007.

Q. And do these board minutes indicate that the Board of Governors voted unanimously to waive the NBA rule prohibiting owners from owning any interest in or controlling a gaming establishment that has a sportsbook including NBA games, and that rule was waived for David Bonderman, a minority owner of the Celtics?

MR. MISHKIN: Of course, the document says what it says. If you're asking the witness to confirm what it says, then I would object to the

Page 161

HIGHLY CONFIDENTIAL - R. BUCHANAN

question. But you can answer it.

A. This reflects a waiver that was granted in respect of that rule for Mr. Bonderman, who was then a minority owner of the Celtics, and for Mr. Gary Loveman, who was a putative owner of interest, a minority interest, in the Celtics.

Q. Mr. Buchanan, were you present at this meeting?

A. I was.

Q. And did you prepare any reports or recommendations regarding this issue?

A. I did not.

Q. Do you know if there was any opposition to this waiver?

A. Well, I think it is fair -- given that the ultimate vote was a unanimous vote in favor of the waiver, I think that is the fairest reflection of the board's view of it at the end. There was certainly discussion of this issue in connection with its presentation, and not all of the comments that were made were in favor. But ultimately the vote was as you see here.

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 162

HIGHLY CONFIDENTIAL - R. BUCHANAN

Q. Why was the waiver granted?

A. Well, I can't -- you know, there's 30 owners who vote on this and they all have their own reasons to do that. I would -- I wish I knew at all times the reasons why our owners voted in favor or against certain things, but I don't.

I would say, though, that as stated by proponents of this, that the view was that in the connection with certain protections that we required to be put in place, that there was not a concern that the small ownership in the team and the ownership in the sportsbook, especially under circumstances where the games of -- the Celtics games would be removed from that sportsbook, would cause a conflict of interest that would -- that would ultimately be a problem for the League.

Q. I'm going to show you what we're going to mark as NBA Exhibit 16.

(Exhibit 16: Meeting minutes Board of Governors 10/22/07-10/23/07 (#PLAINTIFFS' 00002269-2270), was marked for identification.)

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 163

HIGHLY CONFIDENTIAL - R. BUCHANAN

BY MR. HOFFMAN (continuing):

Q. Have you seen this document before?

A. I have.

Q. And what is this document?

A. It's more board minutes, this time from our annual meeting in October of 2008.

Q. And can you briefly describe for the record what waiver was voted on here?

A. In this case, the request for a waiver was from the Sacramento Kings. The Kings owned -- at that time owned a controlling interest in the Palms casino in Las Vegas. The Palms has a sportsbook and prior to this time, that sportsbook was not permitted to include bets on NBA games.

The Kings requested that a waiver of that rule be granted so that NBA games could be added to the sportsbook, recognizing that we would require, as we did, that Kings games could not be included in the offering.

Q. And were you present for this meeting?

A. Yes.

Q. Did you prepare any reports or

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 164

HIGHLY CONFIDENTIAL - R. BUCHANAN

recommendations regarding this issue?

A. I did not.

Q. Why was this waiver granted?

A. It's consistent with the waiver from 2007. Again, the board's view was that under circumstances in which the games of the Sacramento Kings were not available on the sportsbook and under other circumstances that were designed to ensure that the owners of the Sacramento Kings team didn't have access to confidential information about the other NBA teams or were involved directly or indirectly in the setting of betting lines, under all of those conditions, we felt that the -- the board felt that there was not a sufficient conflict of interest such that we would prohibit these games from being included in the book.

Q. Do you know if any waiver regarding ownership in casinos has not been approved by the NBA?

A. After this time, I believe the answer is no. In other words, prior -- the 2007 request in Exhibit 15 was the first

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

HIGHLY CONFIDENTIAL - R. BUCHANAN

waiver that I can recall being granted, and I believe that previously there may have been requests made along these lines that were not -- that were not allowed.

Whether they rose -- whether they came up to the -- to an actual board vote, I'm not aware. Issues percolate up through the League and oftentimes are stopped before they get to the full board for a vote.

Q. But other than these two, do you recall whether any waiver issues come to a board vote?

A. These two, I'm not -- as I sit here, I'm not recalling any.

Q. Sorry, and when I say "waiver issue," I mean a waiver regarding a relationship with a casino.

A. Correct. I'm not remembering any others.

MR. HOFFMAN: I'm going to show you what we're going to mark as NBA Exhibit 17.

(Exhibit 17: Declaration of David Stern 8/6/12, was marked for

HIGHLY CONFIDENTIAL - R. BUCHANAN

identification.)

BY MR. HOFFMAN (continuing):

Q. Did you help prepare this declaration for Commissioner Stern?

MR. MISHKIN: You can answer yes or no.

A. Yes.

Q. Have you discussed this declaration with Commissioner Stern?

MR. MISHKIN: I object on the grounds that I don't see how that could avoid disclosure of attorney-client discussions, and I would instruct the witness not to answer.

Q. Is there any other harm that the NBA's alleging in this case that we have not already discussed today?

A. You know, I don't -- I think I've discussed everything that's -- that's concerning us here. The only thing that came to my mind while we were involved in the question and answer was that there is obviously some data in the surveys that you took me through that reflects a concern on the

HIGHLY CONFIDENTIAL - R. BUCHANAN

part of a number of respondents to those surveys about gambling, about legalizing gambling on sports.

And just from a strict business perspective, when you have roughly 40 percent of respondents saying they oppose gambling on sports, legalizing gambling on sports, from a business perspective, that's something that you certainly have to take account of and be concerned that if it were to occur, that it would harm you because those people are opposed to it.

That's the only other thing that I thought of as we went along here today. But otherwise I think I have testified to everything else.

MR. HOFFMAN: I have no further questions.

MR. MISHKIN: I have none. Thank you.

(Time noted: 2:06 p.m.)

STATE OF NEW YORK )
) ss:
COUNTY OF NEW YORK )

I, RICHARD W. BUCHANAN, the witness herein, having read the foregoing testimony of the pages of this deposition, do hereby certify it to be a true and correct transcript, subject to the corrections, if any, shown on the attached page.

_________________________
RICHARD W. BUCHANAN

Subscribed and sworn to before me this ______ day of ______________, 2012.

________________________________
NOTARY PUBLIC

Page 169

I N D E X

EXAMINATION OF RICHARD W. BUCHANAN — PAGE

By Mr. Hoffman............................ 4

AFTERNOON SESSION......................... 110

HIGHLY CONFIDENTIAL PORTIONS: Pages 53-59, 76-109

INSTRUCTIONS BY COUNSEL NOT TO ANSWER (Page:Line): 166:11

E X H I B I T S

| NBA EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1: | 30(b)(6) Notice of Deposition | 14 |
| Exhibit 2: | Pedowitz report 10/1/08 (#PLAINTIFFS' 00003354-486) | 47 |
| Exhibit 3: | NBA Gambling Survey (#PLAINTIFFS' 00002263-268) | 75 |
| Exhibit 4: | Harris Interactive Quick Query 2007 study (#PLAINTIFFS' 00002292-2300) | 83 |
| Exhibit 5: | Harris Interactive Quick Query 2009 study (#PLAINTIFFS' 00002273-2286) | 91 |
| Exhibit 6: | NBA Integrity Survey 4/16/10 (#PLAINTIFFS' 00002231-248) | 94 |
| Exhibit 7: | NBA Integrity Survey 12/7/09 (#PLAINTIFFS' 00002249-2262) | 102 |

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 170

EXHIBITS (continued):

| NBA EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 8: | NBA Integrity Survey 2011 (#PLAINTIFFS' 00002287-2291) | 104 |
| Exhibit 9: | Fantasy Industry Trends (#PLAINTIFFS' 00003511-557) | 120 |
| Exhibit 10: | NBA.com/Yahoo Sports Fantasy Basketball (#PLAINTIFFS' 00004037-4042) | 126 |
| Exhibit 11: | Constitution and Bylaws NBA 11/1/08 (#PLAINTIFFS' 0001909-914) | 133 |
| Exhibit 12: | Antigambling Rules (#PLAINTIFFS' 00001838-1839) | 140 |
| Exhibit 13: | 2012-2013 Work Rules for NBA Officials (#PLAINTIFFS' 00003504-3506) | 145 |
| Exhibit 14: | Operations Manual 2010-2011 (#PLAINTIFFS' 00003496-3503) | 150 |
| Exhibit 15: | Meeting minutes Board of Governors 10/24/07-10/25/07 (#PLAINTIFFS' 00002271-2272) | 160 |
| Exhibit 16: | Meeting minutes Board of Governors 10/22/07-10/23/07 (#PLAINTIFFS' 00002269-2270) | 162 |
| Exhibit 17: | Declaration of David Stern 8/6/12 | 165 |

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 171

ERRATA SHEET
VERITEXT REPORTING COMPANY
1250 BROADWAY
NEW YORK, NEW YORK 10001
212-279-9424

NAME OF CASE: NCAA VS. CHRISTIE
DATE OF DEPOSITION: NOVEMBER 15, 2012
NAME OF DEPONENT: RICHARD W. BUCHANAN

| PAGE | LINE(S) | CHANGE | REASON |
|---|---|---|---|
| ____ | ________ | ______________ | ______________ |
| ____ | ________ | ______________ | ______________ |
| ____ | ________ | ______________ | ______________ |
| ____ | ________ | ______________ | ______________ |
| ____ | ________ | ______________ | ______________ |
| ____ | ________ | ______________ | ______________ |
| ____ | ________ | ______________ | ______________ |
| ____ | ________ | ______________ | ______________ |
| ____ | ________ | ______________ | ______________ |
| ____ | ________ | ______________ | ______________ |
| ____ | ________ | ______________ | ______________ |
| ____ | ________ | ______________ | ______________ |
| ____ | ________ | ______________ | ______________ |
| ____ | ________ | ______________ | ______________ |

______________________
RICHARD W. BUCHANAN

SUBSCRIBED AND SWORN TO BEFORE ME
THIS___DAY OF ____________, 20__.

______________________ ______________________
(NOTARY PUBLIC) MY COMMISSION EXPIRES:

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400

Page 172

C E R T I F I C A T I O N

I, Sherri Flagg, a Registered Professional Reporter, Certified LiveNote Reporter, and a Notary Public, do hereby certify that the foregoing witness, RICHARD W. BUCHANAN, was duly sworn on the date indicated and that the foregoing is a true and accurate transcription of my stenographic notes.

I further certify that I am not employed by nor related to any party to this action.

______________________
Sherri Flagg, RPR, CLR

VERITEXT REPORTING COMPANY
212-267-6868 www.veritext.com 516-608-2400