**McCARTER & ENGLISH, LLP**
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
(973) 622-4444

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
Four Times Square
New York, New York 10036-6522
(212) 735-3000

**BANCROFT PLLC**
1919 M Street, N.W., Suite 470
Washington, DC 20036
(202) 234-0090

Attorneys for Plaintiffs
    National Collegiate Athletic Association,
    National Basketball Association, National
    Football League, National Hockey League, and
    Office of the Commissioner of Baseball doing
    business as Major League Baseball

|  |  |
|---|---|
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, an unincorporated association, NATIONAL BASKETBALL ASSOCIATION, a joint venture, NATIONAL FOOTBALL LEAGUE, an unincorporated association, NATIONAL HOCKEY LEAGUE, an unincorporated association, and OFFICE OF THE COMMISSIONER OF BASEBALL, an unincorporated association doing business as Major League Baseball, <br><br> Plaintiffs, <br><br> v. <br><br> CHRISTOPHER J. CHRISTIE, Governor of the State of New Jersey, DAVID L. REBUCK, Director of the New Jersey Division of Gaming Enforcement and Assistant Attorney General of the State of New Jersey, and FRANK ZANZUCCKI, Executive Director of the New Jersey Racing Commission, <br><br> Defendants. | UNITED STATES DISTRICT COURT **DISTRICT OF NEW JERSEY** <br><br> No. 3:12-cv-04947-MAS-LHG <br><br><br> **PLAINTIFFS' REPLY STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1** |

Pursuant to Local Rule 56.1, and in support of their motion for summary judgment, plaintiffs National Collegiate Athletic Association, National Basketball Association, National Football League, National Hockey League, and Office of the Commissioner of Baseball doing business as Major League Baseball respectfully submit this Reply Statement of Undisputed Material Facts.

### PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSES

*A.*   *PASPA*

1.      On October 28, 1992, the United States Congress enacted the Professional and Amateur Sports Protection Act, 28 U.S.C. § 3701-3704 ("PASPA").  Pub. L. No. 102-559, 106 Stat. 4227 (1992).

> **Defendants' Response:**  Undisputed.

> **Plaintiffs' Reply:**  Defendants do not dispute this paragraph.

2.      The statute, effective as of January 1, 1993, prohibits any person or governmental entity from sponsoring, operating, advertising, promoting, licensing, or authorizing by law or compact:

> a lottery, sweepstakes, or other betting, gambling, or wagering scheme based, directly or indirectly (through the use of geographical references or otherwise), on one or more competitive games in which amateur or professional athletes participate, or are intended to participate, or one or more performances of such athletes in such games.

28 U.S.C. § 3702.

> **Defendants' Response:**  Undisputed.

> **Plaintiffs' Reply:**  Defendants do not dispute this paragraph.

3.      PASPA gives sports organizations standing to bring a civil action to enjoin any violation of its provisions.  *Id.* § 3703.

> **Defendants' Response:**  Disputed. (*See* Defs.' Mot. to Dismiss, Dkt. 29-1.)

Moreover, Plaintiffs' statement is an improper assertion of law or mixed assertion of law and fact that is inappropriate for a Statement of Undisputed Facts under Local Rule 56.1.

**Plaintiffs' Reply:** *See* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint, dated October 1, 2012 (Dkt. No. 39), and Plaintiffs' Reply Brief in Support of Their Motion for Summary Judgment and, If Necessary to Preserve the Status Quo, a Preliminary Injunction, and Brief in Opposition to Defendants' Cross-Motion for Summary Judgment, dated December 6, 2012.

4. PASPA provides four exceptions to the prohibition on gambling on sporting events. Two exceptions permit certain sports gambling activity already conducted during specified time periods prior to PASPA's passage. *Id.* § 3704(a)(1)-(2). A third exception provided a one-year window from PASPA's effective date during which any state that operated casino gaming for the previous ten-year period could authorize sports betting. *Id.* § 3704(a)(3). The fourth exception applies to pari-mutuel animal racing and jai-alai games. *Id.* § 3704(a)(4).

**Defendants' Response:** Disputed with respect to Plaintiffs' characterization of the statute; the statute speaks for itself.

**Plaintiffs' Reply:** The statute speaks for itself.

5. The Senate Judiciary Committee (the "Committee") determined that PASPA serves "an important public purpose, to stop the spread of State-sponsored gambling and to maintain the integrity of our national pastime." S. Rep. No. 102-248, at 4.

**Defendants' Response:** Admitted only to the extent that the quoted portion of this statement appears in the Senate Judiciary Committee's report. Disputed to the extent that the statement purports to establish that the legalization of sports gambling will negatively affect the integrity of sports. There is no empirical evidence demonstrating that an increase in legal

gambling would result in increased match fixing or an increased perception of match fixing. *See* Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("SUMF") ¶¶ 74-76, 82, 94. Not only will legalizing sports gambling not result in more corruption, the evidence shows that a legalized gambling market will provide transparency that may actually decrease corruption. SUMF ¶¶ 34-37, 85-86.

Moreover, as set forth more fully in Defendants' General Responses and Objections (*supra* pp. 1–2), the Senate Judiciary Committee's report, and the quoted statement contained therein, is inadmissible hearsay.

**Plaintiffs' Reply:** Defendants do not dispute this paragraph. To the extent that defendants challenge the implications or inferences to be drawn from the congressional report, they have argued that challenge in their briefs. To the extent that defendants challenge the admissibility of the congressional report, they are wrong. Congressional records are presumed trustworthy, and thus admissible in evidence, as public records and reports. *See* Fed. R. Evid. 803(8) and advisory committee note. Accordingly, courts frequently admit congressional reports into evidence. *See, e.g., Mariani v. United States*, 80 F. Supp. 2d 352, 360-61 (M.D. Pa. 1999) (holding minority report of congressional committee admissible under Rule 803(8)); *McFarlane v. Ben-Menashe*, No. 93-1304 (TAF), 1995 WL 129073, at *4-5 (D.D.C. Mar. 16, 1995) (holding congressional task force report trustworthy and admissible under Rule 803(8)), *opinion withdrawn in part on reconsideration on other grounds,* 1995 WL 799503 (D.D.C. June 13, 1995); *Hobson v. Wilson*, 556 F. Supp. 1157, 1181 (D.D.C. 1982) (holding portions of Senate Committee report admissible under public records exception), *aff'd in part, rev'd in part on other grounds*, 737 F.2d 1 (D.C. Cir. 1984).

6.      The Committee also found that "[s]ports gambling threatens to change the nature

of sporting events from wholesome entertainment for all ages to devices for gambling. It under-mines public confidence in the character of professional and amateur sports. Furthermore, State-sanctioned sports gambling will promote gambling among our Nation's young people." *Id.*

   **Defendants' Response:**  Defendants admit that Plaintiffs have accurately quoted the statement of the Senate Judiciary Committee, but deny that sports gambling threatens to change the nature of sporting events from wholesome entertainment for all ages to devices for gambling or undermines the public confidence in the character of professional and amateur sports.  There is no empirical evidence demonstrating that an increase in legal gambling would result in increased match fixing or an increased perception of match fixing. *See* SUMF ¶¶ 74-76, 82, 94.  Defendants further deny that State-sanctioned sports gambling will promote gambling among our Nation's young people.  Plaintiffs have provided no empirical evidence demonstrating that the legalization of sports wagering will lead to an increase in overall sports wagering among our Nation's young people.

   Moreover, as set forth more in Defendants' General Responses and Objections (*supra* pp. 1–2), the Senate Judiciary Committee's report, and the quoted statement contained therein, is inadmissible hearsay.

   **Plaintiffs' Reply:**  Defendants do not dispute this paragraph.  To the extent that defendants challenge the implications or inferences to be drawn from the congressional report, they have argued that challenge in their briefs.  To the extent that defendants challenge the admissibility of the congressional report, they are wrong.  Congressional records are presumed trustworthy, and thus admissible in evidence, as public records and reports. *See* Fed. R. Evid. 803(8) and advisory committee note.  Accordingly, courts frequently admit congressional reports into evidence. *See, e.g., Mariani v. United States*, 80 F. Supp. 2d 352, 360-61 (M.D. Pa. 1999)

(holding minority report of congressional committee admissible under Rule 803(8)); *McFarlane*

*v. Ben-Menashe*, No. 93-1304 (TAF), 1995 WL 129073, at *4-5 (D.D.C. Mar. 16, 1995) (holding

congressional task force report trustworthy and admissible under Rule 803(8)), *opinion*

*withdrawn in part on reconsideration on other grounds*, 1995 WL 799503 (D.D.C. June 13,

1995); *Hobson v. Wilson*, 556 F. Supp. 1157, 1181 (D.D.C. 1982) (holding portions of Senate

Committee report admissible under public records exception), *aff'd in part, rev'd in part on*

*other grounds*, 737 F.2d 1 (D.C. Cir. 1984).

      7.     Moreover, the Committee concluded:

> Sports gambling is a national problem. The harms it inflicts are felt beyond the borders of those States that sanction it. The moral erosion it produces cannot be limited geographically. Once a State legalizes sports gambling, it will be extremely difficult for other States to resist the lure. The current pressures in such places as New Jersey and Florida to institute casino-style sports gambling illustrate the point. Without Federal legislation, sports gambling is likely to spread on a piecemeal basis and ultimately develop an irreversible momentum. The committee agrees with David Stern, commissioner of the National Basketball Association, that "[t]he interstate ramifications of sports betting are a compelling reason for federal legislation."

*Id.* at 5-6 (alteration in original).

      **Defendants' Response:**  Defendants admit that Plaintiffs have accurately quoted

the statement of the Senate Judiciary Committee, but dispute to the extent that it purports to es-

tablish harms stemming from further legalization of sports wagering.  Illegal sports wagering is

already an $270 billion-$500 billion national enterprise which makes it "the most widespread

and popular form of gambling in America."  Slocum Decl. Exhibit 7 (Plaintiffs' 00002363); *see*

*also* SUMF ¶ 15.

      Moreover, as set forth more fully in Defendants' General Responses and Objec-

tions (*supra* pp. 1–2), the Senate Judiciary Committee's report, and the quoted statement con-

tained therein, is inadmissible hearsay.

      **Plaintiffs' Reply:**  Defendants do not dispute this paragraph.  To the extent that

defendants challenge the implications or inferences to be drawn from the congressional report, they have argued that challenge in their briefs. To the extent that defendants challenge the admissibility of the congressional report, they are wrong. Congressional records are presumed trustworthy, and thus admissible in evidence, as public records and reports. *See* Fed. R. Evid. 803(8) and advisory committee note. Accordingly, courts frequently admit congressional reports into evidence. *See, e.g., Mariani v. United States*, 80 F. Supp. 2d 352, 360-61 (M.D. Pa. 1999) (holding minority report of congressional committee admissible under Rule 803(8)); *McFarlane v. Ben-Menashe*, No. 93-1304 (TAF), 1995 WL 129073, at *4-5 (D.D.C. Mar. 16, 1995) (holding congressional task force report trustworthy and admissible under Rule 803(8)), *opinion withdrawn in part on reconsideration on other grounds*, 1995 WL 799503 (D.D.C. June 13, 1995); *Hobson v. Wilson*, 556 F. Supp. 1157, 1181 (D.D.C. 1982) (holding portions of Senate Committee report admissible under public records exception), *aff'd in part, rev'd in part on other grounds*, 737 F.2d 1 (D.C. Cir. 1984).

8.   In addition, the Committee stated:

> Sports are national institutions, and Congress has recognized a distinct Federal interest in protecting sports from corruption. The House Judiciary Committee called such corruption "a challenge to an important aspect of American life – honestly competitive sports."
>
> [PASPA] represents a judgment that sports gambling – whether sponsored or authorized by a State or other governmental entity – is a problem of legitimate Federal concern for which a Federal solution is warranted.

*Id.* at 6-7 (footnote omitted).

**Defendants' Response:**  Admitted only to the extent that the quoted portion of this statement appears in the Senate Judiciary Committee's report, but disputed to the extent that it purports to establish that the legalization of sports gambling will result in increased corruption in sports. There is no empirical evidence demonstrating that an increase in legal gambling would

result in increased match fixing or an increased perception of match fixing.  *See* SUMF ¶¶ 74-76, 82, 94.  Not only will legalizing sports gambling not result in more corruption, the evidence shows that a legalized gambling market will provide transparency that may actually decrease corruption.  SUMF ¶¶ 34-37, 85-86.

Moreover, as set forth more fully in Defendants' General Responses and Objections (*supra* pp. 1–2), the Senate Judiciary Committee's report, and the quoted statement contained therein, is inadmissible hearsay.

**Plaintiffs' Reply:**  Defendants do not dispute this paragraph.  To the extent that defendants challenge the implications or inferences to be drawn from the congressional report, they have argued that challenge in their briefs.  To the extent that defendants challenge the admissibility of the congressional report, they are wrong.  Congressional records are presumed trustworthy, and thus admissible in evidence, as public records and reports.  *See* Fed. R. Evid. 803(8) and advisory committee note.  Accordingly, courts frequently admit congressional reports into evidence.  *See, e.g., Mariani v. United States*, 80 F. Supp. 2d 352, 360-61 (M.D. Pa. 1999) (holding minority report of congressional committee admissible under Rule 803(8)); *McFarlane v. Ben-Menashe*, No. 93-1304 (TAF), 1995 WL 129073, at *4-5 (D.D.C. Mar. 16, 1995) (holding congressional task force report trustworthy and admissible under Rule 803(8)), *opinion withdrawn in part on reconsideration on other grounds*, 1995 WL 799503 (D.D.C. June 13, 1995); *Hobson v. Wilson*, 556 F. Supp. 1157, 1181 (D.D.C. 1982) (holding portions of Senate Committee report admissible under public records exception), *aff'd in part, rev'd in part on other grounds*, 737 F.2d 1 (D.C. Cir. 1984).

9.    Although Congress "firmly believe[d] that all such sports gambling is harmful," *id.* at 8, the Senate Report accompanying PASPA explained that "[n]either has the committee

any desire to threaten the economy of Nevada, which over many decades has come to depend on legalized private gambling, including sports gambling, as an essential industry, or to prohibit lawful sports gambling schemes in other States that were in operation when the legislation was introduced." *Id.*

   **Defendants' Response:**  Admitted only to the extent that the quoted portion of this statement appears in the Senate Judiciary Committee's report, but disputed to the extent it purports to establish that sports wagering is harmful.  *See* Responses to Statements 5-8.

   Moreover, as set forth more fully in Defendants' General Responses and Objections (*supra* pp. 1–2), the Senate Judiciary Committee's report, and the quoted statement contained therein, is inadmissible hearsay.

   **Plaintiffs' Reply:**  Defendants do not dispute this paragraph.  To the extent that defendants challenge the implications or inferences to be drawn from the congressional report, they have argued that challenge in their briefs.  To the extent that defendants challenge the admissibility of the congressional report, they are wrong.  Congressional records are presumed trustworthy, and thus admissible in evidence, as public records and reports.  *See* Fed. R. Evid. 803(8) and advisory committee note.  Accordingly, courts frequently admit congressional reports into evidence.  *See, e.g.*, *Mariani v. United States*, 80 F. Supp. 2d 352, 360-61 (M.D. Pa. 1999) (holding minority report of congressional committee admissible under Rule 803(8)); *McFarlane v. Ben-Menashe*, No. 93-1304 (TAF), 1995 WL 129073, at *4-5 (D.D.C. Mar. 16, 1995) (holding congressional task force report trustworthy and admissible under Rule 803(8)), *opinion withdrawn in part on reconsideration on other grounds*, 1995 WL 799503 (D.D.C. June 13, 1995); *Hobson v. Wilson*, 556 F. Supp. 1157, 1181 (D.D.C. 1982) (holding portions of Senate Committee report admissible under public records exception), *aff'd in part, rev'd in part on*

*other grounds*, 737 F.2d 1 (D.C. Cir. 1984).

**B.**     ***New Jersey's Sports Gambling Law and Proposed Regulations***

10.     Effective December 8, 2011, the New Jersey Constitution was amended to permit the New Jersey Legislature to authorize wagering "on the results of any professional, college, or amateur sport or athletic event" at casinos in Atlantic City and horse racetracks throughout the state.  N.J. Const. art. IV, § VII, ¶ 2D.

> **Defendants' Response:**  Undisputed.

> **Plaintiffs' Reply:**  Defendants do not dispute this paragraph.

11.     Prior to this amendment, the New Jersey Constitution prohibited wagering on professional and amateur sporting events (excluding horse racing).  *See In re Casino Licensees*, 268 N.J. Super. 469, 475-76 (App. Div.), *aff'd*, 138 N.J. 1 (1993).

> **Defendants' Response:**  Undisputed.

> **Plaintiffs' Reply:**  Defendants do not dispute this paragraph.

12.     Even as amended, the New Jersey Constitution does not permit gambling "on a college sport or athletic event that takes place in New Jersey or on a sport or athletic event in which any New Jersey college team participates regardless of where the event takes place."  N.J. Const. art. IV, § VII, ¶ 2.

> **Defendants' Response:**  Admitted only to the extent that the quoted portion of this statement appears in the New Jersey Constitution, but disputed to the extent it purports to establish that sports wagering is harmful.

> **Plaintiffs' Reply:**  Defendants do not dispute this paragraph.  To the extent that defendants challenge the implications or inferences to be drawn from the New Jersey Constitution, they have argued that challenge in their briefs.

13.     On January 9, 2012, the New Jersey Legislature passed N.J.S.A. 5:12A-1 *et seq.* (the "Sports Gambling Law").

**Defendants' Response:**  Undisputed.

**Plaintiffs' Reply:**  Defendants do not dispute this paragraph.

14.     Governor Christie signed the Sports Gambling Law into effect on January 17, 2012. *See* L. 2012, c. 231.

**Defendants' Response:**  Undisputed.

**Plaintiffs' Reply:**  Defendants do not dispute this paragraph.

15.     The Sports Gambling Law provides that licensed casino or gambling houses in Atlantic City, and horse racetracks throughout the state, may operate "sports pools" – defined as "the business of accepting wagers on any sports event by any system or method of wagering" – upon approval of the Division of Gaming Enforcement (the "Division") or the New Jersey Racing Commission and in accordance with applicable regulations.  N.J.S.A. 5:12A-1, 5:12A-2.

**Defendants' Response:**  Admitted only to the extent that the quoted portion of this statement appears in New Jersey's Sports Gambling Law, but disputed to the extent it mis-characterizes New Jersey's Sports Gambling Law, which speaks for itself.

**Plaintiffs' Reply:**  The statute speaks for itself.

16.     Gambling on collegiate games held in New Jersey or games involving New Jersey colleges remains unlawful. *Id.* at 5:12A-1.

**Defendants' Response:**  Disputed to the extent this statement purports to estab-lish that sports wagering is harmful.

**Plaintiffs' Reply:**  Defendants do not dispute this paragraph.  Their response is wholly unresponsive.

10

17.     Under the Sports Gambling Law, the Division is responsible for issuing licenses to operate sports betting parlors, and regulating sports pools and the conduct of sports wagering. *Id.* at 5:12A-2, 5:12A-4.

> **Defendants' Response:** Undisputed.

> **Plaintiffs' Reply:** Defendants do not dispute this paragraph.

18.     Before gambling on sports can commence under the statute, the Division first is required to promulgate regulations governing the conduct of sports wagering. *Id.* at 5:12A-4.

> **Defendants' Response:** Undisputed.

> **Plaintiffs' Reply:** Defendants do not dispute this paragraph.

19.     On July 2, 2012, the Division published its proposed regulations, to be codified at N.J.A.C. 13:69N (the "Regulations"), for public comment. 44 N.J.R. 1871(a) (July 2, 2012).

> **Defendants' Response:** Undisputed.

> **Plaintiffs' Reply:** Defendants do not dispute this paragraph.

20.     The public comment period is scheduled to end on August 31, 2012. *Id.*

> **Defendants' Response:** Undisputed.

> **Plaintiffs' Reply:** Defendants do not dispute this paragraph.

21.     Governor Christie has announced that New Jersey's sports wagering operation will be implemented by Fall 2012:

> We intend to go forward and allow sports gambling to happen, and if someone wants to stop us, then they'll have to take action to try to stop us. But I've signed the legislation this year to authorize it. The regulations now will allow us to implement sports gaming. We intend to work with the casino industry here in Atlantic City and with the folks in the horse racing industry to get it implemented by this Fall. Now, am I expecting that there may be some legal action taken against us to try to prevent it? Yes. But that's going to be their burden to try to prevent it. That's why we're doing it the way we're doing it. So I have every confidence that we're going to be successful. We may have to go through some litigation to get there . . . but I think we're going to be successful.

11

Video available at http://www.nj.com/news/index.ssf/2012/05/gov_christie_says_atlantic_
cit.html.

     **Defendants' Response:**  Undisputed to the extent Governor Christie made the
statement, but disputed to the extent that it purports to characterize New Jersey's intent to im-
plement the sports wagering operation by Fall 2012.  Defendants have previously represented
that "the State does not anticipate awarding, and will not award, any license pursuant to the
Sports Wagering Act, N.J.S.A. 5:12A-1, *et seq.*, prior to January 9, 2013."  Dkt. No. 49.

     **Plaintiffs' Reply:**  Defendants do not dispute this paragraph.  Plaintiffs do not
dispute that, since the filing of plaintiffs' opening papers on this motion, defendants have
represented that the State does not anticipate awarding, and will not award, any license pursuant
to the Sports Wagering Act, N.J.S.A. 5:12A-1, *et seq.*, prior to January 9, 2013.

    22.    At least one New Jersey racetrack owner already has expressed his intention to
move forward with sports gambling, despite its illegality under PASPA.  John Brennan, *Mon-
mouth Park plans to offer sports betting in fall, despite federal ban*, NorthJersey.com (July 3,
2012), available at http://www.northjersey.com/news/state/other_state_news/Monmouth_Park
_wants_to_offer_betting_on professional_and_college_sports.html.

     **Defendants' Response:**  Disputed to the extent that Plaintiffs' statement
characterizes New Jersey's Sports Gambling Law's "illegality under PASPA" – the legality of
New Jersey's Sports Gambling Law is a contested question of law in this matter.  Defendants
have previously represented that "the State does not anticipate awarding, and will not award, any
license pursuant to the Sports Wagering Act, N.J.S.A. 5:12A-1, *et seq.*, prior to January 9, 2013."
Dkt. No. 49.  Plaintiffs' statement is an improper assertion of law or mixed assertion of law and
fact that is inappropriate for a Statement of Undisputed Facts under Local Rule 56.1.

Moreover, Mr. Brennan's statement is inadmissible hearsay. *See, e.g., United States v. Baker*, 432 F.3d 1189, 1212 n.23 (11th Cir. 2007) (newspaper article regarding identity of gunmen inadmissible as double hearsay of reporter's account of what eyewitnesses stated); *Horta v. Sullivan*, 4 F.3d 2, 8 (1st Cir. 1993) (newspaper article contained double hearsay and was inadmissible).

**Plaintiffs' Reply:** Defendants do not dispute the accuracy of this paragraph, except to the extent that the paragraph characterizes New Jersey's Sports Wagering Law as illegal under PASPA. The illegality of New Jersey's Sports Wagering Law is clear on its face, and defendants have not argued in their briefs that the state statute does not contravene the provisions of PASPA. Mr. Brennan's statement is not inadmissible hearsay because it is not being offered for its truth, but only for its effect on the listeners, namely plaintiffs.

## SUPPLEMENTAL STATEMENTS

23. Defendants' expert, Professor Willig, readily agreed that the Sports Organizations have an interest in offering a product that is not perceived differently because of the spread of state-sponsored gambling. (Hernandez Certif. Ex. 31 (Willig Dep.) at 290:22-297:3.)

24. Ten witnesses, including four League Commissioners, the NCAA's President and witnesses tendered by each plaintiff pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure all testified under oath, based on their personal knowledge and experience, regarding the Sports Organizations' personal interest in the production of their games, the manner in which their games are perceived by their fans, and the Sports Organizations' reasonable concern about the effects the introduction of sports betting in New Jersey would have on their games and their relationship with their fans. *See, e.g.*, Dkt Nos. 10-3 through 10-7 (Declarations of President Emmert and the four commissioners); Hernandez Certif. Ex. 9 (Bettman Dep.) at 29:17-30:2 (contrasting gambling atmosphere with NHL's desire to create an atmosphere "conducive to

families and children"); *id.* at 33:2-7 (describing opinion, based on 32 years of experience, that "possible perception that comes from betting on games compromises" the league's goals); *id.* at 24:6-19, 37:21-38:12, 81:10-21 (noting that the Rick Tocchet scandal "shows even in its 'most benign' form, what any interaction with gambling can have to sully the name and reputation of a game"); *id.* Ex. 8 (Stern Dep.) at 41:6-21 (describing gambling atmosphere around NBA games in the 1950s and 1960s, noting "It's disruptive, it's not a basis upon which you can build a [fan base]"); *id.* at 30:25-31:5 ("I'm certain beyond certain, based upon my experience with gambling, that when you give people the opportunity to gamble and the State supports it, advertises it and profits from it, it will happen."); *id.* Ex. 5 (Selig Dep.) at 30:16-17 ("I know how the Pete Rose [betting issue negatively] affected things and so on"); *id.* Ex. 2 (Emmert Dep.) at 36:17-37:9 ("[w]e know from all of our experiences, from all of the communications we've always had around gambling, from all of the surveys that we have done and data we've gathered from our own student athletes, we know that the spread of gambling causes [the] erosion [of] confidence in the games, increased pressure on our student athletes, and undermines the basis on which people are fans for universities as a whole"); *id.* at 39:4-25 (noting that state-sponsored sports gambling communicates the message that sports gambling "is not only all right, it's approved and indeed encouraged," it creates a likelihood that sports gambling will increase); *id.* Ex. 7 (NBA 30(b)(6) Dep.) at 110:15-25 (describing NBA's view of harm from sports gambling as "the sort of informed view of people that have . . . worked at the league office for a lot of years"); *id.* Ex. 1 (NCAA 30(b)(6) Dep.) at 71:23-72:13, 72:22-73:10 (experience with NCAA has revealed public perceptions that game fixing may be occurring due to gambling); *id.* Ex. 4 (MLB 30(b)(6) [Ostertag] Dep.) at 60:9-18 (claim that legalization will lead to increased sports gambling is in part based on MLB's Department of Investigation's "belief and their

experience over their entire careers . . . I believe every one of them has the same opinion."); *id.*
Ex. 4 (MLB 30(b)(6) [Mullin] Dep.) at 16:9-17:23 (describing his experience in the New York
Police Department investigating attempts by sports gamblers to get inside information); *id.* Ex. 3
(NFL 30(b)(6) Dep.) at 78:10-25 (describing wrestling and jai alai as "good example" of "where
an affiliation and identity that is too closely associated with gambling . . . [proved] disastrous to
the League's health and financial security.").

    25.    A 1999 National Gambling Impact Study Commission Report found that legalized
sports gambling is injurious to the integrity of sports.  (Slocum Decl. Ex. 7 at Plaintiffs'
00002363.)

    26.    ██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████

    27.    ██████████████████████████████████████████████████

██████████████████████████████████████████████

Dated:  December 7, 2012          Respectfully submitted,

                         **MCCARTER & ENGLISH, LLP**

                         By:  *s/William J. O'Shaughnessy*
                            William J. O'Shaughnessy
                            Richard Hernandez
                            Four Gateway Center
                            100 Mulberry St.
                            Newark, New Jersey 07102
                            (973) 622-4444
                            woshaughnessy@mccarter.com
                            rhernandez@mccarter.com

Jeffrey A. Mishkin
Anthony J. Dreyer
**SKADDEN ARPS SLATE MEAGHER &
    FLOM LLP**
Four Times Square
New York, NY 10036
(212) 735-3000
jmishkin@skadden.com
adreyer@skadden.com

Paul D. Clement
Erin E. Murphy
**BANCROFT PLLC**
1919 M Street, N.W., Suite 470
Washington, DC 20036
(202) 234-0090
pclement@bancroftpllc.com
emurphy@bancroftpllc.com

*Attorneys for Plaintiffs*
  *National Collegiate Athletic Association,*
  *National Basketball Association, National*
  *Football League, National Hockey League,*
  *and Office of the Commissioner of Baseball,*
  *doing business as Major League Baseball*