# Exhibit 1

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

NATIONAL COLLEGIATE ATHLETIC    )
ASSOCIATION, an unincorporated  )
association, NATIONAL BASKETBALL )
ASSOCIATION, a joint venture,   )
NATIONAL FOOTBALL LEAGUE, an    )
unincorporated association,     )
NATIONAL HOCKEY LEAGUE, an      )
unincorporated association, and )
OFFICE OF THE COMMISSIONER OF   )
BASEBALL, an unincorporated     )
association doing business as   )
MAJOR LEAGUE BASEBALL,          )
                                )
          Plaintiffs,           )
                                )
          -vs-                  )  CIVIL ACTION NO.
                                )  3:12-cv-04947-MAS-LHC
CHRISTOPHER J. CHRISTIE,        )
Governor of the State of        )
New Jersey, DAVID L. REBUCK,    )
Director of the New Jersey      )
Division of Gaming Enforcement, )
and Assistant Attorney General  )
of the State of New Jersey, and )
FRANK ZANZUCCKI, Executive      )
Director of the New Jersey      )
Racing Commission,              )
                                )
          Defendants.           )

DEPOSITION OF RACHEL NEWMAN BAKER
     The deposition upon oral examination of RACHEL
NEWMAN BAKER, a witness produced and sworn before
me, Tamara J. Brown, CSR, RMR, CRR, Notary Public in
and for the County of Marion, State of Indiana,
taken on behalf of the Defendants, at the offices of
Ice Miller, One American Square, Indianapolis,
Marion County, Indiana, on the 30th day of October,
2012, pursuant to the Federal Rules of Civil
Procedure with written notice as to time and place
thereof.

---

Page 2

1             A P P E A R A N C E S

2   FOR THE PLAINTIFF(S):

3             Mr. Anthony J. Dreyer
              Mr. Jordan Feirman
4             SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
              Four Times Square
5             New York, NY 10036
              (212)735-3097
6             anthony.dreyer@skadden.com
              jordan.feirman@skadden.com
7

8             Ms. Naima M. Stevenson
              NCAA
9             P.O. Box 6222
              Indianapolis, IN  46206-6222
10            (317)966-9358
              nstevenson@ncaa.org
11

12

13  FOR THE DEFENDANT(S):

14            Mr. Geoffrey Sigler
              Mr. William Wegner
15            Mr. Tim Loose
              GIBSON DUNN & CRUTCHER, LLP
16            1050 Connecticut Avenue N.W.
              Washington, D.C.  20036-5306
17            (202)955-8500
              gsigler@gibsondunn.com
18            wwegner@gibsondunn.com
              tloose@gibsondunn.com
19

20

21

22

23

24

25

---

Page 3

1      I N D E X   O F   E X A M I N A T I O N
2                                          PAGE
3   DIRECT EXAMINATION . . . . . . . . . . . .5
       Questions by Mr. Geoffrey Sigler
4
5      I N D E X   O F   E X H I B I T S
                                           PAGE
6
    Deposition Exhibits:
7
    Exhibit  1   Organization chart . . . . . . . 14
8   Exhibit  2   Organization chart . . . . . . . 17
    Exhibit  3   Amended notice of Rule . . . . . 20
9                30(b)(6) deposition
    Exhibit  4   Complaint . . . . . . . . . . . . 33
10  Exhibit  5   Declaration of Mark . . . . . . . 87
                 Emmert
11  Exhibit  6   2010-11 NCAA Division 1 . . . . . 88
                 manual
12  Exhibit  7   Meeting minutes, 8-6-09 . . . . . 99
    Exhibit  8   National study on . . . . . . . .116
13               collegiate sports wagering,
                 PLAINTIFFS' 00002821 - 2882
14  Exhibit  9   News release, 5-12-04 . . . . . .135
    Exhibit 10   Findings from national . . . . . 148
15               study on collegiate sports
                 wagering, PLAINTIFFS'
16               00002899 - 2929
    Exhibit 11   Study, "Gambling Behavior . . . .149
17               Among College Student
                 Athletes"
18  Exhibit 12   Results from 2008 NCAA . . . . . 154
                 study on collegiate
19               wagering, PLAINTIFFS'
                 00003711 - 3751
20  Exhibit 13   Email, PLAINTIFFS' . . . . . . .184
                 00003912 - 3950
21  Exhibit 14   NCAA research on . . . . . . . . 188
                 collegiate wagering
22  Exhibit 15   Results from 2008 NCAA . . . . . 195
                 study on collegiate
23               wagering, PLAINTIFFS'
                 00003005 - 3049
24  Exhibit 16   NCAA press release, June . . . . 196
                 2010
25

---

Page 4

1      I N D E X   O F   E X H I B I T S
                                           PAGE
2
    Deposition Exhibits:
3
4   Exhibit 17   Email, PLAINTIFFS' . . . . . . .199
                 00003633 - 3638
5   Exhibit 18   Results on NCAA gambling . . . .210
                 surveys, PLAINTIFFS'
6                00002301 - 2318
    Exhibit 19   National Study on . . . . . . . 219
7                Collegiate Wagering and
                 Social Environments
8   Exhibit 20   Email, PLAINTIFFS' . . . . . . .221
                 00004035 - 4036
9   Exhibit 21   Website printout, . . . . . . . 232
                 PLAINTIFFS' 00002812
10  Exhibit 22   Chapter 12A, Sports . . . . . . 235
                 Wagering
11  Exhibit 23   NCAA National Study on . . . . . 239
                 Sports Wagering,
12               PLAINTIFFS' 00003487 - 3089
    Exhibit 24   NCAA National Study on . . . . . 240
13               Sports Wagering,
                 PLAINTIFFS' 00003490 - 3492
14  Exhibit 25   NCAA National Study on . . . . . 241
                 Sports Wagering,
15               PLAINTIFFS' 00003493 - 3495
    Exhibit 26   CBS Sports.com printout . . . . 247
16
17
18
19
20
21
22
23
24
25

Page 5

```
 1          (Time Noted 9:29 a.m.)
 2               RACHEL NEWMAN BAKER,
 3  having been duly sworn to tell the truth, the whole
 4  truth, and nothing but the truth relating to said
 5  matter, was examined and testified as follows:
 6  DIRECT EXAMINATION,
 7    QUESTIONS BY MR. GEOFFREY SIGLER:
 8  Q  Good morning.  My name is Geoff Sigler.  I am
 9     defense counsel in the case NCAA versus
10     Christie.
11          Can you state your full name for the
12     record, please?
13  A  Sure.  Rachel Frances Newman Baker.
14  Q  Thank you.  And what do you prefer to be called,
15     Ms. Baker, or Newman Baker?
16  A  Ms. Baker is fine.
17  Q  And, Ms. Baker, you work for the NCAA, which is
18     the plaintiff in this case, correct?
19  A  Correct.
20  Q  What is your current position at the NCAA?
21  A  I am a managing director of enforcement.
22  Q  And what are your job responsibilities?
23  A  I oversee our development and investigations
24     unit.
25  Q  And do you have responsibility for particular
```

Page 6

```
 1     sports or types of enforcement?
 2  A  I'm responsible for the development of
 3     information specifically related to football,
 4     basketball, and agent issues in the sports of
 5     track and field, men's ice hockey, and baseball.
 6     And what was the other part of --
 7  Q  Let me make sure I've got that part first.  So
 8     that's your development responsibility.
 9  A  Development and investigations responsibility,
10     sports specific responsibilities.
11  Q  Okay.  So let's talk specifically about your
12     enforcement responsibilities.
13  A  Sure.
14  Q  For what specifically do you have enforcement
15     responsibilities?
16  A  Anything related to Division 1 football,
17     Division 1 men's basketball, from an
18     investigations standpoint.  And I also see,
19     oversee our sports wagering unit and our
20     basketball certification and scouting service
21     certification area.
22  Q  Do you have responsibility for all types of
23     infractions relating to football and basketball
24     or just certain types?
25  A  Primarily recruiting and agent issues, agent
```

Page 7

```
 1     amateurism issues, are the primary areas of
 2     focus.
 3  Q  With respect to wagering, do you have
 4     responsibility cutting across all sports, or
 5     just football and basketball?
 6  A  All sports, all divisions.
 7  Q  And do you have just enforcement responsibility
 8     relating to sports wagering, or do you have
 9     responsibilities beyond enforcement?
10  A  Oh, I'm not sure I understand your question.
11  Q  Sure.  Let me ask it a better way.
12          What responsibilities do you have relating
13     to sports wagering?
14  A  I oversee the development of information related
15     to sports wagering as well as investigations
16     related to sports wagering.
17  Q  Who do you report to, Ms. Baker?
18  A  Julie Roe Lach.
19          THE REPORTER:  Spell it for me, please.
20          THE WITNESS:  J-U-L-I-E, Roe, R-O-E, Lach,
21     L-A-C-H.
22  Q  What is Ms. Lach's position?
23  A  She's vice-president for enforcement.
24  Q  When you say you have responsibility for
25     development of information related to sports
```

Page 8

```
 1     wagering, does that mean education and training
 2     and the like?
 3  A  That's included as past that, yes.
 4  Q  And what else does it include?
 5  A  Developing information related to actionable
 6     leads.
 7  Q  Actionable leads?
 8  A  Um-huh.
 9  Q  And actionable leads are what exactly?
10  A  An actionable lead would be information that
11     could result in a case.
12  Q  And a case would be a situation where someone
13     has violated the NCAA's rules related to sports
14     wagering?
15  A  Possibly.
16  Q  What other possibilities would there be?
17  A  You may not know at the onset that it's a clear
18     violation, but there might be some information
19     that could indicate a potential violation.
20  Q  Ms. Baker, does your unit relating to sports
21     wagering have research responsibilities?
22  A  We do not.
23  Q  That's a separate group within the NCAA?
24  A  Yes.
25  Q  Who is the head of that group?
```

Page 9

1   A   I believe Todd Petr, P-E-T-R, is the head.
2   Q   Does the research group have responsibilities
3       beyond sports wagering?
4   A   Yes.
5   Q   Do they report to Ms. Roe or someone else?
6   A   They do not report to Ms. Roe.
7   Q   Who do they report to?
8   A   I'm not sure.
9   Q   Mr. Petr is an employee of the NCAA, to your
10      knowledge?
11  A   Yes.
12  Q   Ms. Baker, have you been deposed previously?
13  A   Yes.
14  Q   How many times?
15  A   Three, I believe.
16  Q   Was any of those situations relating to sports
17      gambling?
18  A   Can you clarify sports gambling?  Can you
19      clarify what you mean by that?
20  Q   How do you define sports gambling?
21  A   Well, the -- I was involved in a deposition
22      involving Rick Neuheisel, which involved a
23      violation of NCAA 10.3 rule.
24  Q   How do you define sports gambling?
25  A   Sports gambling for our purposes is defined as

Page 10

1       putting something at risk with the opportunity
2       to win something in return.
3   Q   Was the Rick Neuheisel case an example of sports
4       gambling?
5   A   The Neuheisel case was a violation of our 10.3
6       because of his involvement in a March Madness
7       auction where he was putting something at risk
8       and able to win something.
9   Q   So the March Madness auction in that case was an
10      example of sports gambling?
11  A   It was an example of a violation of 10.3.
12  Q   Help me understand the distinction you're
13      making.
14          MR. DREYER:  Objection to the form of the
15      question.  You can go ahead and answer.
16  A   I just want to be clear that it's a violation of
17      the NCAA rule related to sports wagering.
18  Q   Okay.  And was it an example of sports gambling,
19      or are you saying something else?
20  A   No, it was considered sports wagering under the
21      NCAA rule, yes.
22  Q   Okay.  Thank you.  Other than the deposition
23      relating to the Rick Neuheisel case, have you
24      had any other situations where you have
25      testified about sports gambling issues?

Page 11

1   A   No other depositions that I can think of.  And I
2       do not believe I have testified in front of any
3       other government setting.
4   Q   Were the three situations you mentioned
5       previously all depositions?
6   A   Yes.
7   Q   Have you testified in court?
8   A   Yes.
9   Q   How many times?
10  A   Twice.
11  Q   Was any of those situations relating to sports
12      gambling?
13  A   One situation was related to Neuheisel, yes.
14  Q   What court was that?
15  A   It was in the state of Washington.  I'm not sure
16      on the specific court.
17  Q   Other than the three depositions you mentioned
18      and the two examples where you testified in
19      court, have you ever had any other testimony
20      during your time being an employee of the NCAA?
21  A   Yes.  I testified before the Puerto Rican
22      government on agent and amateurism issues.
23  Q   Any other examples of testimony you have given?
24  A   None I can think of.
25  Q   Well, Ms. Baker, having given testimony before,

Page 12

1       you know the rules of the road probably.  But
2       just to be sure, I will go over a few of them.
3           Do you understand you are under oath today,
4       just as if you were testifying in court,
5       correct?
6   A   Correct.
7   Q   And you understand one important rule of
8       procedure is that we don't talk over each other,
9       so that the court reporter can make sure that
10      she gets down your testimony, correct?
11  A   Correct.
12  Q   And in conjunction with that, it's very
13      important that you make sure you understand the
14      question I'm asking before you answer the
15      question.  Okay?
16  A   Sure.
17  Q   And if you need a break at any point today, just
18      let me know, and we can take a break.  The only
19      thing I would ask is if a question is pending,
20      that you answer the question before we take the
21      break.  Okay?
22  A   Sure.
23  Q   Now, you understand that you are here to testify
24      today as the NCAA's representative on certain
25      topics relating to this case, correct?

Page 13

1   A   Yes, I do.
2   Q   Ms. Baker, how long have you been in your
3       current position?
4   A   I have been managing director for a little over
5       a year.
6   Q   What position did you have before that?
7   A   I was director of agent gambling and amateurism
8       activities.
9   Q   And can you recall at what point during the year
10      in 2011 you changed roles?
11  A   It was late July, early August, I believe.
12  Q   How long were you the director of agent gambling
13      and amateurism activities?
14  A   A little over six years.
15  Q   What was your job before that?
16  A   I was an assistant director of agent gambling
17      and amateurism activities.
18  Q   How long did you have that position?
19  A   Three years.
20  Q   And help me with the years here.  Approximately
21      2003 through 2006?
22  A   It would have been 2002 through 2005.
23  Q   Thank you.  And what was your job before that?
24  A   I was an intern in enforcement.
25  Q   For the NCAA?

Page 15

1       that reflects your current position at the NCAA?
2   A   Yes.
3   Q   And does this chart accurately reflect your
4       group of people that reports to you at the NCAA?
5   A   Yes, although Sandy Parrott is not listed on
6       this chart, and she does report to me.  She is
7       our associate director for basketball
8       certification.
9   Q   Is she a direct report?
10  A   Yes.
11  Q   Does she have anyone that reports to her?
12  A   Yes.  She has a coordinator.
13  Q   Does anyone else report to her?
14  A   No.
15  Q   Who, that reports to you, has responsibilities
16      relating to sports gambling?
17  A   Mark Strothkamp.
18  Q   Does he have both development and enforcement
19      responsibilities relating to sports gambling?
20  A   Yes.
21  Q   And you have two other direct reports, LuAnn
22      Humphrey, and I guess one patient is vacant,
23      correct?
24  A   Correct.
25  Q   Do the -- and LuAnn Humphrey has basketball

Page 14

1   A   Yes.
2   Q   Was that part of the agent gambling and
3       amateurism activities group?
4   A   I spent three months with that group during my
5       internship.
6   Q   And how long did you have that job?
7   A   The internship?
8   Q   Yes.
9   A   A year.
10  Q   So 2001 to 2002?
11  A   Yes.
12  Q   What was your job before that?
13  A   I was a graduate assistant at the Ohio State
14      University Athletic Compliance Office.
15  Q   Thank you.  Because it's cumbersome to say,
16      would you mind if we refer to the agent gambling
17      and amateurism group as the AGA group?
18  A   Not at all.
19          (Deposition Exhibit 1 was marked for
20      identification.)
21  Q   Ms. Baker, you have been handed a copy of a
22      document marked NCAA 1.  Do you recognize this
23      document?
24  A   I do.
25  Q   And is this a copy of an organizational chart

Page 16

1       related responsibilities, correct?
2   A   Correct.
3   Q   Does LuAnn Humphrey have enforcement
4       responsibilities relating to any sports gambling
5       issues?
6   A   No.
7   Q   So Mark Strothkamp is the only direct report you
8       have that has sports gambling responsibilities?
9   A   Direct report, yes.
10  Q   And Mark Strothkamp has a direct report, Suzanne
11      Brickell?
12  A   Suzanne Brickell.
13  Q   Suzanne Brickell is a direct report of Mark
14      Strothkamp?
15  A   Correct.
16  Q   And does she have sports gambling
17      responsibilities too?
18  A   Yes.
19  Q   Are her responsibilities related to development
20      and enforcement?
21  A   That is part of it.
22  Q   What other responsibilities does she have
23      relating to sports gambling?
24  A   She coordinates the background check for
25      officials.

```
 1   Q   Other than Mark Strothkamp and Suzanne Brickell,
 2       does anyone else that's part of your group have
 3       sports gambling responsibilities?
 4   A   No, not directly.  Obviously if -- we all help
 5       each other out and share, so depending on
 6       caseloads, if there was a need to have
 7       additional help we could tab into the other
 8       investigators on our staff if needed.
 9   Q   Does anyone else at the NCAA other than Mark
10       Strothkamp and Suzanne Brickell have development
11       or enforcement responsibilities relating to
12       sports gambling?
13   A   No.
14           (Deposition Exhibit 2 was marked for
15       identification.)
16   Q   Ms. Baker, you have been handed a document
17       marked NCAA Exhibit 2.  Do you recognize this
18       document?
19   A   I do.
20   Q   Is this a copy of an organizational chart
21       reflecting your group from August of 2009?
22   A   Yes.
23   Q   Does this reflect the entire AGA group from
24       2009?
25   A   Yes.
```

```
 1   Q   Who did you report to in August of 2009?
 2   A   David Price.
 3   Q   What was his role?
 4   A   Vice-president of enforcement.
 5   Q   So Mr. Price had the role that Ms. Roe has now?
 6   A   Yes.
 7   Q   On this chart from August of 2009, is there a
 8       person or persons who had specific
 9       responsibility relating to sports gambling
10       issues?
11   A   No.
12   Q   Who on this chart had responsibility relating to
13       sports gambling issues in August of 2009?
14   A   We all did, except Sandy Parrott was not as
15       involved in gambling.
16   Q   So this group of people, the AGA group from
17       August of 2009, had responsibility relating to
18       sports gambling as well as agent and amateurism
19       issues?
20   A   Correct.
21   Q   Now, comparing this chart, Exhibit 2, to the
22       current organizational chart, Exhibit 1, I see a
23       lot of the same names, correct?
24   A   Everyone that was in the August 2009 AGA group
25       is in the development unit.
```

```
 1   Q   Mark Strothkamp was not part of your group in
 2       August of 2009, correct?
 3   A   Yes.
 4   Q   I'm sorry, that's correct?
 5   A   Correct.
 6   Q   So of the group of people who had
 7       responsibilities relating to sports gambling in
 8       August of 2009, none of them currently has
 9       sports gambling responsibilities anymore?
10   A   Correct, other than Suzanne Brickell.
11   Q   Thank you.  And Suzanne Brickell was an
12       administrative assistant in August of 2009,
13       correct?
14   A   Correct.
15   Q   Ms. Baker, do you have any special educational
16       degrees or training relating to sports gambling?
17           MR. DREYER:  Objection to the form of the
18       question.  You can answer if you are able to.
19   A   I do not have any degrees in sports gambling,
20       no.
21   Q   Do you have any special training relating to
22       sports gambling, other than having been in the
23       positions that you have held?
24   A   I received training from my direct supervisor in
25       AGA when I was assistant director of
```

```
 1       enforcement.
 2   Q   Who was that?
 3   A   Bill Saum.
 4   Q   Any other special training that you have?
 5   A   I also received training from our associate
 6       director of AGA when I was assistant
 7       director, Dina Garner.
 8   Q   Other than training that you have received from
 9       other employees in the NCAA, do you have any
10       special training relating to sports gambling?
11   A   No.
12   Q   Have you ever conducted any research on sports
13       gambling?
14   A   Me individually?
15   Q   Correct.
16   A   No.
17   Q   Have you ever published any articles, papers, on
18       sports gambling?
19   A   I have not.
20           (Deposition Exhibit 3 was marked for
21       identification.)
22   Q   Ms. Baker, you have been handed a document
23       marked NCAA Exhibit 3.  We talked earlier about
24       how you have been designated to testify in
25       certain topics, correct?
```

Page 21

1  A   Correct.
2  Q   And you understand that you are here as the
3      NCAA's representative speaking on the NCAA's
4      behalf today, correct?
5  A   Correct.
6  Q   And I'd like you to look at this document, and
7      tell me whether you've seen it before today.
8  A   I do not recall seeing this, but if you could
9      give me a minute to look at it so I can be sure.
10 Q   Sure.  Take your time.
11 A   I don't believe I have seen this, no.
12 Q   If you could turn with me, please, to page 4 of
13     the document, do you see the statement,
14     "Deposition Topics," in the middle of the page?
15 A   Yes.
16 Q   And do you see that there's a list, items 1
17     through 3, and then if you continue on to the
18     next page, 4 through 6, a list of topics?
19 A   Yes.
20 Q   Have you seen this list of topics 1 through 6
21     before today?
22 A   I have not seen the list.
23 Q   Please take a couple of minutes to read each
24     topic carefully, and then I have got a question
25     for you.

Page 22

1  A   Yes.
2  Q   Ms. Baker, are you prepared to testify today as
3      the NCAA's representative on each of these
4      topics reflected here in Exhibit 3?
5  A   Yes.
6  Q   What did you do to prepare for your deposition
7      today?
8  A   I -- outside of conversations with my attorneys?
9  Q   Correct.
10 A   Nothing.
11 Q   You had conversations with your attorneys to
12     prepare for the deposition today?
13 A   Yes.
14 Q   Did you have an in-person meeting or just phone
15     conversations?
16 A   In-person meeting.
17 Q   When was that?
18 A   Yesterday.
19 Q   How long did you meet?
20     MR. DREYER:  Objection.  You're getting
21     into privileged areas now, so I'm going to
22     instruct her not to answer.
23     MR. SIGLER:  Instruct her not to answer as
24     to how long you met?
25     MR. DREYER:  Correct.

Page 23

1      MR. SIGLER:  Are you going to follow
2      counsel's advice?
3      THE WITNESS:  Yes.
4  Q   Other than meeting yesterday with counsel, did
5      you have any other meetings with counsel?
6  A   No.
7  Q   Did you speak to anyone other than counsel in
8      preparation for your deposition?
9  A   No.
10 Q   Did you speak to President Emmert in preparation
11     for your deposition?
12 A   No.
13 Q   Did you review any documents in preparation for
14     your deposition?
15 A   Outside of my preparation with the attorneys?
16 Q   Did you review any documents at all in
17     preparation for your deposition?
18     MR. DREYER:  You can answer the question
19     yes or no.
20 A   Yes.
21 Q   What documents did you review in preparation for
22     your deposition?
23     MR. DREYER:  Objection to the extent the
24     question calls for attorney-client
25     communications.  The witness can answer with

Page 24

1      respect to documents reviewed outside the
2      presence of counsel.
3  A   I didn't review anything outside the presence of
4      counsel.
5  Q   Well, let's just be clear about this.  I'm not
6      asking you about any documents reflecting a
7      communication from counsel to you or from you to
8      counsel, such as an email exchange between you
9      and Mr. Dreyer, I'm not asking about that at
10     all.  But other than those types of documents,
11     did you review any documents in preparation for
12     your deposition today, whether in presence of
13     counsel or otherwise?
14     MR. DREYER:  You can answer yes or no.
15 A   Yes.
16 Q   And what documents were those?
17     MR. DREYER:  Objection.  You're getting
18     into privileged areas.  Any documents that we've
19     chosen to show the witness reflect attorney
20     mental impressions and are therefore protected
21     by the work product doctrine.
22     MR. SIGLER:  I'm entitled to explore her
23     preparation for the deposition as a 30(b)(6)
24     notice.
25     MR. DREYER:  Not with respect to

Page 25

1   attorney-client communications.  So you have our
2   objection.
3        MR. SIGLER:  Ms. Baker, are you going to
4   follow your counsel's instruction not to answer
5   that question?
6        THE WITNESS:  Yes.
7 Q  Ms. Baker, does the term sports wagering mean
8   the same thing as sports gambling, to the NCAA?
9 A  Yes.
10 Q  And just to be clear, when I used the term
11   sports gambling today, I mean it in the sense
12   that you defined it earlier in the way that the
13   NCAA defines it.  Okay?
14 A  Okay.
15 Q  In the NCAA's view, does sports gambling include
16   fantasy football leagues where there's an
17   entrance fee and payout to the winner?
18 A  If there is an entry fee and prize, yes, that's
19   considered sports gambling.
20 Q  In the NCAA's view, does sports gambling include
21   March Madness pools such as an office pool
22   through which someone pays an entrance fee and
23   there's a payout to the winner?
24 A  Yes, if both pieces exist, it's considered
25   sports gambling.

Page 26

1 Q  In the NCAA's view, does sports gambling include
2   a situation where someone plays a game of pool
3   and the winner -- strike that.
4        Does, in the NCAA's view, does sports
5   gambling include a situation where someone plays
6   a game of pool and the loser has to pay for the
7   next game?
8 A  Pool, can you clarify what you mean by pool,
9   billiards?
10 Q  Billiards.
11 A  No, billiards is not covered under the NCAA
12   rules.
13 Q  And that's because?
14 A  It's not a sport that the NCAA sponsors.
15 Q  So in the NCAA view, does sports gambling
16   include a situation where someone plays a game
17   of basketball and there's something of value
18   that's at stake for the winner?
19        MR. DREYER:  Objection, incomplete
20   hypothetical.  You can answer if you are able
21   to.
22 A  I think I'd need some clarification.  When you
23   say someone who do you mean?
24 Q  Student athletes.
25 A  And can you clarify the competition?  Is it a

Page 27

1   practice, is it a game, what's the -- it's
2   important to the rule, so I just want to make
3   sure I understand what you're -- what scenario
4   it is that they are playing basketball.
5 A  A game.
6 A  So just to make sure I understand, a game, a
7   college, regularly scheduled game or pickup
8   game?
9 Q  A pickup game.
10 A  And it's -- can you repeat?  I want to make sure
11   I understand the question.  Can you repeat?
12 Q  Let me ask this question instead.
13        Can you think of a situation where a group
14   of people would get together to play a
15   basketball game, something of value would be at
16   stake for the winner and the loser of the game,
17   and it would constitute sports gambling, in the
18   NCAA's view?
19 A  Yes, a practice session is included, so if
20   student athletes were playing pickup and had
21   something at risk as part of that pickup contest
22   with the opportunity to win something, then yes,
23   it would be a violation of 10.3.
24 Q  Are some types of sports gambling more of a
25   concern to the NCAA than others?

Page 28

1        MR. DREYER:  Objection to the form of the
2   question.  You can answer if you are able to.
3 A  Well, all sports gambling is of concern to the
4   NCAA, especially those situations that
5   jeopardize our student athletes' well-being or
6   put the integrity of the game at risk.
7 Q  Are some types more of a concern than others?
8 A  In my view, all types are a concern.
9 Q  All types are an equal concern?
10 A  Well, obviously, point shaving concerns are of
11   significant importance, as well as any situation
12   where our student athletes are betting.
13 Q  Is a student athlete's participation in a March
14   Madness pool at the same level of concern to the
15   NCAA as a student athlete conducting a single
16   game bet with a student bookie?
17        MR. DREYER:  Objection to the form of the
18   question.  You can answer.
19 A  Well, it would depend.  If it's a dollar pool,
20   it's probably not going to be of the same
21   significance as if there were thousands of
22   dollars at stake for that student athlete.
23 Q  Ms. Baker, some sports gambling is legal and
24   some is illegal, correct?
25 A  Sports gambling is only legal in the state of

Nevada, in this country.
Q Some is legal and some is illegal, correct?
A Correct.
MR. DREYER: Objection, asked and answered. You have her answer.
Q And an example of legal sports gambling which you just gave would be a situation where someone places a bet in Las Vegas, correct?
A That is legal under the law, yes. It would still be impermissible for our student athletes, coaches or athletic administrators.
Q An example of illegal sports gambling would include a situation where someone places a bet with a student bookie, correct?
A Correct.
Q And just to define the term, what is a bookie?
A A bookie is essentially an oddsmaker in the illegal world that solicits and accepts wagers on almost anything.
Q Is the NCAA aware that there is a substantial illegal gambling market in the United States?
MR. DREYER: Objection to the form of the question, vague. You can answer.
A NCAA is aware that our student athletes have a high percentage of involvement in sports

wagering, based on the studies that we have conducted.
Q I'm not sure you answered my question. I'll just give it another try.
Is the NCAA aware that there's a substantial illegal gambling market in the United States?
MR. DREYER: Same objection to the form of the question, and it's vague terminology. You can answer.
A Yeah, I guess could you clarify what do you mean by substantial?
Q Is the NCAA aware that there is an illegal gambling market in the United States?
A Yes.
Q And in the NCAA's view, is it substantial?
MR. DREYER: Same objection to the form. You can answer.
A Yeah, I don't know that I can quantify it.
Q Does the NCAA have any idea how large the illegal gambling market is in the United States?
A I do not have any idea of the numbers involved, currently involved in the illegal gambling, no.
Q Ms. Baker, I'd like to turn back to Exhibit 3, which is the deposition notice that you still

have in front of you.
Take a look, please, at topic 1, your alleged standing to seek relief in this action. Do you see that topic?
A I do.
Q Do you know what standing is?
A I think so, but if you have a definition that would be helpful.
Q Let's go with what your definition is. What do you understand standing to be?
MR. DREYER: Objection to the extent it calls for a legal conclusion. She can answer as to her understanding.
A Yeah, I don't know in a legal sense. I'm not a lawyer. But I would read that to mean position.
Q And I'm only asking for your understanding as a nonlawyer. So in your understanding as a nonlawyer, standing in the context of topic 1 in this notice means position?
A Yes.
Q Did you review any documents specifically to prepare for this topic, topic 1?
A Outside of any documents that I would have reviewed with my attorneys?
Q Did you review any documents at all?

MR. DREYER: You can answer yes or no.
A Yes.
Q Did you review any documents outside the presence of your attorneys?
A I did not.
Q And with respect to documents you reviewed with your attorneys, what were those documents?
MR. DREYER: Same objection. You have our objection, so why don't we move on.
MR. SIGLER: Are you going to follow your counsel's instruction not to answer?
THE WITNESS: Still am, yes.
Q What is the NCAA standing in this case?
MR. DREYER: Same objection. Why don't you ask in common parlance instead of legal terms?
MR. SIGLER: You can answer.
A What -- can you clarify your question?
Q Your understanding of standing is that it means the NCAA's position?
A Correct.
Q So what is the NCAA's standing in this case, given that understanding?
A That we are opposed to New Jersey offering sports wagering in the state.
Q Anything else?

Page 33

1   A   I think that pretty much sums it up.
2   Q   Is the NCAA alleging that the NCAA or its member
3       institutions would be harmed by a New Jersey
4       sports gambling law?
5   A   Absolutely.
6           (Deposition Exhibit 4 was marked for
7       identification.)
8   Q   Ms. Baker, you have been handed a copy of a
9       document marked Exhibit 4.  Please take a minute
10      to flip through it.  My first question is going
11      to be whether you recognize this document.
12  A   I actually do not recall ever seeing this.
13  Q   Turn with me, please, to page 2 of the document.
14      I'd like you to review paragraphs 5 and 6 on
15      page 3.  And when you're done, tell me whether
16      you agree with the statements in these
17      paragraphs.
18          MR. DREYER:  Objection to form.  Can we do
19      one paragraph at a time at least, so the record
20      is clean?  It is a compound question.
21  Q   Let's go with paragraph 5, Ms. Baker.  Can you
22      read paragraph 5 and tell me whether you agree
23      with it.
24  A   Sure.  Yes, I do.
25  Q   Now can you read paragraph 6, please, and tell

Page 34

1       me whether you agree with it.
2   A   Yes, I do.
3   Q   Ms. Baker, do these paragraphs, paragraphs 5 and
4       6, accurately summarize harms that the NCAA is
5       alleging in this case?
6   A   I think they summarize some of the harms, yes.
7   Q   Is the NCAA alleging harms in this case that are
8       not reflected here in paragraphs 5 and 6?
9           MR. DREYER:  Hold on one second.  I don't
10      think any of the 30(b)(6) topics are related to
11      the allegations in the case.  So with that
12      objection, the witness can answer.
13  A   Well, I think that one of the biggest harms is
14      jeopardizing the welfare of our student
15      athletes.
16  Q   Is the NCAA alleging any other harms in the case
17      other than the student athlete welfare and the
18      harms alleged here in paragraphs 5 and 6?
19          MR. DREYER:  Same objection.  You can
20      answer.
21  A   It's a combination of the harms in 6, but
22      essentially the integrity of the games being
23      compromised, both the public perception of those
24      games, as well as the games themselves and the
25      student athlete well-being concerned.

Page 35

1   Q   And the integrity of the games being compromised
2       is reflected here in paragraphs 5 and 6,
3       correct?
4           MR. DREYER:  Objection to the form of the
5       question.  The paragraphs speak for themselves.
6       You can answer.
7   A   Yes, it's mentioned.
8   Q   Other than the harms alleged in paragraphs 5 and
9       6, and student athlete welfare, are there any
10      other harms that the NCAA is alleging in this
11      case?
12          MR. DREYER:  Same objection as previously
13      stated.  You can answer.
14  A   Well, I don't know that you need more harms if
15      it is jeopardizing our student athletes and
16      integrity of our games, but those would be the
17      two main ones.
18  Q   And just so that we have a clear record, is the
19      NCAA alleging that any other harms would result
20      to the NCAA from New Jersey sports gambling law
21      other than those reflected in paragraphs 5 and
22      6, and student welfare?
23  A   I think that summarizes it.
24  Q   No other harms, correct?
25  A   Those are the main ones.

Page 36

1   Q   Are there any others?
2   A   Not that I can think of.
3   Q   Ms. Baker, you mentioned that the NCAA contends
4       that New Jersey sports gambling law would cause
5       harm by affecting the integrity of the game.  Do
6       I have that correct?
7   A   Correct.
8   Q   Can you explain to me that allegation?
9   A   Well, if there are additional opportunities for
10      sports wagering, then the concern is that there
11      would obviously be additional opportunities for
12      our student athletes to be approached to
13      compromise something within that athletic
14      contest.
15  Q   So is the NCAA's concern about the integrity of
16      its games premised on the belief that
17      legalization of sports wagering in New Jersey
18      would result in additional opportunities for
19      sports gambling?
20  A   That is one piece of it, yes.
21  Q   Does the NCAA contend that legalizing sports
22      gambling in New Jersey will increase the level
23      of sports gambling in the United States?
24  A   Absolutely.
25  Q   What's the basis for that contention?

Page 37

```
 1  A   Well, sports gambling has increased every year,
 2      according to our studies, from a student athlete
 3      perspective.  And it would be common sense that
 4      if you provide additional opportunities, there's
 5      going to be an increase in the number of people
 6      participating.
 7  Q   So the NCAA's contention that legalizing sports
 8      gambling in New Jersey would increase the level
 9      of sports gambling in the United States is based
10      on common sense?
11  A   Partly, and partly based on our survey numbers.
12  Q   Anything else?
13  A   Those are the main ones.
14  Q   Anything else that you can think of?
15  A   Not that I can recall at the moment.
16  Q   In the United States there's both legal and
17      illegal sports gambling, as we discussed
18      earlier, correct?
19  A   Yes.
20  Q   Does the NCAA know how much legal sports
21      gambling on NCAA sporting events occurs in the
22      United States?
23  A   I do not.  I do know that the tournament has
24      exceeded the Super Bowl in the state of Nevada,
25      in terms of the numbers bet, amounts bet.
```

Page 38

```
 1  Q   And when you say the tournament, you're talking
 2      about the March NCAA tournament?
 3  A   Correct.
 4  Q   Does the NCAA know how much was bet on the NCAA
 5      tournament last year?
 6  A   I do not.
 7  Q   Does the NCAA know how much was bet on the NCAA
 8      March basketball tournament in any year?
 9  A   Can you clarify your question?
10  Q   I just asked you previously whether the NCAA
11      knows how much was bet on the tournament last
12      year.  This question is only whether the NCAA
13      knows how much was bet on the tournament in any
14      previous years.
15  A   I've heard varying numbers, and I don't know
16      that I can say for certain that any of them are
17      correct.  And it depends whether you're talking
18      legal or illegal.
19  Q   What numbers have you heard?
20  A   Millions, hundreds of millions.
21  Q   And the numbers that you heard in the hundreds
22      of millions, were they numbers for legal or
23      illegal gambling?
24  A   I honestly cannot recall.
25  Q   Do you have a specific figure in mind, in the
```

Page 39

```
 1      hundreds of millions?
 2  A   I do not.  The FBI used to share a figure
 3      related to the amount they projected was
 4      wagered, and that's the number I'm thinking of,
 5      I just can't recall what that number is.
 6  Q   Does the NCAA know how much illegal sports
 7      gambling on NCAA sporting events occurs in the
 8      United States?
 9  A   I do not.
10  Q   Does the NCAA know how much total sports
11      gambling occurs in the United States on NCAA
12      sporting events?
13  A   I do not, other than the numbers from what our
14      student athletes report to us in our studies,
15      which is a high percentage, in our view, of
16      their involvement in sports wagering.
17  Q   Are you aware of any studies performed by the
18      NCAA or otherwise that show how much sports
19      gambling on NCAA sporting events there is in the
20      United States?
21  A   Not that I recall, other than our surveys.
22  Q   Do the surveys reflect how much sports gambling
23      there is on NCAA sporting events in the
24      United States?
25  A   No.  Our surveys reflect how much our student
```

Page 40

```
 1      athletes wager on NCAA events.
 2  Q   So the NCAA is not aware of any studies or other
 3      analyses that reflect how much sports gambling
 4      there is on NCAA sporting events in the
 5      United States, correct?
 6          MR. DREYER:  Objection.  I think you've
 7      changed your question from what you asked
 8      before.  So you have my objection.  You can
 9      answer if you are able to.
10          THE WITNESS:  Can you repeat the question?
11          MR. SIGLER:  Can you read the question
12      back?
13          (The previous question was read back by the
14      reporter as follows:  "So the NCAA is not aware
15      of any studies or other analyses that reflect
16      how much sports gambling there is on NCAA
17      sporting events in the United States, correct?")
18  A   I'm sure there have been other studies on sports
19      wagering, just none that I can recall at the
20      moment.  I know that ours was the largest of its
21      kind.
22  Q   And by yours you mean the student athlete
23      studies that the NCAA performed?
24  A   The NCAA studies, yes.
25  Q   Other than the NCAA's studies, which we will get
```

1    to, are you aware of any other studies regarding
2    the level of sports gambling on NCAA sporting
3    events in the United States?
4  A  Again, I'm sure that there have been, just none
5    that are coming to mind immediately.
6  Q  Did you take any steps in connection with this
7    deposition to search for studies relating to the
8    impact of sports gambling on the NCAA or its
9    member institutions?
10 A  I did not.
11 Q  And at any point relating to this case, have you
12   taken any steps to search for studies relating
13   to the impact of sports gambling on the NCAA or
14   its member institutions?
15 A  No.  Because the NCAA study is enough data and
16   information, I believe, for purposes of this
17   case.
18 Q  Does the NCAA have any estimate of how much
19   legal sports gambling on NCAA sporting events
20   would occur in the United States if New Jersey
21   moves forward with legalizing sports gambling?
22 A  We have not conducted a study on that, no.  I
23   can tell you that there would have been student
24   athletes from the state of New Jersey included
25   as part of the NCAA study, but because that

1    study is anonymous there would be no way to know
2    which teams from which schools participated.  I
3    just know that there have been teams from those,
4    from that state included.
5  Q  And because the students were not broken out by
6    state, it would be impossible to know from that
7    survey about the specific level of gambling in
8    New Jersey, correct?
9  A  Correct.  There would be no way to do that on a
10   regional basis.  We would just be able to show
11   in total that there's a high percentage of
12   involvement by our student athletes overall.
13 Q  So just to be clear, the NCAA does not have any
14   estimate about how much legal sports gambling on
15   NCAA sporting events would occur in the
16   United States after New Jersey moves forward
17   with legalizing sports gambling?
18 A  We do not have any numbers, to my knowledge, no.
19 Q  Does the NCAA have any estimate of how much
20   illegal sports gambling on NCAA sporting events
21   would occur in the United States if New Jersey
22   moves forward with legalizing sports gambling?
23 A  Seeing as how I don't have a reference point
24   because I don't have a number for illegal
25   gambling, I don't think I can answer that

1    question either.
2  Q  So the NCAA has no estimate; is that correct?
3  A  Not to my knowledge.
4  Q  Does the NCAA have any estimate of how much
5    sports gambling total would occur on NCAA
6    sporting events in the United States if
7    New Jersey moves forward with legalizing sports
8    gambling?
9  A  I'm sorry, can you repeat the question?
10      MR. SIGLER:  Would you mind reading that?
11   Thank you.
12      (The previous question was read back by the
13   reporter as follows:  "Does the NCAA have any
14   estimate of how much sports gambling total would
15   occur on NCAA sporting events in the United
16   States if New Jersey moves forward with
17   legalizing sports gambling?")
18 A  No, I do not.
19 Q  Is the NCAA currently undertaking any analysis
20   or study to try to estimate what impact there
21   would be on the level of sports gambling on NCAA
22   sporting events if New Jersey moves forward with
23   legalizing sports gambling?
24 A  Not to my knowledge.
25 Q  Does the NCAA have any studies or analyses

1    regarding the level of sports gambling in the
2    United States on NCAA sporting events that would
3    exist if any state moves forward with legalizing
4    sports gambling?
5       MR. DREYER:  Just one second.  You can
6    answer.
7  A  I'm sorry, that's a long question.  Can you read
8    that back, or could I have it repeated?
9       (The previous question was read back by the
10   reporter as follows:  "Does the NCAA have any
11   studies or analyses regarding the level of
12   sports gambling in the United States on NCAA
13   sporting events that would exist if any state
14   moves forward with legalizing sports gambling?")
15 A  Yes, I believe our study covers that, because it
16   asks our student athletes about their sports
17   wagering activities specific to NCAA sports.
18 Q  And you're referring to the studies the NCAA has
19   performed of student athlete gambling levels?
20 A  Correct.
21 Q  Does the NCAA have any studies regarding the
22   estimated impact on overall sports gambling
23   levels if any state were to move forward with
24   legalizing sports gambling?
25 A  No, not to my knowledge.

Page 45

```
 1   Q   Does the NCAA have any studies or analyses
 2       regarding how much sports gambling on NCAA
 3       sporting events occurs in Las Vegas?
 4   A   No, I do not believe that we have any.  I'm
 5       pausing because I want to make sure -- I don't
 6       have our study questions in front of me.  There
 7       may be a question in that study that
 8       specifically asks student athletes about placing
 9       bets in the state of Nevada, but I can't recall
10       with a hundred percent certainty.
11   Q   You are referring to the student athlete study
12       the NCAA has performed?
13   A   Correct.
14   Q   And just to confirm, the NCAA doesn't have any
15       studies regarding the level of sports gambling
16       in Las Vegas overall, correct?
17           MR. DREYER:  Objection to the form of the
18       question, asked and answered, but you can
19       answer.
20   A   I'm not aware of any other studies other than
21       our student athlete study that asks questions
22       specific to potentially placing bets in the
23       state of Nevada.
24   Q   Does the NCAA have any estimate of how much
25       sports gambling on NCAA sporting events would
```

Page 47

```
 1   A   No.
 2   Q   Does the NCAA know how much sports gambling on
 3       NCAA sporting events occurs currently in
 4       New Jersey?
 5   A   I do not know.
 6   Q   Does the NCAA have any information about how
 7       much sports gambling on NCAA sporting events
 8       occurs in New Jersey?
 9   A   I do not know.
10   Q   Does the NCAA have any estimate of how much
11       sports gambling on NCAA sporting events would
12       occur in New Jersey if New Jersey moves forward
13       with legalizing sports gambling?
14           MR. DREYER:  Before you answer that, can
15       you just let me know which 30(b)(6) topic you
16       think this line of questioning relates to?
17           MR. SIGLER:  Let's get an answer to the
18       pending question.
19           MR. DREYER:  No, there's an objection.  So
20       can you tell me which 30(b)(6) topic this
21       relates to?
22           MR. SIGLER:  It relates to a number of
23       them, Mr. Dreyer.  Let's continue.
24           MR. DREYER:  Can you identify any of them?
25   Q   Ms. Baker, could you please answer my question?
```

Page 46

```
 1       occur in Las Vegas if New Jersey moves forward
 2       with legalizing sports gambling?
 3   A   Not to my knowledge, no.
 4   Q   Does the NCAA have any information about whether
 5       legalizing sports gambling in New Jersey would
 6       cause the level of sports gambling in Nevada to
 7       go down?
 8   A   Do we have any studies, did you say?
 9   Q   Any information.
10   A   No.  I actually would opine that it would not
11       have an impact on Nevada.
12   Q   What's the basis for that opinion?
13   A   That it's just adding another opportunity for
14       sports betting, which would not eliminate people
15       using or going other places to do it, it would
16       just provide an additional avenue.
17   Q   And what's the basis for that view?
18   A   Just based on my ten years of experience at the
19       NCAA dealing with these issues and seeing the
20       cases of our student athletes, coaches,
21       administrators, and numbers from our study that
22       continue to increase with our student athletes'
23       involvement in gambling, sports wagering
24       specifically.
25   Q   Anything else?
```

Page 48

```
 1           MR. DREYER:  There's a standing objection.
 2           MR. SIGLER:  Are you directing her not to
 3       answer?
 4           MR. DREYER:  There's an objection, standing
 5       objection.
 6           MR. SIGLER:  Are you directing her not to
 7       answer?
 8           MR. DREYER:  If it is not within a 30(b)(6)
 9       topic, I am.  So can you please direct me to the
10       30(b)(6) topic or topics you believe this is
11       relevant to?
12           MR. SIGLER:  Topic 2.  All right.  Let's
13       continue.  Can you read the question back,
14       please.
15           MR. DREYER:  You have an objection.  She
16       can answer the question, but you have my
17       objection.  I think you have gone far afield of
18       the topic, but you have my objection.  The
19       witness can answer if she is able to, if the
20       court reporter would read back the question.
21           (The previous question was read back by the
22       reporter as follows:  "Does the NCAA have any
23       estimate of how much sports gambling on NCAA
24       sporting events would occur in New Jersey if New
25       Jersey moves forward with legalizing sports
```

Page 49

```
 1    gambling?")
 2  A  I don't have any information to be able to
 3     answer that question.
 4  Q  So the NCAA doesn't have any studies, analyses,
 5     or other information that would contain such an
 6     estimate, correct?
 7  A  Not that I'm aware of.
 8  Q  Ms. Baker, earlier in the deposition you said
 9     that the NCAA is alleging that one of the harms
10     it would experience from legalizing sports
11     gambling in New Jersey is that it would affect
12     the integrity of the NCAA's competitions,
13     correct?
14  A  Correct.
15  Q  Is the concern that legalizing sports gambling
16     in New Jersey would cause match fixing?
17        MR. DREYER:  Object to the form of the
18     question.  You can answer.
19  A  I think that's one of the concerns.  And the
20     term we use is more often point shaving issues.
21     And we've seen that occur even within the state
22     of Nevada, obviously, where gambling is legal.
23  Q  And is point shaving a type of match fixing?
24  A  Yes.
25  Q  Okay.  So when I refer to match fixing, I mean
```

Page 50

```
 1    point shaving.  Okay?
 2  A  Sure.  Match fixing is more commonly used in
 3     soccer internationally than within our football
 4     and basketball competitions at the collegiate
 5     level.
 6  Q  Are there other ways in which the integrity of
 7     competition would be impacted by legalizing
 8     sports gambling in New Jersey other than point
 9     shaving and match fixing?
10        MR. DREYER:  Objection, asked and answered,
11     but you can answer.
12  A  Well, there's also the potential for spot,
13     what's now called spot fixing.
14  Q  What is spot fixing?
15  A  Where individuals don't look to throw an entire
16     contest or shave points, but they look to alter
17     the outcome of one particular play.  So it's in
18     game wagering where you could essentially bet on
19     whether someone going to the free throw line
20     hits one free throw, hits one makes one, hits
21     both or makes both.  And the concern from our
22     perspective of what that, the kinds of pressure
23     that that can put on one of our 17, 18, 19, 20,
24     21-year-old athletes does greatly concern us in
25     terms of the harm that can come from that.
```

Page 51

```
 1  Q  And just for ease of terminology, I'm going to
 2     use the term match fixing.  And what I mean by
 3     that is any type of effort to influence the
 4     outcome of a game or a single play within a
 5     game, just so that we can be clear.  Okay?
 6  A  Sure.
 7  Q  Does the NCAA agree that match fixing has
 8     already occurred?
 9        MR. DREYER:  Objection to the form of the
10     question.  You can answer.
11  A  The NCAA has had point shaving cases.
12                    * * *
13     (The excerpt that follows is separately
14     bound and stamped "Highly Confidential.")
15                    * * *
16  Q  And those point shaving cases occurred prior to
17     New Jersey's legalization of sports gambling,
18     correct?
19  A  Those point shaving cases have occurred when
20     gambling has been legal in the state of Nevada,
21     yes.  And actually the Arizona State case
22     involved individuals that were a part of the
23     point shaving, going to Vegas to place
24     additional bets.
25  Q  And just to make sure we have a clear record,
```

Page 52

```
 1     I'm going to ask the question again.  I'm not
 2     sure the answer was a direct response.  The
 3     instances that you are aware of, of match
 4     fixing, occurred prior to New Jersey legalizing
 5     sports gambling, correct?
 6        MR. DREYER:  Objection, asked and answered.
 7     You can answer.
 8  A  Yes.
 9  Q  Is it the NCAA's contention that New Jersey's
10     legalization of sports gambling will cause there
11     to be more instances of match fixing than there
12     have been in the past?
13  A  That is one of the concerns, yes.
14  Q  And what other concerns are there?
15        MR. DREYER:  Objection, asked and answered.
16     You can answer.
17  A  The harm to the student athlete being one of the
18     most concerns.
19  Q  Any other concerns specific to the impact on the
20     integrity of competition?
21        MR. DREYER:  Same objection.  Go ahead and
22     answer.
23  A  The perception of the contest being played in an
24     honest and fair manner, which has a direct
25     impact on the integrity of the games.
```

1  Q   So is the NCAA alleging that it will be harmed
2      by New Jersey's legalization of sports gambling
3      because that legalization will give rise to the
4      perception that you just described?
5  A   That's one, the others that I mentioned as well,
6      primarily the actual integrity of the game
7      itself, and the student athletes' well-being.
8  Q   Ms. Baker, what is the basis for the NCAA's
9      contention that New Jersey's legalization of
10     sports gambling will result in increased match
11     fixing?
12 A   Well, sports wagering is -- several reasons --
13     first, sports wagering is illegal
14     internationally, and that has not seemed to have
15     had any impact on the number of scandals, match
16     fixing incidents, spot fixing incidents that
17     have occurred in the sports of international
18     soccer, cricket, tennis, and even some of the
19     Olympic events as well.
20         Additionally, sports wagering has been
21     legal in Nevada for years, and as I mentioned
22     previously, one of our point shaving scandals
23     involving Arizona State University actually
24     involved betters, individuals involved in that
25     case going to Vegas to lay off some additional

1      bets.  So those would be two of the biggest
2      reasons why there isn't any indication, or there
3      is evidence that increased betting could
4      directly impact the integrity of our games,
5      increased opportunities for betting could
6      directly impact the integrity of our games.
7  Q   Ms. Baker, you mentioned the Arizona State
8      situation.  When did that occur?
9  A   That was in the mid '90s, mid to late '90s.
10 Q   And you mentioned that there were some bets
11     placed in Las Vegas relating to the Arizona
12     State situation?
13 A   Correct.
14 Q   Were all of the bets relevant to the Arizona
15     State situation placed in Las Vegas, or were
16     there other bets as well?
17 A   There were other bets as well, my understanding,
18     there were other bets as well.
19 Q   Were those other bets placed illegally?
20 A   Yes.
21 Q   So the bets placed in Las Vegas were not the
22     sole cause of the Arizona State situation,
23     correct?
24 A   I don't know that I could speak for that.  I
25     know they were a part of the Arizona State case.

Withdrawn

Withdrawn

Withdrawn

Withdrawn

Withdrawn

```
 6   Q   Are there any other examples of match fixing
 7       that the NCAA is relying on in this case?
 8   A   Specific to our sports?  Specific to NCAA
 9       contests?  Because I mentioned the international
10       competition and the problems that the
11       international world has faced, even though
12       sports gambling is legal, but with all the
13       scandals that have occurred in soccer, the
14       tennis scandals that have happened, as well as
15       some of the worst scandals in cricket that have
16       occurred in the last couple of years as well.
17   Q   Where, what information relating to those
18       international scandals are you relying on?
19   A   Public news reports, as well as I actually
20       traveled to the International Olympic Committee
21       last year and met with the International Olympic
22       Committee, because they wanted to find out about
23       what the NCAA does to educate and monitor on
24       this issue because they view us as a leader in
25       this area.  And we had conversations related to
```

```
 1       some of the international scandals that have
 2       happened with both the International Olympic
 3       Committee as well as just sports internationally
 4       overall.
 5   Q   Does the NCAA have any studies, analyses, or
 6       other information, other than what you have
 7       described, about the level of sports gambling
 8       internationally?
 9   A   Well, we spend quite a bit of time with the
10       folks with the International Olympic Committee,
11       and I have since had several conversations with
12       individuals with the Tennis Integrity Unit
13       that's part of the International Tennis
14       Federation, because they have such strong
15       concerns with the, with the possibility of match
16       fixing or spot fixing.
17           Obviously the Olympic Committee has just
18       initiated rules for their athletes related to
19       this.  We've had multiple conversations about
20       that, because of their concerns for what
21       gambling can do to the athletes and to the
22       sport.
23   Q   In these discussions have you received any
24       written materials relating to the incidence of
25       match fixing internationally that the NCAA is
```

Page 61

```
 1      relying on to contend that New Jersey's
 2      legalization will result in match fixing?
 3   A  No, I'm just relying on the work that I do in
 4      this area, and the conversations and
 5      relationships that I have built with those folks
 6      in order to be considered someone that has a lot
 7      of knowledge in this particular area.  So I'm
 8      just relying on conversations and my job
 9      responsibilities.
10   Q  So does the NCAA have any surveys or analyses
11      regarding the level of match fixing
12      internationally?
13   A  No surveys.
14   Q  Does the NCAA have any analyses regarding the
15      incidence of match fixing internationally?
16   A  Not that I'm aware of.
17   Q  Other than the examples that we talked about
18      earlier, Toledo, San Diego State, Arizona State,
19      Auburn and Hawaii, are there any other examples
20      of cases involving the NCAA relating to match
21      fixing on which the NCAA is relying?
22         MR. DREYER:  Same objection as to what the
23      NCAA is relying on in this case.  I don't think
24      that's one of the 30(b)(6) topics.  I think
25      that's a standing objection.  I just want to
```

Page 63

```
 1      related responsibilities as part of my
 2      internship.
```

Withdrawn

Page 62

```
 1      make sure it's clear.  You can answer the
 2      question.
```

Withdrawn

```
21   Q  You had gambling related responsibilities
22      beginning in 2005; is that correct?
23   A  Beginning in 2001, or '02, I can't recall
24      exactly when I transitioned to the AGA area
25      during my internship, but I would have gambling
```

Page 64

Withdrawn

```
21   Q  Does the NCAA maintain files on each of its
22      enforcement actions?
23   A  On our cases?  I'm confused by the word action.
24   Q  Sorry.  Let me change the terminology.  You
25      referred to investigations of match fixing and
```

Page 65

```
 1      the like as involving cases, correct?
 2    A  Correct.
 3    Q  Does the NCAA maintain files on each of its
 4      cases?
 5    A  Yes, we maintain files on our cases.
```

# Withdrawn

```
14    Q  Does the NCAA maintain a database on its cases,
15      or are they paper files or some other format?
16    A  Well, there's -- that question has a couple of
17      different parts to it.
18    Q  Let me withdraw it, then, and ask a better
19      question.
20    A  Okay.
21    Q  How does the NCAA maintain its files about its
22      cases?
23    A  We have an electronic case management system to
24      maintain internally.
25    Q  What's that called?
```

Page 66

```
 1    A  Case Management System.
 2    Q  Does the NCAA have an estimate of how many match
 3      fixing cases it would have next year if
 4      New Jersey moves forward with legalizing sports
 5      gambling?
 6          MR. DREYER:  Objection to the form, to the
 7      term match fixing cases, but you can answer if
 8      you are able to.
 9    A  I don't have any estimates related to the, to
10      next year.  I can tell you that for the last two
11      years we've had four cases.
12    Q  And those four cases related to match fixing?
13    A  Those were the four cases we just reviewed.
14    Q  Does the NCAA rely on self reporting by
15      institutions to identify allegations of match
16      fixing?
17    A  Self reporting is one way that violations can be
18      uncovered, but it is not the only way.
19    Q  What are some of the other ways?
20    A  Well, as part of my job responsibilities that we
21      went over in the beginning, our charge is to
22      develop information related to violations of
23      NCAA rules.
24    Q  Does the NCAA rely on sports gambling operators
25      in Las Vegas to identify potential instances of
```

Page 67

```
 1      match fixing?
 2    A  We don't rely on that, no, but we have had
 3      conversations with them before when they have
 4      spotted information that they believe could be a
 5      possible point shaving issue.
 6    Q  So you have had discussions with sports gambling
 7      operators in Las Vegas initiated by those sports
 8      operators?
 9          MR. DREYER:  Geoff, let me interpose an
10      objection here.  I think there was previously a
11      30(b)(6) topic on relationships with sports
12      gambling entities, and the judge ruled that was
13      impermissible.  So I'll let the witness answer
14      this question yes or no, but I think we've gone,
15      not only have gone far afield of designated
16      topics, we've gone into an area the magistrate
17      has previously ruled on.
18          MR. SIGLER:  We'll note your objection.  I
19      disagree but note your objection.
20          MR. DREYER:  The magistrate has ruled.  You
21      can answer the question yes or no.  You can read
22      it back, and we'll move on.
23          THE WITNESS:  Can you please read it back?
24          (The previous question was read back by the
25      reporter as follows:  "So you have had
```

Page 68

```
 1      discussions with sports gambling operators in
 2      Las Vegas initiated by those sports operators?")
 3    A  Yes.
```

# Withdrawn

```
21          THE WITNESS:  I don't know if we're
22      switching subjects, but if we are, can we take a
23      bathroom break?
24          MR. SIGLER:  Let me ask one more question
25      and we can do that.
```

Page 69

1  Q  Did sports gambling operators in Las Vegas
2     assist the NCAA in its investigation of the
3     Arizona State situation?
4  A  I was not at the NCAA during the Arizona State
5     point shaving investigation, and I honestly do
6     not recall.
7                      *  *  *
8        MR. SIGLER:  All right.  We can take a
9     break.
10       THE WITNESS:  Thank you.
11       (A recess was taken.)
12 Q  Ms. Baker, earlier today we were discussing the
13    harms that the NCAA alleges would result from
14    New Jersey's legalization of sports gambling,
15    correct?
16 A  Yes.
17 Q  And one of those harms that you mentioned was
18    that it would create the perception among the
19    public that the NCAA's contests are being
20    influenced by sports gambling, correct?
21 A  Correct.
22 Q  Does this perception that you described already
23    exist for some portion of the public?
24 A  It, yes, it very well could.
25 Q  Does the NCAA know whether that perception

Page 70

1     exists in some portion of the public?
2  A  I don't think I can speak for the entire general
3     public, but I do know that as director of AGA, I
4     have received emails from the general public
5     when something has happened in a contest
6     questioning the integrity of the game.
7        And obviously if there were additional
8     avenues to place bets, it would seem realistic
9     that that could only increase.
10 Q  You believe the number of emails you would get
11    regarding that perception would increase?
12 A  I believe the number of people questioning when
13    something happens in a game where an 18-year-old
14    kid that is playing in front of a hundred
15    thousand screaming fans accidentally drops a
16    pass or makes a mistake, as a 17, 18, 19,
17    20-year-old kid is going to be, that people in
18    the general public could potentially, with an
19    increase in betting, view that as something
20    intentional on behalf of the student athlete.
21 Q  But you don't know whether the number of people
22    with that perception would increase, correct?
23 A  I would assume that it would, yes.
24 Q  You would assume it, but you don't know it,
25    correct?

Page 71

1  A  Correct.
2  Q  What's the basis for that assumption, other than
3     the emails that you described earlier?
4  A  I think also a lot of the media questions that I
5     field as it specifically relates to gambling on
6     NCAA contests.
7  Q  Anything else?
8  A  The cases themselves that we've had, the sports
9     wagering, point shaving cases that we've had as
10    well.
11 Q  The five cases we discussed earlier?
12 A  Correct.
13 Q  Does the NCAA have any consumer surveys or
14    studies regarding the level of public perception
15    of match fixing?
16 A  Not that I can recall, no, nothing that comes to
17    mind.
18 Q  Does the NCAA have any studies or analyses
19    regarding the level of that perception in the
20    public that would exist if New Jersey moves
21    forward with legalizing sports gambling?
22 A  Nothing that I can, that I'm aware of, no.
23 Q  For people who currently have the perception
24    that NCAA matches are being fixed, does the NCAA
25    know where they get that perception?

Page 72

1  A  I don't know that I could speak on behalf of
2     people that I don't know.
3  Q  Does the NCAA have any studies, focus groups, or
4     analyses regarding where people get that
5     perception?
6  A  Not that I can recall.  I would say that when
7     people have a lot of money on the line, that
8     that is one of the immediate conclusions that
9     they draw when something in a game doesn't go
10    their way.  And that's just based on my years of
11    experience being a director, as well as watching
12    and observing people involved in gambling over
13    the years.
14 Q  You're saying that people with the perception
15    that matches are being fixed are often people
16    who have bets placed on the matches?
17 A  I would guess that, yes, that could be, a
18    percentage of people that have that perception
19    are people that have a large amount of money on
20    the game and a call doesn't go their way or a
21    play doesn't go their way.
22 Q  Does the NCAA have any studies or analyses or
23    focus groups to support that belief?
24 A  No.  I have the emails that I have received over
25    the years from people in the general public that

.

Page 77

```
 1   Q   Do you know how the bets were placed in that
 2       case?
 3   A   I don't recall, because it was a case I oversaw
 4       in my new role, it wasn't a case I actually
 5       investigated.
 6   Q   Did that case involve sports gambling or other
 7       types of gambling?
 8   A   Sports wagering specifically.
 9   Q   And do you know what types of bets were placed
10       in that case by the student athlete?
11   A   I don't recall.
12   Q   What sport did it involve?
13   A   He was a wrestler.
14   Q   I take it he was not betting on his own team,
15       correct?
16   A   Actually, I believe he may have been.  There may
17       have been -- I don't recall that with a hundred
18       percent certainty -- but I do remember that
19       being discussed, so that could have been part of
20       it.  I can't recall.
21   Q   If that was happening, it could have been
22       through a student bookie, correct?
23   A   Well, that would have been one way it could have
24       happened.  There are also places that accept
25       bets on Division 2 and 3.  It's not as commonly
```

Page 78

```
 1       known.  But bookies are one avenue, the internet
 2       is also another avenue that you can place bets
 3       on Division 2 and 3 contests, as well as in the
 4       state of Nevada my understanding is they are
 5       accepting more and more bets on Division 2 and
 6       Division 3 contests.
 7   Q   Do you know whether there is any betting in the
 8       state of Nevada on Division 2 wrestling
 9       involving this particular school?
10   A   I don't know.
11   Q   In the second example that you gave involving
12       the staff member, what school was that?
13   A   I do not recall.
14   Q   Do you recall what sport?
15   A   It would have been basketball.  And I don't
16       recall specifically if it was men's or women's.
17   Q   And did you say that the staff member worked for
18       the school?
19   A   Which staff member?
20   Q   The staff member who was getting text messages.
21   A   Yes.  I'm sorry, I thought you meant our staff
22       member.
23   Q   So the person who was getting text messages
24       about gambling related information that you
25       mentioned earlier worked for the NCAA member
```

Page 79

```
 1       institution?
 2   A   Worked for the athletics department, yes.
 3   Q   How were the bets being placed in that case?
 4   A   Well, I don't know that there were bets being
 5       placed.
 6   Q   Is it the NCAA's contention that if New Jersey
 7       legalizes sports gambling, that there will be
 8       increases in student athlete sports gambling?
 9   A   Yes.
10   Q   And it's because of those alleged increases that
11       the NCAA contends that student athlete welfare
12       would be impacted?
13   A   Yes.  The more avenues and opportunities where
14       student athletes and coaches and athletic
15       administrators can participate, the more
16       concerned we are about that having a negative
17       impact on their welfare.
18   Q   Does the NCAA know how much sports gambling
19       involving student athletes occurs in the
20       United States?
21   A   We know information from our studies that were
22       conducted.  We didn't survey every student
23       athlete.  But we have a general sense based on
24       the 22, approximately 22 thousand Division 1, 2
25       and 3 student athletes, what those results
```

Page 80

```
 1       showed.
 2   Q   And you're referring to the surveys performed by
 3       the NCAA itself of its student athletes,
 4       correct?
 5   A   Correct.
 6   Q   And those surveys were performed in 2004 and
 7       2008, correct?
 8   A   Correct.  And there is one that has yet to be
 9       finalized in 2012.
10   Q   Other than the 2004 NCAA survey, the 2008 NCAA
11       survey, and yet to be finalized 2012 NCAA
12       survey, are you aware of any other studies or
13       analyses regarding the level of sports gambling
14       by student athletes in the United States?
15   A   That the NCAA has conducted?
16   Q   Any other surveys.
17   A   Oh, I think we talked about this.  I'm sure
18       there have been, but I don't recall.
19   Q   Ms. Baker, this morning we talked about three
20       different harms, if I'm counting correctly, that
21       the NCAA alleges.  The first is the increased
22       risk of match fixing that may result from
23       New Jersey legalizing sports gambling, correct?
24   A   Correct.
25   Q   The second is the public perception of match
```

Page 81

```
1     fixing which may increase as a result of
2     legalizing sports gambling in New Jersey,
3     correct?
4  A  Yes.
5  Q  And the third is the impact on student welfare
6     that may result from legalization of sports
7     gambling in New Jersey, correct?
8  A  Yes.
9  Q  Is there another harm that the NCAA alleges
10    would result from New Jersey legalizing sports
11    gambling?
12       MR. DREYER:  Objection to the form of the
13    question.  The pleadings speak for themselves in
14    the case.  But you can answer.
15 A  I think one of the great things about college
16    sports is, if you have ever been to a rivalry
17    game, if you have ever seen Ohio State/Michigan,
18    if you have ever seen Duke/North Carolina, if
19    you have ever gone and watched
20    Kentucky/Tennessee, the people and the fans that
21    come to our contests have a loyalty to the
22    institution and to the student athletes that are
23    on the field that really, in my view, is
24    unmatched.  And they come to those contests
25    because they care about their school, they care
```

Page 82

```
1     about the name that's on the chest of those
2     players, on the front of their jerseys and they
3     have an affinity to that.
4        And if sports gambling is added in the
5     state of New Jersey, then I believe that that
6     could have an impact on the reason why fans are
7     coming to our games and watching and enjoying
8     the 17, 18, 19, 20-year-old kids that are on the
9     court or on the field playing as hard as they
10    can.
11       So in addition to the public perception, in
12    addition to the harm to the student athletes, in
13    addition to the integrity of the game,
14    fundamentally changing the reason why fans come
15    and cheer for the school on the front of the
16    jersey, would be a great harm.
17 Q  Ms. Baker, does the NCAA have any studies,
18    surveys or analyses regarding that harm that you
19    just described?
20 A  Not that I'm aware of, no.
21 Q  Does the NCAA have any studies, surveys, focus
22    groups or analyses regarding how many of its
23    fans currently have the rooting interest you
24    just described?
25 A  Other than the attendance numbers at our college
```

Page 83

```
1     football games where you have a hundred thousand
2     people in the stands to watch, no, I don't have
3     any information about that.
4  Q  Is it possible that some of those people are
5     there because they had a rooting interest
6     because they have placed a bet on the game?
7  A  It could, could be.
8  Q  And the NCAA doesn't have any studies, analyses
9     or surveys regarding the number of people who
10    have rooting interest because of their team or
11    because of gambling or because of something
12    else, correct?
13 A  No.
14 Q  So I believe you just described a fourth harm
15    that the NCAA alleges.  Is there -- are there
16    any other harms that the NCAA alleges would
17    result from New Jersey's legalization of sports
18    gambling?
19       MR. DREYER:  Same objection that the
20    pleadings speak for themselves, but you can
21    answer.
22 A  That harm, no, that's all that I can think of.
23 Q  The NCAA is not alleging that New Jersey's
24    legalization of sports gambling would result in
25    any financial loss to the NCAA or its member
```

Page 84

```
1     institutions, correct?
2        MR. DREYER:  Objection to the form of the
3     question.  You can answer.
4  A  I don't think that we are.  Our championships
5     are still going to occur, they are just not
6     going to occur in the State of New Jersey.
7  Q  And the NCAA doesn't have any studies or
8     analyses regarding any estimated financial loss
9     resulting from New Jersey's legalizing sports
10    gambling, correct?
11 A  Not that I'm aware of.
12 Q  And the NCAA is not alleging that New Jersey's
13    legalization of sports gambling would result in
14    any loss of viewership to the NCAA or its
15    membership, correct?
16       MR. DREYER:  Objection to the form of the
17    question.  You can answer the question.
18 A  Not that I can recall.
19 Q  Does the NCAA have any studies, surveys or
20    analyses regarding the impact on viewership of
21    New Jersey legalizing sports gambling?
22 A  Not that I'm aware of.
23 Q  Does the NCAA have any studies, analyses or
24    surveys regarding the impact on TV ratings of
25    New Jersey legalizing sports gambling?
```

Page 85

```
 1  A   Not that I'm aware of.
 2  Q   And the NCAA is not alleging that New Jersey's
 3      legalization of sports gambling would affect TV
 4      ratings, correct?
 5          MR. DREYER:  Same objection, allegations in
 6      the case.  You can answer.
 7  A   Not that I'm aware of.
 8  Q   The NCAA is not alleging that New Jersey's
 9      legalization of sports gambling would result in
10      any loss of attendance to NCAA or its member
11      institutions, correct?
12          MR. DREYER:  Same objections as to
13      allegations in the case.  You can answer.
14  A   Not that I know of.
15  Q   And the NCAA doesn't have any surveys, studies
16      or analyses regarding any decline in attendance
17      that it alleges would result from legalizing
18      sports gambling in New Jersey, correct?
19  A   Can you repeat that question?
20          MR. SIGLER:  Sure.  I'll do it.
21  Q   Does the NCAA have any studies or analyses
22      showing any estimated decline in attendance that
23      would result from New Jersey's legalizing sports
24      gambling?
25  A   Not that I'm aware of.  I'm still not a hundred
```

Page 86

```
 1      percent sure I understand the question, though.
 2  Q   Well, let's make sure you do.
 3          Does the NCAA --
 4  A   Go ahead.  Sorry.
 5  Q   Do you have a question about the question?
 6  A   I do, but I'll wait and listen to what you're
 7      going to ask me.
 8  Q   Does the NCAA have any studies or analyses
 9      showing the impact on attendance of New Jersey's
10      legalization of sports gambling?
11  A   No studies or analyses.
12  Q   Does the NCAA have any information about the
13      impact on attendance of New Jersey's
14      legalization of sports gambling?
15          MR. DREYER:  Objection to the form of the
16      question.  You can answer.
17  A   Here's where I'm getting confused:  The impact
18      on attendance is that there will not be any
19      championships in New Jersey, so attendance for
20      that is zero.  So that's where I might be
21      confusing myself.
22  Q   Those championships would be held somewhere
23      else, correct?
24  A   Correct.
25  Q   So other than the loss of championships to
```

Page 87

```
 1      New Jersey, does the NCAA have any information
 2      about the impact on attendance of New Jersey
 3      legalizing sports gambling?
 4  A   Not that I recall.
 5          (Deposition Exhibit 5 was marked for
 6      identification.)
 7  Q   Ms. Baker, you have just been handed a copy of a
 8      document marked Exhibit 5.  Do you recognize
 9      this document?
10  A   I do.
11  Q   What is this document?
12  A   President Emmert's declaration.
13  Q   And when did you see this document for the first
14      time?
15  A   I do not recall the specific date.
16  Q   Months ago, weeks ago, days ago?
17  A   I'd say weeks ago.
18  Q   Have you discussed this declaration with
19      President Emmert?
20  A   I have not.
21  Q   Did you help prepare this declaration?
22  A   I did not.
23  Q   For what purpose did you review it?
24  A   I was provided this document by our legal
25      counsel.
```

Page 88

```
 1  Q   Is the NCAA relying on this document to support
 2      its standing in the case?
 3          MR. DREYER:  Objection, calls for a legal
 4      conclusion, and our positions have been made
 5      clear in pleadings, but you can answer if you
 6      are able to.
 7  A   I'm not an attorney, so I don't know that I can
 8      answer that question.  I'm not an attorney for
 9      us in this case or an attorney at all, thank
10      goodness.
11          MR. DREYER:  And don't play one on TV.
12  Q   The record is clear that you are not an
13      attorney.
14          Based on your understanding of standing in
15      your capacity as the NCAA's representative on a
16      topic relating to standing, is the NCAA relying
17      on this document, Exhibit 5, in support of its
18      standing in the case?
19          MR. DREYER:  Same objection.  You can
20      answer.
21  A   I would assume so.  I have not had any
22      conversations with counsel about that, but I
23      would assume if our president is giving a
24      declaration, we're relying on that.
25          (Deposition Exhibit 6 was marked for
```

Page 89

```
 1     identification.)
 2   Q  Ms. Baker, you have been handed a copy of a
 3     document marked Exhibit 6.  Please review this
 4     document, and tell me whether you recognize it.
 5   A  Yes, I do.  It is our rules related to ethical
 6     conduct from 2010 and '11.
 7   Q  Is this the current version of your rules
 8     relating to ethical conduct?
 9   A  I don't know if -- our rules potentially change
10     every year, depending on legislative proposals
11     that are put forward by our membership, and
12     there also can be legislative modifications.
13     And there's other things in the ethical conduct
14     legislation besides just gambling, so there is a
15     possibility that some of the information --
16     particularly I'm thinking about what's contained
17     in 10.1 -- could be somewhat tweaked or a little
18     bit different in the current legislative cycle,
19     if that makes sense.
20   Q  Are you aware of any changes subsequent to this
21     version to 10.3 sports wagering activities?
22   A  I'm not aware of any substantive changes, no.
23     There could have been some wording
24     modifications, but I'm not aware of anything
25     substantive.
```

Page 91

```
 1     staff, so it wouldn't surprise me if there were
 2     slight wording modifications made to some parts
 3     of 10, bylaw 10.  But I'm just not aware of
 4     anything substantive.
 5   Q  Focusing on 10.3, which is on the page with the
 6     Bates number PLAINTIFFS' 00003710 at the bottom.
 7   A  Yes.
 8   Q  Does this summary of 10.3 summarize the NCAA's
 9     current sports wagering policy, to your
10     knowledge?
11   A  Yes.  That has to be applied in conjunction with
12     how a wager in sports wagering is actually
13     defined, so 10.02 is also a partner bylaw to
14     10.3, if that makes sense.  That defines what a
15     wager is and what sports wagering is.
16   Q  10.02, which says "Definitions and
17     Applications," defines sports wagering and
18     wager, correct?
19   A  Yes.
20   Q  And these are the definitions that the NCAA uses
21     in applying its policies, correct?
22   A  Correct.
23   Q  And its policies include 10.3, correct?
24   A  Yes.
25   Q  What substantive revisions to 10.3 have there
```

Page 90

```
 1   Q  Do you have the current version of 10.3 in your
 2     own files?
 3   A  I would have it in the manual.
 4   Q  And the manual is this Division 1 Manual that's
 5     reflected on the first page of this document?
 6   A  Yes.  But the manual is online now, I believe.
 7     Well, there is also a hard copy that is printed.
 8     But the primary source of the manual is what's
 9     online.
10   Q  Is there a 2012 version of the manual?
11   A  There would be, yes.
12   Q  And is there a different version of the manual
13     for each division, Division 1, Division 2,
14     Division 3?
15   A  That's correct.
16   Q  So this is the Division 1 Manual from 2010 and
17     2011, correct?
18   A  That is correct.
19   Q  And just to be clear, are you aware of any
20     specific changes to any part of 10.3, subsequent
21     to this version, the 2010, 2011 version,
22     Exhibit 6?
23   A  I'm not aware of any substantive changes, but
24     every year there's wording modifications that
25     are made by our academic membership and affairs
```

Page 92

```
 1     been in the last five years, that you can
 2     recall?
 3   A  In the last five years?
 4        MR. DREYER:  Objection to the form of the
 5     question, but you can answer.
 6   A  I'm not tracking on substantive changes to 10.3
 7     in the last five years.  The substantive change
 8     occurred in '07, which I think is highlighted in
 9     the actual language of both 10.02 and 10.03
10     where it talks about at the very end, in the
11     parenthetical reference, that it was adopted
12     4-26-07.  So that would have been the
13     substantive change.
14   Q  So the last substantive change to this policy
15     10.3 was in 2007?
16   A  As far as I'm aware, yes.
17   Q  What was that substantive change in 2007?
18   A  It more clearly defined what constituted sports
19     wagering and who was actually, who the policy
20     applied to.
21   Q  And how was the previous version of this policy
22     different with respect to that issue?
23   A  It's been so long ago, I honestly, without
24     having the old rule in front of me, I don't
25     recall all of the specific changes.  I just know
```

Page 93

```
 1       this, from what I remember, it clarified who the
 2       policy applied to and what specific actions were
 3       caught up or would be considered sports wagering
 4       under the definition.
 5    Q  Do you have the previous version of this policy
 6       reflecting the substantive change you just
 7       described in your files?
 8    A  I don't know that I would have it in my files.
 9       It would be in the previous manuals.
10    Q  Focusing on 10.3.2, which is entitled
11       "Sanctions," do you see that section?
12    A  I do.
13    Q  Has this section changed substantively since
14       2007?
15    A  Not that I'm aware of.  But this section would
16       actually be managed by our student athlete
17       reinstatement staff that actually issues
18       sanctions for violations of rules for student
19       athletes.
20          So they could have potentially made changes
21       to the sanctions part of it, and I just am not
22       tracking on it.
23    Q  And when you say you're not tracking, that just
24       means you can't think of any, correct?
25    A  Correct.
```

Page 95

```
 1       parts that you see in (a), which involves point
 2       shaving and actually betting on your own
 3       institution.
 4          There are other types of sports wagering
 5       that can occur outside of these five areas, and
 6       those are handled on a case-by-case basis with
 7       our student athlete reinstatement staff
 8       utilizing case precedent, utilizing the
 9       seriousness of the violation as it relates to
10       any potential mitigating circumstances that may
11       exist.
12          And we would not be involved in assessing
13       those penalties.
14    Q  So is the reason that these particular types of
15       sports gambling in 10.3.2 (a) and (b) are called
16       out in these provisions that they are viewed as
17       more serious types of sports gambling
18       violations?
19    A  In which part?
20    Q  10.3.2(a) and 10.3.2(b).
21    A  At the time these sanctions were put through,
22       yes, because these sanctions have been in place
23       for definitely the entire time I have been at
24       the NCAA, and I believe even several years
25       before me coming there.
```

Page 94

```
 1    Q  So is your group, your current group and then
 2       previously the AGA group, not responsible for
 3       assessing sanctions under 10.3.2?
 4    A  That is correct.  We are only the investigators.
 5    Q  Focusing on 10.3.2(b), which begins with the
 6       statement, "A student athlete who participates
 7       in any sports wagering activity through the
 8       internet, a bookmaker, or a parlay card shall be
 9       ineligible for all regular season and post
10       season competition for a minimum period of one
11       year from the date of the institution's
12       determination that a violation occurred, and
13       shall be charged with the loss of a minimum of
14       one season of eligibility."
15          Do you see that?
16    A  I do.
17    Q  Why does this section specify sports wagering
18       through the internet, a bookmaker, or a parlay
19       card?
20    A  That sanction, even with the previous 10.3, has,
21       to my knowledge, always existed.  Because the
22       membership wanted to specifically pull out
23       really four, five different types of betting,
24       three of those being the ones that you see
25       listed in part (b), and the other two being the
```

Page 96

```
 1          So we were in a different world really,
 2       frankly, related to the types of betting that
 3       were available at that time.
 4    Q  And so just to be clear, the specific types of
 5       sports gambling that are referred to in
 6       10.3.2(a) and (b), point shaving, betting on the
 7       internet through a bookmaker or parlay card, are
 8       viewed by the NCAA as more serious types of
 9       sports gambling than the other types that aren't
10       listed here?
11          MR. DREYER:  Objection to the form of the
12       question.  You can answer.
13    A  I don't know that I can answer that.  Obviously
14       (a) is extremely serious, and there's no
15       question that's at the top of the list.
16          As it relates to (b), this is just an
17       automatic penalty, so it doesn't even go through
18       the reinstatement process if one of these three
19       components exist.  But that doesn't mean if a
20       student athlete bets legally in Vegas, for
21       example, on a college football contest, that
22       their suspension from play might not also equal
23       one year similar to what's listed in (b)
24       depending on the amount of money that was bet
25       legally as well as how many times they may have
```

1     done it as well, if that makes sense.

2 Q  So other types of sports gambling activity that

3     aren't specifically referred to here would be

4     assessed on a case-by-case basis, correct?

5 A  Correct.

6 Q  And legal sports gambling at a sports book in

7     Las Vegas is not one of the types of gambling

8     that is specifically referred to in 10.3.2(a)

9     and (b), correct?

10 A  Correct.

11 Q  Are you aware of any situation where someone has

12     received a sanction as serious as that indicated

13     under 10.3.2(a) or (b) for gambling legally at a

14     sports casino in Las Vegas?

15 A  Oh, gosh.  We've had lots of cases over the

16     years, and without me sitting down and going

17     through all of them, I don't know that I could

18     say with certainty.

19        I know we've probably had cases involving

20     student athletes or coaches or administrators

21     that have placed bets legally, but with all the

22     cases we've had, I'm having trouble recalling a

23     specific one.

24 Q  Betting through a lottery or a pool would be a

25     type of sports gambling that is not specifically

1 A  Yes.

2 Q  The NCAA does not prohibit student athletes from

3     engaging in non-sports gambling, correct?

4 A  Can you clarify your question?

5 Q  Sure.  So there could be sports gambling and

6     there could be non-sports gambling, correct?

7 A  Yes.

8 Q  And non-sports gambling would include playing

9     Blackjack at a casino for someone who is over

10     21, correct?

11 A  Yes.

12 Q  NCAA does not prohibit student athletes from

13     engaging in non-sports gambling, correct?

14 A  Our jurisdiction is only involving sports

15     wagering in which we sponsor a sport or

16     championship in that sport, as well as the BCS

17     football and emerging sports for women.  So

18     that's where our jurisdiction is.

19 Q  And what defines that jurisdiction?

20 A  Where our championships are, as well as the

21     sports that we actually sponsor.

22     (Deposition Exhibit 7 was marked for

23     identification.)

24 Q  Ms. Baker, you have been handed a copy of a

25     document marked Exhibit 7.  Please review this

1     referred to in 10.3.2(a) or (b), correct?

2 A  Well, that is actually --

3     MR. DREYER:  Objection to the form of the

4     question.  You can answer.

5 A  It is not in (b), no, but it is mentioned in

6     10.02.

7 Q  So just to be clear, the NCAA would consider

8     betting through a lottery or a pool to be sports

9     gambling within the meaning of 10.02, correct?

10 A  If there is an entry fee to participate in

11     either of those, and there is the possibility to

12     win a prize, then yes, that would be considered

13     sports gambling.

14 Q  But that type of gambling through a lottery or a

15     pool would not trigger the automatic sanctions

16     in 10.3.2(a) or (b), correct?

17 A  Correct.  It would be reviewed by our student

18     athlete reinstatement staff.

19 Q  Does this policy, 10.3, apply to NCAA's student

20     athletes at all times of the year?

21 A  Correct, yes.

22 Q  Does it apply to them in connection with

23     conference championships?

24 A  Yes.

25 Q  And does it apply to conference staff?

1     document, and tell me whether you recognize it.

2 A  Yes, I do.

3 Q  What is this document?

4 A  These are the minutes from the executive

5     committee meeting in August of 2009.

6 Q  And this exhibit, Exhibit 7, reflects a portion

7     of those minutes discussing the NCAA's

8     championships policy, correct?

9 A  Yes, it looks like it's an excerpt of them.

10 Q  What is the championships policy?

11 A  That no predetermined or non-predetermined

12     session of an NCAA championship may be conducted

13     in a state with legal wagering that is based on

14     single game betting on the outcome of any event,

15     i.e. high school, college, or professional, in a

16     sport in which the NCAA conducts a championship.

17 Q  That is the current championships policy,

18     correct?

19 A  Yes.

20 Q  And that policy was put into place at the

21     executive committee meeting reflected in these

22     minutes, correct?

23 A  It would have been adopted then, yes, correct.

24 Q  What was the previous version of the

25     championships policy?

Page 101

```
 1   A   Oh, gosh.  I can't recall that off the top of my
 2       head.  I can't recall the exact wording of that.
 3   Q   Okay.  Is there a document that reflects the
 4       previous version of the championships policy?
 5   A   Is there?  I would guess, yes, that it would be
 6       included in the bid specifications from our
 7       championships staff.
 8   Q   Does your group or previously the AGA group have
 9       responsibility for the championships policy?
10   A   Responsibility for the championship policy?  No.
11   Q   There's a separate group within the NCAA that
12       has responsibility for the championships policy?
13   A   Well, there's a governance group that has
14       responsibility for policy and legislative
15       changes and recommendations, and then that work
16       hand in hand with our championships group that
17       have policies specifically related to our
18       championships.  So I don't know who has final
19       jurisdiction.  I know they both work on it
20       together.
21   Q   Ms. Baker, looking at the first sentence of the
22       minutes, it states, "The committee reviewed a
23       request from the agents and gambling activities
24       staff to consider revising the championships
25       policy that regulates championships competition
```

Page 102

```
 1       within states that conduct sports wagering."
 2           Do you see that?
 3   A   I do.
 4   Q   And you were on the agents and gambling
 5       activities staff during this period, correct?
 6   A   I was, yes.
 7   Q   You were head of it, right?
 8   A   I was the head of it, and very pregnant during
 9       this time.
10   Q   So were you involved in this request that's
11       discussed here in the minutes?
12   A   Yes.
13   Q   Did you have responsibility for making that
14       request?
15   A   Yes.
16   Q   Were you present at the executive committee
17       meeting to make that request?
18   A   I believe I was at that meeting.  I did not
19       present, but yes, I believe I was at that
20       meeting.
21   Q   Was there a written document that made that
22       request to the executive committee?
23   A   I don't recall if there was a written document
24       to the executive committee.  I know that the
25       committee on sportsmanship and ethical conduct
```

Page 103

```
 1       and the championships cabinet would have also
 2       reviewed the policy.  But I don't recall whether
 3       or not there was a written document provided to
 4       the executive committee.
 5   Q   And are there minutes from the meeting of the
 6       ethical conduct committee that you just
 7       mentioned relating to the change in the
 8       championships policy?
 9   A   I don't know how far back we keep those minutes.
10   Q   Who would know?
11   A   Our legal staff or our governance staff.
12   Q   Ms. Baker, does this discussion in the minutes
13       from August 6, 2009, accurately reflect what was
14       discussed at this executive committee meeting?
15   A   Yeah, I think so.
16   Q   What was the reason for the request in change to
17       the championships policy?
18   A   I remember that for some reason I became aware
19       that the policy only currently applied to the
20       sports of men's and women's basketball.  I can't
21       remember how, if that was just through my own
22       research or what, and it seemed to me, given the
23       efforts that we were putting forward in this
24       area, as well as all of the information that we
25       were getting from our studies about the high
```

Page 104

```
 1       percentages of our student athletes' involvement
 2       in this, that one of the things that we needed
 3       to discuss as an association was if this was the
 4       right policy, which they obviously thought it
 5       was for men's and women's basketball, that this
 6       should be expanded to include all of our other
 7       sports as well.
 8           Additionally, we were also tracking on the
 9       fact that there were more and more sports that
10       were being put up on the boards in Vegas to be
11       able to bet on, so it went beyond just a
12       basketball, football arena.  You can bet on
13       golf, you can get on ice hockey, you can bet on
14       baseball and all other types of sports.  So if
15       that was the case, then it would seem that this
16       policy, the membership needed to discuss whether
17       this should apply to all sports, and they agreed
18       that it should.
19   Q   Can you recall another reason why the
20       championships policy was changed?
21   A   That's the main reason that I can remember.
22   Q   If you could review with me, please, the second
23       sentence of this paragraph, "The staff noted
24       that the policy precludes NCAA championship
25       events in metropolitan areas with legal wagering
```

Page 105

1    that is based on the outcome of any event, i.e.
2    high school, college, or professional, in a
3    sport in which the NCAA conducts a
4    championship."
5        Did I read that correctly?
6  A  You did.
7  Q  Does that sentence summarize the old policy that
8    was being changed in August of 2009?
9  A  That was part of the wording.  I do remember
10   that.  And one of the concerns was that a
11   metropolitan area is very difficult to define,
12   so we were trying to get a much more defined
13   policy by focusing on states.
14 Q  And that sentence doesn't say anything about
15   being limited to men's and women's basketball,
16   correct?
17 A  That sentence does not.
18 Q  But your recollection is that that was another
19   change in the policy?
20 A  At some point, yes, it was expanded to include
21   all championships.  And I think it was during
22   this same time.
23 Q  You're not sure that it was changed on that
24   particular issue at the August 6, 2009 meeting,
25   correct?

Page 106

1  A  I'm just rereading the policy, just to make sure
2    before I answer your question.  Yes, that change
3    happened based -- and I'm basing that on one,
4    two, three, four, five, six, six lines down,
5    that starts with, "The revised policy focuses on
6    legal wagering that is based on single game
7    betting and clarifies that the provisions of the
8    policy apply to all championship sessions,
9    inclusive of predetermined and non-predetermined
10   sites."
11 Q  And that sentence that you just read describes
12   the new policy that was going into effect on
13   August 6th of 2009, correct?
14 A  Yes.
15 Q  Ms. Baker, do you see that the new policy that
16   you just read refers specifically to single game
17   betting?
18 A  I do.
19 Q  And the old policy did not refer to single game
20   betting, correct?
21 A  That is correct, based on my recollection, that
22   those three words were not specifically
23   referenced in the old policy.
24 Q  And if you look at the middle of the paragraph,
25   do you see the sentence that says, "The

Page 107

1    committee noted that single game betting is
2    defined as wagering that involves either a money
3    line or point spread wager."  Do you see that
4    sentence?
5  A  Yes.
6  Q  And next sentence says, "The recommended policy
7    does not apply to states that may offer parlay
8    betting, lottery tickets, or sports pools, pull
9    tabs."  Do you see that?
10 A  I do.
11 Q  And then the next sentence says, "The committee
12   agreed that the integrity of the game is most
13   clearly at risk when single game betting occurs
14   with heightened possibilities for point shaving
15   schemes and other methods of directly affecting
16   the outcome of the game."
17     Did I read that correctly?
18 A  You did.
19 Q  Does that discussion accurately summarize the
20   reason for the focus on single game betting in
21   the new version of the championships policy?
22 A  To my recollection, yes.
23 Q  Under the old version of the championships
24   policy, the NCAA would not hold championships in
25   metropolitan areas involving any type of legal

Page 108

1    sports wagering, correct?
2        MR. DREYER:  Objection to the form of the
3    question.  You can answer.
4  A  I don't have the old policy in front of me to be
5    able to adequately answer that question.  If you
6    have it I can look at it and answer it.
7  Q  We weren't given a copy.  So this is what I
8    have.
9        But based on reading this document, is it
10   your recollection that changing the
11   championships policy to focus on single game
12   betting was one of the changes made at this
13   August 6, 2009 executive committee meeting?
14 A  Correct, yes.
15 Q  Does the championships policy, the current
16   version, apply to early round games in the NCAA
17   March tournament?
18     MR. DREYER:  Objection to the form of the
19   question.  You can answer.
20 A  It would apply to any session of an NCAA
21   championship.
22 Q  And I'm sorry, did you understand what I was
23   asking when I referred to early round games in
24   the NCAA tournament?
25 A  That's a session of the championships, so yes.

Page 109

```
1   Q   So the first round of NCAA's March Madness
2       tournament would be covered by the championships
3       policy, correct?
4   A   Correct.
5   Q   And what about early round games in the NIT
6       tournament?
7   A   Actually I'm not sure on that one.
8   Q   Does the championships policy apply to BCS
9       ballgames?
10  A   Does our championship policy apply to BCS
11      ballgames?  No.  Those aren't our championships.
12  Q   Does the NCAA's championship policy apply to
13      conference championships?
14  A   No.  Those aren't our championships, the NCAA's
15      championships.
16  Q   If the NCAA is concerned about all types of
17      sports wagering, why did it change its
18      championships policy to allow championships to
19      be held in places where sports wagering
20      involving lottery tickets, parlay betting and
21      sports pools occur?
22  A   Well, I think as the minutes note, that the
23      heightened possibility for point shaving schemes
24      occur and have historically occurred when there
25      is single game betting involved, so there's a
```

Page 111

```
1   Q   So the primary concern driving the championships
2       policy is the concern of match fixing, correct?
3   A   Yes.  The game is most clearly at risk, as it
4       says in the minutes, when single game betting is
5       occurring.
6   Q   Why doesn't the NCAA championships policy apply
7       to conference championships?
8           MR. DREYER:  Objection, asked and answered.
9   A   Because those are not NCAA championships.
10  Q   And the NCAA's conduct policy applies in 10.3,
11      in the context of conference championships,
12      correct?
13  A   Can you repeat your question?
14  Q   Sure.  We discussed earlier that the NCAA's
15      student athlete conduct policy 10.3 applies at
16      conference championships, correct?
17  A   It would apply at any point in the year, yes.
18  Q   So why is that any different than the
19      championships policy?
20  A   Competing in a championship or in any contest in
21      Nevada is not a direct violation of 10.3.
22  Q   Why does the NCAA apply its conduct policy to
23      conference championships but not its
24      championships policy?
25  A   Our rules directly relate, the NCAA rules relate
```

Page 110

```
1       line on the game.
2           None of our point shaving scandals have
3       involved a lottery ticket or have involved
4       parlay betting or have involved sports pools or
5       pull tabs, and while not impossible, that is
6       farther removed and would be much more difficult
7       to impact the actual game itself than obviously
8       just the single game betting would be.  So
9       that's where the committee's focus and concern
10      lie.
11  Q   So is it fair to say that the concern driving
12      the NCAA's championships policy is the concern
13      of match fixing and not the concern of student
14      athlete welfare?
15          MR. DREYER:  Objection to the form of the
16      question.  You can answer.
17  A   No, it's not fair to say that.
18  Q   Why not?
19  A   Because obviously we're also concerned about the
20      student athlete welfare issues as well, but as
21      it comes specifically to directly impacting the
22      actual game, single game betting is the number
23      one way where a game could be directly impacted,
24      not by buying a lottery ticket or buying a
25      sports pull tab.
```

Page 112

```
1       directly to the student athlete's behavior, so
2       if a student athlete walks into a sports book
3       and places a bet on Michigan/Ohio State, then
4       that's going to be a violation because that's a
5       direct impact on their behavior.
6           Our rules do not govern how championships
7       are conducted by conferences, how a conference
8       chooses or where a conference chooses to conduct
9       their championship.  We've chosen not to for
10      many of the reasons that we've already talked
11      about today.  But we have no control or
12      authority to be able to tell a conference they
13      cannot post a championship or game there, and in
14      fact, we have two member institutions that are
15      there obviously as well, in the Nevada Reno and
16      UNLV.
17  Q   Do you recall, in connection with this policy
18      change in August of 2009, any specific request
19      by a particular state or metropolitan area to
20      host an NCAA championship that was driving this
21      change in policy?
22  A   I don't recall any specific requests.  Obviously
23      Delaware was going through their legislative
24      process during that time.  But I can't remember
25      from a timing perspective, which, when that all
```

Page 113

1    happened.
2  Q   Does the Pac-12 host its conference
3    championships in Las Vegas?
4  A   I don't know if -- I don't believe they have
5    previously hosted it there.  Well, I can't say
6    for sure.  I know, I believe they are going to
7    host their championship there this year.  But I
8    do not know if they have done it in the past.
9  Q   And just to be clear, that's their basketball
10   tournament, correct?
11 A   Is that what you were referring to, the
12   basketball tournament?
13 Q   Let me ask a clearer question.  The Pac-10 will
14   host its next several basketball championships
15   at, in Las Vegas, correct?
16 A   The Pac-12 will, yes.
17 Q   The Pac-12 will host its next several
18   championships in Las Vegas, correct?
19 A   I don't know about several.  I know they are
20   planning on coming this year.  I don't know what
21   the length of the contract or what the questions
22   are.  I know they are planning on being in Vegas
23   this year, yes.
24 Q   The Mountain West Conference, the Western
25   Athletic Conference, and the --

Page 115

1  Q   The West Coast Conference has held its
2    conference tournament in Las Vegas, correct?
3  A   Yes, I believe so.
4  Q   Has the NCAA had any sports gambling related
5    problems from that tournament?
6        MR. DREYER:  Same objection.  You can
7    answer.
8  A   Again, none that have come to light, but I do
9    know that institutions that have gone to compete
10   in those conference tournaments have reached out
11   to us to talk about proactively educating their
12   student athletes that would be participating in
13   those conference championships because they
14   obviously knew of what some of the inherent
15   risks to their participation there in that type
16   of setting could be.
17 Q   And to your knowledge, those education efforts
18   worked, correct?
19 A   I can't sit -- I can't speak for every student
20   athlete that sat in there, but it was an effort
21   that we gave in conjunction with the schools to
22   try and provide that education.
23       MR. SIGLER:  Let's go off the record.
24       (A discussion was held off the record.)
25       (A lunch recess was taken.)

Page 114

1        THE REPORTER:  Wait, slow it down.
2        MR. DREYER:  I would also suggest that you
3    can ask any way you want, but we do these one at
4    a time so we have a clear record, as the court
5    reporter indicated.  But it is your deposition.
6  Q   The Mountain West Conference has hosted
7    conference championships in Las Vegas, correct?
8  A   Yes, and we have had staff that have gone out
9    there to present and speak to the teams
10   participating in the tournament.
11 Q   Have you had any sports gambling related
12   problems from that?
13 A   None that I can recall.  It was just last year
14   that we participated -- we went out there and
15   spoke to the teams.
16 Q   The Western Athletic Conference has hosted its
17   conference championship in Las Vegas, correct?
18 A   Yes, I believe the WAC has also hosted, and I
19   believe that was also another conference
20   championship that we attended.
21 Q   And has the NCAA had any sports gambling related
22   problems from that conference tournament?
23       MR. DREYER:  Objection to the form of the
24   question.  You can answer.
25 A   None that have come to light.

Page 116

1        A F T E R N O O N   S E S S I O N
2    EXAMINATION, (CONTINUING),
3    QUESTIONS BY MR. GEOFFREY SIGLER:
4        (Deposition Exhibit 8 was marked for
5    identification.)
6  Q   Ms. Baker, you have been handed a copy of a
7    document marked Exhibit 8.  Do you recognize
8    this document?
9  A   I do.
10 Q   What is this document?
11 A   It is the final report of the 2003 sports
12   wagering study.
13 Q   And when was the last time you saw this
14   document?
15 A   That's a good question.  Outside of
16   conversations with counsel, I could not recall.
17 Q   Did you review this document in your discussions
18   with counsel yesterday?
19       MR. DREYER:  You can answer yes or no.
20 A   Yes.
21 Q   And Ms. Baker, the cover of this document says
22   the "2003 NCAA National Study," but I believe
23   I've seen it referred to as the 2004 study.  Is
24   that accurate?
25 A   Both dates have been used, yes.

Page 117

```
 1   Q   Okay.  So just for purposes of today, when we
 2       refer to the 2003 study or the 2004 study, this
 3       is the study, correct?
 4   A   Sure, yes.
 5           MR. DREYER:  So the record's clear, "this"
 6       referring to NCAA No. 8.
 7           MR. SIGLER:  Correct.
 8   Q   Ms. Baker, earlier today you referred to some of
 9       the studies that the NCAA has conducted on
10       student athlete gambling habits, correct?
11   A   Yes.
12   Q   And if this is one of the studies that you were
13       referring to, right?
14   A   Yes.
15   Q   And is the NCAA relying on this document in this
16       case?
17           MR. DREYER:  Same objection to what the
18       NCAA is relying on in this case.  You can
19       answer.
20   A   This would be a study that supports the
21       statement that our student athletes are heavily
22       involved in sports wagering, and that we have
23       concerns related to them being approached to
24       affect the outcome of a game.
25   Q   And does this document, Exhibit 8, support, in
```

Page 119

```
 1   Q   So just to be clear, when you say you were on
 2       staff, that means you were an NCAA employee at
 3       the time?
 4   A   That's correct.
 5   Q   But you had no direct involvement in conducting
 6       the study, Exhibit 8, correct?
 7   A   Not that I remember, no.
 8   Q   And are you familiar with the survey methodology
 9       that the research staff used to conduct this
10       study?
11   A   On a very basic level, yes.
12   Q   And if I needed to understand the statistical
13       techniques that were used, such as sample size
14       and margin of error, who at the NCAA would I
15       need to ask about that?
16   A   Todd Petr.
17   Q   And you would not be able to answer those
18       questions, correct?
19   A   No.
20           MR. DREYER:  Objection to the form of the
21       question.
22   Q   If you could turn with me, please, to the page
23       with the Bates number at the bottom, 2826.  And
24       just to be clear for the record, that's
25       PLAINTIFFS' 00002826.
```

Page 118

```
 1       your view, the claim that New Jersey's
 2       legalization of sports gambling will harm the
 3       NCAA?
 4   A   Yes.
 5   Q   Who conducted this study, Exhibit 8?
 6   A   This was a study that was conducted in-house
 7       with some -- I do believe there was outside
 8       consultants or researchers that also helped the
 9       in-house researchers.
10   Q   So it was primarily conducted in-house?
11   A   Through our research department, yes.
12   Q   And who specifically in the research department
13       helped prepare this study?
14   A   Todd Petr.
15   Q   Was Tom Paskus involved as well?
16   A   I don't remember when Tom Paskus joined the NCAA
17       staff.  And it's hard because I have got three
18       studies in my head that start running together.
19       So he may have been.  I just don't remember when
20       he first started.  I know Todd for sure was
21       involved.
22   Q   Were you involved in conducting this study,
23       Exhibit 8?
24   A   I was on staff at the time, but I was not
25       involved in the actual study conducting.
```

Page 120

```
 1           Do you see it says "Executive Summary" at
 2       the top of the page?
 3   A   I do.
 4   Q   And is this page a summary of the key findings
 5       from the 2003 study?
 6   A   Yes, I believe these are the primary findings.
 7   Q   And if you go to the column on the right-hand
 8       side, the second bullet from the top, it says,
 9       "The most frequent student athlete gambling
10       behaviors included playing cards or boardgames
11       for money, betting on games of personal skill,
12       pool, darts, bowling, purchasing lottery
13       tickets, playing slot or electronic poker
14       machines, and betting via sports cards, football
15       pools or parlays."
16           Did I read that correctly?
17   A   You did.
18   Q   And this is the summary of the most frequent
19       methods that student athletes gamble, according
20       to this study, correct?
21   A   According to the 2003 study, yes.
22   Q   And gambling at a legal sports book in a casino
23       is not one of the listed behaviors that was
24       frequently used by student athletes, correct?
25           MR. DREYER:  Object to the form of the
```

Page 121

```
 1        question.  You can answer.
 2    A   It is not listed as a most frequent gambling
 3        behavior.
 4    Q   The next bullet point says, "Fewer than 50
 5        percent of NCAA student athletes reported
 6        knowing NCAA rules on sports wagering."
 7            Do you see that?
 8    A   I do.
 9    Q   And was one of the conclusions from this 2003
10        study that this was a problem?
11            MR. DREYER:  Objection to the form of the
12        question.  You can answer.
13    A   Can you clarify your question, please?
14    Q   Sure.  Was one of the takeaways from this 2003
15        study, Exhibit 8, that not enough NCAA student
16        athletes knew the NCAA rules on sports wagering?
17    A   One of the takeaways was that we did want to
18        increase the educational efforts of our student
19        athletes.
20    Q   Did the NCAA do that as a result of the study,
21        increase its educational efforts?
22    A   Absolutely.  I lived and breathed it for a lot
23        of years.
24    Q   And did that have a positive impact on level of
25        sports wagering by NCAA student athletes?
```

Page 122

```
 1    A   I believe in the 2008 study there were signs
 2        that showed -- especially where we had focused a
 3        lot of our education in Division 1 men's
 4        basketball and football, was some of the focused
 5        messaging that we were providing -- we do
 6        believe there is some evidence to suggest that
 7        that increase in education helped.
 8    Q   So if you put the studies the NCAA has performed
 9        together, is it fair to say that the NCAA has
10        found that its education efforts can have a
11        positive impact on the level of sports gambling?
12    A   It is one way that we can try and continue to
13        fight our student athletes being involved in
14        sports wagering.
15    Q   Going to the next bullet point, it says,
16        "Approximately one percent of football players
17        reported accepting money for playing poorly in a
18        game; one half of one percent of men's
19        basketball players reported the same; about two
20        percent of men's football and basketball players
21        have been asked to affect the outcome of the
22        game."
23            Do you see that?
24    A   I do.
25    Q   And these are very small percentages that relate
```

Page 123

```
 1        to conduct relating to match fixing, correct?
 2            MR. DREYER:  Object to the form of the
 3        question.  You can answer.
 4    A   That is all in the eye of the beholder.  I view
 5        these numbers as significant because of the fact
 6        that one percent or one half of a percent is too
 7        much.  One student athlete is too much to be
 8        involved in this.
 9    Q   You agree that someone might look at this and
10        conclude that one percent is a small percentage,
11        correct?
12            MR. DREYER:  Objection to the form of the
13        question.
14    A   I would conclude it would depend what your
15        sample size is.  And my recollection of this
16        study is that that one percent equates to at
17        least 17 men's basketball student athletes and
18        over a hundred football student athletes, which
19        means when you're watching a football game on
20        Saturday, the likelihood that there's one player
21        on that field that has done something to, has
22        accepted something or done something to affect
23        the outcome of the game, is there, it is a very
24        real likelihood, and I don't view that as a
25        small percentage, no.
```

Page 124

```
 1    Q   17 men's basketball players accepted money for
 2        playing poorly, or 17 were asked to affect the
 3        outcome of the game?
 4    A   If you turn to page 24 and look at the bottom
 5        chart, Figure 10A, 17 individuals in basketball
 6        and 102 individuals in football reported at
 7        least one of these extreme behaviors, which
 8        includes taking money for playing poorly in a
 9        game, knew of a teammate who took money for
10        playing poorly, been threatened or harmed
11        because of sports wagering, been contacted by an
12        outside source to share inside information, or
13        actually provided inside information about a
14        game.  And so yes, I do view those numbers as
15        high.
16    Q   Just to be clear, we're on the page that has the
17        Bates numbers PLAINTIFFS' 00002845, correct?
18    A   Yes.
19    Q   And the note at the bottom of the page refers to
20        the total of 17 individuals, 4.4 percent in
21        basketball, correct?
22    A   Correct.
23    Q   And the total of 17 includes people who have
24        reported any of the infractions listed in the
25        chart right above that, Figure 10A, correct?
```

Page 125

1  A  Yes.

2  Q  And the top row in the chart refers to taking

3     money for playing poorly in a game, correct?

4  A  Correct.

5  Q  And the percentage listed next to that for

6     basketball is .5 percent, correct?

7  A  Yes.

8  Q  And so of the 4.4 percent that reported at least

9     one of these infractions, only a fraction

10    reported having taken money for playing poorly

11    in a game, correct?

12       MR. DREYER:  Object to the form of the

13    question.  You can answer.

14 A  That number is greater than one, and so in my

15    view that's too many.

16 Q  Understood.  But if you could answer my

17    question -- I just want to make sure we're

18    clear -- of the 17 individuals who reported one

19    of these types of infractions in the chart at

20    Figure 10A, only a fraction reported taking

21    money for playing poorly in a game, correct?

22 A  I wouldn't say a fraction.  I would say .5

23    percent, which is what the number says.

24 Q  The percentage of football players who reported

25    taking money for playing poorly in a game was

Page 126

1     1.1 percent, correct?

2  A  Yes.

3  Q  Based on this chart and the note at the bottom,

4     do you agree that less than 17 individuals

5     reported taking money for playing poorly in a

6     game?

7        MR. DREYER:  Objection to the form of the

8     question.  You can answer the question.

9  A  I would agree that .5 percent of men's

10    basketball student athletes took money for

11    playing poorly in a game.

12 Q  And that .5 percent is less than the 4.4 percent

13    total that results in the 17 individuals,

14    correct?

15 A  Yes.

16 Q  So fewer than 17 individuals took money for

17    playing poorly in a game, correct?

18       MR. DREYER:  Objection to the form of the

19    question.  You can answer the question.

20 A  .5 percent took money.  I don't know, I honestly

21    don't know what that works out to in terms of

22    real numbers, off the top of my head.

23 Q  So you don't know how many individuals in the

24    survey took money for playing poorly in a game,

25    correct?

Page 127

1        MR. DREYER:  Objection to the form of the

2     question.  You can answer.

3  A  I know that .5 percent took money for playing

4     poorly in a game.

5  Q  But you don't know how many individuals,

6     correct?

7  A  I could figure it out.  But I don't have a

8     calculator and haven't -- I don't know it off

9     the top of my head.

10 Q  Do you know what portion of the .5 percent

11    involved legal betting at a sports casino as

12    opposed to illegal gambling?

13 A  I do not.

14 Q  Do you know if any of the .5 percent took money

15    for playing poorly in a game for reasons

16    completely unrelated to sports gambling?

17       MR. DREYER:  Objection to the form of the

18    question.

19 A  Well, the survey is anonymous, so no, I do not.

20 Q  Can you turn with me, please, to the page with

21    the Bates number 2840 at the bottom.  And for

22    the record, it's PLAINTIFFS' 00002840.  This is

23    Figure A, correct?

24 A  Correct, 4A.

25 Q  And there's also a Figure 4B on the next page.

Page 128

1     You see that?

2  A  Yes.

3  Q  Do these two figures go together?

4  A  Yes, it looks like they do.  They are just a

5     continuation of each other.

6  Q  And these figures report the percentage of

7     student athletes reporting any type of gambling

8     activities, which could include gambling other

9     than sports gambling, correct?

10 A  These are all -- it looks like these are all

11    forms of gambling activities.

12 Q  And some of these gambling activities, for

13    example, stock market and commodities, have

14    nothing to do with sports gambling, correct?

15 A  Well, if you talk to researchers in this field,

16    they will tell you there's a lot of similarities

17    between the stock market and gambling

18    activities.  And that's, that's a common

19    question in research such as this.  I think

20    we've always included it in all our, all three

21    of our sports wagering studies, for that reason.

22 Q  Okay.  But just to be clear, this figure is

23    reporting on any type of gambling, not just

24    limited to sports gambling, correct?

25 A  Correct.

Page 129

```
 1        MR. DREYER:  Objection to the form of the
 2    question, as to which figure you are referring
 3    to, but the witness has answered.
 4  Q  Did you understand I was referring to Figure 4A
 5    and 4B?
 6  A  Yes.
 7  Q  Of the categories listed for types of gambling
 8    in Figures 4A and 4B, does any category refer to
 9    legal sports wagering in a casino?
10  A  It does not.  And I believe that is one of the
11    reasons why we added that question in the 2008
12    study.  I do believe it exists in the '08 study.
13  Q  Do you know why it wasn't a category in the 2004
14    study?
15  A  I do not.
16  Q  Can you turn with me, please, to the page with
17    the Bates number 2854 at the bottom.
18        And do you see the first question at the
19    top of the page is, "How old are you?"
20  A  Yes.
21  Q  And the number of student athletes who reported
22    being 21 years old was 18.2 percent, correct?
23  A  Yes.
24  Q  And the number who reported being 22 or older
25    was 11.4 percent, correct?
```

Page 131

```
 1    the percentages of the ages that are indicated
 2    here, 29 percent, 21 older, do you have any
 3    reason to believe the percentage is something
 4    other than that from any other source of
 5    information?
 6  A  No.
 7        MR. DREYER:  Objection to the form of the
 8    question.
 9  Q  So the best information we have is that only 29
10    percent of NCAA student athletes are 21 and
11    older, correct?
12  A  29 percent of the student athletes that were
13    surveyed, because we didn't survey all NCAA
14    student athletes, we surveyed 22,000,
15    approximately 22,000 student athletes.  So of
16    those 22,000, 29.6 percent would have been over
17    21.
18  Q  And you understand the purpose of the survey was
19    to try to get results that could be extrapolated
20    to all student athletes?
21  A  Yes.
22  Q  So the best information we have based on the
23    surveys is 29 percent of all student athletes
24    are 21 or older, correct?
25  A  I don't know if that -- I don't know if you can
```

Page 130

```
 1  A  Yes.
 2  Q  Now, to gamble legally in a casino in Las Vegas
 3    you need to be 21 years old, correct?
 4  A  That is my understanding, yes.
 5  Q  So according to this study, only around 29
 6    percent of NCAA student athletes would even be
 7    allowed to gamble legally in Las Vegas, correct?
 8        MR. DREYER:  Objection to the form of the
 9    question, but you can answer.
10  A  Yes, based on the survey sample.
11  Q  And do you have any other information in mind
12    from the NCAA that would suggest that the
13    percentages who are under 21 or over 21 are any
14    different than what is reflected here?
15  A  I don't know.  I don't recall if we cross --
16    well, we didn't ask the question in '04, so
17    there wouldn't be any information in this that
18    does a cross-check of age and being able to bet
19    in Nevada specifically.
20        So for this study, no, I'm not aware of any
21    analysis that looks at the age compared to being
22    able to bet legally in Nevada, because we didn't
23    ask the question in the study about betting
24    legally in Nevada.
25  Q  Okay.  Let me ask, to make sure I got an answer,
```

Page 132

```
 1    equate that from an age perspective or not.  I
 2    don't know that I'm willing to be able to say
 3    that.
 4  Q  But you're not aware of any information
 5    suggesting that the percentage is anything other
 6    than what is reflected here in this survey,
 7    correct?
 8  A  No.
 9  Q  If you could turn with me, please, to the page
10    with the No. 2863 at the bottom; do you see the
11    question No. 6 on this page is, "Have you ever
12    wagered legally on sports in the state of
13    Nevada?"
14  A  I do.
15  Q  Is that the question that you were thinking of
16    earlier?
17  A  Yes, it must be.
18  Q  Okay.  And this question is whether you have
19    ever wagered legally on sports in the state of
20    Nevada, correct?
21  A  Yes.
22  Q  As opposed to wagered legally within the past 12
23    months or past month, correct?
24  A  I don't recall if we -- I know we did survey
25    student athletes related to the frequency of
```

Page 133

1    their gambling, but without going through and
2    looking, I can't remember if that was a
3    particular question.
4    Q    Okay.  But this particular question at least is
5         have they ever done it, as opposed to in the
6         past 12 months or past month, right?
7    A    Yes, correct.
8    Q    And this question asks whether someone has
9         wagered legally on sports, regardless of what
10        sport was involved, correct?
11   A    The question doesn't specify the sport.
12   Q    And 3.7 percent of the student athletes surveyed
13        responded yes to this question, correct?
14   A    That is correct.
15   Q    So of the 3.7 percent that would include, just
16        by way of example, men's golfer gambling on
17        basketball, correct?
18             MR. DREYER:  Objection to the form of the
19        question.
20   A    Again, because the survey was anonymous, and
21        there's no way to go back and assume that for
22        sure, but that could be a possibility.
23   Q    Do you know whether this question, "Have you
24        ever wagered legally on sports in the state of
25        Nevada," was repeated in any of the later

Page 135

1         to play poorly in a game.
2              So I think all of this shows the harm that
3         could come by having additional opportunities
4         for our student athletes to wager on sports.
5    Q    This survey, Exhibit 8, reflects the sports
6         gambling and gambling related activities of
7         student athletes back in 2003, correct?
8    A    It actually would have been -- because this was
9         announced in '03 or '4 -- it might not have been
10        that '03 or '04 class.  I can't remember the
11        actual cohort of the class.  It might have been
12        '02, '01 or '02 class, but yes.
13   Q    No question in this study gets to the issue of
14        how many student athletes would gamble on sports
15        in 2012 or 2013 in New Jersey, correct?
16             MR. DREYER:  Object to the form of the
17        question.  You can answer.
18   A    There is no question in there specific to
19        New Jersey, because it is illegal to bet on
20        sports in New Jersey.
21             (Deposition Exhibit 9 was marked for
22        identification.)
23   Q    Ms. Baker, you have been handed a copy of a
24        document marked Exhibit 9.  Please review this,
25        and let me know whether you recognize it.

Page 134

1    surveys?
2              MR. DREYER:  Objection, the surveys speak
3         for themselves, but you can answer.
4    A    Yeah, I don't recall the questions.  And I have
5         three studies in my brain that kind of run
6         together.  But I would think that would have
7         been a question we would have continued to ask.
8    Q    Do you recall there being any discussion about
9         whether to ask this question in subsequent
10        surveys?
11   A    I don't recall that.
12   Q    Ms. Baker, nothing in this survey, Exhibit 8,
13        specifically addresses the impact of legalizing
14        sports gambling in New Jersey, correct?
15             MR. DREYER:  Object to the form of the
16        question.  You can answer.
17   A    I disagree.  I think all of it speaks to the
18        impact.
19   Q    Can you explain what you mean by that?
20   A    Yeah.  I think what this shows is that our
21        student athletes are at risk to be involved in
22        sports wagering behaviors, and specifically
23        those behaviors that have an impact on the
24        integrity of the game, by either being
25        approached to share information or taking money

Page 136

1    A    It has been a long time but I do remember the
2         survey announcement and the announcement of the
3         formation of the task force.
4    Q    And is that what this document reflects, it's an
5         announcement of the 2004 survey results and
6         announcement of the task force?
7    A    Yes, I believe, yes, we also announced the
8         formation of a national task force at that time
9         based on President Brand's direction.
10   Q    So this document, Exhibit 9, is a news release
11        on or about May 12, 2004, relating to the 2004
12        student athlete survey we just reviewed,
13        Exhibit 8, correct?
14   A    Correct.
15   Q    And this is obviously a much smaller document,
16        correct?
17   A    Than the study document?  Yes.
18   Q    Exhibit 9 is much smaller than Exhibit 8,
19        correct?
20   A    Yes.
21   Q    And is Exhibit 9 intended to capture the key
22        findings that would be of interest to the press
23        from the entire survey, Exhibit 8?
24             MR. DREYER:  Object to the form of the
25        question.  You can answer.

Page 137

```
 1  A   You know, I wasn't involved in the development
 2      of the press release, but as with any press
 3      release, it's designed to give a snapshot.
 4  Q   Do you know who prepared this news release?
 5  A   It would appear, based on the document that,
 6      Erik Christianson, the director for public and
 7      media relations at the time, would have been
 8      involved in the document preparation.
 9  Q   Would you have expected him to have prepared it
10      in conjunction with someone from the research
11      area, such as Todd Petr?
12  A   I was not involved in the preparation of this,
13      so I don't know all Erik would have worked
14      with at the time.
15  Q   Can you turn with me, please, to the page with
16      the No. 3844 in the bottom right-hand corner.
17  A   Yes.
18  Q   And do you see that this page says "Key
19      Findings" at the top?
20  A   Yes.
21  Q   So does this page 3844 reflect the key findings
22      from the 2004 survey Exhibit 8?
23  A   I was not involved in the preparation of this.
24      So I don't know what they were trying to convey
25      related to -- these were some of the findings,
```

Page 138

```
 1      but these are not obviously all of the findings
 2      that are mentioned in the full report.
 3  Q   And generally when the NCAA makes a news release
 4      to the press, it tries to highlight key points
 5      that it wants the press to understand, correct?
 6  A   That's how we do it now, yes.
 7  Q   And that's how you did it back in 2004
 8      presumably as well, correct?
 9          MR. DREYER:  Objection, foundation.  You
10      can answer.
11  A   I couldn't speak, because I wasn't in, directly
12      involved in the formation of all of these
13      documents in the press release.
14  Q   Are you involved in making news releases or
15      press releases today in your current position?
16  A   Yes.
17  Q   So based on your understanding of how the NCAA
18      handles those today, you would have expected the
19      NCAA to include key findings of interest to the
20      press in its news release back in 2004, correct?
21  A   I would be assuming, because I was not directly
22      involved, but yes, I would have assumed that.
23  Q   Can you turn with me, please, to the next page,
24      3845.  Do you see that it says "Football Issues"
25      at the top?
```

Page 139

```
 1  A   I do.
 2  Q   And do you see that the second bullet point
 3      says, "The football numbers for changing the
 4      outcome of a game for money are not significant
 5      from a percentage standpoint, 1.1 percent, but
 6      any number of student athletes that are in
 7      danger of altering or actually trying to alter
 8      the outcome of a game is significant."
 9          Did I read that correctly?
10  A   You did.
11  Q   Do you agree with that statement?
12  A   I don't, with all due respect to whoever created
13      it.
14  Q   And what part do you agree or disagree with?
15  A   I agree that any number of student athletes that
16      are in danger of altering or actually trying to
17      alter the outcome of a game is significant.  I
18      would say 1.1 percent is too many.  And so I
19      would personally classify that number as
20      significant.
21  Q   And you don't have any special statistical
22      training that would lead you to make an
23      assessment of 1.1 percent as being statistically
24      significant, correct?
25  A   My training would be in dealing with student
```

Page 140

```
 1      athletes over the last ten years and actually
 2      caring about what happens to them, so that's why
 3      I would view that as significant.
 4  Q   You don't have any special statistical training,
 5      correct?
 6  A   I do not have any statistical training, no.
 7  Q   Now, nothing here on the "Football Issues" page,
 8      3845, refers to legal sports gambling in Nevada,
 9      correct?
10          MR. DREYER:  Object to the form of the
11      question.  The document speaks for itself.  You
12      can answer the question.
13  A   I don't see anything specifically referencing
14      Nevada.
15  Q   And on the previous page, 3844, "Summarizing Key
16      Findings," you also don't see anything that
17      relates to legal sports gambling in Nevada,
18      correct?
19          MR. DREYER:  Same objection.  You can
20      answer.
21  A   Well, I think you could make an argument that
22      the first bullet does, because it talks about no
23      campus being immune to the problem, and
24      obviously there are campuses in the state of
25      Nevada.  So that would be the one piece where
```

Page 141

1     there may be a tie.

2  Q  Anything else?

3  A  No.

4  Q  So is it fair to say that for whoever prepared

5     this summary for the press, they did not view

6     the level of sports gambling in Las Vegas to be

7     one of the key findings, correct?

8        MR. DREYER:  Object to the form of the

9     question, and lack of foundation.  You can

10    answer.

11 A  Well, I honestly -- again, because I wasn't

12    involved in the creation of this -- I don't know

13    that all of this was provided to the press.  The

14    press release would seem to indicate that the

15    first three pages were obviously provided to

16    them.  But I don't know about No. 3833 through

17    3846, when, who prepared that, or when it was

18    produced, and if it was produced in conjunction

19    with the press release.  I don't know.

20 Q  Ms. Baker, you mentioned earlier when I showed

21    you this document that you recalled formation of

22    a task force, correct?

23 A  Yes.

24 Q  And if you look at the last page of this

25    document, 3846, it discusses a task force.  Do

Page 142

1     you see that?

2  A  I do.

3  Q  Is this the task force that you were talking

4     about earlier?

5  A  The sports wagering task force that was formed

6     by President Brand in response to the initial

7     findings, yes.

8  Q  Were you part of that task force?

9  A  I was not a member of the task force.  I was a

10    staff member that provided support,

11    administrative support and help to the task

12    force.

13 Q  Was the task force itself comprised of

14    representatives from member institutions?

15 A  That was one category of individuals, based on

16    my recollection, but there were other folks

17    involved as well.

18 Q  Who was responsible for coming up with

19    recommendations for the task force?

20 A  There were three subcommittees, based on my

21    recollection, and all the task force members

22    were assigned to be a part of the subcommittee,

23    part of one subcommittee.  And then those

24    subcommittees developed recommendations based on

25    that area, and those were then presented to the

Page 143

1     full task force for review and approval.

2  Q  Did the task force analyze the results of the

3     2004 study?

4  A  I believe there were, there was information

5     provided to the task force specific to the

6     sports wagering study.

7  Q  And did the task force come up with a specific

8     list of recommendations for the NCAA to follow

9     relating to sports gambling?

10 A  There were several recommendations that the task

11    force put forward, yes.

12 Q  Do you recall what those were?

13 A  Oh, my gosh.  There were so many.  I don't

14    recall all of them, no.  Because there were

15    three subcommittees and recommendations for all

16    of them.

17 Q  Do you recall any recommendations that had to do

18    specifically with match fixing?

19 A  Yes.  There was a recommendation for the NCAA to

20    try and -- my words, I'm not going to get the

21    specific wording because it's been several

22    years -- but be more aggressive in the

23    monitoring of point spreads.

24 Q  And how was the NCAA supposed to be monitoring

25    point spreads?

Page 144

1  A  They didn't tell us how.  They just said figure

2     it out and do it.

3  Q  So how did the NCAA monitor point spreads in

4     response to that recommendation?

5  A  Well, there were various ways.  One was by

6     establishing relationships with law enforcement,

7     establishing relationships with folks in the

8     industry.

9  Q  What industry?

10 A  In the gambling industry; by monitoring what was

11    taking place online with the point spread, with

12    internet sports books; and I'm not going to get

13    all of them.  There were several.

14 Q  And with respect to establishing contacts with

15    the gambling industry, does that mean that the

16    NCAA was communicating with gambling operators

17    in Nevada?

18       MR. DREYER:  Before you answer the

19    question, you're obviously getting into an area

20    we previously objected to as beyond the scope of

21    the 30(b)(6).  I'll give you some latitude, but

22    so the record is clear, the witness is

23    testifying on her own behalf and not on behalf

24    of the NCAA, since it's not within the scope of

25    the 30(b)(6) categories the judge allowed.

Page 145

1          MR. SIGLER:  I disagree, but I appreciate
2     the latitude, so we can move on.
3          MR. DREYER:  No need form attitude either,
4     just so the record's clear.  Let's try and be
5     civil.  You can answer the question.
6          MR. WEGNER:  I think he said latitude, not
7     attitude.
8          MR. DREYER:  No, I said there's no need for
9     an attitude for Mr. Sigler.  I'm trying to be
10     professional here, and I'd appreciate the same
11     courtesy.
12          THE WITNESS:  Counsel, would you repeat the
13     question?
14          (The previous question was read back by the
15     reporter as follows:  "And with respect to
16     establishing contacts with the gambling
17     industry, does that mean that the NCAA was
18     communicating with gambling operators in
19     Nevada?")
20  A  Not at that time, no.
21  Q  So who in the industry, if not gambling
22     operators?
23  A  Well, at the time that the request, or at the
24     time that we were, it was suggested that that
25     was an avenue to do it, we weren't doing it.

Page 147

1  Q  And did that assistance lead to the NCAA being
2     able to identify any instances of gambling
3     misconduct?
4  A  I think we talked about this this morning
5     related to the point shaving incidents.  And I
6     don't recall whether any of those instances
7     started with Vegas or started actually with law
8     enforcement and then Vegas getting involved.
9  Q  Do you recall getting any leads from gambling
10     operators in Nevada?
11  A  I recall having conversations with gambling
12     operators about potential issues, yes.  I just
13     don't know the timing of when those occurred.
14  Q  Okay.  And which gambling operators were those?
15  A  There have been several, Robert Walker at the
16     MGM Mirage, Jay Kornegay at the Hilton, and
17     Kenny White with Las Vegas Sports Consultants.
18  Q  You're not getting any similar assistance from
19     illegal gambling operators, correct?
20          MR. DREYER:  Object to the form of the
21     question.  You can answer.
22  A  I'm not sure how I would answer that, because,
23     well, first off, if you consider the cases that
24     we've worked on where our student athletes have
25     been involved in illegal gambling activities,

Page 146

1     Yeah, if that answers the question.
2  Q  In response to the recommendation or request,
3     did the NCAA in fact establish contacts with
4     gambling operators in Nevada?
5  A  Yes.  I did.
6  Q  And did those operators help the NCAA monitor
7     point spreads?
8  A  I think that those operators and the NCAA
9     understood that we were very much coming at this
10     from two very different positions, and while our
11     preference would be that there not be any
12     wagering on sports in the state of Nevada or
13     Vegas, that we were going to try and make the
14     best of a bad situation.
15          And there have been -- this is one area
16     where we both have an interest but for very
17     different reasons -- and because of that, we
18     have tried to have conversations about what's
19     going on in the world of gambling, sports
20     wagering.
21  Q  So was that a yes?  Let me ask the question
22     again just to make sure.
23          Did sports gambling operators in Nevada
24     help the NCAA monitor point spreads?
25  A  Yes, they have.

Page 148

1     there has been information that we've learned
2     from those cases that have helped us in terms of
3     trying to address and tackle the issue.  But I
4     don't have any contractual arrangements or
5     agreements with illegal betters to monitor
6     what's going on.
7  Q  And the recommendation that was made by the task
8     force was to reach out to legal gambling
9     operators, correct?
10  A  I actually don't know if they specified.  I'd
11     have to go back and look.
12  Q  As a result of that recommendation, you reached
13     out to legal gambling operators, correct?
14  A  That was one group, yes.
15  Q  And did you affirmatively reach out to any legal
16     gambling operators as a result of that
17     recommendation?
18  A  No, I did not.
19          (Deposition Exhibit 10 was marked for
20     identification.)
21  Q  Ms. Baker, you have been handed a copy of a
22     document marked as Exhibit 10.  Do you recognize
23     this document?
24  A  It looks like a PowerPoint presentation that
25     would have been given on the results of the 2004

1    study.  But I don't recall when the -- when it

2    would -- who it would have been presented to.

3  Q  Do you recall this specific document,

4    Exhibit 10?

5  A  I don't.  Obviously I recall the charts that are

6    in it, because it's very similar to what's in

7    the final report.

8  Q  This is another presentation relating to the

9    same 2004 survey that we have been reviewing,

10    correct?

11  A  Yes.  We -- I mean -- that's one of the great

12    things about our study, we use the numbers in a

13    lot of presentations, so it is just variances,

14    you have the slides, you have the initial

15    information, and just depending on the audience

16    there's variance of what it's presenting.

17    Because presenting 20, 30, 31 pages of slides to

18    a room full of student athletes doesn't always

19    go over very well.

20        (Deposition Exhibit 11 was marked for

21    identification.)

22  Q  Ms. Baker, you have been handed a copy of a

23    document marked Exhibit 11.  Do you recognize

24    this document?

25  A  I don't specifically recall this document.  I

1    know that obviously Tom Paskus is listed on

2    here, as is Jeff Derevensky and Durand Jacobs,

3    who also provided outside assistance in

4    reviewing the study.  And those three

5    individuals -- my words -- several

6    articles each time that we have one of these

7    studies.

8  Q  So you don't recall this specific document,

9    Exhibit 11, but you recall there were articles

10    written about the 2004 survey, correct?

11  A  I know that all three of these guys are

12    researchers, and they love writing articles and

13    submitting them to journals, so yes.

14  Q  Do you recall any articles they wrote about the

15    2004 survey, other than this document,

16    Exhibit 11?

17  A  I would not be able to answer that question.

18  Q  You don't recall any?

19  A  I don't know of any.  That doesn't mean there

20    aren't any.

21  Q  Ms. Baker, do you know who Stephen Ellenbogen

22    is?

23  A  I do not.

24  Q  And I believe you said earlier that you do know

25    who Durand Jacobs is.

1  A  Yes.  Durand Jacobs is a researcher that I

2    believe worked with our research staff for the

3    2004 study in assisting with the writing, and,

4    writing of the study, the writing of the final

5    report, and research may have used him in other

6    ways that I'm not tracking well.  Those are the

7    two areas I'm familiar with.

8  Q  And Jeffrey Derevensky and Rina Gupta, do you

9    know either of those two individuals?

10  A  I know Jeffrey Derevensky.

11  Q  Who is he?

12  A  Jeff is, works with the McGill Institute in, I

13    believe, Toronto, and has also provided

14    assistance to our research staff with, more so

15    our 2008 and 2012 studies, but I think he also

16    contributed in some manner to the initial study

17    as well.

18  Q  And Tom Paskus, the last person who is listed

19    here, is an employee of the NCAA, correct?

20  A  Yes.

21  Q  And does this refresh your recollection that he

22    had some involvement in the 2004 survey?

23  A  Well, yes, it looks like -- I don't know at what

24    point he came in, if he was involved in the

25    front end when we first conducted it, or if he

1    was involved more in the back end, but he

2    obviously was involved with this particular

3    article.

4  Q  Can you turn with me, please, to the page with

5    the number 2330 at the bottom.

6  A  Sure.  Okay.

7  Q  And do you see the paragraph about halfway down

8    that starts with, "It would be of considerable

9    concern"?

10  A  Yes.

11  Q  And do you see that the second sentence says,

12    "Typically only one to two percent of student

13    athletes reported breaking such rules," do you

14    see that sentence?

15  A  I do.

16  Q  And do you see that that refers to the conduct

17    in the previous sentence about trying to

18    influence the outcome of a game or providing

19    pertinent information?

20  A  Yes, that's the sentence following that.

21  Q  And then do you see that those results, one to

22    two percent reporting breaking such rules, are

23    consistent with previous studies?

24        MR. DREYER:  Objection to the form of the

25    question.  Are you asking if that's what the

Page 153

```
 1    document says?
 2  Q  Do you see the document says that, Ms. Baker?
 3  A  Yes.
 4  Q  Do you know of any previous studies that report
 5     percentages of student athletes violating such
 6     rules?
 7  A  I know that our study was the first of its kind
 8     in terms of the number of student athletes that
 9     were surveyed.  I've heard of the Cross and
10     Vollano study, because I believe that came out
11     of the University of Michigan.  I don't know a
12     whole lot about it, but I believe that's where
13     it originated.
14  Q  Do you have a copy of that survey?
15  A  Not to my knowledge.  I don't think I do, no.
16  Q  Does Tom Paskus have a copy of that survey?
17  A  I don't know.
18  Q  Do you know what the Cullen and Latessa survey
19     is?
20  A  I do not.
21  Q  Have you ever seen a copy of the Cross and
22     Vollano survey from Michigan?
23  A  I do not think I have seen the actual survey.
24  Q  Do you recall seeing the results of the Cross
25     and Vollano survey with respect to student
```

Page 154

```
 1     athletes trying to influence the outcome of a
 2     game?
 3  A  I don't recall.  It wouldn't shock me that I
 4     have seen it at some point, but I don't recall
 5     it.
 6        (Deposition Exhibit 12 was marked for
 7     identification.)
 8  Q  Ms. Baker, you have been handed a copy of
 9     Exhibit 12.  Do you recognize this document?
10  A  Yes.  This looks like it is the comprehensive
11     PowerPoint presentation that was put together on
12     the 2008 study.
13  Q  So this is one of the other surveys that you
14     were talking about earlier, correct?
15  A  Yes.  This would be No. 2.
16  Q  And you said that this is the comprehensive
17     summary of the 2008 survey; is this the most
18     comprehensive summary that you are aware of on
19     the 2008 study?
20  A  With 80 slides, I am going to guess yes, this is
21     the most comprehensive.  Because again, I am not
22     using an 80-slide PowerPoint presentation when
23     I'm talking to athletic teams and coaches.  So
24     yes, I would believe, I would say this is the
25     most comprehensive one that we have.
```

Page 155

```
 1  Q  Do you know whether there is a version of the
 2     2008 study similar to Exhibit 8 for the 2004
 3     survey that includes narrative summaries?
 4  A  There is not.
 5  Q  And do you know why there is not a similar
 6     version of the 2008 study?
 7  A  My understanding is that due to the changes in
 8     APR in the last couple of years, and the
 9     increased focus and attention on some of the
10     data related to graduation rates and academic
11     success, that we just haven't had the manpower
12     from a research staff standpoint to put together
13     an executive summary.
14        But that information has all been laid out
15     in the PowerPoint presentation that used for
16     the rollout, it just isn't in a Word format.
17  Q  What's APR?
18  A  Academic progress rate, academic performance
19     rate.
20  Q  And so are you saying that the research group
21     was retasked to focusing on APR and other issues
22     that didn't have to do with sports gambling?
23  A  Graduation rates and academic success of our
24     student athletes, if you have been following
25     what's going on in college athletics, has been a
```

Page 156

```
 1     big deal in the last couple of years, so I know
 2     a lot of that has been based on numbers of our
 3     student athletes, numbers of them graduating,
 4     broken down by sport, broken down by division,
 5     all of that.
 6  Q  When was the last time you saw this document,
 7     Exhibit 12?
 8  A  Outside of any conversations with counsel, I
 9     could not tell you.
10  Q  Did you review this document yesterday?
11  A  Yesterday.
12  Q  Do you know who prepared the 2008 study
13     reflected here in Exhibit 12?
14  A  Who prepared these slides?
15  Q  Who actually conducted the study.  So let me
16     just ask the question again to be clear.
17        Do you know who conducted the 2008 study
18     that is reflected in this document, Exhibit 12?
19  A  It would be our research staff in conjunction
20     with any outside consultants that were retained.
21  Q  And was there a person primarily responsible for
22     it?
23  A  Yes.  Tom Paskus and Todd Petr.
24  Q  Todd Petr or Tom Petr?
25  A  Todd Petr.
```

Page 157

```
1          MR. DREYER:  P-E-T-R.
2    Q   Was Dr. Derevensky involved in conducting the
3        2008 study?
4    A   Yes.
5    Q   And Ms. Baker, were you involved in actually
6        conducting this study reflected here in
7        Exhibit 12?
8    A   Our staff has never been involved in the actual
9        conducting of the study, due to the strict
10       standards of the way it must be conducted.
11   Q   And so if I wanted to understand the statistical
12       techniques that were used in this study, I would
13       need to ask the research staff, correct?
14   A   Yes, or review the slides that are in the
15       PowerPoint that I think actually go through some
16       of the statistical analysis.
17   Q   And if I wanted to understand the statistical
18       methodology beyond what is reflected in these
19       slides, I would need to ask Tom Paskus or one of
20       the other researchers, correct?
21   A   Correct.
22   Q   Can you turn with me, please, to the page with
23       the number 3716 in the bottom right-hand corner?
24       And do you see at the top of the page there's a
25       slide that refers to "Wagering Behaviors Among
```

Page 158

```
1        Male Student Athletes"?
2    A   I do.
3    Q   The percentages on wagering are generally higher
4        with males than with females, correct?
5    A   That is correct.
6    Q   So we're going to focus on the male slide here
7        for present purposes.
8            Can you look with me, please, at the bottom
9        row of the slide that refers to "Gambled in
10       Casino"?  Do you see that?
11   A   Yes.
12   Q   And there's a column on the right side that
13       refers to the 2008 study and a column on the
14       left side that refers to the 2004 study,
15       correct?
16   A   Correct.
17   Q   Now, the column for the 2008 study for people
18       who gambled once per month says 3.8 percent,
19       correct?
20   A   Yes.
21   Q   And that means that 3.8 percent of student
22       athletes in this survey reported gambling in a
23       casino once per month, correct?
24   A   No.
25           MR. DREYER:  Object to the form of the
```

Page 159

```
1        question.  You can answer.
2    A   No.
3    Q   Can you explain how that's wrong?
4    A   It doesn't refer to 3.8 percent of all student
5        athletes, it refers to 3.8 percent of male
6        student athletes.
7    Q   Okay.  Thank you for clarifying.  So the 38
8        percent in this column refers to the number of
9        male student athletes from the 2008 study who
10       reported gambling in a casino once per month,
11       correct?
12   A   Yes.
13   Q   And there are no similar percentages listed for
14       2004, correct?
15   A   Correct.
16   Q   And that's because gambling in the casino was
17       not one of the categories from 2004, correct?
18   A   I believe so, yes.
19   Q   Now, this slide refers to all types of gambling,
20       not just sports gambling, correct?
21   A   Yes, that is correct.  There are other things
22       besides just sports gambling listed.
23   Q   And the 3.8 percent that is listed for gambling
24       in the casino once per month would include both
25       sports and non-sports gambling, correct?
```

Page 160

```
1    A   Can you clarify your question?  I just want to
2        make sure I understand.
3    Q   Sure.  Let me try again.  The 3.8 percent that
4        is listed for 2008 gambling in a casino once per
5        month, do you see that?
6    A   Yes.
7    Q   That 3.8 percent reflects gambling in a casino
8        whether sports or non-sports, correct?
9    A   I'm actually not sure about that.  I'd have to
10       go back and look through all the study
11       questions.
12   Q   Okay.  Nothing in this slide at least indicates
13       it is limited to sports gambling, correct?
14   A   It just says "gambled in a casino."  I'd have to
15       go back and look to see if, as part of the
16       question, if there was any additional separation
17       or distinction between the two.
18   Q   Do you have a copy of the questionnaire from the
19       2008 survey?
20   A   I don't know if I do or not.
21   Q   Would you expect Tom Paskus to have one?
22   A   Yes, our research staff would.
23   Q   And would you expect the research staff to have
24       the results on answers to all the questions that
25       were given in the 2008 survey?
```

Page 161

1  A  Can you clarify your question?  Do you mean do
2     they have individual results for every --
3  Q  Well, let's take a look at Exhibit 8.
4  A  Yeah.
5  Q  Do you see at the very end, 2008, for example,
6     page 2857?
7  A  Yes.
8  Q  This is a comprehensive list of all the results
9     for all the questions, correct?
10  A  It looks like it, Section 28, yes.
11  Q  So my question is whether you would expect Tom
12     Paskus or someone else in the research staff to
13     have a copy of a similar summary for the 2008
14     survey that lists the results for all the
15     questions in the survey.
16       MR. DREYER:  Objection to the form of the
17     question.
18  A  I don't know if they have it in this same
19     format, no.  I know they are the keepers of the
20     results or the information.
21  Q  So you would expect them to have the results for
22     all their questions, whether in this format,
23     Exhibit 8, or some other format, correct?
24       MR. DREYER:  Same objection.
25  A  Yes.  I'd just -- I don't believe they actually

Page 162

1     have student X's copy of the results.  They just
2     have the cumulative results.
3  Q  Going back to Exhibit 12, if you could turn with
4     me, please, to the page with the number 3719 in
5     the bottom right-hand corner.
6  A  Um-huh.
7  Q  Do you see the slide at the bottom that refers
8     to the percentage of male student athletes
9     reporting that they wager on sports?
10  A  Yes.
11       MR. DREYER:  I'm sorry.  Okay.
12  Q  And looking at the frequency of once per month,
13     do you see that the results for Division 1 in
14     2004 were 6.6 percent, and the results in 2008
15     were 6.8 percent?
16  A  I do.
17  Q  And these are the percentages specific to
18     wagering on sports, correct?
19  A  By division, so for Division 1, yes.
20  Q  And the 6.8 percent that's listed for 2008,
21     Division 1, includes all types of sports
22     wagering, whether legal or illegal, correct?
23  A  Can you say that again, please?
24  Q  Sure.  The 6.8 percent that is listed for 2008
25     gambling once per month for Division 1 includes

Page 163

1     all types of gambling, whether legal or illegal,
2     correct?
3  A  All types of sports wagering.
4  Q  Thank you.  So the 6.8 percent includes legal
5     and illegal sports wagering, correct?
6  A  I believe so, yes.
7  Q  So you would agree that the percentage of
8     student athletes who are male who gamble legally
9     on sports in a casino would be something less
10     than 6.8 percent in 2008, right?
11       MR. DREYER:  Object to the form of the
12     question.
13  A  No, I would not agree with that.
14  Q  Why not?
15  A  Because that's only Division 1.  We have 400,000
16     student athletes overall.  And so the Division 2
17     and Division 3 percentages are just as
18     important.
19  Q  So specific to Division 1 males gambling once
20     per month in 2008, do you agree that the
21     percentage gambling legally in a casino on
22     sports would be less than 6.8 percent?
23       MR. DREYER:  Object to the form of the
24     question.  You can answer the question.
25  A  I don't know that I can, because there's no way

Page 164

1     according to these numbers to distinguish which
2     is legal and what percentage is illegal if it is
3     all lumped together.
4  Q  The 6.8 percent includes both, correct?
5  A  Yes.
6  Q  And at least on this, from these results, it's
7     impossible to know what portion is legal and
8     what portion is illegal, correct?
9  A  Based on this chart, yes.
10  Q  Can you turn with me, please, to the page with
11     the number 3722 in the bottom right-hand corner.
12     And do you see at the top there's a summary of
13     findings on sports wagering?
14  A  It looks like that's a continuation of
15     something.
16  Q  It looks like the summary of findings starts on
17     3719.  Do you see that?
18  A  Yes.
19  Q  And it looks like the format is that there are
20     key findings, and then data afterwards that
21     summarize those key findings, correct?
22       MR. DREYER:  Object to the form of the
23     question.  You can answer.
24  A  Yes, it looks like the wording comes before the
25     charts.

Page 165

1  Q  So turning back to page 3722 with the summary of
2     findings 7 through 9, do you see that?
3  A  Yes.
4  Q  Do you see that finding No. 8 says, "Whereas
5     male and female student athletes were most
6     likely to bet with friends, many male student
7     athletes also placed bets through modalities
8     such as the internet and their cell phone, PDA."
9     Do you see that?
10 A  I do.
11 Q  So of the most popular methods for gambling
12    listed here in the summary of key findings,
13    casinos are not one of them, correct?
14       MR. DREYER:  Objection, mischaracterizes
15    the document.  You can answer.
16 A  I don't know that I understand the question.
17 Q  Well, No. 8 is one of the key findings, correct?
18 A  Yes.
19 Q  And No. 8 discusses the ways that male and
20    female student athletes were most likely to
21    place bets, correct?
22 A  To wager on sports, yes.
23 Q  Right, the ways in which they were most likely
24    to wager on sports, correct?
25 A  Yes.

Page 166

1  Q  And the ways that are listed in No. 8 include
2     betting with friends, internet, cell phone, and
3     PDA, but do not include casinos, correct?
4        MR. DREYER:  Same objection.  I think you
5     are mischaracterizing the words in the document,
6     but you can answer.
7  A  Well, I actually don't know that that is
8     correct.  Because if you continue turning the
9     page in the chart at the top of 3723, it does
10    include as part of the methods, betting with
11    friends, betting with a student bookie, betting
12    with an off-campus bookie, betting by the
13    internet, betting by a telephone, cell phone, or
14    betting at a casino, sports book, or lottery.
15 Q  So let's turn to that page, then, 3723.  At the
16    top, is this a list of all the different ways
17    that students were asked about in the survey?
18 A  If you would give me just a second to see if
19    there's questions included.  It looks
20    comprehensive, but I don't know that it's all.
21    There's no questions in this.  I can't say with
22    a hundred percent certainty that that's all of
23    the ways that we asked about.
24 Q  And, but this slide at the top of 3723
25    summarizes the different methods used for

Page 167

1     placing sports bets in the 2008 study, correct?
2  A  Wager -- yes.
3  Q  For people who wagered on sports at all during
4     the past year, males, by far the most common
5     method was to bet with friends, correct?
6  A  That is the largest percentage.
7  Q  It's 92.7 percent, correct?
8  A  Yes.
9  Q  So it's the most common method by far, correct?
10       MR. DREYER:  Objection to the form of the
11    question.  The document speaks for itself.  I
12    don't think there's any purpose in
13    characterizing it.  But you can answer.
14 A  I would say it's the highest percentage.
15 Q  The next highest percentage is 22.3 percent,
16    correct?
17 A  Yes, betting by the internet, for males.
18 Q  And the portion of males who reported betting in
19    a casino, sports book, or lottery is 18.5
20    percent, correct?
21       MR. DREYER:  Object to the form of the
22    question.
23 A  Yes.
24 Q  And of this 18.5 percent, do you know what
25    portion gambled legally on sports at a sports

Page 168

1     book in Nevada?
2  A  I do not.
3  Q  The 18.5 percent includes both persons who
4     gambled legally at a sports book as well as
5     persons who gambled by lottery, correct?
6  A  Those are the three mentioned, yes, casino,
7     sports book, lottery.
8  Q  Do you know why there's no category specific to
9     a legal sports book at a casino?
10 A  I'm confused by your question, because this says
11    casino, sports book, or lottery.
12 Q  Do you know why there's no category that is
13    specific to a casino sports book, and does not
14    include a lottery?
15 A  I do not.
16 Q  Someone could bet on sports through a lottery
17    without betting on sports through a casino,
18    correct?
19       MR. DREYER:  Object to the form of the
20    question.  You can answer.
21 A  On a sports lottery?  I'm not sure.
22 Q  Let's turn to the page with 3727 in the bottom
23    right-hand corner.  Do you see there's a summary
24    of findings on fantasy sports participation at
25    the top of the page?

Page 169

```
1   A   I do.
2   Q   And that fantasy sports participation among
3       student athletes is generally higher in 2008
4       than in 2004.  Do you see that?
5   A   I do.
6   Q   And the primary fantasy sport of interest is the
7       NFL, but a substantial number of student
8       athletes reported participating in collegiate
9       fantasy sports, correct?
10  A   Yes.
11  Q   Now, was the increased participation in fantasy
12      sports by student athletes viewed as a concern
13      of the NCAA as a result of these survey results?
14  A   I think all of the increases in gambling
15      behaviors were viewed as a concern, so as part
16      of that, yes.
17  Q   And participation in a fantasy football league
18      with an entry fee and prize money is considered
19      gambling by the NCAA, correct?
20  A   Yes, that would be a violation of our rule.
21  Q   Looking down at the bottom of the page, there is
22      a slide that summarizes participation in fantasy
23      sports.  Do you see that?
24  A   I do.
25  Q   And do you see that the percentage who -- of
```

Page 170

```
1       males -- who reported participating in a fantasy
2       league with entry fee and prize money was 17
3       percent in 2008?
4   A   Yes.
5   Q   And from the slide at the top of the page, is it
6       fair to say that the largest portion of student
7       athletes participating in fantasy sports were
8       participating in an NFL fantasy football league?
9   A   That's actually on the slide, the next page, it
10      breaks out the NFL.
11  Q   Thank you.  The next page, 3728, reflects that
12      64 percent of males reported participating in an
13      NFL fantasy league in the past twelve months,
14      correct?
15  A   Yes, that's what it says.
16  Q   Is the NCAA equally concerned with student
17      athletes' participation in fantasy sports
18      leagues to its level of concern relating to
19      legal sports betting at a sports book?
20          MR. DREYER:  Object to the form of the
21      question.  You can answer.
22  A   Because it is a violation of our rules if they
23      are paying something to participate with the
24      opportunity to win something in the end, then
25      yes, we would be concerned about that because
```

Page 171

```
1       that would directly impact their eligibility,
2       and that would be of great concern.
3   Q   And in the NCAA's view, are the two types of
4       sports gambling equivalent in terms of the level
5       of concern, legal gambling in a casino and legal
6       participation in a fantasy sports league?
7   A   They are both violations of our rule if our
8       student athletes or coaches or administrators
9       engage in it.
10  Q   What steps has the NCAA taken to discourage
11      participation in fantasy sports leagues?
12  A   We have provided an inordinate amount of
13      education on the topic.  Obviously with 400,000
14      student athletes, it is impossible for us to
15      individually interact with every single one of
16      them.  So we work very hard to educate our
17      compliance folks that are on all of our campuses
18      at the Division 1, 2, and 3 level about
19      specifically what the NCAA rules are.
20          Because as the research will continue to
21      show you, that does matter with whether or not
22      student athletes participate, they want to know
23      what the rules are, and they want to know what
24      the consequences are, and that can have an
25      impact on their decision.
```

Page 172

```
1   Q   Has the NCAA taken any steps to contact the NFL,
2       Major League Baseball, or other sports leagues
3       that promote fantasy sports participation in
4       connection with this concern?
5   A   I don't know why that would be our issue.  What
6       they do as relates to their policies, we can't
7       control or impact.  We can only control what our
8       policies are and what our student athletes,
9       coaches and administrators have to abide by to
10      participate.
11  Q   So you're not aware of anything the NCAA has
12      done to contact the NFL or other pro sports
13      leagues about their fantasy sports promotion?
14          MR. DREYER:  Objection to the form of the
15      question.  You can answer.
16  A   I am not aware of that.  I don't -- it would --
17      that would be something that's completely under
18      their purview.  We're only concerned about our
19      student athletes, our coaches and our athletic
20      administrators, because that's where our
21      jurisdiction is.
22  Q   If you could turn with me, please, to the slide
23      with 3738 in the bottom right-hand corner.  Do
24      you see there are two slides on this page that
25      refer to notes on analysis of low base rate
```

Page 173

1    behaviors?

2  A  Yes.

3  Q  And let mow show you the previous page, 3737.

4     Do you see that this section, Part 7, relates to

5     behavior related to contest fairness?

6  A  Yes.

7  Q  And so turning back to 3738, you understand that

8     these slides have to do with contest fairness

9     results?

10 A  Yes, that's my understanding.

11 Q  Looking at the bullet point at the top of the

12    page that starts with, "Any population

13    estimate," do you see that?

14 A  Yes.

15 Q  And do you see that bullet point says, "Any

16    population estimate for a question with an

17    extremely low base rate, e.g. only one to two

18    percent of student athletes endorsing, can

19    easily be incorrect by a large relative margin

20    due to the factors described above or to other

21    research statistical confounds."

22       Do you see that?

23 A  I do see that bullet.

24 Q  And do you understand that that bullet is making

25    the point that results in the range of one to

Page 174

1     two percent can easily be incorrect by a large

2     relative margin?

3       MR. DREYER:  Objection, mischaracterizes

4     the document, speaks for itself, but you can

5     answer the question.

6  A  I understand that that is a statistical analysis

7     that is from our researchers about the

8     significance of those numbers, and, yeah, it's a

9     statistical statement.

10 Q  And what this is saying, this bullet point, is

11    that as a statistical matter in the survey,

12    results of only one to two percent of student

13    athletes endorsing may not be statistically

14    significant, correct?

15      MR. DREYER:  Same objection.

16 A  Well, with all due respect, I would disagree

17    that it is significant, as someone who deals on

18    a real life basis with these student athletes,

19    and has to sit across the table from them and

20    talk to them, interview them about sports

21    wagering involvement, so I would respectfully

22    disagree that that is not significant, because

23    to me it is very significant.

24 Q  That is your perspective as a non-statistician,

25    correct?

Page 175

1  A  That's my perspective based on twelve years --

2     or I'm sorry -- based on ten years of being in

3     this field.

4  Q  As a non-statistician, correct?

5  A  I am not a statistician.

6  Q  And reading this bullet point, do you understand

7     that what the statisticians who prepared this --

8     well, strike that.

9        Do you understand that this bullet point is

10    saying by the researchers who conducted this

11    report that one to two percent of student

12    athletes endorsing may not be statistically

13    significant?

14      MR. DREYER:  Same objection.  You can

15    answer.

16 A  I understand that's what the researchers are

17    saying from the statistical perspective.  From

18    my perspective that's irrelevant.

19 Q  And looking at the next bullet point, it says,

20    "Determining whether a rate is truly different

21    from zero or some other meaningful baseline, or

22    whether a change has occurred from 2004 to 2008,

23    should be assessed using appropriate tests of

24    statistical significance."

25       Do you understand what that is saying?

Page 176

1  A  Not completely.

2  Q  What do you understand from that bullet point?

3  A  It looks like they are trying to describe that

4     if you're going -- it's hard to compare the

5     information from '04 to the information in '08,

6     because -- my words -- it's comparing apples,

7     Granny Smith apples to gala apples.  That's my

8     layman's understanding of it.

9  Q  Can you turn with me, please, to the page with

10    3741 in the bottom right-hand corner.  And do

11    you see at the top of the page there's a slide

12    that refers to "Percentage of Division 1 men's

13    basketball and football players reporting having

14    been asked to influence the outcome of a game,"

15    do you see that?

16 A  I do.

17 Q  And I'll represent to you that there are no

18    results in this report about the percentage of

19    players asked to influence the outcome of a game

20    in sports other than basketball and football.

21    Okay?

22 A  Is that a question?

23 Q  No.  I'm representing to you.  I just want to

24    make sure you understand that.

25      MR. DREYER:  You have the document.  But go

Page 177

```
1      ahead, ask your question.
2   Q  Do you know why that would be the case, that
3      there would be no percentages given for sports
4      other than for basketball and football?
5   A  Because those are the two primary sports where
6      we have had issues of point shaving historically
7      or where players have been asked to influence
8      the outcome of a game.
9   Q  Looking at the results for 2008, Division 1
10     men's basketball is 1.6 percent, and Division 1
11     football is 1.2 percent, correct?
12  A  Correct.
13  Q  And it actually looks like that next row may be
14     the percent of all males outside of these two
15     sports who reported being asked to influence the
16     outcome of a game.  Am I interpreting that
17     correctly?
18  A  I'm sorry, can you say that again?
19  Q  Sure.  The next row in the chart appears to be
20     referring to the percentage of males outside of
21     men's basketball Division 1 and men's football
22     Division 1 who reported being asked to influence
23     the outcome of a game.
24  A  Yes.
25  Q  And that's 1.1 percent, correct?
```

Page 178

```
1   A  Yes -- my -- yeah.
2   Q  And I don't see any results in this survey that
3      reflect what percentage in any sport was
4      actually involved in influencing the outcome of
5      a game as opposed to being asked.
6         Do you see anything like that in here?
7         MR. DREYER:  The document speaks for
8      itself, but you should answer.
9   A  No.  It looks like the focus was on the increase
10     in our players being contacted to share inside
11     information related to their team or actually
12     providing inside information related to their
13     team.
14  Q  Do you know why the 2008 survey results do not
15     include a result for the percentage of athletes
16     who influenced the outcome of a game?
17        MR. DREYER:  Objection to the form of the
18     question.  You can answer.
19  A  I don't recall.
20  Q  Do you know whether it's because the percentages
21     were so low as to be statistically
22     insignificant?
23  A  I couldn't say.  I don't know.
24  Q  Are you aware of the survey results relating to
25     the 2012 survey?
```

Page 179

```
1   A  I know that the survey results have not been
2      finalized, yes.
3   Q  And are you aware of any preliminary results?
4   A  Very preliminary.  It's, my understanding is
5      that the data has not been completely reviewed.
6      So it's not considered a final report or final
7      analysis.  I'm sorry.
8   Q  Is it your understanding that the results for
9      the 2012 survey are so preliminary as to be
10     unreliable at this point?
11        MR. DREYER:  Objection, mischaracterizes
12     the witness' testimony.
13  A  Yeah, I don't know how research defines what's
14     reliable and what's not.  I just know it's not
15     final, and it's not something that we are in a
16     position to be able to announce.
17  Q  Have you seen results from the 2012 survey
18     relating to this question that we have been
19     discussing here on page 3741, the percentage of
20     players having been asked to influence the
21     outcome of a game?
22  A  I have seen some initial results.  I cannot
23     recall if that's actually one of them or not.
24  Q  Have you seen preliminary results about the
25     percentage of student athletes who have actually
```

Page 180

```
1      reported influencing the outcome of a game?
2   A  For the 2012 study?
3   Q  Correct.
4   A  I can't remember if that was a part of it or
5      not.
6   Q  Have you seen a written document summarizing the
7      preliminary results of the 2012 survey?
8   A  I have not seen a written document summarizing
9      it, no.
10  Q  How have you learned about those preliminary
11     results?
12  A  Through some initial slides that were drafted by
13     our research staff -- again, which is some very
14     initial numbers that were shared verbally with
15     us.
16  Q  So you have seen some slides that reflect those
17     results?
18  A  Yes.
19  Q  Do you have those in your email?
20        MR. DREYER:  Object to the form of the
21     question.  You can answer.
22  A  I don't think I still have them, because usually
23     those types of emails are very large and they
24     take up a lot of space.  So I don't think I
25     still have that in my email.
```

Page 181

1   Q   Do you recall who you got the email from?
2   A   Well, I don't even know if it came by email,
3       frankly.  Let me think about it.
4   Q   Do you know who you got the preliminary results
5       from?
6   A   I know that Mark Strothkamp received some of the
7       preliminary results from the research, and I was
8       involved in an initial conversation with
9       research about some of the preliminary results.
10  Q   Can you turn with me, please, to the page with
11      the number 3745 in the bottom right-hand corner.
12      Do you see at the bottom of the page there's a
13      question, "Have you received information on the
14      NCAA rules concerning gambling?"
15  A   Yes.
16  Q   And the results are reflected in that chart, and
17      they include 76.9 percent for males in Division
18      1, correct?
19  A   Correct.
20  Q   Does the NCAA view these results as being
21      positive, negative, or neutral?
22          MR. DREYER:  Object to the form of the
23      question.  You can answer.
24  A   In an ideal world that number would be a hundred
25      percent.  And that's why we have an entire staff

---

Page 182

1       that's partly dedicated to trying to develop
2       ways that we can continue to provide this
3       education to our student athletes, coaches and
4       administrators.
5   Q   Were you personally happy with these results
6       from the 2008 survey?
7   A   With which results?
8   Q   The results reflected in the slide at the bottom
9       of 3745.
10  A   Well, again, in an ideal world that number would
11      be a hundred percent, and that's what we're
12      trying to do, is make sure we get the
13      information into the hands of as many student
14      athletes and coaches and administrators as
15      possible.
16  Q   So you see these results and you think about the
17      room for improvement, correct?
18  A   Yes.
19  Q   Did the NCAA ask student athletes surveyed for
20      this 2008 survey whether they understood the
21      rules or knew the rules concerning gambling?
22  A   I can't recall.  I'd have to -- I can flip
23      through these slides and look.
24          Can you repeat your question?
25  Q   Sure.  Did the NCAA ask student athletes

---

Page 183

1       participating in the 2008 survey whether they
2       knew the rules regarding gambling?
3   A   Yes, according to slide 71, we did.
4   Q   You're talking about the slide at the top of
5       3746?
6   A   Yes.  Sorry, I was looking at the wrong number.
7       Slide 71, page 36, No. 00003746, it says, "Have
8       you received information on the NCAA rules
9       concerning gambling?"
10  Q   Okay.  So that seems to be similar to the
11      question we were just looking at.  I guess I was
12      wondering whether the same question was asked in
13      2008 that was asked in 2004, which is whether
14      the student athletes knew the rules regarding
15      NCAA gambling.
16  A   Well, if you look at No. 3744 with the summary
17      of findings on education and prevention, No. 5
18      states, "The student athletes generally believe
19      that the threat of NCAA penalties is a less
20      effective sports wagering deterrent than
21      education," which would assume that they have
22      been, they have been educated and know the rule.
23  Q   All right.  But other than what's reflected in
24      here in these slides, you're not aware of
25      student athletes being asked whether they knew

---

Page 184

1       the rules concerning gambling in the 2008
2       survey, correct?
3   A   Not in the survey.
4           MR. DREYER:  If you are going to move on to
5       another document, I could use a five-minute
6       break.
7           MR. SIGLER:  Sure.
8           (A recess was taken.)
9           (Deposition Exhibit 13 was marked for
10      identification.)
11          MR. DREYER:  We can start whenever you guys
12      are ready.
13  Q   Ms. Baker, you have just been handed a copy of a
14      document marked Exhibit 13.  Can you review this
15      and let me know whether you recognize it.
16  A   Okay.
17  Q   Recognize it?
18  A   It looks like a typical sports wagering
19      presentation that we give.  But I don't recall,
20      I don't recall it specifically.
21  Q   Okay.  And it appears at least from the last
22      page of the presentation that you were the
23      presenter, correct?
24  A   Well, I don't think we can say that with a
25      hundred percent certainty, because my name is

Page 185

```
 1      often listed on these presentations as the
 2      director.
 3  Q   Have you given presentations to groups of
 4      student athletes or staff at member institutions
 5      about sports wagering?
 6  A   All the time, yes.
 7  Q   And sometimes do those presentations include
 8      data from the research group, like Tom Paskus,
 9      from the surveys?
10  A   Yes.
11  Q   And so even though you don't recall this
12      specific survey, would this be the type of
13      survey that you would give typically?
14  A   You mean presentation? Yes.
15  Q   And when you give a presentation about sports
16      wagering, do you typically get the data for that
17      presentation from Tom Paskus or someone else
18      from the data group?
19  A   Well, it depends; if it's data I don't already
20      have access to, yes.
21  Q   And when you get data from Tom Paskus or others
22      in the research group, do you generally have
23      confidence that the data you get from them is
24      accurate?
25  A   Yes.
```

Page 187

```
 1      On It actually was developed before my time.
 2  Q   Is there any part of the Don't Bet On It
 3      Campaign that specifically focuses on match
 4      fixing?
 5  A   Point shaving is part of the education that we
 6      provide, as evidenced in the presentations that
 7      we give around the basketball tournaments, as
 8      well as throughout the year.
 9  Q   Is the Don't Bet On It Campaign still going on,
10      or has it stopped?
11  A   Yes, it's alive.
12  Q   And I'm sorry, you probably already said this,
13      but are you still in charge of it?
14  A   Yes.
15  Q   So looking at this slide, page 3931, it poses
16      the question, "Why are the Don't Bet On It
17      educational initiatives not as effective as
18      hoped?"
19          Do you see that?
20  A   I do.
21  Q   And is it the NCAA's view that the Don't Bet On
22      It educational initiatives have not been
23      effective?
24          MR. DREYER:  Objection to the form of the
25      question.  You can answer.
```

Page 186

```
 1  Q   And you trust that if Tom includes something in
 2      a presentation that you're going to give, or
 3      that someone else might give, that that data is
 4      accurate, correct?
 5  A   Yes.
 6  Q   If you could turn with me, please, to the page
 7      with the number 3931 at the bottom.  This page
 8      discusses the Don't Bet On It Campaign, correct?
 9  A   Looks like it, yes.
10  Q   And what is the Don't Bet On It Campaign?
11  A   It incorporates a large array of educational
12      initiatives on the NCAA position on sports
13      wagering, the rules, the consequences.
14  Q   And who within the NCAA is primarily responsible
15      for the Don't Bet On It Campaign?
16  A   Now?  That would be myself and Mark Strothkamp
17      and Suzanne Brickell.
18  Q   And in November of 2009, the period when this
19      email exchange occurred, were you also primarily
20      responsible for it?
21  A   That would be myself and the AGA staff, yes.
22  Q   When did the Don't Bet On It Campaign start?
23  A   Well, we have -- it's a difficult question to
24      answer, because we've provided sports wagering
25      education for many years.  The slogan Don't Bet
```

Page 188

```
 1  A   It's my view, in looking at this presentation,
 2      that because we were talking to student
 3      athletes, we were trying to elicit some
 4      discussion to try and brainstorm additional ways
 5      where we might be able to more tailor our
 6      education.  And that's something that we've done
 7      in multiple presentations with our student
 8      athletes, to try and ask thought-provoking
 9      questions, to get additional ideas on ways and
10      avenues that we can provide education.
11  Q   Okay.  So on, just to be clear, is it the NCAA's
12      view that the Don't Bet On It educational
13      initiatives are not as effective as hoped?
14  A   No.  It would be that we are trying to find
15      additional ways to be even more effective.
16  Q   Okay.  Ms. Baker, this presentation that you
17      have reviewed incorporates data from the 2008
18      NCAA study, correct?
19  A   Yes, it looks like that, yes.
20  Q   And that's the same 2008 study that we were just
21      looking at, Exhibit 12, correct?
22  A   Yes, I would -- that all ties in.
23          (Deposition Exhibit 14 was marked for
24      identification.)
25  Q   Ms. Baker, you have been handed a copy of a
```

Page 189

```
 1        document marked Exhibit 14.  Can you please
 2        review this document, and tell me whether you
 3        recognize it.
 4   A    It looks like a presentation that would have
 5        been presented by Tom and Jeff on the 2008
 6        sports wagering study.
 7   Q    And that's the same 2008 survey we were just
 8        discussing, correct?
 9   A    There's only one, so it would have to be.
10   Q    And Tom and Jeff are Tom Paskus and Jeffrey
11        Derevensky?
12   A    Correct.
13   Q    And do you have any specific recollection of
14        this study, or are you speculating that it's a
15        presentation by them based on what you see here?
16            MR. DREYER:  Objection to the form of the
17        question.  You can answer.
18   A    I know that Jeff and Tom do presentations on
19        this all the time, and there's various forms and
20        audiences which they present the information to,
21        so I don't know which one this was specifically
22        for.
23   Q    What types of audiences do they give their
24        presentations to, to your knowledge?
25   A    All types.
```

Page 190

```
 1   Q    Can you give some examples?
 2   A    Faculty, athletics reps, athletic
 3        administrators, people in the gambling research,
 4        or just research field.
 5   Q    And you mentioned earlier that you have
 6        confidence in the data that Dr. Paskus provides
 7        to you for your own presentations, correct?
 8   A    Yes.
 9   Q    And you would also have confidence in the data
10        that he puts in his own presentations, correct?
11   A    Yes.  I would hope that it's the same.
12   Q    Can you turn with me, please, to the page with
13        the Bates number 3053 in the bottom right-hand
14        corner.
15   A    I was there.
16   Q    And do you see that this page includes
17        statistics?
18   A    Yes.
19   Q    And it looks like the statistics continue on to
20        the next page, 3054.  Do you see that?
21   A    I do.
22   Q    And these are statistics regarding the amount of
23        gambling in the United States, correct?
24            MR. DREYER:  Objection to the form of the
25        question, and lack of foundation, but you can
```

Page 191

```
 1        answer.
 2   A    I don't know where these statistics would have
 3        come from.
 4   Q    Looking at the first -- well, strike that.
 5            You would expect that these are statistics
 6        put in this presentation by Dr. Paskus and
 7        Dr. Derevensky, correct?
 8            MR. DREYER:  Object as to foundation.  You
 9        can answer.
10   A    Yeah, I don't know who put these statistics in
11        there.  I know they are part of their overall
12        presentation, but I don't know where they pulled
13        them from.
14   Q    Looking at the first bullet point on 3053,
15        "Approximately 2.57 billion dollars was gambled
16        in 2008 in Nevada's legal sports book."  Do you
17        see that?
18   A    I do.
19   Q    Do you know the source for that figure?
20   A    I do not.
21   Q    Have you seen that figure before?
22   A    2.57 billion?  No, not that -- not that I can
23        specifically recall.
24   Q    Have you ever seen a different figure for
25        gambling in Nevada's legal sports book?
```

Page 192

```
 1   A    As we talked about earlier, there's all kinds of
 2        different figures that have floated around.
 3   Q    And do you have a specific recollection of a
 4        figure other than this 2.57 billion dollars that
 5        you have heard about gambling in Nevada's sports
 6        book?
 7   A    No.
 8   Q    Looking at the next bullet point, "An estimated
 9        380 billion dollars is bet through offshore
10        books or bookies each year."  Do you see that?
11   A    Yes.
12   Q    Have you seen that figure before?
13   A    Not that specific one, no.
14   Q    Have you seen a number that's more general?
15            MR. DREYER:  Object to the form of the
16        question.
17   A    I'm sure I've seen numbers, but I wouldn't be
18        able to begin to put an actual -- or tell you
19        what those have been.
20   Q    Okay.  So you don't have a recollection of
21        another specific number other than this 380
22        billion dollars, correct?
23            MR. DREYER:  Object to the form of the
24        question.  You can answer.
25   A    I know that there's a lot of different numbers
```

Page 193

```
 1        out there.  I believe the FBI uses numbers.  I
 2        wouldn't even want to guess.  But I don't think
 3        they are either one of these.  And there are all
 4        kinds of variances on what that number is, and
 5        it's, I think, almost impossible to be able to
 6        determine that.
 7    Q   And do you know what the source for this number
 8        is, 380 billion dollars?
 9    A   I do not.
10    Q   Are you familiar with any of the statistics
11        listed on this page 3053?
12    A   No, I don't know where they pulled these from.
13    Q   And turning to 3054, the next page, are you
14        familiar with any of these statistics?
15    A   I am not.
16    Q   And you don't have any basis to question the
17        statistics listed on 3053 or 3054, correct?
18        MR. DREYER:  Objection, foundation.  You
19        can answer.
20    A   Well, I don't know where they're coming from.  I
21        know that we did not collect them ourselves.  So
22        I don't know what they're using as the basis for
23        those, or who was using those, whether that's
24        Tom or Jeff or both.
25    Q   And when you say "We did not collect them," what
```

Page 194

```
 1        do you mean by that?
 2    A   The NCAA.
 3    Q   Well, Tom Paskus is part of the NCAA, correct?
 4    A   Correct.
 5    Q   So do you mean that they don't come from the
 6        2008 NCAA survey?
 7        MR. DREYER:  Object to the form of the
 8        question.  You can answer.
 9    A   I mean that I don't know, since both of them
10        presented this presentation, and I was not
11        involved in the development of this
12        presentation, these could be slides that Jeff
13        created and presented, for all I know, that Tom
14        would have nothing to do with or involvement in.
15        So I can't say for certain.
16    Q   Okay.  And if Jeff Derevensky had created these
17        slides, would you have any reason to question
18        their accuracy or validity?
19        MR. DREYER:  Same objection.  You can
20        answer.
21    A   I don't know where he's pulling them from.  So
22        that would be nice to know.
23    Q   This presentation, like the previous one that we
24        just looked at, incorporates data from the
25        NCAA's 2008 survey, correct?
```

Page 195

```
 1    A   Yes, it appears to incorporate that, as well as
 2        comparisons.
 3    Q   Comparisons to the NCAA's 2004 survey, correct?
 4    A   Yes.
 5        (Deposition Exhibit 15 was marked for
 6        identification.)
 7    Q   Ms. Baker, you have been handed a document
 8        marked Exhibit 15.  Can you take a look at this
 9        document, and tell me whether you recognize it.
10    A   It appears that it was the presentation that was
11        provided at the 2010 NCAA convention announcing
12        the results of the 2008 study.
13    Q   Were you present at that convention?
14    A   I was nine months pregnant, so I was not present
15        at that convention.
16    Q   And do you know whether -- strike that.
17        Do you know who the presenter was for this
18        presentation at the January 2010 convention?
19    A   I believe Tom Paskus was involved in the
20        presentation.  There may have been someone from
21        my staff there as well, but I don't recall.
22    Q   This document, Exhibit 15, summarizes results
23        from the same 2008 NCAA survey that we have been
24        discussing, correct?
25    A   I'm assuming so, because there was only one '08
```

Page 196

```
 1        study.
 2    Q   Well, take a look and make sure you agree with
 3        that statement.
 4    A   Yes, it's the results of the 2008 study.
 5    Q   And it also contains results from the 2004 NCAA
 6        study, correct?
 7    A   Yes.
 8        (Deposition Exhibit 16 was marked for
 9        identification.)
10    Q   Ms. Baker, you have been handed a copy of a
11        document marked Exhibit 16.  Please take a look
12        at this document, and tell me whether you
13        recognize it.
14    A   Okay.
15    Q   Do you recognize this document?
16    A   I do.
17    Q   What is this?
18    A   It looks like the formal press release related
19        to the results from the 2008 study.
20    Q   This was a press release issued by the NCAA
21        about the same 2008 survey of student athlete
22        gambling activities that we have been
23        discussing, correct?
24    A   Yes.
25    Q   And the headline of the study is "Sports
```

Page 197

```
1        Wagering Study Shows Progress in Education."  Do
2     you see that?
3   A  I do.
4   Q  Do you agree with that statement?
5   A  Yeah.  I think the results did show that in the
6     areas where we had drilled down and focused
7     particularly with our Division 1 basketball and
8     football student athletes, that there was
9     increased awareness.
10  Q  And the first sentence in the article says, "An
11    NCAA study released today indicates progress in
12    educating student athletes on dangers of sports
13    wagering, but also points to areas where
14    additional efforts are needed."
15       Do you see that?
16  A  I do.
17  Q  You agree with that statement?
18  A  Yes.
19  Q  And then two-thirds of the way down the page
20    there is a quote from, from you, it looks like.
21    Do you see where it says, "We are encouraged that
22    the research provides a positive indicator that our
23    efforts to date have been impactful, and we also
24    will use the findings as guidance for additional
25    educational endeavors."
```

Page 198

```
1        Do you see that?
2   A  I do.
3   Q  Is that an accurate quote --
4   A  Yes.
5   Q  -- that you gave in connection with this press
6     release?
7   A  Yes.
8   Q  And in what way did you find that the 2008
9     survey showed that the NCAA's efforts with
10    respect to education of student athletes were
11    impactful?
12  A  Particularly Division 1 student athletes who
13    were the target of some of our most intensive
14    educational efforts, they were more likely to
15    report familiarity with the NCAA rules than what
16    was reported in 2004, and approximately 90
17    percent of the men and 95 percent of the women
18    across all divisions had received some type of
19    educational NCAA messaging.
20  Q  Do the 2008 NCAA survey results show that
21    education efforts by the NCAA can be effective
22    in reducing the levels of student athlete
23    gambling?
24  A  I think the 2008 study showed that we have a lot
25    of work to do, but in the areas where we had
```

Page 199

```
1     tried to drill down, that it did make a
2     difference, yes.
3   Q  And those efforts were men's basketball and
4     men's football, correct?
5        MR. DREYER:  Object to the form of the
6     question.  You can answer.
7   A  I would also say women's basketball, as well as,
8     there's a multitude of educational initiatives
9     that we've undertaken even in Division 1 in the
10    form of newsletters, in the form of in-services,
11    in-person presentations, videos, brochures.
12    There were a variety of ways that we tried to
13    provide that education for that population,
14    posters.
15  Q  And the areas of focus for your education
16    efforts between the '04 study and '08 study
17    included Division 1 men's basketball and
18    Division 1 men's football, correct?
19  A  Yes, those were two sports included.
20  Q  And those were two areas that you found those
21    education efforts to be impactful, correct?
22  A  Yes.
23       (Deposition Exhibit 17 was marked for
24    identification.)
25  Q  Ms. Baker, you have been handed a document
```

Page 200

```
1     marked Exhibit 17.  Please review it and tell me
2     whether you recognize it.
3   A  Yes, I'm aware of this.  I recognize it.
4   Q  And what is this?
5   A  This is some back and forth between myself, Tom,
6     Stacey, and Jeff Derevensky, specifically
7     related to a Harvard Medical School article in
8     The WAGER.
9   Q  What's The WAGER?
10  A  A newsletter that the medical school produces
11    specific to gambling issues and other -- I'm
12    sorry -- I believe there's other addictive
13    behaviors included in it as well.
14  Q  Who is Erica Marshall?
15  A  I don't know Erica personally.  I believe she
16    was the point person communicating with our
17    research staff on the article.
18  Q  So she was the point person from the Division of
19    Addictions at Harvard Medical School?
20  A  According to the email exchanges and the
21    signature underneath her name, yes.
22  Q  Did the NCAA ask the Harvard Medical School to
23    look at the NCAA's 2008 survey?
24  A  I don't believe we asked them to do this, no.
25  Q  And the article that's being discussed here in
```

1    The WAGER concerns the results of the 2008 NCAA
2    survey, correct?
3  A  I think it also had some references to 2004, but
4    yes, it was about the studies.
5  Q  And the two studies that are primarily being
6    discussed in this article in The WAGER are the
7    2004 and 2008 NCAA surveys that we've discussed
8    today, correct?
9  A  Yes.
10 Q  And do you understand -- well, let's turn to
11   page 3634.  Do you see the email from Erica
12   Marshall at the bottom there?
13 A  Yes.
14 Q  And do you see in the middle of her email she
15   says, "We did come to a conclusion which is less
16   positive than the press release issued by the
17   NCAA in November," do you see that?
18 A  I do.
19 Q  And what do you understand her to be saying
20   there?
21 A  Well, I don't know that I understand her to be
22   saying anything, other than the article that
23   they wrote, they view it as less positive.  The
24   article itself speaks for itself related to
25   their position on the study and the comparison

1    and contrast to how we viewed the study.
2  Q  The people at Harvard Medical School viewed the
3    2008 survey results as less positive than the
4    NCAA did; is that what she's saying?
5  A  I don't think that the Harvard Medical School
6    had the full context so that they were able to
7    write an accurate study related to what all we
8    were doing from both an educational standpoint
9    and some of our other efforts, because they are
10   not directly involved in the implementation of
11   those.
12 Q  I'll ask you in a minute whether you agree with
13   their conclusion or not, but let me just first
14   understand, just to be clear, you understand
15   what Ms. Marshall is saying in her email is that
16   the Harvard Medical School came to a less
17   positive conclusion than the NCAA did in looking
18   at the NCAA's 2008 survey, correct?
19     MR. DREYER:  Object to the form of the
20   question.  You can answer.
21 A  I understand that was the sentence in her Monday
22   February 22nd email, yes.
23 Q  And when you saw this email and the attachment
24   to it, did you agree with the Harvard Medical
25   School's conclusions about the 2008 survey?

1  A  I did not.
2  Q  And turning to the attachment to this email,
3    starting on page 3636 and continuing through
4    3638, is this a copy of the article that the
5    Harvard Medical School prepared about the 2008
6    NCAA survey?
7  A  Yes, it looks like it.
8  Q  And on the right-hand side of the document there
9    are some comments with the letter, lowercase r
10   next to them.  Are those your comments?
11 A  Yes.
12 Q  So those are your comments on the right-hand
13   side reacting to the article in The WAGER from
14   the Harvard Medical School, correct?
15 A  Yes.
16 Q  And your comment, r2 says, "Education was only
17   one of many things we did.  We also increased
18   monitoring efforts as well, point spread
19   monitoring program, reestablished our
20   relationship with Las Vegas, et cetera.  The
21   rule change, Bylaw 10.3 revision, was another
22   change that came about as a result of the study
23   task force."
24     Do you see that?
25 A  I do.

1  Q  And the reference to reestablishing the
2    relationship with Las Vegas, does that refer to
3    the lines of communication relating to point
4    spreads that we discussed earlier today?
5  A  That refers to all lines of communication, not
6    just specific to point spreads.
7  Q  Okay.  So what were the lines of communication
8    with Las Vegas being referred to in this
9    document?
10     MR. DREYER:  Objection, misstates the
11   document.  You can answer.
12 A  Any information that they may have that could
13   help us understand what they see and what's
14   going on in their world.
15 Q  So this document refers to "reestablishing our
16   relationship with Las Vegas."  Was there a
17   period of time when the NCAA did not have a
18   relationship with Las Vegas?
19 A  Yes.
20 Q  And then did there come a point in time when the
21   NCAA reestablished a relationship with
22   Las Vegas?
23 A  Yes.
24 Q  And when was that?
25 A  When was what?  I want to make sure I

Page 205

1  understand.
2  Q  The reestablishment of the relationship with
3     Las Vegas.
4  A  Following the sports wagering task force.
5  Q  And can you place that in a time frame?
6  A  It would have been primarily 2000 -- maybe late
7     2004, 2005, when it began.
8  Q  And I believe you said earlier that you were the
9     NCAA representative who reestablished that
10    relationship with Las Vegas.  Did I have that
11    right?
12 A  I was the director that was primarily
13    responsible for that, yes.
14 Q  Were you the person who had the communications
15    with Las Vegas?
16    MR. DREYER:  Objection to the form of the
17    question.  You can answer.
18 A  Yes.
19 Q  And in terms of reestablishing a relationship
20    with Las Vegas, does that refer to gambling
21    operators in Las Vegas?
22    MR. DREYER:  Objection to the form of the
23    question.  You can answer.
24 A  That's one, yes.
25 Q  Does it refer also to law enforcement entities

Page 206

1     in Las Vegas?
2  A  Yes, although I don't think I would ever
3     characterize our relationship with those folks
4     as nonexistent.
5  Q  So what were the parts of Las Vegas that the
6     NCAA reestablished a relationship with in the
7     2004 time frame?
8     MR. DREYER:  We've covered this.  We're
9     well into something that the magistrate has
10    ruled is not appropriate to 30(b)(6).  So we're
11    going to move on.  I'm instructing the witness
12    not to answer.  You're just asking the same
13    question we've already covered.
14    MR. SIGLER:  I'm not asking the same
15    question.  This is a new question.  This relates
16    to a document that discusses one of the surveys
17    that she said she's relying on.  So I think I'm
18    perfectly entitled to ask this question.
19    I would ask the court reporter to read it
20    back, and if you're going to instruct her not to
21    answer, then we can take it up with the
22    magistrate or we can reopen the deposition
23    later.
24    MR. DREYER:  We've already taken it up with
25    the magistrate, just so the record is complete.

Page 207

1     Topic 6 of the 30(b)(6) includes support or
2     cooperation by sports gambling companies, or
3     states that regulate these companies, with
4     respect to your policies and practices regarding
5     sports gambling, including any assistance by
6     these companies, in your efforts to identify
7     potential violations of these policies.
8        We objected to that as a 30(b)(6) category.
9     The magistrate sustained that objection.  It's
10    not in the re-noticed deposition.  So I'm
11    instructing the witness not to answer consistent
12    with the court's ruling.
13    MR. SIGLER:  All right.  Well, let's be
14    clear about this.
15 Q  What parts of Las Vegas, Ms. Baker, did the NCAA
16    reestablish a relationship with in the 2004/2005
17    time frame in connection with its efforts to
18    alleviate gambling by student athletes?
19    MR. DREYER:  Same objection.  It's clearly
20    within the topic that the magistrate sustained
21    an objection to.
22    MR. SIGLER:  Are you instructing the
23    witness not to answer?
24    MR. DREYER:  Yes.
25    MR. SIGLER:  And are you going to follow

Page 208

1     counsel's instruction?
2        THE WITNESS:  Yes.
3        MR. SIGLER:  Anthony, can I see that copy
4     of the old notice, please?
5        MR. DREYER:  It's got some attorney notes
6     on the back.  Let me see if I have something
7     that's clear.
8        MR. DREYER:  You know what, I've got a
9     different question.  We'll deal with that on a
10    break.
11 Q  Ms. Baker, does the NCAA have any policies
12    relating to interactions with Las Vegas gambling
13    operators?
14    MR. DREYER:  Just answer yes or no.
15 A  No.
16 Q  Does the NCAA have any practices that relate to
17    interacting with gambling operators in Las Vegas
18    concerning sports gambling?
19    MR. DREYER:  You can answer yes or no.
20 A  Yes.
21 Q  What are those practices?
22    MR. DREYER:  Geoff, we're still within 6.
23    6 is a very specific issue.
24    MR. SIGLER:  I don't have the old notice.
25    What I have is the new notice.  I'm looking at

Page 209

```
1     topic 4.  It says your policies and practices
2     regarding sports gambling that apply to you,
3     your member institutions, athletes
4     representatives or other participants in your
5     sporting events.  The question I just asked is
6     about a practice regarding sports gambling.
7          MR. DREYER:  Right.  There was a specific
8     question that I read into the record that dealt
9     with the very issue twice, three times you tried
10    to get into.  The magistrate has ruled on this.
11    And I don't know why you think it is appropriate
12    to defy the court's ruling, but you have our
13    objections.
14 Q  Ms. Baker, what are those practices?
15         MR. DREYER:  Same objection.
16         MR. SIGLER:  Are you instructing her not to
17    answer?
18         MR. DREYER:  Yes.
19         MR. SIGLER:  Are you going to follow that
20    instruction?
21         THE WITNESS:  Yes.
22         MR. SIGLER:  So just to be clear, Anthony,
23    you are blocking all testimony by the witness
24    that relates to the NCAA's cooperation with
25    Las Vegas legal sports gambling operators in
```

Page 210

```
1     connection with its efforts?
2          MR. DREYER:  I think the magistrate has
3     ruled that all of that testimony is foreclosed.
4     So consistent with the magistrate's ruling in
5     this case, I'm instructing the witness not to
6     answer.
7          (Deposition Exhibit 18 was marked for
8     identification.)
9  Q  Ms. Baker, you have been handed a document
10    marked Exhibit 18.  I'd like you to take a look
11    at it and tell me whether you recognize it.
12 A  Yes.
13 Q  What is this document?
14 A  I believe it was an outline for the presentation
15    that Mark Strothkamp gave at the Pro League
16    Sports Wagering Summit, and it was not
17    distributed for, to my knowledge, it was not
18    distributed to the attendees, or even used on a
19    PowerPoint projector.  It was simply to guide
20    him in his verbal presentation.
21 Q  So he was the only one who looked at it during
22    his presentation?
23 A  Yeah.  I did not present with him.  I don't know
24    if he was on a panel with other people.  I can't
25    recall.  But he was the primary presenter of
```

Page 211

```
1     this.
2  Q  Is there a reason why the results weren't shared
3     with the other attendees?
4  A  Yes.
5  Q  What's that reason?
6  A  They aren't final yet.
7  Q  The 2012 results aren't final yet?
8  A  That is correct.
9  Q  And you are referring to the NCAA's 2012 survey
10    of student athlete gambling activities?
11 A  Yes.
12 Q  Are any of those results reflected in this
13    document?
14 A  Are any of what results?
15 Q  The preliminary results from the 2012 survey?
16 A  I do not know.  Oh, yeah, that's right, I don't
17    believe they were because of the fact they
18    weren't final.  So this was results from the
19    previous two surveys.
20 Q  Does that change your recollection of whether
21    this was shared with the attendees at the
22    summit?
23 A  For some reason I still don't think it was, but
24    I may have that wrong.
25 Q  And the presenter, you said, was Mark
```

Page 212

```
1     Strothkamp?
2  A  Strothkamp, yes.
3  Q  And he reports to you, correct?
4  A  Yes.
5  Q  What was the Professional League Sports Wagering
6     Summit?
7  A  It was a summit hosted by the professional
8     leagues.
9  Q  What was the purpose of that summit?
10 A  My understanding was to bring the various
11    professional leagues together to talk about
12    issues related to sports wagering, inclusive of
13    us.
14 Q  Did you attend the summit?
15 A  I did.
16 Q  Did you give any presentations?
17 A  I did.
18 Q  What did you give a presentation on?
19 A  I talked about, in conjunction with our PR
20    representative, it was a crisis 101, how to
21    deal, or what to do in situations where a sports
22    wagering issue has come to light.
23 Q  Were any litigation counsel present at the
24    summit, to your knowledge?
25         MR. DREYER:  Objection to the form of the
```

Page 213

```
 1      question.
 2   A  Not to my knowledge.
 3   Q  Mr. Dreyer wasn't there?
 4   A  No.
 5   Q  Was there discussion about the lawsuit against
 6      New Jersey state officials at the summit?
 7   A  Not to my knowledge, no.
 8   Q  Were there representatives from any Nevada
 9      gambling operators at the summit?
10   A  Gambling operators?
11   Q  Were there representatives from any casinos?
12   A  Let me think -- I can't recall -- none from the
13      casinos, that I can remember specifically.
14   Q  Do you recall anyone being there from the MGM
15      Mirage?
16   A  Yes.  I'm getting two of them confused because
17      we also host our own in-service, and I know that
18      we had casino representatives at our own
19      in-service.  So I can't remember if Robert was
20      there at the pro league or not, unfortunately.
21   Q  Robert Walker?
22   A  No.  What is the guy's name?  Jay, Jay Rood.
23   Q  Jay Rood?
24   A  Jay Rood runs the sports book.  At one point an
25      administrator, an executive was supposed to have
```

Page 214

```
 1      attended from the MGM Mirage, but I can't
 2      remember if they were or not.
 3   Q  Are we talking about your in-service event or
 4      talking about the sports summit?
 5        MR. DREYER:  Let him finish the question so
 6      the court reporter can get it down.
 7   A  I'm getting the two confused, because they
 8      happened in a very short time period, and there
 9      were a lot of people.  So absent a specific
10      roster in front of me, I don't know that I'm
11      going to be able to distinguish them for you.
12   Q  Do you recall Jay Rood being present at either
13      the Sports Gambling Summit at which this
14      presentation, Exhibit 18, was given, or at the
15      in-service event that you mentioned?
16   A  I know Jay was at one of them, I just can't
17      remember which one he went to.
18   Q  What is the in-service event?
19   A  It is an annual event that we host.
20   Q  And is it called the in-service?
21   A  Sports wagering in-service, yes.
22   Q  What does the in-service part of that mean?
23   A  It is just the way we categorize the meeting
24      because we want it to be a discussion, not a
25      presentation or a conference.
```

Page 215

```
 1   Q  Did that take place in September 2012?
 2   A  Did what take place?
 3   Q  The in-service?
 4   A  The NCAA in-service?  That took place in
 5      October.
 6   Q  Did you give any presentations at the NCAA
 7      in-service?
 8   A  I don't -- I actually think this year I did not.
 9   Q  Do you recall a presentation by Jay Rood at the
10      NCAA in-service or at the Professional League
11      Sports Wagering Summit?
12   A  I'm sure if Jay was there he would have, we
13      would have asked him to speak, but I don't
14      recall his presentation specifically, no.
15   Q  Other than you and your direct report, Mark
16      Strothkamp --
17   A  Strothkamp.
18   Q  -- was anyone else from the NCAA present at the
19      Professional League Sports Wagering Summit?
20   A  Yes.
21   Q  Who else?
22   A  Suzanne Brickell.
23   Q  Anyone else?
24   A  Stacey Osborne.
25   Q  Keep going.
```

Page 216

```
 1   A  Emily Potter, Naima Stevenson, Donald Remy,
 2      Alecia Lewis and Abe Frank.
 3   Q  Were there presentations given by the
 4      professional sports leagues at the Sports
 5      Wagering Summit?
 6   A  Yes.
 7   Q  Do you recall any of those presentations?
 8   A  There were several.
 9   Q  Who presented from the NFL?
10        MR. DREYER:  Objection, lack of foundation.
11   A  I'm trying to remember.  Dave Gardi presented
12      from the NFL.  Dina Garner presented from the
13      NFL.  Those are the only ones I specifically
14      remember.
15   Q  Do you recall the presenters from any of the
16      other professional sports leagues?
17   A  Yes.
18   Q  Who else presented?
19   A  Dan Mullen, Kevin Cepalek.
20        THE REPORTER:  Spell that one for me.
21        THE WITNESS:  C-E-P-A-L-E-K.
22   Q  And what leagues are they from?
23   A  Major League Baseball.
24   Q  Okay.  Who else?
25   A  Those are all the ones that I can remember.
```

Page 217

```
 1   Q   Did anyone give a presentation on the impact or
 2       potential impact of New Jersey's legalization of
 3       sports gambling on any of the leagues?
 4   A   Not that I can recall.
 5   Q   Can you turn with me, please, back to
 6       Exhibit 18, the page that has 2316 in the bottom
 7       right-hand corner.
 8           Do you see the slide in the middle of the
 9       page that says, "Trends in Sports Wagering
10       Cases"?
11   A   I do.
12   Q   And the next two slides, the one at the bottom
13       of 2316 and then the one on 2317, seem to relate
14       to the trends in sports wagering cases.  Is that
15       right?
16   A   No, that's not correct.
17   Q   Okay.  The slide at the bottom of 2316 relates
18       to trends, correct?
19   A   Yes.
20   Q   And do you know the basis for this slide at the
21       bottom of 2316?
22           MR. DREYER:  Objection to the form of the
23       question.
24   A   I do not, because I did not put this
25       presentation together.
```

Page 218

```
 1   Q   Do you agree with the trends listed at the
 2       bottom of 2316?
 3   A   I agree that based on the cases that our staff
 4       has been involved in, that those have been some
 5       recurring themes, yes.
 6   Q   Turning on to 2317, do you see the list at the
 7       top of "Sports Wagering Major Infractions
 8       Cases"?
 9   A   Yes, I see that.
10   Q   And the print is somewhat small.  This is the
11       only copy that we got.  But the first example
12       appears to be from University of Missouri,
13       correct?
14   A   Missouri St. Louis.
15   Q   Missouri St. Louis.  And it involved a fantasy
16       league.  Do you see that?
17   A   Involved a head coach who actually owned and
18       operated a fantasy league.
19   Q   Okay.  So it did not involve gambling at a
20       casino or other legal sports book, correct?
21   A   Not that I can recall.
22   Q   And the next example is from University of
23       Washington.  Is that the Neuheisel example?
24   A   That is, yes.
25   Q   And it refers to March Madness pools.  So this
```

Page 219

```
 1       one also did not involve sports gambling at a
 2       sports book or casino, correct?
 3   A   That is correct.
 4   Q   And the third example from University of
 5       Nebraska at Lincoln refers to a student
 6       bookmaker.  Do you see that?
 7   A   Yes.
 8   Q   So this one also did not involve a casino or
 9       other illegal sports book, correct?
10   A   Correct.  These were only the major infractions
11       cases, and do not account for the total number
12       of cases that have been processed by the staff.
13   Q   Do you know who put this slide together on
14       "Sports Wagering Major Infractions Cases"?
15   A   I do not know for certain, no.
16   Q   Do you know what time period this slide is
17       supposed to cover?
18           MR. DREYER:  Objection to the form of the
19       question.
20   A   I do not.
21           (Deposition Exhibit 19 was marked for
22       identification.)
23   Q   Ms. Baker, you have been handed a document
24       marked Exhibit 19.  Do you recognize this
25       document?
```

Page 220

```
 1   A   It appears that it is a copy of the survey
 2       questions from the 2012 study.
 3   Q   Have you seen this document before today?
 4   A   I'm sure I have.  I don't recall it.  I'm
 5       somewhat a little more removed.
 6   Q   Do you know when the survey relating to the 2012
 7       study went out to the member institutions?
 8   A   I don't remember the specific date, no.
 9   Q   Approximately, do you remember when?
10   A   I do not.
11   Q   Do you remember whether it was over the summer
12       or more recently in the fall?
13   A   I don't remember.
14   Q   Okay.  Do you know what the current status of
15       the 2012 study is?
16   A   Yes.
17   Q   What is the current status?
18   A   Our research staff is trying to finalize the
19       results.
20   Q   So the surveys, completed questionnaires have
21       been submitted at this point to the NCAA?
22   A   That's my understanding, yes.
23   Q   And the research team is --
24   A   Let me clarify.  I don't believe the responses
25       are sent directly to the NCAA.  I believe
```

Page 221

1     they're sent to, in order to continue to protect
2     the anonymity, my understanding how it works is
3     the responses are sent somewhere else and then
4     we gather the information.
5  Q  Okay.  So the completed questionnaires have been
6     submitted to whoever collects those, and the
7     results are being analyzed by the NCAA research
8     team?
9  A  Correct.
10        (Deposition Exhibit 20 was marked for
11    identification.)
12 Q  Ms. Baker, you have just been handed a copy of a
13    document marked as Exhibit 20.  Please take a
14    look at this document, and tell me whether you
15    recognize it.
16 A  I do.
17 Q  And so what is this document?
18 A  This is an email exchange from Mark Strothkamp
19    to representatives at California institutions.
20 Q  And you're referring to the bottom email in the
21    chain dated May 4, 2012, at 10:01 a.m.?
22 A  Correct.
23 Q  And you're copied on that email, correct?
24 A  I am, yes.
25 Q  And then at the top of the page there is an

Page 222

1     email from Mark Strothkamp forwarding the
2     earlier email to Julie Roe, copying you again,
3     correct?
4  A  Yes.
5  Q  And that email is dated September 5th of 2012,
6     correct?
7  A  Yes.
8  Q  So focusing on the bottom email in the chain
9     dated May 24, 2012, what prompted this email
10    from Mark Strothkamp to the California athletic
11    directors?
12       MR. DREYER:  Objection as to foundation.
13    You can answer.
14 A  My understanding is that Mark had been contacted
15    by several institutions in the state of
16    California that were looking for information
17    related to not only the NCAA championships
18    policy, but specific information as to the NCAA
19    position on sports wagering and survey data.
20 Q  Where did you get that understanding?
21 A  From Mark.
22 Q  So you discussed this email exchange with him?
23 A  Yes.
24 Q  Did you discuss it in the May 2012 time frame or
25    in the September 2012 time frame, or some other

Page 223

1     time frame?
2  A  The May 2012 time frame.
3  Q  Were you involved in preparing the email that
4     went out on May 4th, 2012?
5  A  I don't remember drafting it.  I may have looked
6     at it before it went out, but I don't know.
7  Q  You recall orally discussing the email with Mark
8     Strothkamp before it went out?
9  A  Yes.
10 Q  What message was Mr. Strothkamp trying to convey
11    in this email to the athletic directors?
12       MR. DREYER:  Objection, foundation.  You
13    can answer.
14 A  Well, I'm not sure it is only to athletic
15    directors.  There may be other people on there
16    that are not strictly ADs.  I don't know that
17    for sure.  There are ADs on here.
18 Q  So what message was he trying to convey in his
19    email dated May 4, 2012?
20 A  What the NCAA championship policy was, what is
21    currently going on in the state for those
22    institutions that may not be tracking on the
23    legislative process; the NCAA position on sports
24    wagering; and specific information related to
25    our research studies.

Page 224

1  Q  Did you understand from your discussions with
2     Mr. Strothkamp that some California institutions
3     were concerned about the possibility that
4     championships would be removed from California
5     because of the passage of SB 1390?
6  A  Yes.
7  Q  And is this email an effort to alleviate those
8     concerns?
9  A  I would not characterize this email as an effort
10    to alleviate.  I would characterize this email
11    as an effort to educate on the four things that
12    I outlined previously.
13 Q  If you go to the bottom of the page, 4035, you
14    see the sentence that says, "It is important to
15    note that the sports wagering championships
16    policy only applies to states that are actively
17    taking single game sports bets."  Do you see
18    that?
19 A  I do.
20 Q  And then do you see the next sentence, "While
21    the California legislature may pass SB 1390
22    authorizing sports wagering, federal law, PASPA,
23    would prohibit California gaming establishments
24    from actively taking sports bets."
25       Do you see that?

Page 225

1   A   I do.
2   Q   And both of those sentences refer to actively
3       taking sports bets, correct?
4           MR. DREYER:  Objection.  The document
5       speaks for itself.  You can answer.
6   A   Yes, that's what it says.
7   Q   So is this email conveying to the athletic
8       directors and others from California
9       institutions that the NCAA would not view it as
10      a violation of the championships policy unless
11      and until there is active taking of single game
12      sports bets in California?
13          MR. DREYER:  Same objection.  The document
14      speaks for itself.  You can answer.
15  A   Yes.  To me, the key is how you define active or
16      actively.
17  Q   Well, before we get there, do you agree with how
18      I just described the purpose of the document?
19  A   Can you repeat that?
20          MR. SIGLER:  Can you read back the
21      question, please?
22          (The previous question was read back by the
23      reporter as follows:  "So is this email
24      conveying to the athletic directors and others
25      from California institutions that the NCAA would

Page 226

1       not view it as a violation of the championships
2       policy unless and until there is active taking
3       of single game sports bets in California?")
4   A   That was the understanding at the time, yes.
5   Q   Has that understanding -- I'm sorry, strike
6       that -- that was whose understanding at the
7       time?
8   A   That was Mark and my understanding at the time.
9   Q   That was your understanding of the NCAA's policy
10      in May of 2012?
11  A   Yes.
12  Q   Has that understanding changed?
13  A   Somewhat, yes.
14  Q   How has that changed?
15          MR. DREYER:  Just -- you may be getting
16      into areas of privileged attorney-client
17      communications.  I'm not sure we are.  But I
18      would caution the witness in answering the
19      question not to disclose the content of any
20      communications with inside or outside counsel
21      with NCAA.
22  A   It would be, it would be inside.
23  Q   Okay.  So the understanding of the NCAA's
24      championship policy reflected here in this May
25      4th of 2012 email changed because of

Page 227

1       communications with counsel?
2   A   Yes.
3   Q   And were there any other discussions or reasons
4       that your understanding of the championship
5       policy changed after this May 4th of 2012 email?
6   A   No.
7   Q   Who was the lawyer that advised you on this
8       issue?
9   A   Naima Stevenson and Scott Bearby.
10          THE REPORTER:  Bearby?
11          THE WITNESS:  Bearby, B-E-A-R-B-Y.
12  Q   And who is Scott Bearby?
13  A   He is a member of our general counsel staff.
14  Q   I met Ms. Stevenson earlier, but could you
15      describe her role for me, please?
16  A   She is a liaison with the enforcement staff.
17  Q   Is she in the general counsel's office?
18  A   She is.
19  Q   Is she a lawyer?
20  A   Yes, a very good one.
21          MR. DREYER:  Let the record reflect
22      Ms. Stevenson is smiling.
23  Q   Were any outside counsel involved in that
24      discussion?
25  A   Not with me directly.

Page 228

1   Q   Were they involved, to your knowledge, in
2       discussions with others about this change in
3       perspective on the championships policy?
4   A   I can't speak for others.
5           MR. DREYER:  I would object to the
6       phraseology of changing perspective.  With that
7       objection, the witness has answered.
8   Q   So what is your understanding of the
9       championships policy today with respect to this
10      issue of whether there needs to be active taking
11      of single game sports bets for it to apply?
12          MR. DREYER:  Just, before you answer, so
13      long as it doesn't constitute a waiver of any
14      attorney-client communications, the witness can
15      answer the question.
16  A   My understanding now is that once the
17      regulations became published in October, that it
18      would be considered active and the policy would
19      now apply.
20  Q   And now you're talking about New Jersey,
21      correct?
22  A   Correct.
23  Q   So in New Jersey the NCAA's view, now at least,
24      is that the promulgation of the regulation in
25      New Jersey is what triggers the exclusion under

Page 229

```
 1    the championships policy?
 2  A The final, the regulations being finalized and
 3    published.
 4  Q And just to be clear, are there any single game
 5    sports bets actively being taken in New Jersey,
 6    to the NCAA's knowledge?
 7  A Not to my knowledge.
 8  Q So under the standard applied to California
 9    under this May 4th of 2012 email, New Jersey
10    would not be in violation of the NCAA's
11    championships policy, correct?
12       MR. DREYER:  Objection to the form of the
13    question.  You can answer.
14  A I don't know that I understand the question.
15  Q Okay.  Well, under the May 4th of 2012 email
16    that went out to the California institutions,
17    active taking of single game bets was a trigger
18    for excluding California under the championships
19    policy, correct?
20  A There were no regulations in California that
21    were published to trigger the active taking of
22    single game bets.
23  Q Well, what the email says is that the
24    championships policy only applies to states that
25    are actively taking single game sports bets,
```

Page 231

```
 1    forwarded from Mark Strothkamp to Julie Roe
 2    copying you in connection with this change in
 3    interpretation on the championships policy?
 4       MR. DREYER:  Same objection as to the term
 5    "change," the phrase "change in interpretation."
 6    You can answer.
 7  A I don't remember the timing.  There's a lot
 8    that's happened since September 5th.
 9  Q Do you recall having the discussion with Julie
10    Roe or Mark Strothkamp, without any lawyers
11    present, about this issue we have been
12    discussing about the interpretation of the
13    championships policy?
14  A Yes.
15  Q And do you recall having a discussion with them
16    in September of 2012 about that?
17  A I don't --
18       MR. DREYER:  Just let me interject here.
19    To the extent the conversation relayed
20    attorney-client communications, that, of course,
21    is privileged, and I would instruct the witness
22    not to disclose the substance of any such
23    discussions in answering the question.
24  A Yes, it would have been about information
25    provided by counsel, even without counsel being
```

Page 230

```
 1    correct?
 2  A Correct.
 3  Q And under that standard, New Jersey would not be
 4    violating the championships policy, correct?
 5  A No, they would be, because actively taking
 6    single game sports bets is defined as the
 7    regulations being published.
 8  Q So the NCAA's view is that by publishing
 9    regulations, New Jersey is actively taking
10    single game sports bets?
11  A Yes, that is my understanding.
12  Q So your understanding is the interpretation of
13    the championships policy has not changed but the
14    meaning of the word "actively taking" has
15    changed?
16       MR. DREYER:  Objection, mischaracterizes
17    the witness' testimony.  You can answer.
18  A Yeah, I don't know that I can.  I know that
19    actively is defined as publishing the
20    regulations.
21  Q When did this change in understanding occur?
22  A I don't recall.  I don't remember when
23    specifically.
24  Q Well, if you look at the top email in the chain
25    dated September 5th of 2012, was that email
```

Page 232

```
 1    a part of those conversations.
 2  Q Okay.  So I'm not asking for the substance of
 3    any advice given by counsel, but just when the
 4    communications happened.  So let me make sure I
 5    ask the question so we have a clear record.
 6       Do you recall a discussion with Julie Roe
 7    and Mark Strothkamp in the September 2012 time
 8    frame about this issue we have been discussing
 9    about how the championships policy should be
10    interpreted?
11  A Generally, yes.
12       (Deposition Exhibit 21 was marked for
13    identification.)
14  Q Ms. Baker, you have been handed a document
15    marked Exhibit 21.  Please review this and tell
16    me whether you recognize it.
17  A Yes, I do.
18  Q What is this document?
19  A It looks like a press release that was issued by
20    us, by the NCAA.
21  Q The press release was issued on October 16th,
22    2012, and concerned the application of the
23    championships policy to New Jersey, correct?
24  A Yes.
25  Q And the NCAA's decision to relocate several
```

Page 233

```
 1      championships from New Jersey because of a new
 2      state law now in effect allowing sports wagering
 3      on professional and collegiate games.  Do you
 4      see that?
 5   A  Yes.
 6   Q  Do you know who prepared this press release?
 7   A  I do not.
 8   Q  Were you involved in the preparation at all of
 9      this press release?
10   A  I was not.
11   Q  Were you involved in the decision to relocate
12      championships from New Jersey?
13   A  No.
14   Q  Do you see the first sentence of the press
15      release, "The NCAA has been forced to relocate
16      several championships from New Jersey because of
17      a new state law now in effect allowing sports
18      wagering on professional and collegiate games"?
19   A  Yes.
20   Q  Do you agree that the NCAA was forced to
21      relocate the championships from New Jersey?
22   A  Yes.
23   Q  How was it forced?
24   A  Because of the action that the state took in
25      publishing the regulations.
```

Page 235

```
 1      was involved in the majority of those
 2      conversations.
 3   Q  Do you know who was involved in the decision to
 4      relocate championships from New Jersey?
 5   A  I know some of the individuals involved, yes.
 6   Q  Who was involved?
 7   A  Mark Lewis.
 8   Q  Who is Mark Lewis?
 9   A  Vice-president of championships.
10   Q  Who else?
11   A  Counsel.
12   Q  Who specifically, the two lawyers you mentioned
13      earlier?
14   A  I don't know who specifically, other than Naima.
15   Q  Okay.  Who else?
16   A  I don't know who all else was involved in that.
17   Q  Was President Emmert involved in that?
18   A  I don't know.
19          MR. DREYER:  Geoff, by my count we've got a
20      little bit less than a half hour to go.  If you
21      guys disagree, let me know.
22          (Deposition Exhibit 22 was marked for
23      identification.)
24   Q  Ms. Baker, you have been handed a document
25      marked Exhibit 22.  We'll represent to you this
```

Page 234

```
 1   Q  Do you think there's any room for interpretation
 2      in the championships policy about whether
 3      passing the regulations versus actively taking
 4      single game bets triggers the policy?
 5   A  No.
 6   Q  But you agreed with Mark Strothkamp in May of
 7      2012 that the trigger was the taking of single
 8      game bets, correct?
 9          MR. DREYER:  Objection, mischaracterizes
10      the witness' testimony.  You can answer.
11   A  Yes, I said that at the time, California did not
12      have regulations published, so that was not at
13      issue.
14   Q  Do you have an understanding of what the
15      California law provides?
16          MR. DREYER:  Again, to the extent that
17      understanding was a product of attorney-client
18      communications, I would instruct you not to
19      answer.  If you can answer the question without
20      disclosing any attorney-client communications,
21      you may.
22          Do you want my instruction read back?
23          THE WITNESS:  No, I'm trying to think.  I
24      don't know that it would be outside the
25      attorney-client privilege.  I believe counsel
```

Page 236

```
 1      is a copy of the New Jersey state gambling law.
 2          My question is going to be focused on the
 3      provision on the first page, two-thirds of the
 4      way down, defining prohibited sports event.
 5          Can you take a look at that definition and
 6      let me know when you're done.
 7   A  Yes, I've reviewed it.
 8   Q  Are you familiar with this provision?
 9   A  I've heard about it, yeah.
10   Q  What have you heard about it?
11   A  That New Jersey has proposed, or as part of the
12      regulations, is prohibiting any sports wagering
13      on any New Jersey athletic teams.
14   Q  Have you heard anything else about this
15      provision?
16   A  No.
17   Q  Do you know anything about the origins of this
18      provision?
19   A  I don't.  But I think it's quite hypocritical.
20   Q  Did Nevada have a provision similar to this at
21      any point, to your knowledge?
22   A  They did.
23   Q  And did Nevada take that provision out of its
24      statute at some point?
25   A  Yes.
```

Page 237

1  Q  When was that?
2  A  Oh, I don't recall specifically.  It's been a
3     few years.
4  Q  Do you know why they took it out?
5  A  I do not.
6  Q  Was the NCAA supportive of that provision in
7     Nevada law before they took it out?
8  A  Can you restate that?
9  Q  Did the NCAA support the provision in Nevada law
10    similar to this provision in New Jersey law
11    before Nevada took it out?
12 A  Meaning did we support Nevada having a law that
13    prohibited betting on Nevada contests?
14 Q  Correct.
15 A  I don't know.  That would have been before my
16    time.
17 Q  Did the NCAA oppose Nevada's decision to take a
18    provision like this regarding prohibited
19    sporting events out of its statute?
20 A  I don't recall.  I don't remember being a part
21    or having a say in any of that, frankly.
22 Q  Do you know who was involved at the NCAA in
23    discussions or decisions relating to the Nevada
24    decision to take a provision like this out of
25    its Nevada statutes?

Page 238

1     MR. DREYER:  Objection, lack of foundation.
2     You can answer.
3  A  I don't know if anyone had conversations to
4     begin with, so I couldn't answer.
5  Q  Did you ever hear any discussion at the NCAA of
6     the Nevada provision similar to this prohibited
7     sports event provision in New Jersey law at any
8     point in time?
9  A  Not that I can specifically recall, other than,
10    again, on its face it would appear to be very
11    hypocritical.
12 Q  Do you recall discussions generally at the NCAA
13    about the Nevada provision?
14 A  I don't.
15 Q  Has the NCAA taken any steps with respect to any
16    type of NCAA event in Nevada following Nevada's
17    removal of the similar provision from Nevada
18    law?
19    MR. DREYER:  Objection to the form of the
20    question.  You can answer.
21 A  I don't know that I understand the question.
22 Q  Has the NCAA removed any championships or any
23    other NCAA sports events from Nevada because of
24    its decision to remove its similar provision
25    from its law?

Page 239

1  A  I don't think we've ever had to remove anything,
2     because they've always had sports betting, which
3     has always applied to our policy.
4  Q  Do you know anything else about this provision
5     in the New Jersey law regarding prohibited
6     sports events, other than what you have already
7     described?
8  A  I do not.  It just appears to be a recognition
9     that there's some harm that could come,
10    otherwise they wouldn't those be included.
11 Q  That's just your speculation, correct?
12 A  Yes.
13    (Deposition Exhibit 23 was marked for
14    identification.)
15 Q  Ms. Baker, you have been handed a document
16    marked Exhibit 23.  I'd like you to take a look
17    at it, and tell me whether you recognize it.
18 A  Yes, I do.
19 Q  What is this document?
20 A  It looks like it is results from a baseball
21    umpire survey that was conducted specific to
22    gambling, wagering or betting activities.
23 Q  Do you know what time frame this survey was
24    conducted in?
25 A  It's been several years.  I can't remember the

Page 240

1     exact year.
2  Q  Who conducted this survey?
3  A  Our research staff was involved in the
4     development of the survey.
5  Q  Is there any part of this survey that the NCAA
6     contends shows the impact or potential impact of
7     legalizing sports gambling in New Jersey?
8  A  Not specific to New Jersey.
9     MR. DREYER:  I'm sorry, were you finished?
10    THE WITNESS:  It just shows the impact that
11    gambling and sports wagering has beyond just our
12    student athletes, on our officials and umpires
13    as well.
14 Q  The survey doesn't address the impact of
15    legalizing sports gambling in New Jersey,
16    correct?
17 A  It does not.
18    (Deposition Exhibit 24 was marked for
19    identification.)
20 Q  Ms. Baker, you have been handed a document
21    marked Exhibit 24.  Please take a look at this
22    and tell me whether you recognize it.
23 A  I do.
24 Q  This is a survey of men's basketball officials,
25    correct?

Page 241

1  A  Yes.
2  Q  Do you know the time frame of this survey?
3  A  No.  As I think about it, I believe it was
4     around the time of the Donaghy case, but I don't
5     recall specifically.
6        MR. DREYER:  D-O-N-A-G-H-Y.
7  Q  And the NCAA research staff prepared the survey?
8  A  Correct.
9  Q  And this survey does not provide any results
10    regarding the impact of legalizing sports
11    gambling in New Jersey, correct?
12  A  Not specific to New Jersey, but similar to the
13    baseball umpires, it shows the concern related
14    to gambling and sports wagering activities of
15    men's basketball officials, and the potential
16    for them to be approached to affect a game.
17  Q  But it doesn't show anything about the impact or
18    potential impact of legalizing in New Jersey,
19    correct?
20        MR. DREYER:  Objection, asked and answered.
21  A  Correct.
22        (Deposition Exhibit 25 was marked for
23    identification.)
24  Q  Ms. Baker, you have been handed a document
25    marked Exhibit 25.  Please take a look and tell

Page 242

1     me whether you recognize it.
2  A  I do.
3  Q  Is this a survey of women's basketball
4     officials?
5  A  Yes.
6  Q  And do you know the time frame for this survey?
7  A  It would have been very similar to the other
8     two.
9  Q  And this survey, too, was conducted by the NCAA
10    research staff, correct?
11  A  Yes.
12  Q  And like the others, this survey, Exhibit 25,
13    does not address the impact of legalizing
14    gambling in New Jersey, correct?
15        MR. DREYER:  Objection to the form of the
16    question.  You can answer.
17  A  Similar to the answers in the two previous
18    surveys, no, it does not.  It shows the impact
19    on women's basketball officials related to their
20    involvement in gambling, wagering or betting
21    activities.
22  Q  Ms. Baker, other than the surveys that we've
23    talked about today and that we've gone through
24    exhibit by exhibit, are you aware of any other
25    surveys regarding the impact or potential impact

Page 243

1     of sports gambling, fantasy sports, and/or March
2     Madness on the NCAA or its member institutions?
3  A  I'm not, not that I recall, no.
4        MR. SIGLER:  Let's take a break.
5        MR. DREYER:  Sure.
6        (A recess was taken.)
7  Q  Ms. Baker, are you aware of any studies that
8     quantify the impact on the NCAA or its member
9     institutions of New Jersey's legalization of
10    sports gambling?
11  A  Not that I can recall.
12  Q  Are you aware of any studies regarding the
13    impact on the NCAA or its member institutions of
14    any state legalizing sports gambling?
15        MR. DREYER:  Objection, asked and answered.
16    You can answer.
17  A  None that immediately come to mind.
18  Q  Has the NCAA had any discussions with the NFL
19    about its promotion of fantasy sports leagues?
20        MR. DREYER:  Objection, asked and answered.
21  A  I have not had any discussions with the NFL
22    about its promotion.
23  Q  Are you aware of any discussions by anyone from
24    the NCAA with the NFL about its promotion of
25    fantasy football?

Page 244

1  A  I haven't, and I don't know if anyone else has.
2  Q  Has there been any discussion internally at the
3     NCAA about reaching out to the NFL about its
4     promotion of fantasy football?
5  A  Nothing that I'm aware of.
6  Q  Ms. Baker, where was the Sports Wagering Summit
7     that took place in September of 2012?
8  A  In New York City.
9  Q  And where specifically within New York City?
10  A  It was at the NFL the first day, and Major
11    League Baseball the second day.
12  Q  And do you have any written materials from that
13    summit in your files?
14  A  Oh, I don't remember if I saved anything from
15    the summit or not.
16  Q  Do you recall getting rid of anything from the
17    summit?
18  A  I know that we got an agenda.  I may still have
19    that.
20  Q  Do you recall receiving anything at the summit
21    and subsequently deleting it or throwing it
22    away?
23  A  I don't know that I would have saved an
24    electronic copy of the agenda, because, again,
25    of the size of it.

Page 245

1    Q    Do you specifically recall deleting it?
2    A    I don't specifically recall deleting it, no.
3    Q    Do you recall receiving a roster of attendees
4         for the summit?
5    A    Not that I can recall.
6    Q    Where was the NCAA's in-service event?
7    A    Indianapolis.
8    Q    Was that at the NCAA's headquarters?
9    A    Yes.
10   Q    And do you have written materials relating to
11        that in-service event?
12   A    Yes.
13   Q    Do you have copies of the presentations that
14        were given at the in-service event?
15   A    I don't know if I have copies of all the
16        presentations or not.  I don't, I don't recall
17        what all is in my in-service folder.
18   Q    Ms. Baker, did you receive a notice from counsel
19        or anyone else telling you to maintain documents
20        relating to this litigation?
21   A    I don't recall receiving one specific to this
22        litigation, no.
23   Q    You don't recall receiving one at any point in
24        time?
25   A    For this?

Page 247

1         or Turner Sports from broadcasting gambling
2         related information?
3    A    Yes.
4    Q    What are those restrictions?
5    A    I can't recall all of them off the top of my
6         head, but I know that we have specific policies
7         related to advertising in conjunction with our
8         championships.
9    Q    Is CBS precluded from showing point spreads?
10   A    I don't recall what all the specific regulations
11        for those policies include.
12   Q    The NCAA also has an agreement with CBS to show
13        college football games, correct?
14   A    I'm not sure on that.  I don't know that the
15        NCAA has the agreement to show college football
16        games.
17   Q    Does CBS broadcast point spreads, to your
18        knowledge?
19   A    Not to my knowledge.
20   Q    Are you familiar with CBS's website CBS Sports
21        Line?
22   A    Yes.
23   Q    Do you know whether CBS Sports Line includes
24        point spreads for NCAA events?
25   A    I do not know.

Page 246

1    Q    For this litigation.
2    A    No, I don't recall.  I have received holds
3         before, but nothing that I remember specifically
4         to this.
5    Q    Have you -- strike that.
6              Earlier today you mentioned receiving
7         emails from the public expressing a view that
8         match fixing could be occurring or could be a
9         problem, correct?
10   A    I have in the past.
11   Q    When did you most recently receive an email like
12        that?
13   A    Oh, I haven't received one in a while.
14   Q    Has it been years since you received one of
15        those?
16   A    Yes.
17   Q    Ms. Baker, you're aware that the NCAA has an
18        agreement with CBS and Turner Sports about the
19        broadcast of March Madness, correct?
20   A    I am.
21   Q    And are you aware that it's a 14-year agreement
22        for eleven billion dollars?
23   A    Yes.
24   Q    Are there any provisions that you're aware of,
25        or policies that the NCAA has, restricting CBS

Page 248

1              (Deposition Exhibit 26 was marked for
2         identification.)
3              MR. DREYER:  Is there a Bates number on
4         this?  Is there a Bates number on this?
5              MR. SIGLER:  No.
6              MR. DREYER:  Why wasn't it produced
7         yesterday in response to our discovery request?
8              MR. SIGLER:  It's a public document,
9         Anthony.
10             MR. DREYER:  It's something obviously you
11        are relying on in this case, and yet you haven't
12        produced it.  Can you explain why?
13   Q    Are you familiar with this website, CBS
14        Sports --
15             MR. DREYER:  Objection.  You're showing the
16        witness a document -- we had a document request
17        for all documents you intended to rely on in
18        this case.  This is a document you haven't
19        produced.  I would like an explanation as to
20        why.
21             MR. SIGLER:  We can talk about that later,
22        offline.
23             MR. DREYER:  I'm going to object to the use
24        of this document.
25   Q    Ms. Baker, have you seen this --

Page 249

1      MR. DREYER:  Just so the record is clear,
2   there's actually a court order that this
3   document be produced, so I want to preserve all
4   objections with respect to any similar documents
5   that have not been produced.  Go ahead.
6  Q  Ms. Baker, are you familiar with this part of
7   CBS Sports Line's -- strike that.
8      Are you familiar with this portion of CBS
9   Sports .com's website?
10 A  I am not.
11 Q  And do you see that it presents lines, money
12   lines, and other gambling related information?
13 A  Yes.
14 Q  Is this a concern of the NCAA's?
15 A  Well, I don't see any of the NCAA marks used in
16   conjunction with the printing of these, so it
17   would not appear that it is anything that has
18   been licensed or approved by us.
19 Q  So as long as it doesn't have any NCAA marks,
20   that would be okay from a policy perspective?
21     MR. DREYER:  Objection to the form of the
22   question.  Go ahead.
23 A  No, that's not what I said.
24 Q  Well, help me understand the point you are
25   making with the fact that it doesn't have any

Page 250

1   NCAA marks.
2  A  It doesn't have any NCAA marks, so it has not
3   been licensed or approved by the NCAA, even
4   though we have an arrangement with CBS Sports
5   .com.
6  Q  Does anyone have to license or approve the use
7   of the school logos reflected on this document?
8  A  I believe that institutions --
9      MR. DREYER:  Objection to the extent it
10   calls for a legal conclusion, and foundation,
11   but you can answer.
12 A  I guess I don't know for sure how that process
13   works.
14 Q  Well, I'll take whatever information you can
15   provide on that.  So in your understanding as a
16   nonlawyer, does there have to be any kind of
17   licensing or authorization to use the NCAA team
18   logos on the site?
19     MR. DREYER:  Same objection as to
20   foundation.  You can answer.
21 A  I don't know.  I don't know how the licensing
22   agreements work.
23 Q  Is the NCAA aware that March Madness pools are
24   popular?
25 A  Yes.

Page 251

1  Q  Does the NCAA have any surveys, data or
2   information about the popularity of March
3   Madness pools?
4  A  Other than the survey data included in the NCAA
5   study, none that I recall.
6  Q  But the NCAA is generally aware that March
7   Madness pools are very popular, correct?
8  A  Yes.
9  Q  And does the NCAA acknowledge that the
10   popularity of these March Madness pools
11   contributes to the popularity of the NCAA's
12   March tournament?
13     MR. DREYER:  Object to the form of the
14   question.  Go ahead.
15 A  No.
16 Q  You don't agree with that statement?
17 A  I do not.
18 Q  What's the basis for that?
19 A  Because I think as evidenced by the fact that
20   college attendance at these contests continues
21   to grow throughout the year, that even though
22   the bracket is necessary to actually conduct and
23   run the actual tournament, that the bracket in
24   any subsequent pools do not have to exist in
25   order for our tournament to be successful.

Page 252

1  Q  Do you agree that some viewers of the NCAA
2   tournament in March perhaps watch games that
3   they would not otherwise watch because they have
4   office pools?
5      MR. DREYER:  Objection to the form of the
6   question.
7  A  I can't speak for other people.  I can tell you
8   that we do our best to provide education related
9   to the pools, and also to encourage people to
10   enjoy the tournament for the shear competition
11   that's taking place and not because of money
12   that they may have in a pool.
13 Q  Have you ever seen any studies or analyses
14   regarding the amount of money that people wager
15   through March Madness pools?
16 A  None that I can recall, no specific data.
17     MR. SIGLER:  Okay.  I think we're done.
18     MR. DREYER:  No questions.
19     THE REPORTER:  Reading and signature, I
20   assume.
21     MR. DREYER:  Yes.
22     (Time Noted 4:40 p.m.)
23        AND FURTHER THE DEPONENT SAITH NOT.
24
25

Page 253

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2         I, RACHEL NEWMAN BAKER, do hereby certify

 3    that I have read the foregoing transcript of my

 4    testimony, and further certify that it is a true

 5    and accurate record of my testimony (with the

 6    exception of the corrections listed below):

 7    Page   Line              Correction

 8    ____|____|_____|_____

 9    ____|____|_____|_____

10    ____|____|_____|_____

11    ____|____|_____|_____

12    ____|____|_____|_____

13    ____|____|_____|_____

14    ____|____|_____|_____

15    ____|____|_____|_____

16    ____|____|_____|_____

17    ____|____|_____|_____

18    ____|____|_____|_____

19    ____|____|_____|_____

20

21              RACHEL NEWMAN BAKER

22    SUBSCRIBED AND SWORN TO BEFORE ME

23    THIS _____ DAY OF _____, 20___.

24

25    _____    _____
      (NOTARY PUBLIC)      MY COMMISSION EXPIRES:
```

Page 255

```
 1              I do further certify that I am a

 2    disinterested person in this cause of action;

 3    that I am not a relative or attorney of either

 4    party, or otherwise interested in the event of

 5    this action, and am not in the employ of the

 6    attorneys for either party.

 7              IN WITNESS WHEREOF, I have hereunto

 8    set my hand and affixed my notarial seal this

 9    1st day of November, 2012.

10

11              _____

12              N O T A R Y     P U B L I C

13

14    My Commission Expires:

15    November 3, 2017

16    County of Residence:

17    Marion

18

19

20

21

22

23

24

25
```

Page 254

```
 1    STATE OF INDIANA       )
                             | SS:
 2    COUNTY OF MARION       )

 3              I, Tamara J. Brown, CSR, RMR, CRR, a

 4    Notary Public in and for the County of Marion,

 5    State of Indiana at large, do hereby certify

 6    that RACHEL NEWMAN BAKER, the deponent herein,

 7    was by me first duly sworn to tell the truth,

 8    the whole truth, and nothing but the truth in

 9    the aforementioned matter;

10              That the foregoing deposition was

11    taken on behalf of the Defendants, at the

12    offices of Ice Miller, One American Square,

13    Indianapolis, Marion County, Indiana, on the

14    30th day of October, 2012, commencing at the

15    hour of 9:30 a.m., pursuant to the Federal Rules

16    of Civil Procedure;

17              That said deposition was taken down

18    in stenograph notes and afterwards reduced to

19    typewriting under my direction, and that the

20    typewritten transcript is a true record of the

21    testimony given by the said deponent; and

22    thereafter presented to said deponent for

23    his/her signature;

24              That the parties were represented by

25    their counsel as aforementioned.
```