**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

```
 1
 2   _____
 3
     NATIONAL COLLEGIATE ATHLETIC
 4   ASSOCIATION, an unincorporated
     association, NATIONAL BASKETBALL    CIVIL ACTION NUMBER:
 5   ASSOCIATION, a joint venture,
     NATIONAL FOOTBALL LEAGUE, an
 6   unincorporated association,         3:12-cv-04947-MAS-LHG
     NATIONAL HOCKEY LEAGUE, an
 7   unincorporated association, and
     OFFICE OF THE COMMISSIONER OF
 8   BASEBALL, an unincorporated
     association doing business as
 9   Major League Baseball,

10             Plaintiffs,

11             -vs-

12   CHRISTOPHER J. CHRISTIE, Governor
     of the State of New Jersey, DAVID
13   L. REBUCK, Director of the New
     Jersey Division of Gaming
14   Enforcement and Assistant
     Attorney General of the State of
15   New Jersey, and FRANK ZANZUCCKI,
     Executive Director of the New
16   Jersey Racing Commission,

17             Defendants,

18        -and-

19   STEPHEN M. SWEENEY, President of
     the New Jersey Senate, SHEILA Y.
20   OLIVER, Speaker of the New Jersey
     General Assembly, and NEW JERSEY
21   THOROUGHBRED HORSEMEN'S
     ASSOCIATION, INC.,
22
               Defendants-Intervenors.
23   _____
           Clarkson S. Fisher United States Courthouse
24         402 East State Street
           Trenton, New Jersey 08608
25         December 18, 2012
```

```
 1   B E F O R E:            HONORABLE MICHAEL A. SHIPP
 2                           UNITED STATES DISTRICT JUDGE

 3
     A P P E A R A N C E S:
 4
     SKADDEN, ARPS, SLATE, MEAGHER & FLOM, ESQUIRES
 5   BY:  JEFFREY MISHKIN, ESQUIRE
              and
 6        ANTHONY J. DREYER, ESQUIRE
     Attorneys for the Plaintiffs.
 7
     MCCARTER & ENGLISH, ESQUIRES
 8   BY:  WILLIAM J. O'SHAUGHNESSY, ESQUIRE
     Attorneys for the Plaintiffs.
 9
     GIBSON, DUNN & CRUTCHER, ESQUIRES
10   BY:  THEODORE OLSON, ESQUIRE
              and
11        JENNIFER NELSON, ESQUIRE
     Attorneys for the Defendants.
12
     OFFICE OF THE ATTORNEY GENERAL
13   BY:  JOHN J. HOFFMAN, ESQUIRE
     Attorneys for the Defendants.
14
     MCELROY, DEUTSCH, MULVANEY & CARPENTER, ESQUIRES
15   BY:  RONALD J. RICCIO, ESQUIRE
     Attorneys for the Intervenor Defendant.
16
     GIBBONS, PC
17   BY:  MICHAEL R. GRIFFINGER, ESQUIRE
              and
18        THOMAS VALEN, ESQUIRE
     Attorneys for the Intervenor Defendant.
19

20   Certified as True and Correct as required by Title 28, U.S.C.,
     Section 753
21        /S/ Cathy J. Ford, CCR, CRR, RPR

22

23

24

25
```

*United States District Court*
*Trenton, New Jersey*

—MOTION—

```
 1            THE DEPUTY COURT CLERK:  All rise.

 2            THE COURT:  Please be seated.  Good afternoon.  Full

 3  house today.

 4        We're here, and on the record, in the matter of the

 5  NCAA, et al versus Chris Christie, et al.  Docket 12-4947.

 6        May I have appearances of counsel, please.

 7        MR. MISHKIN:  Yes, your Honor, for the Plaintiffs,

 8  Jeffrey Mishkin, Skadden, Arps, Slate, Meagher and Flom.  My

 9  partner, Anthony Dryer; and William O'Shaughnessy from

10  McCarter and English.

11        MR. OLSON:  Good afternoon, your Honor.  Theodore

12  Olson, Gibson, Dunn and Crutcher on behalf of the State of New

13  Jersey.  With me is my colleague, Jennifer Nelson, from our

14  firm; and John Hoffman on behalf of the Attorney General's

15  office.

16        MR. RICCIO:  Good afternoon, your Honor, Ronald J.

17  Riccio, McElroy, Deutsch here today for the Defendant

18  Intervenor, New Jersey Thoroughbred Horsemen's Association.

19        MR. GRIFFINGER:  Good afternoon, your Honor.  Michael

20  Griffinger and Tom Valen from the Gibbons firm on behalf of

21  Defendant Intervenor, President Sweeney and Speaker Oliver.

22        THE COURT:  Good afternoon to you as well.

23        Folks, we're here today for oral argument with regard

24  to the limited issue of whether or not the Plaintiff Leagues

25  have met the threshold requirement of Article III standing.
```

—MOTION—

1  The Defendants have previously filed a motion to dismiss on

2  those grounds which was opposed by the Plaintiffs.

3  Subsequently, as part of the Defendant's opposition to

4  Plaintiff's motion for summary judgment, Defendant's

5  cross-moved for summary judgment arguing that Plaintiffs lack

6  standing.  The motion was opposed by the Plaintiffs, who again

7  argued that they are entitled to a finding that they have

8  standing as a matter of law predicated upon the undisputed

9  material facts.  Defendant's summary judgment motion regarding

10 standing has subsumed the previously filed motion to dismiss.

11       The Court has reviewed the Plaintiff's extensive

12 briefing with regard to standing.  In the interest of time,

13 I'd like to ask the parties to focus on some specified areas.

14 Since the burden of demonstrating standing falls on the

15 Plaintiffs, I'm going to ask that we hear from Plaintiff's

16 counsel first regarding their alleged injury-in-fact and how

17 the claimed injury is traceable to the Sports Wagering Law.

18       So, Mr. Mishkin, or whoever wants to argue from the

19 Plaintiffs, I'll hear from you first.  And I am particularly

20 interested in the impact of the *Markell* decision, if any, with

21 regard to the Court's standing analysis, as well as the level

22 of injury which must be demonstrated in order to meet the

23 threshold injury and fact requirement, as well as whether

24 PASPA, in and of itself, confers Plaintiffs' standing; and

25 then, finally, how it is that the Plaintiffs assert that the

─MOTION─

1    Court can find injury-in-fact relying solely upon the

2    undisputed facts here.

3         Mr. Mishkin.

4          MR. MISHKIN:  Thank you very much, your Honor.  Is

5    this working?

6          THE COURT:  I can hear you fine.  I think we're good.

7          MR. MISHKIN:  All right.  May it please the Court, I

8    think it is worth recalling at the outset, your Honor, as to

9    how this case got started.  The State of New Jersey announced

10   that it was going to proceed to implement its Sports Gambling

11   Program in violation of existing federal law, PASPA, and

12   simply challenged anyone to try to stop them.  And when these

13   sports organizations brought this action exactly as Congress

14   had authorized them to do in PASPA if they were confronted

15   with a violation of PASPA, New Jersey countered with the

16   argument that we do not even have the right to bring this

17   lawsuit and be heard at all.

18        The state's position is that in clear violation of

19   federal law, it can appropriate for its own financial purposes

20   the very games produced by these organizations, use those

21   games as vehicles for gambling, and it can commit that clear

22   violation of PASPA with impunity and can avoid any review of

23   their conduct at the request of these Plaintiffs.  And we say

24   that is not the law.

25        There are two separate and distinct reasons, and I'm

— MOTION —

1   going to answer your Honor's question and I will try to do it

2   in as logical an order as I can.  There are two separate and

3   distinct reasons why standing exists in this case.

4        First, the sports organization has the necessary

5   personal stake required for standing because it is their own

6   games that are being used as vehicles for gambling.

7        And second, and wholly independently of that, is the

8   enactment of PASPA, the finding of harm by Congress, and the

9   creation of an expressed cause of action to enjoin a violation

10  of PASPA.  And that provides a separate statutory basis for

11  standing.

12       And let me talk separately about each of these two

13  points.  The doctrine of standing, of course your Honor knows,

14  serves an important but a limited and narrow function.

15  Standing requires, and here's the standards for standing,

16  standing requires nothing more than an identifiable trifle of

17  an injury.  That's what the case has said, an identifiable

18  trifle.  And the purpose of the standing doctrine is only to

19  identify those Plaintiffs who have a personal stake, a

20  personal interest in the litigation sufficient to show that

21  there is an actual case or controversy.  And, your Honor, if

22  there is anyone in this room who does not think that there is

23  an actual case or controversy between these sports

24  organizations and the State of New Jersey over the gambling

25  law, then, perhaps they haven't been paying close attention,

1   or at least they haven't seen the pile of papers that you have

2   had to review.

3        Now, the Supreme Court said in the case of *Lujan*

4   *against the Defenders of Wildlife*, absent unusual

5   circumstances, If a party is itself the object of the

6   challenged conduct, then that party has a personal stake in

7   the litigation and has standing.  The personal stake of the

8   sports organizations in opposing the appropriation of their

9   own games by the State of New Jersey to be used as a basis for

10  gambling, it seems to us is obvious, these sports

11  organizations have made it clear for decades before, during

12  and after the enactment of PASPA, that they oppose the spread

13  of legalized gambling on their own games because of a deeply

14  held and well-founded concern that more gambling on their

15  games will adversely affect how those games are perceived by

16  their fans.  And, in that respect, your Honor, the Plaintiffs

17  here are just like the Plaintiff in the case of *Doe against*

18  *National Board of Medical Examiner* decided by the Third

19  Circuit in 1999.

20       In the *Doe* case, a disabled medical student was

21  identified as disabled on a medical licensing test score.  He

22  was found to have standing to complain about that

23  identification of him as disabled solely because he did not

24  want to be identified as disabled because of a reasonable

25  concern that being identified as disabled might affect, might

─ MOTION ─

1   affect, how other people perceived him.  Here, the sports

2   organizations do not want their games used as a basis for

3   state-sponsored gambling because of a reasonable and

4   well-considered belief as to how state-sponsored gambling will

5   cause their games to be viewed by their customers, by

6   sportsmen.  They are legitimately and justifiably concerned

7   that if gambling is made legal on their games, there will be

8   greater suspicion about all of the normal incidents of the

9   game: every drop passed, every missed free throw will now

10  become an objective suspicion as to the integrity of the

11  competition.  And instead of rooting for their team to win,

12  these newly minted legal gamblers will be as concerned, or

13  more concerned, about the point spread and whether or not they

14  have won their bet.  And the sports organizations

15  understandably would like to avoid that.

16       There is a long history of scandals in sports that have

17  involved gambling, and we know from recent studies that are in

18  the record that many fans oppose the legalization of gambling

19  on sports.  And those fans, our customers, who oppose gambling

20  will very likely have a negative perception of our games if

21  gambling were permitted to become legal on those games, your

22  Honor.

23       And, so, our first point is there is a reasonable and

24  justifiable concern about how our games will be affected if

25  New Jersey implemented its gambling program, and that we say

—MOTION—

```
 1   is plainly enough of a personal stake to confer standing.

 2          THE COURT:  But when we parse this out, isn't it true

 3   that we already have sports gambling in Vegas.  There is

 4   undeniably a black market or illegal sports gambling that goes

 5   on.  So, if we talk about the injury, how is that really

 6   traceable to the statute that's in question?

 7          MR. MISHKIN:  Well, your Honor, this is where Markell

 8   comes in.  Markell has this very problem.  The case there was

 9   Delaware.  Delaware already had sports gambling.  They had

10   parlay betting, and they wished to expand it into single-game

11   betting.  And the question -- and there was lots of debate

12   about, well, there's already Vegas, there's already illegal

13   gambling, although, how much of that is impossible to know.

14          And, by the way, most of our fans do not gamble.  The

15   studies that are in the record show that about 73 percent of

16   sportsmen have never placed a bet.  So, we're dealing with a

17   minority who like to gamble, either in Las Vegas or illegally.

18   But the Markell court in confronting the Delaware expansion of

19   gambling found two things: that the central purpose, or one of

20   the central purposes of PASPA, was to protect the integrity of

21   the games.  And that if Delaware went ahead and expanded the

22   betting, that would bring about and engender, that would

23   engender the very ill that PASPA was intended to combat.

24          So, the Third Circuit, I think, already addressed the

25   question that even a little more gambling is exactly what
```

—MOTION—

 1   PASPA was getting at and it would bring about the very harms

 2   that Congress said would be brought about if there was a

 3   spread of sports gambling.

 4          THE COURT:  Your adversaries have also raised the

 5   whole notion of fantasy sports.  And that the Leagues readily

 6   endorse fantasy sports and that they're tantamount in some

 7   degree to gambling.

 8          MR. MISHKIN:  Well, your Honor, I don't think they're

 9   tantamount to gambling.  Congress in the Unlawful Internet

10   Gambling Act said that's not gambling.  The decision in the

11   District Court here found that fantasy sports were not

12   gambling.  The Leagues view this very differently.  The

13   Leagues view fantasy as just that, they are pretend, it's made

14   up.  It's the difference between playing Monopoly and actually

15   being in the real estate market.  It's made up.

16          But, your Honor, to the extent someone might view it as

17   having elements that are not dissimilar from gambling, that's

18   exactly why we have standing.  We are running a business.  All

19   of these Leagues are running businesses.  They have to make

20   important business judgments, and they have to make

21   distinctions about what they think is good for their game and

22   what they think is bad for their game.

23          They have decided that fantasy leagues, on balance,

24   even if you view them as having some minor, minor elements of

25   gambling, they do not believe they're anything remotely

─MOTION─

1   similar to sports books in casinos and in racetracks.  But

2   even if you accept that there are some elements that are

3   similar to gambling in fantasy leagues, that's a distinction

4   that we make.

5         Fantasy Leagues, we believe, promote the sport, and

6   that's good.  State-sponsored gambling does something very

7   different.  It changes how our fans look at our game.

8         So, again, in standing, we're just trying to decide is

9   there enough of a personal interest, a personal stake.  Are we

10  the right Plaintiffs?  And it seems to me, your Honor, that

11  given this consistent view that serious gambling on our games

12  and the spread of it, just as Congress found, is harmful to

13  our games, that gives us an interest.  They are our games,

14  your Honor.  We're not talking about the ultimate resolution

15  of the case, we're only talking about whether or not we have

16  that sufficient personal stake, that sufficient identifiable

17  trifle of an interest to support standing.

18        And the argument I just made to you has nothing really

19  to do with the enactment of PASPA.  We haven't talked about

20  that.  I've only talked about the fact that they're our games.

21  And even if PASPA didn't exist, we'd have to come up with

22  another substantive cause of action.  And maybe we would dream

23  up one, or maybe we wouldn't, but the question of standing

24  really wouldn't change because they are our games and that

25  gives us a personal stake, that gives us standing.

─ MOTION ─

1       But we do --

2           THE COURT:  And you believe under *Doe* that the

3   perception, that the injury to the perception of the integrity

4   of the games, is enough to show a trifle?

5           MR. MISHKIN:  Yes, your Honor, I do.  I do.  And I

6   think in *Doe*, again, the *Doe* case was brought as an ADA case,

7   an Americans with Disability Act case.  And the first part of

8   the standing issue is, Well, has Mr. Doe proven any

9   discrimination?  And the answer was, Well, no, he hasn't.  He

10  has no proof at all that he's been discriminated against or

11  will be discriminated against.  But the Third Circuit says,

12  Oh, he has standing, he has standing to complain about being

13  identified because he doesn't want to be identified.  He has a

14  concern that people will view him in a different way if they

15  know he's disabled.

16          It's very similar here.  These sports organizations for

17  a long time have believed, with very good reason, that if

18  there is state-sponsored gambling, which is very different

19  than illegal gambling, or the gambling in Las Vegas which is

20  way out in Las Vegas, you got to go to Las Vegas to put your

21  bet on the sports book out there.  But in New Jersey, in a

22  highly populace area, with lots of teams around, you legalize

23  gambling, you tell people, Oh, gambling is good, this is okay,

24  this is normal conduct, that is going to affect at least some

25  of our fans, maybe many of our fans as to how they view our

1   game.  That is enough for standing.  That is enough of a

2   personal interest.  That is an identifiable trifle that gets

3   us standing.  And all of that, your Honor, is before we get to

4   PASPA, which I'm now ready to talk about.

5             THE COURT:  Okay, let's talk about PASPA.

6             MR. MISHKIN:  Your Honor, in adopting that law

7   Congress, Congress now found, based on a full record, that the

8   spread of state-sponsored gambling would threaten the

9   integrity of the competition and change the way fans looked at

10  the game.  Now, so long as that Congressional conclusion was

11  rational, as it plainly was, given the record before Congress,

12  then, your Honor, this Court, we believe, is bound by

13  Congress's finding of harm.  And that of course is enough to

14  confer standing.  But remember, also, as I think we and the

15  Defendants disagree on this point, perhaps more than any

16  other, in Section 3703, PASPA, Congress authorized these

17  sports organizations to bring an action, to enjoin a violation

18  of PASPA.  We have that express authorization, we and the

19  Attorney General, both of us, have that express authorization.

20            Now, in granting that authorization to us, Congress

21  clearly distinguished between a cause of action and standing

22  to bring that action.  They are two different things.  In that

23  section, Congress did not grant a cause of action to just

24  anyone and everyone who might want to challenge a violation of

25  PASPA.  No, Congress only granted a cause of action to those

─MOTION─

1    sports organizations whose own games were being used for

2    gambling.

3        So, if the State of New Jersey decided just to take

4    bets on the World Series, the NBA would not have standing.

5    They were very clear.  It has to be your games.  So, there is

6    a distinction between the claim you can make and having

7    standing to bring that claim.  So, in other words, the parties

8    who can bring an action under PASPA are only those

9    organizations whose personal interests are directly affected

10   in a particular and concrete way and who would be suffering

11   the very harm that Congress found they would suffer if

12   gambling were made legal on their games.

13       One other point, your Honor, beyond the finding of harm

14   by Congress.  The whole point of enacting PASPA was to give

15   the sports organizations the right to be free from the spread

16   of sports gambling.  New Jersey is admittedly trying to take

17   that right away.  And it is a clear principle of law both in

18   the Supreme Court, especially in the Third Circuit, that where

19   a statute creates a legal right, the deprivation of that right

20   confers standing.  This point is fully covered in our briefs.

21   I'm not going to belabor it here, but I would simply invite

22   your Honor's particular attention to the Supreme Court's

23   decision in *Havens Realty against Coleman*; and the Third

24   Circuit's decisions in *Austin against Countrywide* and *Horvath*

25   *against Keystone*.  I'm sure you have those cases.  Those cases

1   are controlling authority for the proposition that where a

2   Plaintiff suffers the very injury that the statute in question

3   was enacted to prevent, the requirement of Article III

4   standing has been met.  And, again, your Honor, I come back to

5   *Markell* because *Markell,* again, in reviewing the Delaware law

6   said, Well, if Delaware can extend gambling here that would

7   engender the very ills that Congress is trying to stop in

8   PASPA.  So I think *Markell*, even though the question of

9   standing was not involved in *Markell*, my view, I'm sure Mr.

10  Olson will have a different view, my view is it was so obvious

11  to everybody in *Markell*, there was no occasion to even address

12  the question of whether these sports organizations had a

13  standing.

14       Of course, the Third Circuit, like every circuit, has

15  an obligation to ask itself whether or not it has the

16  constitutional authority to proceed, to hear the case.  In

17  many cases, the *Austin* case in particular, goes on about how

18  the Third Circuit must ask itself whether or not there is

19  Article III standing.  Now, whether it overtly asked itself

20  whether it had standing in *Markell* or it just believed it did,

21  I don't think this is a drive-by issue.  They were focused on

22  jurisdiction in *Markell*, and they never talked about standing.

23  But they did talk about injury.  They did find that a central

24  purpose of PASPA was to protect the integrity of the games,

25  and that if Delaware went ahead with its little expansion of

— MOTION —

 1   gambling that would be enough.  You would engender the very

 2   ills that Congress found would occur if there was more

 3   state-sponsored gambling.  So, I think *Markell* is very useful,

 4   indeed, perhaps conclusive, on the issue of standing even

 5   though it did not itself address that issue.

 6        Now, let me come back to all the gambling in Las Vegas

 7   and elsewhere.  The state argues that our claim of

 8   injury-in-fact should not be believed.  It shouldn't be

 9   believed because there is gambling in Las Vegas, there is a

10   high degree of illegal gambling and there is no proof, they

11   say, no proof that if the single State of New Jersey were to

12   adopt sports gambling there would be more instances of game

13   fixing or that we would lose television revenues or sponsors.

14   Those arguments, your Honor, are irrelevant to the question of

15   standing.  They are also flatly wrong for a number of reasons.

16        First, I think your Honor knows this, those are the

17   very same points that were argued to Congress by the

18   proponents of gambling during the debate on PASPA.  Congress

19   heard all of those arguments that are now being made to you.

20   Congress rejected all of those arguments and found that the

21   sports organizations would be injured by the spread of

22   state-sponsored gambling.  Now, the Defendants disagree with

23   that conclusion.  I understand that.  Maybe they're right,

24   maybe they're wrong.  But a motion for standing, your Honor,

25   is not the occasion to revisit a debate in Congress.  The

─MOTION─

1    Court is bound by the determination of Congress if they're

2    rational.  And if Defendants disagree with the rational

3    conclusions of Congress, if they disagree with the wisdom of

4    the conclusions that underlie PASPA, their remedy is to go

5    back to Congress and not to simply ask you to ignore clear

6    findings of Congress.

7            Another point, your Honor, that I think it's worth

8    raising, if they're right that we can't bring this lawsuit,

9    then that would amount to, or that argument that we can't

10   bring it really amounts to a constitutional challenge to

11   Section 3703 which gives us the right to bring this lawsuit

12   based on Congress's conclusions that if your own games are

13   being used, you have standing.  Now, again, we are not saying

14   that we have standing because Congress gave us a cause of

15   action.  We're not saying that at all.  We're saying Congress

16   gave us a cause of action because they already found we would

17   be harmed.  We would have standing.  So, to us, it is very

18   important to distinguish between the granting of the cause of

19   action and the standing that Congress found we would have.

20   And I think that if you say we have no standing, then I think

21   the Department of Justice is going to be interested to be

22   heard on the question of the constitutionality of 3703.

23           Your Honor, just a few more points.  The argument that

24   if only the State of New Jersey adopts gambling, of course, if

25   New Jersey can adopt gambling in violation of PASPA, 46 states

— MOTION —

1   can adopt it, but even putting that aside, the idea that one

2   single state can't trace our injury to New Jersey, I think we

3   can.  And, again, I think *Markell* answers that question.

4   Because if the single State of Delaware, by its expansion of

5   gambling, would bring about the very ills that PASPA was

6   designed to combat, then I don't think there is really any

7   room to argue here that the same wouldn't be true of the State

8   of New Jersey which is a lot bigger than the State of

9   Delaware.  So I think *Markell* has answered that question on

10  the traceability to New Jersey.

11       Your Honor, again, a few more points.  The state's

12  argument that the record in this case contains no proof that

13  if New Jersey adopts sports gambling, the sports organizations

14  will suffer any economic losses, like a reduction in

15  television revenues or its sponsors.  They seem to think

16  that's the standard we have to meet in order to establish

17  standing.  But arguments about potential economic losses that

18  might or might not be suffered here have nothing to do again

19  with the issue of standing.  Damages and standing are two

20  different things.  You do not have to prove damages to meet

21  your requirement of standing.  In fact, you do not have to

22  show any economic injury at all.  All you have to prove for

23  standing is an identifiable trifle of an injury.  And, again,

24  that is established as a matter of law so long as the sports

25  organizations have a personal stake.

─MOTION─

 1          Your Honor, one more point before I sit down and Mr.

 2     Olson will talk to you.

 3          THE COURT:  This is your third one more point.

 4          MR. MISHKIN:  This is my one final point, for now.

 5          THE COURT:  Okay.

 6          MR. MISHKIN:  Your Honor, after all the words that

 7     have been written by both parties in their briefs about the

 8     question of standing, it is really the actions of the State of

 9     New Jersey itself that speak the loudest and provide, at least

10     we think, the simplest and most eloquent demonstration

11     possible of a harm that everybody recognizes would be caused

12     by the spread of state-sponsored gambling.  In enacting the

13     gambling law, as you know, New Jersey expressly prohibited

14     gambling on the games of its own colleges and on the games of

15     any colleges if those games were being played anywhere in New

16     Jersey.  So, your Honor, it is crystal clear that the State of

17     New Jersey despite what it says in its legal briefs, in the

18     real world, in the real world, it fully understands and admits

19     that state-sponsored gambling on sporting events poses more

20     than enough of a risk to satisfy the requirements of Article

21     III, standing.

22          I'll not make any further "one more point" and --

23          THE COURT:  We'll allow you an opportunity to come

24     back, Mr. Mishkin.

25          MR. MISHKIN:  Thank you very much.

─MOTION─

```
 1        THE COURT:  Mr. Olson, much like I had issues that I
 2  wanted to hear about from the Plaintiffs, I have some concerns
 3  that I'd like to have addressed by the Defendants.  And first
 4  and foremost is, (a), I'd like you to explain how it is that
 5  this Court can reconcile a finding of lack of standing with
 6  the Markell decision.  How it is that Markell plays into this?
 7  And, then, also if the standard is an identifiable trifle, and
 8  if the Doe case is correct that the perception is enough, why
 9  wouldn't the Plaintiffs here have standing if they, in fact,
10  have shown an identifiable trifle that the perception of the
11  integrity of their games might be harmed.
12        And, then, last I'd like to hear the Defendant's
13  position with regard to whether or not PASPA itself confers
14  standing.
15        MR. OLSON:  Thank you, your Honor.  May I make a
16  couple of preliminary points as I get to those.  First of all,
17  it's important to understand what the Plaintiffs say is
18  involved in this case.  They have said in their reply brief
19  several times over that PASPA does not prevent New Jersey from
20  eliminating prohibitions of gambling in the State of New
21  Jersey.  This is set forth on Page 12 and 13 of their reply
22  brief.  And I will quote, Nothing in PASPA necessarily compels
23  states, either implicitly or explicitly, to maintain
24  prohibitions on gambling and the sports organizations, the
25  Plaintiffs, have never claimed otherwise - these are their
```

1   words - PASPA does not prohibit states from simply removing

2   gambling prohibitions.  Therefore, their position isn't that

3   gambling on sports is bad because federal statute permits that

4   in Nevada and in other states, and their position is that New

5   Jersey can allow gambling on sports, as long as they don't

6   affirmatively authorize it or regulate it, that leaves

7   gambling throughout the United States, in New Jersey, in

8   Nevada, and other places the only thing that the New Jersey

9   law does is regulate that which is already taking place

10  illegally.  That which is in the black market will be

11  regulated and subject to control over whose doing it, how

12  they're keeping their books, and that sort of thing.  So, the

13  idea that legalizing the regulation of something that they

14  don't object to in the black market could hurt organized

15  sports is not plausible.  To use the language of the court

16  decisions, It makes no sense at all.  Now, fundamentally, the

17  Supreme Court has said this about standing as it relates to

18  the case for controversy requirement.

19       The Supreme Court has referred - this is a very

20  important thing - and I am getting to the identifiable trifle

21  point.  Because the Supreme Court has said that standing is a

22  bedrock principle, it's an irreducible minimum, the Supreme

23  Court requires strict compliance with standard requirements,

24  and the Supreme Court has said as recently as three years ago,

25  it is a hard floor.

─MOTION─

1        Now, if you do find standing in this case, you then

2   must rule on the constitutional questions that we have raised

3   with respect to whether the Tenth Amendment prohibits a

4   compulsion by the states to do something, to commandeer, so to

5   speak, to use the Supreme Court's words, the legislature of

6   the State of New Jersey.  And what the Supreme Court of the

7   United States said in *Raines v. Byrd,* which is an explicit

8   statute that gave -- purported to give standing to members of

9   Congress to challenge the line-item veto legislation.  It's a

10  case involving a finding by Congress that members of Congress

11  might be injured by the line-item veto possessed by the

12  President and, therefore, could bring suit to challenge it.

13  The Supreme Court said that our standing inquiry has been

14  especially rigorous when reaching the merits of the dispute

15  would free us to decide whether an action taken by one branch

16  of government of the other two branches of the Federal

17  Government was unconstitutional.  So, the Supreme Court has

18  said standing is particularly important in a case like this;

19  because if you do find standing, then you have to address the

20  constitutionality of a federal statute.  So, it enjoins you,

21  as a federal judge at the threshold of this litigation, to be

22  particularly meticulous about whether or not standing exists.

23  And the Supreme Court said in the *Summers* case, *Summers versus*

24  *Earth Island Institute*, It is settled that Congress cannot

25  erase Article III's standing requirements by statutorily

1  granting the right to sue to a Plaintiff who would not

2  otherwise have standing.  And then, Actual injury is a hard

3  floor jurisdiction that cannot be removed by statute.  So, the

4  fact that standing is purported, or a cause of action,

5  actually, because Mr. Mishkin explicitly acknowledges standing

6  and a cause of action are two separate things.  There is a

7  cause of action there but there must be standing.

8      Now, what is standing according to what the Supreme

9  Court has repeatedly said?  The Supreme Court has repeatedly

10  said that it might be a trifle, but it has to be an actual,

11  identifiable, particularized, concrete injury.  There is no

12  substitute for that.  There has to be an actual, identifiable,

13  particularized, concrete injury.  And as you said at the very

14  outset, this is cross-motions for summary judgment with

15  respect to standing.  What the Supreme Court said in the *Lujan*

16  case is that standing must be identified by facts, affidavits

17  of facts or other evidence of facts.  It's not allegations

18  anymore at this stage of the pleading.  So, we must have

19  concrete, particularized facts of actual injury.

20      Now, what is that actual injury?  The Leagues have said

21  that it is the perception of their games.  Well, in the first

22  place perception is not enough.  And the *Doe* case does not go

23  that far.  That particularly was involved with a handicap or a

24  disabled individual.  And the *Simon versus Eastern Kentucky*

25  point specifically addressed that, it was whether or not

—MOTION—

1   hospitals were going to give less than adequate care to

2   certain individuals.  That action was against the Federal

3   Government.  And the Supreme Court addressed that point.

4   Perceptions aren't enough, otherwise, anybody would have

5   standing.  But they did not prove anything about perceptions.

6   Perceptions of individuals with respect to gambling on sports.

7   Since PASPA was passed, 20 some years ago, gambling in Nevada

8   is a three billion dollar industry.  Illegal gambling in the

9   United States is a $380 billion industry, six billion dollars

10  is gambled on the Superbowl, $2.5 billion is gambled on the

11  March Madness, the NCAA tournament, $5 billion is expended in

12  the fantasy gambling that the Leagues virtually all of them

13  sponsor and support.  The growth of the popularity of the NCAA

14  tournament, I think, goes to the plausibility point.

15  Practically everybody in America fills out one of those

16  brackets, including the President of the United States.  Now,

17  there is no proof that he actually gambled on it, but I would

18  wager that he would have a side bet inside the Whitehouse on

19  whether or not he picked the right team or not.  The point is

20  that illegal gambling on the Superbowl has made the Superbowl

21  the most watched event on television in the world.  And the

22  NCAA tournament, I submit, in part because of gambling on

23  those brackets, $5 pools at the office and that sort of thing,

24  has made that tournament immensely popular, increased

25  television revenues.  But whether you believe me or not, I

1    don't have the burden of proof, the Leagues have to prove

2    that, in fact, that gambling, which is taking place all over

3    the place, and they host games in Las Vegas, they host games

4    in England, they host games in Canada, all the places where

5    legal gambling takes place --

6            THE COURT:  But, Mr. Olson, let me stop you there

7    because I'm concerned about that.  The Leagues have submitted,

8    and remember this is a motion for summary judgment, so we

9    really are concerned with whether or not there are undisputed

10   facts.  And the Leagues have submitted as part of their facts

11   that 17 percent of their fans would definitely spend "less

12   money" on a professional sports league if they were to locate

13   a team in Las Vegas, in other words, close to the geographical

14   proximity of legalized gambling.  There is some recognition

15   and some survey and some study and some proofs that they've

16   offered that their fans would spend less money if there were a

17   team located in Las Vegas.

18           MR. OLSON:  Remember what I said at the outset, your

19   Honor, I respectfully submit, they have said in writing, in

20   their reply brief, they're not objecting.  They say that the

21   PASPA statute does not prohibit New Jersey from eliminating

22   prohibitions on gambling on sports.  So, New Jersey could

23   simply erase the prohibitions that do exist and it would be

24   like Nevada, except that it wouldn't be able to have a

25   regulatory agency look at the people who are doing it, look at

─MOTION─

1    their books and so forth.  And so that is not credible,

2    plausible demonstration of injury.  There is not support for

3    that.

4         The Commissioner of the NBA, and we have quoted this in

5    our summations, said gambling is good.  Now, what is the thing

6    that they're objecting to here?  The thing they are objecting

7    to and what they say PASPA stands for, I don't know whether

8    the government would agree or not, but this is what they say

9    and that's the case that's before you now.  They say that

10   PASPA doesn't prohibit elimination of statutes prohibiting

11   gambling.  So, what they are objecting to, the only thing that

12   New Jersey has done that they are objecting to, is to take the

13   dark part of gambling in New Jersey, the people that are doing

14   it illegally -- and if you are worried about fixing games, is

15   someone going to fix a game that's being gambled on illegally

16   or is someone on a game that is subject to gambling that is

17   regulated, supervised, felons aren't permitted to participate

18   in it, the books have to be open, they have to make reports to

19   the authorities that regulate gambling?  So, what they are

20   objecting to, and they must show they are suffering harm from,

21   is the institution of a licensure process and a regulatory

22   process that would take care of watching over the things that

23   people are doing anyway to a tune of $380 billion in the

24   United States.

25        THE COURT:  Mr. Olson, in the Plaintiff's undisputed

─ MOTION ─

1  facts, they have also submitted that the NCAA studies show

2  that 1.5 percent of men's basketball players and 1.6 percent

3  of football players knew of a teammate who took money to play

4  poorly, 1.2 percent of men's basketball players and

5  2.8 percent of the football players provided inside

6  information to outside sources, 2.1 percent of the men's

7  basketball players and 2.3 percent of the football players

8  were asked to affect the outcome of a game because of a

9  gambling debt and 1 percent and 1.4 percent respectively,

10 actually did so.  Now, if we take those facts as true, doesn't

11 this study almost necessarily indicate that somehow or another

12 gambling is going to be injurious to the integrity of the

13 Plaintiffs' games and if not actually, at least to the

14 perception?

15         MR. OLSON:  What they are objecting to, however,

16 those studies don't distinguish between illegal or legal

17 gambling.  I would submit, that those kind of things happen

18 because of illegal gambling.  People are doing things that

19 they don't want other people to see.  They're engaged in

20 individuals with organized crime connections that are

21 participating and creating the market for that $380 billion

22 industry that might cause some people to go astray.  So, what

23 the Leagues are objecting to here is the oversight by

24 government of activities that might conceivably be harmful.

25         Gambling might be harmful, all sorts of other

─MOTION─

1    activities might be harmful, but they have to identify a

2    specific concrete harm that's traceable to the action of the

3    Defendant that they're seeking.

4          What the Supreme Court said in the *Lujan* case is that

5    when the object of the government action is not the Plaintiffs

6    but someone else -- the object of New Jersey's action here is

7    casinos and places where there might be legal gambling.  It's

8    not the Leagues, it's not the games, it is the gambling on the

9    games.  And we keep hearing from the Plaintiffs that they own

10   the games.  There is an appropriation.  In the first place,

11   they don't own the outcome of the games that is broadcast

12   throughout the world, or the scores of the games that are

13   broadcast throughout the world, this Court looked at that in

14   the NFL case versus Delaware that was 30 some years ago, and,

15   specifically, said, You don't own the scores of the games that

16   are publicized in the newspapers.  You can bet -- and by

17   analogy, that's no different than the people with a popcorn

18   stand on the way to the game, or the people that run the tour

19   buses that go to games, or betting on -- these are my words

20   now -- betting on whether someone gets to work on time or

21   betting on the outcome of something else that might happen,

22   you don't own those events.  They can control the games, but

23   they cannot control whether someone would wager on a

24   particular outcome of a game.  This is not an appropriation of

25   a piece of property.  This is something completely different

──MOTION──

```
 1    than that.  And they have not demonstrated that legalized,

 2    supervised, controlled activity, which is already taking

 3    place, would somehow harm them.

 4         Now, the Markell case you specifically asked about, the

 5    Markell case as Mr. Mishkin acknowledged, the Court didn't

 6    consider standing.  He --

 7         THE COURT:  They must have necessarily considered

 8    standing in order to even decide the case, correct?

 9         MR. OLSON:  That's what the Supreme Court has called

10    drive-by jurisdiction.  And the reason why the Supreme Court

11    calls it that is because it is not a precedent when a court

12    should have considered some issue and didn't consider some

13    issue.  It wasn't briefed, it wasn't argued, it wasn't

14    discussed, it wasn't decided.  So, that case might, it might

15    have been argued in that case that there was a question of

16    standing, but it wasn't argued in that case and it is not a

17    precedent for this Court.

18         What is a precedent for this Court, is the United

19    States Supreme Court decisions that require you to find as a

20    matter of fact at the summary judgment stage, proof of actual

21    facts, of actual injury, traceable to the conduct of the

22    Defendant, in this case, New Jersey which is trying to

23    regulate something that is being done underground now, and

24    they know it, and the State of New Jersey is trying to put

25    some sort of a control over it so it will be done open and
```

—MOTION—

1    aboveboard in the air.

2         So, the *Markell* case did not go into that at all.

3    Whether or not the damage might be a penny, it might be $10 or

4    something, that's the identifiable trifle issue, but you have

5    to prove actual injury not -- what the League has basically

6    come back to is we believe that betting is bad, and they may

7    have believed it in 1990 but they're participating in it now

8    to the tune of $5 billion.  That fantasy sports are -- those

9    are actual players and actual constructed teams based upon

10   actual results of actual games.  They're profiting by that

11   themselves.  And Mr. Mishkin's answer to that is, Well,

12   Congress sort of allowed that to go on.  That's not the point.

13   The point is whether or not gambling in that context is

14   hurting their sports.  Even their testimony acknowledges that

15   fantasy sports leagues have grown tremendously.  It has

16   enhanced interest in the games.  People watch television to

17   see how the players on their fantasy teams do on Sunday.  They

18   listen and read reports of that.

19        So, the fact is that standing, this is a very important

20   place here, that the Supreme Court has said is particularly

21   difficult to establish standing when you're objecting to

22   something that you are not the object of.  The casinos are the

23   object, not the Leagues.  They are not the object.  And this

24   hard floor exists in spade, so to speak, it's serious --

25   particularly serious if the Court, once it finds standing, has

—MOTION—

1   to go on and determine a question of the constitutionality of

2   a statute.

3       I submit, there is no evidence that gambling has hurt

4   the sports leagues or their reputation.  All the evidence is

5   contrary to that.  Sports have grown in this country,

6   televised sports have grown.  It is one of the most

7   significant, major industries in this country.  And it has

8   grown along side the growth of gambling, some legal, some not

9   legal.

10      THE COURT:  Mr. Olson, I've looked at, and we have

11  seen the 2009 NBA integrity study and both parties, by way of

12  citation, rely on the veracity of that study.  With that in

13  mind, I'm concerned with whether or not you can genuinely

14  dispute the studies finding that gambling negatively impacts

15  the integrity of the sports, to some extent, even if it is

16  only a trifle.  And that was the ultimate conclusion.

17      MR. OLSON:  Well, they said that study as I have read

18  it, suggested that 15 percent of the people surveyed, and it's

19  not a very scientific survey, it said that 15 percent

20  perceived gambling influence as a reason for officiating

21  errors.  Now, that could have been illegal, probably was,

22  illegal gambling, but they said that 40 percent, 40 percent of

23  the people believed that league office influence, outcome of

24  the games to benefit their business, was a greater concern.

25  Gambling -- there was 12 choices, apparently.  Gambling came

1  in 12th.

2          THE COURT:  Does it matter?  Isn't it enough that it

3  simply made the list to show the trifle?

4          MR. OLSON:  Well, I submit, that isn't a trifle.

5  That is a perception of a -- what is the perception?  That

6  gambling possibly could have affected the outcome of games.  A

7  perception of some people that they surveyed.  You can always

8  find 15 percent of people probably in any survey that will say

9  something like that, but it didn't mean that actually that

10 perception that actually harmed NBA attendance, or people

11 going to games.  And it didn't prove that it was legalized

12 gambling that had that influence.  And it didn't prove that

13 legalizing and regulating gambling -- what New Jersey is

14 trying to do is already taking place.  The 15 percent of those

15 people would be, I submit, and this is a matter of

16 plausibility, the evidence has to be plausible, would the

17 15 percent of those people that say, I'm a little concerned

18 about gambling on the scores of the game, I'm much more

19 worried about the League management, but -- and gambling is

20 12, but I might say that maybe 15 percent of the people might

21 say, I'm a little bit concerned about that.  But that has to

22 be traceable to harm.  That has to be traced to

23 state-sanctioned gambling, which it wasn't, and then has to be

24 sanctioned to actual harm at the box office or television

25 receipts.  It isn't connected.

─MOTION─

```
 1          THE COURT:  Is harm necessarily only tied to some
 2   kind of pecuniary gain or some kind of revenue boost?  Cannot
 3   the integrity of the actual game be sufficient enough to be
 4   injured?
 5          MR. OLSON:  I submit that all of the Supreme Court
 6   cases that talk about concrete injury, particularized injury,
 7   actual harm, provable injury, aren't -- you would not be able
 8   to satisfy that by saying some people perceive something
 9   happened.  And whether they perceive it or not, has it hurt
10   the sports?  Has it hurt the games?  Has it hurt their
11   popularity?  Has it hurt their attendance?  Has it hurt
12   television receipts?  None of that evidence exists.
13          So, some people are going to perceive sports in a bad
14   way no matter what.  Some people perceive sports in a bad way
15   because of the pay that is given to football coaches.  Some
16   people perceive sports in a bad way because of concussions.
17   There are lots of reasons why people might perceive sports in
18   a bad way, but professional and amateur sports in this country
19   are doing very, very well.  Their success is almost
20   unprecedented.  And to the extent that there is gambling that
21   is a concern, it hasn't been tied to state-sanctioned
22   gambling, and it hasn't been tied to gambling that is already
23   otherwise illegal that's taking place which they say PASPA
24   doesn't stop.  They keep saying -- they made it very clear,
25   the reason they did this, I submit, is because they wanted to
```

 1  avoid the commandeering problem, the Tenth Amendment problem.

 2  So, they're saying that PASPA doesn't require states to do

 3  anything.  So, what New Jersey has done is, according to their

 4  theory, they could eliminate all prohibitions on gambling in

 5  New Jersey.  Gambling would go on and flourish in New Jersey,

 6  and according to their contentions, PASPA wouldn't do it.  But

 7  what they're complaining about is the shining sunlight on the

 8  activity that already exists about which they can't complain.

 9  And they cannot, they cannot, and have not attempted to show

10  that oversight by state-created government agencies licensing

11  that requires qualifications to engage in the business, that

12  requires open books, which by the way, Nevada has, Nevada has

13  this process.  And the Leagues work with the casinos and so

14  forth and it's in the evidence.  The casinos work with the

15  Leagues in Nevada because if someone -- all of a sudden, there

16  is a big shift in the odds, or some unusual betting pattern or

17  something like that, that might suggest some unlawful

18  activity.  They can do that with Nevada which legalizes the

19  activity.  They can't do that in New Jersey.  They can't do

20  that in New York or Louisiana because it's illegal.  It's

21  behind closed doors.  It's organized crime.

22       But what New Jersey is trying to do is this resource

23  that's taking place now, people betting on games, and it's a

24  healthy activity, and the NCAA bracket things and the

25  Superbowl games and that sort of thing, there is revenue going

—MOTION—

```
 1   outside the state, it's either going to New York or it's going

 2   into the hands of organized crime; and what we want, the

 3   citizens of New Jersey want, we want to make sure it's clean.

 4   We want to make sure that it's regulated.  We want to receive

 5   the revenue that's going elsewhere with respect to taxation or

 6   into the hands and pockets of gangsters.  That's all New

 7   Jersey is trying to do.  That's all that they have done.  That

 8   is the only thing that the Leagues can object to.  And they

 9   cannot, they cannot even begin to show that there is harm as a

10   result of that oversight.  And that's what this case is all

11   about.

12          THE COURT:  And just so that we're clear, you don't

13   believe that the *Doe* case stands for the fact that a

14   perception is enough of an area in which you can show an

15   injury?

16          MR. OLSON:  In a particular situation such as that,

17   perhaps, it can be the case, but that's over -- that's a

18   specific situation where someone's -- a perception of whether

19   someone is not capable of doing a job.  Or someone's got some

20   sort of disability that affects their ability to earn a

21   livelihood or something like that.  Yes, that's entirely

22   possible.  But that's not this case at all.  There is not a

23   tie in with the -- even if the perception was proven, which I

24   don't submit it is, the perception that 15 people believe

25   something is not kind of a perception of actual harm to the
```

—MOTION—

1   entire industry who is seeing that.  But to the extent that

2   there is an actual perception on a specific case, I would

3   submit that the *Simon versus Eastern Kentucky* case

4   demonstrates the context in which that's considered.  And it

5   has to be considered in the connection with the case where the

6   standing issue is a precedent to a decision on the

7   constitutionality of a statute.  The Court needs to avoid

8   that.  And to look very, very carefully at standing.  Unless

9   it's really shown, then you can't go forward to decide the

10  constitutionality of a statute which would otherwise be

11  required.  And it's particularly difficult, the Supreme Court

12  said, in a case where the object of the regulation is not the

13  Plaintiffs, what the Plaintiffs are complaining about what

14  other people might do, what other people might perceive,

15  what -- how other people might react.  I submit, that this is

16  a case where the question of standing, it isn't close.  And

17  the statute doesn't create it.  And opinions of the League

18  Commissioners and so forth that testified before Congress,

19  it's just their opinions.  And it's 20 years old.  And it

20  didn't amount to findings.

21        The Supreme Court in the *Morrison* case, Violence

22  Against Women Act's case said, Even actual findings of

23  Congress does not substitute for the judicial responsibility

24  to determine whether Congress is taking place in that case or,

25  in this case, I would submit, by parallel, standing is taking

1    place.  Even actual findings, which is essentially what the

2    *Raines* case was.  Members of Congress wanted their members to

3    be able to attack and challenge and bring a court case against

4    the line-item veto.  They thought this is another case about

5    perception.  Members of Congress really felt that they were

6    disadvantaged vis-a-vis the President, the executive branch,

7    by line-item veto, and they were.  They can't pass thousand

8    page pieces of legislation, all the various pieces of part in

9    it, if the President can reach out and line-item veto those

10   particular things.  So their leverage, members of Congress's

11   leverage in the legislative activity was actually impaired

12   vis-a-vis the executive branch by the line-item veto.  But the

13   Supreme Court made it very clear, Congress cannot grant

14   standing to particular parties and it can't create harm where

15   actual, concrete, particularized harm exists.  The perception

16   of harm or the fact that there was less leverage would not do

17   it.  And that's a relatively recent decision of the Supreme

18   Court.  And it's not unlike the *Summer versus Earth Island*

19   *Institute* case where the Supreme Court said it again, and it

20   said it in the *Lujan* case, because we create a cause of

21   action, doesn't create standing and it doesn't create harm.

22   You have to come into court with facts, prove the harm.  The

23   Leagues have not done that here.  It's not even a close case

24   on standing, we submit.

25            THE COURT:  Thank you, Mr. Olson.

—MOTION—

1          Let me hear from Mr. Mishkin again.  And, Mr. Olson,

2    you'll have the last word.

3          MR. MISHKIN:  Thank you.

4          Your Honor, I agree with Mr. Olson, this is not a close

5    case on standing, but we apparently are approaching that issue

6    of closeness from very different perspectives.

7          The notion, your Honor, that legalizing gambling is

8    somehow good for these Leagues but that they're not quite

9    smart enough to see that it's good for them, is a point that

10   is sort of difficult for us to understand.  Every

11   Commissioner, and we're not talking 20 years ago now, we're

12   talking two weeks ago when the depositions were taken and all

13   the 30(b)(6) witnesses as well, every single Commissioner

14   explained why legalizing gambling in New Jersey would be bad

15   for their sports.  They were very concerned about it.

16         Now, if the Defendants ever become a commissioner of a

17   league, they can choose -- that's up to them, they can choose

18   to have all kinds of legal gambling on sports.  And they would

19   be the first commissioners in history to think that that did

20   not have a negative impact or a serious concern about the

21   negative impact that that would have.

22         A few specific points I do want to address --

23         THE COURT:  And I also want you to throw in there,

24   I'd like to hear your response to Mr. Olson's point that

25   *Markell* is not binding on the issue of standing because the

—MOTION—

1    Court didn't address it head-on, as well as this whole notion

2    that perception isn't enough and that it must be something

3    more than that and somehow or another tying in the fact that

4    the Leagues almost agree universally that they have seen a

5    boost in revenues throughout the years despite there being

6    legal gambling as well as illegal gambling for the teams to

7    persist.

8              MR. MISHKIN:  Well, let me talk about this

9    legal-illegal because a big point was made of it, your Honor.

10   The claim that PASPA does not prevent New Jersey from

11   eliminating prohibitions, that's exactly right.  That's what

12   happened in this case.  The case started with the Constitution

13   of New Jersey which prohibited gambling, that was eliminated.

14   We didn't bring a lawsuit about that.  We brought a lawsuit

15   when the State of New Jersey decided to violate PASPA to

16   sponsor, to authorize, to license.  That's what's happening

17   here.  This is not a case about the absence of any action by

18   the state.  The state has taken action in an area where

19   Congress has preempted that action.  So, this is not the case

20   where New Jersey is free to do nothing.

21             Mr. Olson says, Oh, what New Jersey has done here is

22   they simply regulated illegal gambling.  They haven't done

23   that at all, your Honor.  The record before Congress, and the

24   record in the National Gambling Impact Study said, legalizing

25   gambling does not regulate illegal gambling, it fuels illegal

─ MOTION ─

 1   gambling, it creates more illegal gambling because legal

 2   gambling can never hope to compete with illegal gambling.  All

 3   you're going to do, all the testimony uncontradicted before

 4   Congress is you're going to create a whole new category of

 5   gamblers.  Once you tell them, Gambling is good, gambling is

 6   something that the state promotes, authorizes, and licenses,

 7   they will come to the casinos, and then they will find out,

 8   for example, they can get better odds with the illegal bookie.

 9   They can get credit with the illegal bookie that they can't

10   get from the casinos.  Their earnings are not going to be

11   reported if they go to the illegal bookie so they have got

12   tax-free earnings.  There are all kinds of advantages that the

13   illegal market, that's why it is so big, has.  And, again, the

14   studies will show you that New Jersey is not going to be

15   regulating illegal gambling.  It's going to be creating more

16   illegal gambling.  That's one of our concerns, and has always

17   been a concern.  And it is well founded, based on what law

18   enforcement told Congress, and based on what the National

19   Gambling Institute Study found.

20          Now, *Markell*, your Honor, the fact that *Markell* did not

21   find it necessary to address standing, even though the State

22   of Delaware was making, I was in that case, every single

23   argument about harm: you have no proof, it's good for you, you

24   are doing well, the issue of standing -- now, why the State of

25   Delaware did not use those words, I can only tell you I don't

1  think they believe there was any possible merit to the

2  argument that there was no identifiable trifle of an interest

3  on the part of the Leagues.  And Mr. Olson and I are debating

4  what drive-by means.  Yes, I think a court can on occasion

5  simply not pay much attention to an issue.  In *Markell*, the

6  question of jurisdiction was front and center.  They were

7  focused on a number of jurisdictional issues.  And we all know

8  that Article III has to be one of those issues.  The fact that

9  they did not separately devote themselves to that, I think,

10  suggests in this case, not that it was a drive-by, but that it

11  was obvious that everybody understood that there was standing.

12  And, of course, the Court couldn't have proceeded to enter the

13  judgment that it did unless there was Article III standing.

14  And, again, the Third Circuit repeatedly said that we have to

15  examine our power.  And the issue of jurisdiction was there,

16  and they went ahead and issued the judgment in *Markell,* again,

17  I submit, because it was obvious.

18       The *Raines* case.  This is interesting.  Your Honor has

19  permitted, through intervention, two legislators to be here in

20  the horse racing industry.  The Supreme Court found that the

21  legislators in the *Raines* case did not have standing, because

22  they didn't have a personal stake.  They were only sued in

23  their representative capacities.  And there was no personal

24  interest in *Raines*.  It is just a bit ironic, your Honor, that

25  the Horsemen's Association has enough interest in whether our

─MOTION─

1   games are bet on, but we don't have enough interest in that.

2   I just, I think, again, the *Raines* case is of no help here.

3   Because what the courts found there was Congress simply

4   overlooked, they gave the legislators a cause of action, but

5   did not -- there wasn't enough of a personal stake to support

6   that cause of action.  Here, you have the opposite action by

7   Congress.  In creating the cause of action, Congress

8   distinguished in our case between the cause of action and the

9   people who would have standing; and in Congress's view so long

10  as your games were being used, you would have enough of an

11  interest to have standing.  Now, the idea that the *Lujan* case

12  is highly relevant here, it is highly relevant on the point

13  that Mr. Olson and I are seriously disagreeing about.  The

14  Supreme Court did say that if you are the object of a

15  challenged action, you would have standing.  We are the

16  object.  Our games are being used --

17          THE COURT:  What about Mr. Olson's point that you

18  don't own the outcomes of the games?  You don't own the scores

19  that show up in the newspapers on Monday morning?

20          MR. MISHKIN:  I'm not making an intellectual property

21  point, your Honor.  I'm making a point of who produces those

22  games?  Who spends money producing those games; and,

23  therefore, has a concern about how people view those games.

24  How people perceive those games.  It's not about who owns the

25  scores.  It's about whether or not making use of our games

1    which are now not made use of and have not been made use of in

2    the history of New Jersey but now they are.  They are the

3    basis for gambling.  So that our games are now associated with

4    gambling.  It's not a question of who owns the scores, your

5    Honor.  There is no question that we produce the games.

6    Without our activity and investment, there wouldn't be those

7    games for anybody to bet on.  And that's enough, your Honor.

8         The point of standing, generally -- and *Lujan* I think

9    is a very good example of it, the statute in *Lujan* was the

10   Endangered Species Act protecting elephants in Sri Lanka.  The

11   Plaintiffs in *Lujan* were not the elephants.  The Plaintiffs in

12   Lujan was an organization of the Defenders of Wildlife and

13   some of their members who wanted to bring an action.  And

14   *Lujan* said, Well, you're not the object.  The statute is not

15   related to you directly.  In our case, we are the direct

16   object of New Jersey's gambling law.  They are now taking bets

17   on the games that we produce.  And I think that the idea that

18   we are not the object, I would disagree with that as a matter

19   of fact.  That it is our games that are being used in a way

20   that we don't want them used.

21        Now, the question of perception being enough, it

22   certainly was enough to the Third Circuit in *Doe* --

23        THE COURT:  Well, Mr. Olson disagrees with the

24   reading of *Doe*.  And he's saying that in that unusual case

25   perception can be enough but here we're talking about a

1   concrete, particularized harm, that it's almost always tied to

2   some kind of damages or dollar amount or pecuniary harm.

3       MR. MISHKIN:  Right, but not there.  In *Doe*, the only

4   question was, he was concerned about how people would perceive

5   him.  Here, we're concerned about how our fans, who pay money,

6   who we don't want to turn off certain fans and not turn off

7   others, we have -- again, the study that is in the record, and

8   in our brief, it's something like 38 percent of our fans

9   expressly oppose legalized gambling.  Well, we want to appeal

10   to those fans.  And we -- and so perceptions, not if they're

11   generalized, your Honor, but it's a particular concern here

12   about how our fans will view our games.  The issue is not

13   whether perception is a possible basis or not, it's the

14   reasonableness of the perception and whether or not the people

15   who are concerned about that perception have a reasonable

16   basis.

17       Mr. Doe, the Court and the Third Circuit found, had a

18   reasonable basis that people might perceive him differently if

19   they knew that he was disabled.  And, here, you've got all the

20   Commissioners, the people who are the most knowledgeable about

21   their sports and who have the most at stake, who have the

22   responsibility, whose businesses it is, unanimously, not just

23   in the last two weeks in their depositions, but, historically,

24   over decades, saying the same thing: legalized gambling is

25   going to hurt our relationship with our fans.  We don't want

—MOTION—

1    to be associated with it.  That is not unreasonable.  And

2    certainly Congress, your Honor, in reaching that conclusion,

3    and it doesn't matter that it was 20 years ago, I'm not aware

4    of any principle of law that you can ignore a statute or

5    congressional findings because they're old, if they haven't

6    been changed by Congress.  And they have not yet been changed

7    by Congress.

8         Congress, after creating a lengthy record, decided we

9    would be harmed and that all of those perceptions by the

10   Commissioners, and knowledgeable people, who have the

11   responsibility for running these businesses, that was a

12   reasonable perception.  And when Congress found that we were

13   harmed then the issue for you only becomes, Well, was that a

14   rational determination by Congress, because we believe you are

15   bound by the rational determinations of Congress.  And they

16   found we would be harmed if New Jersey does exactly what it is

17   purporting to do.  And, again, read *Markell* on that, because

18   the expansion of gambling in Delaware was found to engender

19   the very harm that PASPA was enacted to prevent.

20        Thank you very much.

21           THE COURT:  Thank you.  Mr. Olson.

22           MR. OLSON:  Thank you, your Honor.

23        And I think I speak for both of us when I thank you for

24   your time and the attention that you've put into this.  This

25   is an interesting case.  And we both appreciate, I'm sure, the

─MOTION─

 1  fact that you have looked at everything that we have submitted

 2  so carefully.

 3      Mr. Mishkin said something about legalizing the

 4  activity would cause more illegal activity.  This is an

 5  argument that was not made in the briefs, and I really don't

 6  know how to deal with it.  We're talking about a $380 billion

 7  illegal industry as it exists.  We're talking about legalized

 8  fantasy sports betting that the Defendants themselves engage

 9  in, in order to encourage their fans to have more interest in

10  the game.  We're talking about a multi-billion dollar industry

11  in Nevada where it is legal.  And we're not talking about

12  whether or not to legalize something in this case, because as

13  I said before, the Plaintiffs specifically say Defendants err

14  in arguing that PASPA mandates that states maintain a ban on

15  sports betting or require states to enact laws to prohibit

16  sports betting.  They specifically say that allowing it to

17  take place in New Jersey without the hand of the law is not

18  what PASPA is all about.  So, what we're talking about in this

19  case is not legalizing something, we're talking about

20  regulating it.  That's what New Jersey is doing, at least, in

21  the Plaintiff's view is what PASPA is all about, having a

22  regulatory regime.  And they cannot establish that having a

23  regulatory regime is going to cause people to run out and go

24  to illegal gambling and that sort of thing.  There is no

25  evidence of that.  And it's an assertion that is relatively

─MOTION─

1    new, starting today.  Is perception reality?  If it is, there

2    would never be what the Supreme Court says a need for a

3    concrete, particularized, hard floor, actual injury.  Those

4    are words that the Supreme Court says over and over again.

5    Irreducible minimum.  If someone can come in and say, Five

6    people think that that's bad, or I've done a study of

7    everybody walking down the street and 25 percent of the people

8    think that there shouldn't be buildings next to seashores, or

9    something like that, or logging in federal forests.

10           THE COURT:  Mr. Olson, it's not that light.  Didn't

11   the Court in *Doe* say that it is perception based in reality?

12           MR. OLSON:  A perception based in reality where an

13   individual can demonstrate that I was seen in this way.  I

14   might not get a job.  Or I might not be allowed to have

15   certain things.  That may be one thing.  Where it's

16   demonstrable, actual, and there is traceable, traceable to the

17   conduct of the Defendant.  The Sierra Club would never lose a

18   case if perception was all up to it, because everybody in

19   America would say, Those national parks should be pristine,

20   there shouldn't be logging roads on them, and all that sort of

21   thing.  That would be a dream for those organizations.  And

22   they're great organizations.  They're doing good.  But the

23   Supreme Court says we have got to abide by Article III.  We

24   have to have a case for controversy.  There has to be some

25   specific harm or people will come into court seeking advisory

1  opinions.  We don't do that in the federal judiciary.  And so

2  we have to have something that is actual, specific and

3  redressable and attributable to what the Defendants are doing.

4      We had an argument here today about whether or not the

5  Leagues are the object of this legislation.  The object of

6  this legislation is to put in place a regulatory regime over

7  casinos or gambling.  We're not regulating the games.  The

8  State of New Jersey does not want to diminish the games.

9  Those are the games that people will bet on legally with

10  supervision and will generate revenue for the State of New

11  Jersey.  The object of the legislation is to regulate the

12  casinos.  The games are going to go on, the scores are going

13  to be the scores and that sort of thing.  So, perception is

14  not enough to cut it, except, I acknowledge, there could be

15  extraordinary circumstances.  But reading what the Supreme

16  Court said in *Summers versus Earth Island Institute* where they

17  were concerned about permits for burning certain, already

18  burned, small pieces of federal land, the perception would

19  have overcome that easily.  The Supreme Court said, No, it's a

20  hard floor, that's the word in that case.  The *Lujan* case

21  talked about specifically distinguished statutes to give

22  someone a procedural right, a right to hearing, a right to

23  object to something as its taking place.  And *Lujan*

24  distinguished that case from those other cases where there

25  might have been a procedural right.  We're not talking about a

─MOTION─

 1   procedural right here.  We're talking about an alleged

 2   substantive right to be free of regulated industry that

 3   already exists.

 4        And, finally, with respect to PASPA, we kept hearing

 5   the word "findings."  There are not findings in PASPA.  It

 6   takes, as you know, one and a half pages in the federal

 7   statute, there are no findings there at all.

 8        What the Plaintiffs are referring to is a committee

 9   report that regurgitates some of the allegations that the

10   Plaintiffs were making.  Yes, they wanted this legislation.

11   I'm not positive that things might not change.  And we're not

12   saying that anything has changed from the statute over a

13   period of time, but Congress cannot create standing where it

14   doesn't otherwise exist.  And standing requires harm.  The

15   actual concern about that might have been different when this

16   statute was passed than what the record demonstrates here

17   today that the existence of state-authorized,

18   state-sanctioned, state-regulated gambling would somehow hurt

19   the Leagues.  They haven't done that.  And that would not --

20   what they have done, and the assertions that somehow if state

21   controls what already exists, is going to somehow hurt the

22   Leagues or the NFL or the NBA or NCAA, they have not

23   demonstrated that.  And this is a motion for summary judgment.

24   They have the burden.  It is a significant burden.  It might

25   require only a small amount of harm, but it is a

─MOTION─

1  particularized, concrete, actual harm that they must

2  demonstrate.  And harm in ether, harm in the perception, harm

3  because some people think gamblers are bad.  Lots of people

4  think gambling is bad, but that doesn't prove actual concrete,

5  particularized harm required for Article III requirements.

6  The statute can't create it, the statute didn't create it.

7  And even if there were findings, the Supreme Court said in the

8  Morrison case, simply because Congress said it is so, does not

9  make it so.  It is Article III judge's responsibility to find

10  that as actual fact.  And in standing context, it's

11  particularly important where the background concern is whether

12  or not the statute is legal itself, because otherwise you will

13  be required to deal with whether or not Congress violated the

14  Tenth Amendment when it passed the statute, if the Plaintiffs

15  can't prove that they're entitled to be in court to do that

16  you don't and should not go forward to that step.  That's why

17  the standard, the threshold is particularly high in this

18  context.

19       We submit, that the Leagues may not want New Jersey to

20  do this for whatever reasons they might be, but we're talking

21  about an effort by New Jersey to take and put a level of

22  legality and regulation and scrutiny over activities that are

23  taking the resources of their citizens and sending them either

24  to Nevada or into the pockets of organized crime.  Unless they

25  demonstrate that will hurt them, which they have not done,

—MOTION—

```
 1   they may not bring this case.

 2           THE COURT:  Okay.  Thank you very much.

 3       Counsel, thank you so much for the oral argument that

 4   you've presented here today.  I'm going to take a very short

 5   recess and take a quick look over my notes.  If you folks can

 6   stay put, I will be back on the record momentarily.

 7           THE DEPUTY COURT CLERK:  All rise.

 8           (Short recess is taken.)

 9           THE DEPUTY COURT CLERK:  All rise.

10           THE COURT:  Please be seated.

11       Well, counsel, thank you again for the robust

12   discussion as it relates to the standing issue.  We've had an

13   opportunity to take a look at the arguments that have been

14   made, I've looked over my notes.  I think you folks have

15   sufficiently covered the point.  I believe that this is the

16   kind of decision that warrants a written decision, so I will

17   have a written decision out for you by Friday of this week.  I

18   thank you very much.  Have a great day.

19           MR. MISHKIN:  Thank you very much.

20           MR. OLSON:  Thank you your Honor.

21           THE DEPUTY COURT CLERK:  All rise.

22       (Proceeding is concluded for the day.)

23

24   *       *       *       *       *       *       *       *

25
```