## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
|  |  :  |
| NATIONAL COLLEGIATE ATHLETIC | : |
| ASSOCIATION, et al., | : |

|  | : |
| Plaintiffs, | : |
|  | : |
| v. | : | Civil Action No. 12-4947 (MAS) (LHG)
|  | : |
| CHRISTOPHER J. CHRISTIE, | : | **OPINION**
| et al., | : |
|  | : |
| Defendants. | : |
_____ :

### SHIPP, District Judge

This matter comes before the Court upon several motions filed by the Parties. The National Collegiate Athletic Association ("NCAA"), National Basketball Association ("NBA"), National Football League ("NFL"), National Hockey League ("NHL"), and Office of the Commissioner of Baseball doing business as Major League Baseball ("MLB") (collectively, "Plaintiffs" or "the Leagues") filed their Complaint on August 7, 2012. (Compl., ECF No. 1.) On August 10, 2012, Plaintiffs filed a "Motion for Summary Judgment and, If Necessary to Preserve the Status Quo, a Preliminary Injunction" seeking to enjoin Defendants Christopher J. Christie, Governor of the State of New Jersey, David L. Rebuck, Director of the New Jersey Division of Gaming Enforcement and Assistant Attorney General of the State of New Jersey, and Frank Zanzuccki, Executive Director of the New Jersey Racing Commission (collectively, "Defendants" or the "State"), from implementing N.J. Stat. Ann. 5:12A-1, *et seq.* (2012) ("New Jersey's Sports Wagering Law" or "Sports Wagering Law"). (Pls.' Br., ECF No. 10-2.) On November 21, 2012, Defendants filed a Cross Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment. (Defs.' Br., ECF No. 76-1.) Defendants' Cross

Motion challenged the constitutionality of the Professional and Amateur Sports Protection Act ("PASPA"), 28 U.S.C. § 3701, *et seq.* On November 21, 2012, the New Jersey Thoroughbred Horsemen's Association, Inc. ("NJTHA"), and Sheila Oliver and Stephen Sweeney ("Legislative Intervenors") filed Motions to Intervene, which included opposition to Plaintiffs' Summary Judgment Motion. (NJTHA's Mot. to Intervene, ECF No. 72; Legislative Intervenors' Mot. to Intervene, ECF No. 75.) NJTHA's and the Legislative Intervenors' Motions to Intervene were subsequently granted on December 11, 2012. (ECF No. 102.)[1]

On November 27, 2012, the Court entered an Order Certifying Notice of a Constitutional Challenge to the United States Attorney General. (ECF No. 84.) The Leagues filed a Reply in support of their Motion for Summary Judgment, as well as Opposition to Defendants' Cross Motion, on December 7, 2012. (Pls.' Reply & Opp'n, ECF No. 95.) That submission included a request for a permanent injunction. (*Id*. at 20.)

On January 22, 2013, the United States filed a Notice of Intervention. (ECF No. 128.) On the same date, the Court entered an Order granting the Department of Justice ("DOJ") leave to file a brief regarding the constitutionality of PASPA. (ECF No. 129.) The DOJ filed its brief on February 1, 2013. (DOJ's Br., ECF No. 136.) On February 8, 2013, NJTHA, Legislative Intervenors, and Defendants filed additional submissions in response to the DOJ's brief. (NJTHA's Reply to DOJ, ECF No. 138) (Legislative Int.'s Reply to DOJ, ECF No. 139) (Defs.' Reply to DOJ, ECF No. 140.)

The Court heard oral argument on the Cross Motions for Summary Judgment on February 14, 2013. (ECF No. 141.)

---

[1] After the Court granted leave to intervene, NJTHA's Opposition Brief was docketed separately. (NJTHA's Opp'n Br., ECF 108.) Legislative Intervenors did not file a separate brief as to constitutionality but included arguments in their Motion to Intervene. (Legislative Br., ECF No. 75-1.)

The Court, having considered the Parties' submissions, for the reasons stated below, and for other good cause shown, finds that Plaintiffs are entitled to summary judgment and a permanent injunction.

## I.      Summary of the Court's Opinion

This case requires the Court to determine whether an act of Congress is unconstitutional because it purportedly violates New Jersey's sovereign rights. After careful consideration, the Court has determined that Congress acted within its powers and the statute in question does not violate the United States Constitution.

Congress, pursuant to an 88-5 vote in the Senate and with the vocal support of one of New Jersey's own Senators,[2] enacted PASPA in 1992 to stop the spread of gambling on professional and amateur sports. To that end, PASPA made it unlawful for States to authorize a sports wagering system. PASPA included a grandfather clause which exempted states with preexisting sports wagering laws. PASPA also granted New Jersey a one year window to legalize wagering on sports. New Jersey did not exercise that option. Over twenty years later, however, New Jersey amended its state constitution and passed a law authorizing gambling on sports. That law directly conflicts with PASPA.

Professional and amateur sports leagues sued the Governor of New Jersey and other State officials to prevent the implementation of New Jersey's Sports Wagering Law. The State, and other Defendants who intervened in the case, argue that PASPA violates the federal Constitution and cannot be used by the Leagues to prevent the implementation of legalized sports wagering. The Leagues disagree. If Defendants are correct, they will be permitted to enact their proposed

---

[2] *See* U.S. Senate Roll Call Votes, http://www.senate.gov/legislative/LIS/roll_call_lists/roll_call_vote_cfm.cfm?congress=102&session=2&vote=00111.

sports wagering scheme. If they are not, Defendants will be prohibited from enacting sports wagering in New Jersey because PASPA is a federal law which overrides New Jersey's law.

This case presents several issues. Specifically, it is alleged that PASPA violates: 1) the Commerce Clause; 2) the Tenth Amendment; 3) the Due Process Clause and Equal Protection Principles; and 4) the Equal Footing Doctrine. The Court begins its analysis of these issues with the time-honored presumption that PASPA, enacted by a co-equal branch of government, is constitutional. Moreover, the Court is required to adopt an interpretation that would deem the statute constitutional so long as that reading is reasonable. Pursuant to this mandate, the Court has determined that PASPA is a reasonable expression of Congress' powers and is therefore constitutional.

First, PASPA is a rational expression of Congress' powers under the Commerce Clause. The fact that PASPA allows legalized sports wagering to continue in those states where it was lawful at the time of its enactment does not deprive the statute of constitutionality because Supreme Court precedent permits "grandfathering."  Second, PASPA does not violate the Tenth Amendment because it does not force New Jersey to take any legislative, executive or regulatory action. PASPA also does not raise the political accountability concerns outlined by the Supreme Court's Tenth Amendment jurisprudence. Third, regarding Defendants' additional allegations, the Court has determined that Congress had a rational basis to enact PASPA in the manner it chose.

Although some of the questions raised in this case are novel, judicial intervention is generally unwarranted no matter how unwise a court considers a policy decision of the legislative branch. As such, to the extent the people of New Jersey disagree with PASPA, their

remedy is not through passage of a state law or through the judiciary, but through the repeal or amendment of PASPA in Congress.

## II.  <u>Background</u>

Congress enacted PASPA in 1992 to prevent the spread of state-sponsored sports gambling and to protect the integrity of professional and amateur sports. S. Rep. No. 102-248, at 4 (1992), *reprinted in* 1992 U.S.C.C.A.N. 3553, 3555. PASPA renders it unlawful for:

> (1) a governmental entity to sponsor, operate, advertise, promote, license, or authorize by law or compact, or

> (2) a person to sponsor, operate, advertise, or promote, pursuant to the law or compact of a governmental entity,

> a lottery, sweepstakes, or other betting, gambling, or wagering scheme based, directly or indirectly (through the use of geographical references or otherwise), on one or more competitive games in which amateur or professional athletes participate, or are intended to participate, or on one or more performances of such athletes in such games.

28 U.S.C. § 3702.

In considering PASPA, the Senate Judiciary Committee stated, "[a]lthough the committee firmly believes that all such sports gambling is harmful, it has no wish to apply this new prohibition retroactively . . .  or to prohibit lawful sports gambling schemes . . . that were in operation when the legislation was introduced." S. Rep. No. 102-248, at 8, *reprinted in* 1992 U.S.C.C.A.N. 3553, 3559. Accordingly, PASPA provided the following exceptions:

> (a)  Section 3702 shall not apply to--

> (1) a lottery, sweepstakes, or other betting, gambling, or wagering scheme in operation in a State or other governmental entity, to the extent that the scheme was conducted by that State or other governmental entity at any time during the period beginning January 1, 1976, and ending August 31, 1990;

> (2) a lottery, sweepstakes, or other betting, gambling, or wagering scheme in operation in a State or other governmental entity where both--

> > (A) such scheme was authorized by a statute as in effect on October 2, 1991; and
> >
> > (B) a scheme described in section 3702 . . . actually was conducted . . . at any time during the period beginning September 1, 1989, and ending October 2, 1991, pursuant to the law of that State or other governmental entity;
>
> > (3) a betting, gambling, or wagering scheme . . . conducted exclusively in casinos located in a municipality, but only to the extent that--
>
> > > (A) such scheme or a similar scheme was authorized, not later than one year after the effective date of this chapter, to be operated in that municipality; and
> > >
> > > (B) any commercial casino gaming scheme was in operation in such municipality throughout the 10-year period ending on such effective date pursuant to a comprehensive system of State regulation . . . .
>
> > . . . .

28 U.S.C. § 3704.

PASPA's "grandfather clause" resulted in exceptions for four states: Delaware, Oregon, Montana and Nevada. Additionally, New Jersey was the only state qualified to establish sports gambling within the one-year period outlined in § 3704(a)(3). New Jersey chose not to exercise that opportunity.

Two decades later, on January 17, 2012, New Jersey enacted the Sports Wagering Law. It allows casinos, among other entities, to "operate a sports pool" and apply for "a license to operate a sports pool." N.J. Stat. Ann. § 5:12A-2(a). On October 15, 2012, New Jersey promulgated regulations (the "Regulations") pursuant to the Sports Wagering Law. N.J. Admin. Code § 13:69N-1.11, *et seq.* The Sports Wagering Law and Regulations reflect New Jersey's intention to sponsor, operate, advertise, promote, license and/or authorize sports gambling. The Leagues assert that New Jersey enacted the Sports Wagering Law in violation of the clear

mandates of PASPA, and therefore, in violation of the Supremacy Clause of the United States Constitution. U.S. Const. art. VI., cl. 2 ("[T]he Laws of the United States . . . shall be the supreme law of the land."). Defendants and Defendant-Intervenors argue, in sum, that PASPA is unconstitutional.

As drafted, the two statutory regimes cannot co-exist. Accordingly, if PASPA is held to be constitutional, then the Sports Wagering Law must be stricken as preempted by the Supremacy Clause. Conversely, if this Court finds PASPA unconstitutional, it must be invalidated and the New Jersey Sports Wagering Law may be implemented.

In the twenty plus year history of PASPA, three challenges have been lodged against its provisions. One lawsuit, which involved NJTHA and a New Jersey State Senator, challenged but did not reach the constitutionality of PASPA. *See Interactive Media Entm't & Gaming Ass'n, Inc. v. Holder*, 09-1301 (GEB), 2011 WL 802106 (D.N.J. Mar. 7, 2011). In addition, a *pro se* litigant lodged a Tenth Amendment challenge against PASPA which was resolved without reaching the merits of the constitutionality argument. *See Flagler v. U.S. Attorney for Dist. of N.J.*, 06-3699 (JAG), 2007 WL 2814657 (D.N.J. Sept. 25, 2007).

In 2009, the Third Circuit Court of Appeals had the opportunity to consider PASPA in *Office of the Commissioner of Baseball v. Markell*, 579 F.3d 293 (3d Cir. 2009). Although not presented with a direct constitutional challenge to PASPA, the Third Circuit found that PASPA was "not . . . ambiguous." *See Markell*, 579 F.3d at 303. In addition, the *Markell* Court found the argument that a state's sovereignty requires it to be permitted to implement a betting scheme of that state's choosing "unpersuasive." *Id.* The *Markell* Court also recognized the "grandfathering" provisions of PASPA, stating, "[a]lthough PASPA has broadly prohibited state-sponsored sports gambling since it took effect on January 1, 1993, the statute also 'grandfathered' gambling

schemes in individual states 'to the extent that the scheme was conducted by that State' between 1976 and 1990." *Id.* at 296-97.

## III.   Legal Standard and Analysis

### A.   Summary Judgment

Summary judgment is appropriate if the record shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A district court considers the facts drawn from the "materials in the record, including depositions, documents, electronically stored information, affidavits . . . or other materials" and must "view the inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion." Fed. R. Civ. P. 56(c)(1)(A); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002) (internal quotations omitted). The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52 (1986). More precisely, summary judgment should be granted if the evidence available would not support a jury verdict in favor of the non-moving party. *Id.* at 248-49. The material facts in the instant matter are not disputed. Therefore, the case is ripe for decision at the summary judgment stage.

### B.   Congressional Statutes are Presumptively Constitutional

It is a basic tenet of constitutional law that Congressional statutes are presumptively constitutional and should not be struck down unless "clearly demonstrated" otherwise. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2579 (2012) (quoting *United States v. Harris*, 106 U.S. 629, 635 (1883)); *Reno v. Condon*, 528 U.S. 141, 148 (2000); *Close v. Glenwood Cemetery*, 107 U.S. 466, 475 (1883) ("[E]very legislative act is to be presumed to be a

constitutional exercise of legislative power until the contrary is clearly established . . . ."); *Koslow v. Pennsylvania*, 302 F.3d 161, 175 (3d Cir. 2002) (internal citations omitted) ("Federal statutes are presumed constitutional."). When presented with two possible interpretations of a statute, "courts should adopt the meaning" which finds the statute constitutional. *Sebelius*, 132 S. Ct. at 2593; *see also Blodgett v. Holden*, 275 U.S. 142, 148 (1927) (J. Holmes, concurring) ("[T]he rule is settled that as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the Act.").

Moreover, "[t]he question is not whether that is the most natural interpretation of the [statute], but only whether it is a 'fairly possible' one." *Sebelius*, 132 S. Ct. at 2594 (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)). Therefore, "every *reasonable* construction must be resorted to, in order to save a statute from unconstitutionality." *Id*. (emphasis added) (quoting *Hooper v. California*, 155 U.S. 648, 657 (1895)).

### C.   The Constitutionality of PASPA

Defendants challenge the presumption of constitutionality by arguing that PASPA violates 1) Congress' powers accorded to it under the Commerce Clause, 2) the Tenth Amendment's limitations on Congress' powers, and 3) the Due Process Clause and Equal Protection Principles. Additionally, NJTHA argues that PASPA violates the Equal Footing Doctrine. Each constitutional challenge will be addressed in turn.

#### 1)   The Commerce Clause

##### a.   The Parties' Positions

Defendants argue that PASPA is an unconstitutional and improper use of Congress' Commerce Clause powers. (Defs.' Br. at 33-36.) Specifically, Defendants challenge the

exceptions made for states which conducted legalized sports gambling prior to the enactment of PASPA as unconstitutionally discriminatory. (*Id.* at 33.) Defendants reiterate this argument in lodging a challenge against PASPA as violating "equal sovereignty." (*Id.*) In addition, NJTHA argues that PASPA exceeds and does not comport with Congress' broad powers to regulate interstate commerce. (NJTHA's Opp'n Br. at 36-39.)

In response, Plaintiffs and the DOJ argue that PASPA is a permissible exercise of Congress' powers pursuant to the Commerce Clause and the Necessary and Proper Clause. (Pls.' Br. at 7-13; DOJ's Br. at 13-17.)

> **b.     Discussion**
>
> **1)     PASPA's Relation to Interstate Commerce**

Congress has the authority to "regulate Commerce with foreign Nations, and among the several States . . . ." and "[t]o make all Laws which shall be necessary and proper for carrying into Execution" the powers it has under the Commerce Clause.  U.S. Const. art. I, § 8, cl. 3, 18. It is Defendants' burden to overcome the "substantial deference [given] to a Congressional determination that it had the power to enact particular legislation." *United States v. Parker*, 108 F.3d 28, 30 (3d Cir. 1997) (citation omitted).

It is well established that "Congress' power under the Commerce Clause is very broad." *Fry v. United States*, 421 U.S. 542, 547 (1975). Congress is empowered to "regulate purely local activities that are part of an economic class of activities that have a substantial effect on interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 17 (2005). "[A]ctivity that is purely intrastate in character may be regulated by Congress, where the activity, combined with like conduct by others similarly situated, affects commerce among the States or with foreign nations." *Fry*, 421 U.S. at 547.

With the presumption of constitutionality guiding the Court's analysis,

[a] court may invalidate legislation enacted under the Commerce Clause *only* if it is clear that there is no rational basis for a congressional finding that the regulated activity affects interstate commerce, or that there is no reasonable connection between the regulatory means selected and the asserted ends.

*Hodel v. Indiana*, 452 U.S. 314, 323-24 (1981) (internal citations omitted) (emphasis added).

The Supreme Court has clearly instructed that "it is not the function of the courts to substitute their evaluation of legislative facts for that of the legislature." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 470 (1981). The testimony that is part of the legislative record includes the following:

1. The spread of legalized sports gambling would change forever—and for the worse—what [professional and amateur sports] games stand for and the way they are perceived.
2. Sports gambling threatens the integrity of, and public confidence in, amateur and professional sports.
3. Widespread legalization of sports gambling would inevitably promote suspicion about controversial plays and lead fans to think "the fix was in" whenever their team failed to beat the point-spread.
4. Teenage gambling-related problems are increasing. Of the approximately 8 million compulsive gamblers in America, 1 million of them are under 20.
5. Governments should not be in the business of encouraging people, especially young people, to gamble.
6. *Sports gambling is a national problem. The harms it inflicts are felt beyond the borders of those States that sanction it.* The moral erosion it produces cannot be limited geographically. Once a State legalizes sports gambling, it will be extremely difficult for other States to resist the lure. The current pressures in such places as New Jersey . . . to institute casino-style sports gambling illustrate the point. Without Federal legislation, sports gambling is likely to spread on a piecemeal basis and ultimately develop irreversible momentum.
7. *[T]he interstate ramifications of sports betting are a compelling reason for federal legislation.*
8. Although the committee firmly believes that all such sports gambling is harmful, it has no wish to apply this new prohibition retroactively to [States] which instituted sports lotteries prior to the introduction of our legislation.

S. Rep. No. 102-248, at 5-8 (emphasis added), *reprinted in* 1992 U.S.C.C.A.N. 3553, 3556-3559.

The Third Circuit has consistently followed Supreme Court precedent in recognizing the expansive nature of the Commerce Clause. In *United States v. Riehl*, the Third Circuit analyzed a constitutional challenge to Title VIII of the Organized Crime Control Act of 1970. 460 F.2d 454 (3d Cir. 1972). The *Riehl* Court stated that "[i]llegal gambling has been found by Congress to be in the class of activities which exerts an effect upon interstate commerce." *Id.* at 458. According to the *Riehl* Court, "Congress has chosen to protect commerce and the instrumentalities of commerce . . . . We may not substitute our judgment . . . [n]or may we sit in judicial review of congressional legislative findings." *Id.*

Notably, Defendants and NJTHA concede that Congress has the authority to regulate gambling pursuant to its Commerce Clause powers. (*See* Certified Transcript of Oral Arguments ("Tr.") 49:17-19; 73:7-13, respectively.)

In analyzing whether there is a sufficient nexus between interstate commerce and a regulated activity, the Court need not determine whether the spread of legalized sports gambling would have an effect on interstate commerce in fact, but merely whether a "rational basis" existed for Congress to reach that conclusion. *See Gonzales v. Raich*, 545 U.S. at 22.

With this well-established analytical framework as a back-drop, the Court finds that PASPA satisfies rational basis review. PASPA was enacted to prevent the spread of legalized sports gambling and safeguard the integrity of professional and amateur sports. The Senate Judiciary Committee has concluded that sports gambling is a "national problem" that in the absence of federal legislation would spread throughout the country unabashedly. S. Rep. No. 102-248, at 5, *reprinted in* 1992 U.S.C.C.A.N. 3553, 3556.

While the congressional findings underpinning PASPA need not specifically reference the Commerce Clause, the Senate Judiciary Committee's conclusion is consistent with Plaintiffs'

and the DOJ's position that the spread of legalized sports gambling will impact interstate commerce. Notably, the Senate Judiciary Committee found that the "harms [legalized sports gambling] inflicts are felt beyond the borders of those States that sanction it." S. Rep. No. 102-248, at 5, *reprinted in* 1992 U.S.C.C.A.N. 3553, 3556. Additionally, the Senate Judiciary Committee found that "[w]ithout Federal legislation, sports gambling is likely to spread . . . and ultimately develop irreversible momentum." *Id.* Therefore, Congress had a rational basis to conclude that legalized sports gambling would impact interstate commerce. [3]

### 2) PASPA's Grandfathering Clause Comports with the Commerce Clause

In addition, the presence of a grandfathering clause does not undermine rational basis review. The Congressional findings demonstrate that Congress had a rational basis to exempt pre-existing sports gambling systems.[4] The findings also reflect that Congress desired to protect the reliance interests of the few states that had legalized gambling operations. As such, the exceptions made for particular states do not impugn rational basis review.[5] *See Nordlinger v.*

---

[3] The Court, however, recognizes that Congress' Commerce Clause powers are not without limits. *See U.S. v. Lopez*, 514 U.S. 549, 565 (1995); *United States v. Morrison*, 529 U.S. 598, 613 (2000).

[4] While not squarely before the Court, it is worth mentioning that Defendants, in essence, make a fairness argument. From the purview of Defendants, it is unfair for other states to do what New Jersey cannot. However, in navigating this fairness argument, there is an inherent conflict in Defendants' positions. Defendants argue that it is unfair for other States to allow gambling, while simultaneously taking the position that gambling should be permitted in New Jersey but betting on college games in New Jersey, and on New Jersey collegiate sport teams, should be prohibited. At a minimum, the statutory framework of New Jersey's Sports Wagering Law implicitly recognizes the deleterious effects PASPA targets. At most, this framework potentially runs afoul of the protections afforded by the dormant commerce clause. *See Or. Waste Sys., Inc. v. Dep't of Envt'l Quality*, 511 U.S. 93, 99-101 (1994).

[5] Defendants argue that, in an invalid exercise of Congress' Commerce Clause powers, PASPA has violated the fundamental principle that each State has equal sovereignty before the Federal Government by discriminating in favor of states which had legalized sports wagering pre-

*Hahn*, 505 U.S. 1, 13 (1992) ("[P]rotect[ing] legitimate expectation and reliance interests do[es] not deny equal protection of the laws."). It is also rational for Congress to remedy a national problem piecemeal. *See City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (finding it permissible for a legislature to: 1) adopt regulations that only partially ameliorate a perceived evil, 2) defer complete elimination of the evil to future regulations, and 3) implement grandfathering provisions treating similarly situated entities differently predicated upon substantial reliance interests).

Finally, the Court declines to adopt Defendants' argument that *Delaware River Basin* requires heightened scrutiny of grandfather clauses and falls outside of Congress' powers under the Commerce Clause. (Defs.' Br. at 35, 38.) In *Delaware River Basin*, the Third Circuit found that the grandfather provision in that case "appear[ed] to be . . . arbitrary, rather than . . . rational." *Del. River Basin Comm'n v. Bucks County Water & Sewer Auth.*, 641 F.2d 1087, 1098 (3d Cir. 1981). Significantly, *Delaware River Basin* lacked legislative findings that the Court could analyze to determine whether the statute passed rational basis review. Nearly twenty years had passed since the statute's enactment and the Third Circuit stated that it "perceive[d] no reliance interest in free enjoyment of an amount exceeding actual usage." *Id.* at 1099. Nevertheless, the Third Circuit remanded for further proceedings rather than finding the statute unconstitutional. *Id.* at 1100. On remand, the Eastern District of Pennsylvania noted that

---

existing PASPA. (Defs.' Br. at 33-36.) Plaintiffs argue, correctly, that "there is no requirement for uniformity in connection with the Commerce Power." *Currin v. Wallace*, 306 U.S. 1, 14 (1939); *see Railway Labor Execs. Ass'n v. Gibbons*, 455 U.S. 457, 468 (1982); *Hodel*, 452 U.S. at 332. "The States are not immune from all federal regulation under the Commerce Clause merely because of their sovereign status." *Fry*, 421 U.S. at 548. The Court, guided by the presumption in favor of PASPA's constitutionality, finds that Congress' use of its Commerce Clause powers, which here effectuates a difference in treatment of States that have developed a reliance interest on sports gambling pre-dating the inception of PASPA, is both rational and constitutional.

14

substantial reliance interests are "proper grounds for insulating enterprises already *in situ* from the burdens of a newly adopted regulatory scheme." *Del. River Basin Comm'n v. Bucks Cnty. Water & Sewer Auth.*, 545 F. Supp. 138, 145 (E.D. Pa. 1982). Prior to reaching its holding, the district court stated that "the Supreme Court has not said that permanent grandfathering is *per se* [problematic]." *Id.* at 147.  Finally, the district court concluded that the relevant exemptions differentiated "in a manner that is rationally related to the goal[] of preserving . . . and protecting significant reliance interests . . . ." *Id.* at 148.

Unlike *Delaware River Basin*, the Court here has legislative findings to consider. Specifically, the legislative record reveals that the committee believed all sports gambling is harmful, but had no desire to threaten or to prohibit lawful sports gambling schemes in operation prior to the legislation. S. Rep. No. 248, at 8, *reprinted in* 1992 U.S.C.C.A.N. 3553, 3559. Congress has determined that the substantial reliance interests of the grandfathered states merit preservation and protection. The grandfather clause contained in PASPA passes rational basis review. As such, the Court finds that PASPA's regulation of sports betting is constitutional pursuant to Congress' Commerce Clause powers.

### 2)       Anti-Commandeering Principle

For the reasons stated below, the Court has determined that PASPA does not violate the Tenth Amendment. Most importantly, it neither *compels* nor *commandeers* New Jersey to take any action. Moreover, the federal officials who passed PASPA, and continue to support it, are clearly accountable to the citizens of the several States. PASPA, therefore, does not violate the Tenth Amendment.

### a.      The Parties' Positions

Defendants argue that PASPA requires New Jersey to prohibit sports wagering in violation of the Anti-Commandeering principle set forth in *New York v. United States*, 505 U.S. 144 (1992). Integral to Defendants' argument is the proposition that "even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts."  (Defs.' Reply to DOJ at 1 (quoting *New York*, 505 U.S. at 166).)

NJTHA argues that PASPA violates principles of federalism through 1) a "negative command prohibiting [New Jersey] from enacting any law legalizing or licensing Sports Betting," and 2) an "affirmative command requiring [New Jersey] to maintain State laws criminalizing sports betting." (NJTHA's Opp'n Br. at 3-4.) The Legislative Intervenors take a similar position. (Legislative Br. at 11.)

Plaintiffs respond that PASPA does not commandeer or compel the states to do anything. (Pls.' Reply & Opp'n at 9.) Rather, PASPA only prohibits authorizing gambling on professional or amateur sports. (*Id.*) Plaintiffs cite a number of cases for the proposition that Congress is free to exercise its power to prohibit states from conflicting with federal policy. (*Id.*) DOJ takes a position similar to Plaintiffs and contends that the Tenth Amendment is only implicated "when a federal statute requires *affirmative* State action." (DOJ's Br. at 9.)

Whether or not PASPA violates the Anti-Commandeering principles that flow from the Tenth Amendment depends on the extent to which the issue presently before the Court is analogous to the Supreme Court's decisions in *New York* and its progeny.

16

b.      **Discussion**

1)      **Federalism and the Tenth Amendment**

The Tenth Amendment to the Constitution provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

As noted numerous times, it is an express declaration of the idea which permeates the Constitution: the powers of the Federal Government are limited to the powers enumerated therein; all others are retained by the several States and the people. *See New York*, 505 U.S. at 156-57 (The Amendment's restraint upon Congress "is not derived from the text of the Tenth Amendment itself, which, as we have discussed, is essentially a tautology."); *United States v. Darby*, 312 U.S. 100, 124 (1941) (The Tenth Amendment "states but a truism that all is retained which has not been surrendered."); 3 J. Story, Commentaries on the Constitution of the United States 752 (1833) (The Tenth Amendment "is a mere affirmation of what, upon any just reasoning, is a necessary rule of interpreting the constitution. Being an instrument of limited and enumerated powers, it follows irresistibly, that what is not conferred, is withheld, and belongs to the state authorities.").

The diffusion of power between the States and the Federal Government was purposefully designed. *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991) ("As every schoolchild learns, our Constitution establishes a system of dual sovereignty between the States and the Federal Government."). As stated by James Madison:

> In the compound republic of America, the power surrendered by the people is first divided between two distinct governments, and then the portion allotted to each subdivided among distinct and separate departments. Hence a double security arises to the rights of the people. The different governments will control each other, at the same time that each will be controlled by itself.

*Id.* at 459 (quoting The Federalist No. 51, pp. 323 (C. Rossiter ed. 1961)).

Beyond the protection of the rights of the people through the diffusion of power, the Tenth Amendment is an express recognition that "[a]lthough the States surrendered many of their powers to the new Federal Government, they retained 'a residuary and inviolable sovereignty.'" *Printz v. United States*, 521 U.S. 898, 918-19 (1997) (quoting The Federalist No. 39, at 245 (J. Madison)); *see Ashcroft*, 501 U.S. at 457-58.

The balance of power amongst the several States and the Federal Government was of utmost importance to the drafters of the Constitution and those who attended the Constitutional Convention. *See New York*, 505 U.S. at 163 ("[T]he question whether the Constitution should permit Congress to employ state governments as regulatory agencies was a topic of lively debate among the Framers."). The Articles of Confederation prevented Congress from acting upon the people directly; "Congress 'could not directly tax or legislate upon individuals; it had no explicit 'legislative' or 'governmental' power to make binding 'law' enforceable as such.'" *Id.* (quoting Akhil Reed Amar, Of Sovereignty and Federalism, 96 Yale L.J. 1425, 1447 (1987)). Rather, Congress was required to pass laws and hope that States would pass "intermediate legislation" allowing Congress' will to be done upon the people. *Id.* (quoting The Federalist No. 15, p. 109 (C. Rossiter ed. 1961)).

Upon this stage, two opposing plans were considered by the Constitutional Convention: 1) the Virginia Plan, under which "Congress would exercise legislative authority directly upon individuals," and 2) the New Jersey Plan, whereby "Congress would continue to require the approval of the States before legislating, as it had under the Articles of Confederation." *Id.* at 164 (citation omitted). "In the end, the Convention opted for a Constitution in which Congress would exercise its legislative authority directly over individuals rather than over States; for a variety of

reasons, it rejected the New Jersey Plan in favor of the Virginia Plan." *Id.* at 165; *Printz*, 521 U.S. at 919-20 ("[T]he Framers rejected the concept of a central government that would act upon and through the States.").

In return for the power to act upon the people directly, the Federal Government is forbidden from directly *compelling* the States to pass laws which do the Federal Government's bidding. *New York*, 505 U.S. at 166. For example, "[t]he allocation of power contained in the Commerce Clause . . . authorizes Congress to regulate interstate commerce directly; it does not authorize Congress to regulate state governments' regulation of interstate commerce." *Id*. However, "[t]he Federal Government holds a decided advantage in this delicate balance: the Supremacy Clause." *Ashcroft*, 501 U.S. at 460. "As long as it is acting within the powers granted it under the Constitution, Congress may impose its will on the States." *Id*. As such, "Congress may legislate in areas traditionally regulated by the States." *Id*.

### 2)       Pre-*New York* Case Law

The question in this case, whether PASPA violates the system of dual sovereignty by prohibiting New Jersey from enacting state sponsored sports betting, is informed and controlled by Supreme Court opinions over the past forty years. There has been a particularly dynamic development in Tenth Amendment case law over the past two decades. *See New York*, *supra*, (1992), *Printz*, *supra*, (1997), *Reno*, *supra* (2000); Neil S. Siegel, *Commandeering and Its Alternatives: A Federalism Perspective*, 59 Vand. L. Rev. 1629, 1636-42 (2006)).

Before *New York* and its ensuing case law can be discussed, an understanding of the cases which led to *New York* is required. The first of these cases is *National League of Cities v. Usery*, 426 U.S. 833 (1976). In *National League of Cities*, the Supreme Court held that application of the 1974 extension to the Fair Labor Standards Act ("FLSA") to the employees of state and

municipal governments violated the Tenth Amendment. *Id.* at 851. In order to reach that decision, the *National League of Cities* Court inquired whether the FLSA intruded upon "functions essential to [the] separate and independent existence" of the States and whether the areas sought to be regulated by the Federal Government were "traditional aspects of state sovereignty." *Id.* at 845, 849 (citation and internal quotation marks omitted). The Court found that "[o]ne undoubted attribute of state sovereignty is the States' power to determine the wages [paid to state employees], what hours those persons will work, and what compensation will be provided where these employees may be called upon to work overtime." *Id.* at 845. As such, it then held that "both the minimum wage and the maximum hour provisions [in the FLSA] will impermissibly interfere with the integral governmental functions of these bodies" and found them both to be improper exercises of Congress' powers barred by the Tenth Amendment. *Id.* at 851.

The concept that the Tenth Amendment protects States' traditional governmental functions would eventually be overruled in *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 531 (1985). In the meantime, however, the Supreme Court decided several additional Tenth Amendment cases.

In *Hodel v. Virginia Surface Mineral & Reclamation Association, Inc.*, an association of mining companies and Virginia filed suit seeking declaratory and injunctive relief prohibiting the Secretary of the Interior from implementing various provisions of the Surface Mining Control and Reclamation Act of 1977 (the "Mining Control Act"). 452 U.S. 264, 268, 273 (1981). Virginia contended that certain provisions of the Mining Control Act which "prescribe[d] performance standards for surface coal mining" violated the Tenth Amendment because regulation of coal mining impermissibly intruded on the "traditional governmental function of

20

regulating land use." *Id.* at 283-84. The Supreme Court, describing its interpretation of the rule set forth in *National League of Cities*, stated that a Tenth Amendment violation only existed when Congressional action: 1) regulated the "States as States;" 2) impermissibly "address[ed] matters that are indisputably 'attribute[s] of state sovereignty;'" or 3) "directly impair[ed] the States'] ability 'to structure integral operations in areas of traditional governmental functions.'" *Id.* at 287-88 (quoting *Nat'l League of Cities*, 426 U.S. at 845-54).

The *Hodel* Court held that the Mining Control Act did not violate the Tenth Amendment because it only acted upon private individuals and businesses, rather than upon "States as States," and did not *compel* Virginia to *enforce* the standards contained in the act or expend any funds doing so. *Id.* at 288. Rather than *compelling* Virginia to adopt regulations, the Mining Control Act "establish[d] a program of cooperative federalism that allows the States, within limits established by federal minimum standards, to enact and administer their own regulatory programs, structured to meet their own particular needs." *Id.* at 289. In the end, the Court held that "there can be no suggestion that the [Mining Control Act] *commandeers* the legislative processes of the States by *directly compelling* them to *enact* and *enforce* a federal regulatory program." *Id.* at 288 (emphasis added). Although the exact analytical framework used in *National League of Cities* and *Hodel* has been abandoned, the genesis of the underpinnings of the subsequent case law is readily apparent.[6]

---

[6] Another case occupying the time between *National League of Cities* and *Garcia* is *F.E.R.C. v. Mississippi*, 456 U.S. 742 (1982). In *F.E.R.C.*, the Supreme Court again confronted a Tenth Amendment challenge to a federal statute, the Public Utility and Regulatory Policies Act of 1978 ("PURPA"). *Id.* at 745. An extended discussion is not required other than to note that PURPA's requirement that States must "enforce standards promulgated by FERC" and "consider specified ratemaking standards" were hallmarks of the "cooperative federalism" described, and approved, in *Hodel*. *Id.* at 759, 767.

The focus on areas of "traditional governmental functions" outlined in *National League of Cities* was overturned in *Garcia*. Pursuant to *National League of Cities*, the district court in *Garcia* found that "municipal ownership and operation of a mass-transit system is a traditional governmental function and thus . . . is exempt from the obligations imposed by the FLSA." *Garcia*, 469 U.S. at 530. That determination was in conflict with "three Courts of Appeals and one state appellate court . . . ." *Id.* The Supreme Court abandoned the rationale of *National League of Cities* and held that "the attempt to draw the boundaries of state regulatory immunity in terms of 'traditional governmental function' is not only unworkable but is also inconsistent with established principles of federalism and, indeed, with those very federalism principles on which *National League of Cities* purported to rest." *Id.* at 531, 538-39 (surveying lower court cases in which the "traditional governmental function" notion in *National League of Cities* had led to confusing and irreconcilable decisions).

Rather than look to "traditional governmental functions," the *Garcia* Court turned to "a different measure of state sovereignty" and found that a Tenth Amendment violation would only occur when "the procedural safeguards inherent in the structure of the federal system" had failed to protect a State from the encroachment of the Federal Government. *Id.* at 550, 552. Stated differently, the Tenth Amendment's "limits are structural, not substantive-*i.e.,* that States must find their protection from congressional regulation through the national political process, not through judicially defined spheres of unregulable state activity." *South Carolina v. Baker*, 485 U.S. 505, 512 (1988) (construing the holding of *Garcia*). The *Garcia* Court held that there had been no failure of "the national political process" which was "destructive of state sovereignty or violative of any constitutional provision" when Congress decided to include the States, and state owned entities such as transit systems, within the ambit of the FLSA. *Garcia*, 469 U.S. at 554.

22

The *Garcia* Court, however, declined to "identify or define what affirmative limits the constitutional structure might impose on federal action affecting the States under the Commerce Clause." *Id.* at 556. The issue would be partially resolved in *New York*.

A final pre-*New York* case, however, requires discussion. In *South Carolina v. Baker*, the state of South Carolina sued the Secretary of the Treasury to prevent the implementation of a federal tax statute. 485 U.S. at 507-08. The statute in question, the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), required states to issue bonds in registered form if the bond holders wished to qualify for a federal income tax exemption. *Id.* Prior to the enactment of TEFRA, a holder of a state or municipal bond could qualify for the exemption regardless of whether the bond was a registered bond or a bearer bond. *Id.* at 508. In order to reduce tax avoidance and evasion, the exemption was deemed to no longer apply to bearer bonds. *Id.* at 508-09. The States[7] argued that TEFRA "effectively require[d that States] issue bonds in registered form" because, without the exemption, the bonds were not marketable. *Id.* at 511. "For the purposes of Tenth Amendment analysis," the Supreme Court agreed and conducted its review as though TEFRA "directly regulated States by prohibiting outright the issuance of bearer bonds." *Id.*

The States contended that the political process alluded to in *Garcia* had failed them and that Congress was "uninformed" when it concluded that unregistered bonds were linked to tax evasion. *Id.* at 513. The Court rejected that argument and held that South Carolina was not "deprived of any right to participate in the national political process or that it was singled out in a way that left it politically isolated and powerless." *Id.* According to the *Garcia* Court, the Tenth Amendment does "not authorize[] courts to second-guess the substantive basis for congressional

---

[7] Twenty-three (23) states joined in an *amicus* brief filed in support of South Carolina's suit. *Id.* at 507. The Court's discussion will refer to the plaintiffs in *Baker*, therefore, as the "States."

legislation." *Id.* Nor is it "implicated" when "the national political *process* did not operate in a defective manner." *Id.*

The States made an additional argument: TEFRA was unconstitutional "because it commandeer[ed] the state legislative and administrative process by coercing States into enacting legislation authorizing bond registration and into administering the registration scheme." *Id.* The Court rejected that contention, finding that any associated legislative amendments that the States might have to draft in order to be in compliance with the statute were merely "an inevitable consequence of regulating a state activity." *Id.* at 514. Otherwise, "any State could immunize its activities from federal regulation by simply codifying the manner in which it engages in those activities." *Id.* at 515. Stated differently, the States' "theory of 'commandeering' would not only render *Garcia* a nullity, but would also restrict congressional regulation of state activities even more tightly than it was restricted under the now overruled *National League of Cities* line of cases." *Id.*

The Supreme Court has recognized that its jurisprudence regarding the Tenth Amendment "has traveled an unsteady path." *New York*, 505 U.S. at 160. Although not fully consistent with each other, and based upon shifting rationale, certain concepts can be gleaned from the evolution of the Supreme Court's pre-*New York* case law. Those concepts, especially the degree of commandeering of the States' legislative processes required to trigger the Tenth Amendment and the framework of federalism which the Supreme Court's decisions attempted to protect, are brought into closer focus in the following cases.

### 3)   *New York* **and its Progeny**

Ruling 6-3 in *New York v. United States*, the Supreme Court struck down a provision of a federal statute that *compelled* the States to provide a regulatory framework for disposal of low level radioactive waste or be forced to take title to the waste. 505 U.S. at 173-77. In the process of doing so, the Supreme Court set forth its clearest definition yet of what type of congressional action pursuant to the Commerce Clause violated the Tenth Amendment. As framed by Justice O'Connor, *New York* "concern[ed] the circumstances under which Congress may *use* the States as *implements* of regulation; that is, whether Congress may *direct* or otherwise *motivate* the States to *regulate* in a particular field in a particular way." *Id*. at 162 (emphasis added).

Congress enacted the Radioactive Waste Policy Amendments Act of 1985 ("Waste Policy Act") in an effort to address the problem of radioactive waste disposal. *Id*. at 150. The key section of the Waste Policy Act reviewed by the Court "provide[d] three types of incentives to encourage the States to comply with their statutory obligation to provide for the disposal of waste generated within their borders[:]" 1) monetary incentives, 2) access incentives, and 3) the "take title provision." *Id*. at 152.

In reaching its decision, the Court initially noted that Congressional regulation of low level nuclear waste pursuant to the Commerce Clause was permissible. *Id.* at 160. The Court and the parties also agreed that Congressional action in this area would preempt state law through the operation of the Supremacy Clause. *Id.* That was not, however, the end of the Court's analysis.

The Court found the first two incentives well within Congress' power "under the Commerce and Spending Clauses." *Id.* at 173-74. The third provision, which offered States "the option of taking title to and possession of the low level radioactive waste" in lieu of "regulating pursuant to Congress' direction," was "of a different character" and rejected by the Court. *Id.* at

25

174-75. In essence, the Court found that "Congress ha[d] crossed the line distinguishing encouragement from *coercion*." *Id.* at 175 (emphasis added).

Citing *Hodel*, the Court reiterated that "Congress may not simply '*commandee*[*r*] the legislative processes of the States by *directly compelling* them to *enact* and *enforce* a federal regulatory program.'" *Id.* at 161 (quoting *Hodel*, 452 U.S. at 288) (emphasis added). This is so because "the Constitution has never been understood to confer upon Congress the ability to *require* the States to *govern* according to Congress' instructions." *Id*. at 162 (emphasis added) (citing *Coyle v. Smith*, 221 U.S. 559, 565 (1911)). If that were the case, the "accountability of both state and federal officials" would be seriously "diminished" because the federal officials who mandated that a State act in a certain way would "remain insulated from the electoral ramifications of their decision[s]." *Id.* at 168-69. That lack of accountability undermined the balance of power amongst the Federal Government and the several States. *See id.*

Speaking directly to the take title provision, the Court further noted that the States were presented with a "'choice' of either *accepting ownership* of waste or *regulating* according to the instructions of Congress." *Id.* at 175 (emphasis added). Neither "choice," alone, would have been constitutionally permissible if presented to the States as a "freestanding requirement." *Id.* at 175-76 ("A choice between two unconstitutionally coercive regulatory techniques is no choice at all."). Importantly, and unlike the first two provisions of § 2021e,

> the take title incentive does not represent the conditional exercise of any congressional power enumerated in the Constitution. In this provision, Congress has not held out the threat of exercising its spending power or its commerce power; it has instead held out the threat, should the States not regulate according to one federal instruction, of simply *forcing* the States to submit to another federal instruction.

*Id*. at 176 (emphasis added). Such power "has never been understood to lie within the authority conferred upon Congress by the Constitution." *Id.* at 162. Because the Waste Policy Act left

States with "no option other than that of *implementing legislation* enacted by Congress" it "infringe[d] upon the core of state sovereignty reserved by the Tenth Amendment" and was "inconsistent with the federal structure of our Government established by the Constitution." *Id.* at 177 (emphasis added). As such, the Court struck down the take title provision. *Id.*

The Supreme Court's focus on *coercion* and *commandeering* continued in *Printz v. United States*. In *Printz*, the Supreme Court struck down the Brady Handgun Violence Protection Act ("Brady Act"), because it *commandeered* State law enforcement officers to perform background checks on prospective handgun purchasers. *Printz*, 521 U.S. at 935. In essence, Congress had "direct[ed] state law enforcement officers to participate . . . in the *administration* of a federally enacted regulatory scheme." *Id.* at 904 (emphasis added). This was held to be unconstitutional because:

> The Federal Government may neither issue directives *requiring* the States to address particular problems [as in *New York*], nor *command* the States' officers, or those of their political subdivisions, to *administer* or *enforce* a federal regulatory program. It matters not whether policymaking is involved, and no case-by-case weighing of the burdens or benefits is necessary; such *commands* are fundamentally incompatible with our constitutional system of dual sovereignty.

*Id.* at 935 (emphasis added).

Citing to its opinions in *Hodel* and *F.E.R.C.*, the Court noted that Congress "may not *compel* the States to *implement*, by *legislation* or *executive action*, federal regulatory programs." *Id.* at 925 (emphasis added). Specifically, the Court stated that no Tenth Amendment violation occurred in *Hodel*, because the Mining Control Act "merely made compliance with federal standards a precondition to continued state regulation in an otherwise pre-empted field." *Id.* at 926 (citing *Hodel*, 452 U.S. at 288). Similarly describing *F.E.R.C.*, the Court noted that Congress' actions therein "contain[ed] only the 'command' that state agencies 'consider' federal standards, and again only as a precondition to continued state regulation of an otherwise pre-

27

empted field." *Id.* (citing *F.E.R.C.*, 456 U.S. at 764-65). The Supreme Court considered the two cases easily distinguishable from the *affirmative* "federal *command* to the States" which was occurring in *Printz*. *Id.* (emphasis added) (citing *F.E.R.C.*, 456 U.S. at 761-62). The independence and continued vitality of the federalist system at the core of our "compound republic," could not coexist with the Brady Act, which "*dragooned*" State executive officials "into *administering* federal law." *Id*. at 922, 928 (emphasis added).

Finally, and consistent with a rationale for its decision in *New York*, the Supreme Court referred to the clear "accountability" problems which arose from having state executive officials implement a federal regulatory scheme. *Id.* at 930 ("By forcing state governments to absorb the financial burden of implementing a federal regulatory program, Members of Congress can take credit for 'solving' problems without having to ask their constituents to pay for the solutions with higher federal taxes," as well as by shunting onto state officials "the blame for [the Brady Act's] burdensomeness and . . . defects."). The critical defect in the Brady Act was, therefore, the *affirmative conscription* of state executive officials as part of a system to implement federal regulation along with a concomitant shift in accountability.

Unlike *New York* and *Printz*, the Court in *Reno v. Condon* found that a federal statute, the Driver's Privacy Protection Act ("DPPA"), did not violate the Tenth Amendment. 528 U.S. 141 (2000). "The DPPA regulates the disclosure and resale of personal information contained in the records of state DMVs" and "generally prohibits any state DMV, or officer, employee, or contractor thereof, from 'knowingly disclos[ing] or otherwise mak[ing] available to any person or entity personal information about any individual obtained by the department in connection with a motor vehicle record.'" *Id.* at 143-44 (citing 18 U.S.C. § 2721(a)). South Carolina brought suit asserting that "the DPPA violates the Tenth Amendment because it thrusts upon the States

all of the day-to-day responsibility for administering its complex provisions . . . and thereby makes state officials the unwilling implementors of federal policy . . . ." *Id.* at 149-50 (internal quotation marks omitted). The Supreme Court rejected that reasoning and held that, although the DPPA would require "time and effort on the part of state employees" to conform to it, the DPPA *does not* "require the states in their sovereign capacity to *regulate* their own citizens;" "to *enact* any laws or regulations;" or "require state officials to *assist* in the *enforcement* of federal statutes *regulating* private individuals." *Id.* at 150-51 (emphasis added). Unlike the statutes at issue in *New York* and *Printz*, the DPPA lacked an *affirmative* aspect which violated the Tenth Amendment.[8]

### 4)   PASPA Does Not Violate the Tenth Amendment

Several key concepts can be drawn from the preceding case law which directly illuminate the case at bar. Defendants and Defendant-Intervenors state that *New York* must necessarily be read to limit the power of Congress to restrict the legislative prerogatives of the States. This reads too far into those decisions and the Court respectfully declines to adopt such an interpretation. PASPA does not violate the Tenth Amendment.

The Supreme Court's Tenth Amendment jurisprudence, as far as it concerns the scope of Congress' powers pursuant to the Commerce Clause, has several clear threads. In fact, those threads can be construed in the *affirmative* nature of the acts Congress is prohibited from

---

[8] NJTHA supplements the analysis of *New York* and *Printz* with a discussion of the Supreme Court's holding in *Sebelius*. *Sebelius* is inapposite to the issue presented in this case. In short, the Medicaid expansion program passed under Congress' Spending Clause power as part of the Affordable Care Act ("ACA"), was rejected by the Supreme Court because it was financially coercive and forced states to accept the Medicaid expansion or forgo all federal funding for their preexisting Medicaid programs. *Sebelius*, 132 S. Ct. at 2603-04. That type of coercion was deemed a violation of the Tenth Amendment. PASPA, however, does not function similar to the ACA. Other than *Sebelius'* discussion of *New York* and *Printz*, it does not illuminate the Court's decision regarding PASPA.

requiring of the States. Whether the terminology used was *compel*,[9] *commandeer*,[10] *instruct*,[11] *legislate*,[12] *enact*,[13] *regulate*,[14] *enforce*,[15] *implement*,[16] *dragoon*,[17] *conscript*,[18] or *govern*,[19] one thread is clear: Congress cannot, via the Commerce Clause, force States to engage in *affirmative* activity. *See New York*, 505 U.S. at 178 (Congress may not "*command* a state government to *enact state* regulation . . . [and] may not *conscript* state governments as its agents.") (first, second and fourth emphasis added).

---

[9] "To cause or bring about by force, threats, or overwhelming pressure." Black's Law Dictionary (9th ed. 2009).

[10] "To take arbitrary or forcible possession of." Merriam-Webster's Collegiate Dictionary 248 (11th ed. 2005).

[11] "To give an order or command to." Merriam-Webster's Collegiate Dictionary 649 (11th ed. 2005).

[12] "To make or enact laws." Black's Law Dictionary (9th ed. 2009).

[13] "To establish by legal and authoritative act . . . to make (as a bill) into law." Merriam-Webster's Collegiate Dictionary 409 (11th ed. 2005)

[14] "To govern or direct according to rule; to make regulations for or concerning." Merriam-Webster's Collegiate Dictionary 1049 (11th ed. 2005).

[15] "To give force or effect to (a law, etc.); to compel obedience to." Black's Law Dictionary (9th ed. 2009).

[16] "To carry out, accomplish; esp: to give practical effect to and ensure of actual fulfillment by concrete measures." Merriam-Webster's Collegiate Dictionary 624 (11th ed. 2005).

[17] "To force into compliance esp. by violent measures." Merriam-Webster's Collegiate Dictionary 378 (11th ed. 2005).

[18] "To enroll into service by compulsion." Merriam-Webster's Collegiate Dictionary 265 (11th ed. 2005).

[19] "To exercise continuous sovereign authority over; esp: to control and direct the making and administration of policy in." Merriam-Webster's Collegiate Dictionary 541 (11th ed. 2005)

The difference between an affirmative command and a prohibition on action is not merely academic or insubstantial.[20] Simply stated, Defendants request that the Court read *New York* and *Printz* to displace the long held understanding that an otherwise permissible congressional action violates the Tenth Amendment because it excludes a State from enacting legislation in an area in which Congress had made its will clear. Such an expansive construction of these cases cannot be adopted by the Court, especially in light of the rule that Congressional statutes are presumptively constitutional and should be construed accordingly. *See Sebelius*, 132 S. Ct. at 2594.

Moreover, and as noted in *Hodel* and *F.E.R.C.*, the Tenth Amendment is not a bar to Congress' power to preempt state regulations. *See F.E.R.C.*, 456 U.S. at 759 ("[T]he Federal Government may *displace* state regulation even though this serves to 'curtail or prohibit the States' prerogatives to make legislative choices respecting subjects the States may consider important.'") (emphasis added and citation omitted); *Hodel*, 452 U.S. at 289-90 ("[T]he Tenth Amendment [does not limit] congressional power to pre-empt or *displace* state regulation of private activities affecting interstate commerce.") (emphasis added); s*ee also Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364 (2008) (holding that a federal statute which deregulated interstate trucking preempted Maine's state law controlling the distribution of tobacco); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378 (1992) (holding the Airline Deregulation Act

---

[20] Two Courts of Appeals cases decided following *New York* and *Printz* further demonstrate that Congress' powers are only limited by the Tenth Amendment when Congress attempts to *affirmatively direct* the actions of the States. *See ACORN v. Edwards*, 81 F.3d 1387, 1394 (5th Cir. 1996) (holding that a provision in the Lead Contamination Control Act of 1988, which "*require*[*d*] each State to '*establish a program*'" to implement the act, violated the Tenth Amendment) (emphasis added), *cert. denied*, 521 U.S. 1129 (1997)); *Bd. of Natural Res. v. Brown*, 992 F.2d 937, 947 (9th Cir. 1993) (holding that federal timber harvesting statutes which required States to "*determine*" species of trees to be cut and to "*administer*" regulations to bring the federal statute into effect were impermissible "*direct commands*" barred by the Tenth Amendment) (emphasis added).

preempted "States from prohibiting allegedly deceptive airline fare advertisements through enforcement of their general consumer protection statutes"). The ability of Congress to restrict States' legislative prerogatives in the areas discussed in *Rowe* and *Morales* was not even subjected to a Tenth Amendment challenge because the power to *restrict*, rather than *compel*, the actions of States in preempted spheres was, and remains, a settled issue.

Here, Congress has acted through its enumerated powers under the Commerce Clause and determined to control sports betting to the *exclusion* of the States (except to the extent that several states have been grandfathered in). As such, the prohibition in PASPA more closely tracks the statutes in *Morales* and *Rowe* than it does the *affirmative* conduct that the statutes in *New York* and *Printz* required. Although PASPA is not part of a larger single regulatory statute or act passed by Congress such as the Airline Deregulation Act or Clean Air Act, it can reasonably be seen as part of a larger Congressional scheme controlling the area of sports wagering.

To that point, federal criminal statutes forbid wagering on professional and amateur sports except to the extent permitted under state law. *See* 18 U.S.C. 1084(b) ("placing of bets or wagers on a sporting event" where such activity "is legal" under State law does not violate federal criminal laws otherwise prohibiting wagering on sporting events). Here, through PASPA, Congress has chosen to close that loophole and further restrict the areas in which sports wagering is occurring by forbidding any additional states to legalize sports wagering. Although approached differently than general federal regulatory schemes, the effect is substantially the same. Congress has chosen through PASPA to limit the geographic localities in which sports wagering is lawful. It does no more or less. The Court, therefore, cannot conclude that PASPA usurps State sovereignty. The fact that gambling might be considered an area subject to the

32

States' traditional police powers does not change this conclusion. *See Hodel*, 452 U.S. at 291-92 (an exercise of Congressional power pursuant to the Commerce Clause which displaces the States' police powers does not violate the Tenth Amendment). This construction of PASPA is both constitutional and reasonable. As such, the Court finds no reason to hold that PASPA violates the Tenth Amendment. *See Sebelius*, 132 S. Ct. at 2594 (when presented with two reasonable interpretations of a statute, courts must adopt the construction which finds the statute constitutional).

Defendants argue that the holding in *Coyle* requires the Court to find that PASPA unconstitutionally commandeers the States. (Defs.' Reply to DOJ 4-5; ECF No. 140.) The Court respectfully declines to adopt Defendants' reading of *Coyle*. First, *Coyle* is more properly understood as an Equal Footing case. And while *New York* may have featured language from *Coyle*, Justice O'Connor did not use *Coyle* as the *sine qua non* of the holding. Second, unlike PASPA, the actions of Congress at issue in *Coyle* were not based upon the Commerce Clause. Third, the dictate from Congress under suspicion in *Coyle* was of an entirely different character as compared to PASPA. In *Coyle*, Congress had conditioned Oklahoma's entrance to the Union with the command that Oklahoma shall not relocate its capital until after 1913. *Coyle*, 221 U.S. at 563-64. That was rightly described as a restriction of a power which would deprive Oklahoma of "attributes essential to its equality in dignity and power with the other states." *Id*. at 568.

Here, PASPA cannot be said to restrict New Jersey in the same manner. Congress has the power to regulate gambling. *See generally Champion v. Ames*, 188 U.S. 321 (1903); *United States v. Vlanich,* 75 F. App'x 104 (3d Cir. 2003); *Riehl*, *supra*. Moreover, *Coyle* specifically noted that the right to relocate a state's capital "purely [pertained] to the internal policy of the state." *Id.* at 579. State authorized sports wagering cannot reasonably be described as purely

pertaining to the internal policies of a state. Because sports wagering's effects are felt outside the state, and the ability to regulate gambling is within the purview of Congress, Congress' restriction of such does not violate or constrain any "attributes essential to [New Jersey's] equality in dignity and power with the other states." *Id*. at 568.

Defendants also argue that *Reno* "rejected the action/inaction dichotomy" relied upon by the DOJ and outlined above by the Court. (Defs.' Reply to DOJ 7 n. 5.) Rather, Defendants allege that the true touchstone of the Tenth Amendment is whether Congressional action seeks to "control or influence the manner in which States regulate private parties." *Reno*, 528 U.S. at 150. The Court declines to adopt Defendants' interpretation of *Reno*. *See id*. at 151 (the true issue in *Reno*, and under the Tenth Amendment, is whether Congressional action "*require*[*s*] the States in their sovereign capacity to *regulate* their own citizens") (emphasis added).

Moreover, and similar to the DPPA, PASPA does not utilize the States to "control or influence the manner in which States regulate private parties." *Id*. at 150. As noted earlier, Title 18, along with PASPA, forms the federal framework which controls sports wagering. No *action* on the part of the States is *required* in order for PASPA to achieve its ends, namely, restriction of the spread of state authorized sports wagering. In short, PASPA is controlling and influencing the spread of legalized sports wagering, not New Jersey. Moreover, the *Reno* Court itself noted that *New York* and *Printz* focused on concrete restrictions of Congress' powers: The DPPA did "not require the States in their sovereign capacity to *regulate* their own citizens," did "not require the [States] to *enact* any laws or regulations, and it [did] not require state officials to *assist* in the *enforcement* of federal statutes regulating private individuals," therefore making the DPPA "consistent with the constitutional principles enunciated in *New York* and *Printz*." *Id*. at 151 (emphasis added). As such, like the DPPA, PASPA must be found to be "consistent with . . .

*New York* and *Printz*." *Id.* at 151; *see also Sebelius*, 132 S. Ct. at 2593 ("[I]t is well established that if a statute has two possible meanings, one of which violates the Constitution, courts should adopt the meaning that does not do so.").

Finally, one of the main concerns of *New York* and *Printz* was the manner in which federal commandeering of the States led to a lack of accountability to the citizenry. *New York*, 505 U.S. 168-69; *Printz*, 521 U.S. at 930. That concern is not implicated by PASPA. Here, it is eminently clear to anyone who wishes to inquire that the impediment to New Jersey's desire to implement legalized sports betting resides with the decision that *Congress* rendered. As such, there is little chance that the federal officials who voted for PASPA, and continue to support it, will "remain insulated from the electoral ramifications of their decision." *New York*, 505 U.S. at 169. As noted in *Garcia* and *Baker*, if the people of New Jersey wish to change or abolish PASPA because they disagree with the policy judgments contained therein, they must do so through the "national political process." *Baker*, 485 U.S. at 512; *Garcia*, 469 U.S. at 551. As such, accountability concerns do not sway the Court's decision.

For the reasons stated above, PASPA does not violate the Tenth Amendment.[21]

### 3)    The Due Process Clause and Equal Protection Principles

#### a.    The Parties' Positions

Defendants argue that PASPA violates the Fifth Amendment protections of the Due Process Clause and Equal Protection Principles. (Defs.' Br. 36-38.) In response, Plaintiffs and the DOJ contend that a state is not a person for purposes of Fifth Amendment analysis. (Pls.' Br.

---

[21] It is a foundational principle of statutory interpretation that "when the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992) (citations omitted). Accordingly, the Court does not reach Defendants' alternative argument that PASPA and the Sports Wagering Law may be construed such that there is no conflict.

11; DOJ's Br. 21-22.) In addition, both Plaintiffs and the DOJ argue that PASPA does not violate either the Due Process Clause or Equal Protection Principles. Defendants reply that they have both direct standing and *parens patriae* standing on behalf of the citizens of New Jersey. (Defs.' Reply Br. 14.) Defendants further assert, that even in absence of their standing, Defendant-Intervenors have standing. (*Id.*)  In furtherance of their argument that PASPA violates the Due Process Clause and Equal Protection, Defendants allege that the reliance interests underlying the grandfathering clause of PASPA are insufficient to survive rational basis scrutiny. (Defs.' Reply to DOJ 14-15.)

> **b.    Discussion**

The Fifth Amendment Due Process Clause provides, in relevant part, that "[n]o *person* shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V (emphasis added). In addition, the Fifth Amendment Due Process Clause "contains an equal protection component prohibiting the United States from invidious discrimination between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976) (citing *Bolling v. Sharpe*, 347 U.S. 497 (1954)).

It is clearly established that the State of New Jersey, as a governmental entity, is not a "person" and therefore is not afforded the protections of the Due Process Clause. "The word 'person' in the context of the Due Process Clause of the Fifth Amendment cannot, by any reasonable mode of interpretation, be expanded to encompass the States of the Union, and to our knowledge this has never been done by any court." *South Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966).

The Court is not persuaded by Defendants' alleged *parens patriae* standing.[22] Defendants then assert that Defendant-Intervenors are "persons" for purposes of Fifth Amendment protection. Should the Court disagree, there would be no need for Fifth Amendment analysis. While the Defendant-Intervenors do not dedicate much, if any, attention to this discrete issue, the Court will assume, *arguendo*, that Defendant-Intervenors are "persons" for this limited purpose.

The Due Process and Equal Protection concerns lodged here are subject to rational basis review.[23] *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). Rational basis review

---

[22] In *Massachusetts v. Mellon*, the Court considered:

> [W]hether the suit may be maintained by the state as the representative of its citizens. To this the answer is not doubtful. We need not go so far as to say that a state may never intervene by suit to protect its citizens against any form of enforcement of unconstitutional acts of Congress; but we are clear that the right to do so does not arise here. Ordinarily, at least, the only way in which a state may afford protection to its citizens in such cases is through the enforcement of its own criminal statutes, where that is appropriate, or by opening its courts to the injured persons for the maintenance of civil suits or actions. But the citizens of Massachusetts are also citizens of the United States. It cannot be conceded that a state, as *parens patriae*, may institute judicial proceedings to protect citizens of the United States from the operation of the statutes thereof. While the state, under some circumstances, may sue in that capacity for the protection of its citizens, it is no part of its duty or power to enforce their rights in respect of their relations with the federal government. In that field it is the United States, and not the state, which represents them as *parens patriae*, when such representation becomes appropriate; and to the former, and not to the latter, they must look for such protective measures as flow from that status.

262 U.S. 447, 485-86 (1923) (internal citation omitted).

[23] Defendants rely on *North West Austin Mun. Dist. No. 1 v. Holder*, 557 U.S. 193, 203 (2009), for the proposition that any "departure from the fundamental principle of equal sovereignty requires a showing that a statute's disparate geographic coverage is sufficiently related to the problem that it targets." (*See also* Tr. at 99:17-20.) NJTHA requests that the Court adopt the *dicta* in *North West Austin* as the controlling standard in this case. (*Id.* at 68:18-22.) A deeper inspection of *North West Austin* reveals that the Supreme Court exercised "constitutional avoidance" and resolved the case on grounds that did not address constitutionality, by way of the Commerce Clause or otherwise. The Court is not inclined to adopt NJTHA's proposed standard. Rather, the Court adheres to the long standing rational basis standard.

requires "a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993). A classification "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* (internal citation omitted). "[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *Id.* (internal citation omitted). "[C]ourts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." *Id.* at 321.

Since PASPA's classification neither involves fundamental rights, nor proceeds along suspect lines, it is accorded a presumption of validity. PASPA advances the legitimate purpose of stopping the spread of legalized sports gambling and of protecting the integrity of athletic competition. Congress made clear that it was concerned primarily with the *spread* of legal sports gambling, as distinguished from the mere *existence* of legal sports gambling. *See* S. Rep No. 102-248, at 5, *reprinted in* 1992 U.S.C.C.A.N. 3553, 3556 ("Once a State legalizes sports gambling, it will be extremely difficult for other States to resist the lure. Without federal legislation, sports gambling is likely to spread on a piecemeal basis . . . ."). It was not Congress' stated purpose to *extinguish* legalized sports wagering. Rather, Congress saw the spread of legalized sports wagering as having the propensity to impact the youth, the integrity of amateur and professional sports, and as encouraging potentially addictive behaviors, and was concerned with these ills spreading and "ultimately develop[ing] irreversible momentum." *Id.*

PASPA's provisions are rationally related to Congress' aims. The grandfathering clause, which responded to substantial reliance interests, also serves to prevent the geographic spread of legalized sports wagering. Put differently, the exceptions in PASPA are not meant to eradicate

the problem, but merely to contain it. Accordingly, the specific exceptions afforded in PASPA do not impugn its rationality.

Several cases support the Court's holding. In *New Orleans v. Dukes*, the Court upheld a grandfathering clause which guides the Court's review of PASPA. 427 U.S. at 305. In *Dukes*, the issue before the Court concerned a New Orleans ordinance which excepted "vendors who have continuously operated the same business . . . for eight or more years prior to January 1, 1972 . . . ." *Id.* at 298.  Pursuant to this exception, only two vendors were permitted to continue operation and were effectively given a monopoly. *Id.* at 300. The grandfathering clause was challenged on Equal Protection grounds. *Id.* at 301. The Court held it "obvious" that the City's classification rationally furthered its objective "to preserve the appearance and custom valued by the Quarter's residents and . . . tourists." *Id.* at 304 (internal citation omitted). The economic decision was made by the City that the practice "should be substantially curtailed . . . if not totally banned." *Id.* at 305. The Court found that "rather than proceeding by the immediate and absolute abolition of all pushcart food vendors, the city could rationally choose initially to eliminate vendors of more recent vintage." *Id.* at 305. The Court stated, "[t]his gradual approach to the problem is not constitutionally impermissible." *Id.*; *see also Wawa, Inc. v. New Castle Cnty. Del.*, 391 F. Supp. 2d 291, 295-96 (D. Del. 2005) (stating that "grandfathering of existing uses often passes rational basis review, because it protects the reliance interests of property owners whose uses were legal when the government acted" and holding that "the County has acted rationally to reduce the danger . . . even if it has not immediately eliminated every danger.")

In *Minnesota v. Clover Leaf Creamery Company*, the United States Supreme Court heard an appeal from the Supreme Court of Minnesota in which the Court considered an Equal

Protection challenge to a state statute's grandfathering provision. 449 U.S. 456 (1981). The statute at issue created a classification in which "paper containers are to be preserved while plastic nonrefillables are to be banned." *Clover Leaf Creamery Co. v. State*, 289 N.W.2d 79, 81 (Minn. 1979). In essence, the Minnesota Legislature granted the paper container industry a perpetual monopoly.

The Supreme Court of Minnesota struck down the statute because it violated Equal Protection. *Id.* at 87. In reaching this conclusion, the Court relied upon evidentiary findings which "conclusively demonstrate[d] that plastic nonrefillables present fewer solid waste problems than paper containers" and, accordingly, undermined the legislative findings of the statute. *Id.* at 84. The Supreme Court of Minnesota held that discrimination against plastic nonrefillables was not rationally related to the statute's legislative purpose of easing solid waste disposal problems. *Id.* at 86-87. In addition, the Court stated that "the original version of the Act included a provision banning paper containers, but that provision was eventually removed from the Act. There is no evidence, therefore, that paper containers will cease to be used in the Minnesota milk market." *Id.* at 86. A justice of the Minnesota Supreme Court dissented and noted that "[t]he U.S. Supreme Court has frequently observed that a step-by-step approach in economic regulation is permissible . . . and has *never required actual evidence that a legislature intends to take a further step in the near future in the relevant economic area being regulated.*" *Id.* at 88 (internal citations omitted) (emphasis added).

The United States Supreme Court overturned the Minnesota state courts and upheld the grandfathering provision. The Court found the "State's approach fully supportable under our precedents," noting that "this Court has made clear that a legislature need not 'strike at all evils at the same time or in the same way.'" *Clover Leaf Creamery Co.*, 449 U.S. at 466 (citing *Semler*

*v. Or. State Bd. of Dental Exam'rs*, 294 U.S. 608, 610 (1935)). The Court defined the issue as not

"whether *in fact* the Act will promote [a] more desirable [outcome]." *Id.* at 466. Rather, the

Court found that "the Equal Protection Clause is satisfied by our conclusion that the . . .

Legislature *could rationally have decided* that its ban . . . might foster [a] desirable [outcome.]"

*Id.* at 466. The Court warned that "it is not the function of the courts to substitute their evaluation

of legislative facts for that of the legislature" and concluded that the ban must be sustained under

the Equal Protection Clause. *Id.* at 470.

The Court must heed the Supreme Court's strong admonition. The exceptions at issue in

PASPA do not offend rational basis review where Congress, whose evaluation is not to be

substituted by the Court, has determined "that all such sports gambling is harmful," but "has no

wish to apply this prohibition retroactively." S. Rep. No. 102-248, at 8, *reprinted in* 1992

U.S.C.C.A.N. 3553, 3559. The reliance interests of the excepted states, coupled with the

government's legitimate interest in stemming the tide of legalized sports gambling, provide

ample support for upholding PASPA pursuant to rational basis review.[24]

---

[24] PASPA is not entirely unique because other statutes also treat States differently. *See*, *e.g.*, 42 U.S.C § 7543(a)-(b) (the Clean Air Act prohibits states from enacting their own vehicle emission standards, but provides an exception for states which controlled auto emissions prior to March 30, 1966—California is the only such State and is therefore free to set its own standard); 29 U.S.C. § 1144(b)(5) (retroactively exempting a Hawaii statute, by name, from the scope of ERISA preemption); *McKay v. Thompson*, 226 F.3d 752, 755-56 (6th Cir. 2000) (Citing favorably Pub. L. No. 93-579, § 7, 88 Stat. 1896, 1909; and upholding a grandfathering clause that provided for an exception based on the maintenance of "a system of records in existence and operating before January 1, 1975[;]" and stating "[t]he NVRA does not specifically forbid use of social security numbers. As previously discussed, the Privacy Act contains a more specific 'grandfather' provision that Congress intended to survive the more general provisions of the NVRA.")

### 4)      The "Equal Footing" Doctrine

NJTHA also challenges PASPA on "Equal Footing" grounds. (NJTHA's Opp'n Br. 19-25.) According to NJTHA, the Equal Footing Doctrine provides for the admission of additional states on equal footing with the original States and is analogous to the present case because the states should enjoy equal footing under PASPA. (*Id.* at 19-21.) At oral argument, however, NJTHA stated that "when we use the term 'equal footing' and 'equal sovereignty,' we mean the same thing[.]" (Tr. 67:17-19.)

NJTHA relies upon *Coyle v. Smith*, 221 U.S. at 567. As previously discussed, the issue before the Court in *Coyle* was "whether there is anything in the decision of this court which sanctions the claim that Congress may, by the imposition of conditions in an enabling act, deprive a *new* state of any of those attributes essential to its equality in dignity and power with other states." *Coyle*, 221 U.S. at 568 (emphasis added).

The matter presently before the Court does not involve a State that is either attempting to enter the Union or one that is recently admitted to the Union. New Jersey, as one of the original colonies, is inappropriately situated to make an argument that it is being treated differently than the original colonies pursuant to the Equal Footing Doctrine. *See Coyle v. Smith*, 221 U.S. 559, 579 (1995); *United States v. Alaska*, 521 U.S. 1, 5 (1888) (stating that *newly admitted* States are admitted on an "equal footing" with the original Thirteen Colonies). The Court, accordingly, does not find good cause to expand the Equal Footing Doctrine in the manner requested by NJTHA. As such, the constitutionality of PASPA withstands NJTHA's Equal Footing challenge.

### D.      **The Propriety of a Permanent Injunction**

The Court has determined that PASPA is constitutional, and due to the operation of the Supremacy Clause, New Jersey's Sports Wagering Law is preempted. As argued by Plaintiffs, it

is debatable whether a separate showing for a permanent injunction is necessary where New Jersey is in clear violation of a valid federal statute. (*See* Pls.' Reply & Opp'n at 21.) Moreover, considering the Third Circuit's decision in *Markell*, *see* 579 F.3d at 304, and the District Court of Delaware's ensuing *pro forma* entrance of injunctive relief, *see OFC Comm Baseball v. Markell*, No. 09-538 (GMS) (D. Del. Sept. 1, 2009; Nov. 9, 2009) (ECF Nos. 36, 42), the Court is likely bound to enter the requested injunctive relief.

Nevertheless, and in an abundance of caution, the Court will analyze the factors necessary for an injunction. This four factor test requires a demonstration: (1) of irreparable injury; (2) of inadequacy of remedies at law to compensate for said injury; (3) that a balance of the hardships favors the party seeking the injunction; and (4) that a permanent injunction would serve the public interest. *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion." *Id.*

### 1)      Irreparable Injury

Plaintiffs have demonstrated irreparable injury because the Sports Wagering Law has been enacted in violation of federal law. The Third Circuit in *Markell* recognized that the spread of sports gambling "would engender the very ills that PASPA sought to combat." 579 F.3d at 304. Moreover, the enactment of the Sports Wagering Law in violation of the Supremacy Clause, alone, likely constitutes an irreparable harm requiring the issuance of a permanent injunction. *See Am. Exp. Travel Related Servs. Co., Inc. v. Sidamon-Eristoff*, 755 F. Supp. 2d 556, 614 (D.N.J. 2010), *aff'd sub nom.*, *New Jersey Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374 (3d Cir. 2012); *Ass'n for Fairness in Bus., Inc. v. New Jersey*, 82 F. Supp. 2d 353, 363

(D.N.J. 2000) ("[A]n alleged constitutional infringement will often alone constitute irreparable harm.") (quoting *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997)).

### 2)    Inadequacy of Monetary Damages

Plaintiffs demonstrate an inadequacy of a remedy at law because New Jersey, by operation of the Eleventh Amendment, cannot be forced to pay retroactive money damages. *See Temple Univ. v. White*, 941 F.2d 201, 215 (3d Cir. 1991) ("As to the inadequacy of legal remedies, the Eleventh Amendment bar to an award of retroactive damages against the Commonwealth [of Pennsylvania] clearly establishes that any legal remedy is unavailable and that the only relief available is equitable in nature.").

### 3)    Comparative Hardship to the Parties

Here, no hardship will befall Defendants. In essence, the entrance of a permanent injunction will do nothing more than require that New Jersey comply with federal law. "The only hardship imposed upon the Defendants is that they obey the law." *Coach Inc. Fashion Paradise, LLC*, No. 10-4888 (JBS), 2012 WL 194092, at *9 (D.N.J. Jan. 20, 2012); *Port Drivers Fed'n 18, Inc. v. All Saints Exp., Inc.*, 757 F. Supp. 2d 443, 461 (D.N.J. 2010); *see also Sierra Club v. Franklin Cnty. Power of Ill., LLC*, 546 F.3d 918, 936 (7th Cir. 2008). Accordingly, the balance of the hardships weighs in favor of the Court entering a permanent injunction.

### 4)    Public Interest

The entrance of a permanent injunction in this case advances the public interest. The public interest is favored by protecting valid federal statutes from being infringed upon and upholding the mandates of the United States Constitution. *Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003) (affirming the district court's finding that "the public interest was not served by the enforcement of an unconstitutional law") (citation and quotation marks

44

omitted), *aff'd and remanded*, 542 U.S. 656 (2004); s*ee generally Nat'l R.R. Passenger Corp.*, No. 08-5398, 2010 WL 92518, at *9 (E.D. Pa. Jan. 8, 2010).

Accordingly, Defendants are permanently enjoined from sponsoring, operating, advertising, promoting, licensing, or authorizing a lottery, sweepstakes, or other betting, gambling, or wagering scheme based, directly or indirectly (through the use of geographical references or otherwise), on one or more competitive games in which amateur or professional athletes participate, or are intended to participate, or on one or more performances of such athletes in such games.

## IV.   Conclusion

After careful consideration of the Parties' submissions, the Court has determined that PASPA is a constitutional exercise of Congress' powers pursuant to the Commerce Clause. PASPA does not violate the Tenth Amendment, Due Process Clause or Equal Protection Principles; nor does it violate the Equal Footing Doctrine. Plaintiffs' Motion for Summary Judgment, therefore, is GRANTED. Plaintiffs have also demonstrated that they are entitled to a permanent injunction. Defendants' Cross Motion for Summary Judgment is DENIED. An Order consistent with this Opinion will be filed on this date.

  /s/ Michael A. Shipp
**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**

Dated:  February 28, 2013