**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION, et al.,

                    Plaintiffs,                         Civil Action No. 14-6450 (MAS) (LHG)

            v.

CHRISTOPHER J. CHRISTIE, et al.,

                    Defendants.


NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION, et al.,

                    Plaintiffs,                         Civil Action No. 12-4947 (MAS) (LHG)

            v.                                          **OPINION**

CHRISTOPHER J. CHRISTIE, et al.,

                    Defendants.


**SHIPP, District Judge**

        This matter comes before the Court on application for a preliminary injunction by Plaintiffs

National Collegiate Athletic Association ("NCAA"), National Basketball Association ("NBA"),

National Football League ("NFL"), National Hockey League ("NHL"), and Office of the

Commissioner of Baseball, doing business as Major League Baseball ("MLB"), (collectively

"Plaintiffs" or the "Leagues") to enjoin Christopher J. Christie, Governor of the State of New

Jersey; David L. Rebuck, Director of the New Jersey Division of Gaming Enforcement and

Assistant Attorney General of the State of New Jersey; Frank Zanzuccki, Executive Director of

the New Jersey Racing Commission ("State Defendants"); the New Jersey Sports and Exposition Authority ("NJSEA"); and New Jersey Thoroughbred Horsemen's Association ("NJTHA") (collectively "Defendants").[1]  (ECF No. 12; 12-4947, ECF No. 174.)[2]  On November 10, 2014, the Court notified the parties of its intent to consolidate the Leagues' application for a preliminary injunction with a final disposition on the merits.  (ECF No. 50; 12-4947, ECF No. 192.)  The Court conducted oral argument on November 20, 2014.  The Court, having considered the parties' submissions and arguments, and for the reasons stated below, finds that the Leagues are entitled to summary judgment on Count One of the Complaint and a concomitant permanent injunction.

I.     **Introduction**

Sports betting continues to be an issue of great importance to New Jersey.  In 2011, the people of New Jersey passed a referendum, approving a constitutional amendment that authorized sports gambling in the state at casinos and racetracks.  Subsequently, New Jersey enacted legislation in 2012 that legalized and regulated sports gambling at New Jersey racetracks and casinos for individuals age twenty-one and older, with the exception of wagering on college sporting events that take place in New Jersey or on New Jersey college teams (the "2012 Law").  The Leagues then sued, and the Defendants challenged the constitutionality of the Professional and Amateur Sports Protection Act ("PASPA").   The State Defendants, the Legislature Defendants, and the NJTHA vigorously litigated the issue before the Undersigned and the Third Circuit Court of Appeals.  Both courts found PASPA constitutional, and the United States Supreme

---

[1] On November 6, 2014, the Presiding Officers of the New Jersey Legislature, Stephen M. Sweeney, President of the New Jersey Senate, and Vincent Prieto, Speaker of the New Jersey General Assembly ("Legislature Defendants"), requested leave to intervene (ECF No. 46), which was granted on November 7, 2014 (ECF No. 48).

[2] Unless otherwise noted, citations to the docket refer to Civil Action No. 14-6450.

Court declined certiorari.  On October 17, 2014, the State enacted legislation repealing the 2012 Law and other provisions of state law related to gaming insofar as they bar sports wagering in certain contexts (the "2014 Law").  Defendants assert that the 2014 Law results in legal sports gambling at New Jersey racetracks and casinos for individuals age twenty-one and older, with the exception of wagering on college sporting events that take place in New Jersey or on New Jersey college teams.  This case requires the Court to determine whether New Jersey's recent attempt to do indirectly what it could not do directly—bring sports wagering to New Jersey in a limited fashion—conflicts with PASPA.

It is a well-known principle that "the rule of law is sacrosanct, binding on all Americans." (Leagues' TRO Br., Decl. of Anthony J. Dreyer ("Dreyer Decl."), Ex. 8, Governor Christie's Statement Vetoing S. 2250, ECF No. 12-11.)  The Supremacy Clause makes the Constitution and the laws passed pursuant to it the supreme law of the land and provides the mechanism to enforce uniform national policies.  When state law contradicts with federal law, the Supremacy Clause operates to preclude states from following policies different than those set forth by federal law. As the Third Circuit noted in *Christie I*, to allow states to follow policies contrary to federal law would be "revolutionary," reducing the Constitution to the same impotent condition that existed under the Articles of Confederation.  *See Nat'l Collegiate Athletic Ass'n v. Governor of N.J.*, 730 F.3d 208, 230 (3d Cir. 2013), *cert. denied sub nom.*, *Christie v. Nat'l Collegiate Athletic Ass'n*, 134 S. Ct. 2866 (2014) ("*Christie I*").

New Jersey's current desire to allow sports wagering within its borders is not unique to the State.  While New Jersey is at the forefront of this movement, many states around the country appear poised to join should New Jersey provide a roadmap around PASPA.  New Jersey's most recent legislation does not provide such a roadmap.  While novel, the recent legislation still

conflicts with PASPA and thus must yield to the federal law.  As a result, to the extent the people of New Jersey disagree with PASPA, their remedy is to repeal the state's prohibition consistent with the Third Circuit's directive or work towards a repeal or amendment of PASPA in Congress. "Ignoring federal law, rather than working to reform federal standards, is counter to our democratic traditions and inconsistent with . . . Constitutional values."  (Leagues' TRO Br., Dreyer Decl., Ex. 8, Governor Christie's Statement Vetoing S. 2250, ECF No. 12-11.)

## II.   Background

### A.     The Professional and Amateur Sports Protection Act

Congress enacted PASPA, 28 U.S.C. §§ 3701-3704, in 1992 "to 'prohibit sports gambling conducted by, or authorized under the law of, any State or governmental entity' and to 'stop the spread of State-sponsored sports gambling.'"  *Christie I*, 730 F.3d at 216 (quoting S. Rep. 102-248, at 4 (1991), *reprinted in* 1992 U.S.C.C.A.N. 3553, 3555).  To that end, PASPA makes it unlawful for:

(1)   a governmental entity to sponsor, operate, advertise, promote, license, or authorize by law or compact, or

(2)   a person to sponsor, operate, advertise, or promote, pursuant to the law or compact of a governmental entity,

a lottery, sweepstakes, or other betting, gambling, or wagering scheme based, directly or indirectly (through the use of geographical references or otherwise), on one or more competitive games in which amateur or professional athletes participate, or are intended to participate, or on one or more performances of such athletes in such games.

28 U.S.C. § 3702.  PASPA includes a grandfather clause, which exempts states with preexisting sports wagering laws.  *Id.* § 3704.  Additionally, PASPA granted New Jersey a one-year window to legalize wagering on sports, but New Jersey chose not to exercise that option.  *Christie I*, 730 F.3d at 216 (citing § 3704).  At the time Congress enacted PASPA, "*all but one* state prohibited

broad state-sponsored gambling," but states, including New Jersey, were beginning to consider different laws that would allow sports wagering in their states.  *Id.* at 234; *see also* S. Rep. 102-248, at 5.  PASPA's legislative history makes clear that Congress enacted PASPA to "keep sports gambling from spreading" pursuant to a state scheme.  S. Rep. 102-248, at 5.

    **B.**    *Christie I*: **The 2012 Law**

Roughly twenty years after the enactment of PASPA, New Jersey sought to adopt legalized sports wagering within its borders.  In 2010, the New Jersey Legislature held public hearings regarding sports wagering and ultimately asked New Jersey voters to consider an amendment to the State's Constitution,[3] to make it "lawful for the Legislature to authorize by law wagering . . . on the results of any professional, college, or amateur sport or athletic event."  N.J. Const. art. IV, § 7, ¶ 2(D), (F).  In the November 2011 general election, New Jersey voters approved the referendum, and the constitutional amendment became effective on December 8, 2011.  On January 17, 2012, pursuant to this constitutional amendment, New Jersey enacted the 2012 Law, N.J. Stat. Ann. §§ 5:12A-1 to -4, -5 to -6 (2012).  In response to the enactment of the 2012 Law,

---

[3] The official ballot question read:  "Shall the amendment to Article IV, Section VII, paragraph 2 of the Constitution of the State of New Jersey, agreed to by the Legislature, providing that it shall be lawful for the Legislature to authorize by law wagering at casinos or gambling houses in Atlantic City and at racetracks, in-person or through an account wagering system, on the results of professional, certain college, or amateur sport or athletic events, be approved?"  *See* S. Con. Res. 49, 214th Leg. (N.J. 2010).  The interpretative statement that appeared in conjunction with the ballot question stated:  "This constitutional amendment would authorize the Legislature to pass laws allowing sports wagering at Atlantic City casinos and at racetracks. Wagers could be placed on professional, certain college, or amateur sport or athletic events. However, wagers could not be placed on college games that take place in New Jersey or in which a New Jersey college team participates regardless of where the game takes place. A wager could be placed at a casino or racetrack either in-person or from any other location through an account wagering system that uses telephone, Internet or other means."  *Id.*

on August 7, 2012, the Leagues filed a complaint against the State Defendants claiming that the 2012 Law violated PASPA.[4]  (12-4947, ECF No. 1.)

On February 28, 2013, after careful consideration of the positions advanced during the course of the litigation, this Court found that "Congress acted within its power and [PASPA] does not violate the United States Constitution," and entered a permanent injunction.  *Christie I*, 926 F. Supp. 2d 551, 554 (D.N.J. 2013).  On September 17, 2013, the Third Circuit, in a *de novo* review, affirmed this Court's decision.  The Third Circuit held that: (1) the Leagues had standing to bring the action; (2) PASPA's enactment was within Congress's power under the Commerce Clause; (3) PASPA did not violate the anti-commandeering principle; and (4) PASPA was not invalid under the doctrine of equal sovereignty.  *See Christie I*, 730 F.3d at 215.  On June 23, 2014, the United States Supreme Court denied certiorari.  *See Christie I*, 134 S. Ct. 2866 (2014).

On the same day the Supreme Court denied Defendants' certiorari petition, legislation was introduced in the New Jersey Senate "[p]artially repealing prohibitions against sports wagering at racetracks and casinos in New Jersey."  S. 2250, 216th Leg. (N.J. 2014) (vetoed).  Three days later, the Senate and the Assembly both passed the legislation without any recorded debate or discussion. *Id.*  On August 8, 2014, Governor Christie vetoed the legislation.  Governor Christie said the legislation was "a novel attempt to circumvent the Third Circuit's ruling" in *Christie I*.  (Leagues' TRO Br., Dreyer Decl., Ex. 8, Governor Christie's Statement Vetoing S. 2250, ECF No. 12-11.) Governor Christie stated that, while he did "not agree with the Circuit Court's conclusion, [he]

---

[4] On November 21, 2012, the Legislature Defendants and the NJTHA filed Motions to Intervene (12-4947, ECF Nos. 72, 75), which were granted on December 11, 2012 (12-4947, ECF No. 102). On January 22, 2013, the United States filed a Notice of Intervention in response to the Court's Order Certifying Notice of a Constitutional Challenge to the United States Attorney General. (12-4947, ECF Nos. 128.)

believe[s] that the rule of law is sacrosanct, binding on all Americans." (*Id.*)  Governor Christie acknowledged: "[i]gnoring federal law, rather than working to reform federal standards, is counter to our democratic traditions and inconsistent with the Constitutional values I have sworn to defend and protect." (*Id.*)

One month later, on September 8, 2014, New Jersey's Acting Attorney General issued a Law Enforcement Directive to all New Jersey law enforcement personnel regarding the 2012 Law. The Directive concluded that, based on the severability clause in the statute, the central provisions of the 2012 Law, which establish that casinos or racetracks may operate sports pools, remained in effect, and thus, such activity was exempted from criminal and civil liability.  (State Defs.' Clarification Mot. 1-2, 12-4947, ECF No. 161.)  On the same day, the State Defendants filed a motion in *Christie I* requesting that the Court clarify its permanent injunction or modify its injunction to conform to this interpretation of the Third Circuit's decision.  (*Id.* at 8-9.)  In connection with this request, the State Defendants secured a moratorium on sports wagering in New Jersey from all casinos and racetracks until October 26, 2014.  (Oct. 9, 2014 Ltr., Ex. A, 12-4947, ECF No. 168.)  On October 17, 2014, the State Defendants withdrew their motion for clarification or modification and notified the Court that Governor Christie signed New Jersey Senate Bill 2460 into law. (Oct. 17, 2014 Ltr., 12-4947, ECF No. 173.)

C.   *Christie II*: The 2014 Law

The 2014 Law was first introduced in the Senate on October 9, 2014.  S. 2460, 216th Leg. (N.J. 2014) (enacted).  On October 14, 2014, the Senate and the Assembly passed the bill with a 28-1 vote and 73-4-0 vote, respectively.  *Id.*  There is no recorded floor debate or discussion for the 2014 Law.  One of the 2014 Law's sponsors, however, touted the legislation as "a short step away from getting this done and a lot closer to bringing sports betting to New Jersey." (Leagues'

TRO Br., Dreyer Decl., Ex. 10, ECF No. 12-13 (quoting State Senator Raymond J. Lesniak).)  On October 17, 2014, Governor Christie signed the legislation into law.  (Oct. 17, 2014 Ltr., 12-4947, ECF No. 173.)

The 2014 Law is designed to *partially repeal* all state laws and regulations prohibiting sports wagering, but only in certain circumstances.  The 2014 Law "partially repeal[s] the prohibitions, permits, licenses, and authorizations concerning wagers on professional, collegiate, or amateur sport contests or athletic events."  S. 2460, 216th Leg. (2014) (enacted).  In addition to repealing the 2012 Law, the 2014 Law repeals provisions of New Jersey law governing criminal penalties for gambling, N.J. Stat. Ann. §§ 2C:37-1 to -9, civil penalties for gambling, N.J. Stat. Ann. §§ 2A:40-1 to -9, the regulation of equine breeding and racing, N.J. Stat. Ann. §§ 5:5-1 to -189, and the Casino Control Act, N.J. Stat. Ann. §§ 5:12-1 to -233, as well as "any rules and regulations that may require or authorize any State agency to license, authorize, permit or otherwise take action to allow any person to engage in the placement or acceptance of any wager on any professional, collegiate, or amateur sport contest or athletic event, or that prohibit participation in or operation of a pool that accepts such wagers."  N.J. Stat. Ann. § 5:12A-7.  The 2014 Law, however, only repeals these laws "to the extent they apply or may be construed to apply [to sports wagering] at a casino or gambling house operating in this State in Atlantic City or a running or harness horse racetrack in this State, . . . by persons 21 years of age or older."  *Id.*  The 2014 Law also excludes "collegiate sports contest[s] or collegiate athletic event[s] that take[] place in New Jersey or . . . sport contest[s] or athletic event[s] in which any New Jersey college team participates regardless of where the event takes place" from the definition of "collegiate sport contest or athletic event."  *Id.*

The 2014 Law explicitly states that it "shall be construed to *repeal* State laws and regulations." *Id.* § 5:12A-8 (emphasis added). The legislative statement immediately following the 2014 Law provides that it implements the Third Circuit's decision in *Christie I*. It quotes select portions of the *Christie I* decision, including that the Third Circuit does "not read PASPA to prohibit New Jersey from repealing its ban on sports wagering," and "it is left up to each state to decide how much of a law enforcement priority it wants to make of sports gambling, or *what the exact contours of the prohibition will be*." S. 2460 at 3-4. The 2014 Law also contains a broad severability clause. N.J. Stat. Ann. § 5:12A-9.

In response to the 2014 Law, the Leagues filed a Complaint for Declaratory and Injunctive Relief (the "Complaint") on October 20, 2014, against the State Defendants, the NJTHA, and the NJSEA ("*Christie II*"). (ECF No. 1.) In the Complaint, the Leagues allege that "[f]or years, New Jersey has been attempting to devise a way to get around [PASPA's] unambiguous prohibitions and authorize sports gambling in Atlantic City casinos and horse racetracks throughout the state." (*Id.* ¶ 3.) The Complaint asserts four causes of action: (1) violation of PASPA, 28 U.S.C. § 3702(1), against the State Defendants; (2) violation of the New Jersey Constitution against all Defendants; (3) violation of PASPA, 28 U.S.C. § 3702(1), against the NJSEA; and (4) violation of PASPA, 28 U.S.C. § 3702(2), against the NJTHA. (*Id.* ¶¶ 58-74.) All of the claims asserted by the Leagues are based on violations of PASPA pursuant to the 2014 Law. In the Complaint, the Leagues seek an order declaring that either the 2014 Law violates PASPA or, alternatively, the 2014 Law violates the New Jersey Constitution. (*Id.* at 22-23.) The Leagues additionally seek to enjoin Defendants from implementing or enforcing the 2014 Law. (*Id.*)

On October 21, 2014, the Court conducted, on the record, a telephone status conference regarding the briefing schedule for the Leagues' application for temporary restraints and a

preliminary injunction.  During the conference, counsel for the NJTHA confirmed that Monmouth Park planned to start accepting bets on Sunday, October 26, 2014.  The same day, the Leagues filed an order to show cause with temporary restraints seeking a temporary restraining order and preliminary injunction against Defendants in both *Christie I* and *Christie II*.[5]  On October 22, 2014, the NJSEA, the NJTHA, the State Defendants, and the Legislature Defendants submitted their opposition briefs.  The Leagues submitted their reply brief on October 23, 2014.  With an extremely limited amount of time to render a decision based on the NJTHA's planned start date for sports wagering, on October 24, 2014, the Court issued an oral opinion from the bench granting the Leagues' application for a temporary restraining order and requiring the Leagues to post a bond, pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, in the amount of $1.7 million.[6]

Also, on October 24, 2014, the Court issued a Scheduling Order requiring the parties to e-file joint correspondence that provided: (1) whether any party sought discovery prior to the Court's decision on the preliminary injunction application, (2) their positions regarding the necessity of a preliminary injunction hearing, and (3) a proposed schedule for supplemental briefing, if necessary.  (ECF No. 33.)  By correspondence dated October 27, 2014, the parties informed the Court that no discovery was necessary, nor evidentiary hearing required, in connection with the pending preliminary injunction application.  (ECF No. 35.)

---

[5] As the Court has consolidated its determination of the Leagues' application for a preliminary injunction with a decision on the merits through summary judgment, the Leagues' application for a preliminary injunction is terminated as moot in both *Christie I* (12-4947, ECF No. 174) and *Christie II* (ECF No. 12).

[6] To allow for additional briefing on the Leagues' application for a preliminary injunction, the Court extended the temporary restraining order for an additional fourteen days, until November 21, 2014, and ordered the Leagues to post an additional bond in the amount of $1.7 million by November 10, 2014.  (ECF No. 38.)

On November 3, 2014, the NJSEA, the NJTHA, the State Defendants, and the Legislature Defendants submitted their opposition briefs (ECF Nos. 42-44; 12-4947, ECF No. 189).  The Leagues submitted a reply brief on November 7, 2014.  (ECF No. 49; 12-4947, ECF No. 191.)  In an Order dated November 10, 2014, the Court provided notice to all parties of its intention to consolidate the application for a preliminary injunction with a decision on the merits and allowed the parties to file additional correspondence by November 17, 2014.  (ECF No. 50; 12-4947, ECF No. 192.)  By Order dated November 19, 2014, the Court clarified its earlier Order that "the Court shall consolidate Plaintiffs' application for a preliminary injunction with a decision on the merits through summary judgment."  (ECF No. 56.)  The Court heard oral argument on November 20, 2014.

## III.    **Legal Standard**

Rule 65 of the Federal Rules of Civil Procedure "empowers district courts to grant preliminary injunctions." *Doe v. Banos*, 713 F. Supp. 2d 404, 410 (D.N.J.), *aff'd*, 416 F. App'x 185 (3d Cir. 2010).  "Because the scope and procedural posture of a hearing for a preliminary injunction is significantly different from a trial on the merits . . . 'it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits.'" *Anderson v. Davila*, 125 F.3d 148, 157 (3d Cir. 1997) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).  In appropriate circumstances, however, Rule 65(a)(2) provides a district court with the discretion to "advance the trial on the merits and consolidate it with the [preliminary injunction] hearing." Fed. R. Civ. P. 65(a)(2).  A district court may also convert a decision on a preliminary injunction application into a final disposition on the merits by granting summary judgment as long as sufficient notice is provided pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See Krebs v. Rutgers*, 797 F. Supp. 1246, 1253 (D.N.J. 1992); *Air Line Pilots Ass'n,*

*Int'l v. Alaska Airlines, Inc.*, 898 F.2d 1393, 1397 n.4 (9th Cir. 1990); *see also* Fed. R. Civ. P. 56(f).

Under Rule 56, summary judgment is appropriate if the record shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[P]reemption is primarily a question of law . . . ." *Jeter v. Brown & Williamson Tobacco Corp.*, 113 F. App'x 465, 467 (3d Cir. 2004); *see Travitz v. Ne. Dep't ILGWU Health & Welfare Fund*, 13 F.3d 704, 708 (3d Cir. 1994) ("The issue of preemption is essentially legal . . . .")  Further, where a court finds the issue of preemption to be dispositive, the remaining claims and issues need not be addressed.  *See, e.g.*, *Stepan Co. v. Callahan Co.*, 568 F. Supp. 2d 546, 549 (D.N.J. 2008).

The Third Circuit has held, in accordance with principles of due process, that a district court should give the parties notice of its intent prior to entering summary judgment *sua sponte*. *See Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 280 (3d Cir. 2010).  Notice is sufficient, however, "when 'the targeted party had reason to believe the court might reach the issue and received a fair opportunity to put its best foot forward.'" *Zimmerlink v. Zapotsky*, 539 F. App'x 45, 49 (3d Cir. 2013) (quoting *Gibson v. Mayor & Council of City of Wilmington*, 355 F.3d 215, 223-24 (3d Cir. 2004) (finding no notice is required if there is a fully developed record, a lack of prejudice to the parties, and a decision on a purely legal issue)).  "Even if a court fails to comply with the requirements of Rule 56(f), however, any such error 'may be excused if the failure was a harmless error.'" *Zimmerlink*, 539 F. App'x at 49 (quoting *Rose v. Bartle*, 871 F.2d 331, 342 (3d Cir. 1989)).

Advancing a final disposition on the merits, through summary judgment, and consolidating it with the preliminary injunction application is appropriate in this case.  Here, the preliminary

injunctive relief the Leagues seek is the same relief they hope to ultimately obtain through a permanent injunction.   Additionally, the merits of the case have been extensively briefed by all parties.  The parties informed the Court that no discovery or evidentiary hearing was required on the preliminary injunction application.  (Oct. 27, 2014 Ltr., ECF No. 35.)  Significantly, the parties' briefing does not identify any factual disputes for the Court to resolve at trial; rather, the parties' primary disagreement concerns whether the 2014 Law is preempted by PASPA.  Furthermore, the parties had reason to believe the Court might reach the issue.  All of the parties are well aware of the procedural history in *Office of the Commissioner of Baseball v. Markell*, 579 F.3d 293, 297 (3d Cir. 2009), another case interpreting PASPA in which the court consolidated an appeal of a denial of a preliminary injunction with a decision on the merits.  In addition, the Leagues raised the request in their briefing.  Moreover, the Court provided notice to the parties of its intent to consolidate the Leagues' application for a preliminary injunction with a decision on the merits. While "[i]t is often noted that the wheels of justice move slowly[,] . . . . that is not always the case. When a party seeks injunctive relief, the stakes are high, time is of the essence, and a straightforward legal question is properly presented . . . , prudence dictates that [the court] answer that question with dispatch."  *Markell*, 579 F.3d at 297 (finding broad scope of appellate review to decide merits of a purely legal issue on appeal from preliminary injunction ruling).  Accordingly, this is an appropriate case in which to consolidate the application for a preliminary injunction with summary judgment, as the Court is presented with purely a legal question.[7]

---

[7] On November 17, 2014, all parties submitted correspondence in response to the Court's November 10, 2014 Order providing notice of its intention to consolidate the application for a preliminary injunction with a decision on the merits.  The Leagues, the State Defendants, the Legislature Defendants, and the NJSEA did not object to the Court rendering a summary judgment decision.  (ECF Nos. 51, 52, 54.)  The NJTHA objects to summary judgment at this stage of litigation.  (ECF Nos. 53, 61.)  The NJTHA primarily asserts that the Court did not provide fair notice that it would *sua sponte* consider summary judgment.  In addition, the NJTHA intends to

IV.   <u>**Analysis**</u>

The primary question in this case is whether PASPA, a federal statute that prohibits sports

wagering pursuant to a state scheme, preempts a state law that *partially repeals* New Jersey's

prohibitions on sports wagering at casinos and racetracks in the state.  To answer this question, the

Court must consider both the Third Circuit's holding in *Christie I* and ordinary preemption

principles.

The parties agree that the Third Circuit's decision in *Christie I*, which held that PASPA

preempted the 2012 Law and left New Jersey a choice to either maintain or to repeal its prohibition

on sports wagering, informs the Court's analysis in this case.  The parties disagree, however, as to

the exact scope of conduct PASPA operates to preempt.  Defendants interpret the Third Circuit's

decision in *Christie I* to allow New Jersey to "partially repeal any existing laws that apply to sports

wagering (as New Jersey has done with the [2014 Law])."  (Legislature Defs.' Opp'n Br. 4,

12-4947, ECF No. 189.)  On the other hand, the Leagues insist that the Third Circuit's holding in

*Christie I* requires that New Jersey either maintain its prohibition or completely deregulate the

field of sports wagering.[8]  (Leagues' TRO Br. 17, ECF No. 12.)

---

assert Plaintiffs' unclean hands as an affirmative defense.  The Court is not persuaded by either
argument.  The Court provided notice to all parties on November 10, 2014, of its intention to
consolidate the preliminary injunction application with a decision on the merits.  The Court also
provided the parties with the opportunity to raise any issues.  After careful consideration of the
NJTHA's arguments, the Court nevertheless finds its notice sufficient in light of the legal nature
of the inquiry.  In addition, no injunction is being entered against the NJTHA.  Therefore, it is
unnecessary for the Court to determine the validity of the NJTHA's assertion of unclean hands.
The dispositive legal issue before the Court, as the NJTHA conceded at oral argument, is whether
the 2014 Law is invalid as preempted by PASPA.  (Oral Arg. Tr. 42:5-9 Nov. 20, 2014.)

[8] The Leagues appeared to retreat from an "all or nothing" position during oral argument.  At oral
argument counsel suggested that when there is not a complete repeal, preemption must be
determined on a case-by-case basis.  (Oral Arg. Tr. 11:11-16 Nov. 20, 2014.)

The Court agrees with the Leagues' main contention, namely, that the 2014 Law is preempted by PASPA. The Court, however, finds that the present case is not nearly as clear as either the Leagues or the Defendants assert. This case presents the novel issue of whether the 2014 Law, which purports to *partially repeal* New Jersey legislation, nevertheless is preempted by PASPA. In analyzing this novel issue, the Court will begin by discussing the Third Circuit's decision in *Christie I*, including the scope of its holding and the instruction it provides for deciding the present inquiry. The Court will then discuss relevant preemption principles.

A.    **The Third Circuit's Decision in *Christie I***

The Third Circuit in *Christie I* affirmed this Court's decision and, in doing so, found that PASPA was a constitutional exercise of Congress's Commerce Clause power and did not violate anti-commandeering principles derived from the Tenth Amendment. Accordingly, as much as Defendants would prefer, *Christie II* is not, and cannot be, about the constitutionality of PASPA; instead, *Christie II* concerns the doctrine of preemption. While the Third Circuit in *Christie I* addressed the issue of preemption and found that PASPA "operates via the Supremacy Clause to invalidate contrary state action," it did so only in the context of the 2012 Law. The Third Circuit's reasoning in *Christie I*, however, provides a framework for the analysis of the issues raised in *Christie II*: whether PASPA's preemptive scope operates to invalidate the 2014 Law. Of particular relevance are (1) the Third Circuit's findings as to the congressional purpose of PASPA and (2) the Third Circuit's discussion as to what PASPA prohibits with respect to state legislation regarding sports wagering under its anti-commandeering analysis.

1.    <u>The Third Circuit's Findings as to the Congressional Purpose of PASPA</u>

In affirming *Christie I*, the Third Circuit looked directly to the text and legislative history of PASPA to determine Congress's intent. In gleaning Congress's intent, the Third Circuit found

that the goal of Congress in enacting PASPA was "to ban gambling pursuant to a state scheme—because Congress was concerned that state-sponsored gambling carried with it a label of legitimacy that would make the activity appealing." *Christie I*, 730 F.3d at 237. As the Third Circuit noted in *Christie I*, Congress saw "'[s]ports gambling [as] a national problem' . . . because '[o]nce a State legalizes sports gambling, it will be extremely difficult for other States to resist the lure.'" *Id.* at 216 (quoting S. Rep. 102-248, at 5). Congress was concerned that "[w]ithout Federal legislation, sports gambling [would] likely . . . spread on a piecemeal basis and ultimately develop an irreversible momentum." S. Rep. 102-248, at 5. Although all but one state prohibited sports gambling at the time PASPA was enacted in 1992, *Christie I*, 730 F.3d at 234, Congress was cognizant that states were beginning to consider a wide variety of gambling schemes that would allow sports gambling in their states, including New Jersey. *See* S. Rep. 102-248, at 5. Thus, the Third Circuit saw PASPA as Congress's way of making it harder for states to "to turn their backs on the choices they previously made." *Christie I*, 730 F.3d at 234.

The Third Circuit's analysis of the congressional purpose behind PASPA demonstrates that Congress's concern with sports wagering extended beyond the mere form of a state's regulation. Rather, Congress's concern related to the potential for "state scheme[s]" implementing sports gambling and the "label of legitimacy" that would exist as a result. By imposing a hard choice, Congress sought to avoid the appearance of state-sanctioned sports wagering. The Third Circuit's findings regarding the congressional purpose of PASPA provide a backdrop to this Court's application of preemption principles to PASPA and the 2014 Law.

### 2.    The Third Circuit's Anti-Commandeering Analysis

In determining whether PASPA impermissibly commandeers the states, the Third Circuit in *Christie I* first found that PASPA uses "classic preemption language that operates, via the

16

Constitution's Supremacy Clause, to invalidate state laws that are contrary to the federal statute." *Christie I*, 730 F.3d at 226 (citations omitted). Finding that PASPA clearly preempts contrary state law through the Supremacy Clause, the Third Circuit turned to Defendants' argument that PASPA nonetheless violates anti-commandeering principles. *Id.* at 228. In support of this analysis, the Third Circuit provided an in-depth and comprehensive review of the Supreme Court's anti-commandeering jurisprudence. *Id.* at 227-29. The Third Circuit then applied the principles derived from that jurisprudence to determine whether PASPA violates the anti-commandeering principle when it "simply operate[s] to invalidate contrary state law" under the Supremacy Clause. *Id.* at 230. The Third Circuit recognized that no court has ever held that "applying the Supremacy Clause to invalidate a state law contrary to federal proscriptions is tantamount to direct regulation over the states, to an invasion of their sovereignty, or to commandeering." *Id.* at 229-30.

The Third Circuit then determined that the mandate of PASPA is unlike those federal laws that had previously been struck down on the basis of impermissible commandeering. The Supreme Court in *New York v. United States*, 505 U.S 144 (1992), and *Printz v. United States*, 521 U.S. 898 (1997), struck down federal laws on the basis that both required some affirmative action on the part of states in order to implement the federal law at issue. *Christie I*, 730 F.3d at 231. In connection with this distinction, the Third Circuit confronted Defendants' position that PASPA "impose[s] an affirmative requirement [on] states . . . , by prohibiting them from repealing anti-sports wagering provisions." *Id.* at 232. The court rejected this argument, holding instead that PASPA does not restrict states from removing their prohibitions on sports betting. "Nothing in [Section 3702(1)] *requires* that the states keep any law in place." *Id.* (emphasis in original). Rather, the court stated, "[a]ll that is prohibited is the issuance of gambling 'license[s]' or the affirmative 'authoriz[ation] *by law*' of gambling schemes." *Id.* (emphasis and alterations in

17

original).   That is, the Third Circuit found PASPA preempts only a state's support of sports wagering through legislative action.   The court continued, "[w]e do not see how having *no law* in place governing sports wagering is the same as authorizing it by law."   *Id.* (emphasis in original). In other words, "the lack of an affirmative prohibition on an activity does not mean it is *affirmatively* authorized by law."   *Id.* (emphasis in original).

Concluding that PASPA's prohibition was different than the affirmative requirements struck down in *New York* and *Printz*, the Third Circuit reasoned that "PASPA's straightforward *prohibition* on action may be recast as presenting two *options*."   *Id.* at 233 (emphasis in original). Under the framework of PASPA, according to the Third Circuit, states are presented with "two 'choices,'" neither of which "affirmatively require[] the states to enact a law, and both choices leave much room for the states to make their own policy":

> [O]n the one hand, *a state may repeal its sports wagering ban*, a move that will result in the expenditure of no resources or effort by any official. *On the other hand, a state may choose to keep a complete ban on sports gambling*, but it is left up to each state to decide how much of a law enforcement priority it wants to make of sports gambling, or what the exact contours of the prohibition will be.[9]

*Id.* (emphasis added).   Thus, the Third Circuit recognized that a state's choice in eliminating its ban on sports wagering is limited to a simple repeal.   Conversely, if a state chooses to maintain its prohibition, the state possesses a degree of flexibility, both in its enforcement of the prohibition and in its definition of the "complete ban['s]" "exact contours."   Further, the Third Circuit emphasized that these two choices are "not easy choices."   *Id.*   "But the fact that Congress gave the states a hard or tempting choice does not mean that they were given no choice at all."   *Id.* Indeed, the court reasoned that "Congress may have suspected that most states would choose to

---

[9] Defendants go to great lengths to recast this passage in a light contrary to its meaning.  The entire passage is included in full so that its context can be examined.

keep an actual prohibition on sports gambling on the books, rather than permit that activity to go unregulated."[10]  *Id.*

This interpretation of the Third Circuit's decision is buttressed by the opinion of The Honorable Thomas I. Vanaskie, U.S.C.J., in *Christie I*, concurring in part and dissenting in part. Judge Vanaskie dissented from the majority on the specific basis that PASPA impermissibly commandeered state governments.  *Id.* at 241 (Vanaskie, J., dissenting).  Judge Vanaskie's position was a direct result of the majority's determination regarding the scope of PASPA: "according to my colleagues, PASPA essentially gives the states the choice of allowing totally unregulated betting on sporting events or prohibiting all such gambling."  *Id.*; *see also id.* at 250 n.9 ("The majority asserts that the two 'choices' presented to a state by PASPA—to 'repeal its sports wagering ban [or] to keep a complete ban on sports wagering'—'leave much room for the states to make their own policy.'").

Based on the foregoing review, the Third Circuit discerned that PASPA offers two choices to states:  a state may either maintain its prohibition on sports betting or may completely repeal its prohibition.  The Third Circuit held that even if these are a state's only choices under PASPA, the law does not violate anti-commandeering principles and thus is constitutional.  Although some

---

[10] The Supreme Court's anti-commandeering jurisprudence, which the Third Circuit relied upon, provides additional support for this reading of *Christie I*.  In *F.E.R.C. v. Mississippi*, the Court similarly recognized a binary choice put to states: "either abandon[] regulation of the field altogether or consider[] the federal standards."  456 U.S. 742, 766, 767 n.30 (1982) ("[H]ere, the States are asked to regulate in conformity with federal requirements, or not at all.").  The Court also recognized this choice to be a hard choice for states to make; yet, the difficulty of the choice did "not change the constitutional analysis."  *Id.* at 767 ("[I]t may be unlikely that the States will or easily can abandon regulation of public utilities to avoid PURPA's requirements.").  Similarly, the Court, in *New York*, recognized this recurrent choice in anti-commandeering cases.  505 U.S. at 167 ("[W]here Congress has the authority to regulate private activity under the Commerce Clause, we have recognized Congress's power to offer States the choice of regulating that activity according to federal standards or having state law pre-empted by federal regulation.") (citing *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 288 (1981)).

portions of the court's opinion, read in isolation, may suggest a contrary position, the Third Circuit's decision, in its entirety, interprets PASPA to allow states only these two options. These principles provide a guide to this Court in determining whether the 2014 Law is preempted by PASPA.

### B.     Preemption Principles

As discussed, ordinary preemption principles also guide the Court's decision. Preemption doctrine is rooted in the Supremacy Clause of the United States Constitution. Article VI declares that the laws of the United States "shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Under the Supremacy Clause, state law that "interferes with or is contrary to federal law" is preempted. *Kurns v. A.W. Chesterton Inc.*, 620 F.3d 392, 395 (3d Cir. 2010) (quoting *Free v. Bland*, 369 U.S. 663, 666 (1962)). "While the Supremacy Clause plainly provides Congress with the constitutional power to preempt state law, the challenge for courts has been deciding when a conflict between state and federal law requires application of that power." *Deweese v. Nat'l R.R. Passenger Corp.*, 590 F.3d 239, 245 (3d Cir. 2009) (citing *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

Over the years, the Supreme Court has recognized three types of preemption: express preemption, implied conflict preemption, and field preemption.[11] *See Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985). "A federal enactment expressly preempts

---

[11] The Third Circuit in *Christie I*, in an alternative holding, held that, "to the extent PASPA coerces the states into keeping in place their sports-wagering bans," such coercion does not violate principles of anti-commandeering because Congress could otherwise have preempted the field. *See* 730 F.3d at 235-36. Looking at PASPA in the context of field preemption, the Third Circuit found that "PASPA gives states the choice of either implementing a ban on sports gambling or of accepting complete deregulation of that field as per the federal standard." *Id.* at 235.

state law if it contains language so requiring." *Bruesewitz v. Wyeth Inc.*, 561 F.3d 233, 239 (3d Cir. 2009), *aff'd sub nom.*, *Bruesewitz v. Wyeth LLC*, 131 S. Ct. 1068 (2011) (citing *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001)). When construing an express preemption clause, a reviewing court must begin by examining the "plain wording of the clause," as this "necessarily contains the best evidence of Congress' pre-emptive intent." *Sprietsma v. Mercury Marine*, 537 U.S. 51, 62-63 (2002) (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)). "Though the language of the provision offers a starting point, courts are often called upon to 'identify the domain expressly pre-empted by that language.'" *Bruesewitz*, 561 F.3d at 239 (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484 (1996)); *see also Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) ("If a federal law contains an express pre-emption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains."). This analysis is guided by two principles: (1) "[c]ongressional purpose is the ultimate touchstone of [the] inquiry," and (2) "courts must operate under the assumption that the historic police powers of the States are not to be superseded by the Federal Act unless that is the clear and manifest purpose of Congress." *Bruesewitz*, 561 F.3d 239 (internal quotations, citations, and alterations omitted).

Implied conflict preemption "nullifies state law inasmuch as it conflicts with federal law, either where compliance with both laws is impossible or where state law erects an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Farina v. Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010) (internal quotations omitted). "When confronting arguments that a law stands as an obstacle to [c]ongressional objectives, a court must use its judgment: 'What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects.'" *Bruesewitz*, 561 F.3d at 239 (quoting

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)). "Furthermore, implied preemption may exist even in the face of an express preemption clause." *Id.* at 239; *see also Freightliner Corp. v. Myrick*, 514 U.S. 280, 288 (1995) ("Congress' enactment of a provision defining the preemptive reach of a statute implies that matters beyond that reach are not pre-empted," but that "does not mean that the express clause entirely forecloses any possibility of implied pre-emption."). And while "courts define the categories of preemption separately[,] the categories are not 'rigidly distinct.'" *Treasurer of N.J. v. U.S. Dep't of Treasury*, 684 F.3d 382, 406 (3d Cir. 2012), *cert. denied sub nom.*, *Dir. of Dep't of Revenue of Mont. v. Dep't of Treasury*, 133 S. Ct. 2735 (2013) (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 n.5 (1990)).

### C.    The 2014 Law is Preempted by PASPA

In light of the Third Circuit's decision in *Christie I* and with the above preemption principles in mind, the Court must now determine whether the 2014 Law is preempted by PASPA.[12] Count One of the League's Complaint asserts that the 2014 Law violates PASPA, and thus, the 2014 Law must be declared unlawful. (Compl. ¶¶ 58-61, ECF No. 1.) The 2014 Law only partially repeals prohibitions on sports wagering in New Jersey. Specifically, the 2014 Law

---

[12] The State Defendants claim that because the 2014 Law is self-executing—that is, "the State Defendants have no involvement in [its] enforcement or administration"—the Eleventh Amendment bars this Court's adjudication of the Leagues' claim that the 2014 Law is in violation of PASPA. (State Defs.' Opp'n Br. 3, ECF No. 44.) Defendants rely on a Third Circuit case, *1st Westco Corp. v. School District of Philadelphia*, for the proposition that the Eleventh Amendment bars the Leagues' claim because suit against a state official may only be brought where "the official has either enforced, or threatened to enforce, the statute" in question. 6 F.3d 108, 113 (3d Cir. 1993) (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1208 (3d Cir. 1988)). In *Westco*, the court, however, relied exclusively on another Third Circuit case, *Rode v. Dellarciprete*. In *Rode*, the court implicitly recognized an exception to the defendant-enforcement connection requirement, where the statute at issue is self-enforcing and thus no enforcement is required. 845 F.2d at 1208. Moreover, the statute at issue in *Westco* specifically placed enforcement in the hands of an entity other than the government official who was named as a defendant; accordingly, the court was primarily concerned with *the identity* of the state official being sued. 6 F.3d at 113. Thus, the Eleventh Amendment does not bar Plaintiffs' claim against the State Defendants.

"repeals" only those prohibitions "to the extent they apply or may be construed to apply at a casino or gambling house operating in this State in Atlantic City or a running or harness horse racetrack in this State, to the placement and acceptance of wagers on professional, collegiate, or amateur sport contests or athletic events by persons 21 years of age or older."  N.J. Stat. Ann. § 5:12A-7. The 2014 Law additionally excludes "collegiate sport contest[s] or collegiate athletic event[s] that take[] place in New Jersey or . . . sport contest[s] or athletic event[s] in which any New Jersey college team participates regardless of where the event takes place" from the definition of "collegiate sport contest or athletic event."  *Id.*  Defendants argue that this type of *partial repeal* is "[e]xpressly [a]uthorized [b]y [t]he Third Circuit's [d]ecision" in *Christie I.* (State Defs.' Opp'n Br. 15, ECF No. 44.)  However, the court "must . . . identify the domain expressly pre-empted by [the] language" of PASPA.  *Medtronic Inc.*, 518 U.S. at 484 (internal quotations omitted).

PASPA expressly states that it is unlawful for "a governmental entity to sponsor, operate, advertise, promote, license, or authorize by law or compact" sports wagering.  28 U.S.C. § 3702(1). The Third Circuit, in *Christie I*, already held this language to be that of express preemption. Though this language "offers a starting point" in the preemption analysis, a court must still determine the scope and reach of the provision.  *Bruesewitz*, 561 F.3d at 239.

Again, courts seeking to identify the scope of an express preemption provision are compelled to consider "[c]ongressional purpose [as] the 'ultimate touchstone' of [the] inquiry." *Lorillard Tobacco Co.*, 533 U.S. at 541 (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992)).  In determining Congress's purpose, it is "appropriate to consider legislative history to resolve ambiguity in the scope of an express preemption provision."  *Bruesewitz*, 561 F.3d at 244; *see also Cipollone*, 505 U.S. at 519 (citing language from a House of Representative report issued during Congress's consideration of the legislation); *Lorillard Tobacco Co.*, 533 U.S. at 542 (stating

that the Court's task was to "identify the domain expressly pre-empted" and that this was aided "by considering the predecessor pre-emption provision and the circumstances in which the current language was adopted").

The Court is guided by the Third Circuit's determination of the congressional purpose of PASPA—"to ban gambling pursuant to a state scheme . . . because Congress was concerned that state-sponsored gambling carried with it a label of legitimacy that would make the activity appealing." *Christie I*, 730 F.3d at 237.  In 1992, when Congress enacted PASPA, it was aware that all but one state had broad prohibitions on sports wagering.  As the Third Circuit found, Congress sought to make it harder for states "to turn their backs on the choices they previously made." *Id.* at 234.  Congress knew states, including New Jersey, were considering whether to allow some form of sports wagering and was concerned that the spread of sports wagering on "a piecemeal basis" would ultimately result in "an irreversible momentum" of sports wagering in the country.  S. Rep. 102-248, at 5.  In this Court's view, the Senate Report and the Third Circuit's finding of congressional purpose support the conclusion that PASPA preempts the type of *partial repeal* New Jersey is attempting to accomplish in the 2014 Law, by allowing some, but not all, types of sports wagering in New Jersey, thus creating a label of legitimacy for sports wagering pursuant to a state scheme.

This conclusion is supported by the two choices the Third Circuit held available to states under PASPA.  The State Defendants argue that "Plaintiffs cannot now dismiss New Jersey's careful effort to stay on the repeal side of the dichotomy by asserting that there is no practical difference in effect between its repeal and authorization."  (State Defs.' Opp'n Br. 18, ECF No. 44.)  While the Third Circuit was focused primarily on anti-commandeering and not preemption,

this Court reads the Third Circuit's decision in *Christie I* to hold that anything outside of these "two choices" would leave states *too much room* to circumvent the ultimate intent of Congress.

In the context of a preemption analysis, federal courts have been unwilling to allow states to do indirectly what they may not do directly. "The force of the Supremacy Clause is not so weak that it can be evaded by mere mention of [a] word," *Howlett v. Rose*, 496 U.S. 356, 382-83 (1990), nor can it "be evaded by formalism," which would only "provide a roadmap for States wishing to circumvent" federal law, *Haywood v. Drown*, 556 U.S. 729, 742 & n.9 (2009). *See also* 1A Sutherland Statutory Construction §22:1 (7th ed. 2009) ("For purposes of interpretation, an act's effect and not its form is controlling."); *cf. Aetna Health Inc. v. Davila*, 542 U.S. 200, 214-15 (2004) (holding a party may not evade federal preemption by elevating form over substance in connection with the naming of a cause of action).[13]  To accept the State Defendants' argument, the Court would be allowing the 2014 Law to stand as a sufficient obstacle to accomplishing the full purpose and objective of Congress in enacting PASPA.  While styled as a *partial repeal*, the 2014 Law would have the same primary effect of the 2012 Law—allowing sports wagering in New Jersey's casinos and racetracks for individuals age twenty-one and over but not on college sporting events that take place in New Jersey or on New Jersey college teams.  This necessarily results in sports wagering with the State's imprimatur, which goes against the very goal of PASPA—to ban sports wagering pursuant to a state scheme.  The Third Circuit recognized that the choice PASPA left states might be a hard choice, but here New Jersey is not making that hard choice, and the

---

[13] "Abraham Lincoln once asked: If Congress said that a goat's tail was a leg, how many legs would a goat have? Four. Calling a tail a leg does not make it so." *City of Houston v. Am. Traffic Solutions, Inc.*, No. 10-4545, 2011 WL 2462670, at *3 (S.D. Tex. June 17, 2011).

Court cannot ignore Congress's intent in enacting PASPA just because New Jersey carefully styled the 2014 Law as a repeal.[14]

Moreover, in the preemption context, courts have looked to the *state* statute's legislative history as "an important source for determining whether a particular statute was motivated by an impermissible motive in the preemption context." *Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 733 F.3d 393, 419 (2d Cir. 2013); *see also Skull Valley Band of Goshute Indians v. Nielson*, 376 F.3d 1223, 1251-53 (10th Cir. 2004); *Long Island Lighting Co. v. Cnty. of Suffolk, N.Y.*, 628 F. Supp. 654, 665-66 (E.D.N.Y. 1986); *Loyal Tire & Auto Ctr., Inc. v. Town of Woodbury*, 445 F.3d 136, 145 (2d Cir. 2006). Over the last twenty years, New Jersey has changed course with regard to its policy on sports wagering and now wants to bring sports betting to New Jersey in a limited capacity. The 2014 Law was passed in less than a week and provides no legislative history for the Court to examine. However, one of the 2014 Law's sponsors stated that he saw the legislation as "a short step away from getting this done and a lot closer to bringing sports betting to New Jersey." (Leagues' TRO Br., Dreyer Decl., Ex. 10, ECF No. 12-13 (quoting State Senator Raymond J. Lesniak).) As noted above, the goal of PASPA is to "keep sports gambling from spreading" pursuant to a state scheme. S. Rep. 102-248, at 5; *see also Christie I*, 730 F.3d at 237. New Jersey's attempt to allow sport wagering in only a limited number of places, most of which currently house some type of highly regulated gambling by the State, coupled with New Jersey's

---

[14] Despite the New Jersey Legislature's wording, statutory interpretation principles indicate that the 2014 Law may be construed as an amendatory act rather than a repeal. *See* 1A Sutherland Statutory Construction §22:1 (7th ed. 2009) ("[A]ny change of the scope or effect of an existing statute, by addition, omission, or substitution of provisions, which does not wholly terminate its existence, whether by an act purporting to amend, repeal, revise, or supplement, or by an act independent and original in form, is treated as amendatory."). As a consequence, the State Defendants' attempt to fit the 2014 Law into one of the options left by the Third Circuit is even more attenuated.

history of attempts to circumvent PASPA, leads to the conclusion that the 2014 Law is in direct conflict with the purpose and goal of PASPA and is therefore preempted.

New Jersey's position on sports wagering is not unique. In fact, many states are currently rethinking their prohibitions on sports wagering. In *Christie I*, this Court indicated that it could not judge the wisdom of PASPA but only speak to PASPA's legality as a matter of constitutional law. The Third Circuit made a similar recognition in *Christie I*. The Court is yet again faced with similar constraints in *Christie II* and still may not judge the wisdom of PASPA. To the extent the people of New Jersey, or any state, disagree with PASPA, their primary remedy is through the repeal or amendment of PASPA in Congress.

For the foregoing reasons, this Court grants summary judgment for the Leagues on Count One of the Complaint and holds that the 2014 Law is invalid as preempted by PASPA.[15]

### D.    Counts Two, Three, and Four of the Complaint

In their Complaint, the Leagues alternatively assert a claim against all Defendants that the 2014 Law is a violation of the New Jersey Constitution. The Leagues allege that if the 2014 Law

---

[15] The Legislature Defendants alternatively argue that if the Court "finds that a portion of the [2014 Law] is likely to violate PASPA, the Court must conduct the severability analysis to determine the proper scope of any injunction." (Legislature Defs.' Opp'n Br. 12 n.9, 12-4947, ECF No. 189.) "When a federal court is called upon to invalidate a state statute, the severability of the constitutional portions of the statute are governed by state law . . . ." *Rappa v. New Castle Cnty.*, 18 F.3d 1043, 1072 (3d Cir. 1994). The 2014 Law contains a broad severability clause. "Under New Jersey law, however, such a provision merely creates a presumption that the invalid sections of the [statute] are severable." *Old Coach Dev. Corp., Inc. v. Tanzman*, 881 F.2d 1227, 1234 (3d Cir. 1989) (citing *Inganamort v. Borough of Fort Lee*, 72 N.J. 412, 422 (1977)). The critical inquiry is "whether the legislature would have enacted the remaining sections of the statute without the objectionable part." *Kennecott Corp. v. Smith*, 507 F. Supp. 1206, 1225 (D.N.J. 1981) (citation omitted). The New Jersey Legislature's intent has been clear: to permit gambling only at New Jersey racetracks and casinos for individuals age twenty-one and older, with the exception of wagering on college sporting events that take place in New Jersey or on New Jersey college teams. To sever the 2014 Law to provide for a complete repeal of all New Jersey's prohibitions on sports wagering would be to enact legislation never intended by its proponents.

is not a violation of PASPA, "then it violates Article IV, Section VII of the New Jersey Constitution" and is thus unlawful. (Compl. ¶ 64, ECF No. 1.)

The Court declines to entertain this claim. The Eleventh Amendment does not preclude suits against state officers for injunctive relief. *See Ex parte Young*, 209 U.S. 123, 159-60 (1908). The Supreme Court, however, made an exception to *Ex parte Young*, that state officers may not be sued on pendent state law claims. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121-22 (1984). In *Pennhurst*, the Supreme Court found that "when a plaintiff alleges that a state official has violated *state* law. . . . [a] federal court's grant of relief against state officials on the basis of state law . . . does not vindicate the supreme authority of federal law." *Id.* at 106. As a result, the Eleventh Amendment precludes the Leagues' claim against the State Defendants under the New Jersey Constitution.

Additionally, the Court is cognizant that not every Defendant is an agency or officer of the State; however, in accordance with 28 U.S.C. § 1367(c)(1), the Court, in its discretion, declines to exercise supplemental jurisdiction over the Leagues' alternative claim under the New Jersey Constitution.

The Leagues also assert claims against the NJSEA and the NJTHA for violation of PASPA. (Compl. ¶¶ 66-74, ECF No. 1.) The Leagues' claims against the NJSEA and the NJTHA are only for violation of PASPA *pursuant to* the 2014 Law. (*Id.* ¶¶ 68-69, 72, 74.) Accordingly, the preemption of the 2014 Law renders these claims moot.[16]

---

[16] At oral argument, counsel for the Leagues acknowledged: "The last point I'd like to make on the merits concerns proposed sports gambling at Monmouth Park. Once again, you do not need to reach this issue to find that the 2014 Law violates PASPA." (Oral Arg. Tr. 14:2-5 Nov. 20, 2014.)

### E.    Permanent Injunction

Having determined that the 2014 Law is preempted and summary judgment for the Leagues on Count One of the Complaint is appropriate, the Court finds that the Leagues are also entitled to a permanent injunction against the State Defendants.  As the Court reasoned in *Christie I*, it may be "debatable whether a separate showing for a permanent injunction is necessary where New Jersey is in clear violation of a valid federal statute"; however, "the Court is likely bound to enter the requested injunctive relief."  *Christie I*, 926 F. Supp. 2d at 577 (citing *Markell*, 579 F.3d at 304).  Accordingly, the Court will analyze the four factors necessary for an injunction.  "This four factor test requires a demonstration: (1) of irreparable injury; (2) of inadequacy of remedies at law to compensate for said injury; (3) that a balance of the hardships favors the party seeking the injunction; and (4) that a permanent injunction would serve the public interest."  *Id.* at 577-78 (citing *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)).

Similar to the Court's decision in *Christie I*, the Leagues have demonstrated the necessary factors for the Court to grant a permanent injunction.  The Leagues have demonstrated irreparable harm in that the 2014 Law was enacted in violation of and is preempted by PASPA.  This violation constitutes irreparable harm requiring the issuance of a permanent injunction, and there are no factual issues that need to be decided, contrary to the NJTHA's assertion at oral argument, to make a finding of irreparable harm in this case.  *See Am. Express Travel Related Servs. Co. v. Sidamon–Eristoff*, 755 F. Supp. 2d 556, 622-23 (D.N.J. 2010), *order clarified* (Jan. 14, 2011), *aff'd sub nom.*, *N.J. Retail Merchs. Ass'n v. Sidamon–Eristoff*, 669 F.3d 374 (3d Cir. 2012); *Ass'n for Fairness in Bus., Inc. v. New Jersey*, 82 F. Supp. 2d 353, 363 (D.N.J. 2000) ("[A]n alleged constitutional infringement will often alone constitute irreparable harm." (quoting *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997))).  Additionally, under the Eleventh Amendment, a legal remedy

is unavailable to the Leagues. *See Temple Univ. v. White*, 941 F.2d 201, 215 (3d Cir. 1991) ("As to the inadequacy of legal remedies, the Eleventh Amendment bar to an award of retroactive damages against the Commonwealth [of Pennsylvania] clearly establishes that any legal remedy is unavailable and that the only relief available is equitable in nature." (internal citation omitted)). While Defendants again make strong arguments in support of the 2014 Law as a policy matter, the grant of a permanent injunction will do nothing more than require the State Defendants to comply with federal law. *See Coach, Inc. v. Fashion Paradise, LLC*, No. 10-4888, 2012 WL 194092, at *9 (D.N.J. Jan. 20, 2012) ("The only hardship imposed upon the Defendants is that they obey the law."); *Port Drivers Fed'n 18, Inc. v. All Saints Express, Inc.*, 757 F. Supp. 2d 443, 461 (D.N.J. 2010). Lastly, the public interest factor weighs in favor of a permanent injunction by protecting and upholding the supremacy of valid federal law. *See Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003) (affirming the district court's finding that "the public interest was not served by the enforcement of an unconstitutional law") (citation and quotation marks omitted), *aff'd and remanded*, 542 U.S. 656 (2004).

Accordingly, the Court has found the 2014 Law to be invalid because it is preempted by PASPA, and the State Defendants are permanently enjoined from violating PASPA through giving operation or effect to the 2014 Law in its entirety.

## V.   <u>Conclusion</u>

After careful consideration of the parties' submissions and arguments, the Court has determined that the 2014 Law is invalid, under the Supremacy Clause of the United States Constitution, as preempted by PASPA. Therefore, summary judgment is GRANTED in favor of Plaintiffs on Count One of the Complaint. Plaintiffs have also demonstrated that they are entitled to a permanent injunction against the State Defendants. Counts Two, Three, and Four of the

Complaint are DISMISSED as moot.  An Order consistent with this Opinion will be filed on this date.

    s/ Michael A. Shipp
**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**

**Dated:** November 21, 2014