**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW JERSEY**

_____

| | |
|---|---|
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, an unincorporated association, NATIONAL BASKETBALL ASSOCIATION, a joint venture, NATIONAL FOOTBALL LEAGUE, an unincorporated association, NATIONAL HOCKEY LEAGUE, an unincorporated association, and OFFICE OF THE COMMISSIONER OF BASEBALL, an unincorporated association doing business as Major League Baseball, | CIVIL ACTION NUMBER:<br><br>3:12-cv-4947-MAS-LHG<br>3:14-cv-6450-MAS-LHG |

Plaintiffs,

-vs-

CHRISTOPHER J. CHRISTIE, Governor of the State of New Jersey, DAVID L. REBUCK, Director of the New Jersey Division of Gaming Enforcement and Assistant Attorney General of the State of New Jersey, and FRANK ZANZUCCKI, Executive Director of the New Jersey Racing Commission, NEW JERSEY THOROUGHBRED HORSEMEN'S ASSOCIATION, INC., and NEW JERSEY SPORTS AND EXPOSITION AUTHORITY,

Defendants.

and

STEPHEN M. SWEENEY, President of the New Jersey Senate, and VINCENT PRIETO, Speaker of the New Jersey General Assembly, SHEILA Y. OLIVER, Speaker of the New Jersey General Assembly, and NEW JERSEY THOROUGHBRED HORSEMEN'S ASSOCIATION, INC.,

Defendant-Intervenors.

```
 1  _____
           Clarkson S. Fisher United States Courthouse
 2         402 East State Street
           Trenton, New Jersey 08608
 3         November 20, 2014

 4

    B E F O R E:        HONORABLE MICHAEL A. SHIPP
 5                      UNITED STATES DISTRICT JUDGE

 6

 7

    A P P E A R A N C E S:
 8
    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, ESQUIRES
 9  BY:  JEFFREY A. MISHKIN, ESQUIRE
              and
10       ANTHONY J. DREYER, ESQUIRE
    Attorneys for the Plaintiffs.
11
    MCCARTER & ENGLISH, ESQUIRES
12  BY:  WILLIAM J. O'SHAUGHNESSY, ESQUIRE
    Attorneys for the Plaintiffs.
13
    GIBSON, DUNN & CRUTCHER, ESQUIRES
14  BY:  THEODORE B. OLSON, ESQUIRE
              and
15       MATTHEW D. MCGILL, ESQUIRE
    Attorneys for the Defendant.
16
    OFFICE OF THE ATTORNEY GENERAL
17  BY:  JEFFREY S. JACOBSON, ESQUIRE
              and
18       JOHN J. HOFFMAN, ESQUIRE
    Attorneys for the Defendant.
19
    MCELROY, DEUTSCH, MULVANEY & CARPENTER, ESQUIRES
20  BY:  RONALD J. RICCIO, ESQUIRE
              and
21       ELIOTT BERMAN, ESQUIRE
    Attorneys for the Defendant.
22
    GIBBONS, PC
23  BY:  MICHAEL R. GRIFFINGER, ESQUIRE
         THOMAS R. VALEN, ESQUIRE
24              and
         PETER J. TORCICOLLO, ESQUIRE
25  Attorneys for the Defendant.
```

**A P P E A R A N C E S,  cont'd.**

PETER J. PHIPPS, ESQUIRE
United States Department of Justice, Civil
Division.

UNITED STATES ATTORNEY'S OFFICE
BY: J. ANDREW RUYMANN, ASSISTANT UNITED STATES ATTORNEY
Attorneys for the Defendant-Intervenors.


Certified as True and Correct as required by Title 28, U.S.C.,
Section 753
        /S/ Cathy J. Ford, CCR, CRR, RPR

1                 THE DEPUTY COURT CLERK:  All rise.

2            (Open court begins at 9:59 a.m.)

3            THE COURT:  Please be seated.  Good morning.

4            AUDIENCE:  Good morning.

5            THE COURT:  We are here today in the matter of the

6    NCAA versus Chris Christie, et al.  Docket Number 12-4947 and

7    14-6450.

8            May I have appearances of counsel, please.

9            MR. MISHKIN:  Yes, your Honor.  Good morning.

10   Jeffrey Mishkin and Anthony Dreyer, Skadden, Arps, Slate,

11   Meagher and Flom for the plaintiffs.

12           MR. O'SHAUGHNESSY:  William O'Shaughnessy, McCarter

13   and English for the plaintiffs.

14           MR. PHIPPS:  Peter Phipps, your Honor, on behalf of

15   the United States submitted a statement of interest.

16           MR. RUYMANN:  Your Honor, also on behalf of the

17   United States, J. Andrew Ruymann, Assistant United States

18   Attorney for U.S. Attorney's Office for the District of New

19   Jersey.

20           THE COURT:  Good morning.

21           MR. OLSON:  Good morning, your Honor.  Theodore

22   Olson, your Honor, on behalf of the state defendants.  Good

23   morning.

24           MR. MCGILL:  Matthew McGill on behalf of the state

25   defendants.

1          MR. HOFFMAN:  John Hoffman, your Honor, on behalf of

2     the state defendants.

3          MR. JACOBSON:  Jeffrey Jacobson on behalf of the

4     state defendants, your Honor.

5          MR. RICCIO:  Good morning, your Honor.  Ronald Riccio

6     on behalf of New Jersey Thoroughbred Horsemen's Association

7     along with Mr. Eliott Berman.

8          MR. GRIFFINGER:  Good morning, your Honor.  Michael

9     Griffinger on behalf of the Senate President and the Speaker

10    of the Assembly.

11         MR. VALEN:  Good morning, your Honor.  Thomas Valen

12    on behalf of the New Jersey Sports and Exposition Authority.

13         MR. TORCICOLLO:  Good morning, your Honor.  Peter

14    Torcicollo also on behalf of the Sports and Exposition

15    Authority.

16         THE COURT:  Good morning to you too.

17         Okay.  Well, folks, we are here today for oral

18    argument in what I'll be referring to as *Christie II*.

19    Everyone is thoroughly familiar with the underlying background

20    and the procedural history of this case as well as the Court's

21    and the Third Circuit's decision in what I'm referring to as

22    *Christie I*.  We're not here today to rehash and reargue the

23    issues of *Christie I*, as they've already been decided by this

24    Court and by the Third Circuit.

25         So today, I'll hear oral argument only on whether New

1   Jersey's 2014 Law violates PASPA and whether pursuant to the

2   2014 Law any defendant is in violation of PASPA.

3          As provided in the Court's text order, the Court is

4   consolidating the Leagues' application for a preliminary

5   injunction with a decision on the merits through a *sua sponte*

6   summary judgment decision.  Today's oral argument will proceed

7   like any argument on motion for summary judgment.  The

8   argument will not be heard on the Leagues' preliminary

9   injunction application.  The Court has the discretion to

10  consolidate the preliminary injunction with the decision on

11  the merits through summary judgment and that discretion is

12  appropriate in this case where there is only purely a legal

13  issue before the Court and no facts or discovery is needed to

14  decide any of the issues here.

15         The Court has reviewed the parties' extensive

16  briefing here.  And with regard to these issues, the

17  defendants have made some duplicative arguments in their

18  different briefs, so I'm going to ask that counsel refrain

19  from rehashing or rearguing points that may be made by

20  co-counsel here today.  But, certainly, everyone will have an

21  opportunity to be heard.

22         As this matter originally came to the Court upon

23  plaintiffs' application, I'm going to first hear from counsel

24  for the plaintiffs.  I'll then from all of the defendants in

25  opposition.  And then plaintiffs get the last word in their

1    reply.

2         So with that being said, I'm going to invite Mr.

3    Mishkin or Mr. Dreyer, whoever wants to speak for the Leagues.

4         MR. MISHKIN:  Thank you very much, your Honor.

5    Jeffrey Mishkin for the plaintiffs, and may it please the

6    Court.  As your Honor just said, the issue before you is

7    whether New Jersey Public Law 2015, Chapter 62, 2014 Sports

8    Wagering Law violates PASPA and is therefore preempted by the

9    Supremacy Clause of the United States Constitution.  We think,

10   as you know, that statute clearly violates PASPA on its face,

11   and that plaintiffs are entitled to judgment as a matter of

12   law.

13        Let me start with a little background.  I know you

14   have the background but I think the context here is important

15   and I'll be brief.  For the past several years, the State of

16   New Jersey has been trying to achieve precisely what PASPA

17   prohibits and, that is, the authorization, promotion by the

18   State of sports gambling at state-licensed casinos and

19   racetracks.  The State has tried a variety of ways to

20   accomplish that goal.  In 2012, of course we all know, they

21   enacted a law that directly and expressly authorized sports

22   gambling at casinos and racetracks.  This Court and the Third

23   Circuit found that enactment to be a violation of PASPA and

24   that PASPA was constitutional and did not constitute

25   commandeering because PASPA did not require the State to take

1   any affirmative action at all.  And despite not being required

2   to take any action at all to comply with PASPA, the State of

3   New Jersey decided that it very much wanted to take action.

4   And three days after the United States Supreme Court denied

5   certiorari in *Christie I*, the legislature enacted Senate Bill

6   2250, that bill was styled, "a repeal of prohibitions on

7   sports gambling" but the repeal applied only at state-licensed

8   gambling venues, namely, casinos and racetracks.

9          Governor Christie vetoed that legislation on the

10  ground that a so-called repeal of prohibitions that had the

11  purpose and the effect of enabling sports gambling to take

12  place only at state-licensed casinos and racetracks was an

13  obvious circumvention of PASPA.  And the Governor said he

14  could not lend his name to such a clear violation of federal

15  law.

16          Now the Governor apparently had a change of heart.

17  Because about four weeks after that veto, on September 8,

18  2014, he had the Acting State Attorney General issue a

19  directive to law enforcement agencies telling them that New

20  Jersey criminal laws prohibiting gambling should no longer be

21  enforced with respect to sports gambling but only at casinos

22  and racetracks.  That directive was based on what, to us, was

23  the astonishing ground that the operative language of the 2012

24  law that had expressly authorized sports gambling was not

25  really an authorization at all but was only a repeal of

1   prohibitions that could be severed somehow from the rest of

2   the statute that had been found unconstitutional.  And this

3   so-called repeal of prohibitions now permitted gambling to

4   take place, sports gambling at casinos and racetracks.

5          In light of that dubious proposition, the State filed

6   a motion asking your Honor to clarify or modify your

7   injunction so that it could now be read to permit precisely

8   what it had prohibited, state-endorsed gambling at casinos and

9   racetracks.  We were almost finished with the briefing on that

10  motion.  The Leagues and the Department of Justice had

11  submitted their opposition papers and the State had even asked

12  your Honor to extend, I think for a second time, their time to

13  reply.  But instead of filing that reply, the State suddenly

14  withdrew their motion, and said, Never mind about that

15  directive, the legislature has now enacted another statute

16  virtually identical to the one that the Governor had vetoed.

17  And, once again, it purported to enable sports gambling at

18  casinos and racetracks that of course is the 2014 Sports

19  Gambling Law that is now before you.

20         According to the defendants, your Honor, the 2014 Law

21  is once again a repeal of prohibitions that deregulates sports

22  gambling, that's their contention.  But in reality, it is

23  nothing of the kind.  There is no repeal of any prohibitions.

24  All the State's prohibitions on gambling remain in effect.

25  The State has simply enacted an exception to those

1   prohibitions in order to accomplish their long held goal of

2   authorizing and promoting sports gambling at casinos and

3   racetracks in order to help the state's economy.  And the 2014

4   Law does regulate, expressly regulates sports gambling in a

5   number of ways: sports gambling is not permitted anywhere

6   except at state-licensed gambling venues; no one under 21 may

7   bet on sports; betting is not permitted on college games

8   played in New Jersey; betting is not permitted on college

9   teams from New Jersey wherever they are playing their games.

10  And of real critical importance, your Honor, the 2014 Law

11  leaves in place the fundamental requirement that casinos and

12  racetracks must be licensed by the State to even open their

13  doors to sports gambling.  And it leaves in place all the

14  regulations that casinos and racetracks must comply with in

15  order to maintain those licenses.

16          Now, defendants say we have changed our position on

17  whether or not states can repeal their prohibitions on sports

18  gambling.  We have not changed our position at all.  States

19  are free, as we have said, and the Third Circuit, and your

20  Honor has held, they're free to repeal prohibitions and effect

21  a complete deregulation of sports gambling if that is really

22  what they want to do.  But what they cannot do is what they

23  have done here.  And that is maintain all of their

24  prohibitions on sports gambling and create a special exemption

25  that applies only to certain types of sports gambling and only

1  at state-licensed gambling venues.  By leaving in place their

2  prohibitions, but exempting gambling venues, the State has, in

3  our view, clearly authorized and promoted sports gambling at

4  those venues and has conferred the very label of legitimacy

5  that PASPA prohibits.

6          For that reason, your Honor --

7          THE COURT:  Mr. Mishkin, so if I understand your

8  argument correctly from your papers, it's truly an "all or

9  nothing" that you're suggesting when it comes to the repeal?

10 You either repeal everything or nothing?

11         MR. MISHKIN:  Well, certainly, if you repeal

12 everything, your Honor -- and you really are indifferent to

13 sports gambling, that's fine, under PASPA.  If you do

14 something less than that, you know, we're going to have to

15 look at it and see whether or not it amounts to an

16 authorization, a sponsorship, a prohibition, in reality.  I

17 mean, I think that the idea that simply calling something a

18 repeal of prohibition or a partial repeal of prohibitions, is

19 not going to be some sort of silver bullet that means you're

20 not violating PASPA.  PASPA is constitutional.  And so we are

21 past the commandeering argument because the State doesn't have

22 to do anything to comply with PASPA.  So we are past

23 commandeering.  So now the question is, What are they doing?

24 And does it amount to an authorization or a sponsorship?  Does

25 it violate PASPA?  I think that's going to be the question in

1    every case.

2            THE COURT:  In your view, what did the Third Circuit

3    mean in *Christie I* when they talked about the State defining

4    the contours?

5            MR. MISHKIN:  Of the prohibitions.

6            THE COURT:  Of the prohibitions.

7            MR. MISHKIN:  Sure.  If you'd rather have it a Class

8    A felony than a Class B felony?  You'd rather have it a

9    misdemeanor than a felony?  You'd rather have civil penalties.

10   But it's the contours of the prohibition, your Honor, that's

11   what they're talking about.  States do have -- they have room.

12   There are a number of things they can do and that's why it's

13   not commandeering.  But there is not a hint in the Third

14   Circuit's decision that you can leave all your prohibitions in

15   place, create a special exemption for your gambling venues and

16   call that a partial repeal of prohibitions and you somehow

17   manage to escape exactly what PASPA is trying to prevent.

18   That's our argument, your Honor.

19           Let me turn now quickly to the State Constitution and

20   why it is relevant here.  This is not an issue that you need

21   to reach.  It does add, we believe, further support and weight

22   to the conclusion that the 2014 Law is a violation of PASPA.

23           Under the State Constitution, all gambling in the

24   state is expressly prohibited, unless it is authorized by law

25   and regulated.  So unless the 2014 Law is construed as an

1  affirmative authorization of sports gambling, it would violate

2  the State Constitution.  And the State Law, we think, should

3  of course be interpreted in a manner that is consistent with

4  its own State Constitution.

5          THE COURT:  Why should this Court even reach that

6  issue?  Isn't that a question that's better addressed by the

7  New Jersey Supreme Court or the state court?

8          MR. MISHKIN:  Well, I think it's clear, I think

9  they've already told you what the law is there.  I think that

10 gambling can only be permitted in the state if it's authorized

11 and regulated --

12         THE COURT:  But if you're asking a federal court to

13 construe a state law against state actors who are state

14 representatives --

15         MR. MISHKIN:  Yes, I realize you cannot enjoin them.

16 You can reach the question, and I think you do have the

17 discretion and the supplemental jurisdiction to do that,

18 again, it is not necessary at all that you reach it here

19 because if you find that the 2014 Law is a violation to PASPA

20 on its face, you don't have to sort of take the added, the

21 added point that it would violate the State Constitution if it

22 was construed other than as a violation of PASPA because it

23 must be an authorization by law.  But I understand the

24 sensitivity, your Honor.  And the good news is you do not have

25 to reach it in order to find that the 2014 Law is a violation

1  of PASPA.

2        The last point I'd like to make on the merits

3  concerns proposed sports gambling at Monmouth Park.  Once

4  again, you do not need to reach this issue to find that the

5  2014 Law violates PASPA.  But whether or not the 2014 Law

6  violates PASPA, under no circumstances can sports gambling

7  take place at Monmouth Park because Monmouth Park is owned by

8  an instrumentality of the State of New Jersey, namely, the New

9  Jersey Sports and Exposition Authority.

10        Under PASPA --

11        THE COURT:  When you say it's owned, is it owned

12  outright or isn't just simply a landlord/tenant relationship?

13        MR. MISHKIN:  Well, no, the facility is owned by the

14  State, by an instrumentality of the State.  They have a

15  compact, I would call it, but they have a compact, or

16  contract, or lease with the Horsemen's Association.  But the

17  State, through its instrumentality, owns the facility.  And,

18  again, under PASPA, a government entity, such as the Sports

19  and Exposition Authority, is forbidden itself to sponsor,

20  operate, advertise, promote sports gambling and is also

21  forbidden to license or authorize others to conduct such

22  gambling.  And in this written lease, which is hardly a

23  passive relationship, the written lease between the Sports and

24  Exposition Authority and the Thoroughbred Horsemen's

25  Authority, there is an expressed authorization to conduct

1    sports gambling at a state-owned facility.  In addition to

2    that, your Honor, there is a formula but the rent owed to the

3    State would go up if revenue was produced from sports gambling

4    and it's very clear those provisions violate PASPA.

5              Now --

6              THE COURT:  Does the Sports and Exposition Authority

7    have any control or can they exert any control over the park?

8              MR. MISHKIN:  Of course.  Of course, they own the

9    property.  What they say now is that the 2014 Law somehow is

10   abrogated that control.  That, they say, the 2014 Law has

11   overwritten those provisions now abrogates them and that the

12   Sports and Exposition Authority is now left without the

13   ability either to authorize or forbid the gambling that would

14   be going on there.  But the 2014 Law says nothing about

15   abrogating state contracts.  And the contention that the State

16   of New Jersey by enacting the 2014 Law has somehow prevented

17   itself from deciding what may lawfully occur on its property

18   seems to us sort of a silly proposition.  The State of New

19   Jersey owns the property.  And as the owner, it absolutely has

20   the right to authorize what is done on that property.  And

21   what they have done is to authorize sports gambling in

22   violation of PASPA.

23             And, your Honor, even if, even if you could read the

24   2014 Law to somehow compel the Sports and Exposition Authority

25   to tolerate, you must tolerate sports gambling at a

 1   state-owned property like Monmouth Park.  That would only

 2   demonstrate that the 2014 Law was itself an authorization or

 3   promotion of state-sponsored gambling and a violation of

 4   PASPA.

 5           For all those reasons, your Honor, the plaintiffs

 6   believe that we are entitled to a preliminary injunction

 7   enjoining the implementation and enforcement of the 2014 Law

 8   and in all events enjoining sports gambling at Monmouth Park.

 9   All of the elements for permanent injunction are met here

10   exactly as they were met in *Christie I* because the 2014 Law

11   and the operation of sports gambling at Monmouth Park violates

12   PASPA, injunctive relief preventing that violation follows as

13   a matter of course.  Indeed, as the Department of Justice has

14   pointed out in their filing, injunctive relief is the only

15   remedy contemplated and authorized by PASPA.

16           So there is no need here to analyze the specific

17   factors that in other circumstances would be necessary for the

18   issuance of a permanent injunction.  But again, it doesn't

19   matter here at all because all those factors we believe are

20   met - and I'll tip them off very quickly.  There is

21   irreparable harm not only because of the constitutional

22   violation in enacting a state law that violates the Supremacy

23   Clause but also because of the factual evidence this Court and

24   the Third Circuit have already found demonstrates reputational

25   injury to the Leagues and damage to the Leagues' relationship

1   with their fans.  And, of course, the State of New Jersey

2   itself acknowledges the harm that's caused by sports gambling

3   by its own expressed prohibitions of betting on the games of

4   New Jersey colleges and on the collegiate games being played

5   here in New Jersey.  So there is irreparable injury.

6          Monetary damages would not be adequate because, as

7   your Honor found in *Christie I*, the Eleventh Amendment

8   precludes such relief against the State.  The balance of

9   hardships clearly favors the plaintiffs.  The only hardship

10  here would be to comply with the obligation to not violate

11  federal law, that is not a hardship at all.

12         And, finally, your Honor, as to the public interest,

13  it is obviously in the public interest to ensure that federal

14  laws are not violated.

15         And for all those reasons, your Honor, we believe

16  that a permanent injunction should issue.  Thank you very

17  much.

18         THE COURT:  Thank you.

19         MR. PHIPPS:  May it please the Court, my name is

20  Peter Phipps from the Civil Division of the United States

21  Department of Justice.  I represent the United States in this

22  matter.  We're not formally a party to the second matter,

23  *Christie II*, but we filed a statement of interest primarily

24  related to the construction of PASPA vis-à-vis the current

25  State of New Jersey Law.

1        On that issue, I appear primarily in front of the

2   Court to answer any questions the Court may have with respect

3   to our statement of interest.  But, in the meantime, I'm

4   happy, if necessary, to highlight any of the points made, but

5   I kind of remain at the Court's discretion as to whether any

6   of those highlights are needed or not.

7        THE COURT:  I think we're fine.

8        MR. PHIPPS:  Thank you.

9        THE COURT:  Good morning.

10       MR. OLSON:  Thank you, your Honor.  Theodore Olson on

11  behalf of the state defendants.

12       The Leagues previously sought and received from this

13  Court a declaration that New Jersey 2012 Sports Wagering Law

14  was invalid under PASPA.  They repeatedly stated in briefs and

15  oral argument as did the United States, as did the Third

16  Circuit, that PASPA was constitutional because it only

17  prohibited affirmative acts by a state to authorize or license

18  sports betting.  And that New Jersey had no obligation under

19  PASPA to enact or maintain - those are the words in the

20  briefs - laws prohibiting sports gambling.

21       In the argument before this Court on February 14th,

22  2013, as long as they are not affirmatively authorizing, they

23  are not violating PASPA.  In successfully urging the Supreme

24  Court not to take the Tenth Amendment issue, the United States

25  Government stated categorically, on Page 11 in its brief in

1    opposition to the cert. petition, that New Jersey was free

2    under PASPA to repeal its prohibitions on sports wagering in

3    whole or in part.  New Jersey has now fully complied with the

4    Leagues' demands, PASPA's requirements, and this Court's and

5    the Third Circuit's decisions.  It has repealed the 2012

6    Sports Wagering Law as well as certain prohibitions and

7    regulations of sports wagering.  It is not licensing or

8    affirmatively authorizing sports wagering anywhere at any time

9    in any place in New Jersey.  In short, New Jersey is in full

10   compliance with PASPA as the Leagues, the United States, and

11   the Third Circuit construe it.

12          But now the Leagues have switched positions.  They

13   now say that the State must repeal everything to do with any

14   place where unauthorized, unlicensed activity might take

15   place.  The argument is rather strange because there is

16   probably no place in New Jersey that doesn't have some license

17   from the State of New Jersey to do something.  We made a list

18   but it's too long to repeat here, but it would include auto

19   body shops, lawyers, bakeries, barber shops, acupuncture

20   places, scrap yards, hospitals and so forth.  Your Honor would

21   know this.  So the argument that if the institution or the

22   geographical location where sports betting, which is not

23   authorized by the State, not licensed by the State, not

24   permitted by the State, there is no imprimatur from the State,

25   no seal, no piece of paper with a license, no permit, nothing,

1  it would violate PASPA.  This is a switch in tactics by the

2  State and the Federal Government because if they made those

3  arguments to you, and if they made those arguments to the

4  Third Circuit, and if they made those arguments or were

5  allowed those arguments to be made in their opposition to

6  petition for certiorari, I submit that there would be a

7  different result here, a different result in the Third

8  Circuit.  And if there wasn't, there would be a decision by

9  the United States Supreme Court addressing the commandeering

10 Tenth Amendment point.

11         The Leagues admit that PASPA permits repeal.  Their

12 only objection is that some specific restrictions that the

13 other one, other than the part that it might take place where

14 there is a state license of some sort, is that some specific

15 restrictions, background limitations, police power enactments

16 that are not related to sports betting at all, remain still in

17 place.  PASPA cannot possibly mean that.  It would be plainly

18 unconstitutional if it did.

19         The position of the Leagues is such now that New

20 Jersey is allegedly in violation of PASPA because it did what

21 the Leagues, the United States, and the Third Circuit said it

22 could do.  It could eliminate in part its prohibitions, in

23 whole or in part.

24         Your question before was the Third Circuit language

25 was that there -- the State could control the contours of its

1   prohibitions.  That is exactly what the State is doing.

2           THE COURT:  Did the Third Circuit hold that, though,

3   Mr. Olson?  Did the Third Circuit give the State an

4   all-or-nothing proposition when it came down to this

5   regulation, either you can regulate it or it's deregulated?

6           MR. OLSON:  No.  I submit that the context of what

7   the State -- what the Third Circuit said, goes into this

8   category.  If I may answer it this way.  On Page 225 of the

9   opinion it says, PASPA only reaches gambling pursuant to law

10  or compact.  It said over and over again that what PASPA

11  reaches is affirmative acts by the State to permit and provide

12  an imprimatur of the State of sports betting.

13          The Court recited, as you did, the history of PASPA,

14  the concern that the government, the Federal Government, and

15  we felt it was unconstitutional but the concern articulated by

16  you and by the Third Circuit was that if states are in the

17  business of authorizing and licensing, that that will

18  encourage more sports betting.  You asked those questions at

19  the oral argument when we were here that day.  And the

20  conversation is all about whether or not it was a bad thing

21  for states to be in this business.  But the states didn't have

22  to lift a finger.  The Third Circuit said, and the Leagues

23  said, the states do not have to lift a finger.  And the Third

24  Circuit said, We do not read PASPA to prohibit New Jersey from

25  repealing its ban on sports wagering.  That's what it has

 1    done.  Nothing in PASPA requires that the states keep any law

 2    in place.  That's at Page 232.

 3         The effort, on Page 234, the effort PASPA requires is

 4    simply that the states enforce the laws they choose to

 5    maintain.  The Third Circuit, using those words, talking about

 6    the laws that the State of New Jersey might choose to maintain

 7    obviously means they may choose to maintain some laws and they

 8    may choose not to maintain some other laws.

 9         THE COURT:  But then, what could the dissent have

10    possibly meant, right?  When we look at Judge Vanaskie who

11    dissented from that very issue because he believed that the

12    all-or-nothing approach is too coercive.  What is he, in

13    essence, suggesting, that the plaintiffs' reading is an

14    accurate reading?

15         MR. OLSON:  I think he was concerned with that kind

16    of reading because of the implications of that under the Tenth

17    Amendment.  The language of the Court by the Third Circuit

18    allows this argument to be made, but I think in context that's

19    not remotely possible what it could mean.  So the idea that

20    you would have to remove limitations on 10 year olds from

21    engaging in gambling, or you would have to remove laws that

22    would prohibit an armed robbery at a place where gambling was

23    taking place, or that you would have to somehow repeal laws

24    with respect to the aging workers in any business, or that you

25    would have to repeal laws having to do with taxation.  As you

1  know, the Federal Government taxes illegal profits as well as

2  legal profits.  The idea that you would have to remove all of

3  that would clearly implicate the Tenth Amendment.  And I

4  submit that all of this language -- and I will quote one more

5  part, it's on Page 236.  PASPA makes clear that the federal

6  policy with respect to sports gambling is that such activity

7  should not occur under the auspices of the state license.  The

8  State has made it absolutely clear in its legislation, it's

9  repealing these prohibitions, and it's stating that nothing in

10  the laws provide any imprimatur or approval or licensing or

11  permitting by the State of New Jersey with respect to this

12  activity.  So if PASPA -- the irony would be that the argument

13  is that although you have lifted the prohibition, you have

14  decriminalized the activity in certain places, PASPA somehow

15  requires to be in compliance with PASPA that you must allow it

16  by not criminalizing it everywhere.  You must allow people to

17  bet on more games, younger people to bet on games, other laws

18  with respect to the behavior of people in the State of New

19  Jersey must go out the window.  Can Congress possibly have

20  meant that?  Can PASPA possibly mean, when the government,

21  which is responsible for enforcing this law, said that you

22  could repeal your laws in whole or in part, they had read the

23  provision, and that's the position that they're taking.  It

24  seems inconceivable.  And I would love to rewrite that cert.

25  petition and ask the government to file an opposition that

1   withdraws those words and says that, indeed, PASPA requires a

2   highly reticulated sense of regulation in its state that can't

3   have its normal police power, its zoning rules, its

4   environmental rules, its child labor laws, all of the other

5   provisions of state law must go out the window because of

6   PASPA.  The Tenth Amendment would not permit Congress to put

7   its hands on the state government in every walk of the state's

8   life or the citizens of the state in that kind of way.  And

9   that's why I submit, that's exactly why when we started this

10  case we felt that what Congress had done in PASPA was regulate

11  the regulatory function of the legislature and the enforcement

12  activity of the executive in a fashion that was too intrusive.

13  Congress could prohibit the activity, but it couldn't make New

14  Jersey prohibit the activity.  In order to avoid that very

15  compelling Tenth Amendment commandeering argument, our

16  opponent said, no, no, no.  It doesn't require New Jersey to

17  do anything.  New Jersey can repeal their laws.  They cannot

18  enforce their laws.  We talked about speed limits.  I made an

19  argument in this court that said, If the federal law said that

20  you can't regulate or license speeding, would that mean that

21  laws putting speed limits would have to go out the window?  I

22  mean, how far can the Federal Government go with respect to

23  something like that?

24          And --

25          THE COURT:  And the corresponding question is, Are

1  the federal laws so easily evaded that we can cast a law in

2  such a way to, in essence, get around and do indirectly that

3  which you cannot do directly?

4      MR. OLSON:  Well, I think that's a very good question

5  because there are limits on what the Federal Government can

6  do.  And that is what the Tenth Amendment does.

7      The Federal Government -- if the Federal Government

8  wants to prohibit sports betting, it can pass a statute

9  tomorrow.  We concede, maybe not our colleagues, but we

10 concede that there is interstate commercing law in that

11 activity or at least much of it.  So the Federal Government

12 can do that.  It can prohibit any kind of evasion at all, if

13 it wants to take responsibility for the statute and

14 enforcement of the statute.  What it can't do is tell a state,

15 You have got to prohibit sports betting.  And, so, because our

16 opponents understood that argument and it read the cases, they

17 said, Well, the federal law doesn't do that.  It simply

18 prohibits licensing.  So if that's true, New Jersey hasn't

19 licensed anything.  And if that's true, what they said that

20 New Jersey -- when they said that New Jersey could eliminate

21 its prohibitions, it could repeal its prohibition, in whole or

22 in part, that's not an evasion of PASPA.  That's lifting a

23 prohibition.

24     As I said before, the sensible thing would be to

25 allow New Jersey to regulate the activity and license it and

1    control who can do it or not, get it out of the black market.

2    The government comes along and says, no, no, no.  That might

3    be a bad policy.  And the Third Circuit says this too, that

4    might be a bad policy.  But that's up to the people of New

5    Jersey.  PASPA doesn't interdict that policy choice.

6         THE COURT:  If you're correct and this blueprint is

7    effective, would all states throughout the country be entitled

8    to, in essence, repeal its criminal laws or repeal, in

9    essence, any enforcement of the gambling laws on sports

10   wagering?

11        MR. OLSON:  There is no reason why Connecticut or

12   Mississippi couldn't do the same thing.  According to what the

13   Third Circuit said, according to what the government says

14   PASPA does, it only reaches so far.  Now, I agree, it's bad

15   policy.  It's a good policy to allow the states to regulate

16   activity and not be required by the Federal Government to

17   prohibit something that the Federal Government could have

18   prohibited, if it had wanted to take the blame and take the

19   responsibility and take the expense of enforcing it.  The

20   government didn't want to do this.  This is a peculiar

21   statute.  I said before, I still believe it, that PASPA

22   reaches inside the legislators and tells it what laws it must

23   pass.  And that's beyond the Congress power that inhibits --

24   the Congress power is limited by the Tenth Amendment.  There

25   isn't any question about that.  That is not what the

1    government and the Leagues said in defense of PASPA.  And that

2    argument was persuasive to two out of the three judges on the

3    Third Circuit.  Because the Court says, PASPA makes clear that

4    the federal policy with respect to sports gambling is that

5    such activity should not occur under an affirmative license by

6    the state.  So if PASPA only prohibits affirmative licensing,

7    you go to the licensing bureau and get a permit to have sports

8    wagering, that's what PASPA is prohibiting.  That's all that

9    PASPA is prohibiting.  That's what the Third Circuit said over

10   and over again.

11          I started to count the number of times that the Third

12   Circuit in Pages 230 to 236 approximately said, "only

13   affirmative actions to license."  "Only affirmative actions to

14   license" are prohibited by PASPA.

15          Now, this is not the way that the whole industry or

16   activity should be regulated, but that's the government's

17   position, and that's the Leagues' position, and that's the

18   Third's position as to the limits what PASPA does.  The

19   government can do -- the government can fix this with a stroke

20   of a pen tomorrow.  The Leagues, with their power in Congress,

21   can go in and say, The law we passed doesn't go far enough

22   because it doesn't prohibit the activity that we now say,

23   although I think they're changing their minds, we now say that

24   they then said, We don't want all this stuff to take place

25   until they realized how much money is in fantasy sports and

1    all of those things, but assuming they have the same position

2    that betting on their games, that $493 billion industry is a

3    bad thing, with the stroke of a pen, Congress can fix that by

4    passing a statute that's permitted by the Tenth Amendment.

5              THE COURT:  Is the analysis that this Court is

6    concerned with today one of revisiting commandeering or is it

7    really a question of preemption?  This 2014 Law as it relates

8    to PASPA, are we really looking at an issue of preemption

9    here?

10             MR. OLSON:  Well, it's difficult because of the way

11   that PASPA has been explained by the Third Circuit based upon

12   the Leagues' and the government's arguments.  If it's

13   preemption, I mean, I think it is commandeering if it were to

14   be construed the way the Leagues are arguing it's to be

15   construed now, or the way the government's to be construed now

16   because it says that somehow the states have to go in and

17   change other laws with respect to its licensing and it must

18   pass other laws with respect to the age of people doing

19   things.  Although general police powers are subject to this

20   law about sports gambling that seems to me to be commandeering

21   and that seems to me to be unconstitutional under the Tenth

22   Amendment.

23             Preemption is a situation where the government is

24   occupying the field in some way.  It can deregularize all of

25   these things and say, We're not going to have any laws about

1  sports betting, it could do that, then it would be preemption.

2  But if it's preemption in the context of what we're talking

3  about here today, the 2014 repeal of the 2012 law, what is it

4  that is being preempted?  What are you going to enjoin?  I

5  made a list of things that I thought you might possibly say in

6  your injunction that they're asking for.  Are you going to say

7  that the 2014 Law that repealed the 2012 Law is preempted,

8  that law must go away that will reinstate the other laws?  Are

9  you going to say that the lifting of the prohibition is

10 preempted by PASPA?  The 2014 Law is self-executing.  It

11 doesn't require state officials to do anything.  Nothing.  So

12 what would the Court enjoin?  "Do something," on "do

13 something" to pass other laws?  It's a very difficult

14 situation that you are being put into.

15       It seems to me, under PASPA, as construed pursuant to

16 the arguments of the State and the Leagues and the decision of

17 the Third Circuit because after being told -- in a way it's a

18 bait-and-switch thing and it puts the Court in a very awkward

19 position.  You're being told that they can repeal all or a

20 portion of their laws, they can enforce the laws they want to.

21 After being told all of that, you and the Third Circuit are

22 now being told well, no, no, they can't repeal all or part of

23 them.  They must repeal all of them.  But which ones are we

24 talking about?  The one about 21 year olds?  The one about

25 betting on New Jersey games?  The one about allowing sports

1    betting to take place in a barber shop where there is a state

2    license?  What laws are they now saying are preemptive?  It's

3    an impossible situation.  But they're in this situation

4    because of the way the Third Circuit construed the statute.

5    That's the law.  And we accept that.  But we accept it under

6    its terms which says that the thing that PASPA prohibits is an

7    affirmative piece of paper or a seal or some signature on a

8    line that says, You may do this here.  The State Constitution

9    is not authorizing anything.  And the State Constitution

10   issues an Eleventh Amendment that's foreclosed for this State

11   under supplemental jurisdiction or anything else, so I'm not

12   going to spend any time on that.  What is prohibited is an

13   affirmative act by state officials that says, I am giving you

14   the blessing to engage in this activity and the State is not

15   doing that.  The State is doing what the Third Circuit said it

16   could do and, therefore, is not violating PASPA.

17              THE COURT:  Okay.

18              MR. OLSON:  Thank you, your Honor.

19              THE COURT:  Thank you very much.

20              MR. GRIFFINGER:  Good morning, your Honor.  Michael

21   Griffinger on behalf of the Senate President and the Speaker

22   of the Assembly.  And I will try not to be repetitive.

23              What the Leagues are asking you to do is to find that

24   the Repealer Act violates PASPA, plain and simple.

25              In order to do that, you have to look obviously to

1    the precedents.  The precedent was set in the Third Circuit.

2    And in order for you to determine that the Repealer Act

3    violates PASPA, you have to ignore the statement of the

4    majority in the Third Circuit that says, All that is

5    prohibited is the issuance of gambling licenses, not done

6    here, or the affirmative authorization by law of gambling

7    schemes, not done here.  You would have to ignore the

8    statement of the Third Circuit that says they, Do not see how

9    having no law in place governing sports wagering is the same

10   as authorizing it by law.  There is an inequation there.  The

11   two are not comparable.  You would have to ignore that in

12   order to find summary judgment and permanent injunction.

13        You would also have to ignore a statement of the

14   Third Circuit, "The lack of an affirmative prohibition of an

15   activity does not mean it is affirmatively authorized by law."

16   That's what we're talking about here.  The prohibition is an

17   authorization, a licensing or an authorization.  And the Third

18   Circuit has spoken as to what is an affirmative authorization

19   and what is not.

20        And finally, the Third Circuit said that the sports

21   gambling violates PASPA, "Only to the extent that it is

22   conducted pursuant to state law."  There is no state law that

23   pursuant to which sports gambling is being conducted.  So

24   those statements by the Third Circuit were pretty clear as to

25   what does and does not violate PASPA.

1          The Department of Justice, Mr. Olson told you the

2     quote from them in their initial papers, that New Jersey is

3     free to repeal those prohibitions in whole or in part.  And

4     you asked a few questions about that.  I mean, what an anomaly

5     it would be if this were an all-or-nothing situation.  And

6     that is something that the Leagues are seeking here, that

7     there must be absolutely no regulation whatsoever of sports

8     betting or otherwise you violate PASPA.

9          Well, you asked about the language of the exact

10    contours of the prohibition that was in the Third Circuit

11    opinion.  Mr. Mishkin says, Well, that means whether it's a

12    second degree or a first degree or a third degree or

13    misdemeanor or something along those lines.  What that means,

14    plain language to me is, what does the prohibition contours

15    extend to?  Does it extend to all premises?  Does it extend to

16    people over 21 or under 21?  Does it extend to sports teams of

17    the State of New Jersey?  Those are the contours of the

18    prohibition that have been contained properly pursuant to what

19    the Third Circuit permits in the Repealer Law.

20         What else would you have to ignore if you are going

21    to grant the relief that the Leagues seek?  You would have to

22    ignore the explicit legislative intent set forth in Section 2

23    of the Repealer Act.  This is not just a legislative statement

24    that accompanies the Act.  This is part of the statute which

25    makes it pellucidly clear that it is not intended "As causing

1    the State to sponsor, operate, advertise, promote, license or

2    authorize by law" sports betting.  What could be more explicit

3    as the legislative intent.  It's not what an individual

4    legislator says.  It's what the statute says what is the

5    legislative intent.  We are not authorizing sports betting.

6  We are repealing certain portions of the law.

7          If you choose to accept their construction, the

8    Leagues' construction of the intent of my client, which they

9    manufacture out of whole cloth, then you would have to ignore

10   Section 2 as I just quoted.

11         If you accept the plaintiffs' strained effort to

12   persuade you that a *de facto* or indirect violation exists when

13   there is no state involvement or authorization, then you would

14   have to do the same thing straining at the Leagues' request.

15         Mr. Mishkin wants a permanent injunction.  You talked

16   about that in your TRO, some of the elements, four elements

17   that we are all familiar with in your TRO opinion.  One of the

18   things that you said in there is that there must be a showing

19   of -- or that there is a showing of irreparable harm.  And I

20   believe what you said was, quote, Plaintiffs' association with

21   gambling is stigmatizing, end quote.  So there are really two

22   prongs on which you found that there was irreparable harm,

23   that there was a violation of PASPA and that, in and of

24   itself, was an irreparable harm.  No further showing is

25   necessary.  And I just told you why I don't think we buy this

1  statute that the Repealer Act violates PASPA under the Third

2  Circuit's guidance.

3          The other was stigmatizing.  Stigmatizing, it's bad

4  for the football industry, and the hockey industry, and the

5  baseball, and basketball industry, and the college sports to

6  have sports betting or the spread of sports betting as replete

7  in their papers.

8          An interesting hierarchy of stigmatization comes to

9  mind.  Is the sports betting in Las Vegas legally and

10  elsewhere in this country, illegally, really stigmatizing

11  sports?  How about domestic abuse?  How about cover-ups?  How

12  about concussions?  How about drug abuse?  All of the other

13  things that go on in sports today.  Are they not stigmatizing?

14  The self-righteous statements that sports betting is going to

15  be terrible for their teams and for the country is belied not

16  just by the other stigmata that I just mentioned, but by their

17  very own conduct.  Their very own conduct in having an NFL

18  game in London this year and three more next year where

19  betting is wide open.  You can bet minute to minute as I

20  understand it.  The deals that are being made between the

21  Leagues and, what is it, something Face Duel or Fact Duel, one

22  of these fantasy leagues, I don't know what they're doing with

23  the fantasy leagues, what their economic interest is but when

24  somebody says, Well, we're here about the principle of

25  preventing the spread of sports betting and it's really not

1  about the money, the usual case is, it is about the money.

2  They're making deals.  They're making deals, I'm sure, with

3  ESPN, all these other sports fantasy leagues to get a piece of

4  the action.  They want it too.  They recognize sports betting.

5  Commissioner Silver recognizes it.  Mark Cuban recognizes that

6  sports betting is a thing that is not going to go away and,

7  therefore, they want to have their involvement with it.

8  That's hypocrisy, a word I don't hesitate to use.

9          If sports gambling can be condoned by the plaintiffs

10  in those instances where it gives rise to yet another revenue

11  stream for them, then apparently the stigma and the injury

12  claim that plaintiffs say is an irreparable harm just does not

13  exist.

14          Finally, what else must you ignore in order to find

15  for the plaintiffs.  You must ignore something that is quite

16  important and certainly is the fourth element of any permanent

17  injunction, and that's the public interest.

18          To find for the plaintiffs, you must ignore the will

19  of the people of the State of New Jersey as expressed in the

20  public hearings held in 2010, the referendum that was

21  overwhelming passed in 2011, the amendment to the New Jersey

22  Constitution to remit sports betting, the intent of the

23  legislature in the 2012 legislation to permit sports betting

24  and, finally, the 2014 Repealer Act at issue here today which

25  was passed by the legislature and signed into law by the

1    Governor.  That is the public interest that will be defeated

2    by the injunction that is suggested by the plaintiffs.  Only

3    by turning a blind eye to all of these factors that I've just

4    enumerated that have to be ignored in order to find for the

5    plaintiffs, can you grant them summary judgment.

6         However, if you choose to follow the direction of the

7    Third Circuit majority and if you choose to follow the initial

8    views of the Department of Justice, which I'll comment on in a

9    minute, as to what New Jersey could do and if the Court

10   chooses to follow the clearly expressed legislative intent of

11   my clients and to note that plaintiffs' claims of irreparable

12   harm are belied by their own conduct and, most importantly, if

13   the Court recognizes the public interest as expressed in the

14   statements I just made, then summary judgment for plaintiffs

15   must be denied.

16        Now, you asked a couple of questions, you asked,

17   Well, what happens if New Jersey gets sports betting, if it's

18   permitted, will other states be free to follow?  Mr. Olson

19   answered that in large measure.  But, of course, it comes to

20   mind, marijuana.  If marijuana has been permitted in one

21   state, will other states follow?  Answer, yes.  That's a

22   policy issue state by state.  There are states, I'm sure, that

23   may find it anathema to have sports betting.  That's something

24   for their legislators to consider.

25        In answer to your question about preemption, what

 1   comes to mind, in my mind, is that the repealer legislation is

 2   at issue today eliminates regulation.  It eliminates

 3   regulation as is set forth clearly in the act by a number of

 4   agencies.  You see the certifications that were filed in

 5   support.

 6           Eliminating regulation is not preemption.

 7   Instituting regulation in a field that Congress has preempted

 8   by itself regulating, that's preemption.  So this is the

 9   reverse of what preemption is here.

10           I'll just comment on one other thing, and that is the

11   piece we got last night from the United States with their

12   statement of interest.  And there's a very pregnant phrase in

13   their statement of interest that I think is the lynchpin of

14   what this is all about.  They say at Page 12 and 13, "The

15   United States' interest arises if the 2014 Act is interpreted

16   as an authorization by law."  I think we've answered that

17   question.  First of all, the repealer is not an authorization

18   by law.  It is a repealer of regulations and statutes,

19   therefore, it is not saying you may have sports betting.  You

20   may license sports betting.  This is not an authorization.

21   And the other reason is that the legislative intent, as I

22   pointed out earlier, makes it clear that this is an expressed

23   statement to the contrary that this is not an authorization.

24   So that's a very pregnant "if" in the statement of interest.

25   And I think the two reasons I've given you respond to that

1    particular point.

2           That's basically my argument on this, unless your

3    Honor has any questions.

4           THE COURT:  Thank you so much.

5           MR. VALEN:  Good morning.  Thomas Valen also Gibbons

6    PC on behalf of the Sports and Exposition Authority.

7           Your Honor, the Leagues in their reply papers, and

8    Mr. Mishkin this morning, made a number of points specific to

9    the Sports and Exposition Authority that I'd like to address

10   briefly and hopefully not in a way that's duplicative.

11          First of all, the Leagues make a number of sweeping

12   statements that the fact my client, the Authority, owns

13   Monmouth Park and leases it to Mr. Riccio's client, the

14   Horsemen's Association that would cause any sports betting at

15   Monmouth Park to violate PASPA.  It simple doesn't.  PASPA on

16   its face is triggered by a number of verbs.  I can repeat them

17   here: "sponsor, operate," et cetera.  "To own," "to lease" are

18   not among those verbs.

19          They also claim, in a rather sweeping way, that PASPA

20   is violated by the fact that the Authority might possibly in

21   the future derive greater revenue through increased rents from

22   sports wagering if it takes place at Monmouth Park.

23          Now, whether or not the Authority might in the future

24   gain such increased revenue is purely speculation at this

25   point, but in any event, like with ownership, it's immaterial

1   because "to profit from" is not one of the things that PASPA

2   prevents.

3          Next, the Leagues argue that through the lease, the

4   Sports and Exposition Authority has authorized sports wagering

5   by compact, which I don't dispute is the same as contract for

6   these purposes.  But I think the context here is critical.

7   And the timeline, in particular.

8          The 2012 Sports Wagering Act, the one that

9   implemented a regulated system of sports wagering was signed

10  on January 17, 2012.  The lease at issue which is attached to

11  the Ralph Marra certification submitted with our brief was

12  signed on February 29th, 2012, about a month thereafter.  The

13  Repealer Act at issue today wasn't signed until October 17 of

14  2014.  And throughout this entire period there has been no

15  sports wagering at Monmouth Park.  So, as we explained in our

16  brief, the Repealer Act, the 2014 Act, not only repealed the

17  2012 Law, but it also took away the authority of state

18  agencies which we had believed in 2012 we had to authorize

19  sports wagering whether by compact or otherwise.  So any

20  sports wagering that might in the future take place at

21  Monmouth Park won't be personal to any authority that was set

22  forth in the lease.

23          THE COURT:  Didn't Judge Chesler already deal with

24  this issue in the *Pena* case?

25          MR. VALEN:  I believe he did.  I think he ruled that

1   while Monmouth Park is a state agency, it's not necessarily a

2   state actor for the purposes of the operations that take place

3   there.  And certainly as the Marra certification makes clear,

4   if there is anything unclear that's created by the language in

5   the lease, we'll certainly look to amend it.  We don't want

6   any confusion here or any belief that there is state

7   authorization or state imprimatur when there in fact is not.

8   I think that should be the end of it.  But, nevertheless, the

9   Leagues go on to make some arguments based on specific

10  language in the lease.  And as I said, it's important to

11  remember what the legal regime was in place at the time the

12  words in the lease were created.  But I think it's also very

13  important to look at the specific language in the provisions

14  that they cite because there is critical words relevant to the

15  interpretation that I submit they have provided.  Sections

16  7.01 and 7.02 are cited as purportedly authorizing sports

17  wagering by the tenant.  But Section 7, as a whole, expressly

18  applies if and only to the extent that, "Then applicable state

19  and federal law provide for the authorization of certain forms

20  of gambling including sports gambling."  And as the Leagues

21  have, of course, emphasized for years now, and certainly this

22  morning, federal law and particularly PASPA doesn't provide

23  for such authorization.  So Section 7 is both ineffective and

24  immaterial.

25          Similarly, they cite Section 3306.  But again, there

 1  is critical words that they slide past.  The section says,

 2  "Tenants' use and operation of the premises - and here are the

 3  critical words - for racing events shall be deemed sponsored

 4  by the Authority."  Racing events is defined on Page 13 of the

 5  lease as horse racing cards or horse racing events.  So, like

 6  Section 7, Section 3306 has absolutely nothing to do with

 7  sports wagering.

 8          Those are the points I'd like to emphasize, Judge.

 9  If you have any other questions, I'd be happy to address them.

10          THE COURT:  I think we're good.  Thank you.

11          MR. VALEN:  Thank you.

12          MR. RICCIO:  Good morning, your Honor.

13          THE COURT:  Good morning.

14          MR. RICCIO:  Ronald J. Riccio appearing on behalf of

15  the New Jersey Thoroughbred Horsemen's Association.  I'd like

16  to open my comments on some procedural issues.

17          First is, as your Honor probably suspects --

18          THE COURT:  You think I got it wrong.

19          MR. RICCIO:  I want to incorporate what we said in

20  our November 17th letter with respect to the 56F *sua sponte*

21  motion just so the record is clear on that.

22          With respect to the propriety of granting a summary

23  judgment to the Leagues on the basis of the record that is

24  before the Court, as your Honor said at the outset, we're

25  going to treat this as a motion for summary judgment, so I'm

1    going to argue against it because I think summary judgment is

2    the wrong procedure to be followed in this case.  And the

3    reason I say that, your Honor, is primarily because as we

4    stated in our submission, we think that there is a need for

5    discovery here.  And I know your Honor framed the question as

6    being a purely legal question.  And it is a legal question

7    with respect to whether or not the 2014 Law violates PASPA,

8    that may be a legal question, but that's not all that's at

9    play at this juncture in the case.

10          The *Monsanto* case decided by the Supreme Court in

11   2010 makes it clear, contrary to what counsel for the Leagues

12   argue, that a permanent injunction must satisfy a four-factor

13   test.  The standard to be applied now with respect to whether

14   or not a permanent injunction should issue is the same as it

15   was as to whether or not a preliminary injunction should be

16   issued.  There is the requirement that the Leagues prove to

17   your Honor, as a matter of law, that the 2014 Law violates

18   PASPA but they must also show that they are suffering

19   irreparable injury.  They must also show that the hardships

20   predominate in favor of the Leagues and not in favor of any of

21   the defendants.  And they must also be in a position to show

22   that the public interest supports the issuance of an

23   injunction as opposed to a denial of an injunction.

24          So I'm going to talk a little bit, Judge, about the

25   standards that govern this particular application and what the

 1    Leagues have and have not shown at this point in time.  This

 2    is not, as we originally had thought, a trial on the merits.

 3    This is a summary judgment procedure, as your Honor clarified

 4    yesterday.

 5         With respect to discovery, we only learned a few days

 6    ago - and I put it in my certification to the Court and I

 7    attached a bunch of exhibits - but we just found out to quote

 8    a writer on this topic, there appears to be a type of gold

 9    rush between the fancy giants in securing partnerships with

10    major professional sports leagues and the teams situated

11    therein.  What's the gold rush for?  Well, the gold rush seems

12    to be from the literature we're reading, although, we haven't

13    had any discovery, the gold rush seems to be that the Leagues,

14    and/or specific teams in the Leagues, and/or specific players

15    in the Leagues, are looking to get a piece of the action,

16    whether as a sponsor, whether as an operator, or in some cases

17    taking an equity position in FanDuel, DraftKings and the many

18    other fantasy games platforms that are out there.  And these

19    fantasy games, your Honor, are fantasy in name only.  They are

20    wagers that get placed based on the performance of individual

21    players in the Leagues' games.  That's not fantasy.  Fantasy

22    in name only.  And the Leagues are sponsoring it; endorsing

23    it; they have their own platforms for it; their players are

24    participating in it.  And we need to know whether or not this

25    is going on to the same extent that it appears to be going on

1    and why is that relevant?

2            Well, it seems to me, your Honor, it's relevant on

3    irreparable injury, it's relevant on the public interest, and

4    it's relevant on unclean hands.  So for that reason, we think

5    that the procedure of a summary judgment is premature at this

6    point in time.

7            Additionally, Judge, the recent flurry of statement

8    of material facts that came in last night -- I've never had to

9    respond to a summary judgment motion where the statement of

10   material facts came in less than 12 hours before the oral

11   argument so obviously there's a problem with that, but in

12   reading through it, what became obvious to me is that what the

13   State submitted, and what the Sports Authority and the

14   legislature submitted, is disputed by and large by the

15   Leagues.  So to suggest that the record is clean for Appellate

16   purposes, to suggest that there are no genuine issues of

17   material facts, you would have to ignore the flurry of

18   submissions that came in within the last 24 hours.

19           Now, with respect, your Honor, to the standard to be

20   applied to the questioning of whether or not the Leagues are

21   entitled to a permanent injunction, I would refer your Honor

22   to the *Monsanto* case.  I cited it in my November 17th letter.

23   And I'll just read from it briefly because it captures the

24   point.  "A plaintiff seeking permanent injunction must satisfy

25   a four-factor test before a court may grant such relief.  A

 1   plaintiff must demonstrate (1) that it has suffered an

 2   irreparable injury; (2) that remedies available at law, such

 3   as monetary damages, are inadequate to compensate for that

 4   injury; (3) that, considering the balance of hardships between

 5   the plaintiff and defendant a remedy in equity is warranted;

 6   and, (4) that the public interest would not be deserved by a

 7   permanent injunction.

 8         Now, that's their burden on the merits.  In the

 9   context of summary judgment, as your Honor knows, the

10   standards are very familiar.  All doubts get resolved in favor

11   of the nonmovant, all reasonable inferences are resolved in

12   favor of the nonmovant.  So there is a lot of procedural

13   hurdles here that the Leagues have not come close to getting

14   past in order to show their entitlement to the extraordinary

15   remedy of a permanent injunction.

16         I want to now direct my comments to the balancing of

17   hardships.  The Leagues' counsel said, there is no hardship

18   here to any of the defendants.  And it caused me to bristle

19   because it demonstrated a complete disregard for the people

20   whose livelihoods are at stake at Monmouth Park Racetrack, the

21   teller, the clerks, the security guards, the maintenance

22   workers, the trades people.  Tell them there is no hardship if

23   their place of employment has to close because there is an

24   injunction because the one thing that the operators of the

25   facility, the operators of the business believe is needed to

1   save that place, tell them there is no hardship by losing

2   their job, especially in an economy like this, people that

3   have worked there for many, many years being told to go out,

4   people who are old being told to go out, no job.  So there is

5   a hardship.  And it's not just a hardship to people, there is

6   a hardship to the business of Monmouth Park.

7          I mean the suggestion is that we're a tagalong in

8   this case, you know, that the Horsemen are just sort of

9   somehow or other involved in this case.  But there are real

10   people who are in this case because they have a significant

11   stake in the outcome.  The business of Monmouth Park is at a

12   standstill now.  It's at a standstill because the revenue that

13   we thought we would be able to generate from sports betting

14   isn't coming in.  Projects that were on the drawing board are

15   now on hold.  The Horsemen themselves, the 3,000 members of

16   the New Jersey Thoroughbred Horsemen's Association, people who

17   have a liberty right to do whatever the law of New Jersey

18   allows them to do, they're being told you can't do what the

19   New Jersey law allows you to do.  That's a liberty interest.

20   That's a hardship when a liberty interest is cut off, that's a

21   hardship.  The Equine Industry in New Jersey, it's a domino

22   effect, your Honor.  If Monmouth Park closes, the New Jersey

23   Equine Industry is as good as dead and the open areas -- the

24   open space that is protected by the Equine Industry, that's

25   going to go down the tubes.  So for the Leagues to say that

1    there is no hardship is just -- it's missing the obvious

2    points of the hardship that my client and the public will

3    suffer as a result of this injunction.

4         Now, what's the hardship to the Leagues?  What's the

5    hardship to the Leagues?  If no injunction is granted, what's

6    going to happen?  One location in Oceanport, New Jersey, known

7    as Monmouth Park Racetrack is going to be open to do

8    something.  And what is this terrible thing that Monmouth Park

9    is going to do?  They're going to take wagers on the Leagues'

10   games.  What a terrible thing to happen to the Leagues.

11   Meanwhile, in Nevada, there's over 180 locations where that

12   same activity is going on.  It goes on in Delaware.  The

13   Leagues take their games to England so it can go on there.

14   The fantasy games are now, we know, supported completely by

15   the Leagues.  So the bottom line is that the only hardship to

16   the Leagues as a result of the injunction being denied is that

17   there's going to be another competitor in their fantasy game

18   business and that competitor is going to be Monmouth Park.

19   But, your Honor, that's not a hardship in the injunction

20   sense.  What that is, it's unfair competition.  And that's

21   illegal.  That goes to unclean hands which is relevant to

22   whether or not these plaintiffs have a right to a permanent

23   injunction.

24        Now, with respect to the substantive issues that have

25   been addressed by my co-counsel, my colleagues, I try not to

 1   repeat what they say, but some of it does bear reemphasis.

 2          No one has mentioned the fact that when we were here

 3   in *Christie I*, and the Leagues stood up before your Honor to

 4   defend PASPA, what they said to your Honor was that PASPA is

 5   entitled to a presumption of constitutionality and that you

 6   have to do your best to give it a savings interpretation.  And

 7   you did.  And the Third Circuit did as well.

 8          Well, now it's our turn to make that same argument

 9   because you are required, just as you gave PASPA the

10   presumption of validity, to give the New Jersey Law the

11   presumption of validity.  Just as you gave PASPA the savings

12   interpretation, you must give the New Jersey Law a savings

13   interpretation.

14          One of the ways in which you can give New Jersey the

15   benefit of a savings interpretation is built right into the

16   statute, it's Section 4, the severability clause.  And under

17   the severability clause, the New Jersey lawmakers made it

18   clear that if any phrase, clause, sentence, word or provision

19   of this act is declared to be unconstitutional, invalid,

20   preempted or inoperative, in whole or in part, or the

21   applicability thereof to any person is held invalid by a court

22   of competent jurisdiction, the reminder of this act shall not

23   thereby be deemed unconstitutional, invalid, preempted, or

24   inoperative.  Now, what does that mean?

25          Well, the Leagues have said to you that PASPA does

1   not prohibit complete deregulation of sports betting by New

2   Jersey.  That's okay, under PASPA.  If that's okay under

3   PASPA, accepting that premise, then, if you're going to grant

4   an injunction to the Leagues, you need to sever only those

5   parts of the New Jersey law that are preempted.  What might

6   they be?  The age limitation?  The limitation to New Jersey

7   teams?  New Jersey colleges and possibly the locations?  So

8   what your Honor would do if you granted a permanent

9   injunction, which I think you would have to do under the

10  severability clause, is preserve the rest of the statute.  And

11  what's the effect of preserving the rest of the statute?  In

12  preserving the rest of the statute, it would mean that all

13  sports betting in New Jersey is completely deregulated which

14  of course is what the Leagues say PASPA allows but which one

15  of the plaintiffs in the case, namely, the MBA doesn't want.

16  So you got some of the Leagues saying complete deregulation is

17  okay under PASPA.  You got the Commissioner of the MBA saying

18  it isn't, but the reality is that the only road to a permanent

19  injunction in this case that the Leagues could follow would be

20  a severability of those provisions in the 2014 Law that are in

21  violation of PASPA.

22          Now, the other point I wanted to make, Judge, is that

23  you said in response to a comment by one of the counsel, that,

24  Isn't the interpretation of the New Jersey Constitution

25  something that should be resolved by the state courts?

1    Because you recognize correctly that there's comedy there,

2    that you have a limited jurisdiction as a federal judge to

3    interfere with state laws and state constitutions.  And

4    there's another aspect to that and, that is, and we cited this

5    case in our brief, an opinion by Justice Cardozo, and what he

6    said was, When it comes to interpreting what a state statute

7    means, the federal court is bound by what the state lawmakers

8    say the words in the state statute mean.  Even if, I think one

9    powerful example, even if it turned Humpty Dumpty on its head.

10   If that's what the state lawmakers say the state law means,

11   then the federal court is bound to follow it.

12          I would say, your Honor, that under Section 2 of the

13   2014 Law, the New Jersey lawmakers, out of an abundance of

14   caution, because they covered it in Section 1, have explained

15   very clearly what they intended the 2014 Law to mean and how

16   it is to be construed.  And it is not to be construed to be a

17   state sponsorship, operation, advertising, promoting,

18   licensing or authorizing by law or compact, et cetera.  So for

19   your Honor to grant the Leagues' permanent injunction, you'd

20   have to sever the unconstitutional provisions, you'd have to

21   disregard what the state lawmakers said the 2014 Law means in

22   Section 2, and you would have to interpret the repeal language

23   in Section 1 to mean something other than what it means.

24          With respect to the repeal language in Section 1, the

25   Leagues argue that there is all sorts of gambling laws that

1    are not repealed.  I don't know what they're talking about.

2    If you look at Section 1, your Honor, Title 2C of Chapter 37

3    is repealed.  What is that?  Criminal gambling offenses.

4    Chapter 40 of Title 2A is repealed.  What is that?  Gaming and

5    Lottery Civil Penalties Section.  Chapter 5, repealed.

6    Breeding and Racing of Horses.  Title 5 Chapter 12, the

7    entirety of the Casino Control Act.  All repealed.  And then

8    to eliminate any doubt at all, there is a catchall clause.

9    "Or otherwise and any rules and regulations."  "Any rules and

10   regulations that may require or authorize any state agency to

11   license, authorize, permit or otherwise take action to allow

12   any person to engage in the placement or acceptance of any

13   wager on any sports contest."  I don't know what's left to

14   repeal?  There can't possibly be anything left.  The Leagues

15   have not identified what was not repealed.  And it seems to me

16   that everything that could possibly have been repealed, has

17   been repealed.

18        With respect, your Honor, to the Third Circuit's

19   interpretation of PASPA.  I think all of us have read the

20   opinion multiple times, I'm sure.  And I'm not going to repeat

21   what's been said before about the much contours language other

22   than to say that it has nothing to do with penalties.  Talks

23   about prohibitions, not penalties.  That's a rewrite of the

24   Third Circuit's opinion by the Leagues.  But there is two

25   phrases in the opinion that I think are worth mentioning.  One

 1   is on Page 235.  This is a key sentence.  Because the Third

 2   Circuit tells you what it is holding.  It says, But no one

 3   contends that PASPA requires the states to enact any laws and

 4   we have held, that's a word of art as your Honor knows, we

 5   have held that it also does not require states to maintain

 6   existing laws.  It doesn't say complete deregulation.  And to

 7   clarify it or to read it together -- on Page 234, the Court

 8   says, The effort PASPA requires is simply that the states

 9   enforce the laws they choose to maintain.  You would think,

10   your Honor, if the Third Circuit meant to say that New Jersey

11   has an either/or choice, either you completely prohibit

12   everything regarding sports betting or you completely

13   deregulate it, we would not be here trying to divine what the

14   Third Circuit meant.  They told you what they meant.

15        THE COURT:  What is it that you believe the dissent

16   was all about?  What was Vanaskie talking about when he said,

17   he thought it was too coercive to have an approach that would

18   result in somewhat of an all or nothing?

19        MR. RICCIO:  I think he was focusing on the

20   alternative *dicta* that the Court used in talking about

21   complete deregulation.  He was focusing on the alternative

22   *dicta*, the hypothetical.  If PASPA does coerce the states, the

23   Third Circuit said, in the alternative if we were to say it

24   does coerce the states, which is not what they say in their

25   holding, in their holding they said, If it did not coerce the

1    states.  It gave the states a choice.  Maybe this was put in

2    the majority opinion in anticipation of further review down

3    the road, I don't know, but it was an alternative.  It was a

4    hypothetical.  And the hypothetical was, not that New Jersey

5    had the choice of complete deregulation or not, but if PASPA

6    preempted the field by coercing the states, then PASPA could

7    result -- could cause a complete deregulation, that's where

8    the words are used.  If the holding was complete deregulation,

9    it would be impossible to jibe the much contours language --

10   or the contours language, the much room language, the language

11   that I just read to your Honor.  It just doesn't make sense.

12         And one thing for certain is Judge Fuentes knew what

13   he was writing or knew what he meant.  If he meant to say

14   complete deregulation, wouldn't he have said that, isn't that

15   the simplest thing in the world to say.  And there is a

16   reason, a further reason why the Third Circuit did not give

17   New Jersey the "either/or choice."  And the further reason is

18   that's not what the Leagues argued in the Third Circuit and

19   that's not what the DOJ said in their brief in opposition to

20   our cert. petition.

21         Mr. Mishkin said that they haven't changed their

22   position in this case.  And he said their position has been

23   complete deregulation.  Well, I have the words that he used in

24   this court in *Christie I* in describing why he thought PASPA

25   did not violate the Tenth Amendment.  And you're not going to

1    find the words "complete deregulation" in his statement to the

2    Court.  What you will find is him saying, "We've never claimed

3    that PASPA compelled the State to maintain any prohibition on

4    sports gambling."  I don't know why not.  That is a perfectly

5    plausible state of affairs for a state to be indifferent as to

6    whether private individuals are gambling on sports.  And then

7    he concluded by saying, There is nothing in PASPA that

8    requires states to enact, maintain, or enforce any

9    prohibitions on sports gambling.  And for that reason, your

10   Honor, PASPA does not violate commandeering principles.  If

11   that's the same as saying complete deregulation then, you

12   know, I don't know what I am reading.  When he meant to say

13   complete deregulation, he said it today.  They changed their

14   position.

15        Mr. Fishman argued in the Third Circuit, "It is up to

16   the State of New Jersey to determine for itself the extent to

17   which it will or will not enforce that law."  It could not be

18   clearer.  This is not complete deregulation.  It's exactly

19   what the government said in their brief.  You could repeal in

20   whole or in part.  It's what the Third Circuit said in its

21   opinion.  You get to choose what sports betting laws you want

22   to keep and what sports betting laws you don't want to keep.

23   This business about the either/or choice that is given to New

24   Jersey is just not borne out in the Third Circuit's opinion.

25   It's not borne out in counsel's argument.  It's not borne out

1   in the briefing.  It's an effort to have your cake and eat it

2   too, I suppose.  Because that's the end result of all of it.

3          A few words, your Honor, I don't mean to go on for so

4   long, but my apologies.  The Leagues give the reading of the

5   2014 Law, a reading that would produce an absurd result.  They

6   say that the 2014 Law is *de facto* authorization and *de facto*

7   licensing.  But if you look at the 2014 Law, and if you read

8   it in a way that is designed to save its validity that is read

9   in a way to give content to the way the lawmakers say the law

10  was intended, *de facto* authorization and *de facto* licensing is

11  an invention.  It's asking you to judicially rewrite as a

12  federal judge a state law that has been interpreted by state

13  lawmakers in a way that is the exact opposite of what they

14  want you to interpret the State Law to mean.  Respectfully,

15  your Honor, I think that that is not within the scope of your

16  authority as a federal judge for the same reason as you said

17  you didn't think you could get into the state constitutional

18  issue.  It's the same issue, the same issue.  Interpreting the

19  State Constitution, interpreting the State Law, it's the same

20  issue with respect to the proper role of a federal judge in a

21  situation like this.

22         On the issue of the landlord/tenant relationship

23  between Monmouth Park and the New Jersey Sports and Exposition

24  Authority.  The Authority has noting to do with Monmouth Park.

25  Their workers aren't there.  They don't tell Monmouth Park

1   what to do.  They don't get involved in the operations.  They

2   have submitted a declaration from Mr. Marra who tells you

3   exactly what's going on there.  They'll change the lease if

4   the lease has to be changed.  I don't think that it does.

5   And, in any event, all of the context that may involve any

6   state authorization of sports gambling are repealed in Section

7   1 of the 2014 Law.  So the lease issue is a nonissue.

8          On the issue of the scope of the injunction, because

9   we had a question arise toward the tail end, it was an awkward

10  situation, I was on the phone, you were trying to listen and

11  it had to be corrected.

12         If your Honor is inclined to grant a permanent

13  injunction, I hope you're not for the reasons that have been

14  given here, but two things need to be carved out of the

15  injunction.  One is, the Leagues cannot get an injunction that

16  enjoins Monmouth Park from taking sports wagers on games as to

17  which the Leagues are not involved.  If Monmouth Park wants to

18  take sports bets on golf, tennis, or soccer, NASCAR, whatever

19  it is, that's none of the Leagues' business.  They don't

20  have -- they're not representative plaintiffs in a class

21  action.  They don't have third-party standing.  There is no

22  such thing as virtual representation.  They have no basis

23  whatsoever for enjoining Monmouth Park from doing what the

24  Third Circuit says is the liberty right of Monmouth Park which

25  is to do that which is not prohibited by law.  So the

1  injunction needs to carve out any games, any sports activity

2  other than those involving the Leagues.

3      And the second thing, your Honor, that I would

4  respectfully suggest needs to be carved out is Monmouth Park

5  should be allowed to do whatever the Leagues are doing with

6  respect to fantasy games, whatever it is.  I'm not sure

7  exactly what it is, but whatever FanDuel is doing, whatever

8  DraftKings is doing, whatever the NFL's platform on fantasy

9  games is doing, Monmouth Park should be able to do.  They

10 can't enjoin or ask your Honor to enjoin Monmouth Park from

11 doing the very activity that they're engaged in.  Because to

12 do that is, in essence, to use your Honor as an

13 instrumentality to perpetuate unfair competition on Monmouth

14 Park.  So those two things need to be carved out.

15      And then the final point, Judge, is on the amount of

16 the bond in the event an injunction is granted.  We think

17 that's an issue that should be held in abeyance when and if

18 restraints are entered and limited if the restraints are

19 vacated.  As far as the amount of the bond, we think that Mr.

20 Drazin's certification and your Honor's ruling, I think it was

21 a million seven for every 14 days, that should just be

22 continued on a going-forward basis.  The reality is that if an

23 injunction is entered and then vacated, that once sports

24 betting were to take place at Monmouth Park that would be the

25 only game in town.  They would have 100 percent of the New

 1  Jersey market.  And the New Jersey market, we believe, based

 2  on demographics is going to be three times what the Nevada

 3  market is.  And why is it going to be three times?  Because

 4  New Jersey is a bustling metropolis.  It's bordered on

 5  Pennsylvania, Connecticut and Delaware.  Nevada is in the

 6  desert.  They get a lot of visitors but they don't have that

 7  many people living there.  So the demographics are, we think,

 8  three times whatever Nevada does on sports betting, that's

 9  what New Jersey will do.  And if we're the only game in town

10  for six months or a year, however long others decide to weigh

11  in, that will be all Monmouth Park's market.  So the estimate

12  that we gave, we think is reasonable.  It may even be on the

13  low side.  But there is no reason for your Honor to reduce the

14  amount of the bond.

15          Thank you for your patience.

16          THE COURT:  Thank you.  On reply.  Mr. Mishkin.

17          MR. MISHKIN:  Thank you, your Honor.

18          By my count you got somewhere between 12 and 15

19  briefs in front of you on the *Christie II* matter, you asked us

20  not -- trying to count up *Christie I*, you asked us to stay

21  away from that, and I'm not sure we have entirely, and I

22  really just want to make a point or two, sort of a basic point

23  about PASPA.

24          Mr. Olson said that we argued and successfully that

25  PASPA was constitutional and not commandeering because it

1    required no affirmative act at all.  Precisely right.  That's

2    why it's constitutional.  States do not have to do anything,

3    anything, to comply with PASPA.  But the State of New Jersey

4    wanted to do something.  They wanted to take affirmative acts.

5    And they did in several different ways.  And now we got the

6    2014 Law, that's an affirmative act.  And that piece of

7    legislation, your Honor, whatever they call it, has the

8    obvious purpose and effect of having state-enabled gambling in

9    the casinos and the racetracks and only there.  It is on

10   substance impossible to look at what New Jersey has done and

11   has been trying to do for three years to accomplish exactly

12   what PASPA says you can't accomplish.  Now, the argument here

13   is, Well, we somehow outsmarted PASPA.  We somehow figured out

14   a way through the maze of what PASPA is clearly trying to

15   prevent, which is promotion by the State.  Can they really say

16   they're not promoting gambling in their casinos and

17   racetracks?  You've heard over and over again, the economic

18   problems they're trying to address.  How can they not be

19   promoting sports gambling in their casinos and racetracks?

20   That's the whole point of this.  And when you leave all your

21   prohibitions in place and you only exempt your existing

22   gambling venues, there is no way in substance to say that you

23   have not authorized and promoted sports gambling.  Federal

24   preemption is not a game, your Honor.  The cases say, you must

25   look at substance to see what's happening here.  You cannot

1    allow a federal act which is clear on its face, which is valid

2    and constitutional to be circumvented in the obvious way that

3    is being circumvented here.  The 2014 Law, your Honor, is a

4    violation of PASPA.  And we ask that it be permanently

5    enjoined.  If you do permanently enjoin it, we don't have to

6    it talk about a bond.  Thank you.

7         THE COURT:  A few other issues.  Mr. Riccio raised a

8    few questions I wanted you to address.

9         MR. MISHKIN:  Sure.

10        THE COURT:  This whole severability argument.  Let me

11   hear as to your thoughts on whether or not there's a savings,

12   there is a presumption of validity, there's some severability

13   that can occur to save what they're calling the repealer.  And

14   then, also, I'd like to hear from you as to whether or not

15   it's your position that the relief that you're seeking ought

16   to also inure to other sports, such as Major League Soccer or

17   NASCAR or alike?

18        MR. MISHKIN:  Right.  The basic point of the 2014 Law

19   is to enable sports gambling in the casinos and racetracks,

20   the gambling venues that are already heavily regulated.  I'm

21   not sure what severing would -- so it would not be in casinos

22   and racetracks anymore?  That's the point.  The only place

23   it's being permitted is in heavily regulated gambling venues.

24   Now -- no, because I think you have to do a much closer

25   analysis of how important to the overall act this -- you can't

1  bet if you're under 21, New Jersey colleges can't be included,

2  New Jersey venues can't be included.  I think you have to take

3  a much closer look to see whether it would be possible to

4  sever those is not really being central to it.  But what is

5  central to it is that the prohibitions all stay in place

6  except at the specially favored gambling venues.  That's the

7  whole point of the bill.  I don't see how you can sever it and

8  avoid the violation of PASPA.  It doesn't seem possible to me.

9       Now, on the issue of other sports, I think once any

10  sport or the government, for that matter, I'm not here with

11  any sport in particular, convinces you that PASPA is being

12  violated by a particular act of the State than that act is

13  invalid and I don't -- and they're enjoined from violating

14  PASPA through that act, it would apply to any activity that

15  constitutes sports gambling and therefore would apply to any

16  sport, I believe.  I think your Honor concluded that at the

17  end of the TRO proceeding.

18       THE COURT:  Okay.  Thank you.

19       MR. MISHKIN:  Thank you very much, your Honor.

20       THE COURT:  Well, counsel, I appreciate the oral

21  argument.  Again, it's been robust.  It's been diligent and

22  very much appreciated.  Right now, we're going to have a very

23  long night tonight but I do expect to issue a decision by

24  close of business tomorrow.

25       Yes, I'd say by close of business tomorrow is a fair

1    estimate as to when we can get it out.  If not, it will

2    certainly end up with a date of November 21st, meaning it

3    could come out later in the day but you'll have a decision by

4    tomorrow.

5           I thank you for all of the arguments and your

6    submissions.  That's all we have for today.

7           THE DEPUTY COURT CLERK:  All rise.

8           (Court concludes at 11:38 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25